IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION


CENTURY INDEMNITY COMPANY, a
Pennsylvania Corporation,

                          Plaintiff,

          v.

THE MARINE GROUP, LLC, a California
limited liability company, as affiliated with
Northwest Marine, Inc.; NORTHWEST
MARINE, INC., an inactive Oregon
corporation, as affiliated with Northwest
Marine Iron Works; NORTHWEST
MARINE IRON WORKS, an inactive
Oregon corporation,

                          Defendants.


THE MARINE GROUP, LLC, a California
limited liability company, as affiliated with
Northwest Marine, Inc.; NORTHWEST
MARINE, INC., an inactive Oregon
corporation, as affiliated with Northwest
Marine Iron Works; NORTHWEST

Civ. No. 08-1375-AC

OPINION AND
ORDER

MARINE IRON WORKS, an inactive
Oregon corporation; and BAE SAN DIEGO
SHIP REPAIR, INC., a California
corporation,

            Third-Party Plaintiffs,

      v.

AGRICULTURAL INSURANCE
COMPANY, an Ohio corporation;
AMERICAN CENTENNIAL INSURANCE
COMPANY, a Delaware corporation;
CHICAGO INSURANCE COMPANY, an
Illinois corporation; CONTINENTAL
INSURANCE COMPANY, a Pennsylvania
corporation; EMPLOYERS MUTUAL
CASUALTY COMPANY, an Iowa
corporation; FEDERAL INSURANCE
COMPANY, an Indiana corporation;
GRANITE STATE INSURANCE
COMPANY, a Pennsylvania corporation;
HARTFORD INSURANCE COMPANY, a
Connecticut corporation; INSURANCE
COMPANY OF THE STATE OF
PENNSYLVANIA, a New Jersey
corporation; INSURANCE COMPANY OF
NORTH AMERICA, a Pennsylvania
corporation; CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON, and CERTAIN
LONDON MARKET INSURANCE
COMPANIES, each a foreign corporation;
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, a
Pennsylvania corporation; NEW
ENGLAND REINSURANCE COMPANY,
a Connecticut corporation; OLD REPUBLIC
INSURANCE COMPANY, an Illinois
corporation; PACIFIC MUTUAL MARINE
OFFICE INC., a New York corporation;
RELIANCE INSURANCE COMPANY, a
Pennsylvania corporation; ROYAL
INDEMNITY COMPANY, a Delaware

2

corporation; ST. PAUL FIRE & MARINE
INSURANCE COMPANY, a Minnesota
corporation; TWIN CITY FIRE
INSURANCE COMPANY, an Indiana
corporation; WATER QUALITY
INSURANCE SYNDICATE, a syndicate of
foreign corporations; WEST COAST
MARINE MANAGERS, INC., a New York
corporation; and JOHN DOE INSURANCE
COMPANIES,

          Third-Party Defendants.
_____

ACOSTA, Magistrate Judge:

*Introduction*

      Third-party plaintiffs bring the current motion against third-party defendants in this lawsuit.

Third-party plaintiffs (hereinafter "TPPs") are The Marine Group ("TMG"), Northwest Marine, Inc.

("NWM"), Northwest Marine Iron Works ("NWMIW"), and BAE Systems San Diego Ship Repair,

Inc. ("BAE").  Century Indemnity Company ("Century"), an insurance company, filed this lawsuit

against TPPs seeking a declaratory judgment that it owes neither a duty to defend nor a duty to

indemnify them.

      TPPs' claims are against other insurance companies that they contend potentially owed duties

to defend and indemnify them.  Four of these insurance companies are the subject of this motion:

Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company, which

now collectively are known as Great American Insurance Company (hereinafter referred to

collectively as "Great American"); Insurance Company of North American ("INA"); and St. Paul

Mercury Indemnity Company ("St. Paul").  (Collectively, all four insurance companies are referred

to as "Defendants".)  Specifically, TPPs seek summary judgment that each of these four insurance

companies breached its duty to defend TPPs in a Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA") action against them for environmental contamination at the Portland Harbor. St. Paul opposes the motion, and both Great American and INA have joined in that opposition. In addition, Great American and INA submitted supplementary materials on specific issues. The court will address these specific issues where appropriate and to the extent they materially differ, if at all, from St. Paul's opposition arguments.

The motion raises three issues: (1) whether there is a suit that triggers the duty to defend; (2) whether any policy exclusions apply that avoid the duty to defend; and (3) whether the insurance policy benefits have followed, by way of corporate succession, from the original named insured to the particular parties to the CERCLA action. Defendants have also raised a collateral issue regarding the constitutionality of the Oregon Environmental Cleanup Assistance Act ("OECAA") as applied to the facts of this case.

On the record before it, the court concludes as a matter of law that there is a suit sufficient to trigger the duty to defend and that the deductible endorsement does not excuse certain insurers from their duty to defend. The court further finds that there are genuine issues of material fact as to whether corporate succession occurred such that the policies transferred from the named insured to the potentially responsible parties. The court also finds that OECAA is constitutional as applied.[1]

*Factual Background*

TPPs claim coverage under insurance policies issued for discontinuous policy periods beginning in 1954 and ending in 1982. The policies provide comprehensive coverage for general

---

[1] All parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636 (c)(1).

liability and refer to a location in the Portland Harbor Superfund site ("the Site").  Over the years, the corporate form of the named insured, NWMIW, changed and the parties seeking defense coverage under the insurance policies at issue, TMG and BAE, were not named on the original policies.  In the recent past, federal and state agencies have contacted both TMG and BAE regarding their possible liability for contamination at the Site.  TMG and BAE seek a defense of and indemnification for these claims, and each has tendered requests for such coverage to numerous insurance companies.

I.    Insurance Policies

    A.    INA Policies

INA issued two policies to NWMIW, the sole named insured, which policies are identical in relevant part for purposes of this motion.  (INA's Opposition ("Opp.") 2.)  The policies were effective July 1, 1978, to July 1, 1980.  (Stapley Declaration ("Decl.") Exhibit ("Ex.") 1 at 6; Ex. 2 at 67.)  The policies provide for Comprehensive General Liability ("CGL") insurance.  The policies cover "all sums which the Insured shall become legally obligated to pay as damages because of . . . property damage[.]"  (Rycewicz Decl., Ex. 1 at 3.)  Under the policies, "the company shall have the right and duty to defend any suit against the insured seeking damages on account of such . . . property damage[.]"  (*Id.*)  The policies are explicitly limited by Endorsements #7 and #8, respectively (the endorsements are identical and thus collectively hereinafter referred to as "the deductible endorsement").  The deductible endorsement limits the insurer's payment to amounts in excess of the deductible.  It also provides:

> However, if the named insured, or a claims servicing organization acting on behalf
> of the named insured, fails to pay any damages within the deductible amounts after
> the legal obligation of the insured becomes definitely determined, the company shall

pay such damages and the named insured shall reimburse the company promptly for any part of the deductible amount that has been paid by the company.

(Stapley Decl., Ex. 1 at 28.)

B.    *Great American Policies*

Great American issued CGL policies to NWMIW for the policy period from July 1, 1980, to July 1, 1982.  (Rycewicz Decl., Ex.3 at 11, 65.)  Great American states that their terms are essentially identical to those terms in INA's policies, and this is not otherwise disputed.  (Great American Opp. (#336) 4.)

C.    *St. Paul Policy*

St. Paul issued a policy to NWMIW for the period of February 11, 1954, to February 11, 1957.  (Rycewicz Decl., Ex. 15 at 22.)  The sole named insured under this policy is NWMIW.  It provides that the St. Paul will pay "on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law or contract for damages because of injury to or destruction of property . . . ."  (*Id.* at 23.)  The policy provides further that "the company shall . . . defend in his name and behalf any suit against the Insured alleging such . . . damage or destruction and seeking damages on account thereof . . . ."  *Id.*  Unlike the other policies at issue, this policy does not contain a deductible endorsement.

