Exhibit 1

James P. Murphy,
jpm@maflegal.com
MURPHY ARMSTRONG & FELTON LLP
701 Millennium Tower
719 Second Avenue
Seattle, WA 98104
Telephone:  (206) 985-9770
Facsimile:  (206) 985-9790

James P. Ruggeri (*pro hac vice*)
jruggeri@goodwin.com
SHIPMAN & GOODWIN, LLP
1875 K Street, N.W., Suite 600
Washington, DC  20006-4305
Telephone:  (202) 469-7750
Facsimile:  (202) 469-7751

*Attorneys for Agricultural Insurance Company and
Agricultural Excess and Surplus Insurance Company*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| CENTURY INDEMNITY COMPANY, | Case No. 08-cv-01375-AC |
| Plaintiff, | AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2) |
| v. | |
| THE MARINE GROUP, *et al.*, | |
| Defendants. | |
| THE MARINE GROUP, *et al.*, | |
| Third-Party Plaintiffs, | |
| v. | |
| AGRICULTURAL INSURANCE COMPANY, et al., | |
| Third-Party Defendants. | |

AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE
COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2)

Case No. 08-cv-01375-AC

Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company submit their expert witness designations and reports pursuant to Fed. R. Civ. Pro. 26(a)(2) and the court's case scheduling order of February 28, 2015. Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company reserve the right to amend this disclosure as discovery and this litigation continue. Any expert(s) listed herein may be called upon to review additional materials produced in the course of this litigation, including but not limited to the expert reports and/or testimony of other expert witnesses disclosed in this case. Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company reserve the right to amend and/or supplement the opinions of any expert(s) listed herein. This disclosure supplements Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company's initial disclosures and responses to any relevant discovery requests in this action. Disclosure of any expert(s) by Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company shall not be deemed a guarantee that any identified expert will be called to testify at trial and all rights are reserved in that regard.

1.      Dennis R. Connolly
        17 Philip Drive
        Princeton, NJ 08540
        (609) 497-7352

Mr. Connolly's qualifications, training, experience, and opinions are set forth fully in the attached report and exhibits thereto. In addition to testimony on the subject matter set forth in Mr. Connolly's attached report, he may also be called upon to offer testimony in rebuttal to expert or other testimony offered by any other party in this action.

## **RESERVATIONS**

1.      Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company reserve the right to call and elicit expert opinions from any witness whose testimony

AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2)

Case No. 08-cv-01375-AC

has not yet been taken, and from the experts of any party to this action, whether disclosed or undisclosed, as it relates to their knowledge and observations, opinions, qualifications, training, expertise, reports, and/or other testimony.

2.      Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company reserve the right to disclose additional expert witnesses as rebuttal experts in response to any disclosures of experts of other parties to this action to the fullest extent allowable under the applicable rules of civil procedure.

　　　　DATED this 10th day of March, 2015.

By:_____
James P. Murphy (OSB# 067084)
Attorneys for Agricultural Insurance Company
and Agricultural Excess and Surplus Insurance
Company

AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE
COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2)

P A G E | **3**

Case No. 08-cv-01375-AC

## CERTIFICATE OF SERVICE

I hereby certify that a copy of AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2) was sent via sent via electronic mail this 10th day of March 2014 to the following counsel of record:

Mr. Christopher A. Rycewicz
E-mail:  chris.rycewicz@millernash.com
Ms. Hong N. Huynh
E-mail:  hong.huynh@millernash.com
Miller Nash LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204-3699
Phone:  (503) 224-5858
Facsimile:  (503) 224-0155
*Attorneys for Defendants and Third-Part Plaintiffs*
*The Marine Group, LLC, Northwest Marine, Inc.,*
*and Northwest Marine Iron Works, and Third-Party*
*Plaintiff BAE Systems San Diego Ship Repair, Inc.*

Mr. R. Lind Stapley, Esq.
E-mail: stapley@sohalang.com
Ms. Misty A. Edmundson, Esq.
E-mail: edmundson@sohalang.com
Soha & Lang, P.S.
1325 Fourth Avenue, Suite 2000
Seattle, Washington 98101-2570
Phone:  (206) 624-1800
Fax:  (206) 624-3585
*Attorneys for Plaintiff Century Indemnity Company,*
*Third-Party Defendant Insurance Company of North*
*America, and Counter-Defendant Century Indemnity*
*Company*

Mr. William G. Earle
E-mail: wearle@davisrothwell.com
Mr. Jonathan Henderson
E-mail: jhenderson@davisrothwell.com
Davis Rothwell Earle & Xóchihua P.C.
2700 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204-3650
Phone: (503) 222-4422
Fax: (503) 222-4428
*Attorneys for Plaintiff Century Indemnity Company,*
*Third-Party Defendant Insurance Company of North*
*America, and Counter-Defendant Century Indemnity*
*Company*

Mr. John M. Woods
E-mail: john.woods@clydeco.us
Mr. George Cornell
E-mail: George.cornell@clydeco.us
Clyde & Co US LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Phone: (212) 710-3900
Fax: (212) 710-3950
*Attorneys for Third-Party Defendant*
*Water Quality Insurance Syndicate*

Mr. John P. Hayes
E-mail: jhayes@forsberg-umlauf.com
Mr. Charles E. Albertson
E-mail: calbertson@forsberg-umlauf.com
Mr. Carl E. Forsberg
E-mail: cforsberg@forsberg-umlauf.com
Forsberg & Umlauf, P.S.
901 Fifth Avenue, Suite 1400
Seattle, Washington 98164-2047
Phone: (206) 689-8500
Fax: (206) 689-8501
*Attorney for Third-Party Defendants Certain*
*Underwriters at Lloyd's, London, and Certain*
*London Market Insurance Companies*

Mr. Doug Tuffley
E-mail: dtuffley@cozen.com
Thomas M. Jones
E-mail:  tjones@cozen.com
Ms. Jodi A. McDougall
E-mail: jmcdougall@cozen.com
Ms. Molly Siebert Eckman
E-mail: meckman@cozen.com
Cozen O'Connor
1201 Third Avenue, Suite 5200
Seattle, Washington 98101
Phone: (206) 340-1000
Fax: (206) 621-8783
*Attorneys for Third-Party Defendant*
*Chicago Insurance Company and*

AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2)

Case No. 08-cv-01375-AC

Mr. Michael R. Seidl
E-mail: mick@seidl-law.com
Seidl Law Office, P.C.
121 S.W. Morrison Street, Suite 475
Portland, Oregon 97204
Phone: (503) 224-7840
Fax: (503) 224-9721
*Attorney for Third-Party Defendant*
*American Manufacturer's Mutual*
*Insurance Company*

Mr. Ira Revich
E-mail: irevich@crwllp.com
Charleston, Revich & Wollitz LLP
1925 Century Park East, Suite 1250
Los Angeles, California 90067-2746
Phone: (310) 551-7020
Fax: (310) 203-9321
*Attorney for Third-Party Defendant*
*American Manufacturer's Mutual*
*Insurance Company*

Mr. Jay W. Beattie
E-mail: jbeattie@lindsayhart.com
Ms. Resa Boxell
E-mail: rboxell@lindsayhart.com
Ms. Carolyn Weeks
E-mail: cweeks@lindsayhart.com
Lindsay, Hart, Neil & Weigler, LLP
1300 S.W. Fifth Avenue, Suite 3400
Portland, Oregon 97201-5640
Phone: (503) 226-7677
Fax: (503) 226-7697
*Attorneys for Intervenor Argonaut*
*Insurance Company*

Ms. Margaret M. Van Valkenburg
E-mail: megge.vanvalkenburg@bullivant.com
Bullivant Houser Bailey, P.C.
300 Pioneer Tower
888 S.W. Fifth Avenue
Portland, Oregon 97204-2089
Phone: (503) 228-6351
Fax: (503) 295-0915
*Attorney for Third-Party Defendants Employers*
*Mutual Casualty Company, Pacific Mutual Marine*
*Office, Inc., and West Coast Marine Managers, Inc.*

*Royal Indemnity Company*
Mr. C. Kent Roberts
E-mail: ckroberts@schwabe.com
Mr. Brien J. Flanagan
E-mail: bflanagan@schwabe.com
Schwabe, Williamson & Wyatt, P.C.
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204
Phone: (503) 222-9981
Fax: (503) 796-2900
*Attorneys for Third-Party Defendant*
*Water Quality Insurance Syndicate*

Mr. Gary V. Abbott
E-mail: gabbott@abbott-law.com
Ms. Klarice A. Benn
E-mail: kbenn@abbott-law.com
Abbott Law Group, P.C.
215 SW Washington Street, Suite 300
Portland, Oregon 97204
Phone: (503) 595-9510
Fax: (503) 595-9519
*Attorneys for Third-Party Defendant*
*American Centennial Insurance Company*

Ms. Stephanie M. Parent
E-mail: stephanie.m.parent@doj.state.or.us
Oregon Dept. of Justice
Special Litigation Unit
1515 S.W. 5th Avenue, #410
Portland, Oregon 97201
Phone: (971) 673-1880
Fax: (971) 673-5000
*Attorney for Intervenor State of*
*Oregon/Attorney General*

Mr. Damon L. Henrie
E-mail: dhenrie@henriesmith.com
Ms. Katherine L. Smith
E-mail: ksmith@henriesmith.com
Henrie & Smith LLP
15455 NW Greenbrier Pkwy, Suite 125
Beaverton, Oregon 97006
Phone: (503) 593-8548
Fax: (503) 214-8001
*Attorneys for Third-Party Defendants Hartford*
*Insurance Company, New England*
*Reinsurance Corporation, and Twin City Fire*
*Insurance Company*

AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE
COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2)
P A G E | 5

Case No. 08-cv-01375-AC

Mr. Jeffrey V. Hill
E-mail: jhill@hill-lamb.com
Hill & Lamb LLP
1000 S.W. Broadway, Suite 1780
Portland, Oregon 97205
Phone: (503) 417-1104
Fax: (971) 373-8801
*Attorney for Intervenor Argonaut*
*Insurance Company*

Mr. Lawrence Gottlieb
E-mail: lgottlieb@bpmlaw.com
Betts Patterson & Mines P.S.
One Convention Place
701 Pike Street, Suite 1400
Seattle, Washington 98101
Phone: (206) 268-8613
Fax: (206) 343-7053
*Attorneys for Third-Party Defendant*
*Continental Insurance Company*

Mr. Kenneth H. Sumner
E-mail: ksumner@spcclaw.com
Sinnot, Puela, Campagne & Curet, APLC
Two Embarcadero Center, Suite 1410
San Francisco, California 94111
Phone: (415) 352-6200
Fax: (415) 352-6224
*Attorney for Third-Party Defendants Granite State*
*Insurance Company, Insurance Company of the State*
*of Pennsylvania, and National Union Fire Insurance*
*Company of Pittsburgh, PA*

Mr. Peter J. Mintzer
E-mail: pmintzer@ckbllp.com
Chamberlin Keaster & Brockman, LLP
500 Union Street, Suite 645
Seattle, Washington 98101
Phone: (206) 447-6461
Fax: (206) 223-4021
*Attorneys for Third-Party Defendant*
*Federal Insurance Company*

Mr. Mark D. Paulson
E-mail: mpaulson@clausen.com
Phone: (312) 606-7751
Ms. Amy Rich Paulus
E-mail: apaulus@clausen.com
Phone: (312) 606-7848
Clausen Miller P.C.
10 South LaSalle Street
Chicago, Illinois 60603
Fax: (312) 606-7777
*Attorneys for Third-Party Defendant*
*Old Republic Insurance Company*

Mr. David M. Schoeggl
E-mail:  dschoeggl@mms-seattle.com
Ms. Stephania Camp Denton
E-mail:  sdenton@mms-seattle.com
Mills Meyers Swartling
1000 Second Avenue, 30th Floor
Seattle, Washington  98104
Phone:  (206) 382-1000
Fax:  (206) 386-7343

Mr. Thomas W. Brown
E-mail: tbrown@cosgravelaw.com
Cosgrave Vergeer Kester LLP
888 S.W. Fifth Avenue, Suite 500
Portland, Oregon 97204
Phone: (503) 323-9000
Fax: (503) 323-9019
*Attorneys for Third-Party Defendants Granite*
*State Insurance Company, Insurance Company*
*of the State of Pennsylvania, and National*
*Union Fire Insurance Company of Pittsburgh,*
*PA*

Mr. Michael D. Compean
E-mail: mcompean@blackcompeanhall.com
Black, Compean & Hall, LLP
700 South Flower Street, Suite 3350
Los Angeles, California  90017
Phone:  (213) 629-9500
Fax:  (213) 629-4868
*Attorney for Intervenor Argonaut Insurance*
*Company*

AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE
COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2)

Case No. 08-cv-01375-AC

Mr. Wayne S. Karbal
E-mail: wkarbal@karballaw.com
Phone: (312) 431-3610
Mr. Alan M. Posner
E-mail: aposner@karballaw.com
Karbal Cohen Economou Silk & Dunne, LLC
150 S. Wacker Drive, Suite 1700
Chicago, Illinois 60606
Phone: (312) 431-3632
Fax: (312) 431-3670
*Attorneys for Third-Party Defendants Hartford Fire
Insurance Company, New England Reinsurance
Corporation, and Twin City Fire Insurance Company*

Mr. Thomas A. Gordon
E-mail: tgordon@gordon-polscer.com
Mr. Andrew S. Moses
E-mail: amoses@gordon-polscer.com
Gordon & Polscer, L.L.C.
9755 S.W. Barnes Road, Suite 650
Portland, Oregon 97225
Phone: (503) 242-2922
Fax: (503) 242-1264
*Attorneys for Third-Party Defendant St. Paul Fire
and Marine Insurance Company*

Mr. Jordan R. Silk
E-mail: jsilk@schwabe.com
Schwabe, Williamson & Wyatt, P.C.
1211 S.W. Fifth Avenue, Suite 1900
Portland, Oregon 97204
Phone: (503) 222-9981
Fax: (503) 796-2900
*Attorney for Third-Party Defendant
Old Republic Insurance Company*

Darcie Byrd, Legal Assistant

AGRICULTURAL INSURANCE COMPANY AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE
COMPANY'S DISCLOSURE OF EXPERTS PURSUANT TO FRCP 26(A)(2)

PAGE | 7

Case No. 08-cv-01375-AC

**REPORT OF EXPERT DENNIS R. CONNOLLY**
**OF THIRD-PARTY DEFENDANTS AGRICULTURAL INSURANCE COMPANY**
**AND AGRICULTURAL EXCESS AND SURPLUS INSURANCE COMPANY**

I, Dennis R. Connolly, on behalf Third-Party Defendants Great American Assurance Company, formerly known as Agricultural Insurance Company, and Great American E&S Insurance Company, formerly known as Agricultural Excess and Surplus Insurance Company (together, "Great American"), offer the following report containing a statement of my opinions and the bases and reasons therefor, the documents and other information supporting my opinions that I expect to offer in this case, my qualifications, and my compensation. Appended to this report as Exhibit A is a list of the documents I reviewed.

