SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC
    W. David Campagne, pro hac vice
    dcampagne@spcclaw.com
    Kenneth H. Sumner, pro hac vice
    ksumner@spcclaw.com
Two Embarcadero Center, Suite 1410
San Francisco, California  94111
Tel.: (415) 352-6200; Fax: (415) 352-6224

Thomas W. Brown, OSB #801779
tbrown@cvk-law.com
COSGRAVE VERGEER KESTER LLP
888 SW Fifth Avenue, Suite 500
Portland, OR  97204
Tel: (503) 323-9000; Fax: (503) 323-9019

Attorneys for GRANITE STATE INSURANCE COMPANY,
NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA, and INSURANCE COMPANY OF
THE STATE OF PENNSYLVANIA

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **CENTURY INDEMNITY COMPANY**, | CASE NO. 3:08-CV-01375-AC |
| Plaintiff, | **GRANITE STATE INSURANCE COMPANY AND INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA'S DISCLOSURE OF REBUTTAL EXPERT PURSUANT TO FED. R. CIV. PRO. 26** |
| v | |
| **THE MARINE GROUP, LLC**, **et al.**, | |
| Defendants. | |

3:08-cv-01375-AC
_____
GRANITE STATE'S AND ICSOP'S FRCP 26 REBUTTAL EXPERT DISCLOSURES

Exhibit 1
Page 1 of 31

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

Pursuant to the Amended Joint Case Management Order Regarding Resolution of Issues of Duty to Defend entered in this case ("CMO"), Third Party Defendants Granite State Insurance Company ("Granite State") and Insurance Company of State of Pennsylvania ("ICSOP") hereby designate the following expert in rebuttal to the expert designations of Dennis Connolly by Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company, and Robert Hughes by The Marine Group, LLC, Northwest Marine Iron Works, BAE Systems San Diego, Inc. and Argonaut Insurance Company:

Allan D. Windt

27 West Athens Avenue, Suite 230

Ardmore, PA 19003

This disclosure is based on the information currently available to the Granite State or ICSOP. Accordingly, these parties reserve their right under the Federal Rules of Civil Procedure to supplement these disclosures should additional information become available.

Granite State and ICSOP reserve the right to disclose all persons designated as experts by any party in this matter and the right to use and adopt the report of any such expert. Granite State and ICSOP further reserve the right to present as evidence at trial the testimony of any expert witness who has been produced for deposition by any party. Granite State and ICSOP specifically reserve the right to disclose additional experts that may testify in rebuttal to any expert disclosed by other parties pursuant to the CMO.

In accordance with the Federal Rules of Civil Procedure, the CMO and applicable case law, Granite State and ICSOP reserve the right to designate additional experts in the future, including any that Granite State and ICSOP may later retain. At such time as any additional expert has been identified or retained, Granite State and ICSOP will notify and give other parties the opportunity to depose the additional expert(s) before trial at a date

GRANITE STATE'S AND ICSOP'S FRCP 26 REBUTTAL EXPERT DISCLOSURES

Exhibit 1
Page 2 of 31

that is convenient for the additional expert(s), counsel for Granite State and ICSOP, and the other parties and their counsel.


DATED: April 9, 2015

SINNOTT, PUEBLA, CAMPAGNE & CURET, APLC


*/s/  Kenneth H. Sumner*

Kenneth H. Sumner, pro hac vice
ksumner@spcclaw.com
W. David Campagne, pro hac vice
dcampagne@spcclaw.com
Two Embarcadero Center, Suite 1410
San Francisco, California  94111
Tel.: (415) 352-6200; Fax: (415) 352-6224
Attorneys for GRANITE STATE INSURANCE COMPANY,
NATIONAL UNION FIRE INSURANCE COMPANY OF
PITTSBURGH, PA and INSURANCE COMPANY OF THE
STATE OF PENNSYLVANIA

GRANITE STATE'S AND ICSOP'S FRCP 26 REBUTTAL EXPERT DISCLOSURES

**Exhibit 1**
**Page 3 of 31**

*OPINION*

*CENTURY INDEMNITY COMPANY*

*v.*

*THE MARINE GROUP, et al*

BY:  *ALLAN D. WINDT*

**Exhibit 1**
**Page 4 of 31**

# TABLE OF CONTENTS

ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   I.    Excess Insurance: General Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

   II.   "True" Excess Policies Versus "Non-True" Excess Policies: In General . . . . . . . 6

   III.  What Happens When a Primary Insurer Is Insolvent: "Non-True"
       Excess Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

   IV.  What Happens When a Primary Insurer Is Insolvent:
       "True" Excess Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

   V.    Mr. Connolly's Report Is Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

   VI.  Granite State and ICSP Are Not Obligated
       to Pay Any of the Insured's Defense Costs:
       Mr. Hughes' Report Is Also Incorrect . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**Exhibit 1**
**Page 5 of 31**

1.      I am the author of Windt, Insurance Claims and Disputes (West, 1981 first edition, 1988 second edition, 1995 third edition, 2001 fourth edition, 2007 fifth edition, 2013 sixth edition). The book has been cited as authoritative by more than 300 different courts across the country.

2.      I specialize in insurance coverage, claim handling and bad faith, which is what my book deals with. In particular, I have been called upon to review and draft insurance policies, recommend coverage determinations, evaluate the propriety and reasonableness of such determinations, monitor and oversee the defense of insureds, and render advice concerning the handling of insurance claims in compliance with the applicable legal standards as well as the customs, practices and standards of the insurance industry. I have been retained by over 70 different insurance companies and hundreds of insureds to assist them with regard to the foregoing. I have also been a frequent lecturer across the country on those issues. I have handled more than 10,000 insurance claims over approximately 30 years.

3.      In addition, I have been retained as an expert witness and have rendered expert opinions on issues of coverage and duties to settle, defend and indemnify on behalf of both insurers and insureds in Illinois, Washington, California, Pennsylvania, New York, Massachusetts, Missouri, Ohio, Mississippi, Oklahoma, Kentucky, Nebraska, Arizona, Colorado, the District of Columbia, Delaware, Georgia, Texas, Michigan, Alaska, Maryland, New Jersey, Florida, Alabama, West Virginia, South Carolina, North Carolina, Nevada, Indiana, Tennessee, Louisiana, New Hampshire, Montana, Hawaii, Utah, New Mexico, Wisconsin, Idaho, Connecticut, Virginia, Bermuda, Iowa, Kansas and the Virgin Islands.

4.      During my more than thirty years of experience, I have become thoroughly familiar with the accepted customs, practices and standards in the insurance industry concerning insurance claims handling and coverage and duties to defend and indemnify.

## ANALYSIS

### I. Excess Insurance: General Rules

5.      Insurance is sold in layers: an umbrella policy layer is excess over the primary policy layer, and an excess policy layer is excess over the umbrella policy layer.[1] Accordingly, the Granite

---

[1]See, for example, the discussion in section 7.2, pages 7-15 to 7-19, of my book.

(I)n some cases, a carrier will provide insurance that, at the time it is purchased, is designed to be excess over another policy. The policy, in fact, often expressly refers to the underlying insurance, and, presumably, the premium charged by the insurer will reflect the insurer's reduced risk because of the existence of the underlying insurance. There is no question, under those circumstances, that such a policy should be

(continued...)

3

**Exhibit 1**
**Page 6 of 31**

State and ICSP policies, being excess policies,[2] afford fundamentally different insurance than

──────────────

[1](...continued)
        treated as an excess policy.


