UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CENTURY INDEMNITY COMPANY,
a Pennsylvania Corporation,

     Plaintiff,

   v.

THE MARINE GROUP, LLC, a California
limited liability company, as affiliated with
Northwest Marine, Inc.; NORTHWEST
MARINE, INC., an inactive Oregon
corporation, as affiliated with Northwest
Marine Iron Works; NORTHWEST
MARINE IRON WORKS, an inactive
Oregon corporation,

     Defendants.

THE MARINE GROUP, LLC, a California
limited liability company, as affiliated with
Northwest Marine, Inc.; NORTHWEST
MARINE, INC., an inactive Oregon

Case No.: 3:08-CV-1375-AC

OPINION AND
ORDER

corporation, as affiliated with Northwest
Marine Iron Works; NORTHWEST
MARINE IRON WORKS, an inactive
Oregon corporation; and BAE SAN DIEGO
SHIP REPAIR, INC., a California
corporation,

                Third-Party Plaintiffs,

      v

AGRICULTURAL INSURANCE
COMPANY and AGRICULTURAL
EXCESS AND SURPLUS INSURANCE
COMPANY, each an Ohio corporation;
AMERICAN CENTENNIAL INSURANCE
COMPANY, a Delaware corporation;
CHICAGO INSURANCE COMPANY, an
Illinois corporation; CONTINENTAL
INSURANCE COMPANY, a Pennsylvania
corporation; EMPLOYERS MUTUAL
CASUALTY COMPANY, an Iowa
corporation; FEDERAL INSURANCE
COMPANY, an Indiana corporation;
GRANITE STATE INSURANCE
COMPANY, a Pennsylvania corporation;
HARTFORD INSURANCE COMPANY, a
Connecticut corporation; INSURANCE
COMPANY OF THE STATE OF
PENNSYLVANIA, a New Jersey
corporation; INSURANCE COMPANY OF
NORTH AMERICA, a Pennsylvania
corporation; CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON and CERTAIN
LONDON MARKET INSURANCE
COMPANIES, each a foreign corporation;
NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA, a
Pennsylvania corporation; NEW
ENGLAND REINSURANCE COMPANY,
a Connecticut corporation; OLD REPUBLIC
INSURANCE COMPANY, an Illinois
corporation; PACIFIC MUTUAL MARINE
OFFICE INC., a New York corporation;

              *{SIB}*

RELIANCE INSURANCE COMPANY, a
Pennsylvania corporation; ROYAL
INDEMNITY COMPANY, a Delaware
corporation; ST. PAUL FIRE & MARINE
INSURANCE COMPANY, individually
and as successor to ST. PAUL MERCURY
INDEMNITY COMPANY, a Minnesota
corporation; TWIN CITY FIRE
INSURANCE COMPANY, an Indiana
corporation; WATER QUALITY
INSURANCE SYNDICATE, a syndicate
of foreign corporations; WEST COAST
MARINE MANAGERS, INC., a New York
corporation; AMERICAN MANUFACTURER'S
MUTUAL INSURANCE COMPANY, an
Illinois corporation; DANIELSON
NATIONAL INSURANCE COMPANY,
successor to MISSION NATIONAL
INSURANCE COMPANY, a California
corporation; FM GLOBAL INSURANCE
AGENCY, successor to ARKWRIGHT
BOSTON MANUFACTURER'S MUTUAL
INSURANCE COMPANY, a Delaware
corporation; STERLING CASUALTY
INSURANCE COMPANY, successor to
NATIONAL AUTOMOBILE AND
CASUALTY COMPANY, a California
corporation; and JOHN DOE INSURANCE
COMPANIES,

                Third-Party Defendants.

_____

ACOSTA, Magistrate Judge:

*Introduction*

      This action addresses the alleged obligations of numerous insurance companies to defend and

indemnify third-party plaintiffs The Marine Group, LLC ("Marine Group"); Northwest Marine, Inc.

("NW Marine"); Northwest Marine Iron Works ("Marine Iron"); and BAE Systems San Diego Ship

Repair, Inc. ("BAE Systems") (collectively referred to as "Insureds") with regard to the assessment, removal, and remediation of hazardous materials released at the Portland Harbor Superfund Site (the "Environmental Claims").  At Insureds' request, the court bifurcated the proceedings into two separate stages: the first involving duty to defend issues, including identification of insurance companies with a duty to defend, allocation of defense costs under the Oregon Environmental Cleanup Assistance Act (OR. REV. STAT. 465.475-465.484) (the "OECAA"), designation of expenditures as defense costs, and the reasonableness and necessity of such defense costs, and the second involving issues related to coverage and the duty to indemnify.[1]

Currently before the court are motions for partial summary judgment filed by various insurance companies with regard to their duty to defend, Insureds' motion for summary judgment on their status as an uninsured under the OECAA, and a motion for summary judgment filed by a managing general agent for a pool of insurance companies.  Specifically:

1)   National Union Fire Insurance Company of Pittsburgh, PA ("National Union") moves for partial summary judgment on its obligation to provide Insureds with a defense under the terms of its policies which expressly exclude coverage for environmental claims brought or issued by or on behalf of any federal, state, or local governmental authority;

2) Century Indemnity Company ("Century") moves for partial summary judgment on its duty to defend Insureds under its policies, which require Century to indemnify Insureds for identified defense costs, and on the allocation of a share of defense costs to Insureds as an insurer under the

---

[1]Insureds expressed concern over engaging in discovery with regard to facts underlying the Environmental Claims required to establish the right to indemnification under the insurance policies while the allocation of liability on the Environmental Claims was unresolved.  The court allowed the bifurcation of the action, limiting motion practice and discovery to the duty to defend and proper defense costs in the first stage.

OECAA based on a self-insured retention;

3)  Granite State Insurance Company ("Granite State") moves for partial summary judgment on its obligation to participate in the defense of the Environmental Claims as an excess/umbrella insurer over Century's primary policies;

4)  Insureds seek a ruling they are not "uninsured" under the OECAA based on policies issued by National Union, Century, and Granite State, and that occurrence-based general liability policies covering the Environmental Claims were not commercially available between August 1, 1985, and February 28, 1987;

5) Insurance Company of the State of Pennslyvania ("ICSOP") moves for partial summary judgment on its obligation to defend Insureds as an excess/umbrella insurer over underlying policies issued by St. Paul Fire & Marine Insurance Company ("St. Paul"); Argonaut Insurance Company ("Argonaut"), and Home Insurance Company ("Home"); and

6) The Water Quality Insurance Syndicate (the "Syndicate") moves for partial summary judgment on its duty to defend Insureds under policies providing coverage for ships, or vessels, owned or operated and declared by Insureds.

The court finds:

1) Insureds' liability results from actions brought by or on behalf of a federal or state government;

2) a duty to indemnify for defense costs does not create a current duty to defend;

3) excess insurers have no duty to defend until the underlying insurance is either exhausted or found to exclude the Environmental Claims;

4) the insolvency of an underlying insurer does not alter the obligations of an excess insurer

or require the excess insurer to drop down into the position of primary insurer for either indemnification or defense purposes;

5) the Environmental Claims do not allege a release of hazardous materials from a vessel;

6) the existence of self-insured retentions do not make an insured an "insurer" for purposes of OECAA allocation for defense costs; and

7) any determination that Insureds are "uninsured" under the OECAA or that occurrence-based general liability insurance for the Environmental Claims was commercially unavailable after August 1, 1985, is premature.

Accordingly:

1) the policy exclusion found in the National Union insurance policies relieves National Union of any duty to defend;

2) Century has no current duty obligation to defend based on its obligation to indemnify Insureds for defense costs;

3) Granite State and ICSOP, as excess insurers, have no duty to defend until the underlying insurance is either exhausted or found to exclude the Environmental Claims;

4) the Syndicate has no duty to defend in the absence of a vessel-related release;

5) Insureds are not an "insurer" under the OECAA based on a self-insured retention; and

6) Insureds' status as "uninsured" under the OECAA between July 1, 1982, and February 28, 1987, including whether occurrence-based general liability insurance for the Environmental Claims was commercially unavailable after August 1, 1985, is deferred to the indemnity stage of this litigation.

/ / / / /

*Background*[2]

In December of 2000, the United States Environmental Protection Agency (the "EPA") listed a stretch of the lower Willamette River from approximately river mile 2 to river mile 11, located near Portland, Oregon, on the National Priorities List as a federal Superfund Site ( the "Site"). (Rycewicz Decl. dated April 27, 2015 ("April 27th Rycewicz Decl.") Ex. 6 at 1.)  At that time, the EPA began contacting individuals or entities identified as potentially responsible parties ("PRPs") of their possible liability for costs incurred in responding to the release, or threats of release, of hazardous material at the Site under the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. §§ 9601-9675)(the "CERCLA").  (April 27th Rycewicz Decl. Ex. 6 at 1.)  The EPA advised that parties are liable as PRPs under CERCLA:

> if they owned or operated a facility at the time of the release of hazardous substances, they became the owner or operator after the time of the release but knew or reasonably should have known of the release when they first became the owner or operator, or who obtained actual knowledge of the release and subsequently transferred ownership or operation without disclosing such knowledge, or if they caused or exacerbated the release or unlawfully hindered or delayed entry to or investigation or removal activities at a facility.

(April 27th Rycewicz Decl. Ex. 6 at 2.)

In January 2008, Insureds received correspondence informing them they were being considered as PRPs with regard to the Site.  In a confidential letter dated January 11, 2008, David C. Batson ("Batson"), as the convening neutral of a group "brought together by the [EPA] for the

---

[2]Consistent with its past practice, the court is considering the evidence offered by the parties with regard to the pending summary judgment motions as a whole, without regard to who offered the evidence or the motion for which the evidence was offered.  The alleged release of hazardous materials, the investigations initiated by various governmental authorities, the correspondence between Insureds and these authorities, and the information provided by the insurers is constant and universally applicable to all pending motions.  To the extent evidence is unique to a motion or insurer, the court will limit its consideration of that evidence to the relevant motion and parties.

purpose of exploring the creation of a PRP group[,]" invited BAE Systems, as successor to Marine Iron, to participate in an informational meeting regarding cleanup at the Site. (April 27th Rycewicz Decl. Ex. 6 at 1.) Batson stated that "one or more participants in the Convening Group believe that you or your company are potentially responsible for response costs incurred and being incurred at the Site under Section 107(a) of CERCLA and ORS 465.255. A narrative summary of information about your facility and its relationship to the Site is enclosed with this letter." (April 27th Rycewicz Decl. Ex. 6 at 2.) Those attending the meeting "will learn about Site conditions and contamination, EPA and Natural Resource Trustees intentions regarding cleanup of the Site and legal actions and how parties are associated with the Site. " (April 27th Rycewicz Decl. Ex. 6 at 3.)[3]

The narrative summary provided the following information with regard to Insureds' activities at, and relationship to, the Site between 1944 and 1993:

> Northwest Marine Iron Works (NMIW) operated as a private contractor for marine vessel repair operations (including sandblasting and painting). Primarily, NMIW utilized the Portland Ship Yard (PSY) and the former Port of Portland dry docks located at Willamette Cove for its operations. NMIW operated in the Portland Harbor Area for more than 40 years. In addition to the facilities leased by NMIW, it reportedly owned two lots (Lots 1 and 2 of Block 38) at the Triangle Park property. The parcels associated with NMIW operations also are the locations for other parties (e.g., Cascade General, Metro, Triangle Park, LLC) which received General Notice Letters in 2000.

> In addition to the marine vessel repair operations at the dry docks, NMIW also utilized several facilities to support its activities such as carpentry and steel fabrication. Overwater activities were key to NMIW operations, and numerous releases to the Willamette River near the PSY have been documented. In particular, (1) a release of lube oil in 1982, (2) reported dumping of sandblast grit in 1988, (3) possible release of unknown sludge from barrels at the PSY dry dock berths, and (4) release of waste oil/lubricants in 1991. Another significant event occurred in 1944, when the U.S. Army Corps of Engineers reported that a Russian vessel, being

---

[3]A similar letter dated March 26, 2008, was sent to NW Marine, regarding Marine Iron. (April 27th Rycewicz Decl. Ex. 7.)

repaired by NMIW for the War Assets Administration, capsized at the former Port of Portland dry docks (Willamette Cove). No additional information is available concerning the condition of the vessel and/or releases from the vessel during the removal action. In addition to the known releases, NMIW was also cited for poor housekeeping and waste disposal practices at facilities it leased at the PSY including incidents involving open burning of industrial waste which was a common practice prior to 1965. Also a 1996 Bureau of Fire inspection report required NMIW to cease storing marine paint, zinc, chromate and other flammable materials.

Environmental assessments at PSY, Triangle Park and Willamette Cove, all locations utilized by NMIW for its ship repair operations, have revealed soil and groundwater contamination consisting of SVOCs, VOCs, PCBs, heavy metals, petroleum, hydrocarbons, and PAHs. As a ship repair company NMIW likely produced discharges of hazardous substances to the surface waters and sediments of the Swan Island Lagoon and the River; as reported by EPA, these substances were likely to include but not necessarily be limited to chromium, copper, lead, mercury, zinc and other heavy metals, grease and oils, abrasives, solvents, cutting fluids, organic compounds, organotins, resins, fiberglass, cyanide and used paints.

As reported in the PSY RI Work Plan, contamination exists on the PSY facility including contamination associated with ship buildings activities; areas such as the dry docks were used for ship hull surface preparation and painting and contamination includes metals (copper, nickel, zinc), HPAHs, LPAHs and phthalates. The preliminary second round sampling results near adjacent river sediments at PSY, Triangle Park and Willamette Cove revealed contamination from one or more of the following constituents: pesticides, PAHs, PCBs dioxin/furans, phthalates, SVOCs and VOCs and heavy metals.

Finally, NMIW disposed of waste materials at the Rivergate Oil Sump, Parcel 100. For example, NMIW disposed of three shipments of waste materials at the Rivergate Oil Sump at Parcel 100 through a transporter in 1948. Barges transported waste oil and waste bilge water to the sump and transferred the waste materials to the sump area using a pipeline. Laboratory analysis of groundwater and soil samples collected between 2000 and 2006 in the vicinity of the sump revealed the presence of hazardous substances including: diesel fuel, metals (including arsenic, chromium, copper, lead, mercury, nickel and zinc), PAHs, PCBs and VOCs. Laboratory sampling of sediments adjacent to Parcel 100 revealed the presence of hazardous substances including: chromium; copper, lead, zinc, PCBs, PAHs and TPH.

(April 27th Rycewicz Decl. Ex. 6 at 4-6.)

On January 18, 2008, the EPA sent identical letters to BAE Systems, and to NW Marine and

Marine Group on behalf of Marine Iron (collectively "Marine"), informing Insureds of a remedial investigation to identify Site characteristics and define the nature and extent of soil, air, surface water, and groundwater contamination at, and risks posed by, the Site, and feasibility studies to evaluate different cleanup options at the Site.  (April 27th Rycewicz Decl. Exs. 8, 9.)  The letter indicated the EPA was "seeking information from current and past landowners, tenants, and other entities believed to have information about activities that may have resulted in releases or potential threats of releases of hazardous substances to the Site." (April 27th Rycewicz Decl. Exs. 8 at 1; 9 at 1.)   The EPA requested information relating to Insureds and the Site under authority of the CERCLA, and advised Insureds the information would be used to assist in identify them as PRPs. (April 27th Rycewicz Decl. Exs. 8 at 1-2; 9 at 1-2.)  The letter cautioned that even if the EPA has "documents related to one or more of your Properties already in [its] possession," Insureds still needed to provide information relevant to those documents.  (April 27th Rycewicz Decl. Exs. 8 at 2; 9 at 2.)  The information requested related nearly exclusively to property in which Insureds had an interest and the possible release of hazardous materials on, or from, that property.