II.    Corporate Succession

NWMIW originally incorporated in the State of Oregon on May 28, 1943.  (Moses Decl., Ex. 1.)  Its stock was purchased by a separate corporate entity, Southwest Marine, Inc. ("SWM").  (Engel Decl ¶ 5.)  NWMIW changed its name to Northwest Marine, Inc. ("NWM") on January 25, 1990.  (Engel Decl. ¶ 6.)  At that time, NWM also merged with SWM, "with SWM as the surviving

corporation." (*Id.*)

In 1997, Southwest Marine Holdings, Inc. ("SWM Holdings"), purchased the stock of SWM, and TMG was formed as a "repository of certain assets, including some assets and liabilities of NWMIW, that were spun out of the sale of the SWM shipyard to SWM Holdings." (Engel Decl. ¶¶ 7-8.) A Stock Purchase Agreement ("1997 SPA") governed this transaction. The 1997 SPA stated that the sellers, stockholders of SWM, would retain certain liabilities, which the 1997 SPA referred to as the "Excluded Liabilities": "[T]he Excluded Liabilities shall specifically include all of the liabilities associated with the businesses conducted or formerly conducted by any of the Companies or their predecessors under the names 'Northwest Marine' . . . ." (Engel Reply Decl., Ex. 5 at 12, Ex. 6 at 1.) SWM assigned these liabilities to TMG in an agreement entitled "Assignment and Assumption Agreement." That agreement provided for assignment of the liabilities described in the 1997 SPA, "[a]rising from, relating to or in connection with any business or activity conducted or formerly conducted by any of the Companies (as defined in the Stock Purchase Agreement) or any of their respective predecessors" with specific reference to "Northwest Marine." (Engel Decl., Ex. 12 at 1-2.)

In 2005, SWM was renamed BAE. (Vinck Decl. Ex. 2.)

III.    Agency Communications

In a confidential letter dated January 11, 2008, David C. Batson ("Batson"), as the convening neutral of a group "brought together by the [EPA] for the purpose of exploring the creation of a PRP group[,]" invited BAE to participate in an informational meeting regarding cleanup at the Site. The letter stated that "one or more participants in the Convening Group believe that you or your company are potentially responsible for response costs incurred and being incurred at the Site under Section

107(a) of CERCLA and ORS 465.255."  (Huynh Decl. Ex. 1 at 2.)

On January 18, 2008, the United States Environmental Protection Agency ("EPA") sent a letter to BAE via its Secretary and General Counsel, Lloyd A. Schwartz, Esq.  (Rycewicz Decl. Ex. 5.)  That same day, an identical letter was sent to NWM and TMG (collectively referred to as "the January 2008 letters").  (Rycewicz Decl. Ex. 6.)  The January 2008 letters informed TPPs that it was investigating contamination at the Site by way of a Remedial Investigation and Feasibility Study (the "RI/FS").  The RI/FS was expected to conclude in 2009, after which, the January 2008 letters stated, the "EPA will select a cleanup plan for the Site through a Record of Decision, which is likely to be issued in 2010."  The January 2008 letters stated that EPA was "seeking information from current and past landowners, tenants, and other entities believed to have information about activities that may have resulted in releases or potential threats of releases of hazardous substances to the Site." (Rycewicz Decl., Ex. 5 at 1.)  The information would be used to identify potentially responsible parties ("PRPs") who would be liable for the costs of cleanup.  The the January 2008 letters also stated:

> Pursuant to the authority of Section 104(e) of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), 42 U.S.C. § 9604(e), you are hereby requested to respond to the Information Request attached to this letter.  While EPA seeks your voluntary cooperation with this investigation, compliance with the Information Request is required by law.  Failure to respond fully and truthfully to the Information Request by the due date provided below may result in an enforcement action by EPA.  Under Section 104(e)(5)(B) of CERCLA, 42 U.S.C. § 9604(e)(5)(B), pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1996, 31 U.S.C. § 3701, EPA is authorized to commence an action to assess civil penalties of not more than $32,500 per day for each day of noncompliance against any person who unreasonably fails to comply with an Information Request.

(*Id.* at 2.)  The Information Request accompanied the January 2008 letters and sought a vast array of information with respect to the Site and affiliated entities from 1937 to the present.  At the time,

the EPA also issued a fact sheet in which it explained that the January 2008 letters "d[id] not designate an entity as a potentially responsible party[,]" though the letters did request additional information to use in identifying PRPs.  (Moses Decl. Ex. 4.)

On January 3, 2008, the Portland Harbor Natural Resource Trustee Council ("PHTC") sent a letter to "Interested Party,"[2] notifying TPPs of its intention to perform a natural resource damage assessment ("NRDA") for the site in question.  The letter states:  "This notice is to invite you to participate in funding and implementing this assessment.  The notice requests that you respond in writing within 30 days of this letter to express your preliminary interest in participating."  (Rycewicz Decl., Ex. 7 at 2.)  On January 30, 2008, the PHTC sent another letter to Interested Party, stating that since the previous letter, they had been identified as an "entity that may potentially be liable for response costs under Section 107 of the CERCLA."  (*Id.* at 1.)  The letter also pointed out that this notice was separate from the EPA's PRP notice.  (*Id.*)

In a March 26, 2008, letter, Batson informed NWM that it was a PRP:  "Based on issuance of the 104(e) information requests and information obtained from the RI/FS currently being performed for the Site, it is believed that you or your company are potentially responsible for response costs incurred and being incurred at the Site under Section 107(a) of CERCLA and ORS 465.255."  (Huynh Decl., Ex. 2 at 2.)

In a letter dated May 7, 2008, TMG and BAE were granted an extension of time to respond to the first request for information.  The letter stated:  "Failure to respond fully and truthfully to the Information Request by the due date provided in this letter may result in an enforcement action by

---

[2] The identity of "Interested Party" is ambiguous and the Rycewicz Declaration does not resolve this ambiguity.

EPA." (Rycewicz Decl., Ex. 8 at 1.)  On July 9, 2008, TPPs requested defense and indemnification

from INA with respect to their involvement with the Site.  (Rycewicz Decl., Ex. 16 at 1.)

The EPA sent a General Notice Letters to TMG and BAE on March 12, 2010.  The letters

stated that "[b]ased on information presently available to EPA, EPA has determined that The Marine

Group [and BAE] may be responsible under CERCLA for cleanup of the Site or costs EPA and

others have incurred in cleaning up the Site."  (Rycewicz, Ex. 9 at 3; Stapley Decl., Ex. 7 at 1.)

Subsequently, on March 22, 2010, and again on April 20, 2010, TPPs sent a letter to counsel for St.

Paul, INA, and Great American "tender[ing] EPA's claims for defense and indemnity coverage" in

response to the EPA's General Notice Letter dated March 12, 2010.  (Rycewicz Decl., Ex. 9 at 1;

Ex. 10 at 1.)

In a September 27, 2010, letter, the PHTC sent a letter to TMG and BAE informing them that

they had been identified by the EPA as PRPs, but that this "notice [was] separate from the EPA

General Notice Letter and [was] connected with the Natural Resource Damage Assessment portion

of the CERCLA cleanup action at Portland Harbor."  (Rycewicz Decl., Ex. 11 at 3.)  On September

28, 2010, TPPs sent a letter to all insurers stating in relevant part:

> On September 23, 2010, we provided notice and demand to your counsel of my
> Clients' participation in discussion with the NRD Trustees about potentially
> participating in a Phase 2 Funding and Participation Agreement ("FPA").  A copy of
> that communication, with its enclosures, is attached.  As we advised counsel, the
> NRD Trustees have identified my Clients as entities which are potentially liable for
> NRD.  Funding the FPA is presently due on October 4, 2010.  We hereby demand
> that you agree to fund participation in activities pursuant to the FPA, and we hereby
> tender this matter to you for a defense and indemnity.

(Rycewicz Decl., Ex. 12 at 1.)

*Legal Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2011). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Where disputed issues of material fact exist, the evidence is viewed in the light most favorable to the non-moving party. *Bamonte v. City of Mesa,* 598 F.3d 1217, 1220 (9th Cir. 2010). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). However, deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a *genuine* issue for trial." FED. R. CIV. P. 56(e) (2008) (emphasis added). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks omitted).