## I.    INTRODUCTION

1.    I have been asked by Great American to present expert testimony regarding the issuance, limits, terms and conditions of certain comprehensive general liability ("CGL") and shiprepairer's liability ("SRL") insurance policies at issue in this case.  I have spent my entire career in the field of insurance and products and environmental liability law.  I am, therefore, familiar with many aspects of insurance, particularly (as relates to this case) with the underwriting and interpretation of primary, excess, and umbrella CGL insurance policies issued in the 1950s, 1960s, 1970s, and 1980s.

## II.    QUALIFICATIONS

2.    I retired in 2004 as a Managing Director of Marsh USA Inc. ("Marsh USA"), the world's largest insurance broker, working in Marsh USA's Risk Consulting Group.  I am now an independent consultant with respect to insurance and tort matters.  Attached to this Report as Exhibit B is my current *curriculum vitae*.  Over the course of my career, I have been responsible for handling thousands of disputed claims.

3.      I was graduated in 1962 from Colby College and in 1965 from Brooklyn Law School.  After law school, I spent eleven years working for two law firms that served as "captive counsel" for two insurance companies.  Specifically, from 1965 to 1973, I worked for Fogarty & Nielsen, which provided legal services to Liberty Mutual Insurance Company.  I had a lot of involvement with marine liability policies, as Liberty Mutual insured stevedores and railroads. From 1973 to 1976, I worked for Katz & Gantman, which provided legal services to Public Service Mutual Insurance Company.  During my employment with these firms, I handled all aspects of litigation for those insurance companies, including litigation involving these companies' insurance policies (*e.g.*, disputes about coverage, claims handling, contribution claims, and interpretation of policy provisions).  During this time, I was an employee of the insurance companies.  I was responsible at times for handling Jones Act claims.  I routinely reviewed CGL policies from the 1940s, 1950s, and 1960s.  While working on early "long tail" claims, I reviewed policies issued by numerous domestic underwriters to many different policyholders from the 1940s through the 1960s and became familiar with the underwriting, issuance, renewal, terms, conditions, and limits of those policies.

4.      From 1976 to 1986, I worked for the American Insurance Association ("AIA"), which is the leading trade association for U.S. property and casualty insurers.  Its members wrote the majority of CGL policies issued in the United States during this period.  Many of AIA's members subscribed to policies issued by the Water Quality Insurance Syndicate ("WQIS").  We periodically had meetings with the people who ran WQIS, including representatives from WQIS's major law firm, Bigham Englar.  As a spokesperson for the insurance industry, I wrote articles, gave presentations, and testified before state and federal legislators and regulators on insurance and mass tort issues.  I also frequently consulted and worked with the Insurance

Services Office, Inc. ("ISO"), the largest collector of insurance statistics and drafter of insurance policies in the world.  I was on two separate occasions approached by ISO to become its general counsel.

5.      In connection with my work for AIA, in October 1979, I authored a committee report entitled "Product Liability Insurance:  Underwriting, Rates, Reserves, Business Cycles." The report provided guidance to underwriters with respect to underwriting product liability risks, *e.g.*, what information to collect, how to obtain it, how to collate it to particular types of policies, how to draft appropriate exclusions, and how to set rates.  I drafted the report based on my own experience and research, as well as the input of other committee members, including the chief underwriters of a number of the nation's largest insurers and the staff of ISO.

6.      While at AIA, I was involved in the legislative efforts concerning the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), commonly known as "Superfund," other legislation involving pollution, and also product liability issues.  These efforts included testifying on numerous occasions before Congress and supplying materials for Congressional review.

7.      In 1986, I joined Johnson & Higgins, at the time the third largest insurance broker in the world, and became a Principal in the company.  In particular, I managed the Claims Department and co-managed the Casualty Department in Johnson & Higgins's New York office, which at the time was its home and largest office.  The departments that I supervised placed insurance and processed claims, including CGL placements and CGL claims, and audited premiums.

8.      In 1989, while I was with Johnson & Higgins, I served as the spokesman for the National Association of Insurance Brokers during legislative hearings on various matters of

concern to brokers, insurers, and policyholders, including CERCLA.  Also while working at Johnson & Higgins, I was appointed to a special joint committee of the American Bar Association and the National Association of Insurance Commissioners to draft a new insurance policy form for environmental liability insurance.  While the final form was never adopted, much of the committee's draft language has been incorporated in environmental liability policy forms in use today.

9.    Between 1984 and 1988, I participated in a number of projects with the Keystone Center.  The Keystone Center tries to develop consensus solutions to various policy issues.  One such project was an attempt to draft model legislation to address perceived problems in underwriting and obtaining product liability insurance.  At the Keystone Center, I also worked on an environmental liability report to Congress that was influential in the Superfund Amendments and Reauthorization Act of 1986.

10.   From 1986 to 1994, I was a member of the Wharton School Risk and Decisions Processes Center Advisory Committee.  From 1992 to 1994, I was chairperson of that Committee.  The Committee was influential in developing methods to underwrite and draft insurance policy language for environmental liability.

11.   In 1997, Marsh USA acquired Johnson & Higgins and I became a Managing Director of Marsh USA.  I handled Marsh USA's clients' largest claims, helping to develop settlements and negotiate claim payments from insurers.  I also assisted in reviewing insurance policy language and advising clients, particularly relating to mass tort and environmental exposures.

12.   I have participated in special liability programs at the University of Houston Law School, the Wharton School of Business, and Yale Law School.  In 2002, I co-taught a four-

credit course on insurance and tort law at Harvard Law School with Professor David Rosenberg. In April of 2002, I was a speaker at an ALI-ABA program on United States Litigation in London, England (other speakers included Justice Sandra Day O'Connor, Judge Jack B. Weinstein, Professor Arthur Miller, and Professor Geoffrey Hazard). In 2002, 2003, and 2004, I taught classes on insurance and mass tort liabilities at the University of Pennsylvania Law School with Professor Geoffrey Hazard and United States Court of Appeals Judge Anthony Scirica.

13.    In preparation of this Report, I reviewed Third-Party Plaintiffs' Second Amended Third-Party Complaint, and other documents identified in the list attached as Exhibit A. Based on that review, and my knowledge, training, education, and over forty-nine years of insurance industry experience, I am able to render opinions with respect to certain matters that I understand are relevant to this action.

## III.    OPINIONS REGARDING CGL INSURANCE GENERALLY

### A.    CGL Insurance Provides Broad Coverage to the Policyholder.

14.    Prior to 1941, liability insurance was publicly available only by purchasing policies covering specified hazards. Like patrons in a cafeteria, policyholders purchased only those individual coverages that they wished to buy *a la carte*. There were, among others, policies tailored solely to cover operations on defined premises, contractual liability, manufacturer's liability, or products liability. Thus, a manufacturer insured particular risks by selecting from among the available coverages only those it considered to be relevant to its particular circumstances.

15.    In March 1941, this changed when the insurance industry announced the creation of a liability policy heralded as covering "all hazards." This new CGL policy combined into a

single policy all of the coverages formerly available only by purchase of separate coverages.

16.     CGL insurance is designed to cover all risks arising out of claims for third-party bodily injury or property damage unless specifically excluded.  It was intended to cover all such risks arising out of a policyholder's premises, products, completed operations, and personal injury exposure.

17.     CGL policies include two fundamental obligations on the part of the insurer. First, subject to the terms and conditions of the particular CGL policy, the insurer agrees to pay directly or to reimburse the policyholder's payment of any settlement, judgment, or other award of damages for which the policyholder is responsible (sometimes referred to as "paying indemnity").  Second, at the primary or "working" layer (and sometimes the "umbrella" layer), the insurer accepts the duty to defend, which was intended to apply as soon as a claim is made or a suit is brought against the policyholder by a third party and thus to provide protection against the costs of the policyholder's defense.  Such costs (known in the insurance industry as "defense costs" or "costs of defense") typically include, but are not limited to, attorneys' fees, court reporters' fees, investigators' fees, and experts' fees.  That was certainly true of insurance policies using standard CGL policy form or policy language prepared by ISO and its predecessors from the 1950s to the 1980s, and it remains true of many CGL policies underwritten today.

**B.     U.S. Policyholders Layered CGL Policies to Manage Risk.**

18.     The policy above the primary policy is frequently known as an "umbrella" liability policy.  In addition to providing coverage above underlying coverage, umbrella liability policies sometimes provide coverage for types of liability not included in the primary policy, often only after the insured has paid a "self-insured retention."  In that sense, an umbrella

liability policy may — in certain respects — act like a primary policy.

19.    In a typical CGL tower, the policies that sit on top of umbrella liability policies are known as "excess" liability policies.  Typically, excess liability policies expressly incorporate all of the significant terms, conditions, and provisions (including insuring agreements) contained in the underlying policy or policies, but with additional limits.  An excess liability policy will not respond to a liability unless and until the limits of the policy that sits immediately beneath it have been exhausted.

**C.    Types of Documents Evidencing Missing CGL Policies.**

20.    Secondary evidence of insurance coverage comes in a number of forms that are relevant to this litigation.  With regard to policies from the 1940s, 1950s, and 1960s, it was very rare that anybody had copies of the actual policies.[1]  This led to the creation of the field of insurance archaeology, in which experts are retained to find policies or evidence of policies from these periods.  In most cases, neither insurers, nor policyholders, nor brokers retained copies of these policies.  Because the U.S. Navy required evidence of insurance for companies doing business with it, the Navy has been a fertile field for insurance archaeologists.  The existence of insurance policies often is evidenced by the following types of documents:

- Insurance company records, including underwriting materials, claims records, correspondence, premium records, and, in some cases, other policies issued by that insurer.

- Insurance broker documents, including certificates of insurance, invoices, claims records, and correspondence.  Certificates of insurance are brief summaries confirming the details of coverage used to affirm and certify to third parties that insurance is in

---

[1] After the advent of long-tail continuous exposure claims, insurers, policyholders, and brokers adopted practices to retain policies indefinitely.

effect.  They are typically signed and issued by either a representative of the insurance company or a broker.  In cases where the broker issues the certificate of insurance, it typically would also send a copy of the certificate to the insurer, providing the insurer with the opportunity to correct the certificate or deny that it issued a policy.

- Policyholder records, including logs of insurance, evidence of premium payments, accounting records, and correspondence between the policyholder and various parties such as the insurer or insurance broker.

- Specimen policy forms and insurer underwriting manuals or internal memoranda. Because most U.S. insurers use standard-form policy provisions developed by ISO on behalf of (and by representatives of) member and subscriber companies, sample copies of an insurer's policy forms provide reliable proof of the terms and conditions of missing or lost policies.  In addition, because most insurers use prefixes or numerical codes as part of their policy numbering system to identify the particular kind of coverage and specimen policy form used, a policy number containing such prefixes provides additional evidence of policy terms.  By extension, underwriting manuals or internal memoranda describing policy placing practices can provide additional information about the terms or conditions of missing or lost policies.

- Schedules of underlying insurance in excess or umbrella insurance policies.  Excess and umbrella policies typically have schedules that identify and list underlying insurance policies and are a clear indication that such underlying insurance existed (particularly as respects underlying primary insurance).  If an underlying policy varied materially from a standard-form CGL policy, the schedule would normally reflect that variation.

### D. U.S. Insurers Used Form Language in Their CGL Policies.

21.     The ability of the insurance industry to create standardized policy forms is important to allow for the mass marketing of insurance products, and, in turn, the existence of standardized policy terms and forms allows the insurance industry to perform actuarial analyses of statistics on claims presented under a given policy form. These analyses allow the industry to "rate" certain classes of risks and thus to calculate insurance rates — or "premiums" — efficiently and on an "apples to apples" basis.

22.     Primary CGL insurance is standardized and drafted by insurance industry groups that have traditionally been called "rating bureaus." The insurance industry drafting groups included members of major property casualty insurance companies in the U.S. These groups were committees operating under the auspices of insurance industry rating bureaus, including the Insurance Rating Board and its predecessor created in the 1930s, the National Bureau of Casualty Underwriting (collectively, the "IRB"); the Mutual Insurance Rating Bureau ("MIRB"); and others. The IRB, MIRB, and others merged in the early 1970s to form ISO, and henceforth, I will refer to all insurance industry rating groups as ISO.

23.     In 1941, ISO's drafting committees created the first standard-form CGL policy form. Thereafter, ISO revised the standard CGL policy form periodically, issuing updated CGL policy forms for use throughout the U.S. in 1943, 1947, 1955, 1966, 1973, 1986, and periodically thereafter. In drafting an updated CGL policy form, the drafting committees sought to satisfy the demands of the insurance-buying public for additional or broader coverages, to resolve ambiguities or inconsistencies created by the application of the form, and to address issues made apparent by court decisions interpreting prior CGL forms.

24.     During the time periods at issue in this case, most policyholders tended to

purchase coverage through a broker who would work continuously with that policyholder over the course of many insurance policies. The brokers would develop close working relationships with certain insurance companies. Because of these factors, it was very common for policyholders, through their brokers, to be offered renewals of their insurance on the same terms, conditions, and limits. Standard practice was for policyholders to renew their coverage with the same insurer on the same terms, conditions, and limits. Some policyholders would occasionally move from one insurer to another, but such moves were rare, particularly compared to the insurance market today.