    [2]Among the cases cited in my book discussing the fact that an umbrella policy is a type of excess policy are New Hampshire Ins. Co. v. Hanover Ins. Co., 296 Ill. App. 3d 701, 231 Ill. Dec. 293, 696 N.E.2d 22, 25 (1st Dist. 1998) (''It is well known that an umbrella policy is different from a primary policy containing an excess insurance clause in that an umbrella policy provides a special and unique coverage. Since umbrella policies, by their nature, only pay above the primary policies, this different type of coverage generally allows for lower premiums than those of primary policies. We are reluctant to interfere with this market driven fact. In our view, deciding an umbrella policy should pay before a primary policy with an excess clause makes neither commercial nor legal sense. . .. (W)e conclude that the trial court in the instant case properly decided that New Hampshire's umbrella policy was excess over and above Hanover's primary commercial general liability policy''); Bosco v. Bauermeister, 456 Mich. 279, 571 N.W.2d 509, 513–18 (1997) (Umbrella policy is a ''true''excess policy and, as such, it is excess over a primary policy that contains an excess clause); Institute for Shipboard Educ. v. Cigna Worldwide Ins. Co., 22 F.3d 414, 426, 91 Ed. Law Rep. 40, 1994 A.M.C. 1775 (2d Cir. 1994) (Pennsylvania law) (true umbrella policy is excess to what was, in effect, a primary policy with an excess clause); State Farm Fire and Cas. Co. v. LiMauro, 103 A.D.2d 514, 481N.Y.S.2d 90, 91 (2d Dep't 1984), order aff'd, 65 N.Y.2d 369, 492 N.Y.S.2d 534, 482 N.E.2d 13, 67 A.L.R.4th 1 (1985) (court held that one policy was excess over another because (a) ''it was specifically structured to provide multiple high-risk coverage in excess of any provided by other available collectible insurance—i.e., last resort coverage, commonly referred to as 'umbrella' or 'catastrophe' coverage,'' and (b) it had a ''large liability'' and ''relatively modest premium''); Illinois Emcasco Ins. Co. v. Continental Cas. Co., 139 Ill. App. 3d 130, 93 Ill. Dec. 666, 487 N.E.2d 110, 112 (1ˢᵗ Dist. 1985) (umbrella policy held to be excess regardless of language of other insurance clauses because it was intended to be excess); Grant v. North River Ins. Co., 453 F. Supp. 1361, 1369 (N.D. Ind. 1978) (although two competing policies both had excess clauses, court gave effect to one over the other because it was ''clear from all of the terms of the Maryland policy that it was negotiated and executed not as primary coverage but as an 'umbrella' policy''); Berkeley v. Fireman's Fund Ins. Co., 407 F. Supp. 960, 969-70, 1976 A.M.C. 856 (W.D. Wash. 1975) (although two competing policies both had excess clauses, court gave effect to one over the other because ''it is apparent from both the language of the policies and the scheme of overall coverage . . . that the Eagle Star policy was intended to provide the broad 'umbrella' layer of secondary coverage''); Aetna Cas. and Sur. Co. v. United Services Auto.Ass'n, 676 F. Supp. 79, 81-82 (E.D. Pa. 1987) (as between two excess insurers, one was excess to the other because it was a ''true umbrella policy''; it provided ''extended coverage for a low premium; it is labeled 'excess indemnity policy'; and the named insured must maintain underlying primary insurance''); Home Ins. Co., Inc. v. Liberty Mut. Ins. Co., 678 F. Supp. 1066, 1069–70 (S.D. N.Y. 1988) (''an umbrella policy is not required to contribute to the payment of a settlement until all other applicable policies have been exhausted regardless of the wording of those policies' 'other insurance' clauses''); Carrabba v. Employers Cas. Co., 742 S.W.2d 709, 714–15 (Tex. App. Houston 14th Dist. 1987) (ignoring ''other insurance'' clauses because policies were ''not of the same character; one was a primary policy and one was an umbrella policy''); Allstate Ins. Co. v. American Hardware Mut.

                              (continued...)

4

**Exhibit 1**
**Page 7 of 31**

primary policies. As explained in section 6.45 of my book, excess insurers are liable only for amounts that exceed the primary insurance. Accordingly, for example, as discussed in section 2.1, pages 2-3 to 2-4, of my book, unless and until the primary insurer tenders or pays its entire policy limit, an excess insurer is not obligated to pay any money on behalf of the insured.[3]

> (W)hen an excess insurer is put on notice of a claim, it is not automatically obligated to take any action if it has no duty to provide a defense. Beyond a general duty of good faith and fair dealing - - obligating the excess insurer reasonably to respond to reasonable questions from its insured about coverage - - the excess insurer would not be obligated to do anything unless and until the amount of the primary limits were made available to settle the claim against the insured. Only at that point might the excess insurer have a duty to provide any policy benefits; accordingly, it is only at that point that the excess insurer must come to a conclusion as to the settlement value of the covered claims. An excess insurer might have previously monitored the litigation and conducted an investigation, but if it did so, it would not have done so out of any legal obligation to take such actions at that time. It would have done so because, as a practical matter, it might not later have had adequate time to evaluate the claims made against the insured if and when the primary limits were tendered and the excess insurer was called upon to make a contribution to a settlement.

---------

[2](...continued)

Ins. Co., 865 F.2d 592, 594 (4th Cir. 1989) (West Virginia law) (umbrella policy is excess to non-umbrella policy with excess clause); Allstate Ins. Co. v. Frank B. Hall & Co. of California, 770 P.2d 1342, 1347 (Colo. Ct. App. 1989) ("total policy insuring intent" required that umbrella policy be excess to policy designed to provide primary protection, even though latter policy had excess "other insurance" clause); Oelhafen v. Tower Ins. Co., 171 Wis. 2d 532, 492 N.W.2d 321, 324 (Ct. App. 1992) (umbrella policy is excess over a primary policy containing an excess clause); LeMars Mut. Ins. Co. v. Farm & City Ins. Co., 494 N.W.2d 216, 218–19 (Iowa 1992) ("To determine the priority among applicable insurance policies, we construe these policies as a whole in light of the pattern of coverage intended to result from multiple policies." Accordingly, in a conflict between multiple excess clauses, the umbrella policy was excess to a policy that was "marketed and sold as a primary insurance policy"); Independent Fire Ins. Co v. Mutual Assur. Inc., 553 So.2d 115, 117-18 (Ala. 1989) (umbrella policy excess over policy with excess clause).

[3]A recent case consistent with my analysis - - that an excess insurer has no duties before the primary is exhausted/tendered - - is Newmont USA Ltd. v. America Home Assur. Co., 795 F.Supp.2d 1150, 1175, 1177 (E.D. Wash. 2011) (quoting from section 2.1 of my book, the section referred to above).

5

**Exhibit 1**
**Page 8 of 31**

6.      The same is true with regard to defense cost benefits. Consistent with industry practice, excess policies do not provide defense costs benefits unless and until the primary layer is exhausted. See the discussion in section 4.11, pages 4-135 to 4-140, of my book.

### §4:11   Excess insurer's duty to defend

Most courts have held that an excess insurer that has a duty to defend is not obligated to provide a defense if the primary insurer is so obligated.

x   x   x

In short, the correct rule is that since the primary insurer's duty, once activated, encompasses the claims that have been made against the insured regardless of whether they are in excess of the primary insurer's policy limits, the excess insurer's duty to defend does not come into existence.

### II.   "True" Excess Policies Versus "Non-True" Excess Policies: In General

7.      As discussed in section 7.2 of my book, there are two types of policies that afford excess insurance: (1) policies that were designed to be excess at the time that they were issued, the premium for which was calculated based on the fact that the policy was an excess policy, and (2) policies that were issued as primary policies, but may happen to afford excess insurance because they contain excess "other insurance" clauses.[4] See, for example, the discussion on pages 7-15 to 7-

---

[4]"Other insurance" clauses are discussed in section 7.1 of my book. Pages 7-2 to 7-8 explain as follows.

Insurance policies almost always contain provisions attempting to limit or eliminate coverage under the policy in the event the insured has other insurance available. There are three basic types of such *other insurance* clauses: a pro rata clause, which limits the insurer's liability to its pro rata share of the loss; an excess clause, which provides that the policy is excess over other available insurance; an escape clause, which provides indemnity only in the event that other insurance is unavailable.

x   x   x

(I)f one other insurance clause states that the policy is primary, and the other insurance clause states that it is excess, the courts will

(continued...)

6

Exhibit 1
Page 9 of 31

20 of my book.

> (I)n some cases, a carrier will provide insurance that, at the time it is purchased, is designed to be excess over another policy. The policy, in fact, often expressly refers to the underlying insurance, and, presumably, the premium charged by the insurer will reflect that insurer's reduced risk because of the existence of the underlying insurance. There is no question, under those circumstances, that such a policy should be treated as an excess policy. Similarly, an umbrella or true excess policy should be held to be excess over what was, in fact, a primary policy even when the applicable "other insurance" clause in the primary policy states that it is excess.

8.    The Granite State and ICSP policies at issue are all true excess policies.

### III.    What Happens When a Primary Insurer Is Insolvent: "Non-True" Excess Policies

9.    As discussed in section 4.11, pages 4-141 to 4-143, of my book, when a primary policy underlying a "non-true" excess policy refuses to defend the insured, the 'non-true' excess insurer should provide the insured a defense, and then later seek reimbursement from the primary

---

[4](...continued)
routinely give the clauses effect, regardless of the parties' actual intent.