On January 30, 2008,[4] the Portland Harbor Natural Resource Trustee Council ("Council") sent a letter addressed to "Interested Party,"[5] inviting the recipient to participate in funding and implementing a natural resource damage assessment ("NRDA").  (April 27th Rycewicz Decl. Ex. 15.) The Council represented the notice was separate from the EPA notice and connected with the NRDA portion of the CERCLA action at the Site.  (April 27th Rycewicz Decl. Ex. 15.)

---

[4]The letter referenced, and included as an attachment, a similar letter dated January 3, 2008.

[5] The identity of "Interested Party" is ambiguous and the April 27, 2015 Rycewicz Declaration indicates only that the letter was obtained from the Insureds' files.

Between May and July 2008, Insureds sent letters to numerous insurance companies from which they purchased insurance policies, demanding provision of a defense for, and indemnification of, the Environmental Claims.  (Sumner Decl. dated April 22, 2015 ("April 22nd Sumner Decl.") Ex. E; Woods Decl. Ex. 9.)  In at least one of the letters, Marine indicated two distinct claims had been made against them: 1) the EPA's claim under CERCLA "related to site assessment and characterization and removal and remediation activities at the Site"; and  2) the Council's claim under CERCLA "related to natural resource injury assessment, damages, and restoration at the Site." (April 22nd Sumner Decl. Ex. E at 2.)

On November 8, 2008, Century filed this action against Marine seeking a declaratory judgment that it owes neither a duty to defend nor a duty to indemnify Marine with regard to the Environmental Claims.  Marine, joined by BAE Systems, filed a third-party complaint against numerous insurance companies alleging such companies issued insurance policies to Insureds covering the Environmental Claims, asserting a claim for breach of contract, and seeking declaratory judgment regarding the insurers' duties to defend and indemnify the Insureds.

In "General Notice Letters" dated March 12, 2010,[6] Batson informed Insureds they had been identified as PRPs based on a belief "that hazardous substances have been or are being released from the facilities located at 5555 North Channel Avenue, 5815 North Lagoon Avenue, and 5851 North Lagoon Avenue in Portland, Oregon, into the 'study area' for the . . . Site."  (April 27th Rycewicz Decl. Ex. 10 at 2; Ex. 11 at 2.)  Batson advised Insureds they might be required to perform response actions deemed necessary by the EPA and be held responsible for "costs incurred by the government

---

[6]The Council sent its own version of a general notice letter on September 27, 2010, which Insured forwarded to "Insurers Counsel" by letter dated September 28, 2010.  (April 22nd Sumner Decl. Ex. D; Wood Decl. Ex. 14.)

in response to any release or threatened release at the Site" as well as "damages to, destruction of, or loss of natural resources, including the costs of assessing such damages," and encouraged Insureds to communicate with other PRPs to allocate damages and resolve intra-party issues prior to settlement discussions with the EPA.  (April 27th Rycewicz Decl. Ex. 10 at 1-2; Ex. 11 at 1-2.)  On March 22, 2010, Marine sent a letter addressed to "Insurers' Counsel" again tendering EPA's claims for defense and indemnity coverage.  (April 22nd Sumner Decl. Ex. C.)[7]

Argonaut is the only insurer to accept Insureds' tender of defense of the Environmental Claims, and it has paid approximately eight million dollars in defense costs. (Rycewicz Decl. dated June 3, 2015 ("June 3rd Rycewicz Decl.") ¶ 7.)  The court allowed Argonaut to intervene in this action as a third-party defendant.  *Century Indem. Co. v. The Marine Group*, Civ. No. 08-1375-AC, 2010 WL 3946958 (D. Or. Oct. 6, 2010).  Insureds have paid an additional $420,000, which amount Argonaut has not reimbursed.  (June 3rd Rycewicz Decl. ¶ 7.)  In a prior opinion, this court found four other insurers, the Insurance Company of North America, Agricultural Insurance Company, Agricultural Excess and Surplus Insurance Company, and St. Paul have a duty to defend Insured as well.  *Century Indem. Co. v. The Marine Group*, CV No. 08-1375-AC, Opinion and Order, at 3 (D. Or. Dec. 26, 2012) ("the court concludes that Insurers have a duty to defend [Insureds].").  These insurers have yet to contribute to, or participate in, the defense of the Environmental Claims.

*Legal Standards*

I.  Summary Judgment

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

---

[7]BAE Systems sent a similar letter on April 20, 2010.  (Woods Decl. Ex. 13.)

56(a) (2013).  Summary judgment is not proper if material factual issues exist for trial.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial.  *Id*. at 324.  A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements.  *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003).  Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party.  *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982).  All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party.  *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976).  Where different ultimate inferences may be drawn, summary judgment is inappropriate.  *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits.  A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence.  FED. R. CIV. P. 56(c) (2013).  The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there

is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

II.  Construction of Insurance Policies

Under Oregon law, the interpretation of plain and unambiguous contract provisions is a question of law for the court. *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992). Construction of insurance contracts requires ascertaining the parties' intent, which is determined from the terms and conditions of the policy. *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303, 307 (1999); *Mcleod v. Tecorp Int'l, Ltd.*, 318 Or. 208, 215 (1993).  If an insurance policy explicitly defines the word or phrase at issue, the court is bound to apply that definition. *Holloway v. Republic Indem. Co. of America*, 341 Or. 642, 650 (2006).  If the policy does not define the word or phrase, the court next looks to its primary and general meaning. *Id.*; OR. REV. STAT. § 42.250. Where the word or phrase is susceptible to two or more plausible interpretations, it must be considered in the particular context in which is used in the policy and in the broader context of the policy as a whole.  *Holloway*, 341 Or. at 650.  A term is ambiguous only if more than one interpretation remains reasonable after such review. *Hoffman*, 313 Or. at 470.  The insurer has the burden of drafting insurance policies that are clear and unambiguous. *North Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 29 (2001).  Therefore, any unresolved ambiguity in an insurance policy should be strictly construed against the insurer. *Hoffman*, 313 Or. at 470.

III.  Insurer's Duty to Defend

In *Ledford v. Gutoski*, 319 Or. 397, 400 (1994), the Supreme Court of Oregon wrote: "[w]hether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy.  An insurer has a duty to defend an action against its insured

if the claim against the insured stated in the complaint could, without amendment, impose liability for conduct covered by the policy." Thus, "[a]n insurer should be able to determine from the face of the complaint whether to accept or reject the tender of the defense of the action." *Id.* (citing *Ferguson v. Birmingham Fire Ins.*, 254 Or. 496, 505-506 (1969)).

> Accordingly, the duty to defend arises if:

> the complaint provides *any basis* for which the insurer provides coverage. Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy. Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured.

*Id.* (internal citations omitted) (emphasis in original). To be clear: "[i]f some of the allegations pertain to conduct that could be covered by the insurance policy, and some that could not, the insurer must defend the entire action." *Klamath Pacific Corporation v. Reliance Insurance Co.*, 151 Or. App. 405, 413 (1997) (citing *Timberline Equip. v. St. Paul Fire and Mar. Ins.*, 281 Or. 639, 645, 576 P.2d 1244 (1978)).

## IV. Interpretation of Policy Exclusions

> The Oregon Court of Appeals described the method for interpreting a policy exclusion:

> In determining whether a policy exclusion applies to the conduct at issue, we look "only at the facts alleged in the complaint to determine whether they provide a basis for a recovery that could be covered by the policy." If the allegations in the complaint are ambiguous, but a reasonable interpretation would bring them within coverage, there is a duty to defend. Moreover, if some allegations reasonably can be interpreted as falling within the coverage, the insurer owes a duty to defend – even if other allegations of conduct or damage are excluded.

*Fred Shearer & Sons*, 237 Or. App. at 478 (quoting *Ledford*, 319 Or. at 400) (internal citations omitted). It is the insurer's burden to prove that an exclusion applies. *ZRZ Realty Co. v. Beneficial*

*Fire and Casualty Insurance Co.*, 349 Or. 117, 127 (2010). Whether an exclusion applies is a question of law which seeks to determine the parties' intent. *Id.* at 480.

V. Construction of Statutes

A federal court interpreting Oregon law should "interpret the law as would the [Oregon] Supreme Court." *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir 2004). Therefore, the court  must "apply the familiar framework for statute interpretation established in *Portland Gen. Elec. v. Bureau of Labor and Indus.*, 317 Or. 606, 859 P.2d 1143 (1993), and subsequently modified by *State v. Gaines*, 346 Or. 160, 206 P.3d 1042 (2009)." *Sundermier v. State ex rel. Pub. Emps Ret. Sys.*, 269 Or. App. 586, 595 (2015).

Under this framework, the primary goal of statutory construction is to discern the legislature's intent in enacting the statute at issue. *Gaines*, 346 Or. at 171; OR. REV. STAT. 174.020. To do so, the court first looks to the "text and context" of the statute as "there is no more persuasive evidence of the intent of the legislature than 'the words by with the legislature undertook to give expression to its wishes.'" *Id.* (quoting *State ex rel. Cox v. Wilson*, 277 Or. 747, 750 (1977)).

Courts must assume the legislature intended the words of the statute to have their plain, natural, and ordinary meaning unless specifically defined by the legislature. *Gaines*, 346 Or. at 175. A statutory term's "context" includes both its immediate context – "the phrase or sentence in which the term appears" – and the "broader context," which includes other statutes "on the same subject." *State v. Stamper*, 197 Or. App. 4013, 417-18 (2005).  After reviewing the statutory text and context, the court should consider pertinent legislative history offered by the parties. *Gaines*, 3346 Or. at 172. Finally, and only if the legislative intent remains in doubt after consideration of the text, context, and legislative history, the court may resort to general rules of statutory construction for guidance in

resolving the issue before it. *Id*. at 172.

*Discussion*

## I.  National Union's Duty to Defend in Light of Pollution Exclusion

Third-party defendant National Union issued two comprehensive general liability insurance policies to Marine Iron,[8] which were in effect from August 1, 1985, to February 28, 1987.  National Union Policy No. GLA 160 2986 RA covered a one-year term from August 1, 1985, to August 1, 1986, while National Union Policy No. GLA 502 0229 RA originally covered a one-year term from August 1, 1986, to August 1, 1987, but was cancelled effective February 28, 1987 (the "National Union Policies").  (April 22nd Sumner Decl. Ex. F at MG202117, MG202150, MG202143.)  The issue before the court is whether the Hazardous Substance Remedial Action Exclusion found in the National Union Policies (the "Exclusion") applies to the claims asserted against National Union by Insureds, thereby relieving National Union of any duty to provide the Insureds with a defense to the Environmental Claims.

National Union asserts the Environmental Claims are unambiguously excluded from coverage by the Exclusion.  The Exclusion provides:

> This policy does not apply to the liability of the Insured, or liability of another for which the Insured may be liable in whole or in part, resulting from any suit, action, proceeding or order brought or issued by or on behalf of any Federal, State or local

---

[8]Insureds argue they are successors to Marine Iron and, therefore, entitled to a defense under insurance policies issued to Marine Iron.  The court found issues of fact exist with regard to whether BAE Systems or Marine Group have succeeded to the insurance policies in this case and denied summary judgment on this issue, but still determined the insurance policies obligated the insurers to provide a defense for the Environmental Claims pursuant to the terms of the policies.  *Century Indem. Co. v. The Marine Group*, 848 F. Supp. 2d 1238, 1259 (D. Or. 2012); *Century Indem. Co. v. The Marine Group*, CV No. 08-1375-AC, Opinion and Order, at 3 (D. Or. Dec. 26, 2012) ("the court concludes that Insurers have a duty to defend [Insureds].").

governmental authority seeking (a) Remedial Action or the cost[9] thereof, (b) damages for injury to, destruction of or loss of natural resources, including the costs of assessing such injury, destruction or loss, if such suit, action, proceeding or order arises from the release of a hazardous substance at any area, whether or not owned by the Insured.  The company shall not have the obligation to defend any suit, action or proceeding seeking to impose such liability.

(April 22nd Sumner Decl. Ex. F at MG202137, MG 202167.)  The Insureds[10] acknowledge the Exclusion applies to claims brought by or on behalf of a federal, state, or local governmental authority, but argue it does not exclude claims for natural resource damage ("NRD") asserted by Indian Tribes ("Tribes") as national resource trustees under the CERCLA.  Therefore, the only dispute between the parties relates to whether the Tribes, asserting NRD claims as members of the Council, are properly characterized as federal, state, or local governmental authorities for the purposes of this action.[11]

First, the court must determine whether the underlying complaint could, without amendment, impose liability for a claim covered by the National Union Policies.  Insureds' sole argument in

_____

[9]National Union Policy No. GLA 502 0229 RA uses the term "costs".

[10]All of the insurers seeking partial summary judgment on their duty to defend were identified by Insureds and/or other insurers as having an obligation to provide a defense to Insureds on the Environmental Claims. With the exception of Argonaut, who filed a joint response with Insureds to the motions filed by Century and the Syndicate, none of the other insurers have responded to the pending motions for partial summary judgment.  In the absence of independently expressed opposition, the court assumes the other insurers have joined in, or defer to, Insureds' position on the pending partial summary judgment motions.

[11]National Union argues for the first time in its reply brief that the NRD claim is derivative of the EPA's claim for evaluation, removal, and remediation and, therefore, should be viewed as initiated by the EPA, which is clearly a federal governmental authority.  Alternatively, National Union asserts Insureds concede the EPA's claim is clearly covered by the Exclusion and that National Union is entitled, at the least, to summary judgment on its duty to defend that action.  As the court finds National Union is entitled to summary judgment based on other grounds, these arguments need not, and will not, be addressed.

Page 18 - OPINION AND ORDER                                                                          {SIB}

support of coverage is that the Exclusion does not bar coverage for the Environmental Claims to the extent they are asserted by a Tribe.  In other words, Insureds assert that if the Tribe has asserted an NRD claim against Insureds, the Exclusion does not apply and National Union must participate in the defense of the Environmental Claims.  Accordingly, the court must determine if the underlying complaint could be viewed to contain a Tribe claim for NRD.

Insureds received letters detailing their current, and possible future, obligations as PRPs from the EPA and Council, but no formal complaint has been filed delineating the specific claims asserted against Insureds.  The court previously held administrative communications, such as the 104(e) letter and notifications of PRP status, constitute suit documents triggering the insurers' duty to defend. *Century Indem. Co. v. The Marine Group, LLC*, 848 F. Supp. 2d 1238, 1255-56 (D. Or. 2012).  Consequently, the court will look to the contents of these communications to determine if they contain a claim asserted by a Tribe.

The initial communications from the EPA do not assert claims for NRD and are, therefore, not relevant.  The initial communications from the Council to Insureds invite them to participate in the ongoing NRDA and reference a list of "Natural Resource Trustees" for the Site.  The CERCLA designates the United States Government, the States, and Indian tribes as public trustees for natural resources belonging to, managed by, controlled by, or appertaining to them ("Natural Resource Trustees").  42 U.S.C. §9607(f).  An individual or entity responsible for the injury to, destruction of, or loss of natural resources is liable to the Natural Resource Trustee tasked with protecting the natural resource affected and only Natural Resource Trustees may take action to recover for NRD. *Id*.