*Discussion*

I.    Duty to Defend

TPPs seek summary judgment that Defendants owe them a duty to defend.  Generally, "[i]n

a contract dispute, a party will be entitled to summary judgment only if the governing terms of the

contract are unambiguous." *Milne v. Milne Construction Co.*, 207 Or. App. 382, 388, 142 P.3d 475

(2006) (citing *Hauge v. Vanderhave*, 121 Or. App. 221, 225, 854 P.2d 1002, *rev den*, 317 Or. 583,

859 P.2d 540 (1993)).  A contract provision is ambiguous where it is susceptible to "more than one

plausible – that is, sensible and reasonable – interpretation."  *Id.* (citing *Deerfield Commodities v.

Nerco, Inc.*, 72 Or. App. 305, 317, 696 P.2d 1096, *rev den*, 299 Or. 314, 702 P.2d 1111 (1985)).  A

court may refer to parol evidence to evaluate the ambiguity of a contract term.  *Id.* (citing *Deerfield

Commodities*, 72 Or. at 317).  If the court finds that the contract term is genuinely ambiguous, the

meaning of that term is a question of fact.  *Id.* at 389 (citing *Hauge*, 121 Or. App. at 224).

In *Ledford v. Gutoski*, 319 Or. 397, 400, 877 P.2d 80 (1994), the Supreme Court of Oregon

wrote:  "Whether an insurer has a duty to defend an action against its insured depends on two

documents:  the complaint and the insurance policy.  An insurer has a duty to defend an action

against its insured if the claim against the insured stated in the complaint could, without amendment,

impose liability for conduct covered by the policy."  Thus, "[a]n insurer should be able to determine

from the face of the complaint whether to accept or reject the tender of the defense of the action."

*Id.* (citing *Ferguson v. Birmingham Fire Ins.*, 254 Or. 496, 505-506, 460 P.2d 342 (1969)).

The duty to defend arises if:

> the complaint provides *any basis* for which the insurer provides coverage.  Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy.  Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured.

*Id.* (internal citations omitted) (emphasis in original).  To be clear:  "[i]f some of the allegations pertain to conduct that could be covered by the insurance policy, and some that could not, the insurer must defend the entire action."  *Klamath Pacific Corporation v. Reliance Insurance Co.*, 151 Or. App. 405, 413, 950 P.2d 909 (1997) (citing *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or. 639, 645, 576 P.2d 1244 (1978)).

Although the court focuses on the complaint and the policy language when considering the duty to defend, where a dispute arises as to whether the party seeking a defense is an insured under the policy, the court may consider extrinsic evidence.  *Fred Shearer & Sons, Inc. v. Gemini Insurance Co.*, 237 Or. App. 468, 477-478 , 240 P.3d 67 (2010).

A.    *Existence of Duty to Defend in Policy*

INA and Great American argue that their policies do not contain a valid duty to defend clause in light of subsequent endorsements which extinguish their duty to defend.[3]  In particular, INA and Great American argue that the endorsement establishing a "deductible per occurrence" and which requires an agreement with a "claims servicing organization" extinguishes their duty to defend.  INA briefed this issue extensively, which briefing Great American joins.  For clarity, the court refers solely to INA, but its analysis and conclusion applies equally to Great American.

---

[3] St. Paul's policy does not contain such an endorsement.

The Oregon Court of Appeals described the method for interpreting a policy exclusion:

> In determining whether a policy exclusion applies to the conduct at issue, we look "only at the facts alleged in the complaint to determine whether they provide a basis for a recovery that could be covered by the policy." If the allegations in the complaint are ambiguous, but a reasonable interpretation would bring them within coverage, there is a duty to defend. Moreover, if some allegations reasonably can be interpreted as falling within the coverage, the insurer owes a duty to defend – even if other allegations of conduct or damage are excluded.

*Fred Shearer & Sons*, 237 Or. App. at 478 (quoting *Ledford*, 319 Or. at 400) (internal citations omitted). Notably, it is the insurer's burden to prove that an exclusion applies. *ZRZ Realty Co. v. Beneficial Fire and Casualty Insurance Co.*, 349 Or. 117, 127, 241 P.3d 710 (2010). Furthermore, this is a question of law which seeks to determine the parties' intent. *Id.* at 480.

INA argues that the duty to defend language in its original policy was invalidated by the deductible endorsement which imposed a "deductible per occurrence" and created a system whereby defense costs were borne jointly by the insurer and insured. TPPs argue that the deductible endorsement does not alter the duty to defend as it clearly contemplates an allocation of costs after a claim reaches a settlement or final judgment.

INA issued to NWMIW two policies relevant to this motion. The relevant policy language is identical unless otherwise noted. The deductible endorsement provides:

> The Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of [bodily injury or property damage] to which this insurance applies, caused by an occurrence and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such bodily injury or property damage . . . .

(Rycewicz Decl., Ex. 1 at 3; Ex. 2 at 2.) The relevant portions of the deductible endorsement states that INA has an obligation to pay damages only in excess of the stated deductible; that if the insured does not pay damages up to the deductible, INA will pay those damages but will be entitled to

OPINION AND ORDER                    14                    {KPR}

reimbursement by the insured; and that the insured must pay the deductible for each separate occurrence, though that amount is limited by a maximum annual obligation, referred to in the policy as the "deductible-annual aggregate." (Rycewicz Decl. Ex. 1, 20-23; Ex. 2, 17-20.) The deductible endorsement also states: "Whereas the named insured has entered into a written agreement with a qualified claims servicing organization . . . it is understood and agreed that [INA] has no duty or obligation to provide investigation, defense or settlement services with respect to such claims or suits so long as such agreement with the claims service [sic] organization remains in effect." (Rycewicz Decl., Ex. 1 at 21; Ex. 2 at 18.)

INA also points to sections of the deductible endorsement which provide that INA has the right to control and associate with the insured with respect to claims where the claim is within the policy's coverage and is "reasonably likely to exceed the 'deductible per occurrence.'" (Rycewicz Decl., Ex. 1, 21-22; Ex. 2, 18-19.) INA further points to a section of the deductible endorsement which provides for payment of loss-adjustment expenses, which generally refers to attorney fees and costs. Essentially, such expenses are paid by INA to the extent that their amount, plus the amount of any settlement or judgment, exceeds the deductible per occurrence. (Rycewicz Decl., Ex. 1 at 22; Ex. 2 at 19.)

INA argues that the provisions of the deductible endorsement create a relationship between the insurer and insured that departs from the traditional model found under a duty to defend. Instead, the deductible endorsement creates "a mutual system wherein the insured with the insurer agree to pay certain amounts at certain times based upon certain contingencies," and where the insured pays a fixed deductible amount for each occurrence giving rise to insurance coverage. (INA's Opp. 14.) INA also argues that the condition precedent to operation of the deductible endorsements has not

occurred, namely a settlement or judgment, from which to apportion lost adjustment expenses and, therefore, TPPs motion on this point is premature and not justiciable. Finally, INA argues that there are questions of fact regarding whether there has been an "occurrence" or there is "property damage" sufficient to satisfy the policy terms in this case.

TPPs acknowledge the existence and applicability of the deductible endorsement but argue that, under the facts before the court, it does not relieve INA of liability as a matter of law. First, TPPs argue that where there is no agreement between the insured and a claims processing service, the endorsement does not relieve INA of its duty to defend. TPPs cite the language of the endorsement that provides for this exclusion from coverage, "so long as such agreement with the claims servicing organization remains in effect." (Rycewicz Decl., Ex. 1 at 21; Ex. 2 at 18.) Second, TPPs submitted the declaration of Resa Boxell, who testified that she served a subpeona on the purported claims servicer, ESIS, and that ESIS responded that its "internal search had discovered no relevant records." (Boxell Decl. ¶ 3-4.) Boxell later followed up on the inquiry and was again "advised via email that [the] further search efforts had found no responsive documents and that there was no evidence of a claims servicing agreement between ESIS and Northwest Marine Iron Works." (Boxell Decl. ¶¶ 5-6.) TPPs observe that, as the moving party, they need only point to the absence of evidence that such an agreement was in place, citing the analysis set forth by the Ninth Circuit in *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001): "When the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'" (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). TPPs argue that because there is no evidence of such an agreement, INA has failed to

establish this necessary fact and thus cannot rely on the exclusion.[4]

The court concludes that, to the extent the deductible endorsement modifies the relationship between the insurer and the insured by establishing a deductible and creating a system of payment based on that deductible, the deductible endorsement does not interfere with the duty to defend set forth under the original policy. The provision regarding the claims processing service is another matter, however, because it potentially extinguishes INA's duty to defend. Under the provision, where a claims processing agreement is in place, INA has no duty to defend "so long as such agreement with the claims servicing organization remains in effect." (Rycewicz Decl., Ex. 1 at 21; Ex. 2 at 18.) Although this produces a somewhat unusual result, with the duty to defend premised on the insured's continued maintenance of a claims servicing agreement, the provision's language is clear: if no agreement with a claims servicing organization is in place, the duty to defend is placed on INA. Thus, in the absence of a claims servicing agreement, the insurer's duty to defend claims against the insured remains in place.