> **E.    Standardized Form CGL Policy Language May Be Used to Establish the Terms and Conditions of Missing Insurance Policies.**

25.    It is common in cases involving coverage for "long-tail claims" — including the underlying environmental liabilities in this case — for policyholders and insurers not to be able to find copies of insurance policies purchased decades ago. In fact, an entire field known as "insurance archaeology" developed with the advent of asbestos and environmental liability in the late 1970s.

26.    A common issue in insurance coverage litigation over the past three decades has been coverage for long-tail claims in which the injury or damage activates, or "triggers," insurance coverage of policies issued successively over time. This happens because prior to the mid-1980s, most CGL insurance policies were standard-form "accident" or "occurrence" policies that are activated, or "triggered," by property damage or bodily injury that takes place during the policy period. Such policies are different from "claims-made" insurance (*e.g.*, modern environmental impairment liability insurance), under which only claims made against the policyholder during the policy period trigger coverage.

27.    In cases involving long-tail claims where insurance contracts are missing or lost,

insurers, brokers, and policyholders often use various forms of "secondary evidence" to establish the policies' issuance, limits, and terms.

28.     In my experience, insurers often rely on standardized insurance policy forms and terms to establish the terms of missing or incomplete CGL insurance policies.  Primary, umbrella, and excess CGL policies in the 1950s, 1960s, and 1970s varied from policy to policy very little in their terms and instead tended to use standard language, for the reasons explained above.  Primary and excess insurers competed with each other over the premium charged, but typically did not compete over the terms of coverage because those terms were standardized and congruent across insurers and their respective policies in a given time period.  Typically, excess insurance policies incorporated the same basic exclusions and other terms and conditions as the underlying policy or policies.

29.     In the 1950s, 1960s, and early 1970s, standardized form CGL policies did not exclude coverage for environmental losses.  Indeed, I am unaware of any insurer excluding coverage for environmental losses during this time period, and standard form exclusions for environmental losses were not in use prior to the 1980s.  During the 1970s, there were some common forms of environmental exclusions not applicable in this case.

## IV.    OPINIONS REGARDING COVERAGE ISSUED TO NWMIW

### A.    *St. Paul Has a Duty to Defend Pursuant to Comprehensive General Liability Policies it Issued to Northwest Marine Iron Works for the Period from June 1, 1954 through July 1, 1972.*

30.     In my experience, the custom and practice in the insurance industry would lead an experienced claim handler to conclude that St. Paul Mercury Indemnity Company and St. Paul Fire & Marine Insurance Company (together, "St. Paul") issued primary CGL insurance coverage, including a broad duty to defend, to Northwest Marine Iron Works ("NWMIW") from

February 11, 1957, to July 1, 1972 (collectively, the "Lost St. Paul CGL Policies").  An experienced claim handler would, based on industry custom and practice, further conclude that the Lost St. Paul CGL Policies had per-occurrence limits for third-party property damage of $300,000, with annual property damage aggregate limits of $300,000, in substantially the form of St. Paul Policy No. 1419213 and specimen St. Paul CGL policy forms which St. Paul has produced in this litigation.  *See* STP0001-STP0016; STP00001- STP00014; STP00019-STP00026.  As such, an experienced claim handler would also conclude based on industry custom and practice, that the Lost St. Paul CGL Policies require St. Paul to defend NWMIW against claims "outside of limits," meaning that defense costs do not erode the limits of the Lost St. Paul CGL Policies, but rather are covered in addition to those limits.

31.    The foregoing opinions are based upon, in addition to my nearly fifty years of experience in the insurance industry, the following information:  (a) St. Paul Policy No. 1419213; (b) a certificate of insurance identifying St. Paul Policy No. 504JA1276, issued for the policy period February 11, 1957 to February 11, 1960; (c) a Risk Management Program proposal created by Marsh & McLennan for NWMIW in 1972; (d) a 1967 placement slip for excess coverage, (e) NWMIW's 1970 application for excess insurance coverage; and (f) a ledger of NWMIW's insurance policies created by NWMIW employee Dale Weitzel in 1980.

32.    I understand that St. Paul Policy No. 1419213 was obtained by the Third-Party Plaintiffs ("TPPs") from the archive records of the Department of the Navy.  *See* STP0001-STP00016.  I also understand that St. Paul issued this policy for the policy period of February 11, 1954 to February 11, 1957.  *See* Opinion and Order, at 6, Jan. 27, 2012 [Dkt. No. 392].  The policy contains property damage limits of $100,000 each accident and $100,000 in the aggregate and the following defense provision:

> As respects such insurance as is afforded by the other terms of this policy the Company shall
>
> (a)   defend in his name and behalf any suit against the Insured alleging such injury sickness or disease, damage or destruction and seeking damages on account thereof, even if such suit is groundless, false or fraudulent; but the Company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the Company;

STP0002.  I understand that St. Paul has a duty to defend TPPs under this policy.  Opinion and Order, Dec. 26, 2012 [Dkt. No. 452].

33.    The records TPPs obtained from the Navy show that NWMIW maintained its primary CGL insurance with St. Paul after the expiration of Policy No. 1419213.  Jewett, Barton, Leavy & Kern ("JBLK"), an insurance agent and broker, subsequently issued a certificate of insurance dated January 24, 1957, for St. Paul Fire & Marine Insurance Company Policy No. 504JA1276 for policy period February 11, 1957 to February 11, 1960.  STP0017.  The certificate identifies the limits of Policy No. 504JA1276 for property damage as $300,000 each accident and $300,000 in the aggregate.  *Id.*  JBLK also signed this certificate as St. Paul's authorized agent.

34.    The available evidence shows that NWMIW also maintained coverage with St. Paul during the interim between Policy No. 504JA1276 (February 11, 1957 to February 11, 1960) and 1967.  In my experience, during the 1950s to 1970s, it was habit in the industry for an insured and its broker to continue coverage with the same carrier without even considering other carriers.  Indeed, this may have led NWMIW to ask Marsh & McLennan to conduct the 1972 study in order to review other options that may not have been previously considered.  Here there is no evidence that NWMIW obtained (or tried to obtain) coverage from any other insurer during this period.

35.     On the contrary, NWMIW's records confirm that it maintained coverage with St. Paul between 1960 and 1972.  In March and April 1980, NWMIW employee Dale Weitzel created a ledger of all of NWMIW's insurance (not just its CGL policies) in response to a series of asbestos incidents involving NWMIW's employees.  Tr. of Dep. of Dale Weitzel ("Weitzel Tr."), at 19:12-21.  The majority of the policies identified in Mr. Weitzel's ledger as issued to NWMIW between the mid-1950s and early 1970s were written by St. Paul.  *See* MG215482-MG215484.  Mr. Weitzel's ledger identifies Policy No. 1419213, under which the Court has already held St. Paul has a duty to defend.  MG215483.  The ledger identifies only the February 11, 1955 to February 11, 1956 and February 11, 1956 to February 11, 1957 policy years of Policy No. 1419213.  *Id.*  Because TPPs have located a copy of this policy, however, we know that it was issued for a three-year period from February 11, 1954 to February 11, 1957.  Mr. Weitzel's ledger identifies St. Paul Policy No. 504JF2428 as issued to NWMIW.  *Id.*  The ledger identifies the policy period of Policy No. 504JF2428 as May 31, 1963 to May 31, 1964.  *Id.*  Given, however, that from 1954 to 1978 NWMIW purchased several three-year policies which are identified in Mr. Weitzel's ledger by single years (for example, Policy No. 1419213, as described above), Policy No. 504JF2428 was likely also issued as a three-year policy for the period May 31, 1962 to May 31, 1965.  This is consistent with my knowledge of insurance underwriting at the time.  It was common for insurers to provide three-year policies.  These policies were to the mutual advantage of insurers and policyholders to build a three-year business relationship.  Insurers sought to retain clients year after year and limit the transaction costs on both parties to underwrite and issue policies.  Policyholders sought and received continuous coverage.  In keeping with this approach, as described previously, terms would be constant (or near-constant) over time, and the insurer would treat three-year policies as providing separate

annual limits. Additionally, Mr. Weitzel's ledger identifies St. Paul Policy No. 504-JH-5407 as NWMIW's CGL policy covering July 1, 1966 to July 1, 1972. MG215484. In the ledger, Mr. Weitzel identifies St. Paul Policy No. 504-JH-5407 as a policy which Mr. Weitzel and NWMIW had on hand at the time Mr. Weitzel created the ledger. *Id.*

36. Records of an insurance review conducted by Marsh & McLennan in 1972 show that St. Paul was NWMIW's primary general liability carrier in early 1972. TPPs located a Risk Management Program report drafted by Marsh & McLennan in response to NWMIW's request that it "make a complete study of the existing program for the purpose of taking a 'fresh look' and providing an analysis of the risk including suggestions for a total risk management program." MG213904-MG213919, at MG213907. Marsh & McLennan conducted this study in the spring of 1972. *Id.* The report describes NWMIW's coverages for various liabilities. A page dedicated to NWMIW's general liability coverage identifies St. Paul Fire & Marine Insurance Company as NWMIW's carrier under the column "Present." The report identifies the limits of the St. Paul property damage coverage as $300,000 each occurrence and $300,000 in the aggregate. Because Argonaut Insurance Company became NWMIW's primary CGL carrier starting July 1, 1972, ARG 00003, it is likely that NWMIW's last St. Paul primary CGL policy expired July 1, 1972.

37. Marsh & McLennan's report is confirmed by references to St. Paul's coverage in excess insurance documents. A placement slip for thirty-six months of various excess liability coverages beginning on June 8, 1967 was found in the records of a Lloyd's syndicate that subscribed to certain policies issued to NWMIW. LMI 01153-LMI 01154; *see also* Tr. of 30(b)(6) Dep. of Eileen Gentle, at 28:25-29:6 (identifying the syndicates records as the likely source of the placement slip). The placement slip identifies the underlying general liability

carrier at St. Paul with policy limits as $300,000 per occurrence and $300,000 aggregate for property damage coverage.  LMI 01153.  The contents of the placement slip were provided by NWMIW to its broker at the time.  Tr. of 30(b)(6) Dep. of Richard Youell ("Youell Tr."), at 57:13-17.  The Lloyd's underwriters would have relied on the accuracy of this information from NWMIW and its broker in rating and issuing excess coverage.  Youell Tr. at 55:12-16.

38.    The years and limits of the St. Paul coverage are further confirmed by NWMIW's 1970 application for an umbrella policy found in the files of the Insurance Company of the State of Pennsylvania ("ICSOP"), NWMIC's umbrella insurer from 1970 to 1978.  ICSOP0089-ICSOP0091.  The application contains a schedule of primary policies, under which NWMIW listed its CGL carrier as St. Paul with a $300,000 limit for property damage.  ICSOP0090.  A handwritten note references an attached audit sheet.  *Id.*  The attached St. Paul Mercury Insurance Company Report of Audit identifies St. Paul Policy No. 504 JH 5407 with policy period July 1, 1968 to July 1, 1969.  This $300,000 limit is consistent with the earlier London placement slip and all other available information regarding St. Paul's coverage.

39.    The Marsh & McLennan report -- combined with the ICSOP application and attached Audit Report and the London placement slip -- would lead an experienced claim handler to conclude that St. Paul was NWMIW's primary CGL carrier from 1967 to 1972, issuing policies with $300,000 limits of property damage coverage.

40.    The fact that St. Paul was not able to locate copies of policies issued to NWMIW for the period 1957 to 1972 is not convincing evidence that St. Paul did not issue policies during that period.  Lori Lauf, a paralegal at Travelers who conducted and managed St. Paul's searches for policies issued to TPPs, did not expect to find these policies because St. Paul did not maintain its files from that period.  Tr. of Dep. of Lori Lauf, at 23:9-19, 25:13-16, 28:15-20, 49:12-16,

57:22-58:20.  St. Paul would have destroyed all of its files from that time period pursuant to document retention policies that were in effect in the 1970s and 1980s.  Tr. of March 18, 2014, Dep. of Thomas M. Hornbeck ("Hornbeck Tr."), at 52:10-15, 60:11-19.

41.    An experienced claim handler would conclude that St. Paul issued the following policies to NWMIW:

| Policy Number | Policy Period | Property Damage Limit |
|---|---|---|
| 1419213 | February 11, 1954 - February 11, 1957 | $100,000 |
| 504JA1276 | February 11, 1957 - February 11, 1960 | $300,000 |
| Unknown | February 11, 1960 - May 31, 1962 | $300,000 |
| 504JF2428 | May 31, 1962 - May 31, 1965 | $300,000 |
| Unknown | May 31, 1965 - July 1, 1966 | $300,000 |
| 504JH5407 | July 1, 1966 - July 1, 1972 | $300,000 |

42.    These policies issued by St. Paul to NWMIW from 1954 to 1972 would have contained a duty to defend.  In my experience, all CGL policies in that time period contained a duty to defend.  Moreover, St. Paul's corporate designee confirmed that he is not aware of any St. Paul policies from the 1960s or 1970s that did not contain a duty to defend.  Hornbeck Tr., at 58:3-11.  This is confirmed by the policy forms that may have been used by St. Paul from 1954 to 1972, all of which contained a duty to defend.  *See* STP00001-STP000014;STP00019-STP00026.

**B.**    ***St. Paul is Obligated to Pay Defense Costs Under Ship Repairer's Liability Policies it Issued to Northwest Marine Iron Works from before February 1, 1953 to as Late as March 1, 1973.***

43.    St. Paul issued ship repairer's legal liability Policy No. PH-0213 to NWMIW effective February 1, 1953.  St. Paul refuses to acknowledge that it issued this policy.  *See*

Hornbeck Tr. at 79:1-17.

44.      The first page of Policy No. PH-0213 identifies it as "Replacing Policy No. 47/3956."  MG203650.  In my experience, when a policy identifies another policy that it is "replacing," the replaced policy was issued by the same carrier and contains very similar terms and conditions.  Even St. Paul acknowledges that only "a minority" of policies identify a "replaced" policy issued by a different carrier.  Hornbeck Tr. at 80:8-81:17.

45.      The policy is effective "continuously until cancelled."  MG203650.  St. Paul has not located any evidence that the policy was ever cancelled.  Hornbeck Tr. at 82:23-83:5.  The earliest primary SRL policy issued to NWMIW by an insurer other than St. Paul incepted on March 1, 1973.  *See* LMI 00288.  The parties have not identified any evidence of any other SRL coverage issued to NWMIW during this time.  Accordingly, St. Paul likely would have continued to provide primary SRL coverage until March 1, 1973.