> In other circumstances, there is a conflict of authority in the case law. Most courts have held that if one policy states that it provides coverage in excess of other policies, while a second policy states that its liability is limited to a pro rata portion of the loss, the language does not conflict and the latter policy provides primary coverage. A few courts however, have held that such clauses are mutually repugnant.

> Similarly, most courts have held that an escape clause takes precedent over a pro rata clause. Again, however, there is authority holding that such clauses are mutually repugnant.

> The courts have had more difficulty in dealing with excess-escape clause combinations. One line of cases has imposed liability on the policy containing the escape clause, reasoning that the policy with the excess clause does not in fact provide other valid and collectible insurance within the meaning of the escape clause. Other courts have taken the opposite view, giving full effect to the escape clause and holding that the insurer with the policy containing the excess clause is primarily liable. And still others have held that the two clauses are mutually repugnant.

**Exhibit 1**
**Page 10 of 31**

insurer.

> The foregoing rule with respect to the excess insurer's responsibilities assumes that the primary insurer has, in fact, assumed the defense. If it has not, the courts will apply a different rule. Recognizing that it is more equitable, vis-a-vis the insured, to condition the excess insurer's obligation to defend on the primary insurer's actually assuming the defense, it has been held that, when the primary insurer refuses to defend, an excess insurer that is not a "true" excess insurer and has a duty to defend provision in its policy must defend, assuming, of course, that the claim against the insured exceeds the policy limits of the underlying insurance.[5] The burden would then be on the non-true excess insurer, rather than the insured, to obtain reimbursement from the primary insurer. The insured, having obtained the protection provided by the non-true excess policy, should be entitled so to rely on that insurer.

10.     As explained on page 4-143, footnote 11, however, the foregoing rule "should not normally be followed if the primary insurer is insolvent. See §§6.13, 6.45. (Citations omitted.) Although it is equitable to put the burden on the excess insurer of proceeding against the primary insurer in order to establish that the primary insurer provided coverage, it is not equitable to compel the excess insurer to bear the ultimate cost of the defense when it did not contract for it.

### IV.   What Happens When a Primary Insurer Is Insolvent: "True" Excess Policies

11.     As discussed in section I of this report, in general, insurance benefits are not owed under an excess policy - - whether it is a "true" excess policy or a "non-true" excess policy - - unless the primary policies have been exhausted.[6] Moreover, as discussed in section III of this report, that general rule should probably apply to "non-true" excess policies when the primary insurer is

---

[5] Among the cases cited in my book is School Dist. No. 1, Multnomah County v. Mission Ins. Co., 58 Or. App. 692, 650 P.2d 929, 944, 6 Ed. Law Rept. 819 (1982).

[6] Note that, as discussed in section 6.45, pages 6-455 to 6-457, of my book, if multiple years of coverage afford coverage, all of the primary insurance should be exhausted before an excess policy should have to afford coverage.

> (A)s indicated in the discussion in §7.5, assuming duplicative coverage is triggered in multiple years, any and all benefits owed under any primary policy in any year should be considered before any excess policy in any year should be obligated to pay. The fact that the total amount of primary insurance affording coverage exceeds the amount contemplated by, or referred to in, the excess policy is irrelevant.

8

**Exhibit 1**
**Page 11 of 31**

insolvent.

12.     As discussed in section II of this report, the subject Granite State and ICSP policies are "true" excess policies. Whether or not (as discussed in section III of this report) "non-true" excess policies have to afford coverage if the primary insurer is insolvent, "true" excess policies do not. See, for example, the discussion in section 4.11, footnote 8, of my book. In the context of discussing the fact (analyzed in section III of this report) that a "non-true" excess insurer should have to afford coverage when a (solvent) primary insurer refuses to defend, footnote 8 explains that a different rule applies to a "true" excess insurer.

> "True" excess insurers are discussed in §7.2. Those insurers should not have to provide a defense when a primary fails to do so because the excess' coverage was designed not to be triggered unless and until the amount of the primary insurance has been exhausted.[7]

13.     As discussed in section 6.45, page 6-464, of my book, "excess policies will rarely 'drop down' and pay a portion of a loss that a primary carrier would have paid had it not become insolvent.".... (S)ince excess policies are intended to insure against third party liability claims, not against the solvency of underlying insurers, there should be no drop down unless the excess policy expressly provided for a drop down."[8]

---

[7]In addition to the cases cited in section 4.11 of my book, analogous cases cited in section 6.45 of my book include National Cas. Co. v. Western World Ins. Co., 669 F.3d 608, 617 n.6 (5th Cir. 2012) (Texas law) (Court distinguished a "true excess policy" from a policy that is "excess by coincidence." "True excess policies, which require the policyholder to obtain primary insurance . . ., are only triggered when that additional insurance is exhausted." Policies that are excess by coincidence "do not require the policyholder to obtain additional coverage," and "only limit the insurer's responsibilities when the policyholder happens to have another policy covering the same incident"); Liberty Mut Ins. Co v. Pella Corp, 633 F. Supp. 2d 714, 725 (SD Iowa 2009) ("An 'other insurance' clause found in a primary policy is an attempt by the insurer to define which coverage is primary and which coverage is excess between policies.... In the case of a 'true excess' policy, however, any underlying primary coverage must be exhausted before coverage under the excess policy is triggered"); Allmerica Financial Corp. v. Certain Underwriters at Lloyd's, London, 449 Mass. 621, 871 N.E.2d 418, 426 (2007) ("(E)xcess insurance policies . . . are separate and distinct contracts from the primary policy. An insurance program involving a primary policy and one or more excess policies divides risk into distinct units and insures each unit individually. The individual insurers do not (absent a specific provision) act as co-insurers of the entirety of the risk. Rather, each insurer contracts with the insured individually to cover a particular portion of the risk . . . The layer of risk each insurer covers is defined and distinct").

[8]Among the cases cited in my book are Playtex FP, Inc. v. Columbia Cas. Co., 622 A.2d 1074, 1078 (Del. Super. Ct. 1992) ("'The purpose of a liability insurance program is to protect the insured against third party liability claims, not to insure the solvency of underlying insurers. Absent policy language indicating that the parties intended to provide for insolvency drop down, the court would be adding coverage which was not provided by the contract if it were to require insolvency drop down''); 

(continued...)

**Exhibit 1**
**Page 12 of 31**

14.     See also the discussion in section 6.13, pages 6-209 to 6-211, of my book.

> When an insurance policy is expressly stated to be excess over some underlying policy, the excess insurer's liability should not be affected if the primary policy proves to be uncollectible. Coverage under the primary policy may, for example, be lost because the policy is allowed to expire, because the policy is canceled, because the policy is rescinded as a result of a misrepresentation by the insured, or because the insured fails to comply with contractual obligations under the policy. In all events, the excess insurer, having contracted with the insured and set a premium based on the existence of the underlying insurance, should have such liability as would have existed had the primary policy been collectible. This result will normally be called for by the terms of the excess policy, but the result should ordinarily be the same even in the absence of such express policy terms. The only exception should be if the policy indicates that the excess insurer agreed to accept the risk that the primary policy would prove to be uncollectible.

15.     See also the discussion in section 3.9, page 3-65, emphasizing that "courts are simply not allowed to rewrite insurance contracts in order to make them more favorable to the insured." One would have to rewrite the ICSP policy if one were to require ICSP to pay what the primary policy was supposed to have paid. As written, ICSP is not obligated to pay any defense costs because the ICSP policy obligates ICSP to pay only what the primary insurer is not obligated to pay. Under the terms of the Home primary policies, Home is obligated to pay all of the defense costs.

16.     See also the discussion in section 11.22E that "considerations of fairness do not allow a court to write a better contract for the insured."

17.     As a practical matter, therefore, as discussed in section 6.45, pages 6-461 to 6-462 and 6-472 to 6-473, "(t)he excess insurer is entitled to a credit for all of the benefits that should have been paid under the terms of the primary policy."    With regard to coverage for settlements/judgments, that means that "the excess insurer is ... entitled to a credit in the amount of the primary policy's total limit."    With regard to coverage for defense costs, that means that the excess insurer does not have to pay any of the defense costs, since (as discussed at the end of section I of this report) all of the defense costs should have been paid by the primary insurer (until the primary's limit is exhausted by settlements/judgments exceeding the primary's limit).

## V.   Mr. Connolly's Report Is Incorrect

---

[8](...continued)

Wurth v. Ideal Mut. Ins. Co., 34 Ohio App. 3d 325, 518 N.E.2d 607, 610–11 (12th Dist. Warren County 1987) (excess insurer not required to drop down by reason of primary carrier's insolvency; court gave a common-sense interpretation to language of excess policy, and held that public policy did not require a different result because excess insurer did not insure against risk of underlying carrier's insolvency).