The Natural Resource Trustees on the list established the Council, which has the authority

to conduct activities for the benefits of its members with regard to the NRD and NRDA for the Site. (April 27th Rycewicz Decl. Ex. 15 at 3.)  Members of the Council include:

      Confederated Tribes and Bands of the Yakama Nation

      Confederated Tribes of the Grande Ronde Community of Oregon

      Confederated Tribes of Siletz Indians of Oregon

      Confederated Tribes of the Umatilla Indian Reservation

      Confederated Tribes of the Warm Springs Reservation of Oregon

      Nez Perce Tribe

      Oregon Department of Fish and Wildlife

      United States Department of the Interior

      National Oceanic and Atmospheric Administration (NOAA).

("Member" or "Members").  (April 27th Rycewicz Decl. Ex. 15 at 3.)  By identifying a number of Tribes as Members, the initial communications from the Council indicate the possibility, if not the likelihood, that at least one Tribe is asserting a claim for NRD through the Council.

      Next, the court must look to the express terms of the Exclusion to determine whether it bars NRD claims brought or issued by or on behalf of a Tribe as a Member.  The National Union Policies do not define the terms "Federal, State or local governmental authority," which are at issue here. Accordingly, the court must consider the terms' primary and general meanings.

      Black's Law Dictionary defines "government" as "[a]n organization through which a body of people exercises political authority; the machinery by which sovereign power is expressed." BLACK'S LAW DICTIONARY 764 (9th ed. 2009).  The term "authority" is defined as the "right or permission to act legally on another's behalf" or "a governmental agency or corporation that

administers a public enterprise." BLACK'S LAW DICTIONARY 152 (9th ed. 2009). Accordingly, the plain and general meaning of "governmental authority" includes an organization, agency, or corporation having the right or permission to exercise political authority or discretion for the benefit of the public they serve. Federal governmental authority relates to those acting for the benefit of citizens of the United States, state governmental authority relates to those acting for the benefit of citizens of the individual states, and local governmental authority relates to those acting for the benefit of citizens of a "particular locality, such as a city, county, or parish." BLACK'S LAW DICTIONARY 764 (9th ed. 2009) (defining "local government").

Insureds do not offer a different interpretation of these terms. Rather, Insureds argue at least one court has found the Exclusion ambiguous and this court must, therefore, interpret the Exclusion in their favor. The unreported case upon which Insureds rely addressed the question of whether counterclaims asserted between private parties could be viewed as "resulting from" a CERCLA action brought against one of the private parties by a state government authority. *IMACC Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. C 98-01025-CW (N.D. Cal. Oct. 5, 1998). The case did not address the proper construction of the terms "Federal, State or Local governmental authority" and is not instructive here.

Similarly, the court rejects National Union's reliance on *Montana Refining Co. v. Nat'l Union Fire. Ins. Co. of Pittsburgh, PA*, 918 F. Supp. 1395 (D. Nev. 1996). In *Montana*, the Nevada district court considered the phrase "resulting from any suit, action, proceeding or order brought or issued by or on behalf of any Federal, State or local governmental authority seeking (a) Remedial Action or the cost thereof, (b) damages for injury to, destruction of or loss of natural resources, including the costs of assessing such injury, destruction or loss" found in the Exclusion and held that

"a common sense reading of the exclusion is that, when a hazardous substance has been released, there is no coverage if a government sues for natural resource damages, or for 'Remedial Action' (which, as explained above, is reasonably interpreted as meaning any or all of the actions which define that term), or for both." *Id*. at 1402.  The court was not construing the terms "Federal, State, or Local governmental authority" but rather whether both a Remedial Action and a claim for natural resource damages must be initiated against the insured for the Exclusion to apply.  As such, the ruling is not relevant to the issue before the court.

Having determined the clear and unambiguous language of the Exclusion applies to any claim resulting from any suit, action, proceeding or order brought or issued by or on behalf of any organization, agency, or corporation having the right or permission to exercise political authority or discretion for the benefit of citizens of the United States, citizens of the individual states, or citizens of a particular locality, such as a city, county, or parish, the court must now consider whether the Tribe's claims fall with in the Exclusion.  No Tribe has asserted a claim directly against Insureds.  Any claim asserted by a Tribe would be through its involvement with the Council.  Accordingly, the court must determine if the Tribes' assertion of NRD claims in its capacity as a Member qualifies as an action brought or issued by or on behalf of a Federal, State, or local governmental authority.

 National Union argues the Council, as a whole, should be considered a governmental authority under the terms of the Exclusion.  Insureds argue the Tribes' presence on the Council defeats any argument the Council is properly characterized a governmental authority.  Insureds' argument contradicts the document creating and controlling the Council, federal regulations, and the only reasonable interpretation of congressional intent underlying the CERCLA.

The Council was created in 2002 by Natural Resource Trustees tasked with protecting natural

resources which may have been damaged by the release of hazardous materials at or from the Site. The Natural Resource Trustees entered into a Memorandum of Agreement for the purpose of facilitating the coordination and cooperation of the Members with regard to the assessment, remedial activities, and prosecution or settlement of NRD claims arising from the Site (the "Memorandum"). (Rycewicz Decl. dated June 2, 2015 ("June 2nd Rycewicz Decl.") Ex. 1.)  The Memorandum identifies the Members, including the Tribes, as "governmental entities".  (June 2nd Rycewicz Decl. Ex. 1 at 1.)    The Members executed the Memorandum "as representatives of their respective agencies, which act on behalf of the public as Trustees for natural resources, and as representatives of tribal governments, which act on behalf of their tribal membership."  (June 2nd Rycewicz Decl. Ex. 1 at 9.)

The Memorandum requires the Council to work as a single entity for the benefit of the Members and the parties they represent.   The purpose of the Council is explained in the Memorandum as follows:

> The [Members] recognize the importance of coordinating: 1) an assessment of natural resource damages for injuries to natural resources resulting from hazardous substance releases at or from the Portland Harbor Site ("Site"); 2) any actions to restore, replace, or acquire the equivalent of those resources (restoration); and 3) any prosecution or settlement of natural resource damage claims associated with the Site. Further, the [Members] recognize the importance of coordinating their efforts as participants in the February 2001 Intergovernmental Memorandum of Understanding (Intergovernmental MOU) for the Portland Harbor Superfund Site with the Environmental Protection Agency (EPA) and Oregon Department of Environmental Quality.  The purpose of this [Memorandum] is to provide a framework for such coordination and cooperation between the [Members] and for implementation of joint activities.

(June 2nd Rycewicz Decl. Ex. 1 at 1.)  The Council is the "forum through which the [Members] will coordinate their NRDA activities in connection with the Site" and is responsible for developing and

communicating joint positions on PRP deliverables in accordance with the Intergovernmental Memorandum of Understanding; facilitating development and implementation of the assessment of NRD; assisting the Members in the negotiation and funding of participation agreements for, along with managing the funding of, NRDA activities; and developing joint negotiation, settlement, litigation, and restoration activities.  (June 2nd Rycewicz Decl. Ex. 1 at 2-3.)

Council decisions must be unanimous, with all funding decisions memorialized in a resolution signed by the voting representatives.  (June 2nd Rycewicz Decl. Ex. 1 at 4.)  All monies generated by funding and participation agreements between the Council and PRPs for NRDA activities "are intended for the joint and undivided use and benefit of all the [Members] acting cooperatively in planning, coordinating and conducting joint [Members] NRDA activities."  (June 2nd Rycewicz Decl. Ex. 1 at 6.)  The Council is tasked with evaluating appropriate means for recovery of individual costs of participation and seeking reimbursement of these costs from PRPs. (June 2nd Rycewicz Decl. Ex. 1 at 6.)

The Council also works together cooperatively to settle NRD claims  and "may enter into settlement negotiations with a PRP(s) for the purpose of resolving any natural resource damage claims."  (June 2nd Rycewicz Decl. Ex. 1 at 7.)  With the exception of attempts to obtain reimbursement NRDA costs, "[n]o [Member] may conduct independent settlement negotiations with a PRP . . . unless all [Member] representatives agree in writing to such independent settlement negotiations," and any "[Member] engaging in independent claims or negotiations must withdraw from this [Memorandum]."  (June 2nd Rycewicz Decl. Ex. 1 at 7, 8.)  The Council deposits all funds recovered for the purpose of restoring natural resources injured, destroyed, or lost as a result of the release of hazardous materials into the Portland Harbor NRD Fund.  (June 2nd Rycewicz Decl. Ex.

1 at 6.)

The Memorandum acknowledges the terms of the Memorandum may be inconsistent with existing directives of a Member as a Natural Resource Trustee, and it provides it should not be construed as requiring a Member to abrogate or cede "any responsibility or authority inherent in its trusteeship over natural resources." (June 2nd Rycewicz Decl. Ex. 1 at 9.) In fact, in 2009, the Confederated Tribes and Bands of the Yakama Nation (the "Yakama Nation") withdrew from the Council based on concerns the Council was concentrating primarily on damage to the Willamette River, not the downstream damage to the Columbia River. (June 2nd Rycewicz Decl. Ex. 2 at 1.) The Yakama Nation, whose reservation and ceded lands include the Yakima and Klickitat Rivers, and portions of the Columbia River, planned to conduct their own studies of the Columbia River. (June 2nd Rycewicz Decl. Ex. 2 at 1.)

It is evident from the Memorandum the Members are acting for the benefit of all Members as co-trustees, seeking the full amount of damage caused by the release of hazardous substances at the Site. The Council decisions are required to be unanimous, which means all Members must specifically consent to actions taken by the Council on their behalf, including settlement of any Member's NRD claim. Any Member engaging in negotiations to protect their independent rights is required to withdraw from the Council, supporting a conclusion that the Council is acting to enforce the CERCLA for the benefit of the Council as a whole, not the unique rights of one Member. Further, all funds generated by Council actions are placed in an account for the "joint and undivided use and benefit" of all Members. Consequently, the Tribes' participation in the Council not only benefits themselves, but also the federal and state agencies participating in the Council.

Viewed in this light, the Tribes are participating in a suit, action or proceeding brought by

Page 25 - OPINION AND ORDER                                                              *{SIB}*

or on behalf of the Members who are federal or state agencies.  Alternatively, the federal and state agency Members are pursuing the claims of the Tribes with their consent.  Despite Insureds' claim to the contrary, a Tribe may consent to the United States acting on their behalf with regard to NRD claims.  *United States v. Asarco Inc.*, 471 F. Supp. 2d 1063, 1068 (D. Id. 2005) ("[T]he Tribe has agreed to let the United States government represent its interests.)

Insureds have not identified any NRD claim asserted individually by a Tribe.  The NRD claims asserted by a Tribe as a Member are brought on behalf of the federal and state agencies participating in the Council, or are brought by the federal and state agencies for the benefit of the Member Tribes.  Either way, the NRD claims fall within the plain and unambiguous language of the Exclusion and National Union is not obligated to provide a defense for the Environmental Claims.

This conclusion is consistent with federal regulations, which encourage, if not require, Natural Resource Trustees to "coordinate and cooperate in carrying out their responsibilities" when necessary because of "coexisting or contiguous natural resources or concurrent jurisdictions."  40 C.F.R. § 300.615(a) (2015).  At least one court has similarly recognized the need for Natural Resource Trustees to act collectively in pursuing claims related to NRD under the CERCLA where the trustees hold joint interests in the natural resources and has held that "[i]n fact, in many instances, co-trustees are the norm and not the exception."  *Coeur D'Alene Tribe v. Asarco Inc.*, 280 F. Supp. 2d 1094, 1115 (D. Id. 2003).  The same court later held the language of the CERCLA "dictates that a co-trustee acting individually or collectively with the other co-trustees may go after the responsible party or parties for the full amount of the damage . . . ."  *United States v. Asarco Inc.*, 471 F. Supp. 2d at 1068.

Finally, general congressional policy supports a finding Tribes are properly considered

federal governmental authorities for the purposes of the CERCLA.  The CERCLA provides that a party responsible for the release of a hazardous substance shall be liable for, among other things, "damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release." 42 U.S.C. § 9607(a)(4)(C). The entities entitled to recover such damages are limited to the United States Government, any State, and any Indian tribe which owns, manages, or controls the damaged resources for the benefit of the public or the tribe.  42 U.S.C. § 9607(f)(1).

Congress has recognized Tribes' unique political status and have afforded them broad authority to govern themselves, although Tribes remain subject to the "plenary and exclusive" powers of Congress given to it by the Constitution to regulate and modify the status of the Tribes. *United States v. Lara*, 541 U.S. 193, 200 (2004); *see also California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 207 (1987) ("The Court has consistently recognized that Indian tribes retain 'attributes of sovereignty over both their members and their territory' and that 'tribal sovereignty is dependent on, and subordinate to, only the Federal Government, not the States.'")(citations omitted) For example, while reserving certain lands for the exclusive use and occupancy of the Tribes, Congress retained general supervisory power over such lands.  *McLanahan v. State Tax Comm'n of Arizona*, 411 U.S. 164, 174-75 (1973).

Congress gave the Tribes the authority to pursue claims for NRD under the CERCLA on behalf of their Tribe members, who are also United States citizens.  *Lara*, 541 U.S. at 203 ("Congress has advanced policies of integration by conferring United States citizenship upon all Indians.").  In the absence of such express delegation of authority, the Tribes would lack the ability to protect natural resources detrimentally affected by the release of hazardous substances otherwise

provided to federal and state governments. *Nat'l Ass'n of Mfrs. v U. S. Dept. Of Interior*, 134 F.3d 1095, 1113 (D.C. Cir. 1998) ("It is true that CERCLA does not permit private parties to seek recovery from damages to natural resources held in trust by the federal, state or tribal governments.") Therefore, in asserting NRD claims under CERCLA, the Tribes are acting pursuant to the right or permission to act legally on another's behalf.  Stated another way, the Tribes are acting pursuant to the authority provided them by the federal government, or under federal governmental authority, not exclusively under tribal government authority.

National Union argues the Tribes should be considered local governmental authorities. However, CERCLA designates the United States government, State governments, and Tribes as public trustees of natural resources and authorizes only trustees designated by the President, the governor of each state, or tribal chairman to initiate and pursue claims for damages to natural resources under their trusteeship.  42 U.S.C. §9607(f)(2); 42 C.F.R. § 300.610.  Therefore, unless a local government has been designated by a state as a trustee, local governments are not authorized to pursue actions for natural resource damage under CERCLA.  *Rockaway v. Klockner & Klockner*, 811 F. Supp. 2013, 1049 (D.N.J. 1993) ("[O]nly a 'state official,' specifically appointed by the governor of the state, may be an 'authorized representative' for purposes of bringing an action to recover for natural resource damages.") As Tribes clearly have the authority to pursue natural resource damage claims, they are not properly characterized as local governmental authorities.

To the extent the Tribes are pursuing actions under the CERCLA as a Natural Resource Trustee for the benefit of Tribe members, who are also United States citizens, the Tribes are exercising governmental authority granted to them by Congress for the benefit of citizens of the United States.  Accordingly, Tribes, in their capacity as Natural Resource Trustees, are acting

pursuant to federal government authority.

The court finds NRD claims asserted by a Tribe as a Member are brought by or on behalf of a Federal or State governmental authority and fall within the Exclusion. National Union has no duty to defend the Environmental Claims and is entitled to partial summary judgment.