INA contends that the recital itself confirms the existence of the claims servicing agreement, or at least the intent of the parties that NWMIW would enter into one. INA reads the subject clause to mean that the parties left open the possibility of the relationship changing but did not require INA to assume a duty to defend in the absence of such agreement. TPPs respond that INA has failed in

---

[4] Century, the plaintiff here but not a party to the current motion, moved to strike Boxell's declaration based on lack of personal knowledge, as inadmissible hearsay, as unsupported by evidence in the summary judgment record, and for failure to establish that ACE and ESIS were the proper sources of the information allegedly sought. TPPs respond that the declaration was submitted to demonstrate the diligence of Boxell's attempts to locate a claims servicing agreement and, as such, does not suffer from the defects asserted by Defendants. The court accepts the declaration as admissible for the purpose of establishing the diligence of Boxell's search efforts, and nothing more. Accordingly, Century's motion to strike (#334) is denied.

its burden to establish the exclusion and that the exclusion is properly read to make the duty to defend contingent on the existence of a claims servicing agreement.  TPPs also submit evidence of a search on their part to come up with just such a document, and the failure of that search.  They emphasize that the burden is on INA to produce evidence of the agreement and, INA having failed to do so, TPPs are entitled to summary judgment on this particular issue.

On the record before it, the court agrees that TPPs are entitled to summary  judgment that INA failed to create a genuine issue of material fact as to the existence of a claims servicing agreement.  As such, TPPs are entitled to summary judgment that INA's duty to defend is not extinguished by a claims servicing agreement.  Although the recital in the insurance policy represents evidence that the parties contemplated the inclusion of a claims servicing agreement, it is not evidence that such agreement existed.  Here, the absence of evidence of a claims servicing agreement, the existence of which would be INA's to prove at trial, supports summary judgment that the claims servicing agreement exclusion does not apply.

TPPs next argue that the provisions in the deductible endorsement that allocate loss adjustment expenses do not limit or eliminate the duty to defend found in INA's policies.  TPPs point out that the allocation of defense costs does not modify the duty to defend, but rather that it presumes a defense was tendered as it "anticipated the allocation of deductible amounts after the claim has been defended to conclusion, either by settlement of judgment."  (TPPs' Reply 37 (emphasis omitted).)  Instead, TPPs argue, the question of whether a duty to defend exists under the policy hinges on the claims servicing organization provision.  Finally, TPPs refute INA's argument that there are questions of fact as to whether defense costs in this case will exceed the deductible amount and trigger INA's duty to defend, arguing that it is exceptionally unlikely that defense costs

in this substantial environmental cleanup action will be less than the deductible.[5]

The court agrees that the sharing and allocation of loss adjustment expenses via the deductible endorsement do not extinguish the duty to defend. With respect to whether the issue is premature because the amount of defense costs has not been established and, therefore, the threshold to trigger payment of defense costs has not been reached, the court is unpersuaded. The duty to defend does not depend on the ultimate amount expended in defense of a claim. The language of the deductible endorsement itself contemplates that the insurer will pay defense costs up front and, if appropriate, be entitled to seek reimbursement up to the deductible amount. Furthermore, premising the duty to defend on the amount ultimately spent in defense would nullify the policy language that establishes a duty to defend in the first place.

In conclusion, the court concludes that there are no genuine issue of material fact as to whether the deductible endorsement exempts INA from its duty to defend under the policy and that TPPs are entitled to summary judgment on this issue.

B.      Existence of a Suit

TPPs argue that the claims made under CERCLA against the insureds comprise a "suit" which triggers INA's duty to defend. Specifically, TPPs cite the Batson letters, the 104(e) information requests, the General Notice Letters, and the NRDA letters from January 2008 and September 2010, and assert that these documents are the functional equivalent of a complaint that triggers a duty to defend. TPPs also cite the OECAA to support its position that such communications amount to a suit sufficient to trigger an insurer's duty to defend. Defendants do not dispute their duty to defend a suit against an insured, but argue that there is no suit to trigger this duty

---

[5] The deductible amount at issue is $100,000.

in the present matter.

The OECAA provides that a "suit" or "lawsuit" includes, "but is not limited to formal judicial proceedings, administrative proceedings and actions taken under Oregon or federal law, including action taken under administrative oversight of the Department of Environmental Quality or the United States Environmental Protection Agency pursuant to written voluntary agreements, consent decrees and consent orders." OR. REV. STAT. 465.480(1)(a) (2009). The OECAA sets forth several rules of construction that govern actions between insureds and insurers for coverage of an environmental claim, "whether in response to governmental demand or pursuant to a written voluntary agreement, consent decree or consent order," for which the insured seeks coverage under a general liability insurance policy. OR. REV. STAT. 465.480(2) (2009). One such rule states that an "action or agreement" of DEQ or the EPA "against or with an insured" wherein the agency "directs, requests or agrees that an insured take action with respect to contamination with the State of Oregon is equivalent to a suit or lawsuit as those terms are used in any general liability insurance policy." OR. REV. STAT. 465.480(2)(b) (2009). The OECAA is explicit, however, that the rules of construction, which include this definition of suit or lawsuit, "do not apply if the application of the rule results in an interpretation contrary to the intent of the parties to the general liability insurance policy." OR. REV. STAT. 465.480(7) (2009).

This same question arose in *Ash Grove Cement Co. v. Liberty Mutual Ins. Co.*, No. 09-239-KI, 2010 WL 3894119 (D. Or. Sept. 30, 2010), a recent decision from this district, specifically "whether a request for information from the United States Environmental Protection Agency ("EPA") to Ash Grove, pursuant to section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9604(e), constitutes a 'suit' under the

terms of the insurance policies, triggering the insurers' duty to defend Ash Grove." *Ash Grove*, 2010 WL 3894119, at *1. The court cited OR. REV. STAT. 465.480, as well as *Schnitzer Investment Corp. v. Certain Underwriters,* 197 Or. App. 147, 155, 104 P.3d 1162, 1168 (2005), *aff'd,* 341 Or. 128, 137 P.3d 1282 (2006), for its holding that "[a]n administrative agency's requirement that a property owner clean up environmental contamination constitutes a 'suit' within the terms of an insurer's duty to defend." *Ash Grove*, 2010 WL 3894119, at *4. The court rejected the insurers' arguments that the letter Ash Grove received from the EPA constituted only a "voluntary" request that was "not adversarial" and that imposed no obligations on Ash Grove to do anything in response. *Id*. The court observed that Ash Grove's compliance with the letter requests "'is required by law,'" and that "[t]he letter is not merely a request that Ash Grove provide information; it contains a threat of legal action and substantial penalties for failure to comply with the request under penalty of civil action and possible monetary penalties." *Id*. The court concluded that the 104(e) letter imposed an obligation on the plaintiff sufficient to trigger the duty to defend set forth in the policy, as a matter of law.