46.      The policy provides that St. Paul will not pay more than $300,000 "for any one accident or casualty or disaster or any combination of said accidents, casualties, or disasters." MG203652.

47.      The 1970 application for excess insurance with ICSOP identifies St. Paul as NWMIW's primary SRL provider, up to a limit of $300,000.  ICSOP 0091.  The accompanying memo identifies that primary policy as Policy No. 388FA0202 with a continuous policy period. ICSOP 0092.  While to my knowledge the parties have not located a copy of Policy No. 388FA0202, it likely contains the same relevant terms and conditions as Policy No. PH-0213.  Indeed, the memo confirms that it contains the same continuous policy period and $300,000 limit.  ICSOP 0092.  This is consistent with the custom during this time period for policies to be renewed according to the same or very similar terms and conditions.

48.    Marsh's 1972 Risk Management Program report also identifies St. Paul as NWMIW's then-current ship repairer's liability provider.  MG213916.  The report also states that Marsh anticipates NWMIW "continuing [ship repairer's liability] coverage with the St. Paul Fire & Marine Insurance Company."  MG213916.

49.    Policy No. PH-0213 provides:

> This insurance also covers the legal liability of the Assured as ship repairers for loss or damage to property of others within the port where their plant is located, or where such repairs are being carried out, caused by vessels, craft, and their cargoes which are in their care, custody or control for the purpose of repair, or by the Assured's employees while working on such vessel or craft.

MG203651.

50.    Policy No. PH-0213 also requires St. Paul to pay for defense costs based on alleged liability for covered claims:

> The cost of defending any suit against the Assured or any claim based on a liability or an alleged liability of the Assured covered by this insurance shall be payable by the Assurers, but these Assurers shall not be liable for the cost or expense of prosecuting any suit unless the same shall have been incurred with the written consent of the Assurers.  The Assurers, however, reserve the right to conduct the defense of any actions or suits at their own expense.

MG203653 (Clause 15).  This provision is similar to the broad duty to defend, described above, contained in general liability policies during the same time period, except that it requires St. Paul only to pay for the costs of the insured's defense, not assume the defense -- which it may do at its option.  According to the custom and practice of the insurance industry, the consent portion of this defense provision requires (1) the insured to provide timely notice of claims to St. Paul and (2) limits St. Paul's obligation to reimburse to only reasonable costs of defense.  Such provision, according to industry custom and practice, is not interpreted by experienced claim handlers to allow an insurer to deny its obligation to pay defense costs.

51.     Based on the material provided to me, I have seen no allegations against TPPs in any of the underlying proceedings to rule out the possibility that TPPs are alleged to be liable for damage to the property of others in the Portland Harbor caused by vessels, craft, their cargoes, or the TPPs' employees while working on such vessels or craft.  On the contrary, I understand that ship repairs were NWMIW's primary operations.  *See, e.g.*, Memo. in Supp. of TPPs' Mot. for Summ. J. at 2 ("[NWMIW] conducted industrial operations including ship repairs . . . beginning in 1950.").  Accordingly, an experienced claim handler would conclude that TPPs' alleged liabilities are potentially covered by Policy No. PH-0213, triggering St. Paul's obligation under Clause 15 to pay defense costs.

### C.     The Water Quality Insurance Syndicate Issued Policies that Covered Northwest Marine Iron Works from August 19, 1981 to April 14, 1989 and Obligate the Syndicate to Pay Defense Costs.

#### 1.     NWMIW purchased Water Quality Insurance Syndicate policies from August 19, 1981, through April 14, 1989.

52.     TPPs have located six policies issued by the Water Quality Insurance Syndicate ("WQIS") to NWMIW for policy periods from August 19, 1981 to August 19, 1983.  WQIS issued Policy No. 10-4256 02 to NWMIW with policy period August 19, 1981 to August 19, 1982.  *See* MG202474.  WQIS subsequently issued Policy No. 10-4256 03 with policy period August 19, 1982 to August 19, 1983.  *See* MG202482.

53.     TPPs have also located policies issued by WQIS to NWMIW for policy periods from August 19, 1985 to April 14, 1989.  WQIS issued Policy No. 10-4256 06 to NWMIW for policy period August 19, 1985 to August 19, 1986.  *See* NWM208190.  WQIS issued Policy No. 10-4256 07 to NWMIW for policy period August 19, 1986 to August 19, 1987.  *See* NWM208221.  WQIS issued Policy No. 10-4256 08 to NWMIW for policy period August 19, 1987 to August 19, 1988.  *See* MG216439.  And WQIS issued Policy No. 10-4256 09 to

NWMIW for policy period August 19, 1988 to August 19, 1989.  *See* MG213264.  Policy No. 10-4256 09 was subsequently cancelled effective April 14, 1989.  *See* MG216601.

54.    Based on my experience in the insurance industry, an experienced claim handler would conclude that WQIS almost certainly issued to NWMIW policies numbered "10-4256 04" and "10-4256 05" for the missing policy periods from August 19, 1983 to August 19, 1985.  First, the successive policy numbering indicates the existence of missing policies ending in -04 and -05 suffixes.  Second, WQIS is a specialty insurer providing coverage that is not readily available on the commercial market from other insurers.  Indeed, many of those insurers instead subscribed to WQIS policies and so would not have sold their own policies.  Finally, the terms of the WQIS policies before and after the missing period are substantially the same, indicating continuity.  Indeed, TPPs located a letter dated July 30, 1985, from Marsh & McLennan altering NWMIW that WQIS Policy No. 10-4256 05, as issued for policy period August 19, 1984 to August 19, 1985, was set to expire.  *See* NWM208202.

55.    WQIS's inability to locate these policies does not indicate that they were not issued.  WQIS's records also did not contain copies of the policies that TPPs did locate.  WQIS also did not expect to find copies of any policies it issued before 1992, including policies that have been confirmed.  Tr. of Dep. of Harry Diamond ("Diamond Tr."), at 78:3-13.  WQIS only maintained copies of policies for seven years until its recent transfer of all of its files to the ImageWrite program.  Diamond Tr., at 41:10-42:8.  In fact, WQIS's designee testified that the terms and conditions of the missing policies could be identified by "interpolation" from the terms of policies on hand.  This is consistent with the understanding and practice within the industry.  Therefore, an experienced claim handler would conclude that WQIS issued policies to NWMIW for the entire period from August 19, 1981 through April 14, 1989 (collectively, the "WQIS

Policies").

**2.      The WQIS Policies require WQIS to pay TPPs' defense costs.**

56.      The WQIS Policies contain two coverage sections.  Section A provides coverage

related to the Federal Water Pollution Control Act Amendments of 1972.  The final paragraph of

Section A reads:

> The Insurers also agree to indemnify the Assured for costs, charges
> and expenses incurred in defending against any liability insured
> against hereunder, subject to all of the GENERAL CONDITIONS
> AND LIMITATIONS of this SECTION A.

MG202468; MG202487; NWM208193; NWM208224; MG216442; MG213267.  This provision

is the same in all of the WQIS Policies.  Diamond Tr., at 95:19-96:4.

57.      Section B of the WQIS Policies provides coverage for pollution:

> [T]he Insurers do hereby agree to indemnify the Assured for such
> amounts as the Assured shall, as owner or operator of the Vessel
> named on the Declarations page, have become liable to pay and
> shall pay, in consequence of the sudden and accidental discharge,
> emission, spillage or leakage upon or into the seas, waters, land or
> air, of oil, petroleum products, chemical or other substances of any
> kind or nature whatsoever.

MG202469; MG202488; NWM208194; NWM208225; MG216443; MG213268.

58.      Section B(2) of the WQIS Policies obligates WQIS to pay defense costs.

Diamond Tr., at 110:13-16.  Section B(2) reads:

> The Insurers also agree to indemnify the Assured for costs, charges
> and expenses incurred in defending any claim or suit against the
> Assured arising out of a liability or an alleged liability of the
> Assured covered by this SECTION B, subject to the prior written
> consent of the Insurers who shall have the option of naming the
> attorneys in any such defense and subject further to the conditions
> and limitations contained herein.

MG202469; MG202488; NWM208194; NWM208225; MG216443; MG213268.

59.      As described in relation to the St. Paul shiprepairer's policies in Paragraph 50,

according to the custom and practice of the insurance industry, the consent portion of this

defense provision (1) requires the insured to provide timely notice of claims to WQIS and (2)

limits WQIS's obligation to reimburse to only reasonable costs of defense.  Industry custom and

practice is not to ask a denying insurer for its consent to incur defense costs the insurer has

already stated it will not repay.  Indeed, such a request could potentially waive attorney-client

privilege.  Such provisions are not interpreted by experienced claim handlers, according to

industry custom and practice, to allow an insurer to deny its obligation to pay for defense of

covered claims.

60.     In addition to the coverage provided by Sections A and B, WQIS Policy Nos. 10-

4256 06, 10-4256 07, 10-4256 08, and 10-4256 09 contain an endorsement providing coverage

for liability imposed on NWMIW pursuant to the Comprehensive Environmental Response,

Compensation, and Liability Act of 1980 ("CERCLA"):

> [T]he Insurers do hereby agreed to indemnify the Assured for such
> amounts as the Assured shall, as Builder, Repairer or Scrapper, as
> the case may be, of the Vessels declared as provided for in the
> policy, have become liable to pay and shall pay, by reason of or
> with respect to any liability imposed on the Assured pursuant to
> Section 107(a)(1) of [CERCLA].

NWM208197; NWM208217; MG216436; MG213260.

61.     The CERCLA Endorsement of WQIS Policy Nos. 10-4256 06, 10-4256 07, and

10-4256 09 provides that WQIS shall pay defense costs for CERCLA claims:

> The Insurers shall not be liable to indemnify the Assured for any
> costs, charges or expenses incurred in investigating, or defending
> against any claim insured against under this Endorsement unless
> the same shall have been incurred with the written consent of the
> Insurers, who shall have the option of naming the attorneys in such
> defense.  Any such costs, charges or expenses shall be paid by the
> Insurers in addition to the limit of liability set forth in "1" above.

NWM208198; NWM208218; MG213261.

62.     As described above, WQIS is obligated to pay NWMIW's defense costs under each of the coverages provided by the WQIS Policies.  Accordingly, an experienced claim handler would conclude that all of the WQIS Policies, including Policy Nos. 10-4256 04 and 10-4256 05 for which TPPs have not located copies, contained a duty to pay defense costs.

### D.     The Insurance Company of the State of Pennsylvania Owes a Share of TPPs' Defense Costs

63.     ICSOP issued umbrella policies to NWMIW from 1970 to 1978.  Three of these policies, Policy Nos. 4573-1771, 4576-1950, and 4577-2144 (the "ICSOP Policies"), *see* ICSOP000019- ICSOP000038, ICSOP000051- ICSOP000066, and ICSOP000070-ICSOP000087, covered NWMIW for policy years in which NWMIW's primary CGL carrier was the Home Insurance Company ("Home").  Specifically, Home was NWMIW's primary CGL carrier between July 1, 1975 and July 1, 1978.  *See, e.g.*, NU000845-NU000941, NU000705-NU000750, and NU000290-NU000291.

### 1.     ICSOP Has a Duty to Defend TPPs Pursuant to its Umbrella Policies Sitting Above Primary Policies Issued by the Insolvent Carrier Home.

64.     The ICSOP Policies contain a "Defense Endorsement" that reads as follows:

> In consideration of the premium provided, it is understood and agreed that in the event there be no underlying insurance against loss or claim covered by this Policy, the Company agrees to defend in his name and behalf any suit against the Assured alleging Personal Injury, including death at any time resulting therefrom, or property damage and seeking damages on account thereof or seeking damages by reason of a contract under which the Assured assumed or is alleged to have assumed liability of others therefor, even if such suit is groundless, false or fraudulent; but the Company shall have the right to make such investigation, negotiation and settlement of any such claim or suit as may be deemed expedient by the Company.

ICSOP000027; ICSOP000062; ICSOP000081.

65.     ICSOP's designee testified that ICSOP is required to defend its insured, pursuant

to this defense endorsement, whenever (1) a claim is covered by the ICSOP policy and (2) "there

be no underlying insurance."  Tr. of Dep. of Joshua Meir Fine ("Fine Tr."), at 72:13-73:11.

According to the testimony of ICSOP's designee, "there be no underlying insurance" when the

underlying insurance is "not available."  Fine Tr., at 40:11-14.

66.    Home is insolvent and has been since before 2008.  Fine Tr., at 92:9-11.[2]

Therefore, according to ICSOP's designee, the primary policies issued by Home are not

available to TPPs to pay claims and ICSOP has a duty to defend.

**2.    ICSOP Is Obligated to Pay Defense Costs as Ultimate Net Loss.**

67.    Section I. ("Coverage") of the ICSOP Policies provides that ICSOP will:

> indemnify the Assured for all sums which the Assured shall be
> obligated to pay by reason of the liability
>
>> (a) imposed upon the Assured by law
>>
>> . . .
>
> for damages, direct or consequential and expenses, all as more
> fully defined by the term "ultimate net loss" on account of
>
>> . . .
>>
>> (ii) Property Damage
>>
>> . . .
>
> caused by or arising out of each occurrence happening anywhere in
> the world.

ICSOP 000021; ICSOP 000053; ICSOP 000072.

68.    Section 6 of the ICSOP Policies' Definitions defines "Ultimate Net Loss" as:

> the total sum which the Assured, or any company as his insurer, or
> both, become obligated to pay by reason of personal injury,
> property damage or advertising liability claims, either through

---

[2] Indeed, The Home Insurance Company was placed in liquidation by order of the Merrimack County Superior Court dated June 13, 2003.

> adjudication or compromise, and shall also include . . . law costs,
> . . . expenses for . . . lawyers, . . . and investigators and other
> person, and for litigation, settlement, adjustment and investigation
> of claims and suits which are paid as a consequence of any
> occurrence covered hereunder . . . .