10

Exhibit 1
Page 13 of 31

18.     Mr. Connolly does not dispute that, as written, the primary policies issued by Home afford defense costs coverage for the subject claims against the insured. That is, he does not dispute that the subject claims <u>are</u> covered by "underlying insurance." He then asserts, however, that ICSP has a duty to defend because (a) the ICSP policies state, in the Defense Endorsement, that they will afford coverage "in the event there be no underlying insurance," and (b) there is "no underlying insurance" because Home is financially unable to pay the "underlying insurance" that undisputedly exists. Mr. Connolly's assertion is flawed.

19.     There is a difference between there being no primary insurance and there being primary insurance (that is not paid). It is one thing for an excess insurer to assume the risk that a loss might fall within the gaps in the coverage afforded under the terms of a primary policy form that is written more narrowly than the excess policy form (a common occurrence), and quite another for an excess insurer to assume the risk that a primary insurer (that affords coverage) might become insolvent.  The first risk is a risk that used to be assumed under standard umbrella policy forms, and it is a risk that could be (and was) evaluated by excess insurers' underwriting departments at the time that the excess insurer quoted the premium that it would charge. The latter risk, by contrast, could not be (and was not) evaluated by excess insurers' underwriting departments. No premium was charged for that risk,[9] and an insured would have had no reason to believe otherwise. As discussed in section 6.2, pages 6-44, of my book.

> It must not be forgotten that the object of contract interpretation is to arrive at and carry out the intent of the contracting parties.[10]

20.     Moreover, reading the subject policy language in context[11] leads to the same

---

[9]As discussed in section 6.45, pages 6-467 to 6-468, of my book, some umbrella policies used to be written to afford coverage excess over the "amount recoverable" under the primary insurance. Umbrella insurers, having intended the language to mean the amount that the insured would have been able to recover had the primary insurer not become insolvent, went to court. Some courts held in favor of the umbrella insurer, and some did not. As summarized in page 6-468, of my book:

> Many ... courts have similarly held that the phrase "amount recoverable" does not require a drop down. Some courts, however, have held to the contrary.

[10]See also section 6.2, pages 6-67 to 6-68, of my book.

> The conclusion that there may have been a "clearer" way to have written a questioned clause does not support a finding of ambiguity.

[11]See section 6.2, page 6-21, of my book.

(continued...)

11

**Exhibit 1**
**Page 14 of 31**

result. In fact, as referred to in footnote 9 of this report, my book collect numerous cases holding that, read in context, even a provision in an excess policy stating that the excess insurance was excess over the "amount recoverable" under the primary policy does not require that the excess insurer afford coverage when the primary insurer is insolvent.

21.    Turning to the language used in the ICSP policy - - in order to put the language in the Defense Endorsement in context - - the insuring agreements in the ICSP policy (set forth on the first page of the basic policy form) state that ICSP would afford primary coverage only if a claim was "not covered"[12] by a primary policy. If a claim was "covered" by a primary policy, ICSP's coverage would be excess over "the limits of the underlying insurance."[13]  Accordingly, ICSP would afford coverage "in the event of exhaustion" of the primary coverage. What was the coverage that would be afforded by ICSP?  ICSP would pay for the insured's defense costs (as part of ICSP's duty to pay "ultimate net loss"), but ICSP would not have a duty to defend. What the  "Defense Endorsement" to the ICSP policy does add a duty to defend. The endorsement adds a duty to defend when "there be no underlying insurance." Reading the endorsement in context with the policy's insuring agreements, when is there "no underlying insurance"? The answer is when, to use the words in the insuring agreements, (i) a claim is "not covered" by a primary policy, or (ii) "the limits of the underlying insurance" have been exhausted. That is to say, reading the policy as a whole, the policy tells the reader what is meant by the words "no underlying insurance," and the words do not mean "when the primary insurer has become insolvent." The endorsement does not purport to rewrite the policy to afford solvency coverage in contravention of the terms of the insuring agreements. As

_____

[11](...continued)
          The words used in a policy should be read in context, in order to
          give the words the meaning intended as evidenced by the context.

Among the cases cited on page 6-23 of my book is Schutt v. Farmers Ins. Group of Companies, 129 Or. App. 401, 879 P.2d 1303, 1305 (1994) ("for a term to be 'legally ambiguous,' ... it must be susceptible to at least two alternative interpretations that remain plausible after having been examined in the light of the particular context in which the term is used in the policy and the broader context of the policy as a whole").

[12]As discussed near the top of page 6-467 of my book, the word "covered" "refer(s) to whether the (primary) policy insured against a certain risk and (does) not refer to collectability."

[13]The use of the words "limits of insurance" means that the ICSP policy will not afford primary coverage simply because the primary insurer is insolvent. See the discussion in section 6.45, pages 6-464 to 6-465, of my book.

          Turning to the policy language that courts have found to
          preclude a drop down, some excess policies contain a provision stating
          that the insurer agrees to pay sums excess of the "limits of liability" of
          the underlying insurance. The foregoing proviso makes it fairly clear that
          the excess policies do not drop down when an underlying insurer is
          insolvent.

Exhibit 1
Page 15 of 31

evidenced even by the title of the endorsement[14] - - Defense Endorsement - - all that the endorsement does is add a duty to defend when (as set forth in the insuring agreements) the ICSP policy happens to afford primary coverage. See the discussion in section 6.2, pages 6-18 to 6-19, of my book is on point. "Endorsements should, if possible, be construed together with the terms of the insurance policy to which they are attached.... In general, one must attempt to harmonize policy provisions."

22.    In short, the policy interpretation advanced by Mr. Connolly does not make sense. It also contravenes fundamental rules of insurance contract construction. It is also not supported by the analysis adopted in analogous case law. In addition to the discussion of the insolvency issue in section IV of this report, see the analogous discussion in section 6.45, pages 6-466 to 6-468, of my book.

The decision in American Re-Insurance Co v SGB Universal Builders Supply, Inc is similar. The excess policy in that case had a provision that did not clearly prohibit a drop down. The excess policy "provided that liability shall attach only after the underlying insurers have paid or have been held liable to pay the full amount of their respective net loss liability." Although recognizing that at least one other state might reach a different result, the court nevertheless held that the excess insurer did not drop down.

Excess liability insurance is a low-cost method of providing extended protection where primary (and secondary) insurance leaves off; its premiums do not reflect the assumption of risk of the primary carrier's insolvency. (Citation omitted.) In the instant case, it would seem that they do not even reflect the cost of scrutinizing the financial condition of the primary providers. Those risks and costs are better left with the purchaser of the primary policy. (Citations omitted.)

This court has not been directed to any case in which a New York court has allowed excess liability coverage to drop down when the primary insurer becomes insolvent. In Pergament Distributors, Inc. v. Old Republic Ins. Co., 128 A.D.2d 760, 513 N.Y.S.2d 467 (2d Dep't 1987), yet another case arising out of

---

[14]Among the cases cited in the 2015 supplement to my book is International Multifoods Corp v. Commercial Union Ins. Co., 309 F.3d 76, 86-87, 2002 A.M.C. 2939 (2d Cir. 2002) (New York law) ("we must consider the caption (of a policy provision) in tandem with the actual contractual provisions"; policy must be read as a whole).

13

Exhibit 1
Page 16 of 31

the insolvency of Ambassador, the insured argued for such a drop down and sought a declaratory judgment to that effect. Defendant's motion for summary judgment dismissing the complaint had been denied below and partial summary judgment granted to plaintiff. The Appellate Division for the Second Department reversed and granted defendant's motion. The insured there had argued that the words "covered" and "not covered" (by the underlying policies) were ambiguous and resolution of that ambiguity should be resolved in its favor. The Appellate Division, however, found that in context they referred to whether the policy insured against a certain risk and did not refer to collectability (supra, at 761). In Prince Carpentry, Inc. v. Cosmopolitan Mut. Ins. Co., 124 Misc. 2d 919, 930–931, 479 N.Y.S.2d 284 (Sup 1984), it was similarly held that "the excess insurer is not insuring against the insolvency of the primary insurer." In St. Vincent's Hosp. & Medical Center v. Insurance Co. of North America, 117 Misc. 2d 665, 668, 457 N.Y.S.2d 670 (Sup 1982), it was held that insolvency and/or unidentifiability did not create liability on the part of an excess insurer because such occurrences do not result in claims in excess of the amounts specified in the primary policy.