## II. Century's Duty to Defend v. Duty to Indemnify for Defense Costs

Marine Iron purchased insurance from Century covering the period from July 1, 1982 to August 1, 1985. (Rycewicz Decl. dated June 5, 2015 ("June 5th Rycewicz Decl.") Ex. 1-2.) Specifically, Century Policy CIS 43 06 595 was effective from July 1, 1982, to August 1, 1984 (the "1982 Policy") while Century Policy CIS 43 11 40, which was a renewal of the 1982 Policy, was effective August 1, 1984, to August 1, 1985 (the "1984 Policy") (collectively the "Century Policies"). (June 5th Rycewicz Decl. Ex. 1-2.)

In the 1982 Policy, Century agreed:

to indemnify the Insured for all sums which the Insured shall be obligated to pay by reason of liability

    (a)    imposed upon the Insured by Law, or
    (b)    assumed under contract or agreement by the Named Insured and/or any officer, director, stockholder, partner or employee of the Named Insured, while acting in his capacity as such,

for damages, direct or consequential, and expenses, all as more fully defined by the term ultimate net loss on account of:

    (1)    personal injury,
    (2)    property damage

caused by or arising out of an occurrence, occur[r]ing anywhere in the United States of America, its territories and possessions and/or Canada.

(June 5th Rycewicz Decl. Ex. 1 at 2.) Century's liability is limited to "the ultimate net loss in excess

of the self insured retention stated in the declarations in respect of each occurrence and then only up

to a further limit as stated in the declaration in respect of each occurrence." (June 5th Rycewicz Decl.

Ex. 1 at 3.)  The 1982 Policy has a self-insured retention of $100,000 per occurrence, with an

$300,000 aggregate.  (June 5th Rycewicz Decl. Ex. 1 at 2.)

> "Ultimate net loss" is defined as:

> the total sum which the Insured becomes obligated to pay as damages either through adjudication or compromise, after making deductions for all recoveries and for other valid and collectible insurances, and shall also include claim expense.  Claim expense shall include court costs, interest upon awards and judgements investigation, adjustment and legal expenses but shall not include salaries paid to the employees of the Insured or the company, fees paid to the Insured's service company for handing claims or retainers paid to persons or firms consulted on or handling claims.

(June 5th Rycewicz Decl. Ex. 1 at 6.)  With respect to payments under the 1982 Policy:

> The Company shall be liable for payment under this policy only after the Insured has paid the amount of the self insured retention.  Also, the Insured's obligation to pay an amount of ultimate net loss in excess of the "self insured retention" shall have been fully determined either:

> > (1)    by judgement against the Insured after actual trial, or
> > (2)    by written agreement of the Insured, the claimant, and the Company.

> Any claim against the Company by the Insured under the policy shall be made within twelve months after the Insured shall have paid or become obligated to pay an ultimate net less in excess of the self insured retention.

(June 5th Rycewicz Decl. Ex. 1 at 12.)  The Insured has the duty to defend any action against it and

Century has the option of participating in the defense of an action likely to result in the ultimate net

loss amount.  The 1982 Policy specifically provides:

> The Insured shall be responsible for the settlement or defense of any claim made or suit brought or proceeding instituted against the Insured which no underlying insurer is obligation to defend.  The Insured shall use due diligence and prudence to settle all such claims and suits which in the exercise of sound judgment should be settled, provided, however, that the Insured shall make no settlement for any sum in excess

of the self insured retention without the approval of the Company.

When an occurrence involves, or appears reasonably likely to involve ultimate net loss in excess of the self insured retention the Company shall have the right and shall be given the opportunity to associate with the Insured in the defense and control of any claim, suit or proceeding and the Insured and the Company shall cooperate in all things in the defense of such claim, suit or proceeding.

(June 5th Rycewicz Decl. Ex. 1 at 6.)  The 1984 Policy contains virtually identical language with a few minor exceptions not relevant to the issues before the court.  (June 5th Rycewicz Decl. Ex. 2.)

The Century Policies do not require Century to provide Insureds with a defense of the Environmental Claims.  The policy language obligates Century to indemnify Insureds, subject to other provisions, but provides Century with the right, not the duty, to participate in the defense of an action, and then only when the ultimate net loss appears likely to exceed the self-insured retention.  The clear and unambiguous terms of the Century Policies relieve Century of any duty to defend or otherwise participate in the defense of the Environmental Claims.

Insureds[12] do not dispute this interpretation of the Century Policies.  Instead, Insureds assert Century's duty to indemnify for "claim expense," which includes "legal expenses," creates a duty to defend.  Insureds argue the punctuation of the ultimate net loss definition places Century in a primary position for defense costs, requiring them to immediately participate in, and contribute to, the defense of the Environmental Claims.

"Ultimate net loss" is defined as "the total sum which the Insured becomes obligated to pay as damages either through adjudication or compromise, after making deductions for all recoveries and for other valid and collectible insurances, and shall also include claim expense."  While Insureds

_____

[12]Argonaut joins in Insureds response to Century's motion for partial summary judgment.

admit this language arguably establishes Century is an excess insurer for damages, and need not contribute until all other insurance is exhausted based on the presence of the restrictive phrase "after making deductions for all recoveries and for other valid and collectible insurances," they contend the phrase modifies only damages, not claim expense, thus making Century a primary insurer for defense costs.

Insureds rely on the duty-to-defend analysis in *Hernandez v. County of Dupage*, No. 96 C 8030, 1998 WL 832644 (N.D. Ill. Nov. 23, 1998), in which the court addressed the question of when an insurer's duty to defend is ripe for adjudication. In *Hernandez*, the insured sought a declaratory judgment on several insurance companies' duties to defend, pay defense costs, or indemnify the insured with regard to an underlying action alleging civil rights and constitutional violations. *Id.* at *1. The insurers moved to dismiss the action asserting, among other things, lack of justiciability based on the absence of an actual, existing controversy with regard to their duties under the policies during the pendency of the underlying action. *Id.* at *3. The insurers argued the policies were indemnity, rather than liability, policies and there was no present duty to indemnify or defend. *Id.* at *5. The insurers were liable for insured's ultimate net loss which was defined as "the total sum which the Assured becomes obligated to pay by reason of personnel injury or property damage claims, either through adjudication or compromise, . . . , and shall also include . . . all sums paid as salaries, wages, compensation, fees, charges and law costs for litigation, settlement, adjustment, and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder." *Id.* The court found "[t]he policy clearly separates out damages, which Lloyd's is required to pay only after litigation on the merits or settlement, from defense costs, which includes no such time limitations." *Id.* at *6. The court found the question of the insurers' duty to defend was

*{SIB}*

ripe for adjudication while their duty to indemnify was not. *Id*. at *4.

Hernandez is easily distinguishable from the issue currently before the court. First, the court in *Hernandez* found "that there is an actual controversy regarding whether the Insurance Defendants have [a] present duty to defend, but that the County's claims regarding the Insurance Defendants' duty to indemnify are not ripe." *Id*. at *3. The court denied the insurers' motion to dismiss with regard to the duty to defend but did not address the merits of the issue or find the duty to defend existed based on the terms of the policy. Therefore, *Hernandez* is not instructive on the issue here. Second, the policies before the *Hernandez* court did not contain language providing that the insurer has the option, but not the duty, to advance defense costs. *Id*. at *5. In fact, the court specifically distinguished a case which contained such language. *Id*. (citing *Zaborac v. American Casualty Co. of Reading, PA*, 663 F. Supp. 330 (C. D. Ill. 1987)). In *Zaborac*, the court found the duty to indemnify for defense costs arose only when the issue of indemnification was resolved. *Zaborac*, 663 F. Supp. at 333 ("This Court has already found from its reading of the liability insurance policy that the insurance company need only indemnify the insureds for losses, and the fact that the insurance company has agreed to reimburse the defense costs of the insureds does not create a duty to defend on the part of the insurance company.")

When construing the terms of an insurance contract, a court must "construe the context of the policy as a whole, rather than view particular parts of the policy in isolation." *Bresee Homes, Inc. v. Farmers Ins. Exchange*, 353 Or. 112, 122 (2012). The Century Policies contain express language relieving Century of the duty to defend. Construing the "ultimate net loss" definition as creating a present duty to defend is inconsistent with this express language, as well as other provisions of the Century Policies.

In the Century Policies, Century agrees to indemnify Insureds for all "damages, direct or consequential, and expenses, all as more fully defined by the term ultimate net loss" they "shall be obligated to pay by reason of liability (a) imposed upon the Insured by law, or (b) assumed under contract or agreement by the Named Insured." "Ultimate net loss" includes both damages and claim expense, and are addressed consistently in this provision. To read the "ultimate net loss" definition in the manner offered by Insured – that it creates a duty to defend or pay claim expenses before their liability or duty to indemnify has been imposed by law or resolved through settlement – would force the court to ignore the clear language of the Century Policies.

Furthermore, the Century Policies expressly provide Century shall be liable for payment under the Century Policies only after the Insured has paid the amount of the self-insured retention and Century's obligation to pay the ultimate net loss in excess of the self-insured retention has been fully determined either: "(1) by judgement against the Insured after actual trial, or (2) by written agreement of the Insured, the claimant, and the Company." Again, the Century Policies clearly provide Century has no responsibility to pay Insured the ultimate net loss, which includes both damages and claims expenses, until the Environmental Action has been fully resolved by judgment or settlement.

The clear, unambiguous language of the Century Policies establish Century has no present duty to participate, or contribute to, the defense of the Environmental Action. Century's duty to indemnify Insureds for defense costs relies on a finding Century has a duty to indemnify Insureds, which issue the court has previously deferred and thus will not be addressed at this time. Accordingly, Century's duty to indemnify Insureds for defense costs is deferred as well. Century is

entitled to partial summary judgment on its current duty to defend Insureds.[13]

III.  Insureds as "Insurer" under OECAA based on Century Policies

Century and Insureds also seek direction on whether Insureds are responsible for a share of defense costs under the OECAA based on the Century Policies.  Century argues the self-insured retention in the Century Policies makes Insureds a primary insurer to be included in the allocation of damages under OR. REV. STAT. 465.480 (5).  Insureds contend they are neither an insurer or uninsured under the OECAA and, therefore, should not be included in the apportionment.

When more than one insurer is responsible for costs related to an environmental claim under the OECAA, the court must allocate damages between them in accordance with the requirements of OR. REV. STAT. 465.480 (5).  OR. REV. STAT. 465.480 (5) provides:

> If a court determines that the apportionment of recoverable costs between insurers is appropriate, the court shall allocate the covered damages between the insurers before the court, based on the following factors:
>
> > (a) The total period of time that each solvent insurer issued a general liability insurance policy to the insured applicable to the environmental claim;
> >
> > (b) The policy limits, including any exclusions to coverage of each of the general liability insurance polices that provide coverage or payment for the environmental claim for which the insured is liable or potentially liable;
> >
> > (c) The policy that provides the most appropriate type of coverage for the type of environmental claim
> >
> > (d) The terms of the policies that related to the equitable allocation between insurers; and
> >
> > (e) If the insured is an uninsured for any part of the time period included in the environmental claim, the insured shall be considered an insurer for purposes of

---

[13]The parties' arguments with regard to whether the Century Policies are properly characterized as excess based on the self-insured retention and ultimate net loss provisions are issues to be decided in the indemnity stage of this proceeding, not at this time.

allocation.

The term "uninsured" is defined as:

> an insured who for any period of time after January 1, 1971, that is included in an environmental claim failed to purchase and maintain an occurrence-based general liability insurance policy that would have provided coverage for the environmental claim, provided that such insurance was commercially available at such time. A general liability insurance policy is "commercially available" if the policy can be purchased under the Insurance Code on reasonable commercial terms.

OR. REV. STAT. 465.480 (1) (c).   For the purposes of OR. REV. STAT. 465.475 to 465.484, general

liability insurance policy means:

> any contract of insurance that provides coverage for the obligations at law or in equity of an insured for bodily injury, property damage or personal injury to others. "General liability insurance policy" includes but is not limited to a pollution liability insurance policy, a commercial general insurance liability policy, a comprehensive general liability policy, an excess liability policy, an umbrella liability insurance policy or any other kind of policy covering the liability of an insured for the claims of third parties.

OR. REV. STAT. 465.475 (2).

The Century Policies are subject to a self-insured retention in the amount of $100,000 per

occurrence.  Century asserts the self-insured retention makes Insureds a primary insurer subject to

an allocation under the OECAA. Century relies on a prior ruling by this court that "self-insured

retentions are the equivalent to primary liability insurance."  *Century Indem. Co. v. The Marine*

*Group, LLC*, No. 3:08-CV–1375-AC, 2012 WL 6016953, *2 (D. Or. Dec. 3, 2012).  In that decision,

the court was distinguishing between the deductible endorsement then at issue, which required the

insurer to pay defense costs up front and seek reimbursement from the insured in the amount of

deductible, from a self-insured retention, which must be paid before the insurer's duty to indemnify.

The characterization of a self-insured retention as equivalent to a primary liability insurer does not

automatically equate to a finding that a self-insured retention makes an insured an insurer for the purposes of the OECAA.  In fact, the express language of the OECAA requires a contrary finding.

The OECAA directs the court to allocate covered damages between "insurers" based on the language and terms of the underlying insurance policies.  For example, the court must look to the period of time a policy covered the loss; the policy limits, exclusions, and payment terms; and the type of environmental coverage covered by the policy.  OR. REV. STAT. 465.480 (5).  An insurer becomes obligated to contribute when its policies are triggered.  OR. REV. STAT. 465.480 (3)(b) ("The insured or the insurers have a right to contribution as specified in subsection (4) of this section from all other insurers whose policies are triggered. . . . ").  The OECAA clearly contemplates an insurer subject to an allocation of costs has issued a "policy."

Policy is defined in the OECAA as "the written contract or agreement, and all clauses, riders, endorsements and papers that are a part of the contract or agreement, for or effecting the insurance." OR. REV. STAT. 465.475 (5).  A self-insured retention is created through the issuance of a policy issued by an insurer.  An insured does not issue a written contract or agreement setting forth the terms of the coverage created by the self-insured retention.  Accordingly, the terms of a self-insured retention are either nonexistent or too vague to allow the court to determine the appropriate share to allocate an insured under the OECAA.  In the absence of a written policy setting forth the terms of the self-insured retention, the existence of such retention does not convert the insured into an insurer under the OECAA.

The proper construction of the term  insurer provides additional support for this conclusion. "Insurer" is not specifically defined in OECAA.  Accordingly, the court must look to primary and general meaning of the term for guidance.  Black's Law Dictionary defines "insurer" as "one who

agrees, by contract, to assume the risk of another's loss and to compensate for that loss." BLACK'S LAW DICTIONARY 879 (9th ed. 2009). Again, the existence of a "contract" is primary to the identification of one as an insurer. Further, an insurer agrees to assume the risk of another's loss, not their own loss. The self-insured retention obligates the Insureds to assume their own risk, not that of another.

The OECAA provides guidance as well, as it permits a court to consider an insured an "insurer" for purposes of allocation only if the insured is uninsured. OR. REV. STAT. 465.480 (5)(e). A self-insured retention exists only when an insured has purchased other insurance creating the self-insured retention, generally preventing an insured with a self-insured retention from qualifying as an "uninsured" under the OECAA. To hold otherwise would require the court to ignore the specific language of the statute.