A similar conclusion resulted in *Certain Underwriters at Lloyd's London and Excess Ins. Co., Ltd. v. Massachusetts Bonding and Ins. Co. ("Massachusetts Bonding")*, 235 Or. App. 99, 230 P.3d 103 (2010), a recent Oregon Court of Appeals decision, where the duty to defend was premised on a letter and accompanying documents sent by DEQ to the common insured, Zidell. The court outlined its analysis with respect to whether the DEQ letter was sufficient to trigger the duty to defend, posing two questions: "(1) Did the letter and accompanying documents demonstrate the existence of a 'suit' within the meaning of the insurance policies? (2) Did the letter and accompanying documents contain allegations that, without amendment, could impose liability for

conduct covered by the policy?" *Id.* at 120. The court also noted that where there were doubts on the second question, such doubts would be resolved in favor of the insured. *Id.*

The court found, first, that the DEQ letter gave rise to a "suit" within the meaning of the policies. The letter stated that DEQ had performed a preliminary assessment, that further action was required, that samples would be taken to determine the extent of contamination, and that site owners would be held strictly liable. The letter directed Zidell to inform DEQ as to how it planned to proceed and informed Zidell that, regardless, DEQ would seek to recover its costs. The court characterized the letter: "In effect, DEQ told Zidell to investigate and remediate contamination at the site or pay DEQ to do it – the type of agency ultimatum that we have previously held to constitute a 'suit' for purposes of the duty to defend." *Id.* at 121 (citing *Schnitzer Investment Corp.*, 197 Or. App. at 155). The court noted that the insurance policies in question did not themselves define the term "suit" and it thus "[saw] no reason to reach a different interpretation of the term 'suit' than [it] reached in [its] previous cases." *Id.*

As to the second question, whether the allegations in the letter could alone impose liability under the policies, the court reasoned:

> The facts alleged in the letter and attached document could be read narrowly as Beneficial and U.S. Fire contend – as merely recommending further investigation. But it is reasonable to read them as more than that. In light of the facts in the "Site Assessment Program–Strategy Recommendation," including the long history of Zidell's waste disposal activities and the fact that adjacent property "is known to have soil and groundwater contamination," it is reasonable to read the DEQ letter as requiring further samples to determine the *extent* of groundwater contamination–that is, not *whether* there is groundwater contamination, but *how much*. That is sufficient to trigger the duty to defend.

*Id.* at 122 (emphasis in original) (citing *National Union Fire Ins. Co. v. Starplex Corp.*, 220 Or. App. 560, 584, 188 P.3d 332 (2008)). Thus, the Oregon Court of Appeals found a duty to defend where,

although further tests were needed to determine the extent of the contamination, there were sufficient factual allegations establishing that there was contamination at the site and of the insured's history with respect to the waste disposal at the site.

Based on these precedents, TPPs argue that INA's duty to defend was triggered by the relevant agency communications because the communications allege TPPs' liability under CERCLA, TPPs were directed to participate in the process to allocate liability for contamination and damage, and TPPs were directed to respond to the EPA's 104(e) Information Request.  Thus, TPPs argue, the claims amount to a "suit" under the policy and Defendants are required to tender a defense on their behalf.  Defendants respond that there is no "suit" by which a duty to defend is triggered.  They characterize Oregon law on this point:  "The common thread of the foregoing Oregon decisions is that in order for administrative action to serve as the functional equivalent of a lawsuit, it must be adversarial in nature; it must recite facts supporting the agency's intent to assess liability against the insured; and it must charge the insured with undertaking remedial measures and/or paying the costs of clean up."  (St. Paul's Response Memo at 24.)

Defendants cite *St. Paul Fire & Marine Ins. Co., Inc. v. McCormick & Baxter Creosoting Co.*, 126 Or. App 689, 870 P.2d 260 (1994), wherein the Oregon Court of Appeals held generally that administrative proceedings may qualify as a suit sufficient to invoke coverage under an insurance policy.  The court described its analysis:  "We sought to ascertain the intent of the parties, and we considered that 'suit' was subject to more than one interpretation.  After doing so, we arrived at the conclusion that 'suit' was sufficiently broad to cover administrative proceedings."  *Id.* at 701.  The court assumed that not all administrative actions would trigger a duty to defend, but concluded that the case before it did in fact trigger such a duty:

> Assuming there are administrative actions that do not obligate the insurers to respond, we agree with M & B that this is not such an instance.  Under the statutes governing cleanup of environmental damage, M & B was going to have to pay.  The fact that it chose to try to gain a more favorable resolution by cooperation instead of litigation does not mean that the agency was not making a claim that M & B was responsible for damages.

*Id.*

According to Defendants, the administrative action must *require* that the insured act in a particular manner in order to give rise to a suit and thus trigger a duty to defend.  They also cite *Schnitzer Investment Corp.*, 197 Or. App. 147.  In *Schnitzer*, the Oregon Court of Appeals wrote in its introductory paragraph that "[t]he Department of Environmental Quality (DEQ) required plaintiff to remedy the contamination at significant expense to the plaintiff." *Id.* at 150.  The court, however, went on to describe the facts which gave rise to the insurers duty to defend.  The plaintiff, having discovered contamination on its own, informed DEQ of the contamination.  The plaintiff agreed to investigate the contamination further, which investigation recommended remedial action on contamination of the soil, and continued monitoring of groundwater contamination.  In a letter dated June 7, 1991, DEQ informed the plaintiff of its intent to list the plaintiff's property as contaminated and requiring cleanup.  DEQ would remove the property from the list when the remedial action was complete.  At this point, the plaintiff requested the insurer provide a defense, but the insurer denied the request.  In evaluating whether and when the duty to defend arose between the plaintiff and the insurer, the court concluded that the communications between the plaintiff and DEQ up to and including the June 7, 1991, amounted to the functional equivalent of a judicial complaint and, thus, a "suit." *Id*. at 157.  The Court of Appeals characterized those communications:  "When read together, they described the factual basis on which DEQ sought to hold plaintiff liable for the cost

of the environmental cleanup on its property." *Id*. Defendants distinguish this case on the ground that the documents cited in this case, read together, do not describe the factual basis upon which the agencies sought to base liability.

In *GE Property & Casualty Inc. Co. v. St. Paul Fire & Marine Ins. Co.*, No. CV 04-727-HU, 2005 U.S. Dist. LEXIS 40189 (D. Or. Nov. 17, 2005), the plaintiff and DEQ entered into a voluntary cleanup agreement, which agreement stated explicitly that it was neither an admission of liability by plaintiff nor a waiver of future claims by DEQ. It was not disputed that this voluntary agreement was the functional equivalent of a suit and the court concluded that it was "analogous to a complaint in court or charges in an administrative contested case proceeding, and therefore a 'suit' within the terms of an insurer's duty to defend." *Id.* at *11. Defendants argue that *GE Property* is distinct from the current case because, in *GE Property*, the parties entered into a voluntary agreement regarding the possible contamination whereby liability was presumed. Here, according to Defendants, no presumption of liability is present and so *GE Property's* holding is inapposite.

For these reasons, Defendants contend that the documents TPPs have submitted do not amount to the functional equivalent of a judicial complaint and, thus, there is no "suit" giving rise to the insurers' duty to defend. In particular, Defendants argue that the communications do not attribute contamination to TPPs; that TPPs have not been ordered to remediate the areas in question; that the 104(e) letters explicitly state that they are not designating any entity as a potentially responsible party; and that the letters from the Trustee Council are explicit in that they do not amount to a determination of liability. In sum, the communications "do not articulate any demands, and do not describe any potential loss of right by [TPPs]." (Defendants' Memo. 26.) Defendants also maintain that *Ash Grove* was wrongly decided and its conclusion is inconsistent with the conclusions

other courts have reached.

TPPs contend, in their reply, that the administrative actions and communications amounted to a threat of liability that would ultimately be judicially enforceable. According to TPPs, the Batson letters alleged that they were potentially responsible for contamination at the site, requested their participation in the ADR process, threatened to initiate enforcement actions against those who did not participate in ADR, and further demanded the submission of information, under threat of a fine of upwards of $30,000 per day. TPPs also assert that they were invited to participate in an NRDA proceeding having been identified as potentially liable under CERCLA, and that the GNLs also identified TPPs as potentially liable.