ICSOP 000021; ICSOP 000053; ICSOP 000072.  An experienced claim handler would conclude

that ICSOP has a duty to contribute to TPPs' defense costs as part of Ultimate Net Loss.

## V.    CONCLUSIONS

69.    Based on my industry experience and the documents I reviewed, I believe that an

experienced claim handler would conclude the following:

a.    St. Paul issued CGL policies to NWMIW containing a duty to defend

covering the period June 1, 1954 to July 1, 1972.

b.    St. Paul issued SRL policies to NWMIW beginning sometime before

February 1, 1953 and continuing until March 1, 1973 with policy limit of

$300,000.  These policies do not contain a duty to defend, but they do require St.

Paul to pay defense costs.

c.    WQIS issued policies to NWMIW covering the period August 19, 1981 to

April 14, 1989.  These policies contain a duty to pay NWMIW's defense costs.

d.    ICSOP issued umbrella policies to NWMIW that sit above policies issued

by the insolvent carrier Home for July 1, 1975 to July 1, 1978.  Because Home is

insolvent, ICSOP is required to participate in the defense with the primary

insurers.

70.    I am being compensated at my standard hourly rate of $600.

*        *        *

Date:  March 10, 2015

Respectfully submitted,

Dennis R. Connolly

## Exhibit A

Documents Reviewed in Preparation of the Expert Report of Dennis Connolly

| Document Description | Date | Beginning Bates No. | Ending Bates No. |
|---|---|---|---|
| Northwest Marine's Second Amended Answer, Affirmative Defenses, and Counterclaims to Complaint for Declaratory Judgment and Third-Party Complaint (Dkt. No. 153) | Feb. 1, 2010 | | |
| Opinion and Order (Dkt. No. 392) | Jan. 27, 2012 | | |
| Opinion and Order (Dkt. No. 452) | Dec. 26, 2012 | | |
| Joint Case Management Order Regarding Resolution of All Issues of Duty to Defend and Pay for Defense (Dkt No. 571) | Nov. 20, 2013 | | |
| Third-Party Defendant Argonaut Insurance Company's Motion for Summary Judgment Seeking Contribution of Past and Future Defense Costs from Agricultural Insurance Company,  Agricultural Excess and Surplus Insurance Company, Insurance Company of North America and St. Paul Mercury Indemnity Company; Memorandum in Support of Motion (Dkt. 469, 471) | Feb. 14, 2013 | | |
| Declaration of Ron Lucchesi in support of Third-Party Defendant Argonaut Insurance Company's Motion for Summary Judgment Seeking Contribution of Past and Future Defense Costs from Agricultural Insurance Company,  Agricultural Excess and Surplus Insurance Company, Insurance Company of North America and St. Paul Mercury Indemnity Company; Exhibits 1-6(Dkt. 470) | Feb. 14, 2013 | | |
| Century Indemnity  Company's Opposition to Third-Party Defendant Argonaut Insurance Company's Motion for Summary Judgment; Exhibit A to Opposition; Stapley Declaration in Support of Opposition (Dkt. 474, 475) | Mar. 7, 2013 | | |
| Opposition of Third-Party Defendants Great American Assurance Company and Great American E&S Insurance Company to Motion of Third-Party Plaintiff Argonaut Insurance Company for Summary Judgment; Declaration of James P. Ruggeri in Support of Opposition (Dkt. 476, 477) | Mar. 7, 2013 | | |
| Exhibit 1 to James P. Ruggeri Declaration in Support of Opposition | Feb. 11, 1957-Feb. 11, 1960 | MG204701 | MG204701 |
| Exhibit 2 to James P. Ruggeri Declaration in Support of Opposition | Mar. 18, 1980 | MG215483 | MG215484 |
| Exhibit 3 to James P. Ruggeri Declaration in Support of Opposition | Oct. 1972 | MG213904 | MG213919 |
| Exhibit 4 to James P. Ruggeri Declaration in Support of Opposition | Feb. 1, 1953 Until Cancelled | MG203649 | MG203667 |
| Exhibit 5 to James P. Ruggeri Declaration in Support of Opposition | Mar. 1, 1975-Mar. 1, 1976 | PMMO_000159 | PMMO_000187 |
| Exhibit 6 to James P. Ruggeri Declaration in Support of Opposition | Mar. 1, 1982-Mar. 1, 1983 | PMMO_000032 | PMMO_000120 |
| Exhibit 7 to James P. Ruggeri Declaration in | Aug. 19,1981- | MG202463 | MG202480 |

| | | | |
|---|---|---|---|
| Support of Opposition | Aug. 19, 1982 | | |
| St. Paul Fire and Marine Insurance Company's Response to Third-Party Defendant Argonaut Insurance Company's Motion for Summary Judgment; Declaration of Andrew S. Moses in Support of Responses (Dkt. 483, 484) | Apr. 17, 2013 | | |
| Third-Party Defendant Argonaut Insurance Company's Reply in support of its Motion for Summary Judgment Seeking Contribution of Past and Future Defense Costs from Agricultural Insurance Company,  Agricultural Excess and Surplus Insurance Company, Insurance Company of North America, and St. Paul Mercury Indemnity Company (Dkt. 488) | May 1, 2013 | | |
| List of Marine Group Insurance Policies | | LMI 01226 | LMI 01231 |
| Cheri Pearson E-mail Attaching Draft Documents Regarding Third Amended Answer, Affirmative Defenses, and Counterclaims to Complaint | Mar. 17, 2011 | LMI 01239 | LMI 01323 |
| Answer, Affirmative Defenses and Counterclaim for St. Paul Fire and Marine Insurance Company to Third-Party Plaintiff's Second Amended Third-Party Complaint (Dkt. 161) | Feb, 16, 2010 | | |
| Third-Party Defendant St. Paul Fire and Marine Insurance Company's Responses to Third-Party Defendants Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company's First Set of Interrogatories | Nov. 18, 2013 | | |
| Transcript of the Deposition of Thomas Hornbeck | Feb. 9, 2011 | | |
| St. Paul Fire and Marine Insurance Company's Response to Third-Party Plaintiffs' Second Request for Production and Interrogatories | Feb. 4, 2011 | | |
| St. Paul Fire and Marine Insurance Company's Response to Argonaut Insurance Company's First Request for Admissions | Feb. 23, 2011 | | |
| Thomas Gordon Letter to Christopher Rycewicz Submitting Policy Documents | Aug. 31, 2009 | | |
| Thomas Gordon Letter to Christopher Rycewicz Submitting Policy Documents | Oct. 12, 2009 | | |
| Thomas Gordon Letter to Christopher Rycewicz Regarding St. Paul Policy Search | Dec. 14, 2009 | | |
| St. Paul Fire and Marine Policy No. PH-0213 | Feb. 1, 1953-Until Cancelled | MG203649 | MG203668 |
| Endorsement from Assistant Industrial Manager, USN, Astoria to Northwest Marine | Mar. 15, 1957 | MG203670 | MG203670 |
| Harry Hollister Letter to Office of Naval Material Regarding Endorsement for St. Paul Policy No. PH-0213 | Mar. 29, 1957 | MG203671 | MG203671 |
| Letter from Office of Naval Material to Northwest Marine Regarding Expiration of St. Paul Policy No. 1419213 | Jan. 10, 1957 | MG203699 | MG203700 |
| Endorsement from Assistant Industrial Manager, USN, Astoria to Northwest Marine | Mar. 15, 1957 | MG203704 | MG203704 |
| St. Paul Policy No. 1419213 | Feb. 11, 1954- | STP0001 | STP0016 |

| | Feb. 11, 1957 | | |
|---|---|---|---|
| St. Paul Policy No. 1419213 Certificate of Insurance | Feb. 11, 1954-Feb. 11, 1957 | MG203697 | MG203697 |
| Workman's Compensation Coverage Chart | Apr. 7, 1980 | MG215482 | MG215484 |
| St. Paul Policy No. 1419213 | Feb. 11, 1954-Feb. 11, 1957 | MG203680 | MG203695 |
| St. Paul Policy No. 504JA1276 Certificate of Insurance | Feb. 11, 1957-Feb. 11, 1960 | MG203701 | MG203701 |
| Assistant Industrial Manager Letter to Chief of Naval Material Enclosing St. Paul Policy No. 504JA1276 | Feb. 26, 1957 | MG203707 | MG203707 |
| Chief of Naval Material Letter to Northwest Marine Acknowledging Receiving Copy of St. Paul Policy No. 504JA1276 | Mar. 21, 1957 | MG203703 | MG203703 |
| Handwritten List of Policy Information | | MG215481 | MG215481 |
| Risk Management Program for Northwest Marine Iron Works and Affiliated Companies | Oct. 1972 | MG213904 | MG213919 |
| Documents Produced by St. Paul | | STP 00001 | STP 00461 |
| Documents Produced by St. Paul | | STP 00716 | STP 01112 |
| Ship Repairer's Legal Liability Subscription Policy JBL&K 441 | Aug. 8, 1969 | NWMAR061479 | NWMAR061481 |
| Megge Van Valkenburg E-mail to Charles E. Albertson with Attachments of Subscription Policies | Oct. 23, 2013 | LMI 01347 | LMI 01435 |
| Water Quality Insurance Syndicate's Answer and Affirmative Defenses to Second Amended Third-Party Complaint (Dkt. 179) | Mar. 11, 2010 | | |
| Third-Party Defendant Water Quality Insurance Syndicate's Response to Third-Party Plaintiff's Second Request for Production and First Set of Interrogatories to Plaintiff and All Third-Party Defendants | Feb. 14, 2011 | | |
| Karen Reed Letter to WQIS Regarding Notice of Claim and Tender of Defense for WQIS Policy No. 10-4256-09 | May 8, 2008 | MG213808 | MG213809 |
| John Woods Letter to Karen Reed Regarding Claims Made on Northwest Marine | May 23,2008 | MG214586 | MG214587 |
| John Woods Letter to Karen Reed Regarding Claims Made on Northwest Marine | May 23,2008 | MG214588 | MG214589 |
| Clyde & Co. Letter to Christopher Rycewicz Enclosing Document Production | Aug. 31, 2009 | | |
| Clyde & Co. Letter to Christopher Rycewicz Regarding WQIS Policy Search | Oct. 19, 2009 | | |
| WQIS Policy No. 10-4256-02 | Aug. 19, 1981-Aug. 19, 1982 | MG202462 | MG292471 |
| WQIS Policy No. 10-4256-03 | Aug. 19, 1982-Aug. 19, 1983 | MG202481 | MG202490 |
| WQIS Policy No. 10-4256-06 | Aug. 19, 1985-Aug. 19, 1986 | NWM208190 | NWM208203 |
| WQIS Policy No. 10-4256-07 | Aug. 19, 1986-Aug. 19, 1987 | NWM208204 | NWM208227 |
| WQIS Insurance Summary for Northwest Marine | Mar. 1, 1989 | MG213256 | MG213256 |
| WQIS Policy No. 10-4256-09 | Aug. 19, 1988- | MG213258 | MG213270 |

3

| | Aug. 19, 1989 | | |
|---|---|---|---|
| WQIS Letter Regarding Immediate Notice Requirement in the Event of a Possible Claim Under the WQIS Policy | | MG213361 | MG213361 |
| Northwest Marine's Letter to Marsh & McLennan Enclosing Six Monthly Report from 2/20/1988-8/19/1988 | Sept. 16, 1988 | NWM208187 | NWM208188 |
| John Woods Letter to Judge Acosta Regarding the 11/12/2013 Proposed Case Management Order | Nov. 14, 2013 | | |
| Documents Produced by WQIS | | WQIS 000001 | WQIS 000492 |
| Third-Party Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies' Answer, Affirmative Defenses, and Counterclaim to Second Amended Third-Party Complaint (Dkt. 209) | Apr. 12, 2010 | | |
| Third-Party Defendants Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company's First Set of Interrogatories to Third-Party Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies and London Market Insurers' Objections and Answers | Nov. 26, 2013 | | |
| Third-Party Plaintiffs' Third Requests for Production and Second Set of Interrogatories to Third-Party Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies with Answers and Responses Thereto | Dec. 5, 2011 | | |
| Third-Party Defendant St. Paul Fire and Marine Insurance Company's First Set of Interrogatories to Third-Party Defendants Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies with Answers Thereto | Dec. 17, 2013 | | |
| Carl Frosberg Letter to Christopher Rycewicz and Hong Huynh Regarding Third Amended Answer, Affirmative Defenses and Counterclaims to Complaint | Mar. 21, 2011 | LMI 01324 | LMI 01328 |
| Christopher Rycewicz Letter to Carl Forsberg re: Dismissal of Policies | Apr. 1, 2011 | LMI 01329 | LMI 01334 |
| Charles Albertson E-mail to Paul Cole Attaching Policy Search Spreadsheet | Dec. 13, 2010 | LMI 01335 | LMI 01340 |
| Charles Albertson E-mail to Christopher Rycewicz Attaching Joint Broker Request to Aon for Policy Copies | May 29, 2013 | LMI 01341 | LMI 01343 |
| Charles Albertson E-mail to Christopher Rycewicz Attaching Updated Joint Broker Request to Aon for Policy Copies | Jun. 6, 2013 | LMI 01344 | LMI 01346 |
| Stipulated Protective Order (Dkt. 217) | Jun. 18, 2010 | | |
| Protective Order Regarding Confidential Mediation/Allocation Information | Jan. 2, 2013 | | |
| Transcript of the Deposition of Harry Diamond with Exhibits 96-113 | Feb. 27, 2014 | | |
| Transcript of the Deposition of Thomas Hornbeck | Mar. 18, 2014 | | |