The policy must be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed. (Citation omitted.) What is basic and unequivocal in the instant case is that the coverage is described in the Policy as "Excess Umbrella Liability" (item 3). "Excess Umbrella Liability" is a readily understood phrase. It was probably even more readily understood in 1976, when the policy was issued (most of the "drop down" litigation seems to have occurred in the 1980's). The "Limit of Liability—Underlying Limits" provision of the policy that "liability shall attach to [First State] only after the Underlying Umbrella Insurers have paid or have been held liable to pay the full amount of their ultimate net loss liability" of $1,000,000 for each occurrence and $1,000,000 for

14

Exhibit 1
Page 17 of 31

each year and that First State ''shall then be liable to pay only the excess thereof up to a further'' $2,000,000 of $4,000,000 per occurrence and per year is also clear, even standing alone. When it is read in the context of an ''Excess Umbrella Liability'' insurance policy (see, Pergament Distribs. v. Old Republic Ins. Co., supra, at 761), the intention of the parties is clear beyond even a shadow of doubt. No reading of the policy can justify a drop down by the excess insurers into the first million of liability. (Emphasis added.)

Another analogous case, discussed on page 6-465 of my book, is J.Kinderman & Sons v. United National Insurance Co., 406 Pa. Super. 37, 593 A.2d 857, 859-60 (1991), aff'd, 533 Pa. 87, 619 A.2d 1058 (1993) ("United's coverage does not drop down simply because the underlying insurer has become insolvent").

23.    Finally, it should be noted that Mr. Connolly's reference to the testimony of Mr. Fine is inexplicable. Either the ICSP polices were written to provide insurance against Home's insolvency or they were not. If, as discussed above, they were not, the insurance that was purchased from ICSP in the 1970s is not somehow retroactively changed because of how Mr. Fine happened to word one of his answers at a recent deposition. See the discussion in section 6.2, pages 6-128 to 6-30, of my book.

(A)n insurance company employee's interpretation of a policy provision, whether at a deposition or as reflected in the claim file, should be irrelevant. (Collecting cases.)

Citing Leach v. Scottsdale Indemn. Co., 261 Or. App. 234, 323 P.3d 337, 345 (2014), page 13 of the 2015 supplement to section 6.2 of my book goes on to state that "(b)y the same token, an insurer cannot deny coverage based upon the insured's interpretation of a policy provision at his or her deposition...."

## VI.  Granite State and ICSP Are Not Obligated to Pay Any of the Insured's Defense Costs: Mr. Hughes' Report Is Also Incorrect

24.    For the reasons discussed in section V of this report, if ICSP were to have a duty to pay defense costs, it would have to be either (a) because the (primary) Home policies do not "cover" the subject claims against the insured, or (b) because if Home had not been insolvent, the

15

**Exhibit 1**
**Page 18 of 31**

limits of the Home policies would have been exhausted by the payment of settlements/judgments.[15] Mr. Connolly does not contend that (the insured has satisfied its burden of proving[16] that) either of those things is true. Nevertheless, he asserts on pages 25-26 of his report that ICSP is obligated to pay a share of the defense costs based upon the insuring agreements in the ICSP policy. That assertion is false for the reasons discussed in section I-V of this report.

      25.     For essentially the same reasons that ICSP is not presently obligated to pay any defense costs, neither is Granite State. Granite State affords excess insurance; as a result, unless and until the primary policies that afford coverage are exhausted, Granite State is not obligated to pay any of the defense costs. See the discussion in sections I-IV of this report.

      26.     Does Mr. Hughes disagree? He does not dispute that Granite State's coverage is excess if a primary policy affords coverage, and he does not dispute that non-exhausted primary policies do, in fact, afford coverage. As discussed in sections I-IV of this report, when as in the matter at hand, a primary policy affords defense cost coverage, consistent with industry practice, an excess insurer should not be obligated to pay any defense costs.[17] Does Mr. Hughes disagree? If so,

---

    [15]As one would expect, the limits of the Home policies could not have been exhausted by the payment of defense costs, since defense costs are owed in addition to limits.

    [16]As discussed in section 9.1, pages 9-2 and 9-6, of my book, "in general, the burden is on the insured to demonstrate that a loss is encompassed by the general coverage provisions of the insurance contract....If the policy is an excess policy, the insured also has the burden of proving that the loss exceeds the primary coverage, or that the primary has otherwise been exhausted. That is because, if the policy is a true excess policy, the requirement that the primary insurance be exhausted/exceeded is part of the insuring agreement."

    [17]In the event that all of the primary insurance is exhausted, Granite State would then provide "underlying insurance, subject to the terms ... of this policy." (Emphasis added). Under the terms of the Granite State policy, if a primary insurer ever afforded coverage, Granite State would pay for the cost of the defense as part of the "ultimate net loss." Necessarily, therefore, if and when the primary policies are exhausted, Granite State would not have a duty to defend, since under the terms of the Granite State policy, Granite State would be obligated only to pay for the defense costs as part of the "ultimate net loss."

    Note that it would have been different if the Granite State policies had contained a broad following form provision - - a provision that incorporated the terms of the primary policies for defense and indemnity. (Such provisions are discussed in section 6.2, pages 6-55 to 6-56, of my book.) The Granite State policies do not contain such a following form provision. Accordingly, since the Granite State policies do not contain a broad provision incorporating the terms of the primary policies, it is irrelevant that the primary policies contain a duty to defend provision. The coverage afforded by Granite State depends upon what the Granite State policies say, not upon what another insurer's policies say. Consistent with industry practice, section 6.2, page 6-126, of my book explains that "the provisions in

            (continued...)

**Exhibit 1**
**Page 19 of 31**

why? He does not say in his report.

     27.     I have reviewed the documents on the enclosed list.

     28.     I have enclosed a resume and list of prior testimony.

     29.     My hourly rate is $585.

4/1/15

_____

Date

_____

ALLAN D. WINDT

----

[17](...continued)
another insurance company's policy" should not "be considered."

     In short, in the event that all of the primary insurance is exhausted, Granite State would then provide primary insurance. Does that mean that the Granite State policies would be rewritten to contain a duty to defend provision? No. The fact that an insurer affords primary insurance does not mean that the insurer has a duty to defend. As pointed out in section 4.1, pages 4-3 to 4-4, of my book, some primary policies contain a duty to defend provision, and some do not. The Granite State policies do not, and one is not allowed, as Mr. Hughes has done, to rewrite an insurance policy after a loss in order to expand its coverage. See the discussion in section 3.9, page 3-65, of my book.

     Courts are simply not allowed to rewrite insurance contracts in
     order to make them more favorable to the insured.

     Note that, as is also true with regard to the ICSP policies, it should make little practical difference even if a duty to defend did exist under the Granite State policies. The fact would remain that the policy limit would still be used up by defense costs. The first page of the ICSP and Granite State policies puts a cap on the amount that the insurers will pay "for damages... and expenses," the cap being the policy limit.

17

Exhibit 1
Page 20 of 31

## <u>DOCUMENTS REVIEWED</u>

1.  Complaint filed in the action *Century Indemnity Co. v. The Marine Group, LLC, et al.*, United States District Court of Oregon Case No. CV08-1375-AC.

2.  Granite State Insurance Company policy numbers 6579-6286 (effective July 1, 1979 to July 1, 1980), 6580-7440 (effective July 1, 1980 to July 1, 1981), 6581-8085 (effective July 1, 1981 to July 1, 1982), 6582-9729 (effective July 1, 1982 to July 1, 1983), 6583-0732 (effective July 1, 1983 to July 1, 1984), and 6584-1790 (effective August 1, 1984 to August 1, 1985).

3.  Insurance Company of the State of Pennsylvania policy numbers 4573-1771 (effective July 1, 1973 to July 1, 1976), 4576-1950 (effective July 1, 1976 to July 1, 1977), and 4577-2144 (effective July 1, 1977 to July 1, 1978).

4.  Insurance Company of North America policy numbers ISG1001 (effective July 1, 1978 to July 1, 1979) and ISL1062 (effective July 1, 1979 to July 1, 1980).

5.  Home Indemnity Company policy numbers GA996225 (effective July 1, 1975 to July 1, 1976) and GA996305 (effective July 1, 1976 to July 1, 1977).

6.  Century Indemnity Company policy numbers CIS430659 (effective July 1, 1982 to July 1, 1984) and CIS431140 (effective August 1, 1984 to August 1, 1985).

7.  Agricultural Insurance Company policy numbers SL0005754 (effective July 1, 1980 to July 1, 1981) and GL0003655 (effective July 1, 1981 to July 1, 1982).

8.  Expert Report by Dennis R. Connolly on behalf of Agricultural Insurance Company and Agricultural Excess and Surplus Insurance Company.