Finally, this construction of the statute is consistent with the legislature's intent to omit self-insured parties from being classified as "insurers" under OR. REV. STAT. 465.480 (5)(e). Early versions of the subsection provided that both self-insured and uninsured parties would be considered an "insurer" for purposes of allocation. (June 5th Rycewicz Decl. Ex. 7 at 9.) For example, the July 16, 2013, version of the bill provided:

> If the insured is self-insured or does not have insurance that by its terms provides coverage for environmental claims for part of the time period included in the environmental claim, the insured shall be considered an insurer for purposes of allocation.

(June 5th Rycewicz Decl. Ex. 7 at 9.) The legislature deleted the reference to self-insured parties, restricting the allocation of costs to an insured that is uninsured for any period. The removal of the term self-insured from the statute makes clear the legislature intended to hold an insured liable for

a share of the costs only when they have failed to purchase insurance providing coverage for environmental claims, not when the insured agrees to a self-insured retention under an excess policy.

Insureds are not considered insurers under the OECAA based on the self-insured retention in the Century Policies.  Century's motion for partial summary judgment on Insureds' status as an insurer under the OECAA based on the self-insured retention is denied.

Alternatively, Century argues Insureds must be considered uninsured for purposes of defense costs because the Century Policies do not obligate Century to participate in the defense at this time. The OECAA defines "uninsured" as a party who fails to "purchase and maintain an occurrence-based general liability insurance policy that would have provided coverage for the environmental claim" and "general liability insurance policy" as a contract of insurance providing "coverage for the obligations at law or in equity of an insured for bodily injury, property damage or personal injury to others."  OR. REV. STAT. 465.480 (1)(c); 465.475(2).  The statute does not address defense costs. However, the definition of general liability insurance policy requires coverage for obligations to others.  As defense costs are the obligation of the insured, an insured's failure to obtain insurance requiring the insurer to provide the insured with a defense does not make the insured "uninsured" under the OECAA.

Insureds are not considered uninsured under the OECAA based solely on a finding Century does not have a present duty to defend.  The resolution of Insureds' status as uninsured is contingent on Century's duty to indemnify Insureds for losses resulting from the Environmental Claims and is necessarily deferred to the indemnity state of these proceedings.

Finally, Insureds seek a finding they are not uninsured under the OECAA from 1982 to 1985 based on the Century Policies, as well as insurance policies issued by other insurers, arguing such

policies provide covered for the Environmental Claims.  The court found Century has no present

duty to participate in, or contribute to, the defense of the Environmental Claims, and deferred ruling

on Century's obligation to indemnify Insureds under the Century Policies, finding the issues

appropriate for the indemnity stage of the proceeding.  Again, the question of whether Insureds were

uninsured for the relevant period requires a determination of whether the Century Policies, as well

as the other policies identified by Insureds, provide coverage for the Environmental Claims, as

required by the OECAA.  This determination should be made during the indemnity stage of this

action.  Accordingly, Insureds' request for a finding it was not uninsured from 1982 to 1985 is

denied as premature.  Insureds' motion for partial summary judgment on their status as uninsured

during the term of the Century Policies is denied with leave to refile during the indemnity stage of

this action.

## IV.  Granite State's Duty to Defend as Excess/Umbrella Insurer

Granite State insured Marine Iron from July 1979[14] to August 1, 1985 pursuant to umbrella

liability insurance policies issued annually.  Specifically, Granite State issued Policy No. 6579-6286

covering the period from July 1, 1979, to July 1, 1980; Policy No. 6580-7440 covering the period

from July 1, 1980, to July 1, 1981; Policy No. 6581-8085 covering the period from July 1, 1981, to

July 1, 1982; Policy No. 6582-9729 covering the period from July 1, 1982, to July 1, 1983; Policy

No. 6583-0732 covering the period from July 1, 1983, to July 1, 1984; and Policy No. 6584-1790

covering the period from August 1, 1984, to August 1, 1985.  (Sumner Decl. dated April 23, 2015

("April 23rd Sumner Decl.") ¶ 6.)  While various parties identified all six policies as creating a duty

---

[14]Granite State also insured Marine Iron from July 1, 1978 to July 1, 1979, under policy numbers 6578-0471 and 6578-5407.  Insureds do not claim Granite State had a duty to defend under these policies.  Accordingly, these policies are not before the court at this time.

to defend, Insureds apparently concede Policy Nos. 6579-6286, 6580-7440, and 6581-8085, covering the period from July 1, 1979, to July 1, 1982, do not create a present duty to defend because they have not objected to Granite State's motion for summary judgment with regard to these policies.[15] Accordingly, only Granite State Policy Nos. 6582-9729, 6583-0732, and 6584-1790, covering the period from July 1, 1982, to August 1, 1985,[16] (collectively the "Granite State Policies") are at issue at this time.

The Granite State Policies contain the following identical insuring agreement language:

I. COVERAGE.  The Company hereby agrees, according to the term and conditions but subject to the limitations hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability

(a) Imposed upon the Assured by law, or
(b) Assumed under contract or agreement by the Named Assured and/or any officer, director, stockholder, partner, or employee of the Name Assured, while acting in his capacity as such,

for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss" on account of:

(i)   Personal injuries including death at any time resulting therefrom,
(ii)  Property Damage,
(iii) Advertising Liability,

caused by or arising out of each occurrence happening anywhere in the world.

II.  LIMIT OF LIABILITY.  The Company shall only be liable for the ultimate net loss, the excess of either:

---

[15]Insureds were the only parties to file opposition to Granite State's motion for partial summary judgment.  In the absence of objection from the parties designating Granite State as owing a duty to defend under Policy Nos. 6579-6286, 6580-7440, and 6581-8085, the court finds Granite State is entitled to summary judgment with regard to these policies.

[16]It is unclear from the record if any Granite State policy was in effect for the month of July 1984.

(a) The limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances, or
(b) the amount as set out in the declarations as the self-insured retention in respect of each occurrence not covered by said underlying insurances, (hereinafter called the "Underlying Limits"):

and then only up to a further sum as stated in Item 3(a) of the Declarations in all in respect of each occurrence, subject to a limit as stated in Item 3(b) of the Declarations in the aggregate for each annual period during the currency of the Policy, separately in respect of Products Liability and in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurances by reason of losses paid thereunder, this policy shall

(1) in the event of reduction pay the excess of the reduced underlying limit
(2) in the event of exhaustion continue in force as underlying insurance, subject to all the terms and conditions of this policy.

The inclusion or addition hereunder of more than one Assured shall not operate to increase the Company's limit of liability.

III.  SUPPLEMENTAL DEFENSE.  It is agreed that with respect to any occurrence covered only by the terms and conditions of this policy except for the amount of the self-insured retention as stated in Item 3(c) of the Declarations the Company shall:

(a) defend any suit against the Assured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false, or fraudulent; but the Company may make such investigation, negotiation and settlement of any claim or suit it deems expedient.

(April 23rd Sumner Decl. ¶ 8.)

The Granite State Policies define "Ultimate Net Loss" as follows:

The term "Ultimate Net Loss" shall mean the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges, and all sums paid as salaries, wages, compensations, fees, charges and law costs, premiums on attachment or appeal bonds; interest, expenses for doctors, lawyers, nurses, investigators and other persons, and for litigation, settlement, adjustment and

investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurer's permanent employees.

(April 23rd Sumner Decl. ¶ 9.)  The term "Occurrence" is defined as "an accident, or a happening, or event, or a continuous or repeated exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period.  All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence."  (April 23rd Sumner Decl. Ex. D. at 79, 94, 105.)

The Granite State Policies are subject to the following conditions:

J. LOSS PAYABLE.  Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence.  The Assured shall make a definite claim for any loss for which the Company may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain, either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and the Company.  If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time.  Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy.

L. OTHER INSURANCE.  If other valid and collectible insurance with any other insurer is available to the insured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be excess of and shall not contribute with such other insurance.  Nothing herein shall be construed to make this policy subject to the terms, conditions, and limitations of other insurance.

S.  MAINTENANCE OF UNDERLYING INSURANCE POLICIES.  It is a condition of this policy that the policy or policies referred to in the attached "Schedule of Underlying Insurances" shall be maintained in full force during the currency of this policy except for any reduction of the aggregate limit or limits contained therein, solely by payment of claims in respect of accidents and/or occurrences during the period of this policy.  Failure of the Assured to comply with the foregoing shall not invalidate this policy; but in the event of such failure, the

Company shall only be liable to the same extent as they would have been had the Assured complied with the said condition.

(April 23rd Sumner Decl. ¶10.)  The Granite State Policies are excess over primary policies issued by Century.  (April 23rd Sumner Decl. ¶ 11.)  The self-insured retention amount is $10,000.  (April 23rd Sumner Decl. Ex. D. at 75, 89.)

It is undisputed the Granite State Policies are excess over the Century Policies.  Granite State argues it is not obligated to participate in the defense of the Environmental Action until the Century Policies have been exhausted or Century is otherwise excused under the terms of the Century Policies.  Further, it asserts the supplemental defense provision requires it to provide a defense only if no other insurance covers the loss.  In other words, Granite State contends that because Argonaut is currently defending, and the court has found four other insurance companies have a present duty to defend the Environmental Claims, it has no duty to defend under the supplemental defense provision.

The Granite State Policies provide Granite State shall be liable only for ultimate net loss in excess of the limits of the underlying insurance.  "Ultimate net loss" is defined as the total sum Insured becomes obligated to pay as a result of a claim, and includes charges and law costs, premiums on attachment or appeal bonds, and expenses for investigators, lawyers, and litigation and settlement.  Accordingly, Granite State has a duty, subject to the other provisions of the Granite State Policies, to participate to some degree in the defense of the Environmental Claims once Insureds have exhausted the self-insured retention and Century has exhausted the limits of, or been excused under the terms of, the Century Policies.  However, Granite State has no liability under the Granite State Policies unless and until Century has paid the limits of the underlying Century Policies.

Insureds concede Century, the underlying insurer, has not paid any sums under the Century Policies. The court has found Century has no current obligation to participate in, or contribute to, the defense of the Environmental Claims, deferring resolution of Century's duty to indemnify Insured for defense costs to the indemnity stage of this litigation. Century's duty to defend is contingent on Century's duty to indemnify Insureds for losses under the terms of the Century Policies. Accordingly, Granite State's duty to defend is similarly contingent on Century's duty to indemnify Insured for losses under the terms of the Century Policies

Insureds concede "[t]he factual issue whether any of the Century policies cover the alleged occurrence is disputed" and that "the Court has not had an opportunity to rule on the extent of Century's pollution exclusion." (Insureds' Response to Granite State's Mot. for Partial Summ. J. at 4, 10-11.) This factual issue has been deferred and will be resolved in the indemnity stage of this litigation. The duty of Granite State to provide a defense to Insureds in Century's stead should Century be found to not have a duty to indemnify or defend Insureds can not be addressed until Century's liability is resolved.

The parties also address Granite State's duty to defend under the supplemental defense provision. The supplement defense provision creates a duty to defend with regard to "any occurrence covered only by the terms and conditions of this policy." Insureds argue the definition of occurrence, which includes conduct resulting in damage "during the policy period" obligates Granite State to provide a defense if the Century Policies are found to exclude the Environmental Claims. In other words, Insureds argue the supplemental defense provision requires only vertical exhaustion. Granite State contends the supplemental defense provision should be read to create a duty to defend only when no other insurer is defending Insureds on the Environmental Claim, or that the supplemental

defense provision requires both vertical and horizontal exhaustion. Therefore, because Argonaut is currently defending Insureds and the court has found four other insurers owe Insureds a defense, Granite State would not obligated to participate in the defense under the supplemental defense provision.

The supplemental defense provision is relevant only if Century is found to have no duty to indemnify Insureds for the Environmental Claims under the Century Policies. Consequently, the proper interpretation of the provision need not, should not, and will not be addressed at this time.

Insureds assert the court should allocate a share of defense costs to Century and Granite State to ensure Insureds have seamless future defense-cost coverage, despite the issues of fact which Insureds admit exist with regard to coverage for the Environmental Claims under the Century Policies. Insureds assert such a ruling is appropriate to avoid the need to relitigate defense costs upon exhaustion of the Century Policies. The determination of Century's defense obligations are contingent upon Century's duty to indemnify Insured for the Environmental Claims under the terms of the Century Policies. Insureds concede issues of fact remain with regard to this predicate issue. Insureds requested bifurcation of this proceeding into two stages, asking that defense obligations be determined first and deferring both discovery on, and resolution of, indemnity obligations to a future second stage. If Insureds are inconvenienced by the court's refusal to address indemnification issues during the defense stage, it is a result of this request.

Granite State's duty to defend Insureds is contingent on Century's duty to indemnify Insured under the Century Policies. Any consideration of Century's duty to indemnify has been deferred to the indemnity stage. Granite State's duty to defend under both the insuring provisions, and the supplemental defense provisions, of the Granite State Policies must be deferred to the indemnity

stage as well.  Granite State's motion for summary judgment on its present duty to defend Insureds

against the Environmental Claims is granted.

## V.  Insureds as "Uninsured" under the OECAA

Insureds ask the court to find they were not uninsured under the OECAA between July 1,

1982, and February 28, 1987, and, therefore, are not responsible for a share of defense costs during

this period.  Alternatively, Insureds ask to court to find that after August 1, 1985, "occurrence-based

general liability insurance that would cover the type of environmental claim at issue in this case was

no longer commercially available within the meaning of Oregon Revised Statute 465.480(1)(c)."

(Insureds' Mot. for Summ. J. at 3.)

As noted above, the OECAA defines "uninsured" as:

> an insured who for any period of time after January 1, 1971, that is included in an
> environmental claim failed to purchase and maintain an occurrence-based general
> liability insurance policy that would have provided coverage for the environmental
> claim, provided that such insurance was commercially available at such time.  A
> general liability insurance policy is "commercially available" if the policy can be
> purchased under the Insurance Code on reasonable commercial terms.

OR. REV. STAT. 465.480 (1) (c).  For the purposes of OR. REV. STAT. 465.475 to 465.484, "general

liability insurance policy" means:

> any contract of insurance that provides coverage for the obligations at law or in
> equity of an insured for bodily injury, property damage or personal injury to others.
> "General liability insurance policy" includes but is not limited to a pollution liability
> insurance policy, a commercial general insurance liability policy, a comprehensive
> general liability policy, an excess liability policy, an umbrella liability insurance
> policy or any other kind of policy covering the liability of an insured for the claims
> of third parties.

OR. REV. STAT. 465.475 (1).

Insureds assert the insurance policies issued by Century, Granite State, and National Union

were occurrence-based general liability insurance policies within the meaning of the OECAA. Based on the existence of these policies, Insureds claim to be insured under the OECAA between July 1, 1982, and February 28, 1987.

The Century Policies and Granite State Policies covered the period from July 1, 1982, to August 1, 1985. Century argues, and the court has found, the Century Policies are indemnity-only policies. Further, the Century Policies contain exclusions which may affect, or eliminate, coverage for the Environmental Claims. Whether the Century Policies provide coverage to Insureds has been deferred to the indemnity stage, where discovery regarding the factual underpinnings of the Environmental Claims will occur and evidence supporting Insureds claims of coverage will be available to the court and the parties. Insureds' motion for partial summary judgment is premature with regard to the Century Policies.

Similarly, the Granite State Policies contain exclusions which may bar coverage for the Environmental Claims. Resolution of the type of coverage the Granite State Policies provide, and whether such policies provide coverage for the Environmental Claims, must be deferred to the indemnity stage of the litigation. Insureds' motion for partial summary judgement with regard to the Granite State Policies is denied as premature.