Furthermore, TPPs contend that although couched as voluntary in nature, the agency requests for action and participation were anything but: "Nonparticipation would have severely compromised their ability to protect themselves from CERCLA liability." (TPP Reply Memo. 25.) They argue that, were TPPs unable to participate in the voluntary process and unable to negotiate an agreement through that process, "the EPA could issue a unilateral administrative order to perform remediation with joint and several liability, subject only to arbitrary and capricious review." *Id*. This, TPPs note, would present an undue risk in light of the extremely high stakes involved, with cleanup likely to cost upwards of $1 billion. TPPs point out that the 104(e) letters clearly threaten substantial fines, and the Batson letters clearly threaten enforcement for failure to participate. According to TPPs, although the letters purport to "invite" participation, they actually impose serious consequences for a failure to participate and, as such, are only reasonably read as threatening liability and giving rise to a suit.

The court agrees with TPPs that the relevant agency communications give rise to a suit such

that the's insurers duty to defend is triggered, and finds on point and persuasive the decisions in *Ash Grove* and *Aetna Casualty and Surety Co., Inc. v. Pintlar Corp.*, 948 F.2d 1507 (9th Cir. 1991).  In *Ash Grove*, the court specifically held that a 104(e) letter imposed an obligation sufficient to trigger an insurer's duty to defend.  It stated:

> The § 104(e) letter says that while EPA seeks Ash Grove's "voluntary cooperation," compliance with the request is "required by law," and that if Ash Grove fails to respond fully within a certain time, EPA can commence an action for civil penalties of up to $32,500 per day for noncompliance.  The letter is not merely a request that Ash Grove provide information; it contains a threat of legal action and substantial penalties for failure to comply with the request.

*Ash Grove*, 2010 WL 3894119, at *4.  The *Ash Grove* court also cited the Ninth Circuit's decision in *Aetna Casualty* for the proposition that a PRP notice exposed an insured to "'immediate and severe implications'" and that "'in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process.'"  *Ash Grove* at *5 (quoting *Aetna Casualty*, 948 F.2d at 1517).  The *Ash Grove* court concluded that the 104(e) letter was subject to the same analysis as that of a PRP notice:  "in view of the substantial penalties available to the EPA should Ash Grove not comply with the letter's requests, it is not accurate to say that the letter imposed no obligation on Ash Grove to investigate the contamination."  *Id*.

In reaching its decision in *Aetna Casualty*, the Ninth Circuit looked to the nature of CERCLA to determine when an insured's interests would be genuinely in jeopardy.  It noted that CERCLA was a coercive statutory scheme that "greatly empowers the government.  In order to influence the nature and costs of the environmental studies and cleanup measures, the PRP must get involved from the outset."  948 F.2d at 1517.  In addition to the strong incentives to cooperate with the EPA with respect to CERCLA, the court noted that coverage under a CERCLA claim "should not depend on

OPINION AND ORDER                    27                              {KPR}

whether the EPA may choose to proceed with its administrative remedies or go directly to litigation. A fundamental goal of CERCLA is to encourage and facilitate voluntary settlements." *Id*. (citation omitted). The court stated that, in evaluating whether an insured faces liability such that its rights are in jeopardy, "[t]he focus should be on the underlying rationale and not on the formalistic rituals. If the threat is clear then coverage should be provided." *Id*. at 1518.

Here, the agency communications combined to achieve the same "suit" equivalent within the meaning of the subject policies. In January 2008, Batson informed BAE that it had been identified as a possible PRP and invited it to attend an exploratory meeting. That same month, the EPA sent letters to BAE and TMG seeking information to assist in identifying PRPs, invoking section 104(e) of CERCLA, which itself provides that failure to cooperate with the information request authorizes the EPA to pursue enforcement and levy fines. The PHTC also issued letters in January 2008 in which it, first, invited participation and, second, identified TPPs as PRPs. In March 2008, Batson referenced the 104(e) information requests and informed NWM that it was a PRP. In March 2010, GNLs issued to TMG and BAE. In September 2010, the PHTC informed TMG and BAE that had been identified PRPs.

The CGL policies in this case do not define the term "suit." The OECAA sets forth a rule of construction for such term, provided it does not interfere with the intent of the contracting parties. The court finds that finding a "suit" exists here does not interfere with the parties' intent. Relevant and binding precedent counsel that a suit arises when an insured's rights are genuinely in jeopardy and an obligation has been imposed. This can occur at least as early as a request to provide information or otherwise comply with a CERCLA action, even absent an explicit declaration of liability. Indeed, as the Ninth Circuit has observed,

> The terms of an insurance contract dictate the obligations of the parties.  Clear and unambiguous terms in insurance policies are construed according to their plain meaning, that is, what an ordinary reasonable lay person would interpret the meaning to be. * * *  [A]n "ordinary person" would believe that the receipt of a PRP notice is the effective commencement of a "suit" necessitating a legal defense.

*Aetna Casualty.*, 948 F.2d at 1512, 1517.  Here, administrative communications, including the 104(e) letter and notifications of PRP status, provided clear notice of the need to affirmatively defend allegations of liability for environmental contamination and were sufficient to trigger Defendants' duty to defend.  Accordingly, the court finds that, at least as early as the 104(e) notices, the agency actions and communications gave rise to a "suit" as a matter of law.

III.    Corporate Succession

      *A.    Succession Under Oregon Corporate Law*

"Under Oregon law, when a corporation purchases the assets of another corporation, the purchasing corporation generally does not assume the debts and liabilities of the selling corporation." *Cox v. DJO, LLC*, Civ. No. 07-1310-AA, 2009 WL 3855084, at *2 (D. Or. Nov. 16, 2009) (citing *Erickson v. Grande Ronde Lumber Co.*, 162 Or. 556, 92 P.2d 170 (1939)).  A corporation's debts and liabilities may transfer if any of four circumstances are present:

> 1) the purchasing corporation expressly or impliedly agrees to assume those liabilities; 2) the transaction constitutes a consolidation or merger of the corporations; 3) the purchasing corporation is a "mere continuation" of the selling corporation; or 4) the corporations effectuated the transaction for fraudulent purposes to escape liability.

*Cox*, 2009 WL 3855084, at *2 (citing *Erickson*, 162 Or. at 568).

In *Cox*, the plaintiffs sought to recover from an alleged successor corporation for liability that arose prior to the succession on the theory that the liability of the original corporation had transferred to the successor corporation under one of the four exceptions.  The district court gave multiple

OPINION AND ORDER                    29                    {KPR}

reasons for rejecting plaintiffs' argument: the merger agreement explicitly stated that the successor would not take on any liabilities arising prior to the closing date of the merger; the merger with the another closely-aligned corporation was not a de facto merger with the original corporation; the merger did not create a mere continuation as the original corporation continued to operate as "an existing, separate corporate entity and an active defendant" and there was "no continuity of management, directors, or shareholders"; and the plaintiffs did not produce evidence that the corporations had colluded in the transaction to avoid liability. *Id.* at *3-4.

In *Dahlke v. Cascade Acoustics, Inc.*, 216 Or. App. 27, 171 P.3d 992 (2007), the Oregon Court of Appeals analyzed the third exception to the "no transfer" rule, where the asset purchase gives rise to a new corporation that is a "mere continuation" of the previous corporation. The court held that there was no continuation where the purchase was less than all of the original corporation's assets:

> Plaintiff argues that, under the third exception quoted in *Erickson*, Drake Management is liable for FMD's debts because Drake Management "is merely a continuation of" FMD. . . . Most notably, Drake Management did not purchase *all* of FMD's assets. Rather, FMD was left with significant assets and continued to operate as a separate corporation for more than a decade. Plaintiff's theory that Drake Management was simply a continuation of FMD ignores the separate legal existence of the two corporations and disregards the legislative policy that corporations are distinct legal entities.

*Id.* at 37 (emphasis in original). However, the Ninth Circuit, in a case applying California law, has held that an insurance policy's benefits transfer when enough of the predecessor corporation's assets are purchased: "the benefits of an insurance policy, including the right to a defense, issued to a predecessor corporation transferred by operation of law to the successor corporation when it purchased substantially all the predecessor's assets." *Quemetco Inc. v. Pacific Automobile Insurance*

*Co.*, 24 Cal. App. 4th 494, (1994) (citing *Northern Insurance Co. of New York v. Allied Mutual Insurance*, 955 F.2d 1353, 1358 (9th Cir. 1992)).