| | | | |
|---|---|---|---|
| with Exhibits 114-129 | | | |
| Transcript of the Deposition of Lisa Lauf with Exhibits 130-133 | Mar. 18, 2014 | | |
| Transcript of the Deposition of John Glowacki with Exhibits 134-142 | Mar. 20, 2014 | | |
| Transcript of the Deposition of Joshua Fine with Exhibits 143-157 | Apr. 11,2014 | | |
| Water Quality Insurance Syndicate Policy No. 10-4256-06 | Aug. 19, 1985-Aug. 19, 1986 | NWM208189 | NWM208200 |
| Water Quality Insurance Syndicate Policy No. 10-4256-07 | Aug. 19, 1986-Aug. 19, 1987 | NWM208217 | NWM208227 |
| Transcript of the Deposition of Richard Youell with Exhibits 158-167 | Jul. 24, 2014 | | |
| Transcript of the Deposition of Eileen Gentle with Exhibits 168-172 | Jul. 25, 2014 | | |
| Transcript of the Deposition of Joshua Fine with Exhibits 143-157 | Apr. 11, 2014 | | |
| Transcript of Deposition of Dale Weitzel with Exhibits 68-76 | Jan. 22, 2014 | | |
| Memorandum in Support of Third-Party Plaintiffs' Motion for Summary Judgment Against Agricultural Insurance Company, Agricultural E&S Insurance Company, Insurance Company of North America, and St. Paul Mercury Indemnity Company (Dkt. 299) | Apr. 20, 2011 | | |
| Argonaut Policy No. CL 80-288-808151 | Jul. 1, 1972 - Jul. 1, 1975 | ARG 00001 | ARG 00024 |
| Jesse Russell Letter to Argonaut Regarding Notification of Claim | Jun. 23, 2008 | ARG 00025 | ARG 00028 |
| Michael Compean's Letter to Marsh USA Regarding Affording Defense to Insureds | Nov. 14, 2008 | ARG 00029 | ARG 00036 |
| Michael Compean's letter to Christopher Rycewicz Regarding Response to Tendered Claims | Sept. 28, 2010 | ARG 00037 | ARG 00040 |
| Certificate of Insurance for Home Indemnity and ICSOP Policies | Jul. 22, 1977 | NU 000290 | NU 000291 |
| Marsh & McLennan Letter to NW Marine Requesting Report of Vessels at Risk | Jul. 30, 1985 | NWM208202 | NWM208202 |
| Northwest Marine's Letter to US Coast Guard Enclosing WQIS Six-Month Report of Vessels Coming at Risk | Mar. 28, 1986 | NWM208209 | NWM208216 |
| Northwest Marine's Letter to Susan Wheeler Enclosing Monthly Reports | Sept. 16, 1988 | NWM208187 | NWM208188 |
| Susan Wheeler (Marsh & McLennan)'s Letter to Northwest Marine Regarding Additional Premium Due | Sept. 28, 1988 | NWM208185 | NWM208186 |
| Susan Wheeler (Marsh & McLennan)'s Letter to Ellen Vinck Enclosing Cancellation Request/Policy Release | Jul. 10, 1989 | MG216600 | MG216601 |

# Exhibit B

# Dennis R. Connolly

17 Philip Drive
Princeton, NJ  08540
609 497 7352
dconnolly@sprynet.com

Dennis R. Connolly was a Managing Director of Marsh USA Inc., the world's largest international insurance brokerage, human resource, and employee benefits consulting firm.  He retired from Marsh on May 28, 2004.  He was in the Professional Resources Group, and was previously the manager of the New York branch Casualty Department and Claims Division at Johnson & Higgins.  Also at Johnson & Higgins prior to its merger with Marsh in 1997, he headed the Law Advisory Division which handled all errors and omissions claims and directors and officers litigation against the firm.  This division also set standards for Johnson & Higgins' brokerage practices.  He also served on the broker's Market Security Committee which set financial resource standards for determining which insurers could be used by Johnson & Higgins.  While at Johnson & Higgins he was Chair of the National Association of Insurance Brokers Claims Committee.  He has negotiated settlements of over $1,000,000,000.00 with insurers and with claimants.

Mr. Connolly came to Johnson & Higgins from the American Insurance Association, where he was responsible for developing and implementing insurance industry policy positions and for supervising liability issues. These included all major liability issues including products liability, environmental liability, medical and professional malpractice, directors and officers' liability and nuclear liability.

As a spokesperson for the insurance industry, Mr. Connolly has testified frequently before state and federal legislatures on product liability, toxic torts, nuclear liability, taxes, medical malpractice, governmental liability, self-insurance, and issues concerning the availability of insurance.  In 1979 he prepared a report, "Product Liability Insurance, Underwriting, Rates, Reserves, Business Cycles" for Congress and a federal interagency investigation. This report has been used by several insurers as a training manual. He has authored numerous articles and has appeared on many television and radio programs to discuss insurance and liability issues.  Mr. Connolly has debated Ralph Nader, Bob Hunter and Joan Claybrook.  His TV appearances include ABC Nightline, ABC Good Morning America, NBC Today Show, WNET MacNeil/Lehrer News Hour, Merv Griffin Show and CNN Crossfire.  He has also been interviewed on CBS, NBC, CNN and INN daily news programs.

During his career, Mr. Connolly has served on the Board of Directors of the Love Canal Medical Trust Fund, as the chairperson of two National Association of Insurance Commissioner Task Forces on Major Exposures, as an advisor to the League of Women Voters Hazardous Substance Study Group, and as a member of the National Association of Manufacturers Product Liability Task Force, the Keystone Center's Programs on

Compensation for Environmental Injuries and its program on Products Liability, as well as numerous state, federal and National Association of Insurance Commissioner study groups.  He serves on the advisory Boards of the BNA Toxic Law Reporter, the Executive Enterprise Environmental Quarterly, and the Wharton School Risk Management and Decision Process Center.  From 1992 to 1994 he was Chair of the Wharton Center's Advisor Committee.  In 1994 he was appointed by the court as Technical Advisor to and Co-Chair of the Foreign Fracture Panel Bowling Pfizer Heart Valve Class Settlement.

Mr. Connolly has been involved in claims arising from Love Canal, L-Tryptophan, steel frame buildings, soil expansion, heart values, breast implants, Phen-Fen, environmental toxic torts and clean-ups, diabetes and antacid medicines, and asbestos among others.  He has been involved in insurance claims relating to exposures involving benzene, food and drink recalls, defective packaging, breast implants, asbestos, environmental claims, automotive products and vehicles, tires, soil expansion and others.

Mr. Connolly is a graduate of Colby College in Waterville, Maine and has a J.D. from Brooklyn Law School.  Mr. Connolly has participated in special liability programs at the University of Houston Law School, the Wharton School of Business, and Yale Law School.  His papers on Mass Tort Liability have been used at Columbia and Harvard Law Schools.  He was elected to the American Law Institute in 1992 and was an advisor to the Institute's Compensation and Liability for Product and Process Injuries Project and the Restatement of Law – Torts: Apportionment of Liability.  He was on the Consultative Committees for the Restatement of Torts sections on Basic Principles of Torts and on Aggregate Liability.  He was Vice Chairman of the American Bar Association's committee on Energy Resources Law.  He served on the Business Section's Special Committee on Tort Reform and the TIPS Special Committee to Draft Environmental Insurance Policy Language, a committee appointed by the American Bar Association and the National Association of Insurance Commissioners.  In December 2004-5 he was selected to serve as chairperson of the Corporate Insurance Committee at the International Institute for Conflict Resolution and Prevention (CPR) which produced a protocol for insurance coverage dispute mediation.

In 1999 he taught a seminar for the PLI on Insurance Issues in the New Millennium.  In 2000 he taught a seminar for ALI-ABA on insurance coverage issues.  In 2001 he taught at a Risk and Insurance Management annual meeting session on Mass Torts.  In January 2002 he taught a seminar as visiting lecturer with Professor David Rosenberg on mass torts and insurance at Harvard Law School and in April of 2002 he was a speaker at the ALI-ABA London, England program on United States Litigation (other speakers included Justice Sandra Day O'Connor, Judge Jack B. Weinstein, Professor Arthur Miller, and Professor Geoffrey Hazard).  In 2002, 2003 and 2004 he lectured in a class on mass torts taught by Professor Geoffrey Hazard and Judge Anthony Scirica (U.S. Circuit Court of Appeals, 3rd Circuit) at the University of Pennsylvania Law School.

From 1965 to 1973 Mr. Connolly was employed by Liberty Mutual Insurance Company in its captive law firm Fogarty & Nielsen.  He litigated and settled cases on behalf of Liberty Mutual and its insureds.  He also defended cases against Liberty in matters

involving coverage disputes.  From 1973 to 1976 he held a similar position with Public Service Mutual Insurance Company's captive law firm Katz & Gantman.  In both companies he worked with senior officials, including the general counsels of the companies, and was involved in issues relating to the regulation of insurance.

He has been qualified in many cases and has never been found disqualified.

Records of his publications and speeches between 1995 and 2002 were lost in the World Trade Center on September 11, 2001.

Miscellaneous employment before 1965: Law firm clerk 3 years during school year, janitor World Fair, department store salesman and inventory clerk, merchant marine 3 summers.

Dated: February 13, 2015

## **Testimony and Expert Reports**

Product Liability Insurance: Underwriting, Rates, Reserves, Business Cycles - A report to Congress and the Federal Interagency Task Force on product liability. October 1979.

Owens-Illinois: consulting expert and expert report on availability of insurance for asbestos from 1943 to 1995.  McCarter & English, LLP (New Jersey).

NSI: expert report on availability of asbestos insurance 1985 to present, May 31, 2007; deposition July 7, 2007.  Gilbert Heinz & Randolph.

Asarco: expert report and deposition on availability of asbestos insurance 1984 to present.  Porzio Bromberg & Newman P.C.

Brinco/Keene/Genlite: expert report and deposition on insurance industry's view of asbestos liability.  McCarter & English, LLP.

Ticona (Hoechst Celanese) (Bermuda arbitration): expert report on product liability development of the law, underwriting practices and responsive insurance products. Jenner & Block LLP.

Conoco (Bermuda arbitration): expert report regarding meaning of XL policy.  Anderson Kill & Olick, P.C..

Uniroyal: expert report, deposition and trial on availability of asbestos insurance, underwriting practices, and reasonable availability test.  Qualified by court.McCarter & English, LLP (New Jersey).

Warner-Lambert: expert report and deposition on availability of environmental insurance. Dughi & Hewit (New Jersey); Covington & Burling LLP.

Supplied declarations on the cost of medical monitoring programs in class action removal cases involving Paxil, Baycol, Rezulin, Prepulsid, Bextra, Celebrex, Neurontin and an Olin environmental claim; law firms include Kaye Scholer LLP, Drinker Biddle, Reed Smith LLP, Shook, Hardy & Bacon LLP, Sidley Austin LLP, and Davis Polk & Wardell LLP. All declarations found qualified.

GE:  insurance operations, underwriting and asbestos allocation; no expert report, no deposition. McCarter & English, LLP.

Eljer: expert report on meaning of "known loss."  McCarter & English, LLP (Pennsylvania).

Viacom:  expert report and arbitration on meaning of policy language, operations of insurers, meanings of binders, before Hon. Richard Cohen. Found qualified by arbitrator. April 27 - 28, 2004.  Paul, Wiess, Rifkind, Wharton & Garrison LLP and Robertson, Freilich, Bruno & Cohen LLC.

GlobalNet v. Frank B. Crystal & Co.:  expert report on broker malpractice January 2004. Lowenstein Sandler PC (New Jersey).

CSR v. Century et. al.:  expert report and deposition on availability of asbestos insurance, underwriting, and the international insurance market August 2004.  McCarter & English, LLP (New Jersey).

Congoleum Corp. v. ACE Insurance Co. et al.:  expert report on asbestos insurance issues July 22, 2004.  Dughi, Hewit & Palatucci (New Jersey).

Spaulding Composites Company Inc. v. Aetna Casualty & Surety Company et al.:  expert report on the availability and amounts of insurance for environmental exposures September 7, 2004.  Pitney Hardin (New Jersey).

Roman Catholic Archbishop of Boston v. Lumberman's Mutual Casualty Insurance: affidavit and deposition on insurance practices, missing policies, unfair claims practices, underwriting and reasonableness of tort settlements November 9, 2004; expert opinion and report February 1, 2005.  Qualified in court opinion.Ropes & Gray LLP (Massachusetts).

Roman Catholic Bishop of Manchester v. Centennial Insurance Company and The New Hampshire Insurance Guaranty Association:  preliminary report on insurance policy meanings, claims settlement practices internationally, reasonableness of tort settlements November 2004.  Devine, Millimet & Branch.

Coca Cola and Aqua-Chem v. Insurers (Wisconsin):  expert report and deposition on availability of asbestos coverage, affidavit December 22, 2004.  King & Spalding.

WEPCO v. Insurers (Wisconsin):  expert report on insurer claim practices, late notice, affidavit on policy language meaning and underwriting practices 2004; rebuttal report June 2005; deposition July 28, 2005.  Swidler Berlin.

Union Carbide v. Certain Underwriters at Lloyd's:  validity of Equitas certification requirements in Wellington Agreement Arbitration, 2005; no expert report or deposition. Mayer, Brown, Rowe & Maw.

United Nuclear v. Insurers (New Mexico):  Expert report regarding availability of insurance for environmental exposures May 5, 2005; deposition August 5, 2005;affidavit on EIL insurance January 23, 2014.  McCarter & English, LLP.

GAF v. Hartford Ins.:   expert report and depositions regarding bad faith and policy availability in environmental claim September 30, October 14, 2005, November 29, 2005 and December 16, 2005.  McCarter & English, LLP (New Jersey).

G. I. Holdings v. Reliance Insurance (United States District Court):  expert report regarding bad faith in a D&O insurance context April 29, 2005, deposition December 2, 2005.  McCarter & English, LLP (New Jersey).

AstenJohnson, Inc. v. Columbia Casualty (United States District Court for the Eastern District of Pennsylvania):  meaning of "ASBESTOSIS" exclusion May 11, 2005; rebuttal June 2005; depositions July 7 and 13, 2005; trial testimony found qualified by court. September 22 - 23, 2006.  Anderson, Kill & Olick, P.C.

Gauches v. Chubb:  expert on underwriting and insurance business practices; deposition June 23, 2006.  Day Berry & Howard.

AmQuip v. Admiral:  expert report on bad faith claims practices, disparagement matter, August 26, 2005; rebuttal report September 9, 2005; deposition September 13, 2005. McCarter & English, LLP (Philadelphia).

John Crane v. Admiral (Illinois):  deposition regarding asbestos insurance coverage November 11, 2005.  Covington & Burling LLP.