9.  Expert Report by Robert N. Hughes on behalf of The Marine Group.

10. Opinion and Order of the Court dated January 27, 2012 on The Marine Group's Motion for Summary Judgment against Agricultural Insurance Company, Agricultural Excess and Surplus Insurance Company, Insurance Company of North America, and St. Paul Mercury Indemnity Company.

11. Coverage Chart of policies at issue.

**Exhibit 1**
**Page 21 of 31**

# CURRICULUM VITAE

**NAME:**    Allan D. Windt

**BUSINESS ADDRESS**

Allan D. Windt
27 West Athens Avenue
Suite 230
Ardmore, PA  19003
(610) 649-8150
(610) 649-8194  Facsimile
Allanwindt@verizon.net

**EDUCATION:**

Duke Law School                     Sept. '73 - June '76
Graduated First in Class

**PUBLICATIONS:**

Insurance Claims & Disputes, Representation of Insurers and Insureds, West, 1982 first edition, 1988 second edition, 1995 third edition, 2001 fourth edition, 2007 fifth edition, 2013 sixth edition.

**LECTURES:**

Mr. Windt has given more than 40 lectures across the country, including presentations to the American Bar Association's Insurance Law Section, the Texas Bar Associations's Consumer Law Section, Mealey's and American Conference Institute events, and the home offices of numerous insurance companies.

Mr. Windt's book has been cited as authoritative by more than three hundred courts throughout the country.

**Exhibit 1**
**Page 22 of 31**

Mr. Windt has handled insurance claims, in all 50 states, for more than 70 insurance companies and hundreds of insureds. He has handled more than 10,000 claims over approximately 30 years. In addition to his work as a claims handler, Mr. Windt has written insurance policies for numerous insurance companies. During his more than thirty years of experience, Mr. Windt has become thoroughly familiar with the accepted customs, practices and standards in the insurance industry concerning insurance claims handling, coverage, and the duties to defend, settle and indemnify.

Mr. Windt has been retained as an expert witness on bad faith, coverage and breach of duty to settle issues in Mississippi, California, Oklahoma, Nebraska, Oregon, Minnesota, Texas, Tennessee, Michigan, Washington, Alaska, Colorado, Arizona, Maryland, New Jersey, New York, Florida, Alabama, West Virginia, South Carolina, North Carolina, Montana, Ohio, Illinois, Nevada, Indiana, Louisiana, Montana, Pennsylvania, New Hampshire, Massachusetts, Hawaii, Utah, New Mexico, Wisconsin, Delaware, Georgia, Montana, Idaho, Connecticut, Missouri, the District of Columbia, Virginia, Kentucky, Iowa, Bermuda and the Virgin Islands.

## Judicial Proceedings In Which Testified At Trial During The Past Ten (Plus) Years

1.    McNatt v. Aon, et al. (Northern District of MIssissippi). Engaged by Caryn Anlage of Copeland, Cook in Ridgeland, Mississippi. Testified on behalf of insured.

2.    Rinehart v. Shelter Insurance Company. Engaged by Louis Accurso of Accurso Law Firm in Kansas City, Missouri. Testified for insured.

3.    Allstate v. Fie. Engaged by James Kipp of Trzuskowski, Kipp & Kelleher of Wilmington, Delaware. Testified on behalf of insured.

4.    Ceda Mills v. Cincinnati Insurance Co. Engaged by Paul Walsh of Walsh, Collis & Blackmer, Pittsburgh, PA. U.S. Bankruptcy Court for W.D. of Pa. Adversary Proceeding No. 04-2773BM. Testified on behalf of insurer.

5.    Brethren Mutual Insurance Co v. Thomas. Engaged by Martin Durkin of Durkin Law Offices, Philadelphia, PA. U.S. D.Ct. for M.D. of Pa., Case 3:04 cv 1509. Testified on behalf of insurer.

6.    MacLean Townhomes, LLC v. Charter Oak Insurance Co. Engaged by Mark Thorsrud of Thorsrud, Cane & Paulich in Seattle, Washington. Testified on behalf of insurer. U.S. D. Ct. for Western District of Washington at Tacoma. Civil Action No. C06-1093BHS

7.    Hartford v. Federal. Engaged by Gary Gassman of Meckler, Bulger, Tilson, Marick & Pearson of Chicago, Illinois. Testified on behalf of Federal. Bermuda arbitration.

8.    Sun Healthcare Group v. National Union Fire Insurance Co. Engaged by Susan Sullivan of Sedgwick, Detert, Moran & Arnold in Los Angeles, CA. Superior Court of California, Orange County, Civil Action No. 04CC06344. Testified on behalf of insurer.

9.    Continental Carbon v. National Union. Texas arbitration. Engaged by Jeffrey Wolff of Fulbright & Jaworski in Houston, Texas. Testified for insurer.

10.    Treadways v. Travelers Insurance Company. Engaged by Francis Deasey of Deasey, Mahoney in Philadelphia, PA. U.S. D. Ct. for ED of Pa, Phil., Pa. Civil Action No. 08-04751, Testified for insurer.

11.    Lake Texoma Highport, LLC v. Bowood Insurance Brokers, Ltd., District Court of Grayson County, Texas, No. 08-0604-397. Engaged by Ashley Parrish of Cantey, Hanger, LLP, Dallas, Texas. Testified for broker and against insured.

12.    Wolfe v. Allstate, U.S.D.Ct. for Middle District of Pa., No. 4:10-cv-080. Engaged by Sara Richman of Pepper Hamilton, LLP, Philadelphia, PA. Testified for insurer.

13.    Maricopa County v. Insurance Company of the West, CV 2007-003947, Superior Court of Arizona, Maricopa County. Engaged by Michael Warzynski of Jardine, Baker, Hitchman, Houston of Phoenix, Arizona. Testified for insured.

**Exhibit 1**
**Page 24 of 31**

**Judicial Proceedings In Which Given Deposition Testimony**
**During the Past Ten (Plus) Years**

1.    Education America v. Coregis. Engaged, on behalf of insurer, by George Manos of Bollinger, Ruberry & Garvey in Chicago. Testified in South Carolina.

2.    Evanston Insurance Co. v. Oxford Life Insurance Co. Engaged by Miles Morgan of Henrickson & Long in Charleston, West Virginia. Testified against Evanston.

3.    Hercules, Inc. v. Various Insurance Companies. Testified for Hercules. Engaged by Mark Kolman, Esquire of Dickstein, Shapiro Morin & Oshinsky in Washington, D.C.

4.    Goodyear v. Lloyds, et al. Testified on behalf of Goodyear. Engaged by Nicholas Zoogman of Dickstein, Shapiro in New York.

5.    Perez v. Odyssey Re (London). Testified on behalf of Odyssey. Engaged by Addison Meyers of Mintzer, Sarowitz in Coral Gables, Florida.

6.    Research Corp v. Mt. Hawley Ins. Co. Engaged by Steven Plitt of Kunz Plitt of Phoenix, Arizona. Testified on behalf of Mt. Hawley.

7.    McGirt v. Gulf Insurance Co. Engaged by Robert Ferguson of Ferguson, Schetelich & Ballew in Baltimore, Maryland. Testified on behalf of Gulf Insurance Company.

8.    Toll v. Lexington Ins. Co. Engaged by Tom Contois of Steptoe & Johnson in Washington, D.C. Testified on behalf of insurer.

9.    Porter-Hayden v. Fireman's Fund. Engaged by Jeff Kaufman of Kaufman & Logan in San Francisco, California. Testified on behalf of insurer.

10.   Alia v. Royal. Engaged by Russell Love of Thorsurd, Cane & Paulich in Seattle, Washington. Testified on behalf of insurer.

11.   Everest v. Maremont. Engaged by Mark Kolman of Dickstein, Shapiro in Washington, D.C. Testified on behalf of insured.

12.   API v. Fireman's Fund. Engaged by Thomas Jensen of Lind, Jensen, Sullivan & Peterson, Minneapolis, Minnesota. Testified on behalf of insurer.

13.   AstenJohnson v. Columbia Insurance Company. Engaged by Jay Morstein of Piper Rudnick in Baltimore. Testified on behalf of insurer.

14.   Allstate v. Ford Motor Credit Company. Engaged by Modrall Sperling of Albuquerque, New Mexico. Testified on behalf of insurer.

15.   Scott v. Allstate. Engaged by Richard Sweebe of Ulmer & Berne in Cleveland, Ohio. Testified on behalf of insurer.

16.   Murphy v. GuideOne Mutual Insurance Company. Engaged by Jan Campbell of Leeuw, Oberlies and Campbell in Indianapolis, Indiana. Testified on behalf of insurer.