The National Union Policies cover the period from August 1, 1985, to February 28, 1987. The court has found the Exclusion applies to the Environmental Claims and that National Union has no duty to defend Insureds under the terms of the National Union Policies. While not specifically addressing National Union's duty to indemnify Insureds for losses relating to the Environmental Claims, the court is hard pressed to imagine a scenario in which the same ruling would not apply to National Union's indemnification obligations. However, as these motions are related solely to the

duty to defend, the court finds the National Union Policies are not occurrence-based general liability insurance policies providing duty to defend coverage for the environmental claim. Accordingly, Insureds' motion for a ruling they are not uninsured from August 1, 1985, to February 28, 1987 based on the duty to defend coverage provided by the National Union Policies is denied.

Insureds seek an alternative ruling that occurrence-based general liability insurance providing coverage for the Environmental Claim, was not commercially available after August 1, 1985. Under the OECAA, "[a] general liability insurance policy is 'commercially available' if the policy can be purchased under the Insurance Code on reasonable commercial terms." OR. REV. STAT. 465.480 (1)(c).

Insureds argue absolute pollution exclusions became standard in all occurrence-based general liability insurance policies beginning in 1985, making it impossible for corporations to purchase policies providing coverage for environmental claims. Consequently, occurrence-based general liability coverage for environmental claims was not reasonably commercially available after August 1, 1985. Insureds assert the legislative history of the OECAA supports this interpretation.

Insureds have failed to offer support for their assertion that general liability insurance policies covering environmental claims were not commercially available after August 1, 1985. A California case on which Insureds rely states that "policies issued after 1985 generally include an absolute pollution exclusion." *CDM Investors v. Travelers Cas. and Sur. Co.*, 139 Cal App. 4th 1251, 1260 (2006). The court's use of the term "generally" implies some policies issued after 1985 do not include an absolute pollution exclusion. Earlier, the California Supreme Court noted the "absolute pollution exclusion" first appeared in 1985. *MacKinnon v. Truck Ins. Exchange*, 31 Cal. 4th 635, 644 (2003). If the absolute pollution exclusion first appeared in 1985, it is difficult to believe the

Page 49 - OPINION AND ORDER                                    *{SIB}*

exclusion permeated the industry quickly enough to make general liability insurance policies providing environmental claim coverage commercially unavailable within a year. Insureds offer no evidence that in fact the change occurred that quickly.

Insureds refer to a Cornell Law Review article as support for the statement that "legal scholars confirm the general understanding that in 1985 CGL policies covering environmental claims were no longer available." (Insureds' Reply to Nat'l Union and Granite State's Opp'n to Summ. J. at 13). In fact, the article states the absolute pollution exclusion was inserted into standard form comprehensive general liability policies in 1985. Nancer Ballard & Peter M. Manus, *Clearing Muddy Waters: Anatomy of the Comprehensive General Liability Pollution Exclusion*, 75 Cornell L. Rev. 610, 633 (1990); *see also Hatco Corp. v. W.R. Grace & Co.*, 801 F. Supp. 1334, 1352 (D. N.J 1992)("The ISO exclusion was one step removed from the absolute pollution exclusion that in 1985 became standard policy language in the form CGL policy.") The inclusion of the absolute pollution exclusion into standard or form policies does not eliminate the possibility that specialized or unique policies not containing the exclusion still were available. Additionally, "general liability insurance policy" is defined to include, in addition to a comprehensive general liability policy, "a pollution liability insurance policy, a commercial general liability insurance policy, . . . an excess liability policy, an umbrella liability insurance policy or any other kind of policy covering the liability of an insured for the claims of third parties." OR. REV. STAT. 465.475(1). The article does not address the availability of environmental claim insurance through these other types of policies.

Similarly, Section 32.8 of the Toxic Torts Practice Guide represents "[t]he absolute pollution exclusion, [was] adopted in the early 1980's and present in almost all liability policies by 1985." 2 TOXIC TORTS PRACTICE GUIDE § 32:8 (James T. O'Reilly ed. 2015). "Almost all" is not "all"

and leaves open the possibility some liability policies may not contain the absolute pollution exclusion. The statement "[t]he insurance industry modified the qualified pollution exclusion in 1985 to exclude all polluting discharges based on the ambiguity that many courts found in relation to the interpretation of the phase 'sudden and accidental,'" does not equate to the commercial unavailability of occurrence-based general liability insurance for environmental claims after 1985. 8A COUCH ON INSURANCE, § 127:13 (3rd ed. 2015).

One of the cases referenced by Insureds lends support to the conclusion the absolute pollution exclusion was not uniformly established in 1985 as Insureds contend. In *Hussey Copper, Ltd. v. Royal Ins. Co.*, Civil Action No. 07-758, 2009 WL 2913959, *6 (W.D. Pa. Sept. 9, 2009), the court noted the Pennsylvania Insurance Department approved a pollution exclusion endorsement offered by an insurance group in 1985. However, the group submitted amendments to the endorsement in 1986 and again in 1989. *Id*. The 1989 submission related to:

> a proposed "total" (as opposed to "absolute") pollution exclusion, with the explanatory comment:
>
>> [T]he total pollution exclusion . . . [is] for potential use – on a limited but critically important basis – by certain insureds who might not be able to obtain all of the other GCL coverages because the pollution coverage provided within basic contact [sic] is inappropriate for their particular risk situation.

*Id*. It appears that various versions of the absolute pollution exclusion, or a total pollution exclusion used when an underlying basic pollution coverage did not cover the specific risk, were available, or at least being considered, by the insurers in the group. Additionally, the group referenced "pollution coverage" within a basic contract, further supporting the conclusion some form of insurance for environmental claims was available after 1985.

Insureds' reliance on legislative history is equally unavailing.  When construing statutory language, the court must look to the text and context of the statute to determine the legislative intent. The definition of "uninsured" contains a definitive start date, January 1, 1971, but has an end date based on the availability of commercially reasonable insurance for environmental claims.  Had the legislature intended to limit an uninsured's liability for costs under the OECAA to a specific time period, it could easily have added the August 1, 1985, end date offered by Insureds and eliminate any reference to commercially available insurance.  It did not.  Instead, the legislature left the end-date fairly open, limited only by a corporation's ability to obtain insurance covering environmental claims on reasonable commercial terms. The court must give effect to the language of the statute. Construing the definition to include an end date of August 1, 1985, would require the court to ignore nearly half the statute, and make an entire sentence unnecessary.

Next, the court considers pertinent legislative history offered by the parties.  Insureds rely on testimony offered during an August 22, 2003, conference committee meeting discussing the parameters of the definition of "uninsured" in the OECAA.  The testimony makes clear the 1971 date was selected based on passage of the "Clean Air Act" and the Clean Water Act" in the early 1970's in what was identified as the "modern era of environmental regulation." (April 27th Rycewicz Decl. Ex. 14 at 2.)  Keith Leavitt ("Leavitt"), representing the coalition that initially proposed the bill, explained that any date before 1971 would result in "difficulty in producing records, in making – coming up with evidence that shows that, in fact, this type of insurance was offered, and it adds to the litigation and the time and it's something that we simply don't think would be practical and make any sense." (April 27th Rycewicz Decl. Ex. 14 at 2.)  Leavitt did not dispute insurance covering environmental claims was available prior to 1971, but indicated the 1971 date was important to avoid

creating a "brand new area of litigation" and to "reduce transaction and litigation cost." (April 27th Rycewicz Decl. Ex. 14 at 2.)  Leavitt expressed similar concerns with the post-1985 period and "whether in fact, current space, general liability insurance was available" but acknowledged the House committee disagreed and did not share his concern.  (April 27th Rycewicz Decl. Ex. 14 at 2.)

Similarly, Greg Baird ("Baird"), an attorney with "extensive experience in environmental insurance coverage litigation and analytical matters" noted that under the definition of "uninsured", "in light of the historical underwriting of pollution losses, an insured would not be uninsured post 1985." (April 27th Rycewicz Decl. Ex. 14 at 14.)  Baird explained:

> At that time, the insurance industry began expressly excluding from occurrence based policies the pollution risk and then writing separate specialty pollution liability coverage, which was not written on an occurrence base.  In other words, the policies were either claims made or had coverage grants that were not based on an occurrence for a particular risk for pollution.  Therefore, post 1985, based on the definition of uninsured, it would be highly likely that in all cases the insured would simply say well, occurrence based general liability coverage was not available for pollution and avoid the definition of uninsured when in fact pollution liability coverage was specifically available and an insured may have looked into that and rejected paying the premium for that particular type of sur[e]ty.

(April 27th Rycewicz Decl. Ex. 14 at 14.)

Tom Gallagher ("Gallagher"), who represented proponents of the bill, very specifically stated that "under uninsured, we want to set the measurement period of 1971 to 1985, that's the measurement period for us. We want to measure a time period when the knowledge that we were polluting was within the scope of business, should have known it.  And we believe that there was generally available, general liability insurance policies which would be covered by McCormick and Baxter."[17]  (April 27th Rycewicz Decl. Ex. 14 at 16.)  However, Gallagher then opened the door for

---

[17]Gallagher is more than likely referring to the case of *St. Paul Fire & Marine Ins. Co., Inc. v. McCormick & Baxter Creosoting Co.*, 324 Or. 184 (1996) in which the Oregon Supreme Court

an alternative date, stating "If someone can find another reasonable measurement period here for which a company went out and did not buy insurance, did not protect themselves against the risk that they got coverage for McCormick and Baxter in a period in which environmental laws are changing, liability is becoming absolutely one hundred percent on everybody. And I'm willing to look at that." (April 27th Rycewicz Decl. Ex. 14 at 16.)

Insureds are correct the legislative history contains at least three witnesses identifying 1985 as the date occurrence-based general liability policies providing coverage for environmental claims became commercially unavailable, and recommending the definition of "uninsured" be limited to the period from 1971 to 1985. However, testimony from private opponents or proponents of the bill is not evidence that lawmakers viewed 1985 as the operative end-date of an insured's possible liability for a share of costs and damages as an uninsured under the OECAA. The legislature expressly rejected the recommendations by failing to include a 1985 end-date in the definition and, instead, left the end date open for determination on a case-by-case basis. This is evidence the lawmakers did not view 1985 as a definitive end date an insured could be deemed an "uninsured." The legislative history, in fact, supports the court's construction that an insured must prove occurrence-based general liability insurance policies providing coverage for an environmental claim were not commercially available to avoid allocation of a share of costs and damages as an uninsured under the OECAA, even after such policies became generally unavailable, or at least more difficult to obtain, in 1985.

---

determined "sudden and accidental" exceptions to pollution exclusions in general comprehensive liability policies were ambiguous and must be construed against the drafter, resulting in a finding the policies covered damages resulting from an unexpected and unintended release of hazardous materials. It is unclear how a court ruling issued in 1996 supports a 1985 end date.

In the absence of factual evidence establishing Insureds' attempts to purchase an occurrence-based general liability policy offering coverage for environmental claims and the terms of the policies offered to them, or expert testimony that such policies containing reasonable commercial terms did not exist after August 1985, the court is not willing to find as a matter of law that occurrence-based general liability insurance policies providing coverage for environmental claims were not commercially available after August 1985. The relatively short time period covered by Insureds' request – between August 1, 1985, February 28, 1987 – and the proximity of this period to the time absolute pollution exclusions were nearly universally used by insurance companies – 1985 – increase the likelihood occurrence-based general liability insurance policies not containing the absolute pollution exclusion, or containing a less inclusive form of the exclusion, were commercially available. Insureds' request for a finding that occurrence-based general liability insurance policies providing coverage for environmental claims were not commercially available after August 1985 is denied.

Insureds' motion for partial summary judgment with regard to their obligation to participate in the allocation of defense costs as "uninsured" under the OECAA for the period from July 1, 1982, to August 1, 1985, is contingent on Century and Granite State's duty to indemnify them under the Century Policies and Granite State Policies. The court has deferred ruling on this issue to the indemnity stage of the proceedings. Accordingly, Insured's motion for partial summary judgment on their status as uninsured for this period is denied. Based on the finding National Union has no duty to defend Insureds under the terms of the National Union Policies, Insureds' motion for a ruling they are not uninsured from August 1, 1985, to February 28, 1987, is denied. Finally, the court denies Insureds' motion for a ruling that occurrence-based general liability insurance policies

providing coverage for environmental claims was not commercially available after August 1, 1985.

VI.  ICSOP's Duty to Defend as Excess/Umbrella Insurer

ICSOP insured Marine Iron pursuant to umbrella policies for more than eight years, from June 8, 1970, to July 1, 1978.  Specifically, ICSOP issued Policy No. 450-1641 covering the period from June 8, 1970, to July 1, 1973; Policy No. 4573-1771 covering the period from July 1, 1973, to July 1, 1976; Policy No. 4576-1950 covering the period from July 1, 1976, to July 1, 1977; and Policy No. 4577-2144 covering the period from July 1, 1977, to July 1, 1978 (collectively the "ICSOP Policies").  (Sumner Decl. dated July 8, 2015 ("July 8th Sumner Decl.") ¶ 3.)

The ICSOP Policies contain the following identical insuring agreement language:

I.  COVERAGE.  The Company hereby agrees, subject to the limitations, terms and conditions hereinafter mentioned, to indemnify the Assured for all sums which the Assured shall be obligated to pay by reason of the liability,

(a) Imposed upon the Assured by law, or
(b) Assumed under contract or agreement by the Named Assured and/or any officer, director, stockholder, partner, or employee of the Name Assured, while acting in his capacity as such,

for damages, direct or consequential, and expenses, all as more fully defined by the term "ultimate net loss" on account of:

      (i)   Personal injuries including death at any time resulting therefrom,
      (ii)  Property Damage,
      (iii) Advertising Liability,

caused by or arising out of each occurrence happening anywhere in the world.

II.  LIMIT OF LIABILITY.  The Company shall only be liable for the ultimate net loss, the excess of either:

(a) the limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances, or

(b)  the amount as set out in the declarations as the self-insured retention in respect

of each occurrence not covered by said underlying insurances,

 (hereinafter called the "Underlying Limits"):

and then only up to a further sum as stated in Item 2(a) of the Declarations in all in respect of each occurrence – subject to a limit as stated in Item 2(b) of the Declarations in the aggregate for each annual period during the currency of this Policy, separately in respect of Products Liability and in respect of Personal Injury (fatal or non-fatal) by Occupational Disease sustained by any employees of the Assured.

In the event of reduction or exhaustion of the aggregate limits of liability under said underlying insurances by reason of losses paid thereunder, this policy shall

(1) in the event of reduction pay the excess of the reduced underlying limit
(2) in the event of exhaustion continue in force as underlying insurance, subject to all the terms and conditions of this policy.

The inclusion or addition hereunder of more than one Assured shall not operate to increase the Company's limit of liability.

(July 8th Sumner Decl. ¶ 5.)

The ICSOP Policies define "Ultimate Net Loss" as follows:

The term "Ultimate Net Loss" shall mean the total sum which the Assured, or any company as his insurer, or both, become obligated to pay by reason of personal injury, property damage or advertising liability claims, either through adjudication or compromise, and shall also include hospital, medical and funeral charges, and all sums paid as salaries, wages, compensations, fees, charges and law costs, premiums on attachment or appeal bonds; interest, expenses for doctors, lawyers, nurses, investigators and other persons, and for litigation, settlement, adjustment and investigation of claims and suits which are paid as a consequence of any occurrence covered hereunder, excluding only the salaries of the Assured's or of any underlying insurer's permanent employees.