TPPs argue that they have alleged the succession of TMG and BAE to NWMIW's insurance policies sufficient to entitle them to a defense under those policies. TPPs cite the administrative communications that gave rise to this suit as identifying BAE and TMG as the corporate successors of NWMIW. In particular, they refer to the January 2008 letters from Batston, the 104(e) CERCLA notices, communications from the EPA requesting information about the Site, the General Notice Letters, and letters from the PHTC. TPPs argue that this evidence is sufficient to allege corporate succession such that the duty to defend is triggered.

TPPs cite *Shearer* for the proposition that extrinsic evidence is relevant to determine the identity of an insured, but does not necessarily need to be pleaded where the evidence is not otherwise relevant to the merits of the underlying case:

> The facts relevant to an insured's relationship with its insurer may or may not be relevant to the merits of the plaintiff's case in the underlying litigation. The plaintiff in the underlying case is required to plead facts that establish the defendant's liability; the plaintiff often is not required to establish the nature of the defendant's relationship to some other party or to an insurance company in order to prove a claim.

237 Or. App. at 477. TPPs thus argue that the court may consider extrinsic evidence of facts not alleged in the pleading. They further argue that in two years of discovery the insurers have failed to uncover evidence that rebuts the succession of their policies to BAE and TMG.

Defendants assert that TPPs bear the burden of proving coverage and must establish their identity as insureds and, thus, their entitlement to defense coverage. According to Defendants, TPPs have produced no evidence of the transfer of liabilities and assets from NWMIW to BAE and TMG, and have only produced correspondence which presupposed the corporate succession of

environmental liability.  Furthermore, Defendants argue that the 1997 SPA agreement is ambiguous which itself presents genuine issues of fact regarding succession of the insurance policies. Defendants also argue that the insurance policies at issue include anti-assignment clauses and do not otherwise provide for successor coverage, which point TPPs concede, though TPPs contend the policies transferred by operation of law and, as such, any anti-assignment clauses were overridden.

The court agrees that TPPs have the burden to establish coverage and have failed to do so here.  Although the evidence cited by TPPs suggests a possible succession of liability from NWMIW to BAE and/or TMG, it does not establish it as a matter of law.  In fact, TPPs state in their reply that the 1997 SPA is ambiguous.  The parties dispute which of them is entitled to a favorable inference where the corporate succession documents are ambiguous.  The court need not answer this question because, even if the inferences are made in favor of TPPs, the documents are themselves still ambiguous regarding which entity, BAE or TMG, is the successor to the insurance policy.  Thus, Defendants are correct that there are genuine issues of material fact as to the corporate succession and, more specifically, whether the policies issued by St. Paul and the other insurers were validly transferred by way of corporate succession.

Defendants argue that a duty to provide a defense to more than one potential successor to an insurance policy is a requirement unsupported by law.  However, in light of the ambiguity created by the corporate succession documents, the court has determined that there are questions of fact as to whether either BAE or TMG have succeeded to the insurance policies in this case.

B.    *Succession by Operation of Law*

The parties dispute whether there was a transfer of liability under CERCLA by operation of law.  TPPs argue that, in the context of CERCLA and principles of equity, coverage for damage

occurring during a policy period transfers to a subsequent owner regardless of the laws of corporate succession. They rely in large part on the holding in *B.S.B. Diversified Co., Inc. v. American Motorists Ins. Co.*, 947 F. Supp. 1476 (W.D. Wa. 1996), a case from the Western District of Washington involving groundwater contamination and subsequent cleanup efforts. The court held that the insurer was liable for coverage under two theories: first, that an assignment transferred all liabilities and assets to a successor corporation and, second, that the liabilities and assets transferred by operation of law. The court relied on a prior decision by the Ninth Circuit, *Northern Ins. Co. of New York v. Allied Mutual Ins. Co.*, 955 F.2d 1353 (9th Cir. 1992), which it described as follows:

> In *Northern Insurance*, the court held that there was no explicit transfer of liabilities in an asset purchase agreement in which Brown-Foreman Corporation purchased California Cooler. The Ninth Circuit, however, relied on Washington and California law to conclude that liability for pre-sale activity "transferred irrespective of any clauses to the contrary in the asset purchase agreement." Then, under "operation of law," the court concluded that the rights under insurance policies to indemnification and a defense followed the liability.

*B.S.B. Diversified*, 947 F. Supp. at 1481. The district court concluded that "where the events creating liability occurred prior to transfer of liability," the successor assumes responsibility and "the insurance benefits covering liability for those acts" are also transferred to the successor. *Id.* at 1481-1482.

Defendants argue that this case, and the Ninth Circuit precedent it relies on, have since been undermined, as demonstrated by *Quemetco Inc. v. Pacific Automobile Ins. Co.*, 24 Cal. App. 4th 494, 29 Cal. Rptr. 2d 627 (1994). In *Quemetco*, the court surveyed relevant California precedent and the holding in *Northern Insurance*, and considered whether the insurance policy issued to a corporation necessarily transferred to a successor corporation "when it purchased substantially all of the predecessor's assets." *Quemetco*, 24 Cal. App. 4th at 499. The *Quemetco* court cited a 1986

OPINION AND ORDER                    33                    {KPR}

California Court of Appeals decision which cited the *Northern Insurance* holding and had declined to "extend the rule for determining liability to the issue of insurance coverage, instead preferring to look to the contract itself to resolve the issue of coverage." *Id*. at 500. The *Quemetco* court distinguished cases that had validated the transfer of insurance benefits as situations wherein the corporate succession had been established. *Id*. at 501. It also noted that the timing of the succession relative to the liability-inducing occurrence was relevant, in that a liability arising after the corporate transfer would not carry with it the coverage of a pre-existing policy. *Id*. The court concluded:

> In this case, appellant was found to be liable for hazardous waste clean up costs based on an act passed after it purchased Old Quemetco's assets. Thus, unlike the situation in *Northern*, no liability passed as a matter of law at the time of the asset sale as no such liability existed at that time.

*Id.* Thus, under *Quemetco*, the insurance benefits of a pre-existing policy transfer when the liability transfers under the state's law of corporate succession and where the liability existed at the time of the succession.

The court does not agree that *Quemetco* necessarily undermines the holdings of either *Nothern Insurance* or *B.S.B. Diversified*. In the court's view, the confusion stems from the discussion by the district court in *B.S.B. Diversified*. There, the court presented its duty inquiry as two distinct analyses, rather than a single analysis. The court first determined that liability flowed to the successor corporation under principles of corporate law and so the insurance benefits should also attach. Then, the court determined that liability and insurance benefits transferred to the successor corporation by operation of law, irrespective of anti-assignment language contained in the insurance policy itself. Although seemingly presented as a separate ground for finding coverage under the insurance policy, the "operation of law" argument presupposed that corporate succession

occurred sufficient to transfer liability and merely provided that a successor would be "responsible for environmental cleanup where the events creating liability occurred prior to transfer of liability." *B.S.B. Diversified*, 947 F. Supp. at 1482. The discussion is otherwise sound, except to the extent that it created the appearance of a dichotomy where there is no such difference.

Here, there are questions of fact regarding whether corporate succession occurred sufficient to transfer liability to BAE or TMG, and summary judgment on this point is denied. However, if a finder of fact determines that BAE and TMG did indeed succeed to the liabilities of NWMIW, the benefits of the insurance policies will flow to BAE and TMG just as the liability for an occurrence that took place prior to their tenure does.

III.    Constitutionality of the OECAA

St. Paul[6] objects to application of OECAA rules of construction to its policy language as an unconstitutional violation of the Contracts Clauses of both the United States and Oregon Constitutions. The State of Oregon ("the State") intervened in order to defend the OECAA, a position with which TPPs concur. In its responsive briefing, St. Paul makes clear that it does not challenge the OECAA's facial constitutionality, but only the constitutionality of the application proposed by TPPs as overbroad and beyond the intent of the legislature and the contracting parties. St. Paul argues, specifically, that interpreting the agency communications that occurred in this case as a "suit" for purposes of the OECAA would amount to an unconstitutional application.