Wyeth v. Lexington Insurance Company (Superior Court of New Jersey, Essex County): designated expert on the Bermuda Form Jan. 17, 2006; deposition February 22 - 24, 2006; certifications April 28, 2006.  Orrick, Herrington & Sutcliffe.

West American Insurance Co. v. Quagmire Two, L&H Plumbing and Heating Supplies, Inc. availability of coverage for asbestos, drafted report. (Superior Court of New Jersey, Ocean County):  Starkey, Kelly, Bauer & Kenneally.

Vaicom International v. Admiral Insurance (Superior Court, New Jersey): expert report issues relating to environmental insurance May 30, 2006; deposition October 10 - 11 and November 17, 2006.  Paul, Weiss, Rifkind, Wharton & Garrison LLP and Robertson, Freilich, Bruno and Cohen, LLC.

Rhone-Poulenc AG Co., Inc., v. Royal Insurance (Superior Court, New Jersey, Middlesex County): expert report on underwriting environmental insurance August 18, 2006; deposition October 13, 2006.  Porzio, Bromberg & Newman.

National Union Fire Insurance Co. v. EPT Management Co. and Mary Hardnet (United States District Court for the Northern District of Georgia):  expert report on insurance claims handling and settlement techniques; coverage in premises rape case, deposition January 10, 2007.  Reed Smith LLP and Jett & Liss.

Thomas & Betts Corp. v. Travelers Insurance Company (Superior Court, New Jersey, Middlesex County): bad faith and availability of environmental insurance, report January 5, 2007, deposition March 20 - 21, 2007.  Robertson, Freilich, Bruno & Cohen, LLC.

Columbia Energy Group v. Fisher et al. (Supreme Court of New York, New York County): consulting and testifying expert on broker and insurance service provider liability; declaration January 2007.  Robertson, Freilich, Bruno & Cohen, LLC.

Brown Group Retail, Inc. v. Allstate Insurance Group (District Court, City and County of Denver, Colorado):  expert report regarding the availability of environmental insurance after 1985 January 9, 2007; deposition February 9, 2007.  Covington & Burling LLP.

Degussa Corp v. Century Indemnity, et al. (Superior Court, New Jersey, Union County): expert report on allocation and availability of environmental insurance April 2007; deposition June 5, 2007; certification on insurer coverage positions June 26, 2007. Lowenstein Sandler PC.

Bank of America v. SR International (General Court of Justice, State of North Carolina, Superior Court Division, Mecklenburg County): report and deposition regarding bank investment risk policy, underwriting of policy and bad faith claims July 20, 2007.  King & Spalding.

Continental Insurance Co, et al., v. Honeywell International (Superior Court, New Jersey Law Division, Morris County):  expert report on asbestos insurance availability and meaning of asbestosis exclusion July 27, 2007; rebuttal report November 13, 2007; deposition December 15, 2010,  Kirkpatrick & Lockhart.

WEPCO v. Northern Assurance Company of America (United States District Court for the Western District of Wisconsin):  expert report on environmental liability and late notice January 7, 2008; deposition February 25, 2008.  Heller Ehrman LLP.

State Auto Property & Casualty Company v. ADEQ et al. (Pulaski County Circuit Court, Arkansas):  interpretation and meaning of "absolute pollution insurance exclusion," waste, products, deposition January 14, 2008; jury trial verdict for policyholder. Found qualified by court. January 22 - 23, 2008.  Chisenhall, Nestrud & Julian.

SPX v. ACE Property & Casualty Co., et al. (Superior Court, State of North Carolina, Mecklenburg County):  expert report and deposition regarding availability of asbestos insurance after 1986 February 12, 2008.  Covington & Burling LLP.

Freeport LNG v. SRI et al. (arbitration):  expert report on the meaning of policy language and claims practices March 28, 2008; testimony in arbitration hearing, found qualified by panel. April 24, 2008.  King & Spalding (London, England).

Quick Service Management Inc. (Taco Bell) v. Insurers (Superior Court, New Jersey, Middlesex County):  affidavit regarding meaning of insurance policy and underwriting practices, business interruption,  May 20, 2008.  Anderson, Kill & Olick, P.C..

Blue Capital v. Palmer & Cay (United States District Court for the Northern District of Texas):  consultant on broker malpractice 2008.  Hobgood and Rutherford LLC (Atlanta, Georgia).

National Union Fire Ins. Co. of Pittsburgh and Titeflex Corp. (American Arbitration Association):  meaning of Named Peril Time Element Pollution Endorsement; pollution-products liability, deposition January 9, 2009, testified at hearing February. Found qualified by panel. 19 - 20, 2009.  Covington & Burling LLP.

NCR Corp. v. AIG Centennial Ins. Co., et al.: (Circuit Court, Brown County, Wisconsin): expert report on late notice, known loss, claims and underwriting practices of insurers October 22, 2008; deposition January 15, 2009 and February 16, 2009; deposition on defense coverage issues February 18, 2010; Qualified and testified at special master hearing on defense cost issue May 6, 2010.  Covington & Burling LLP.

James River Insurance Co. v. Quanta Reinsurance Co.:  arbitration, insurer's party arbitrator, proper value of letter of credit October 30, 2009.  ARBITRATED TO AWARD

Moon Mountain Farms, LLC v. Rural Community Insurance Company  (American Arbitration Association):  expert report, "Right to Coverage, Underwriting and Claims Practices" farm insurance, May 28, 2009; deposition November 12, 2009.  Attorney Larry DeRaspino, Arizona.

Intalco v. Century and Central National: (Superior Court, Washington, Whatcom County):  rebuttal expert report on bad faith July 9, 2009; deposition October 1, 2009. Robertson, Freilich, Bruno & Cohen, LLC.

General Electric Company v. Lines et al., and One Beacon Intervenor - Defendant (Superior Court, Suffolk County, Massachusetts):  affidavit on availability of environmental insurance October 5, 2009; witness on intent, policy interpretation, known loss, misrepresentation, deposition March 25, 2010.  McCarter & English, LLP.

Rockwood Holdings, Inc., v. Lexington Insurance Company:  named as party arbitrator JAMS Rules, appointed December 11, 2009, D&O policy dispute.   AWARD December 23, 2010.  Lowenstein Sandler PC.

Highlands Fuel Delivery, LLC et al. v. ACE INA Insurance Co. (Maine Superior Court): affidavit on meaning of pollution exclusion April 27, 2010.  Covington & Burling LLP.

Lexington Ins. Co. v. UnitedHealth Group (United States District Court for the District of Massachusetts):  expert report on insurance policy drafting June 21, 2010; deposition July 13, 2010. Covington & Burling LLP.

American Safety Ins. Co. v. ALEA London: insurer party arbitrator, reserving, appointed June 21, 2010.  Morris, Manning & Martin.

Teck Metals Ltd. v. Certain Underwriters at Lloyd's, London and Certain London Market Insurance Companies (United States District Court for the Eastern District of Washington):   expert report on timeliness of notice and prejudice, environmental liability deposition January 7, 2011.  Orrick Herrington & Sutcliffe LLP.

Lloyd's Underwriters v. Teck Metals Ltd. (Vancouver Registry, Action No. S056205, Canada):  expert report on timeliness of notice and prejudice, environmental, January 20, 2011.  Lawson Lundell.

General Refractories Co., v. First State Insurance Co., et al. (United States District Court for the Eastern District of Pennsylvania):  expert report on insurance policy drafting in case involving asbestos, January 20, 2011; deposition March 25, 2011.

Babcock & Wilcox v. American Nuclear Insurers (Court of Common Pleas of Allegheny County, Pennsylvania):  affidavit for interested party Atlantic Richfield Company on claims handling and bad faith, nuclear insurance, February 5, 2011, Report July 15, 2011, James Dattilo & Associates.

Tyson Foods Inc. v. Allstate Insurance, et al. (Superior Court of the State of Delaware in and for New Castle County):  affidavit on missing policies, policy forms and drafting, insurance regulation, pollution exclusion, application of "absolute pollution exclusion" products liability, March 4, 2011.  Jenner & Block LLP.

T H Agriculture & Nutrition v. ACE P&C Casualty Co. (Circuit Court, Cook County, Illinois, Chancery Division):  expert report on lost policies, availability of asbestos insurance, annual and stub period limits, follow form practices, March 22, 2011. Deposition June 2 &3, 2011, March 21, 2012, Rebuttal Report March 6, 2012, Qualified, Kasowitz, Benson, Torres & Friedman LLP.

UnitedHealth Group v. Columbia Casualty Co., United States District Court for the District of Minnesota, Underwriting practices, policy drafting, consent to settlement, notice provisions, insurance basics, defense cost issues, April 15, 2011, Rebuttal Report June 13, 2011, Deposition June 28, 2011, Trial testimony may 24, 2012, Trial testimony June 26, 2013, found qualified, Oppenheimer, Wolff & Donnelly LLP and Covington & Burling LLP

Triumph Foods v. RLI and brokers, Missouri District Court, Builder's Risk Policy, Claims handling, underwriting, no report, deposition April14,2011, Anderson Kill & Olick LLP

INA  V. Sygenta Crop protection Inc. American Arbitration Association #13 195 00880 09, Environmental Liability, product liability, personal injury, release of environmental liabilities, expert witness, no report, deposed June 7, 2011, qualified at hearing Ken Feinberg arbitrator June 15, 2011, Hoguet Newman Regal & Kenny and  McCarter & English

Travelers Insurance v. Honeywell International, New York Supreme Court, County of New York, #102138/06, asbestos settlement practices of insurers meaning of policy provisions, affidavit June 10, 2011, affidavit September, 27, 2011, K&L Gates

In Re Arbitration between Soo Line Railroad Company (Doing Business as Canadian Pacific) and London Market Insurers, availability of insurance without pollution exclusions between 1944 and 1986, Report June 17, 2011, Trial hearing July 13, 2011 qualified at hearing, Orrick, Herrington & Sutcliffe

AT&T Wireless Services, Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA, et al. Case No. 03C-12-232-WCC, Superior Court of the State of Delaware, insurer bad faith, London custom and practices, report July 14, 2011, Corr, Cronin, Michelson, Baumgardner & Preece, Seattle Washington.

Newport Associates Phase I v. Travelers, Superior Court of New Jersey, Law Division, Hudson County, Certification on insurer claims practice in environmental claims, September 15, 2011, Riker, Danzig, Scherer, Hyland and Perretti.

Generali US Branch v. DeLonghi America Inc., Superior Court of New Jersey, law Division, Bergen County, Products Liability, Bad Faith, Report October 31, 2011, deposition February 1, 2012, McElroy, Deutsch, Mulvaney & Carpenter.

F. C. Bloxom Company v. Fireman's Fund, United States District Court, Western District of Washington, Insurer bad faith, report, property loss claim,  November 16, 2011, Devlaration February 13, 2012, Corr Cronin Michelson Baumgardner & Preece.

Viking Pump and Warren Pumps v. Century Indemnity, Superior Court of the State of Delaware, New Castle County, Asbestos, Custom and practice and policy provisions concerning follow form, exhaustion, defense coverage issues, non-cumulation clause, Report December 23, 2011, Rebuttal Report March 9, 2012, Deposition April 16, 17, 2012, Trial Testimony November 1, 2012 Kasowitz, Benson Torres & Friedman.

The Wornick Company v. Houston Casualty Company, USDC for the Southern District of Ohio Western Division, Civil Action 11-391, Report April 5,2012, Insurance industry policy interpretation custom and practice and insurer bad faith, Anderson, Kill & Olick

U-Haul Co. of PA v. Utica Mutual, USDC, for the District of Delaware, (1:11-cv-00510-JCJ) insurer custom and practice, bad faith, Report May 28, 2012, Polsinelli Shugart

Mine Safety Appliances v. North River, U.S. D.C. Western  District PA No 2:09-cv-00348, North River v. Mine Safety Appliances, Court of Common Pleas, Allegheny County Pa, No. G.D. 10-007432, Report on insurance basics, defense costs, effect of pollution exclusion, products liability July 27, 2012, rebuttal report August 30, 2012, deposition Sept 14, 2012, Addition to Report April 23, 2013, second deposition September 12, 2013. Reed Smith

U. S. Silica v. ACE et al, Circuit Court of Morgan County, West Virginia, Affidavit pollution exclusion and product liability, August 13, 2012, availability of product liability

insurance for silica liability, deposition June 20, 2013, Trial September 25, 2013. K&L Gates

Cannon Electric Inc. (Goulds Pumps) v Affiliated et al., Superior Court of California, County of Los Angeles, availability and sufficiency of asbestos coverage 1930's to 1980's, use of aggregates in products liability insurance, deposition August 21, 2012, September 18, 2012, trial testimony January 7 and 8, 2013. Morgan Lewis

Atlantic Research Corp v. Admiral Ins. Co. et al., Superior Court of New Jersey, Law Division, Bergen County, Environmental insurance availability, report October 16, 2012, Deposition February18, 2013, Saretsky Katz Drandoff & Glass

Danaher Corp. v. Travelers et al., USDC, Southern District of New York, Availability of asbestos insurance, report October 22, 2012, Reed Smith and McCarter & English.

Long Island Lighting and Keyspan Corp v. American Re-Insurance and Century Indemnity, Supreme Court of New York, County of New York, Index No. 97-604715, Environmental loss, late notice, waiver of defense, availability of insurance, report, April 15, 2013, Deposition September 20, 2013, Deposition November 14, 2013, Covington & Burling

Travelers Casualty and Surety Company v. Quigley Company Inc, Arbitration, Honorable John S. Martin, Jr. CPR File No. w-09-01TJ, insurance policy writing, custom and practice, asbestos and similar diseases exclusion, report April15, 2013, Deposition August 8, 2013, hearing testimony January 30, 31, 2014, Wilk Auslander

Lincoln Electric Co., V. Travelers and St. Paul Insurance Companies, USDC, Northern District of Ohio, Eastern District, #1:11-CV-2253, Access to umbrella policies after settlement of primary polices, insurers defense obligations, report May 10, 2013, Covington & Burling

Todd Gelfand, Trustee of the REATA Trust v. North American Capacity Insurance, USDC, Northern District of California, San Francisco Division, #C12-04819 EMC, Bad faith, insurance practice, your work product clause, Report September 18, 2013, rebuttal report October 6, 2013, deposition November 1, 2013, Manatt, Phelps & Phillips

Northwest Pipe v. RLI and Employers of Wausau, USDC, District of Oregon, Case No. 3:09-cv-1126-BR, Availability of environmental insurance after February 19, 1986, report September 25, 2013, rebuttal October 9, 2013, Black Helterline.