**Exhibit 1**
**Page 25 of 31**

17.    B.F. Goodrich v. Commercial Union and London Underwriters. Engaged by Judith Herrmann of Lane & Waterman in Davenport, Iowa and Michael Comisky of Lord, Bissell, Brook in Chicago, Illinois. Testified on behalf of insurer.

18.    Slater v. Progressive Insurance Company. Engaged by Terence Perkins of Smith Hood in Daytona Beach, Florida. Testified on behalf of insurer.

19.    Cargotec v. Westchester Fire Ins. Co. Engaged by Jonathan Schapp of Lustig & Brown in Buffalo, New York. Testified on behalf of insurer.

20.    Joseph v. CIGNA. Engaged by Wilfredo Geigel in St. Croix, U.S. Virgin Islands. Testified on behalf of insurer.

21.    Stanfill v. Acceptance Insurance Co. Engaged by Wayne Carroll of MacKenzie & Peden in Louisville, Kentucky. Testified on behalf of insurer.

22.    Penske v. Federal Insurance Co. Engaged by Nicholas Van Valen of Nicklaus & Associates in Coral Gables, Florida. Testified on behalf of insured.

23.    Aero Falcons v. Global. Engaged by Garry Montanari of Michaelis, Montanari in Westlake Village, California. Testified on behalf of insurer.

24.    Moeller v. Specialty Surplus Insurance Co. Engaged by Russell Love of Thorsrud, Cane & Paulich in Seattle, Washington. Testified on behalf of insurer.

25.    Poteet v. Farmers Insurance Co. Engaged by Steve Springer of Fletcher & Springer in Dallas, Texas. Testified on behalf of insurer.

26.    Bennett v. Ohio Farmers. Engaged by Ernest Hentschel of Kesner, Kesner and Bramble in Charleston, West Virginia. Testified on behalf of insurer. Circuit Court of Wood County, West Virginia. CA No. 00-C-133.

27.    Pilliod v. Auto Owners Ins Co. Engaged by Robert Bahret of Bahret & Associates Holland, Ohio. Court of Common Pleas of Lucas County, Ohio. Case No. CI02-3190. Testified on behalf of insurer.

28.    Oliver v. Steadfast Insurance Co. Engaged by Steven Clarfield of Sellers, Marion & Bachi, West Palm Beach, Florida. Testified on behalf of insurer. Circuit Court of 15th Circuit for Palm Beach County, Florida. Case No. 50 2004 CA 008514 AL

29.    TMSL v. Nationwide. Engaged by Pamela Carlos of Bennett Bricklin, Philadelphia, PA. Testified on behalf of insurer. U.S.D.C. for E.D. of Pa, Case No. 06-2087.

30.    Spine Care Delaware v. State Farm Mut Auto Ins Co., in February 2007. Engaged by John Spadaro of John Spadaro, LLC, Hockessin, Delaware. Testified against insurance company. Delaware Superior Court, New Castle County, Case No. 04C-04-264JEB.

31. Global Aerospace v. Arthur J. Gallagher & Co., in March 2007. Engaged by Timothy Ryan of Ryan & Fong, Sacramento, CA. Testified against broker. U.S.D.Ct. for E.D. of California, Case No. 2:06-CV-00594-LKK-KJM.

32. American Optical v. Admiral Ins Co., et al, in November 2007. Engaged by Mark Kolman of Dickstein Shapiro, Washington, D.C. Testified on behalf of insured. Sup. Ct. of N.J., Union County, Docket No. UNNL-2505-01.

33. Kelly-Moore Paint v. U.S. Fire, et al, in January 2008. Engaged by Evan Nadel of Squire, Sanders & Dempsey in San Francisco, California. Testified on behalf of insurer. Superior Court of Cal. for San Francisco, Case No. 325147.

34. Korndorffer v. USAA. Engaged by Greg Copeland of Copeland, Cook in Ridgeland, Mississippi. Testified on behalf of insurer. Circuit Court for Hancock Court, Case No. 06-0365.

35. Travelers v. National Union. Engaged by Robert Cockerham of Brown & James in St. Louis, Missouri. Testified on behalf of Travelers. U.S.D.Ct. for E.D. of Mo., Case No. 4:05 CV02193-RWS.

36. Strouse Greenberg Properties v. Lexington Ins. Co. Engaged by James Rocap of Steptoe Johnson in Washington, D.C. Testified on behalf of insurer. Civil District Court for Parish of New Orleans, Louisiana, Case No. 2007-8378, Division N-8.

37. Phillips, Gardill, Kaiser & Altmeyer, PLLC v. Acordia of West Virginia. Engaged by Eric Iskra of Spilman, Thomas & Battle in Charleston, West Virginia. Testified on behalf of Acordia. State Court, Civil Action No. 04-C-202.

38. Continental Cas. Co. v. MultiService Corp. Engaged by David Hoffman of Vasos Law Firm in Fairway, Kansas. U.S.D.Ct. for District of Kansas, Civil Action No. 06-2256-CM. Testified on behalf of insured.

39. Ben-Zeev v. Zurich American Ins. Co. Engaged by Ernie Ramos of Ramos Law Firm in Cincinnati, Ohio. U.S. D. Ct. for S.D. of Ohio, Civil Action No. 1:08-CV-0086. Testified on behalf of insured.

40. Kurtz v. ANPAC. Circuit Court of Jackson County, Missouri Case No. 0716-CV32494. Engaged by Louis Accurso of the Accurso Law Firm, Kansas City, Missouri. Testified for insured.

41. Vision One, LLC v. RSUI. U.S.D.C. for Western District of Washington at Seattle. No. 08-cv-1386 RSL. Engaged by David East of McNaul, Ebel, Nawrot and Helgren, Seattle, Washington. Testified for insurer.

42. Flintkote Company v. General Accident Assurance Company of Canada. No. C04-01827MHP. U.S. D.Ct. for Northern District of California. Engaged by Archie Robinson of Robinson & Wood, San Jose, California. Testified for insurer.

43.     Rohm and Haas, et al v. Utica Mutual Ins. Co.  No. 2:07-cv-584 (GP). U.S. D. Ct. for Eastern District of Pennsylvania. Engaged by Lon Berk of Hunton & Williams, McLean, Virginia. Testified for insurer.

44.     In re Cool Partners, Royal Indemnity Co, v. Admiral Ins. Co.  U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division. Case No. 02-30446-hdh-7.  Adversary No. 07-03361-hdh. Engaged by Everett New of Cox Smith in Dallas, Texas.  Testified for Admiral and against Royal.

45.     Retail Ventures v. National Union. U.S.D.Ct. for Southern District of Ohio, Eastern Division. Case No. 2:06-cv-00443. Engaged by Steven Janik of Janik & Dorman, Cleveland, Ohio. Testified for insurer.

46.     Duke University v. Coregis Insurance Company. U.S.D.Ct. for the Middle District of North Carolina. Civil Action No. 1:09-CV-00281. Engaged by Deborah Bowers of Pinto, Coates, Kyre and Brown, Greensboro, North Carolina. Testified for insured.

47.     Tool Touring v. Clarendon National Ins. Company.  Superior Ct. of California, County of Los Angeles.  Civil Action No. BC 371155. Engaged by Tracy Rane of McPherson & Rane in Los Angeles. Testified for insured.

48.     Lentz v. Northwestern National Ins. Co.  U.S. District Court for E.D. of Louisiana. Civil Action No. 02-1235.  Engaged by Neil Freund of Freund, Freeze and Arnold, Dayton, Ohio. Testified for insurer.

49.     Guy v. Mendakota Insurance Company.  U.S. District Court for District of Colorado. Civil Action No. 10-cv-00310-REB-CBS.  Engaged by Thomas Roberts of Roberts, Levin & Rosenberg, Denver, Colorado. Testified against insurer.

50.     Thompson v. Cincinnati Insurance Company. U.S. District Court for Northern District of Florida, Pensacola Division. Case No. 3:10cv318-RS-EMT. Engaged by Charles Wiggins of Beggs & Lane, Pensacola, Florida. Testified for insurer.

51.     Patterson v. Home State Insurance Company. 334th Judicial District of Harris County, Texas, Civil Action No. 2010-35479. Engaged by Harry Herzog of Herzog & Carp, Houston, Texas. Testified against insurer.

52.     Hollander v. XL Capital Ltd. Superior Court of California, Los Angeles County, No. BC365455. Engaged by Gregory MacGregor of MacGregor & Berthel in Woodland Hills, CA. Testified for insurer.