The Company shall not be liable for expenses as aforesaid when such expenses are included in other valid and collectible insurance.

(Rycewicz Decl. dated June 8 ("June 8th Rycewicz Decl.") Ex. 1. at 10, 31, 47, 65.)  The term

"Occurrence" is defined as "an accident or a happening or event or a continuous or repeated

exposure to conditions which unexpectedly and unintentionally results in personal injury, property damage or advertising liability during the policy period.  All such exposure to substantially the same general conditions existing at or emanating from one premises location shall be deemed one occurrence." (June 8th Rycewicz Decl. Ex. 1. at 10, 31, 47, 65.)

The ICSOP Policies are subject to the following conditions:

J.  LOSS PAYABLE.  Liability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of such occurrence.  The Assured shall make a definite claim for any loss for which the Company may be liable under the policy within twelve (12) months after the Assured shall have paid an amount of ultimate net loss in excess of the amount borne by the Assured or after the Assured's liability shall have been fixed and rendered certain, either by final judgment against the Assured after actual trial or by written agreement of the Assured, the claimant, and the Company.  If any subsequent payments shall be made by the Assured on account of the same occurrence, additional claims shall be made similarly from time to time.  Such losses shall be due and payable within thirty (30) days after they are respectively claimed and proven in conformity with this policy.

L.  OTHER INSURANCE.  If other valid and collectible insurance with any other insurer is available to the Assured covering a loss also covered by this policy, other than insurance that is in excess of the insurance afforded by this policy, the insurance afforded by this policy shall be excess of and shall not contribute with such other insurance.  Nothing herein shall be construed to make this policy subject to the terms, conditions, and limitations of other insurance.

S.  MAINTENANCE OF UNDERLYING INSURANCES.  It is a condition of this policy that the policy or policies referred to in the attached "Schedule of Underlying Insurances" shall be maintained in full effect during the currency of this policy except for any reduction of the aggregate limit or limits contained therein, solely by payment of claims in respect of accidents and/or occurrences during the period of this policy. Failure of the Assured to comply with the foregoing shall not invalidate this policy; but in the event of such failure, the Company shall only be liable to the same extent as they would have been had the Assured complied with the said condition.

(July 8th Sumner Decl. ¶ 7.)

All four ICSOP Policies contained the following "Defense Endorsement":

In consideration of the premium provided, it is understood and agreed that in the event there be no underlying insurance against loss or claim covered by this Policy, the Company agrees to defend in his name and behalf any suit against the Assured alleging Personal Injury, including death at any time resulting therefrom, or property damage and seeking damages on account thereof or seeking damages by reason of a contract under which the Assured assumed or is alleged to have assumed liability of others therefor, even if such suit is groundless, false or fraudulent; but the Company shall have the right to make such investigation, negotiation and settlement of any such claim or suit as may be deemed expedient by the Company.

All other terms and conditions remain unchanged.

("Defense Endorsement") (June 8th Rycewicz Decl. Ex. 1. at 16, 41, 56, 70.)  The "Following Form

Endorsement" set forth below was included all of the ICSOP Policies except Policy No. 4377-2144:

Except with respect to the definitions of personal injury and property damage and except with respect to the exclusions contained in the attached umbrella policy form, it is understood and agreed that notwithstanding anything contained herein to the contrary, it is hereby understood and agreed that where underlying insurance is written under terms and conditions providing greater protection or indemnity to the Assured than the terms and conditions of this Policy, this insurance shall indemnify the Assured upon the same terms, conditions and limitations of the applicable underlying insurance, but where no such underlying insurance exists this insurance indemnifies the Assured upon the terms, conditions and limitations of the attached umbrella form.[18]

(June 8th Rycewicz Decl. Ex. 1. at 17, 40, 71.)

The ICSOP Policies provided umbrella/excess coverage to primary policies issued by St. Paul

from June 8, 1970, to July 1, 1972; Argonaut from July 1, 1972, to July 1, 1975; and Home from July

1, 1975, to July 1, 1978.  As Argonaut is currently providing a full defense to Insureds, Insureds

concede ICSOP does not have a present duty to defend for this time period.  Accordingly, ICSOP

is entitled to partial summary judgment on its duty to defend for the period from July 1, 1972, to July

1, 1975.

---

[18]The endorsements were printed in all caps in the relevant policies.  The court reproduced in it upper and lower case capitalizing the terms capitalized in other policy provisions.

Home is insolvent and unable to honor the terms of its policy (the "Home Policy").  ICSOP argues that under the express terms of the ICSOP Policies, its obligation to pay is contingent on payment of the limits of the Home Policy.  As the Home Policy limits have not been paid, ICSOP's obligations have not been triggered.  ICSOP contends Home's insolvency, and resulting inability to exhaust the limits of the Home Policy, does not alter ICSOP's obligations, which are independent of Home's inability to pay.  Insureds disagree and argue ICSOP must "drop down" and assume the role of a primary insured in Home's stead.  Insureds contend that because Home is insolvent and unable to pay the limits of the Home Policy with regard to the Environmental Claims, there is no underlying insurance against loss or claim covered by the Home Policies.

First, the court will look to the language found in the body of the ICSOP Policies.  The Oregon Supreme Court has construed language similar to that of the insuring agreement in the ICSOP Policies and found the excess insurer was not obligated to pay on an occurrence until the covered loss exceeded the aggregate policy limits of the primary policies, even if one of the primary insurers was insolvent and unable to honor its obligations under its policy.  *Hoffman*, 313 Or. at 477.  The policy language at issue was the term "amount recoverable" in the limit of liability provision, which provided: "[t]he company shall only be liable for the ultimate net loss of the excess of either (a) the amount recoverable under the underlying insurances as set out in Item 7 of the Declarations, or (b) the amount of the retained limit stated in Item 4 of the Declarations in respect of each occurrence not covered by said underlying insurances, (hereinafter called the 'underlying limits')." *Id*. at 467.  The insured argued the term "amount recoverable" meant the amount it was able to recover from the primary insurers.  As the insured was unable to recover any amount from the insolvent primary insurer, it asserted the excess insurer was required to drop down into the place of

the insolvent insurer. *Id*. The excess insurer argued "amount recoverable" meant the amount capable of recovering, or the amount the insured would have been able to recover if one of the primary insurers had not been insolvent. *Id*.

The court recognized both interpretations were plausible in isolation, but found only the insurer's interpretation remained reasonable when considered both in the context of the limit of liability provision and in light of the policy as a whole. *Id*. at 471. The insured's definition rendered meaningless the drop-down language in the limit of liability provision, which obligated insured to pay the excess of the reduced underlying limit in the event of reduction of the primary's aggregate limit by payment of claims. *Id*. If "amount recoverable" was limited to the amount the insurer was able to recover from the primary insurer, the drop-down provision obligated the insured to pay what he was already obligated to pay under the limit of liability provision. *Id*. at 471-72. When viewed in the context of the excess policy as a whole, the insured's version also made the loss payable provision redundant and ignored the use of the term "collectible insurance" in the "other insurance" provision. *Id*. at 472-74. The court adopted the insurer's version of the language, finding it unambiguous after considering the context of the particular provision and the policy as a whole, and held the excess insurer did not have any obligation under the excess policy until the covered loss exceeded the aggregate limits of the underlying policies. *Id*. at 477. In other words, the excess insurer did not drop down into the position of the insolvent primary insurer, but retained its excess position despite the primary insurer's inability to pay the limit of the primary policy.

Similarly, Judge Haggerty found Home's insolvency did not require the excess insurer to drop down and provide primary coverage where the excess insurer's liability was limited to the excess of the amount recoverable under the underlying insurance identified on an attached schedule.

*California Ins. Co. v. Stimson Lumber Co.*, No. Civ. 01-514-HA, 2004 WL 1173185 (D. Or. May 26, 2004).  The court found this language was "meant to apply only to amounts in excess of the applicable limits of any underlying insurance coverage. The policies establish a minimum dollar threshold for coverage, regardless of the availability of the underlying insurance coverage to pay that sum." *Id*. at *14.  Judge Haggerty considered additional policy language, including the definition of "Ultimate Net Loss" which was defined as the "total of the applicable limits of the underlying policies listed on the schedule of underlying insurance," and the provision limiting the excess insurer's liability to the aggregate limits of the underlying policies in the event the insured failed to maintain the underlying policies, to be consistent with his conclusion.  *Id*. at *15.  In sum, he found the excess insurer was not liable to the insured until the insured's covered loss exceeded the primary insurance policy limits.  *Id*. at *16.

The limitation of liability provision in the ICSOP Policies provides ICSOP "shall only be liable for the ultimate net loss, the excess of either: (a) the limits of the underlying insurances as set out in the schedule in respect of each occurrence covered by said underlying insurances, or (b) the amount as set out in the declarations as the self-insured retention in respect of each occurrence not covered by said underlying insurances, (hereinafter called the 'Underlying Limits')."  The limitation of liability provision makes clear ICSOP becomes liable only after a loss covered by the Home Policy exceeds the limits of the Home Policy.  This conclusion is supported by the language in the loss payable provision that "[l]iability under this policy with respect to any occurrence shall not attach unless and until the Assured, or the Assured's underlying insurer, shall have paid the amount of the underlying limits on account of such insurance," which requires payment of the limits of the Home Policies, either by Home or Insureds, before ICSOP becomes liable to Insureds under the

terms of the ICSOP Policy,  as well as the maintenance of underlying insurance provision, which limits ICSOP's liability to the excess of the Home Policy in the event Insureds' fail to maintain the Home Policy.

The clear, unambiguous language of the ICSOP Policies establishes the parties intended ICSOP would act as excess insurer for losses covered by the Home Policy and that ICSOP would have no liability until the covered loss exceeded the limits of the Home Policy.  In other words, the ICSOP Policies require payment of the limits of the Home Policies, either by Home or Insureds, before ICSOP becomes liable to Insureds for a loss covered by the Home Policy.  While neither party expressly states the Home Policy covers the Environmental Claims, both parties have limited their arguments to the effect of Home's insolvency on ICSOP's duties under the ICSOP Policies, impliedly conceding the Home Policy provides coverage for the Environmental Claims.  Based on the arguments of the parties, and in the absence of a copy of the Home Policy to determine coverage, the court will assume the Home Policy covers the Environmental Claims.  Based on this assumption, the court finds ICSOP has no duty to Insured under the limitation of liability provision in the ICSOP Policies until the Home Policies limits have been paid by Insureds.  In other words, Insureds, not ICSOP, assumes the position of primary insurer in the place of the insolvent Home.

Insureds virtually ignore the limitation of liability language in the body of the ICSOP Policies, instead concentrating on the deductible endorsement in which ICSOP agrees to defend Insureds "in the event there be no underlying insurance against loss or claim covered by this Policy." Insureds argue the insuring agreement sets forth ICSOP's duty to indemnify for losses covered by the Policy and are not relevant to ICSOP's duty to defend.  Alternativley, even if ICSOP's duty to indemnify is not triggered under the insuring agreement until the limits of the Home Policies have

been exceeded, the defense endorsement creates an additional separate, distinct duty to defend triggered under different circumstances.

Insureds urge the court to construe the term "no underlying insurer" in the defense endorsement broadly, to encompass any situation in which underlying insurance is not available to the Insured. Insureds assert ICSOP could have specified circumstances in which underlying insurance would be deemed unavailable for the purposes of the deductible endorsement, such as by reason of exhaustion or exclusions of coverage, but instead used the broad term "no underlying insurer." As a result, Insureds argue, ICSOP agreed to provide a defense anytime no underlying insurer covers the loss or claim. In light of Home's insolvency and Insureds' resulting inability to recover from Home with regard to the Environmental Claims, Insureds assert they have no underlying insurance and, therefore, are entitled to a defense from ISCOP.

Insureds support this conclusion with a discussion of the difference between a loss and a claim. Insureds assert a "loss" covered by the policy suggests exhaustion of the underlying insurance is required before ISCOP has a duty to defend while "or claim" expands the obligation to defend to any action falling with the coverage of the ICSOP Policies. Consequently, by using the term "loss or claim" in the defense endorsement, ICSOP agreed to provide a defense when Insureds have no underlying insurance, regardless of the reason for the lack of underlying insurance.

Insureds' construction of these terms are consistent with the primary and general meaning of the terms.[19] Assuming such construction is correct, the language appears to differentiate between

---

[19]Neither "loss" nor "claim" are defined in the ICSOP Policies. Therefore, the court must look to the primary and general meaning of the terms. For the purposes of insurance, "loss" is defined as "the amount of financial detriment caused by an insured person's death or an insured property's damage, for which the insurer becomes liable. BLACK'S LAW DICTIONARY 1030 (9th ed. 2009). "Claim" is defined as "the assertion of an existing right; any right to payment or to an

excess insurance, which covers risk involving amounts in excess of primary insurance, and umbrella insurance, which insures risks not covered by other insurance. *Hoffman*, 313 Or. at 466 n.1. The Home Policy is identified as underlying insurance in the ICSOP Policies. The parties do not dispute, and impliedly concede, the Home Policy covered the Environmental Claims. Accordingly, the Home Policy qualifies as "underlying insurance against the loss" and ICSOP has no duty to defend the Environmental Claims under the terms of the deductible endorsement. Home's inability to pay the loss due to its insolvency does not alter the fact the Home Policy is underlying insurance against the loss.

This conclusion is consistent with a second opinion issued in *Stimson* addressing the share of defense costs attributable to the policy issued by insolvent Home. Based on the previous opinion finding the insured was responsible for losses in the place of the insolvent insurer up to the limit of the primary policies, the insurers argued the insured was virtually self-insured during these policy periods, had a duty to defend, and should share in the costs of the defense. *California Ins. Co. v. Stimson Lumber Co.*, No. Civ. 01-514-HA, 2005 WL 627624, *5 (D. Or. Mar. 17, 2005). Judge Haggerty agreed, and after noting the insolvent insurer had contracted to both indemnify the insured for losses incurred during the policy period and pay associated defense costs, found that "[d]ue to The Home's insolvency, Stimson is now responsible for The Home's pro rata share of the indemnity. It follows that Stimson is also responsible for The Home's pro rata share of the defense costs." *Id.* at *6.

Judge Haggerty applied his initial finding that an insured must step into the shoes of an

_____

equitable remedy, even if contingent or provisional." BLACK'S LAW DICTIONARY 282 (9th ed. 2009).

insolvent primary insurer in the context of indemnification to the insolvent insurer's duty to defend obligation as well. Even if the duty to defend is, as Insureds argue, separate and distinct from the duty to indemnify, the determination that an insurer must assume the obligations of in insolvent primary insurer is equally applicable to both the duty to indemnify and the duty to defend. Consequently, the finding that Home's insolvency does not erase the existence of the underlying Home Policy, requiring ICSOP to "drop down" into the place of a primary insurer for indemnification purposes, supports the finding that the Home Policy continues to be underlying insurance against the loss for the purpose of the defense endorsement and the duty to defend despite Home's insolvency.