The United States Constitution provides: "No State shall . . . pass any . . .Law impairing the Obligation of Contracts[.]" U.S. CONST. Art. I § 10. The Oregon Constitution provides: "No . . . law impairing the obligation of contracts shall ever be passed[.]" OR. CONST. Art. I § 21. The

---

[6] St. Paul alone objected to the State's motion to intervene.

parties agree generally that to determine whether a law violates either contract clause, a three-step analysis is applied. First, the court considers whether the contract is substantially impaired. Second, the court examines whether the state has a "significant and legitimate public purpose" for the regulation. Third, the court determines whether the resulting adjustment of the contract obligations is reasonable in its conditions and character in light of the underlying public purpose. *Energy Reserves Group v. Kansas Power & Light Co.*, 459 U.S. 400, 411-412 (1983).

Under the OECAA, when an agency "directs, requests or agrees that an insured take action with respect to contamination with the State of Oregon" such action is considered a "suit" for purposes of a CGL policy, so long as that interpretation does not undermine the intent of the parties to the policy. St. Paul argues that expanding the definition of a "suit" for purposes of the OECAA in the manner proposed by TPPs would render the statute unconstitutional. St. Paul contends such application would interfere with the intent of the contracting parties, as expressed in the policy terms themselves. In particular, St. Paul points to the distinction made in the policy between claims and suits, where the insurer has a duty to defend a suit, but not a claim. In light of this distinction, St. Paul argues, it cannot be required to defend what would qualify as a "claim" under its policy, regardless of whether it would qualify as a "suit" under the OECAA. In other words, the definition of "suit" in the statute is broader than the definition contemplated by the policy, and imposition of the statute's definition on the policy thus would unconstitutionally impair the bargain agreed to by the contracting parties.

St. Paul then turns to the three-step analysis. First, St. Paul identifies the particular right that will be substantially impaired by application of the OECAA, namely its right to deny a defense to a what is merely a claim, and not a suit. This impairment is substantial, it argues, because the terms

of a duty to defend are a central component of a liability insurance policy.  Second, St. Paul argues that such an interpretation would bring the OECAA beyond its significant and legitimate public purpose, this because the interpretation would actually benefit a narrow class of interested parties, rather than the people of Oregon.  St. Paul argues further that the rules of construction set forth in the OECAA apply only to a narrow class of insurance claims, specifically environmental claims. In St. Paul's view, a rule that applies solely to environmental claims, and not all claims under the policy, would be improper and represent a departure from the purportedly substantial and legitimate public purpose of the OECAA.  Third, St. Paul argues that application of the OECAA as urged by TPPs is outside of the substantial and legitimate public purpose of the statute.  According to St. Paul, the statute's purpose is to "encourage parties to cooperate with environmental agencies in remedying contamination."  (St. Paul Opp. Memo. 35.)  In particular, St. Paul notes that the agency communications TPPs seek to introduce as initiating a suit are mere requests for cooperation that do not concern an agreement to remedy contamination by a responsible party.  In the absence of an allegation of liability, the agency communications cannot constitute a suit sufficient to trigger St. Paul's duty to defend.  Finally, St. Paul urges the court to construe the statute in a manner that avoids a constitutional conflict.

The State argues that the statute is facially constitutional and its uses the history and purpose of the statute to support its argument.  First, the State argues that the legislative history and purpose of the statute reveal that it was enacted to allow policy holders to voluntarily comply with environmental cleanup efforts prior to the formal initiation of litigation.  In doing so, the law sought to prevent situations where an insurer would deny its duty to defend or the existence of coverage, and thus discourage or at least delay voluntary efforts by policy holders to remedy environmental

damage while such issues were litigated in courts of law. Second, the State argues that the statute was drafted to avoid violating the contracts clause. OECAA's definition of "suit" applies only where the court cannot ascertain the meaning of "suit" from the face of the policy. Furthermore, the rule of construction is not applied if its result would be contrary to the parties' intent. The State notes that where contract terms are ambiguous, courts turn to maxims of construction which are often established by statute. Thus, the inclusion of rules of construction in the OECAA is neither unusual nor unconstitutional.

With respect to the three-step analysis, the State argues first that the statute does not substantially impair the insurance policy by modifying the scope of coverage. Rather, the statute supplies rules with which to evaluate ambiguous contract terms and does not change the underlying contract in any way. And, even if it did modify the contract as St. Paul argues, this would not be considered "substantial" in the context of the heavily regulated insurance industry. Second, the State argues that the purpose of the OECAA is both significant and legitimate in that environmental cleanup benefits all citizens of the State, not any special interest. Furthermore, the State argues, where contract terms are ambiguous, courts ultimately resort to considering policy goals, which goals are appropriately left to elected officials and not to courts. The State also distinguishes *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 (1978), as representing a materially different situation wherein a legislative enactment was not broadly applicable and may have been enacted with a single entity in mind. Third, the State argues that the rule of construction currently at issue is reasonable measure and is appropriate to achieve its purpose – it applies only where the contract term is ambiguous and facilitates voluntary compliance in environmental cleanup efforts.

For their part, TPPs defend the constitutionality of the OECAA and its definition of "suit"

as a construction that has been validated by Oregon courts, noting that a contract can hardly be impaired by a statutory definition for a term the insurer did not bother to define in the policy itself.

The court agrees that this application of the OECAA's rules of construction does not violate the contracts clause of the United States or Oregon Constitutions. First, the application does not substantially impair the terms of the policy. The policy requires St. Paul defend the insured in the event of liability for property damage. The OECAA merely provides guidance for courts in determining when a suit has been initiated where determining that occurrence otherwise is ambiguous, provided that determination is not in conflict with the contract terms. As previously discussed, a duty to defend arises where there is a threat of liability, and that threat exists under these facts. OECAA's definition of "suit" does not in any way alter or amplify that duty. Second, the OECAA has a significant and legitimate public purpose in protecting the citizens of Oregon from serious environmental contamination and in holding polluters responsible for environmental degradation. In light of this purpose, and weighed against the purported contractual interference, the readjustment of obligations is reasonable in condition and character. The OECAA seeks to facilitate cleanup efforts and encourage voluntary compliance in these efforts, purposes both legitimate and substantial. And, in light of the coercive nature of CERCLA, the OECAA does not unduly impair the insurance policy by interpreting "suit" to encompass specific administrative actions that seek to identify and impose liability.

TPPs also argue that St. Paul should have pleaded the alleged unconstitutionality of the OECAA as an affirmative defense. TPPs' sole citation in support for this contention is a treatise which states that certain other issues not specifically set forth in Federal Rule of Civil Procedure 8(c) must be "set forth affirmatively in the responsive pleading." Wright & Miller, *Federal Practice and*

*Procedure*, Civil 3d § 1271. The rule itself does not provide guidance to determine which unspecified issues must be so pleaded, but the cited treatise notes that, in spite of this lack of guidance, "it is possible to formulate some working principles for determining what constitutes a defense contemplated by the final clause of Rule 8(c)." *Id.*

The Wright & Miller treatise cites three cases. Two are from different circuits, namely the Fifth and Tenth Circuits, and they state categorically that a constitutionality challenge must be pleaded. *Kewanee Oil & Gas Co. v. Mosshamer*, 58 F.2d 711, 712 (10th Cir. 1932); *Butts v. Curtis Publishing Co.*, 225 F. Supp. 916, 920 (D.C. Ga. 1964) (citing *Kewanee*). The other case cited is from the Idaho Supreme Court and stands for the opposite proposition: "The constitutionality of a statute, however, is not ordinarily an issue upon which evidence must be presented at trial or about which one must be forewarned in order to prepare evidence for trial. In this case the constitutional question is a matter of law." *Williams v. Paxton*, 98 Idaho 155, 163 n.1 (1976). However, in light of the uncertainty of federal law on this issue and the fact that the court otherwise finds the statute constitutional and the pleading issue thus moot, the court declines to rule on this issue.

*Conclusion*

For the reasons stated, TPPs motion for summary judgment (#298) is GRANTED in part and DENIED in part. Century's motion to strike (#334) is DENIED. Argonaut's motion to join (#302) is DENIED.

DATED this 27th day of January, 2012.


        /s/ John V. Acosta
        JOHN V. ACOSTA
    United States Magistrate Judge