Travelers Indemnity et al. v. Northrup Grumman Corp. USDC, Southern District of New York, 12 Civ. 3040 (KBF) Availability of environmental insurance, the basics of insurance, notice and claims handling, report October 7, 2013, deposition January 10, 2014, Covington & Burling.

The Humane Society of the United States v. National Union, USDC, District of Maryland (Southern Division) #8:13-cv-01822-DKC, D&O, insurance basics, notice, application, report October 9, 2013, Motion to strike denied but additional report required July 3,

2014, Supplemental report August 8, 2014, deposition September 30, 2014, Declaration on D&O experience February 2, 2015, Perkins Coie, Howard Weir Esq., Miller & Miller

Goodyear Tire & Rubber Co. v. Travelers Casualty and Surety Co., United States District Court for the Western District of Pennsylvania, Civil Action No. 13-00256, Report custom and practice in umbrella polices, January 28 ,2014, rebuttal report February 19, 2014, deposition February 26, 2014, Covington & Burling

Allianz Global Risks US Insurance Company v. ACE et al., Circuit Court of the State of Oregon, For the County of Multnomah, No. 1204-04552, Missing policies and custom and practice in providing coverage where policies are lost, January 31, 2014, rebuttal report February 14, 2014, trial March 3, 2014. Fronting policies, reasonableness of asbestos and environmental settlement, reserving practices, underwriting practices, trial testimony October 14, 15, 2014, McDermott Will & Emery

CITGO Petroleum Corp. v. Century Indemnity, et al. 14th Judicial District Court for the Parish of Calcasieu, State of Louisiana, Division E – Case No. 2005-1523, Report on notice issues,  March 7, 2014, Deposition June 27, 2014, found qualified by court, October, 2104 Orrick

Turkey Run Properties v. Seneca Ins and Gleason Agency, Lycoming County, Court of Common Pleas No. 11-02404, Pennsylvania,  Insurance application and broker practices, report May 31, 2013, qualification hearing March 28, 2014, Anderson Kill

Apogent Transition v. Hartford Accident & Indemnity, Superior Court of New Jersey, Law Division Hudson County, #HUD-L-3983-13, Report pollution exclusions and availability of insurance after the 1985 policy, April 15, 2014, Covington & Burling

Utica Mutual Insurance v. Fireman's Fund Insurance Co., United States District Court for the Northern District of New York, Civil Action 6:09-cv-0853 (DNH/TWD), Product liability aggregate limits 1960's and 1970's, umbrella and excess insurance, 30(b)6 witness for Utica, May 13, 2014, expert report June 23, 2014, response report July 8, 2014, expert deposition September 18, 2014, Hunton & Williams

Mine Safety Appliances Co., v. AIU Insurance Company et al., Superior Court of the State of Delaware in and for New castle County C. A. No. N10C-07-241 (MMJ), Report general insurance custom and practice, defense cost coverage, claims made coverage, follow form, multi-year policies, consent to settlement, Non-Cumulation Clauses, June 25, 2014,  Rebuttal report October 6, 2014, deposition December 11, 12, 2014, January 29, 2015, Gilbert LLP

Passiac Valley Sewerage Commission v. Continental Casualty et al., Docket No. ESX-L-820-11, New Jersey, report on missing policies , limits,  provisions on primary layer, October 2, 2014, Piro, Zinna, Cifelli, Paris &  Genitempo

ExxonMobil Corporation v. Certain Underwriters at Lloyd's, et al.,  Supreme Court of the State of New York, County of New York, #650503/2012, report on notice issues asbestos, December 17, 2014,  rebuttal report February 13, 2015, Covington & Burling

United Healthcare Corporation n/k/a UnitedHealth Group Incorporated v. Reliance Insurance Company, Proof Claim No. 2134100, No. 8 REL 2013, Use of claims-made and occurrence insurance policies in managed care insurance, report December 22, 2014, rebuttal report February 12, 2015, Oppenheimer, Wolff & Donnelly

Cooper Industries, LLC v. Employers Insurance of Wausau, et al., Docket No. ESX-9284 (N. J. Super. Law Div. - Essex County), report on insurance availability for environmental liability pre-1957 and post 1986, February 12, 2015,Jones Day and Lowenstein Sandler

Cooper Industries, LLC v. Employers Insurance of Wausau, et al., Docket No. Hud-2471-13 (N.J. Super. Law Div. – Hudson County) report on insurance availability for environmental liability pre-1957 and post 1986, February 12, 2015 Lowenstein Sandler and Jones Day

## Congressional Testimony

| Date: | Testified Before: |
|---|---|
| April 28, 1977 | Subcommittee of Senate Committee on Science, Commerce & Transportation |
| June 6, 1977 | House Small Business Committee |
| November 28, 1977 | House Small Business Committee |
| September 27, 1979 | Subcommittee on Consumer Protection & Finance, House Committee on Interstate & Foreign Commerce |
| November 14, 1979 | Subcommittee on Consumer Protection & Finance, House Committee on Interstate & Foreign Commerce |
| April 22, 1980 | Senate Committee on Commerce, Science & Transportation |
| April 29, 1980 | Subcommittee on Consumer Protection & Finance, House Committee on Interstate & Foreign Commerce |
| April 9, 1981 | Commerce, Transportation & Tourism Subcommittee of the House Energy & Commerce Committee |
| 1985 | Multiple hearings on Superfund Re-Authorization |
| September 27, 1990 | Subcommittee on Policy Research & Insurance |

## Publications and Journals

"Real Competition in Health Care", letter to the editor, New York Times, March 3, 2010

"Insuring the Continued Solvency of Pharmaceutical Companies In the Face of Product Liability Class Actions," Rochelle Chodock MD, David Yolkut, and Dennis R. Connolly American Bar Association, Tort & Insurance Practice Section Journal, Spring 2005, Volume 40, Number 3, 997- 1017

Appointed to the Advisory Committee of the BNA Toxic Law Reporter, 1987

Appointed to the Board of Advisors, Executive Enterprises Publications, Environmental Claims Quarterly, 1988

First place Johnson & Higgins award for publications 1987, 1988, 1990

Economic Decision Processes in Mass Liability Litigation, ALI – ABA Judicial Conference Civil Practice and litigation Techniques in the federal Courts, October 13-15, 1994, Paper presented in panel Chaired by Judge Pointer.

Slain Messenger II, National Academy of Engineering, Fall 1994

"Superfund Faces an Uncertain Future", Review of Worldwide Reinsurance, February 1994

Environmental Decalogue, 1992

"Government Risk Bearing: What Works, What Doesn't", proceedings of conference held at the Cleveland Federal Reserve Bank – publisher Kluwer Academic Publishers, 1993

Comments on "Clean-up of Old Wastes Risk Analysis", Volume II, No. 1, 1993

"Superfund Whacks the Banks", Wall Street Journal op-ed page, August 28, 1990

"Structured Settlements in Environmental Litigation" (with David Miller), For the Defense, May 1990; BNA Toxics Law Reporter; April 18, 1990, American Bar Association, August 8, 1990; Insurance Law Review (Clark Boardman Callaghan publisher), 1993; anthology of best article written in the insurance law field

"Acquiring Problem Properties: Insurance Considerations", Practicing Law Institute, 1990

"Toxics TOO Risky to Insure – Yes, No, Maybe So," American Bar Association, August 8, 1989

"Superfund Insurance Coverage – Litigation Schizophrenia," BNA Toxic Law Reporter, February 10, 1990

"Environmental Liability and the Risk Retention Act", International Congress on Hazardous Waste, June 1987

"Insurance: the Case of the Slain Messenger," BNA Toxic Law Reporter, April 15, 1987

Directed and supervised production of American insurance Associations Survey of Environmental Liability Legislation & Regulations- Hazardous Substances 1982, 1984, mid year 1986

## Appointments and Distinctions

International Institute for Conflict Prevention & Resolution, Chairperson, Corporate Insurance Coverage Committee - developed mediation principles for insurer-insured disputes 2005, 2006.

American Law Institute, Principles of the Law of Aggregate Litigation - member Consultative Committee, 2005 –2011

Advisor, American Law Institute Restatement of Law Torts:  Apportionment of Liability, 1994 –2004

Court appointed technical advisor to and co-chair of Foreign Fracture Panel – Bowling Pfizer Heart Valve Class Settlement, 1994 – 1995

Member, American Law Institute, 1992 –

Advisor, American Law Institute –Report's  Enterprise Liability Study, 1987-1991

Member, Consultative Committee Restatement of Law Torts, Products Liability, 1993 – 2001

Member, National Center for Lead Safe Housing Work Group for the National Insurance Task Force, 1993 –1995

Chairman, The Wharton School Risk and Decision Process Center Advisory Committee, 1991- 1994 – member of committee, 1988-1997

Member, American Tort Reform Board of Directors and Steering Committee, 1988 – 2002, chair Legal Committee, 1989 –2001

Insurance Brokers Association of New York – Member Government Affairs Committee and Technical Task Force, 1988 –1991

Member, the Product Liability Alliance Steering Committee, 1987 –1991

Member, Associated General Contractors Energy and Environmental Committee and Hazardous Waste Committee, 1987 –1990

Member, Association of Insurance Brokers – chair Claims Committee, Member State, Federal and Environmental Committees, 1991- 1997 – chair Environmental Committee, 1994-1995

Chairman's Award National Association of Insurance Brokers, 1995

Member, National Association Insurance Commissioners Environmental Liability
Insurance (D) Task Force Advisory Committee, 1989 – 1997

Member,   American Bar Association:
        Vice Chairman – Energy Resources Committee, 1989 –
        Member, Special Committee on Tort Reform, Corporation, Banking and
          Business Law section, 1987 –
        Member, Special Environmental Liability Insurance Policy Language
          Drafting Committee, 1989 – 1991

## 2007 Speeches

Panelist Mealey's Bad Faith Litigation Seminar September 25, 2007 (Philadelphia)

## 2004 Speeches

New Jersey Institute for Continuing Legal Education, "Hot Topics in Insurance Law"
April 20, 2004

## 2002

ALI-ABA Seminar in London England on American Liability  April, 2002

## 1996

ABA Demonstration Exercises in Florida, August 4, 1996 at invitation of Judge Robert
Keeton author Keeton on Insurance.

## 1995 Speeches

J&H NY Seminar April 13, 1995

J&H Philadelphia Health Care September 20, 1995

CPCU, October 25, 1995 (Charlotte)

CPCU RIMS October 26, 1995 (Denver)

New Jersey Corporate Counsel Association, "Key Trends and Hot Issues in
Environmental Insurance Coverage Litigation Allocation" (Owens, Illinois)

## 1994 Speeches

ALI-ABA, Mass Tort Panel October 5, 1994

Society for Risk Analysis and New York State Bar Association, June 28, 1994

Counsel of Insurance Brokers and Agents, BIPAR Conference May 16, 1994

PRIMA Conference February 23, 1994 (Phoenix)

## **1993, 1991, 1990, 1989 Speeches**

Television – two programs "Your Premium Dollar" – FNN – presented several times

Speaker – Massachusetts Bar Association June 21, 1989 (Boston)

Speaker – National Business Institute June 29, 1989 (Detroit)

Speaker – American Bar Association August 7 - 8, 1989 (Hawaii)

Speaker – Institute for International Research September 19 - 20, 1989 (New York)

Speaker – PETRO-SAFE '89 Conference October 3, 1989 (Houston)

Speaker – Canadian Council of International Law Conference "Preserving the Global Environment" October 20, 1989 (Ottawa, Canada)

Speaker – Management Center Europe Product Liability Seminar November 13 - 14, 1989 (Madrid, Spain)

German Parliament, Joint Committee on Justice and the Environment January 4, 1990 (Washington, DC)

New York Bar Association Program on Environmental Issues January 19, 1990 (New York)

American Tort Reform Association annual meeting – moderator Product Liability Issues February 9, 1990 (Washington, DC)

Boston University Law School – Liability issues in Biotechnological Research March 1990 (Boston)

Practicing Law Institute Seminar, Acquiring Problem Properties April 19, 1990 (New York)

Primex Loss Control Personnel May 10, 1990 (Philadelphia)

Seminar on hospital crisis management May 11, 1990 (Allentown, PA)

American Assembly Program on Liability and Competition May 31, 1990; June 1, 1990

ASSE Seminar Environmental June 27, 1990 (Hartford)

American Law Firm Association, Future of Insurance June 29, 1990 (San Francisco)

Rims Environmental Seminars – July 19, 1990 (Denver); November 5, 1990 (New York); November 6, 1990 (Chicago); November 8, 1990 (Los Angeles); National Pipeline Association – Liability Issues October 8, 1990 (Santa Fe, NM)

Testimony U.S. House of Representatives Banking Committee, Subcommittee on Policy, Research and Insurance September 27, 1990

Association – Liability Issues October 8, 1990 (Santa Fe, NM)

Speaker – Conference of Insurance Legislators, on insurer insolvency

Federal Reserve Bank of Cleveland – presented paper on governmental risk bearing May 30 - 31, 1991

Institutional Investor Conference on Insurance Legislation October 7, 1991

DSM Seminar managers meeting October 30, 1991

NACSA Convention February 16, 1993 (Washington DC)

Chamber of Commerce – Defense Research Institute Panel April 20, 1993 (Washington DC)

Risk and Insurance Management Society on International Environmental Liability April 28, 1993 (Orlando)

Seminar with Heller Erhman May 17, 1993 (San Francisco)

Wharton International Forum September 11, 1993 (Philadelphia)

National Academy of Engineering Product Liability September 20 - 21, 1993 (Washington DC)

## **1977**

Speaker and panelist First World Congress on Product Liability other speakers include Ralph Nader, Melvin Belli, Robert Begham (Pres. ATLA), Frank L. Farwell (Pres. Liberty Mutual Insurance Company) and various representative of European legislators, insurers and regulators, Dr Ralph Baldwin (Pres Oliver Machinery Company) January19-21, 1976, London, England