53.     James v. Preferred Professional Ins. Co., State Court in Delaware, C.A. No. 10C-04-212. Engaged by Kenneth Roseman of Kenneth Roseman, P.A., Wilmington, Delaware. Testified for insured.

54.     Mirarchi v. Seneca Specialty Ins. Co., U.S. D. Ct. for E.D. of Pa, No.2:10-cv-03617. Engaged by Kenneth Richmond of Richmond & Hevenors, Philadelphia, PA. Testified for insured.

55.    AJT Properties, LLC v. Lexington Ins. Co., Court of Common Pleas of Lackawanna County, Pa., No. 2008-cv-4252. Engaged by Gene Goldenziel of Needle, Goldenziel, Pascale & Consagra, Scranton, PA. Testified for insured.

56.    J.R. Marketing, LLC v. Hartford Casualty Ins. Co., San Francisco Superior Court case No. CGC06449220. Engaged by Ira Greenberg of Edwards, Wildman and Palmer, LLP, New York, New York. Testified for insurer.

57.    Johnson v. GEICO, U.S.D.Ct. for Delaware, case No. 1:06-cv-408 (JJF). Engaged by Richard Cross of Cross & Simon, LLC, Wilmington, Delaware. Testified for insured.

58.    Brousseau v. Prudential Ins. Co., case No. 1:09-cv-00403-SAP. Engaged by Daniel Griffith of Whiteford, Taylor & Preston LLC, Wilmington, Delaware. Testified for insured.

59.    Kinnison-Wilson v. State Auto Property and Casualty Ins Co., Circuit Court of Jackson County, Missouri. Case No. 1016-cv-14244. Engaged by Robert Cockerham of Cockerham & Associates, LLC, in St. Louis, Missouri. Testified for insurance company.

60.    National Union v. Evanston Insurance Company. Case No. 3:10-cv-00347-MLC-LHG. Engaged by Patrick Fredette of McCormick Barstow, LLP, Cincinnati, Ohio. Testified that Evanston breached its duty to settle.

61.    Ondrus v. Citizens Insurance Company, Circuit Court for the County of Macomb, Michigan. Case No. 08-04408-NE. Engaged by Lori McAllister of Dykema Gossett PLLC, in Lansing, Michigan. Testified for insurance company.

62.    Dobson v. Twin City Fire Insurance Company. U.S.D.Ct. for the Central District of California, Santa Ana Division. Case No. SACV11-00192DOC. Engaged by Michael Perlis of Locke Lord in Los Angeles, California. Testified for insurance company.

63.    Mine Safety Appliances Co. v. North River Ins. Co., Ct. of Common Please for Allegheny County, Pa. Case No. 10-007432. Engaged by Alan Miller of Picadia, Sneath, Miller & Norton, P.C. in Pittsburgh, Pa. Testified for insurance company.

64.    Scott v. GEICO, USDC for the Middle District of Pa., No. 3:11-cv-1790. Engaged by Francis Rothermel of Bernhardt, Rothermel & Sigel, P.C. in Philadelphia, PA. Testified for insured.

65.    Downs v. Minnesota Life Insurance Co., U.S.D. Ct. for Nevada, No. 3:11-cv-00885-LRH-WGC. Engaged by Adam McMillen of Watson Rounds in Reno, Nevada. Testified for insured.

66.    Mulrooney v. Life Insurance Co. of the Southwest, Superior Ct. of Delaware, New Castle County, No. N11C-04-192 JAP. Engaged by Lisa McLaughlin of Phillips, Goldman & Spence, Wilmington, DE. Testified for insured.

67.    3M v. Travelers Insurance Company, Minnesota District Court, Ramsey County, No. 62-c2-07-2419. Engaged by Ken Newa of Plunkett Cooney, Bloomfield Hills, Michigan. Testified for insurer.

68.     The Doctors Company v. Bennett Bigelow and Leedom, P.S., Superior Court of Washington for King County, No. 12-2-06654-1 SEA. Retained by Robert Gould in Seattle, Washington. Testified against law firm.

69.     Weitz Company v. Allied World Assurance Co., et al., U.S.D.Ct. for S.D. of Iowa, No. 4:10-cv-00254-JAJ-RAW. Retained by John Camp of Carlton Fields, Miami, Florida. Testified for insurer.

70.     Ford Motor Company v. National Indemnity Co., U.S. Ct. for E.D. of Va., No. 3:12-cv-839. Retained by Jane Byrne of Quinn, Emanuel, Urquhart & Sullivan, LLP, New York, New York. Testified for insurance company.

71.     Rudersdorf v. American Family Mutual Insurance Co., Nebraska D. Ct. for Douglas County, No. CI 11-8658. Retained by Joel Feistner of Locher, Pavelka, Dostal, Braddy & Hammes, LLC, Omaha, Nebraska. Testified for insured.

72.     National Credit Financial Services Corp v. American Bankers Life Assurance Co., arbitration reference no. 1460000666. Retained by Walter Willson of Wells Marble, Jackson, Mississippi. Testified for insurer.

73.     Crown Capital Securities, L.P., v. Endurance American Specialty Insurance Co., Superior Court of California, County of Los Angeles, No. BC 474442. Retained by Richard Johnson of Locke Lord LLP, Los Angeles, California. Testified for insurer.

74.     American Trades Institute of Florida, Inc. v. John A. Parks, Co., Circuit Court of Eleventh Judicial Circuit for Miami-Dade County, Miami, Flordia, No. 07-25383 LA05. Retained by C. Mark Vazzana of Wadsworth Huott, LLP, Miami, Florida. Testified for broker.

75.     West Side Salvage v. RSUI Indem. Co., U.S. D.Ct. for S.D. of Illinois, East St. Louis Division, No. 3:13-cv-363-MJR-PMF. Retained by Matthew Preston of Brady, Preston, Brown, Cedar Rapids, Iowa. Testified against insurer.

76.     Automax Hyundai South, LLC v. Universal Underwriters Ins. Co., U.S. D.Ct. for W.D. of Oklahoma, No. 5:11-CV00165R. Retained by Brittan Buchanan of VanOsselaer & Buchanan, Austin, Texas. Testified for insurer.

77.     Cohan v. Provident Life and Accident Ins. Co. U.S. D. Ct. for District of Nevada, Case 2:13-cv-00975-LDG-UCF. Retained by Peter Klee, Sheppard, Mullin, Richter & Hampton, LLP, San Diego, CA. Testified for insurer.

78.     Alaska Village Electric Cooperative, Inc., et al v. Zurich American Ins. Co., et al. U.S. D.Ct. for Western District of Washington, No. 2:11-cv-01375-RAJ. Retained by Daniel Knox of Schwabe, Williamson & Wyatt, Portland, OR. Testified for insurer.

79.     Fosdyck v. Certain Underwriters at Lloyds. Circuit Ct. of the Ninth Judicial Circuit of Illinois, McDonough County, No. 10-L-3. Retained by Jill O'Donovan of Walker Wilcox Matousek LLP, Chicago, IL. Testified for insurer.

80.     Smith v. Maryland Casualty Co. Circuit Court of Laclede County, Missouri, No. 12LA-CC00250. Retained by Timothy Wolf of Brown & James, St. Louis, Missouri. Testified for insurer.

81.     Broffman v. Provident Life and Accident Ins. Co. U.S.D.Ct. for the Northern District of California, San Francisco Division, No. 4:13-CV-04922-JD. Retained by Peter Klee of Sheppard Mullin, San Diego, CA. Testified for insurer.

82.     Victaulic Company v. American Home Assurance Co., et al. Superior Ct. for Alameda County, California, Case No. RG12642929, Dept. 24. Retained by William Goines of Greenberg Traurig, East Palo Alto, CA. Testified for insurer.

83.     Fox v. Admiral Insurance Co., ND of Illinois, Eastern Division, Case No. 1:12-cv-08740. Retained by Scott Rauscher of Loevy & Loevy, Chicago, IL. Testified for insured.

84.     Sabre, Inc. v. Insurance Co of the State of Pa, et al, Supreme Court of New York for County of New York, No. 652241-2012. Retained by Amy Stewart of Amy Stewart, P.C., Dallas, Texas. Testified for insured.

85.     Cooper v. Omni Insurance Co., US D.Ct. for District of South Carolina, Florence Division, C.A. No. 4:14-cv-706-PMD. Retained by Russell Hines of Young Clement Rivers, LLP, Charleston, South Carolina. Testified for insurer.

Exhibit 1
Page 31 of 31