Requiring ICSOP to defend the Insureds prior to exhaustion of the limits of the Home Policy would be against the clear intention of the parties that ICSOP's obligations under the ICSOP Policies would be triggered only after the limits of the Home Policy were exceeded. It would also contravene the majority view on the relationship between primary and excess insurers, which is "that excess or umbrella carriers are responsible for defense costs only after exhaustion of the primary policy limits." *Texas Employers Ins. Assn. v. Underwriting Members of Lloyds*, 836 F. Supp. 398, 404 (S. D. Tx. 1991). The Ninth Circuit has adopted the majority view. *See Guar. Nat. Ins. Co. v. Am. Motorists Ins. Co.*, 981 F.2d 1108, 1109 (9th Cir. 1992) ("[A] true excess policy is one which is specifically intended to only come into play when the limits of the underlying coverage are exhausted. It is issued in anticipation of the existence of the underlying policy and is priced in the belief that the excess carrier will not have to provide a defense."); *Hartford Acc. & Indem. Co. v. Cont'l Nat. Am. Ins. Companies*, 861 F.2d 1184, 1187 (9th Cir. 1988) ("[A]n excess insurer predicates the premiums it charges upon the obligations that it and the primary insurer assume,

including the primary insurer's obligation to defend all suits until exhaustion of its liability limits.")

The court finds Home's insolvency is irrelevant to ICSOP's duties as an excess insurer. In other words, ICSOP's obligations under the ICSOP Policies must be considered as if Home was solvent and able to perform under the Home Policy. Practically speaking, this means ICSOP has no liability to Insureds until the loss covered by the Home Policy exceeds the limits of the Home Policy and ICSOP has no present duty to participate in the defense of the Environmental Claims under the terms of the defense endorsement.

Finally, the St. Paul policy identified as an underlying policy in the ICSOP Policies is lost. The existence, terms, and conditions of the policy are disputed material facts which will be resolved at the trial scheduled in November 2015. Insureds argue ICSOP's motion for partial summary judgment on its duty to defend for the period from June 8, 1970, to July 1, 1972, is premature. The court agrees. In the absence of the relevant St. Paul policy, the court is unable to determine whether the policy is "underlying insurance against loss or claim covered by" the ICSOP Policies.

ICSOP argues that even if the St. Paul policy is not underlying insurance for the purpose of the defense endorsement, the existence of other insurance providing a defense to Insureds on the Environmental Claims relieves it of its duty to defend. However, if the court finds the St. Paul policy is underlying insurance, the court will not need to address the effect of other insurance on ICSOP's duty to defend. The court will not address the complex issue of vertical versus horizontal insurance coverage in what would, in reality, be an advisory opinion on an issue not directly before the court.

ICSOP is entitled to summary judgment on its current duty to defend the Environmental Claims for the period from July 1, 1972, to July 1, 1978, based on Argonaut's participation in the

defense and the finding that the Home Policy is underlying insurance covering the Environmental Claims for the purposes of the defense endorsement in the ICSOP Policies. ICSOP's motion for summary judgment on its duty to defend for the period from June 8, 1970, to July 1, 1972, is premature, as the relevant policy issued by St. Paul is lost and its terms unknown.

## VII.  The Syndicate's Duty to Defend

The Syndicate insured Marine Iron against liabilities related to vessels owned or operated by Marine from August 19, 1981, to April 14, 1989.[20]  Specifically, the Syndicate issued Policy No. 10-4256 02 covering the period from August 19, 1981, to August 19, 1982; Policy No. 10-4256 03 covering the period from August 19, 1982, to August 19, 1983; Policy No. 10-4256 04 covering the period from August 19, 1983, to August 19, 1984; Policy No. 10-4256 05 covering the period from August 19, 1984, to August 19, 1985; Policy No. 10-4256 06 covering the period from August 19, 1985, to August 19, 1986; Policy No. 10-4256 07 covering the period from August 19, 1986, to August 19, 1987; Policy No. 10-4256 08 covering the period from August 19, 1987, to August 19, 1988; Policy No. 10-4256 09 covering the period from August 19, 1988, to April 14, 1989[21] (collectively the "Syndicate Policies").  (Diamond Decl. ¶ 9,10; Exs. 1-6.)

The CERCLA endorsement of the Syndicate Policies provides the Syndicate does "hereby

---

[20]The Syndicate also insured Southwest Marine, Inc., a separate, but related, entity during the same period under policy numbers 10-7204 01, 10-7204 02, 10-7204 03, 10-7204 04, 10-7204 05, 10-7204 06, 10-7204 07, and 10-7204 08 (collectively the "Southwest Policies").  Insureds agreed to drop the Southwest Policies from this litigation.  Argonaut identified the Southwest Policies as creating a obligation on the Syndicate to defend the Environmental Claims but is currently considering dropping their claims based on the Southwest Policies as well.  In any event, the Syndicate's obligations under the  Southwest Policies are not addressed in this Opinion.

[21]Policy 10-4256 09 originally covered a one-year term from August 19, 1988, to August 19, 1989, but was cancelled effective April 14, 1989.

agree to indemnify the Assured for such amounts as the Assured shall, as Builder, Repairer or Scrapper, as the case may be, of the Vessels declared as provided for in the policy, have become liable to pay and shall pay, by reason of or with respect to any liability imposed on the Assured pursuant to Section 107(a)(1) of the [CERCLA]." (Diamond Decl. Ex. 4 at 2.)[22]  Under Section A, the Syndicate  agreed to "indemnify the Assured for such amounts as the Assured shall, as owner or operator of the said Vessel, have become liable to pay and shall pay" under the "Federal Water Pollution Control Act Amendments of 1972 (Public Law 92-500) as amended by the Clean Water Act 1977 and the 1978 Amendments to Sections 104 and 311 thereof" and to "indemnify the Assured for costs, charges and expenses incurred in defending against any liabilities insured against hereunder."  (Diamond Decl. Ex. 4 at 4, 9.)  The CERCLA Endorsement and Section A require Insureds to promptly notify the Syndicate of any event which may result in liability under the Syndicate Policies. Specifically, Section A provides: "[i]n the event of any occurrence which may result in a loss, damage or expense for which the Insurers are or may become liable to indemnify the Assured under the Section A, . . . the Assured shall give immediate notice of said occurrence to the Insurers and shall forward to the Insurers immediately all information, communications, processes, pleadings or other legal papers relating to such occurrence."  (Diamond Decl. Ex. 4 at 4, 9.)[23]

---

[22]There is no dispute the Syndicate Policies contain the similar relevant language, with the exception that the CERCLA endorsement is not in Policy 10-4256 02 or Policy 10-4256 -3. Following counsel's lead, the court will cite the language of Policy 10-4256 07, which is Exhibit 4 to the Diamond Declaration, as representative of the language in the other policies.

[23]The CERCLA endorsement provides: [i]n the event of any incident which may result in a loss, damage, or expense for which the Insurers are or may become liable to indemnify the Assured under this Endorsement, the Assured shall give immediate notice of said incident to the Insurers and shall forward to the Insurers immediately all information, communications, processes, pleadings or other legal papers relating to such incident.  (Diamond Decl. Ex. 4 at 2.)

Section A also requires Insured, as a prerequisite to coverage, to obtain the consent of the Syndicate prior to incurring defense costs. "The Insurers shall not be liable to indemnify the Assured for any costs, charges or expenses incurred in investigating or defending against any claim insured against under this Section A unless the same shall have been incurred with the written consent of the Insurers, who shall have the option of naming the attorneys in any such defense." (Diamond Decl. Ex. 4 at 9.) Finally, for the purposes of Section A, the terms "Vessel" or "Said Vessel" is defined as:

> any vessel for which the Assured, as a Ship Repairer, is required to file evidence of its financial responsibility to meet its liabilities under the Federal Water Pollution Control Act Amendments of 1972 as amended by the Clean Water Act of 1977, provided such evidence is filed under a Master Certificate in accordance with 46 CFR Part 542.11(a). The Assured shall furnish Insurers, promptly, which a copy of the report which the Assured is obligated to file with the Federal Maritime Commission every six months in accordance with 46 CFR Part 542.11(e). Any vessel which the Assured is not obligated to declare to the Federal Maritime Commission is hereby excluded.

(Diamond Decl. Ex. 4 at 8.) The declarations protect Vessels "named herein" and require "Vessel(s) to be declared as provided for under policy terms and conditions."[24] (Diamond Decl. Ex. 4 at 4.)

The Syndicate argues the Syndicate Policies require the Syndicate only to indemnify Insureds for costs related to the defense of the Environmental Claims, not provide Insureds with a defense, and that because the Environmental Claims do not state a claim based on a release, or threat of release, of hazardous materials from a vessel, they do not trigger coverage under the Syndicate Policies. Alternatively, the Syndicate contends Insureds failed to declare the covered vessels, as required under the Syndicate Policies, and did not pay the requisite premiums, which were based

---

[24]The latter quoted phrase is in all caps in the original document.

upon "gross ton days" of the declared vessels. Argonaut[25] asserts the Syndicate has admitted the Syndicate Policies contain a duty to pay defense costs; such duty is not contingent on Insureds' obtaining the prior written consent of the Syndicate; the Environmental Claims, while ambiguous, could be read to assert a claim based on Insureds' interest in, or relationship to, a vessel; and genuine issues of fact exist with regard to the declaration of vessels and payment of related premiums.

The Syndicate did not agree to provide Insureds with a defense. Rather, it agreed to indemnify Insured for defense costs and expenses, and made such duty to indemnify contingent upon Insureds obtaining prior written consent, with the Syndicate retaining control over the attorneys providing such defense. "Indemnify" is defined as "to reimburse (another) for a loss suffered because of a third party's or one's own act or default" while "reimburse" means to "pay back or compensate (another party) for money spent or losses incurred." BLACK'S LAW DICTIONARY 1399 (9th ed. 2009); THE AMERICAN-HERITAGE DICTIONARY 1481 (5th ed. 2011). One who agrees to indemnify another party agrees to pay  for money spent or lost by that party. *See Okada v. MGIC Indem. Corp.*, 823 F.2d 276, 280 (9th Cir. 1987)("In an indemnity contract, . . . the insurer agrees to reimburse expenses to the insured that the insurer is liable to pay and has paid.)  Accordingly, the Syndicate agreed to pay Insured for defense costs and expenses Insureds incurred while providing their own defense, not to provide the defense for Insureds. This conclusion is supported by the Syndicate's retention of the right to name the attorney to provide the defense: had the Syndicate agreed to provide the defense to Insureds, they would  have the ability to name counsel providing

---

[25]Insureds did not designate the Syndicate as an insurer owing a duty to defendant. Rather, Argonaut and Great American (formerly known as Agricultural Insurance Company, and Agricultural Excess and Surplus Insurance Company) designated the Syndicate. Argonaut filed a joint opposition with Insureds but Insureds withdrew their opposition at oral argument. Great American has not opposed the Syndicate's motion for partial summary judgment.

the defense, making the language giving such right to the Syndicate unnecessary. *Peterson v. Reliance Ins. Co.*, 5 Fed. Appx. 687, 688 (9th Cir. 2001)("The duty to defend gives the insurer absolute right to control the defense and the insured is required to surrender all control over the defense.") The Syndicate does not have a duty to defend Insureds against the Environmental Claims.

Even assuming the Syndicate Policies created a duty to defend, the initial communications previously identified as the suit documents do not allege a claim covered by the Syndicate Policies. The Syndicate Policies provide insurance for damages arising from Insureds interest in, or relationship to, a vessel. The initial communications are based nearly exclusively on Insureds' interest in, or relationship to, real property. The January 11, 2008 letter from the EPA included a narrative summary of Insureds' "facility and its relationship to the Site." The summary described Insureds' activities at dry docks, overwater,[26] and on property; likely releases of hazardous substances resulting from Insureds' operations; and tests results revealing contamination associated with these types of activities. The only references to any type of vessel in the summary were the capsizing of a Russian vessel being repaired by Insureds in 1944 and Insureds' disposal of waste materials at the Rivergate Oil Sump  via barge and pipeline in 1948, both well outside of the effective dates of the Syndicate Policies. The January 18, 2008 letter sought information from "current and past landowners, tenants, and other entities" regarding their facilities. The March 12, 2010 general notice letters advised Insureds they were identified as PRPs based on the likely release of hazardous materials at facilities on North Channel Avenue and North Lagoon Avenue in Portland,

---

[26]"Overwater" refers to activities such as "material loading and unloading operations associated with vessels, materials handling and storage practices, ship berthing and anchoring, ship fueling, and ship building, retrofitting, maintenance, and repair."  (April 27th Rycewicz Decl. Ex. 8 at 8.)

Oregon.  The initial communications, or suit documents, allege claims based on Insureds' interest in, and activities on, property.  There are no allegations of discharge of hazardous materials from a vessel and no claims asserted based on Insureds interest in, or relationship to, any vessel.

Argonaut notes the EPA recognized that as a ship repair company, Insured likely discharged hazaradous materials into surface waters and sediments, and assert this constitutes an allegation of liability potentially falling with the Syndicate Policies.  The court disagrees.  The discharge of hazardous materials is just as likely to have emanated from Insureds' activities at their facilities as from a vessel.  The general notice letter unambiguously establishes the EPA identified Insureds as PRPs based on their relationship to, and operations on, their facilities located at 5555 North Channel Avenue, 5815 North Lagoon Avenue, and 5851 North Lagoon Avenue.  The summary of Insureds' activities offered by the EPA in support of their initial consideration of Insureds as a PRP included the utilization of several facilities to support its operations such as carpentry and steel fabrication, overwater activities at dry docks used for ship hull surface preparation and painting, and poor housekeeping and waste disposal practices at leased facilities.  The only references to vessels related to events in 1944 and 1948, and do not implicate the Syndicate Policies.  Based on the terms of the Syndicate Policies and the allegations set forth in the initial communications, the Environmental Claims do not allege conduct within the coverage of the Syndicate Policies.  The Syndicate has no duty to defend the Environmental Claims.

The Syndicate Policies obligate the Syndicate to indemify Insured for defense costs and expense, not to provide Insureds with a defense.  Additionally, the Environmental Claims do not allege liability based on Insureds' interest in, or relationship to, a vessel and, therefore, do not without amendment state a claim covered by the Syndicate Policies.  The Syndicate has no duty to

defend or current duty to contribute to Insureds' defense costs, and is excused from the upcoming trials on duty-to-defend issues.[27]

*Conclusion*

The motions for partial summary judgment on a current duty to defend filed by National Union (#669), Century (#689), Granite State (#673),[28] and the Syndicate (#676) are GRANTED. ICSOP's motion (#685) for partial summary judgment on its current duty to defend as excess insurer over the primary policies of Argonaut and Home is GRANTED.  However, ICSOP's motion with regard to the lost St. Paul policies is premature and is DENIED as such.  Century's motion for partial summary judgment on Insureds' status as an uninsured under the OECAA based on the self-insured retention is DENIED with leave to refile during the indemnity stage with regard to Insureds' status as uninsured based on coverage provided by the Century Policies.  Insureds' motion (#693) for partial summary judgment on their status as uninsured under the OECAA from July 1, 1982, to February 28, 1987, is DENIED with leave to refile during the indemnity stage.   Insureds' motion

/ / / / /

/ / / / /

/ / / / /

/ / / / /

---

[27]The Syndicate also seeks to be excused from the upcoming trial on the reasonableness and necessity of defense costs.  While the court will not require the Syndicate to participate in this trial, the Syndicate may be allocated a share of defense costs in the future based on its obligation to indemnify Insureds for such costs and may want to be involved in the determination of which costs are reasonable and necessary.

[28]This includes Granite State's  duty to defend under both the Granite State Policies and Policy Nos. 6579-6286, 6580-7440, and 6581-8085.

(#693) for partial summary judgment on the commercial availability of occurrence-based general liability insurance policies covering environmental claims after August 1, 1985, is DENIED.

DATED this 11th day of September, 2015.


                                              /s/ John V. Acosta
                                                 JOHN V. ACOSTA
                             United States Magistrate Judge