IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

```
CENTURY INDEMNITY COMPANY       )
a Pennsylvania Corporation,     )
                                )
                    Plaintiff,  ) Case No. 3:08-cv-01375-AC
                                )
          v.                    )
                                ) November 4, 2015
THE MARINE GROUP, LLC, a        )
California limited liability    )
company, as affiliated with     ) Portland, Oregon
Northwest Marine, Inc., et al.  )
                                )
                    Defendants. )
_____)
```

TRIAL DAY 1

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE JOHN V. ACOSTA

UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

```
 1                              APPEARANCES

 2   FOR CENTURY INDEMNITY:R. LIND STAPLEY
                           Soha & Lang, P.S.
 3                         1325 Fourth Avenue
                           Suite 2000
 4                         Seattle, WA 98101

 5   FOR CENTURY INDEMNITY:WILLIAM G. EARLE
                           Davis Rothwell Earle & Xochihua PC
 6                         111 SW 5th Avenue
                           Suite 2700
 7                         Portland, OR 98101

 8   FOR GRANITE STATE:    KENNETH H. SUMNER
     et al.                Sinnott Puebla Campagne & Curet, APLC
 9                         Two Embarcadero Center
                           Suite 1410
10                         San Francisco, CA 94111

11   FOR AGRICULTURAL :    JAMES P. RUGGERI
     SURPLUS and EXCESS    Shipman & Goodwin LLP
12   INSURANCE CO.         1875 K. Street NW
                           Suite 600
13                         Washington, DC 20006

14   FOR AGRICULTURAL :    JAMES P. MURPHY
     SURPLUS and EXCESS    Murphy Armstrong & Felton LLP
15   INSURANCE CO.         701 Millennium Tower
                           719 Second Avenue
16                         Seattle, WA 98104

17   FOR THE ARGONAUT:     MICHAEL D. COMPEAN
                           Black, Compean & Hall, LLP
18                         700 South Flower Street
                           Suite 3350
19                         Los Angeles, CA 90017

20   FOR THE ARGONAUT:     JAY W. BEATTIE
                           Lindsay Hart LLP
21                         1300 SW Fifth Avenue
                           Suite 3400
22                         Portland, OR 97201

23   FOR THE MARINE GROUP: DAVID O. BECHTOLD
                           Miller Nash Graham & Dunn, LLP
24                         111 SW Fifth Avenue
                           Suite 3400
25                         Portland, OR 97204
```

```
 1   FOR THE MARINE GROUP:  CHRISTOPHER A. RYCEWICZ
                            Miller Nash Graham & Dunn, LLP
 2                          111 SW Fifth Avenue
                            Suite 3400
 3                          Portland, OR 97204

 4
     FOR ST. PAUL:          THOMAS A. GORDON
 5                          Gordon & Polscer, LLP
                            9755 SW Barnes Road
 6                          Suite 650
                            Portland, OR 97225
 7
     FOR ST. PAUL:          ROBERT KOLE
 8                          Choate, Hall & Stewart, LLP
                            Two International Place
 9                          100 - 150 Oliver Street
                            Boston, MA 02110
10
     FOR ST. PAUL:          ANDREW S. MOSES
11                          Gordon & Polscer, LLP
                            9755 SW Barnes Road
12                          Suite 650
                            Portland, OR 97225
13
     FOR EMPLOYERS MUTUAL   MARGARET M. VAN VALKENBURG
14   CASUALTY COMPANY:      Bullivant Houser Bailey, PC
                            300 Pioneer Tower
15                          888 SW Fifth Avenue
                            Portland, OR 97204
16

17   ALSO PRESENT TELEPHONICALLY:  Mark Paulson

18

19

20

21

22

23

24

25
```

```
 1                              INDEX

 2                            TRIAL DAY 1

 3   OPENING STATEMENTS:

 4     Opening Statement by Mr. Gordon              19

 5     Opening Statement by Mr. Ruggeri             27

 6   WITNESSES:

 7     ARTHUR ENGEL

 8     Direct Examination by Mr. Rycewicz           35

 9     Cross-Examination by Mr. Kole                57

10     ROBERT HUGHES

11     Direct Examination by Mr. Rycewicz           68

12     Cross-Examination by Mr. Moses              116

13     Cross-Examination by Mr. Beattie            144

14     Cross-Examination by Mr. Ruggeri            146

15     Redirect Examination by Mr. Rycewicz        147

16     DENNIS CONNOLLY

17     Direct Examination by Mr. Ruggeri           157

18     Direct Examination by Mr. Stapley           200

19     Cross-Examination by Mr. Kole               203

20

21

22

23

24

25
```

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2              DEPUTY COURTROOM CLERK:  All rise.

 3              THE COURT:  Good morning.  Well, we think everything

 4     is working.  At least the realtime is working.

 5          Foam core.  Old school.  Thank you.  Doesn't need to be

 6     plugged in.  All right.  Mr. Rycewicz.

 7              MR. RYCEWICZ:  Yes, Your Honor.

 8              THE COURT:  Do you want to start?

 9              MR. RYCEWICZ:  Yes, Your Honor.  I think we have a

10     few pretrial matters.

11              THE COURT:  Go ahead.

12              MR. RYCEWICZ:  One of which is a declaration of

13     Hong Huynh regarding third-party plaintiffs' search efforts.

14              THE COURT:  Yes.  I've reviewed it.

15              MR. RYCEWICZ:  I think that we got the agreement of

16     all counsel yesterday to allow the declaration and the

17     attachments to it to come in as substantive evidence in this

18     case so that I don't have to call my colleagues to describe the

19     search efforts undertaken by third-party plaintiffs.

20              THE COURT:  Any objection to the declaration coming

21     in as substantive evidence?

22              MR. GORDON:  No, Your Honor.

23              THE COURT:  All right.  Hearing none, admitted.

24              MR. RYCEWICZ:  Thank you, Your Honor.  I think we

25     should mark it as Exhibit 75.
```

1       THE COURT:  All right.  We'll mark it as Third-Party

2    Plaintiffs' Exhibit No. 75.  It will be admitted as Exhibit No.

3    75.

4       MR. RYCEWICZ:  This is the original, Mr. Gale.

5    Thank you, Your Honor.

6       THE COURT:  All right.

7       MR. RYCEWICZ:  We also have something of an issue

8    with a piece of demonstrative evidence offered by St. Paul that

9    we received yesterday in the afternoon.

10      THE COURT:  I have not seen it, that I know of.

11      MR. RYCEWICZ:  So do you just intend to use it at a

12   later time?

13      MR. MOSES:  Right.  It is really a demonstrative.

14      MR. RYCEWICZ:  Okay.  Thank you, Your Honor.  We can

15   address that then.

16      THE COURT:  All right.  All right.  Any other

17   matters, pretrial matters, before we start?

18      Seems not.  Mr. Rycewicz, in the email that I received on

19   Monday, I believe, you also asked to have 20 minutes for your

20   opening.  You said there was no objection from anyone else to

21   that, so it seems to me we're ready for that.

22      MR. RYCEWICZ:  Thank you, Your Honor.

23      Well, may it please the Court, I would like to introduce

24   my client representatives.  We have Mr. Art Engel in the

25   courtroom, who's the managing member of Marine Group, LLC, and

1    we have Ray Parra, who's counsel for BAE Systems.  They will be

2    attending today.

3              THE COURT:  All right.  Thank you.

4              MR. RYCEWICZ:  We also have demonstrative exhibits

5    marked as 74 in the courtroom, Your Honor, and it should be a

6    little difficult to see the details of it from where you are,

7    but you have it in your book.  And what it is is it's a roadmap

8    to the factual issues in this case.  And what we intend to

9    prove -- in fact, we think that the admitted exhibits already

10    establish that what St. Paul did is issue to Northwest Marine

11    Iron Works a continuous and uninterrupted comprehensive general

12    liability coverage beginning in 1954 and continuing through

13    1972, but first -- in three-year policy periods, Your Honor,

14    with limits of $300,000 per policy period.

15         The first of the policies is the 1954 to 1957 policy.

16    It's on the far left side of the demonstrative exhibit.  And

17    that's the policy that you have already ruled on summary

18    judgment exists and poses an obligation to defend on St. Paul.

19         But, interestingly enough, when St. Paul's 30(b)(6)

20    witness was deposed and after your ruling, he would not admit

21    that that policy had been issued.  But, in any event, we'll

22    talk more about that, I think, as the case progresses.

23         Our burden of proof is set forth in really a couple of

24    places.  One place is in the statute.  And there's also a case

25    that is instructive, and that case is the *Niemi Oil* case.

1    That's at 2005 WL 3050460.  And what it is instructive to is

2    the question of whether endorsements are necessary in order to

3    prove the terms of coverage.

4         What Judge Mosman said is in the absence of endorsements,

5    you're not going to consider the endorsements.  Essentially, he

6    ruled that that's the burden of the carrier to prove.  And I --

7    I believe there will be an absence of any evidence of

8    endorsements in this case, Your Honor.

9         In turn, we expect that St. Paul is going to fail to meet

10   its burden of proving any exclusions to coverage or any

11   limiting endorsements.

12        I'll talk briefly about the search efforts that were

13   undertaken, Your Honor.  You'll see from the latter exhibits in

14   our binder, as well as Exhibit 75 that was admitted this

15   morning, that we really undertook some fairly extraordinary

16   search efforts that included Northwest Marine Iron Works'

17   historic documents, as well as the archives of the Navy, of the

18   Port of Portland, of the City of Portland, and of numerous

19   other places.

20        The documents that are exhibits are documents that we

21   found in those various locations.  We also looked other places

22   and didn't find anything.

23        St. Paul also undertook a search, as it's obligated to do

24   pursuant to the statute, and did not find anything.

25        So you're going to hear from two witnesses on our side,

1    Your Honor.  The first is Art Engel.  And Mr. Engel has a

2    little more than 50 years' experience working in shipyards and

3    operating shipyards and providing ship repair services to the

4    Navy and other entities.

5        He, in fact, purchased Northwest Marine Iron Works through

6    one of his corporations in the late '80s.  And he's going to

7    describe to you the contracting process and requirements that

8    Northwest Marine Iron Works had to comply with, specifically

9    relating to working for the U.S. Navy, which Northwest Marine

10    Iron Works did throughout its lifetime.

11        He's going to tell you that in order to perform work for

12    the Navy you have to have what's called a master ship repair

13    contract.  And we're going to take a look at one of those in a

14    moment, at Exhibit 42.  I'm going to point a few things out to

15    you.

16        The second witness you're going to hear from is our

17    expert, Bob Hughes, who also has a lifetime of experience, but

18    in the insurance industry.  His experience is varied.  He has

19    been an agent and a broker.  He has underwriting credentials.

20    He's been an insurance consultant and an expert witness on many

21    matters, and he's going to describe to you the efforts that we

22    took to reconstruct the St. Paul lost policy periods.

23        On the chart, the green policy on the far left-hand side

24    is the St. Paul policy that's already proven.  The five yellow

25    blocks that follow that are the St. Paul lost policy periods.

1    Mr. Hughes will address those.

2         So Mr. Engel is going to describe to you in some detail

3    how a ship repair contracting company goes about doing business

4    for the federal government.

5         There's a few things I want to point out about Exhibit 42,

6    so if we could pull that up.  What that is is it's a 1968

7    master ship repair contract between the U.S. Navy and Northwest

8    Marine Iron Works.  And essentially what this document does is

9    a few things.  One, it prequalifies the contractor.  There's a

10   fairly substantial qualification effort period where the

11   contractor has to demonstrate the manpower, the facilities, the

12   insurance obligations, and the other infrastructure that's

13   required to work on naval vessels.

14        I want to point out to you on page 11 of that exhibit,

15   clause 10.  And what clause 10 does, Your Honor, is it

16   obligates -- 10C obligates the contractor to indemnify the

17   federal government for the sum of up to $300,000 for any

18   accident with respect to a vessel.

19        Let's look at 10D.  What 10D does is it obligates a

20   contractor to satisfy that indemnity obligation by having at

21   least $300,000 in insurance coverage, including casualty and

22   liability insurance.

23        So you'll see reference throughout this case and

24   throughout the documents to a satisfaction of clause 10 of

25   master ship repair contracts.  And that's a uniform standard

11

1     that is in all ship repair contracts, we believe.  We only

2     found this one, but there's numerous references to it

3     throughout.

4          I also want to take a look at, briefly, Exhibit 55, if we

5     may.  And what Exhibit 55 is is it was a bid that was submitted

6     by Northwest Marine Iron Works in 1985 to the Navy to perform

7     work on the USS DULUTH.  There's a couple of pieces of this

8     that I think are relevant to the issues before the Court.  One

9     is a statement on page 7 where Northwest Marine Iron Works

10    reflects its history of repair, overhaul, and conversion of

11    ships, Navy and commercial, American and foreign, that began in

12    1942.

13         Page 65 of this exhibit is a roster of some exemplar

14    vessels that Northwest Marine Iron Works worked on

15    historically, and you'll see that the years go from 1985, at

16    the earliest -- at the latest, to 1957 at the latest.  1957 is

17    the end of the first policy period that's at issue in this

18    case.  And the TULARE is, in fact, a naval vessel.

19         So this reflects a history of repair by Northwest Marine

20    Iron Works of naval vessels.

21         I'm also going to highlight just a few pieces of evidence

22    now, Your Honor, that I think will provide something of a road

23    map for you through some of the secondary evidence.  We'll

24    start at Exhibit 1, which is the 1954 to 1957 policy.  This

25    policy is already proven, and we've got the declarations page.

12

1    It shows the policy period.  It shows the insured.  It shows

2    limits on the declaration page, or the face page of the policy,

3    of $100,000 in indemnity limits, but that is modified for

4    particular purposes.

5        If we look at page 12 -- page 12 is an endorsement, I

6    believe.  Yes, it's an endorsement that shows an increase of

7    property damage limits under coverage C to $300,000 for work

8    under particular naval contracts.  There's a reference at the

9    top of this document to contract MST-3026.  That's a master

10   ship repair contract.  There's a reference down below, at the

11   bottom of this endorsement, to clause 10 of contract MST-3026.

12   So this reflects an -- reflects the reason for this endorsement

13   is to increase premiums in conformance with the obligations

14   that are set forth in master ship repair contracts.

15       There's another page I want to look at, as well, and

16   that's page 6.  The importance of page 6 is as follows:  It's

17   another endorsement.  This is endorsement number two.  And what

18   it shows is that for purposes of work done on the port -- the

19   port was the landlord, essentially, of Northwest Marine Iron

20   Works and its Swan Island facility.  But what this does is it

21   indicates a common practice of Northwest Marine Iron Works, and

22   that is to add as an additional insured some of its subsidiary

23   entities.  This particular one references Industrial

24   Refrigeration and Equipment Company.

25       There also are a number of endorsements and other

13

1    documents that reflect that Northwest Marine Iron Works

2    uniformly added an entity that it took control of in 1958 as an

3    additional insured, and that's Electrical Construction Company.

4    That's important when we reconstruct the 1960 to 1963 policy.

5        I want to talk for a moment about the 1957 through 1960

6    policy period, and what you'll find is that there's a whole

7    host of naval correspondence regarding that policy.  That

8    policy is lost.  We reconstruct it using reliable and generally

9    relied upon types of evidence that the insurance industry uses

10   every day.  And those are documents such as endorsements that

11   were issued in this case by JBL&K -- Jewett, Barton, Leavy &

12   Kern -- which was Northwest Marine Iron Works' brokerage during

13   the relevant time frame.  They were a prominent Northwest

14   broker serving commercial lines and also were very closely

15   affiliated with St. Paul.  We have a plethora of

16   endorsements -- or, I'm sorry, certificates of coverage that

17   were issued by JBL&K reflecting coverage in this case.

18       Let's take a look at Exhibit 7, which is -- which is

19   germane to the 1957 to 1960 policy period.  What this document

20   is is it's a letter from the chief of naval material, March of

21   1957 letter.  It references two contracts, which are ship

22   repair contracts.  And it's acknowledging receipt of a copy of

23   St. Paul Fire & Marine policy, by number, covering for CGL,

24   effective February 11, 1957, through 1960.  That's our first

25   lost policy period.

1        Let's also take a look at Exhibit No. 5.  And what

2   Exhibit 5 is is a letter with a couple of attachments to it --

3   I'm sorry.  It's interoffice correspondence, I believe.  This

4   was a document that we got from a search of naval archives.

5   What it reflects is that there are enclosures, one of which

6   relates to the 1957 through 1960 policy, by number, under

7   number two, and it reflects that evidence has been received.

8        And there's an awful lot of due diligence undertaken by

9   the Navy relating to Northwest Marine Iron Works' historic or

10  policy coverage.  Back then it was current.

11       If you look at page 2 of this exhibit, what it is is it's

12  a certificate issued by JBL&K relating to a particular naval

13  contract, listing limits of $300,000, showing a policy number,

14  a policy period, also showing the named insured of Northwest

15  Marine Iron Works, and also showing some additional insureds,

16  including Industrial Refrigeration and Equipment Company.

17       Page 3, the next page, is similar.

18       So the next lost policy period is 1960 to 1963, and I

19  expect you'll get some argument about this policy period,

20  Your Honor.  We have a lot of evidence of coverage issued to

21  Northwest Marine Iron Works' affiliate Electrical Construction

22  Company, and we have certificates of coverage that reflect

23  liability limits of $300,000.  We have information that

24  establishes a merger that -- I'm sorry, that establishes that

25  Northwest Marine Iron Works -- let's look at Exhibit 15 --

15

1    acquired a controlling stake in Electrical Construction

2    Company.   Page 1.

3        What it did -- what Northwest Marine Iron Works did was it

4    bought 150 of the 250 -- of 290 outstanding shares of

5    Electrical Construction Company.

6        We also have Exhibit No. 11, which shows an address for

7    EC.  Let's look at page 25.  In fact, this is a piece of

8    Electrical Construction letterhead showing an address of

9    Northwest Thurman.  Whereas, if we look at a certificate issued

10   to EC -- let's look at the next page, page 26 -- we'll see an

11   address of Northwest 29th Avenue.  And, actually, that address

12   is the address of Northwest Marine Iron Works, and we'll find

13   that all certificates issued regarding EC bear a Northwest

14   Marine Iron Works address, not the EC address.

15       We also have a whole host of documents showing that, as I

16   mentioned earlier, it was a regular practice at Northwest

17   Marine Iron Works to list its affiliates as additional

18   insureds.  There's some other documents regarding this EC

19   period, but I'm not going to go through them all right now.

20       For -- I think the easiest place to find the roster of

21   policies that show EC and others as an additional insured is to

22   look at Document No. 870 at page 9.  That's our opposition to

23   St. Paul's motion in limine, where we went through policies

24   between 1954 and right up to 1982, that, really, without

25   exception, list EC and others as additional insureds.  So this

16

1   supports the common practice.

2        Moving to the next policy period -- that's 1963 to 1966 --

3   let's take a look at Exhibit 21.  Exhibit 21 is a certificate

4   issued to the Port of Portland listing the named insured,

5   Northwest Marine.  Limits 300,000, policy number, policy

6   period, and so on.  This was, again, issued by Jewett, Barton

7   Leavy & Kern.

8        If you look at Exhibit 17, this is a cover letter sent by

9   JBL&K to the Port of Portland reflecting the '63 to '66 policy,

10  also showing additional insureds, Industrial Refrigeration and

11  Electrical Construction Company.  Actually, what this relates

12  to is an extension endorsement.  That's the next page.  It

13  extends the coverage.  Again, it shows all the critical

14  information, such as policy period, named insured, policy

15  number, additional insureds.

16       The next policy period is 1966 through 1969, and we have

17  numerous certificates and numerous letters that demonstrate

18  coverage.  For example, Exhibit 22 is a certificate of coverage

19  showing all the critical information again.  Exhibit 23 is the

20  cover letter for this certificate, and Exhibit 45 is naval

21  correspondence concerning the CGL renewal.

22       Essentially, what the Navy is saying is, "Look, your CGL

23  is expiring as of July 1, 1969.  This is our second request.

24  Please furnish evidence of the renewal of the above insurance."

25       So this is one of the pieces of correspondence that

1    constitutes the Navy's, you know, diligence in ensuring that it

2    had in its own records evidence of the required coverage under

3    master ship repair contracts.

4        The final lost policy period is 1969 to 1972.  And, again,

5    we have numerous correspondence from the Navy, including

6    Exhibit 41, which is from the Navy to Northwest Marine Iron

7    Works.  It's dated December of 1969.  That's early in the

8    policy period for that policy.  And there's a reference to

9    number two, comprehensive general liability expiring July 1,

10   1972, and it says, "We have received satisfactory evidence of

11   insurance indicated by the item above."

12       For this policy period, we also have a couple of other

13   types of evidence, including some information from other

14   carriers.  For example, Exhibit 37, page 2, is a London Market

15   schedule of underlying insurance that shows general BI PD under

16   item A, about halfway down the page, showing coverage by

17   St. Paul.

18       We have Exhibit 35, page 2, which is a questionnaire for

19   an application for umbrella insurance.  And it, again, lists as

20   the GL carrier St. Paul, showing limits.  And we have Exhibit

21   29, which is an Argonaut underwriting document.  It's a little

22   hard to read, but what it does is it relates to -- it relates

23   to Argonaut's intent to provide a quote for GL insurance for

24   the 1972 to 1975 policy period.

25       And, in fact, Argonaut did write that coverage.  There's a

1    reference here to rating -- ratings that were made by St. Paul.

2         Yeah, that's it, Amy.

3         And what it says is, among other things, with this figure

4    in mind -- and that figure was a premium target of $30,000 --

5    underwriting set its sights on the composite rates established

6    by the St. Paul for the 1971 to 1972 policy year and rated

7    accordingly.

8         We also have Exhibit 38, which is page 11, which is a

9    Marsh schedule.  And it also lists St. Paul as the carrier.

10        Your Honor, collectively, this evidence is the type of

11   evidence and the type of documents that are routinely used by

12   the insurance industry to do a number of things.  One, the

13   certificates are used to reflect coverage.  We have a plethora

14   of certificates.  We also have a lot of underwriting material.

15   We have a bunch of correspondence between agencies and

16   Northwest Marine Iron Works and agencies and Northwest Marine

17   Iron Works' brokerage, and so, collectively, we think that this

18   will meet the burden of proof -- does meet the burden of

19   proving the existence of the coverage, the relevant terms of

20   the coverage.

21        We also have Exhibit 10, which I have not yet mentioned,

22   and what Exhibit 10 is is it's a letter from counsel attaching

23   policy forms.  And that was done in order for St. Paul to

24   satisfy its obligations under the Environmental Cleanup

25   Assistance Act to provide to us the forms that would have been

Opening Statement by Mr. Gordon

1    used if coverage had been issued.

2        So the secondary evidence establishes that coverage was

3    issued.  Exhibit 10 demonstrates the forms that were used.

4        You're going to hear from Mr. Hughes about the importance

5    of these forms and the importance of the secondary evidence.

6        Thank you, Your Honor.

7            THE COURT:  Thank you.  Mr. Gordon, would you like to

8    go next?

9            MR. GORDON:  Yes, Your Honor.

10           THE COURT:  I'll stand up here if it's all right.

11           MR. GORDON:  Yes.  Does that work, Your Honor?  Good.

12           THE COURT:  Your Honor.

13

14               OPENING STATEMENT

15           MR. GORDON:  Are we good?

16       Good morning, Your Honor.  Thank you.  On behalf of

17   St. Paul.  When we spoke the other day at the pretrial

18   conference, you asked us to spend a few minutes just to,

19   quote/unquote, highlight what we thought might be important for

20   the Court.  And we do agree with the overall sort of structure

21   that Mr. Rycewicz outlined for you.  I think the three areas

22   that are of concern, as we go through the course of the trial,

23   are the burden, the actual factual evidence, both the written

24   as well as the oral -- by that I mean the contemporaneous at

25   the time these policies were alleged to have been issued from

Opening Statement by Mr. Gordon

1    '54 through to the last one, which was, I think, '69 -- and

2    then, finally, the experts.

3        So on those three issues, I don't intend to go through in

4    detail to counter what Mr. Rycewicz said.  I think that's

5    probably more appropriate for that to roll out as we go through

6    the day, the testimony, and have the opportunity to examine and

7    cross-examine.

8        So let me just talk briefly.  We do disagree about the

9    burden, and I think that is probably going to get flushed out

10   more or quite a bit more, actually, in the post-trial briefing,

11   but suffice it to say that we think that the statute did not

12   change the burden of Oregon common law for most of what's

13   important here.  By its own definition, it changed only the --

14   the burden to a preponderance for whether a policy was, in

15   fact, issued.

16       We believe and are prepared to briefly disagree with

17   meaning -- disagree with his interpretation of the meaning.  We

18   believe that the burden here would be what I would refer to as

19   clear and convincing.  Other Oregon courts have described it as

20   definite and certain or conclusive.

21       So at the end of the day we think you're going to have to

22   take the evidence, both as they present it and we challenge it,

23   and conclude, as a level of burden, that it shows conclusively

24   that these policies were issued, what the terms and conditions

25   were, and equally as importantly what the limits were.

Opening Statement by Mr. Gordon

1    So I guess for highlight number one, that's a big one.

2  That's the burden.

3    Now with respect to the factual evidence, you'll find

4  there's no contemporaneous factual evidence of any kind, either

5  written or oral, which is to say that the one corporate witness

6  they're going to call is Mr. Engel.  He didn't become

7  associated with Northwest until 1989.  Now, that's 20 years

8  after the last of our alleged policies was issued.  '69.  So

9  two decades.  And it's 35 years after the initial policy was

10  alleged to have been issued.

11    So he's not an expert.  He's supposedly a fact witness,

12  and he had no connection to this company at all for at least

13  two decades after the contemporaneous incidents.  So we

14  obviously haven't heard his testimony yet, but he can't offer

15  anything that was at or near or around the time that these

16  policies were issued, nor is there going to be any testimony

17  from anybody else at Marine Group.  Nobody who would have been

18  involved in insurance placement in those years, nobody who

19  would have been involved in, for example, claims handling that

20  came in that might have been tendered to an insurance company.

21  There is nobody that's going to come and testify as to how the

22  company would have either insured itself or how it would have

23  handled claims.

24    There's going to be no testimony from brokers, JBL&K or

25  anybody else, contemporaneously, and nothing from their

Opening Statement by Mr. Gordon

1    records, as far as we can tell.  And/or there will be no

2    testimony from outside lawyers or accountants.  Although,

3    they're trying to sort of, in our view, spin this ECCO '60/'63

4    with a fair amount of legal conclusions to connect up what we

5    think is the unconnectable.

6        So in terms of the paper, there are no policies, actual

7    policies, beyond the '54, from the Navy or from anybody else.

8        Most of what you saw on the screen were certificates,

9    which as plaintiff or third-party plaintiffs attempted to

10   portray in its pretrial brief and by Mr. Rycewicz, it was sort

11   of like the gold standard.

12       We have cited cases to just the opposite, which is that by

13   nature these certificates are inherently inaccurate.  And both,

14   later, through the course of the trial, and particularly in the

15   closing briefs, we intend to point out there's a lot of

16   assumptions, presumptions, and potentially inaccuracies that

17   don't float one way or the other, in terms of helping them on

18   the burden of proof.

19       So that's the second highlight.  We think that if you take

20   the contemporaneous testimony, of which there isn't any

21   factually, you line it up with what we see are some fragmented

22   sort of disparate pieces of paper, we don't see that there's

23   any way on that record that they can carry their burden of

24   proof.

25       So what they've done is what most in their shoes would do,

23

Opening Statement by Mr. Gordon

1   is they went out and hired experts.  And you're going to hear

2   from the expert Mr. Hughes.  You may also hear from a

3   Mr. Connolly.  It's unclear.  I don't think it really adds or

4   subtracts much to what I have to say at this point.  We'll deal

5   with those as they come along.

6       But, for example -- let me just focus on Mr. Hughes -- in

7   1954, which is the first policy year, if I read his resumé

8   correctly, he was a sophomore in high school or maybe even a

9   freshman.  In 1969, by the time the last policy was issued, he

10  graduated from high school but was a local insurance agent in a

11  small town in Texas, Pecos, a farm community, where he was

12  selling farm insurance, homeowners, and auto.

13      So throughout the entire course, contemporaneously, from

14  when these policies were alleged to have been issued, he wasn't

15  gaining any expertise hands-on with respect to this kind of

16  coverage or, for that matter, any kind of coverage that would

17  be applicable here.

18      So from what I can tell from his resumé, and we'll go

19  through this in more detail later, he didn't have any marine

20  insurance experience during that period of time.  That's pretty

21  clear.  It doesn't appear he has ever had any, other than to

22  act as an expert; a testifying witness.

23      He has no underwriting experience, from what we can tell,

24  other than he got certified as a CPCU, charter property

25  casualty underwriter.  But nowhere in his resumé do I see

Opening Statement by Mr. Gordon

1   anything that says he actually worked in an underwriting

2   capacity for a living.

3        Equally importantly, he's never been licensed in Oregon to

4   do anything, either to adjust claims, to underwrite claims, to

5   act as a broker, to offer what these certificates may or may

6   not mean to an Oregon broker, how they're issued and so forth,

7   and he has no regulatory approval experience in Oregon, which

8   is to say that Oregon is a -- what they call a file of use

9   state, so you have to take the forms, go to the insurance

10  commissioner in a regulatory capacity and work them through the

11  system, none of which he's ever done or been licensed to do.

12       So what has he done?

13       Well, since 1990 he's been pretty much a full-time

14  testifying witness.  Over that period of time, he's been

15  retained in over 650 cases.  Probably more than that now

16  because the resumé is I think probably a year old, based on

17  what I saw.  That breaks down, Your Honor, to 26 assignments a

18  year or one every two weeks for a quarter of a century.  That's

19  his expertise.  He's testified over 370 times.  Some by

20  depositions; some at trial.  My math says that that's 15 times

21  or more a year.  Again, for a quarter of a century.  So I

22  believe that he's the ultimate professional witness.

23       Given that, that he had no real experience in these areas,

24  that whatever he has gained has been as a paid witness, we

25  think the '60 to '63 instruction by him is particularly

Opening Statement by Mr. Gordon

1    egregious.

2        Just to go back through that briefly, Mr. Rycewicz

3    referred to Exhibit 15. That is the stock purchase agreement

4    from October 1 of 1958 where Northwest bought 51 percent of the

5    shares, roughly. But there's nothing in that agreement to

6    suggest that the companies were then operating anything other

7    than they had been previously, which is totally independently

8    of that.

9        And ECCO, as we referred to it, was at the time a company

10    probably the size of Northwest, in terms of assets, in terms of

11    employees, in terms of revenue, and obviously had its own

12    insurance program going. And there's nothing in that document

13    to suggest that anything in that respect changed.

14        The companies were, in fact, not merged until June 1st of

15    1963, and I think that document is Exhibit 18, which he's put

16    into the record, which of course is well after the alleged

17    '60 to '63 policy was, in fact, issued.

18        And during that period of time there's nothing to suggest

19    that -- in this record, that Northwest Marine took over the

20    insurance management of ECCO. They made a leap of faith with

21    one other corporate resolution that was entered into on

22    June 1st of 1960.

23        Well, if Mr. Connolly is going to testify later, his

24    conclusion in his report, on page 41, is that this '60 to

25    '63 policy or '60 policy was already issued at that point.

Opening Statement by Mr. Gordon

1      Even if you listen to Mr. Hughes' version of this, there's

2    less than a month from the time this resolution I'm going to

3    mention was enacted to the time that the alleged policy was, in

4    fact, renewed by ECCO.

5      And this resolution was nothing more than this:  The board

6    of directors got together and said that from that point forward

7    Northwest Marine would provide some supervisory service and

8    some general accounting to ECCO.  It says nothing about placing

9    insurance.  It says nothing about merging those insurance

10   programs.  They provided no contemporaneous testimony from

11   anybody corrected at Northwest Marine as to what this meant.

12     So based on that, and that alone, Mr. Hughes opines that

13   somehow the ECCO certificate that's in the record equates to

14   full coverage for Northwest Marine.  And our take on that is,

15   one, based on his background, that's not something he's really

16   qualified to testify to.  But, in any event, it's a huge gap

17   and leap of faith.  So particularly with '60 to '63, we think

18   they get nowhere close to over the bar of clear and convincing

19   evidence.

20     So I guess that's highlight number three.  We think the

21   Court should take the experts with a true grain of salt when

22   you compare what their real background is, what they really do

23   for a living, and how they take bits and pieces and scraps of

24   paper and try to weave them together to opine about what is, in

25   their view, continuous, uninterrupted coverage for the period

Opening Statement by Mr. Ruggeri

1    of '54 to '72.

2        And we don't think it matters, really, what burden of

3    proof they -- the Court assumes there.  We don't think they've

4    covered it.

5        So that's an overall view of what we think the highlights

6    are.  And as we go through it, there will be more detail

7    flushed out.  And I think it will be particularly helpful to

8    the Court in the post-trial briefing to see how this all lays

9    out.

10        Thank you, Your Honor.

11            THE COURT:  Thank you, Mr. Gordon.

12        Would anyone else like to present an opening statement?

13            MR. RUGGERI:  Your Honor, James Ruggeri, briefly.

14            THE COURT:  Mr. Ruggeri.

15

16                OPENING STATEMENT

17            MR. RUGGERI:  Your Honor, it's refreshing to see that

18    everyone heeded your suggestion that everyone broke free from

19    the blue and gray suits.  No one did.  Although, I spruced it

20    up with a blue shirt.  First time in federal court with a blue

21    shirt, so that was -- there's a response of those comments.

22        Your Honor, I'm not going to repeat what Mr. Rycewicz

23    said.  He marched through and marshaled all of the evidence

24    that supports the issuance of these policies and the terms and

25    conditions.  I did want to introduce the Court to

Opening Statement by Mr. Ruggeri

1    Dennis Connolly, who's here in the courtroom and prepared to

2    testify, depending on how the days proceed.

3         Mr. Gordon did say that ordinarily, Your Honor, we don't

4    have the benefit of knowing how oral testimony is going to come

5    in.  This is one of those rare cases where we actually do, at

6    least from one of the parties, and that party is St. Paul.  And

7    I would like to just highlight a few of the excerpts that I

8    think are important to highlight to give a flavor for this

9    case.

10        I think, Your Honor, that the St. Paul position is simple

11   and defiant.  Mr. Rycewicz's preview that we did ask their

12   corporate designee, Thomas Hornbeck, questions about the '54 to

13   '57 policy marked as Exhibit 1, which the Court has already

14   found existed, and provides for a duty to defend.  I asked

15   Mr. Hornbeck about this exhibit only two years ago, two years

16   after the Court ruled.  And if we can pull that up for us.

17   It's an excerpt from the transcript.  We may be having

18   technical difficulties.

19        Your Honor, I'll have to do it the old-fashioned way.

20   I'll read it.  This excerpt comes from the March 18, 2014,

21   transcript at page 32, line 14, through page 33, line 4.  We

22   did mark the deposition transcript for identification as

23   Exhibit 207.

24        Question:  I think you've said earlier that you still

25   didn't know that this policy was issued or ever enforced.  Is

Opening Statement by Mr. Ruggeri

1    that still your testimony after reviewing the document marked

2    as Exhibit 116?  And that's the document marked here as

3    Exhibit 1.

4         Answer:  Yes, it is.

5         Question:  What would you have to see for you to conclude

6    that the policy was issued and ever in force?

7         Answer:  I would have to see evidence that there was a

8    payment of premium and the issuance by the company of a policy

9    to the policyholder.

10        Question:  Doesn't this show issuance of the policy by the

11   company to the policyholder?

12        Answer:  No, it does not.

13        Question:  What else would you need to see?  What else

14   could you see?

15        Answer:  I don't know.

16        Your Honor, the testimony is clear that unless the actual

17   complete copy of the policy is found in the St. Paul files

18   itself, St. Paul is not going to acknowledge that it issued

19   policy -- or the coverage under the policies that it issued

20   that is missing.

21        You may hear -- you will see from the deposition excerpts

22   that St. Paul has designated that they looked high and low for

23   these policy documents.  They didn't look once.  They looked

24   several times.  But here's the kicker, Your Honor, because we

25   asked the simple question, "Well, what happened to those

Opening Statement by Mr. Ruggeri

1  documents?  Did you expect to find them?"  Here is what we

2  learned happened.  The Hornbeck deposition, March 18, 2014,

3  transcript, pages 52, lines 16 through 17, page 60, lines 9

4  through 16.

5       Question:  The policies would have been destroyed; right?

6       Answer:  The policies would have been destroyed.

7       Answer:  Again, it was like in that three to five years,

8  but what I'm comfortable saying is whatever it was, had it been

9  in place, had that retention guideline been in place back

10 during the time frame we're talking about, the documents would

11 have been destroyed.

12      Your Honor, there are designations to Mr. Hornbeck's

13 paralegal, who was involved in the search for the documents.

14 We asked her many of these same questions.  We asked her if,

15 when she conducted these searches, she had any reason to

16 believe that she was finding any documents.  Here's her

17 testimony:  March 18, 2014.  Lisa Lauf.  Deposition transcript

18 at pages -- page 23, lines 9 through 19.

19      Question:  When you undertook to search for those seven

20 alleged policy numbers based on the policy period, did you

21 expect to find anything?

22      Answer:  No, I did not.

23      Question:  Why not?

24      Answer:  Because it's very, very rare that we would find

25 policies that are 50-plus years old.

Opening Statement by Mr. Ruggeri

1      Question:  Why is that?

2      Answer:  Because they're just not -- they're not available

3  in the resources that we -- that we have available to us.

4      Your Honor, that's the state of the evidence that St. Paul

5  is going to offer today.  They declined to bring witnesses here

6  to testify at trial, and we do have the benefit of knowing what

7  the evidence will be as it comes in, and I did want to

8  highlight those for the Court.

9      The other point that I would highlight for the Court is a

10  very simple one.  It's just to make clear that the Court

11  appreciates that on whether these policies, assuming they're

12  found to have issued, include a defense obligation or a defense

13  provision, that is undisputed.  Mr. Rycewicz previewed Exhibit

14  10, Mr. Moses's letter, that attaches the policy forms.

15      We have Exhibit 209, which the Court has ruled is

16  admissible -- that's St. Paul's responses to our requests for

17  admission -- taking out of play the issue of whether there was

18  a defense obligation under these policies, because there is,

19  unless we need any more, we have Mr. Hornbeck's, the corporate

20  designee's, testimony on that issue, as well, March 18, 2014.

21  Transcript page 57, line 25, through 58, line 11.

22      Question:  How about early 1950s?

23      Answer:  Anytime in the '50s.  I don't have a specific

24  recollection.

25      Question:  How about the 1960s?  Have you ever seen a

Opening Statement by Mr. Ruggeri

1   primary CGL policy issued by St. Paul in the 1960s that did not

2   contain a duty to defend?

3        Answer:  No.

4        Question:  How about the 1970s?  Have you ever seen a

5   policy issued by St. Paul, the primary CGL policy issued in the

6   1970s, that did not contain a duty to defend?

7        Answer:  I do not recall seeing it.

8        Your Honor, those are the highlights that we wanted to

9   call to the Court's attention as we begin this proceeding, and

10  we thank you for your patience.

11        THE COURT:  Thank you, Mr. Ruggeri.

12        Anyone else?  Mr. Sumner?

13        MR. SUMNER:  Just briefly, Your Honor.  As you know,

14  I represent ICSOP, which is the excess carrier.  Based on the

15  summary judgment briefing, we're here because you considered

16  our summary judgment motion premature, at least as to the 1970

17  to 1972 period, pending your finding that St. Paul issued the

18  primary insurance in the duty to defend in that period.

19        You've heard some of the evidence now from Mr. Rycewicz

20  and Mr. Ruggeri.  You've heard response by St. Paul.  This is a

21  documents case.  St. Paul characterized the documents as bits

22  and pieces and scraps of paper.  We're not looking at wadded-up

23  napkins or candy wrappers here.  We're looking at

24  contemporaneous documents from interlocking companies.

25        Argonaut issued a letter referencing a St. Paul policy in

Opening Statement by Mr. Ruggeri

1    the 1970 to 1972 period.  ICSOP issued their own policy based

2    on an application that acknowledges St. Paul issued --

3            THE COURT REPORTER:  I'm sorry.  Can you repeat what

4    you just said?

5            THE COURT:  Can you speak up, Mr. Sumner?  Your voice

6    drops at the end of the sentence, and it's hard for us to hear

7    on this side.

8            MR. SUMNER:  I apologize, Your Honor.

9        My own client, ICSOP, issued their own policy based on the

10   representation and acknowledgment that St. Paul issued primary

11   insurance in the 1970 to 1972 period and Marsh & McLennan

12   summarized the entire insurance program and recorded the fact

13   that St. Paul issued the primary CGL insurance in the 1970 to

14   1972 period.

15       So they're more than just scraps of paper.  They're

16   interlocking contemporaneous records from independent sources

17   that confirm the issuance of policies.

18       You again heard from Mr. Rycewicz and Mr. Ruggeri.  Once

19   you establish the policy was issued, there's really no dispute

20   that any policy issued by St. Paul would include a duty to

21   defend in that period.

22       Thank you, Your Honor.

23           THE COURT:  Thank you.  Anyone else?

24       All right.  Mr. Rycewicz, your first witness?

25           MR. RYCEWICZ:  Yes, Your Honor, we call

Opening Statement by Mr. Ruggeri

1    Mr. Art Engel.

2         THE COURT:  Mr. Engel, if you would come forward,

3    please, sir, and be sworn as a witness.

4                        ARTHUR ENGEL,

5    was called as a witness in behalf of the defendant, being first

6    duly sworn, is examined and testified as follows:

7         THE WITNESS:  I do.

8         DEPUTY COURTROOM CLERK:  Please step around and have

9    a seat.  That was water poured for him, I assume?

10        MR. RYCEWICZ:  That was water poured for Mr. Engel.

11   Your Honor, our technology is again not working.

12        MR. GORDON:  Your Honor, ours does work, so --

13        THE COURT:  Are we just talking about displaying

14   exhibits on the screen, Mr. Rycewicz?

15        MR. RYCEWICZ:  Yes, Your Honor.

16        THE COURT:  All right.  So to the extent that you can

17   coordinate that, that will be much appreciated by the Court and

18   I'm sure the witness.

19        MR. RYCEWICZ:  Thank you, Your Honor.  We'll see how

20   it goes.

21        DEPUTY COURTROOM CLERK:  State your name for the

22   record and spell your last name.

23        THE WITNESS:  My name is Arthur Edward Engel,

24   E-N-G-E-L.

25

Engel - D

DIRECT EXAMINATION

BY MR. RYCEWICZ:

Q.    Mr. Engel, can you give the Court just a very brief
snapshot of your educational background?

A.    Well, I grew up in San Francisco, graduated from Mills
High School in Burlingame.  I applied for the University of
California.  I went to UCSP from 1964 to 1968.  I graduated in
economics and business administration.

Q.    Mr. Engel, can you give us a snapshot of your experience
in the ship repair industry?

A.    I started in the ship repair industry in 19 --
approximately 1960, when I was a freshman in high school.  My
father and my -- his two brothers, my uncles, had started a
ship repair facility right after the conclusion of World War
II.  And I was a freshman, so my father had a very strong work
ethic, and he believed I should go to work in the shipyards
during the summer.  I went to work in the shipyard for my
family business as a freshman, sophomore, junior, and senior
year until I went to college.  So I worked those three months.

        And during that process in the three months, I primarily
worked in various trades.  I learned electrical shop business.
I learned how to be a machinist.  I learned welding, ship
fitting, carpentry work, the entire gamut of what a shipyard
has, and I did it for three months each summer.

Q.    What was the company called?

Engel - D

1    A.    The name of the company was Triple A Machine Shop.    It was

2    located in San Francisco.

3    Q.    Okay.  So after you graduated from high school you went to

4    college.  Did you have exposure to the ship repair industry

5    while you were in college?

6    A.    Yes.  Every summer I returned from Santa Barbara up to my

7    parents' house, and I worked in the shipyards there during that

8    time frame, and I did some trade work, but I also learned some

9    contracting work during the summer.  I learned some contract

10   negotiations and worked on the various aspects of it, including

11   some management of the small jobs that they did in the yard.

12   Q.    Were you involved in that time frame in any insurance

13   placement positions?

14   A.    Not during that time, no.

15   Q.    Okay.  So after you graduated college, what did you do?

16   A.    I worked in the -- in San Francisco for about a year, and

17   then they wanted to -- my family wanted to open a facility in

18   San Diego.  They sent me to San Diego.  I relocated there,

19   moved, and we started a company down there.  We acquired

20   property, and we hired people, and we applied for what was

21   called a master ship repair contract license, and I began to

22   put the company together.  And it started so we could go

23   forward and started bidding on naval work that was done at that

24   time at the naval station in San Diego, and we sort of launched

25   the company.

Engel - D

1    Q.    Prior to the time you moved and opened up the San Diego

2    facility, was Triple A doing work for the Navy?

3    A.    Triple A did work for the Navy as long as I can remember.

4    When I was very young, seven, eight, nine years old, I would

5    accompany my father to the shipyard because it was an

6    interesting place for a young boy to go, and during that time

7    frame there were numerous Navy ships in there.

8    Q.    Tell us -- you mentioned the -- the application for master

9    ship repair contract that took place in San Diego.  Can you

10   explain to the Court what a master ship repair contract is

11   and what it's --

12   A.    What a master ship repair contract is is a contract that

13   the Navy issues to a contractor and it's an agreement which you

14   have to execute and sign, and they use that as the basis to

15   provide job orders to you.  So it's a single contract, and it

16   stays in place continually, as long as you don't violate any of

17   the rules.  If they make modifications to the contract, you

18   have to acknowledge them and agree to them.  But it's a single

19   contract, and it can be in place, which has been in -- in the

20   various businesses I have been involved in, for years and

21   years.

22        And the Navy issues it after they come out and look at the

23   facility.  They do a pre -- what they call a preorder survey.

24   They look at all your shops.  They look at your systems.  They

25   look at your -- at that time your quality assurance systems,

Engel - D

1    your management systems, your contract systems, your personnel

2    systems, look at all your insurance requirements, how you

3    manage jobs and run it.  They really, really look through the

4    inner workings of the company, and if you -- you pass their

5    checklist which they have, which also includes a facilities

6    requirement -- because at that time you had to have the

7    capability of bringing on -- bringing to your own facility a

8    ship which was classified as an FMG, and you had to have the

9    ability to have that in your facility in order to qualify for a

10   master repair contract.

11       If you couldn't do that, then you obviously wouldn't --

12   were not granted the contract.

13       Now, the value of the contract was the Navy would put

14   solicitations out for individual job orders or work orders, and

15   that consisted of a single package of work to be performed on a

16   ship.  The only people that could bid on that work were people

17   that had a master ship repair contract.

18       So if there were in -- as an example, in San Francisco, if

19   there were five master ship repair contracts, only those five

20   people could bid.  Somebody else from -- that wanted to start

21   in the business or that was not located on the water or was a

22   general contractor doing buildings or something couldn't bid on

23   a contract.

24           THE COURT:  So, Mr. Engel, a master ship repair

25   contract is not a contract that gave you work, but it was a

Engel - D

1    contract that allowed you to bid on work?

2                THE WITNESS:  That's correct.

3                THE COURT:  Thank you.

4    BY MR. RYCEWICZ: (Continuing)

5    Q.    Continue if you have more to say, Mr. Engel, regarding

6    contracts.  Did you want to continue with your testimony, or do

7    you want me to ask you another question?

8    A.    No, that pretty well -- then you're awarded this contract.

9    That's the people -- that's the pool that the Navy looks to for

10   accomplishing their work efforts in their various ports.

11   Q.    All right.  Those are -- are fairly hard to get?

12   A.    Well, the -- they only issue -- there's very few of them.

13   You know, effectively, there's -- there were, at the time,

14   maybe on the entire West Coast, 15 in all the ports.

15   Q.    All the ports, collectively, maybe 15 master ship repair

16   contracts?

17   A.    Right.

18   Q.    All right.  And -- well, let's take a look at Exhibit 42,

19   if we could, and I want to focus obviously on the insurance

20   aspects of a master ship repair contract.  Those will be

21   contained at pages -- page 8 -- I'm sorry, exhibit page 11 of

22   Exhibit No. 42.

23        So, Mr. Engel, during your -- during your tenure as -- as

24   a fellow who has run ship repair facilities, did you, yourself,

25   get involved in satisfying insurance requirements and procuring

Engel - D

1    insurance coverage?

2    A.    Yes, I did.

3    Q.    When was that?

4    A.    I really started in my first involvement, other than

5    knowing that my family's business in San Francisco had it, was

6    when I started the facility in San Diego and we had to apply

7    for a separate master repair contract license because you can't

8    transfer the one from San Francisco to San Diego.  It's a

9    separate facility.  So I had to apply for a new master repair

10   contract license in San Diego.  And with that you had to have

11   the appropriate insurance in place in order to make that

12   application.

13   Q.    So were you, yourself, involved in purchasing insurance?

14   A.    Well, I used brokers, but the answer is correct.  I was,

15   yes.

16   Q.    As a representative of your company; right?

17   A.    Yes.

18   Q.    All right.  And were you involved in communicating or

19   facilitating communication to the Navy about satisfaction of

20   the insurance requirements of your company?

21   A.    Yes.

22   Q.    Okay.  And so you're familiar, are you not, with clause 10

23   of the master ship repair contract?  And it's -- it should be

24   in front of you there.

25   A.    Well, there's nothing in front of me but a blank screen.

Engel - D

1   It's --

2   Q.   I see.  It's showing up on mine.

3            THE COURT:  Paul?

4            MR. RYCEWICZ:  42.  Page 11.

5            THE COURT:  Check his screen first, Paul.  There's

6   nothing on his screen at all.  Is his screen up?

7            DEPUTY COURTROOM CLERK:  Yeah.  And he's got

8   frequency numbers.

9        Here's a hard copy.

10           THE WITNESS:  Okay.

11  BY MR. RYCEWICZ:  (Continuing)

12  Q.   Mr. Engel, are clauses C and D of paragraph 10 the clauses

13  that pertain to the requirement to have insurance coverage to

14  do work for the Navy?

15  A.   Yes, they are.

16           MR. KOLE:  Your Honor, object to the foundation, or

17  maybe it's a clarification.  Is the question whether Mr. Engel

18  has seen this particular contract and these particular

19  provisions or provisions similar to these or exactly identical

20  to these?  It's unclear based on the timelines here whether the

21  witness has seen this contract or we're talking about generally

22  similar contracts.

23           THE COURT:  Sure.  Thank you.  Mr. Rycewicz, if you

24  could clarify, please?

25           MR. RYCEWICZ:  Yes, Your Honor.  I'd be happy to.

Engel - D

1    BY MR. RYCEWICZ: (Continuing)

2    Q.    Mr. Engel, let's back out of this line and establish a

3    little more of your experiences.  How long did you work at

4    Triple A?

5    A.    I worked at Triple A, you know, as I said, during the

6    summers for eight years, and I worked there for, after I

7    graduated, about seven years.  So 15 years.

8    Q.    And then what did you do next?

9    A.    I went off on my own and left the company, which my family

10   was affiliated with, and started Southwest Marine.

11   Q.    And how long -- so what did Southwest Marine do?

12   A.    Well, Southwest Marine started in a facility in Chula

13   Vista and started doing top side repair and got a master repair

14   contract and began the shipbuilding, the ship repair business.

15   Q.    Was Southwest Marine essentially a competitor of Triple A?

16   A.    Yes, it was.

17   Q.    And how long did you -- what was your position with

18   Triple A -- or, sorry, with Southwest Marine?

19   A.    I was the chief executive.

20   Q.    How long did you operate that entity?

21   A.    I operated it until 1997 when I sold it.

22   Q.    Okay.  And during that time frame did Southwest Marine --

23   did Southwest Marine purchase Northwest Marine Iron Works?

24   A.    Yes, they did.

25   Q.    And when did that happen?

Engel - D

1  A.    Southwest Marine purchased Northwest Marine Iron Works

2  about 1989.

3  Q.    Okay.  Prior to purchasing Northwest Marine Iron Works,

4  were you familiar with the Northwest Marine Iron Works

5  operations?

6  A.    Yes, I was.

7  Q.    And how did that come about?

8  A.    I belonged to an association called the Shipbuilders

9  Council of America.  It was a trade organization headquartered

10 in Washington, D.C.  Everybody in the industry, whether it was

11 ship repair, shipbuilding, were members of the Shipbuilders

12 Council of America.  So that included the entire industry, and

13 they did -- what they effectively did was lobby the Hill, work

14 on budgets, interacted with the Navy, interacted with the EPA,

15 representing the industry in its entirety.

16 Q.    Were most of the West Coast companies that performed ship

17 repair operations for the Navy members of that organization?

18 A.    All of them were.

19 Q.    So that would include Northwest Marine Iron Works?

20 A.    That's correct.

21 Q.    And you become familiar with the principles of Northwest

22 Marine Iron Works during the course of that effort?

23 A.    Yes.  We met in Washington every -- quarterly, at a

24 minimum, and then we had various committees, and I had been on

25 committees and I went to the quarterly meetings with the

Engel - D

1  principles from Northwest Marine Iron Works.  Primarily, their

2  CEO at the time was Bill Zavin.

3  Q.    How did Southwest Marine eventually come to buy Northwest

4  Marine Iron Works?

5  A.    Well, during the early '80s, the Navy sort of made a

6  change in their procurement policy and big contracts, big

7  overhauls and repairs, which were quite large jobs, were, prior

8  to that time, restricted to the home port where the ship was

9  located.  And they did that primarily because it's -- the

10  sailors associated with the ship, they were at the home port,

11  and their families were there, and it made sense.  It was good

12  crew morale.

13      Due to some political pressures primarily from up in this

14  northwest area, they eventually changed their policy and said

15  that contracts that were considered overhauls, which had

16  durations of nine months to a year, were to be bid coast-wide.

17  And coast-wide bidding up in the ship in San Diego, if it was a

18  year of procurement and full overhaul, that every master repair

19  contractor on the West Coast would bid it.

20      So Northwest Marine would bid on ships out of San Diego,

21  as would Todd's up in Seattle, and so that's how the

22  procurement process was.  And so they became a direct

23  competitor of ours during that process.  And during the

24  process, when they became a direct competitor, we lost a few

25  ships, three or four major overhauls, to Northwest, of San

Engel - D

1  Diego ships, which we were obviously trying to compete and be

2  successful in.

3      And so I recognized that this competition was going to go

4  on for a while, and it seemed to be the way in the future for

5  the Navy, and Bill Zavin came and visited me in San Diego and

6  asked me if I was interested in acquiring Northwest Marine.

7  Q.  So eventually you did acquire Northwest Marine; correct?

8  A.  Yes.

9  Q.  What sort of due diligence process did you undertake

10 before acquiring Northwest Marine?

11 A.  Well, we had done them -- since this was, like, the third

12 shipyard I acquired, I had a due diligence team.  And we came

13 up here.  And I had a team of about ten people that were

14 composed of the various functions that you do in a shipyard.

15 We had HR people come.  We had insurance people.  We had

16 quality assurance.  We had our environmental people -- our

17 environmental people come up.  We had our contracts people come

18 up.  We had the shop people come up.  And then, of course, the

19 stuff dealing with labor, because labor up here at that time

20 was union.  So we had a team that came through -- into the

21 facility and went through everything that they did.

22      And through that process, they were in financial trouble.

23 That's the reason why he came to me about acquiring them, and

24 we had to do a prepackaged bankruptcy in which case we

25 negotiated an arrangement with SAIF, which is the Oregon state

46

Engel - D

1  insurance for their work comp business.  We negotiated with

2  them a package.  We negotiated with the Port of Portland a

3  package.  And we negotiated with the unsecured creditors a

4  package.  We put the whole package together as a prepackaged

5  bankruptcy, took it into bankruptcy court.  It was approved,

6  and then we acquired the shares of Northwest Marine.

7  Q.    Was one of the approvals that you needed approvals from

8  the Navy to innovate or assign over to the new shareholders --

9  A.    Yes.  Our contracts people had to go up to Seattle where

10  that contract was issued out of, the master repair contract,

11  and went up there and the contract had to be novated to us.

12  Because whenever there's management change, even though it's

13  the same company we acquired, whenever there's a management

14  change in the company, over, I think, 20 percent, or 25

15  percent, you have to novate the contract.  It has to be

16  approved by the Navy.

17  Q.    So is it your testimony that the Northwest Marine Iron

18  Works ship repair contracts with the Navy were novated over to

19  the new company?

20  A.    That's correct.

21  Q.    All right.  During the course of your due diligence and

22  also based on your experience in the industry, did you know

23  Northwest Marine Iron Works to have been a longtime -- a

24  company that did longtime repair work on Navy ships?

25  A.    Oh, yeah, definitely, because I knew -- I knew of the -- I

Engel - D

1  knew of them 25 years before that.  I mean, they were in

2  existence, and I knew they competed on contracts against us,

3  and I knew that they had been -- I assumed at the time they had

4  been around since right around -- after the war.

5  Q.    And so throughout your career you've seen, I assume, a

6  number of master ship repair contracts; is that correct?

7  A.    Yes, I have.

8  Q.    Are you familiar with the terms and conditions of them?

9  A.    Yes, I am.  Pretty much, yeah.

10 Q.    Are the insurance requirements fairly uniform in those

11 contracts?

12 A.    Yeah.  The contract that -- the master ship repair

13 contract hasn't been changed in -- in years.  In fact, right

14 now they're in the process of making a change, which will be

15 the first time it's been changed in 20 years, because I'm

16 applying for another master repair contract license in San

17 Diego currently, and the Navy advised us that they haven't had

18 an application for one in 25 years.  And so they're -- they're

19 revising it slightly right now, but it's been modified,

20 tweaked, so to speak, through the years, but it's basically

21 been in -- in play since I know when I was in the ship repair

22 business -- ship repair business with my parents.

23 Q.    During your career, approximately, on a dollar-value

24 sense, how much work have your companies done for the Navy?

25 A.    Well, up until the day I sold it, I did about two and a

Engel - D

1   half billion.

2   Q.   So turning back to Exhibit 42, page 11, if we could, let

3   me ask you again, are the indemnity and insurance requirements

4   set forth in paragraphs C and D of paragraph 10?

5   A.   Yes, they are.

6   Q.   All right.  Now, also, what sort of due diligence does the

7   Navy do in ensuring that a company who has a master repair

8   contract has in place its insurance requirements?

9   A.   Well, you have to submit your policies and your

10  certificates to them on a yearly basis, and I know they -- they

11  monitor and check it.  It goes into a specific office, and

12  if -- if you're untimely or late or they want to remind you,

13  they'll send you correspondence.  But in order -- these master

14  repair contract licenses that we're looking at, because it's

15  annotated on the bottom, is Northwest Marine.  This contract

16  we're looking at is exactly the same as every one in the United

17  States.  There is no difference.  They're not made for a

18  specific company.

19  Q.   They're a uniform contract --

20  A.   A uniform contract.

21  Q.   -- that the Navy offers essentially on a

22  take-it-or-leave-it basis?

23  A.   That's a good way to describe it.  There's not much

24  negotiation.

25  Q.   Just kind of like most insurance companies, huh?

Engel - D

1          MR. KOLE:  Objection, Your Honor.

2          THE COURT:  Sustained.

3          MR. RYCEWICZ:  I apologize.

4          THE COURT:  All right.

5   BY MR. RYCEWICZ: (Continuing)

6   Q.    Let's take a look at Exhibit 55 if we may here.  Let's

7   look at page 2 of it.  So, Mr. Engel, are you generally -- is

8   it up on your screen there, sir?

9   A.    Yes.

10  Q.    Are you generally familiar with documents of this type?

11  A.    Yes, I am.  That's a proposal for actually a San

12  Diego-based ship that I bid on and lost to Northwest Marine.

13  Q.    So in the way -- the way the process works, if I

14  understand it, is the master contract is issued.  That's sort

15  of a prequalification to a company to submit particular

16  proposals to do work on vessels.  Is that a good way of saying

17  it?

18  A.    Well, there's two ways that they solicit work.  One is

19  this way, and this is a -- will be a technical and pricing

20  proposal, and this is going to be an RFP.  It's going to be a

21  negotiated procurement.  It's either going to be -- it's going

22  to be a cost-plus contract or it's going to be a fixed-price

23  contract or an incentive contract.

24       So there's three or four different types that they'll do

25  with a technical proposal.

Engel -- D

1      The other type of proposal that they'll solicit is they'll

2  do plan and spec work.  The Navy themselves will draw up the

3  specifications and submit all the plans, and you bid on that

4  exactly what it is.  And when you do that, that is basically --

5  you provide a number to accomplish all the tasks, so it's a

6  firm fixed-price number, and you only provide that number.

7  That's different than this one I'm looking at here.

8  Q.    Okay.  Do you remember seeing this proposal at the time it

9  was submitted in 1985?  Just curious.

10 A.    I remember -- I remember Southwest Marine's proposal that

11 was submitted on 1985 on the DULUTH, and I remember Northwest

12 Marine won the contract.

13 Q.    Have you dealt with this contract since?

14 A.    Yeah, I'm still dealing with it today.  Right now.  It's

15 been trapped and in court for -- the contract was finished in

16 '86.  It will be 29 years next year.

17 Q.    Now, let's -- I want to take a look at just a couple of

18 pages on here.  Let's look at page 7 first.  And left-hand

19 column, if we could blow up about the top half of that, is one

20 of the things that is typically contained in a bid package the

21 statement of the experience of the company?

22 A.    Yes.  That's typically a requirement.  You have to provide

23 your experience.

24 Q.    So here this document says "Our history of repairs,

25 overhaul, and conversion of ships, Navy and commercial,

Engel - D

1    American and foreign, began in 1942."  Is that statement in

2    conformance with your understanding of the history of Northwest

3    Marine Iron Works?

4    A.    It does, yes.

5    Q.    Let's also take a look at page 65.  Can you read that?

6    A.    Yes, I can.

7    Q.    Okay.  What is this page?  What does this do or say?

8    A.    It's a list of contracts of different ships that they

9    worked on in the past, going back from -- back in 1957 up to

10   1985.

11   Q.    So do you believe that all of the ships would have been --

12   all of the work on these ships would have been done under

13   master repair contracts?

14          MR. KOLE:  Objection.  I'm not sure how this witness

15   could possibly know that, Your Honor, going back to 1957.

16          THE COURT:  Overruled.  You can answer if you know.

17          THE WITNESS:  Yes, I can.  I can tell you, yes, that

18   the fact that TULARE in 1957 was done under an MSR contract

19   because they were in existence at the time.

20   BY MR. RYCEWICZ:  (Continuing)

21   Q.    What was --

22   A.    The deliverance -- as you go up the list from the bottom,

23   some of the ships are military sealift command.  That's MSC.

24   They have their own master repair contract license.  But it's

25   comparable to what the Navy has.  Some of the ships are Coast

Engel - D

1  Guard, and some of them, as you go forward, are more and more

2  Navy, but there's -- it's a mixed bag of various military ships

3  or Coast Guard.

4  Q.    All right.   What's down at the bottom?   The TULARE.

5  What's an AKA.   What does that mean?

6  A.    Is a supply ship.

7  Q.    Is that a naval --

8  A.    It's crewed by the Navy.   Different than a military

9  sealift command ship.   It's a ship owned by the Navy, crewed by

10 civilians.

11 Q.    What about the next one up?   The DELIVER.   Do you know

12 what kind of vessel that is?   It's an ARS.

13 A.    That -- I don't know that one.   I'm not familiar with that

14 particular ship, no.

15 Q.    How about tell us a couple of these that you recognize --

16 A.    Well --

17 Q.    -- specifically, if you would.

18 A.    Going up the list, it looks like the -- there's an LSD.

19 That's a Navy ship.   Done in '64.   DE done in '63.   That's the

20 MCGINTY.   That's a navy ship.   The TAO is a Navy oiler.   That's

21 done in 19, looks like, '63.   The HOLT is a DE.   That's a

22 destroyer escort.   That's a military combat ship.   That was

23 done in 1963.   The APA, the GEORGE CLYMER is a Navy ship.

24 Continuing up there, as you go further up the list, the ALGOL

25 is a spy ship.   The FF.   In 1970.   The MEYERKORD is an FF, a

Engel - D

1    fast frigate, a Navy ship.  The one above it, the LIND, is a

2    destroyer.  That's a Navy ship.  The SAMUEL GOMPERS is an AD,

3    is a ship that provides support machinery tool repair.  It's a

4    navy ship.

5        And then all the ones above that are DDs and FFs.  They're

6    all military combat ships.  The lion's share of this list is

7    Navy.

8    Q.   Which would make some sense considering that Northwest

9    Marine Iron Works was submitting a proposal to do work on a

10   Navy ship?

11   A.   That's correct.  Yes.  That's what you would highlight if

12   you were trying to win the proposal.

13   Q.   When you were purchasing insurance and was an owner of

14   Southwest Marine and essentially an owner of Northwest Marine

15   Iron Works, did you rely on brokers to acquire your insurance

16   for you?

17   A.   Well, you -- always we would rely on brokers.  I mean, I

18   can't call up St. Paul, I guess, or Argonaut, and say, "Sell me

19   insurance."  We go through a broker.

20   Q.   I understand.  Do you rely on those brokers to communicate

21   with the Navy concerning your satisfaction of insurance

22   requirements?

23   A.   Well, they would typically do that, but, you know, if --

24   the policies came into people that handled it in our offices

25   and a lot of the stuff we would forward directly to the Navy.

Engel - D

1   Q.   I see.

2   A.   But we did it all in a timely fashion, yeah.

3   Q.   Let's take a look at Exhibit 60.  Exhibit 60 is a piece of

4   correspondence from the Department of Navy to Northwest Marine

5   Iron Works in 1976, and it's acknowledging receipt of

6   satisfactory evidence of insurance.  Okay?  Is that what

7   that -- is that how you read that document?

8   A.   Yes, I do.

9   Q.   All right.  Is this the type of document that you have

10  seen in the past reflecting insurance coverage?

11  A.   Yes.

12  Q.   So, similarly, if we take a look at Exhibit 45, that's a

13  September 1969 letter from Military Sea Transportation Service

14  Pacific, and it's directed specifically to Northwest Marine

15  Iron Works, and the subject is request for insurance regarding

16  CGL with expiration of July 1, 1969.

17      Is that the type of document that you remember receiving

18  from the Navy as part of the Navy's due diligence to ensure

19  that insurance was in place?

20  A.   Yes.  That would come into the offices of the corporation,

21  yeah.

22          MR. RYCEWICZ:  Your Honor, we have no further --

23  yeah, one last conclusion question here.

24  BY MR. RYCEWICZ:  (Continuing)

25  Q.   Is it -- based on your experience, is it possible that an

Engel - D

1  entity could do repair work for the Navy without insurance in

2  place?  Without it.

3  A.    Based on my experience, it's impossible.

4         MR. RYCEWICZ:  Thank you, Mr. Engel.

5      Your Honor, no further direct questions.

6         THE COURT:  Thank you.  We'll take a ten-minute

7  break.  Be back here, please, at 25 to 11:00.

8      Mr. Engel, you can step down.

9         DEPUTY COURTROOM CLERK:  Court is in recess.

10                       (Recess taken.)

11        MR. RYCEWICZ:  Your Honor, I spoke too soon.  With

12  your indulgence, if I could ask a few more questions, please?

13        THE COURT:  No take-backs, Mr. Rycewicz.

14        MR. KOLE:  Your Honor, I defer to you as to whether

15  you want to hear more direct questions after he tendered the

16  witness.  It's unusual, if it would be helpful to you, I'm not

17  going to object.

18        THE COURT:  Well, I believe what we discussed at the

19  pretrial conference, all the direct would be -- would go first

20  and then the cross.  That would make the most sense and be less

21  confusing I think for everyone, so -- where's Paul?

22      Mr. Gale and I had a trial a couple -- was it last year

23  where we were all here and we started back in after a break and

24  we got about two minutes into the testimony and realized the

25  court reporter wasn't here.  It doesn't matter.

Engel - D

1    Mr. Rycewicz, how much more?

2         MR. RYCEWICZ:  A couple of minutes, Your Honor.

3         THE COURT:  All right.  Go ahead, please.

4    BY MR. RYCEWICZ: (Continuing)

5    Q.   Mr. Engel, in your years as a businessman, have you

6    operated multiple businesses at the same time?

7    A.   Yes.

8    Q.   Were some of those affiliated?

9    A.   Some affiliated and some not.

10   Q.   What's your practice with respect to purchasing insurance?

11   A.   Typically, we put everything together and we package it to

12   go out to get insurance quotes so that we get the best deal.

13   We found through the years that the more you can offer the

14   insurance carriers, the better the deal will be.  We don't

15   typically go and try to buy policies for one type of business

16   and then go to another carrier for another.

17        MR. RYCEWICZ:  Okay.  Thank you.  No further

18   questions, Your Honor.

19        THE COURT:  All right.  Now, other direct questions?

20   All right.  Mr. Kole, go ahead, please.

21        MR. KOLE:  Thank you, Your Honor.

22

23   ///

24   ///

25   ///

Engel - X

1                         CROSS-EXAMINATION

2   BY MR. KOLE:

3   Q.    Good morning, Mr. Engel.  We haven't met before.  My name

4   is Rob Kole.  I represent St. Paul in this matter.  Thank you

5   for coming here today.  We appreciate it.  I want to start with

6   a timeline.

7         You testified on direct that you first became involved in

8   procuring insurance in San Diego.  Was that at Southwest

9   Marine?

10  A.    No.

11  Q.    Was it Triple A?

12  A.    Yes.

13  Q.    When was that?

14  A.    Triple A South was in -- I went down there in 19 -- right

15  around 1970.

16  Q.    And so, to the best of your memory, your first involvement

17  in procuring insurance in connection with government contract

18  was in 1970?

19  A.    The first that I had direct involvement.  I had been

20  around it through the years in the Triple A machine shop in San

21  Francisco, but my father was running contracts, and we -- when

22  I was in high school, we used to ride to work together because

23  I lived with my mother and father and I heard a lot of things

24  that took place in the business, yes.

25  Q.    Your first direct involvement was 1970?

Engel - X

1 A. I didn't do anything district.  Just heard it, yes.

2 Q. And while you were at Southwest Marine, starting -- and

3 that started in 1976; correct?

4 A. Yes.

5 Q. And from 1976 to the mid-1980s, the person at Southwest

6 Marine who knew the most about Southwest Marine insurance's

7 program was Jack Hanley; correct?

8 A. He was our CFO.  And in addition to being the chief

9 financial officer, insurance fell under his guise.

10 Q. So he was the person most knowledgeable about Southwest

11 insurance between 1976 and the mid to late '80s.  Fair to say?

12 A. Yes.  That's probably fair to say.

13 Q. And then after him Ellen Vinck was the person most

14 knowledgeable with regard to Southwest Marine's insurance

15 program.  Is that fair to say?

16 A. That's correct to say.

17 Q. And at no time were you the person who was primarily

18 responsible or most responsible for Southwest Marine's

19 insurance program.  Is that fair to say?

20 A. I was ultimately responsible for it all.  They had to come

21 to me for approval to buy any of it.

22 Q. But you weren't directly responsible.  That would have

23 been Mr. Hanley and Ms. Vinck; correct?

24 A. They went out and solicited it, and then the information

25 was provided with their recommendation, and then I approved the

Engel - X

1    purchase of it.

2    Q.    And on direct you testified about Exhibit 45.

3          MR. KOLE:  Would you pull that up, please?

4    BY MR. KOLE: (Continuing)

5    Q.    And this is the September 3, 1969, document.  Just to be

6    clear, you had no involvement in or around September of 1969

7    with this document; correct?

8    A.    That's correct.

9    Q.    Okay.  And then you talked about Exhibit 60.

10         MR. KOLE:  Would you pull up Exhibit 60, please.

11   BY MR. KOLE: (Continuing)

12   Q.    Also fair to say you had no involvement with this

13   particular document in or around the time it was issued?

14   A.    That is also correct.

15   Q.    And you also testified about Exhibit 55.

16         MR. KOLE:  Could you pull up Exhibit 55, please?

17   BY MR. KOLE: (Continuing)

18   Q.    And this document is dated in 1985; is that correct?

19   A.    Yes.

20   Q.    Do you know when the last alleged St. Paul policy at issue

21   in this case is alleged to have expired?  The last -- the final

22   alleged St. Paul policy in this case, do you know when it was

23   alleged to have expired?

24   A.    No.

25   Q.    Okay.  I think you testified on direct -- and you can

Engel - X

1    clarify if I have this right -- that Southwest Marine purchased

2    the stock of Northwest Marine in 1989; is that right?

3    A.    I think it was '88, 89.   In that time frame.

4    Q.    And you don't know what insurance policies were actually

5    purchased by Northwest Marine Iron Works prior to 1989;

6    correct?

7    A.    No.   I do not know personally, no.

8    Q.    And you don't know who was involved in purchasing

9    insurance policies for Northwest Marine Iron Works prior to

10   1989; correct?

11   A.    I know that Art Farr was and I know that Bill Zavin was.

12   Q.    That they were involved in purchasing insurance prior to

13   1989?

14   A.    That's what they told me.

15         MR. KOLE:   Could you pull up Mr. Engel's deposition

16   transcript, please, at page 30, lines 15 to 18.

17   BY MR. KOLE: (Continuing)

18   Q.    Is that in front of you, sir?

19   A.    Yes.

20   Q.    Question:   Would you be able to testify as to who may or

21   may not have been involved in the purchase of insurance for

22   Northwest Marine Iron Works prior to 1989?

23         Answer:   No.

24         Was that accurate at the time that you testified to it in

25   your deposition?

Engel - X

1   A.   That was accurate at that time, correct.

2   Q.   And you haven't spoken to the gentleman that you just

3   mentioned since the date of your deposition about their

4   purchase of insurance policies for Northwest Marine Iron Works,

5   have you?

6   A.   No, that's not correct.

7   Q.   You have spoken to them since then?

8   A.   I've spoken to Bill Zavin.

9   Q.   About the purchase of insurance policies?

10  A.   About the general case and generally about the whole case

11  we're in today.

12  Q.   You, yourself, had no involvement in purchasing insurance

13  for Northwest Marine Iron Works prior to 1989?

14  A.   I did not.  That's correct.

15  Q.   And you haven't seen any commercial general liability

16  insurance policies allegedly issued from St. Paul's Northwest

17  Marine Iron Works prior to 1972; correct?

18  A.   I have not seen one.

19  Q.   Okay.  And -- and on direct you testified about Exhibit

20  42.  Do you remember that?  It was a master Navy contract.

21  A.   Show it to me again, please.

22       MR. KOLE:  Will you pull that up, please.

23  Specifically, if you would turn to -- or if you could flash on

24  the screen for him Bates No. NWMAR061182.  If you could

25  highlight first paragraph C.

Engel - X

1    BY MR. KOLE: (Continuing)

2    Q.    Now, you were shown this on direct.  Do you remember?  Do

3    you remember that?

4    A.    Yes.

5    Q.    And under this clause, paragraph C, Northwest Marine Iron

6    Works is obligated to indemnify and hold the government

7    harmless and the vessel owner harmless in connection with

8    claims or suits arising out of the negligence of Northwest

9    Marine Iron Works in performing work under a contract.

10         Is that generally how the indemnification provision works

11   in this kind of a contract?

12   A.    Well, I'm not an expert in insurance.  I'll leave it for

13   what it says.

14   Q.    Well, you were shown this language on direct and so --

15   A.    And I testified it was part of the master repair contract.

16   Q.    Do you have an understanding as to how the indemnity

17   obligation in paragraph C actually works?

18   A.    As a layman, that's just all I would say.  As a layman, I

19   know that they have to have $300,000 worth of insurance to

20   cover these type of incidents.

21   Q.    And as a layman, the way this works is that the ship

22   repairer, in this case Northwest Marine Iron Works, is

23   obligated to indemnity the government.  The government is

24   concerned about being indemnified for negligence by a company

25   like Northwest Marine in performing a contract.  Is that fair

Engel - X

1    to say?

2    A.    That's fair to say, yes.

3    Q.    And then the insurance requirement in paragraph D requires

4    the contractor, in this case Northwest Marine Iron Works, to

5    obtain insurance for the purposes of insuring that indemnity

6    obligation.  Is that again generally how it works?

7    A.    Yes.

8    Q.    And what the government is concerned about in a clause

9    like this, is that that indemnification obligation be insured.

10   It's not concerned about Northwest Marine's only insurance for

11   its own liability separate and apart from the government

12   contract.  Right?  The government cares about the contract.  Is

13   that fair to say?

14   A.    I don't know if it's fair to say.

15          MR. RYCEWICZ:  Object, Your Honor.

16          THE COURT:  Go ahead.

17          MR. RYCEWICZ:  We're getting testimony from the

18   examiner here, as opposed to questions, and as well as the

19   document does speak for itself.  We're also getting into legal

20   argument.

21          THE COURT:  Hang on.

22       All right.  Mr. Kole, you can ask this witness about his

23   understanding of what the insurance was intended to do based on

24   his experience.  Legal interpretations, obviously, are beyond

25   the canon of this witness.

Engel - X

1           MR. KOLE:  Fair enough, Your Honor.

2           THE COURT:  Be mindful of that, please.

3           MR. KOLE:  Sure.

4    BY MR. KOLE: (Continuing)

5    Q.   Generally speaking, Mr. Engel, the government's concern in

6    the insurance requirements of a master ship repair contract

7    like this one was to make sure that Northwest Marine's

8    indemnity obligation to the government was insured.  That's

9    what it cared about; right?

10   A.   Yes.

11          MR. RYCEWICZ:  Same objections, Your Honor.

12          THE COURT:  Overruled.  You can answer.

13   BY MR. KOLE: (Continuing)

14   Q.   Can you finish?

15   A.   Yes.

16   Q.   Thank you.

17       And would the government, under a ship repair contract

18   like this one, have any concern about Northwest Marine Iron

19   Works' liability for its own operations on its own property?

20       So, really, simply speaking, if the mailman slips and

21   falls and hurts himself on a facility that's being run by a

22   Northwest Marine -- being run by Northwest Marine, that has

23   nothing to do with the government contract.  That's not

24   something the government is concerned about in a ship repair

25   contract like this one, are they?

65

Engel - X

1    MR. STAPLEY:  Objection.  Your Honor, lack of

2  foundation.

3    THE COURT:  Mr. Engel, you can answer questions to

4  the extent that you know based on your experience and personal

5  knowledge.  You don't have to speculate.  You don't have to

6  make guesses at things.  We're here to take evidence.  Those

7  things are not evidence.

8    So if you only answer to Mr. Kole's question based on your

9  experience in the industry, you can answer.  If you would be

10  only speculating or guessing at the answer what the government

11  thought or would want, then you don't have to answer unless you

12  know.

13    Make sense?

14    THE WITNESS:  That makes sense.

15    THE COURT:  All right.  Go ahead, please.

16    THE WITNESS:  I don't know.

17  BY MR. KOLE: (Continuing)

18  Q.   Would you look at Exhibit 1, please?  Is this a document

19  you have seen before, Mr. Engel?

20  A.   I don't recall.

21  Q.   Okay.  And you -- you've talked about having some

22  experience in -- in obtaining insurance coverage.  You

23  testified about that on direct; correct?

24  A.   I wasn't -- I had been initially involved in it, correct.

25  Q.   You have seen an insurance policy before?

Engel - X

1  A.   Yes.

2  Q.   If you would look at the first page under C, you see

3  there's a property damage limit of $100,000 each accident, and

4  it goes on.  Do you see that?

5  A.   Yes.

6  Q.   And if you would turn to endorsement eight of this

7  contract, which is on Bates No. 217115.  And we'll pull it up

8  on the screen for you.  At the top it says:  It is hereby

9  understood and agreed that the limits of liability hereunder

10 are amended as follows, but only as respects work being

11 performed under contract MST-3026.  Do you see that?

12 A.   Yes.

13 Q.   And then the limits under C are $300,000.  Do you see

14 that?

15 A.   Yes.

16 Q.   Okay.  In your experience, have you ever seen situations

17 in which the $300,00 insurance limit required by a government

18 contract was provided by an endorsement like this one?

19 A.   If I've seen -- you have to repeat that.  I don't

20 understand it.

21 Q.   You had testified on direct about government contracts

22 having a $300,000 insurance requirement.  Do you recall that?

23 A.   Yes.

24 Q.   Have you ever seen an endorsement, similar to this one, in

25 which that requirement was included in an endorsement to an

Engel - X

1  insurance policy?

2  A.    No, I have not.

3  Q.    And have you ever, in your experience, seen an insurance

4  policy that had limits on the first page, like this one, of

5  $100,000, which were different from ones provided in an

6  endorsement -- like endorsement eight?

7  A.    No.

8  Q.    And you don't know, in your experience, whether it was

9  common or uncommon for companies to have limits provided for

10 purposes of a ship repair contract that were different from the

11 limits of an insurance policy for a company's own liability.

12 Is that fair to say?

13 A.    Yes.

14 Q.    Do you know with respect to any of the alleged St. Paul

15 policies in this case between 1957 and 1972 whether the limits

16 of the policies were the same or different from the limits that

17 may have been provided in connection with a particular

18 government contract?

19 A.    I don't know.

20        MR. KOLE:  Give me one second.  I think I may be

21 done.

22    Thank you very much, Mr. Engel.  I have nothing at this

23 time.

24        THE COURT:  Thank you.

25    Mr. Rycewicz, redirect?

Hughes - D

1        MR. RYCEWICZ:  We have no redirect, Your Honor.

2        THE COURT:  Thank you, Mr. Engel.  You may step down.

3    Mr. Rycewicz, your next witness.

4        MR. RYCEWICZ:  We call Bob Hughes, Your Honor.

5        THE COURT:  Mr. Hughes, come forward and be sworn as

6    a witness.

7                          ROBERT HUGHES,

8    was called as a witness in behalf of the defendant being first

9    duly sworn, is examined and testified as follows:

10        THE WITNESS:  I do.

11        DEPUTY COURTROOM CLERK:  Please step around and have

12    a seat.  Please state your full name for the record and spell

13    your last name.

14        THE WITNESS:  My name is Robert Neal Hughes,

15    H-U-G-H-E-S.  Neal is spelled N-E-A-L.

16        DEPUTY COURTROOM CLERK:  Thank you.

17

18                        DIRECT EXAMINATION

19    BY MR. RYCEWICZ:

20    Q.   Mr. Hughes, have you been hired to testify as an expert

21    witness in this case?

22    A.   Yes, I have.

23    Q.   Before I ask you specific questions about your background

24    and about the opinions that you've rendered, have you undergone

25    any medical procedures in the last year?

Hughes - D

1  A.   Yes, I have.

2  Q.   And are any of those, in your view, going to affect your

3  ability to testify today?

4  A.   No, they're not.

5  Q.   Will you tell the Court about your background and

6  experience in the insurance business.

7  A.   Well, I actually grew up in the insurance business.  My

8  grandfather founded an insurance agency in the small town, as

9  has already been stated, in west Texas called -- and it's

10  pronounced Pecos.  In 1926 he was the county judge of Reeves

11  County, which is a county larger than most of the New England

12  states.

13       And the county judge in Texas law is the principal

14  administrative office for the county, so he had a lot of

15  responsibility on his plate, but he also founded a small

16  insurance agency.

17       My mother, being very entrepreneurial, joined him in the

18  1950s, took the agency, quote/unquote, downtown, and began to

19  make it grow, and she did make it grow very rapidly.  So by the

20  time I went to university, in 1956 -- 1955, I was interested in

21  the insurance business.  I decided when I got to SMU that I

22  would major in insurance because they had a great insurance

23  department, and I did graduate with a bachelor of business

24  administration and a major in insurance.

25       But I will point out that I worked in the insurance agency

Hughes - D

1    since the time I was 14 years old doing mostly tasks, handling

2    documentation.  Our agency had what was known as general agency

3    contracts, which meant that the agency had some underwriting

4    authority in accordance with the contracts that we had.  They

5    had some, actually, claims authority.

6         And so having the underwriting authority, we -- the agency

7    issued all of their own policies, including general liability

8    policies.  So we had these what was called supplies, which

9    consisted of insurance policies, which were valid policies with

10   a valid policy number and had to be protected and almost had to

11   be accounted for, almost like money.  So that was my job as a

12   teenager to take care of those.

13        So I saw lots and lots of different kinds of policies from

14   lots and lots of different companies because the major

15   income-producing area for insurance agents in that area was the

16   writing of crop hail insurance and it was a gigantic -- it was

17   hundreds of millions of dollars' worth of insurance premiums

18   because the area was one of the most prolific producers of

19   long-staple cotton in the world.

20        So when I went back to Pecos with a new bride, I had to

21   find a way to make some money because I wasn't involved in the

22   crop hail business, didn't know anything about it, but I did

23   have a degree in insurance and I knew a lot about property and

24   casualty insurance.  And because of the gigantic

25   income-producing area in the area of agriculture, you had to

Hughes - D

1   have a lot of support businesses.  So there were manufacturing

2   firms, there were support firms doing all kinds of repair work,

3   et cetera, plus the large cotton-ginning and

4   cottonseed-crushing.  And Anderson Clayton had the world's

5   largest cottonseed crushing plant there, and I was involved in

6   writing some of the insurance for that.

7        So it's not as if I was just a kid out there with a piece

8   of straw stuck in my mouth and a bandanna in my back pocket.  I

9   knew the insurance business, and we were very active in writing

10  insurance for heavy industries.

11       Then in 1964 or '65 a gentleman came to town named

12  Anderson and purchased the local telephone company, which was

13  one of my clients.  So I was emboldened to go to Dallas and

14  asked him if I could write the insurance for the whole company.

15  And the long story/short story is that I got the business, and

16  that company was Transcontinental Telephone Electronics, which

17  eventually became General Telephone.  It was the third largest

18  telephone company in the country, and I wrote the insurance.

19       He got out of the telephone business and went into the

20  heavy industrial manufacturing business and took me with him as

21  his insurance agent.  So I wrote insurance for Mesco Metal

22  Buildings, the second largest metal buildings manufacturer in

23  the country; Riverside Industries, the third largest

24  manufacturer of Transcontinental Telephone -- Transcontinental

25  Electrical transmission towers; Holt's Sporting Goods, which

Hughes - D

1  was the second largest sporting goods manufacturing company in

2  the country, and a number others.

3      So I was involved in heavy industry.  I did write their

4  insurance.  I wrote a lot of their -- all of their general

5  liability insurance, so it's not to say I didn't know anything

6  at all about the business.

7      Then in 1972 I left Pecos because of -- a number of

8  reasons, mainly because it was clear that the agricultural

9  economy was in decline, and went to Dallas and went into the

10 consulting business.

11     One of my very first clients was Noble Affiliates in

12 Oklahoma, which you'll see regularly displayed in information

13 about the stock market.  It's one of the more successful

14 oil-related companies in the country, and they had -- they had

15 a large drilling company.  Offshore and onshore they had

16 production companies.  It was a big firm.  And I actually acted

17 as their surrogate risk manager.

18     As a consultant, what we mostly did was acted not in

19 opposition to the agent, but in support of the agent as almost

20 a surrogate risk manager for the client.

21     So as time went by, my clientele included some of the

22 largest industrial firms in the world.  I consulted with

23 Brewmeister and Wayne, which was the largest company in

24 Denmark, and one of the things they did was build ships.  And

25 they built more ships than anybody in the world, except the

Hughes - D

1  Japanese, so I knew -- I know about the shipbuilding industry

2  from that.

3      I consulted to the largest oil-drilling company and

4  producing company in Mexico, Protex Co.  I consulted to Chevron

5  on the placement of their mobile arctic case signs in the

6  arctic.

7      I -- so I've had lots and lots of experience with heavy

8  industry, just to sort of dispel the idea that I was just some

9  hayseed that came from a little bitty town in west Texas.

10 But -- and I think that pretty much brings us to date as far as

11 my experience is concerned.

12     Oh, one other thing.  There is no such thing as a

13 professional expert.  You have people who are professionals in

14 various fields who do expert witness work.  I'm a professional

15 insurance agent or a professional insurance person, and I

16 certainly do a lot of expert witness work and have done a lot

17 of expert witness work, but most of that is in response to my

18 telephone ringing and picking it up and people wanting me to be

19 an expert for them.

20     So I don't know whether there's anything onerous about

21 having been successful in what you do, but I wouldn't say that

22 I'm a professional expert.  I'm an expert that's a professional

23 in the insurance industry.

24     I think that's it.

25 Q.   Thanks, Mr. Hughes.

Hughes - D

1    Now, did I ask you to render an opinion in this case on

2    whether or not St. Paul -- whether, in your opinion, St. Paul

3    issued continuous, uninterrupted primary general liability

4    coverage to Northwest Marine Iron Works between 1957 and 1972?

5    A.    Yes, you did.

6    Q.    All right.  And did I provide you with a copy of Exhibit

7    1?

8              MR. RYCEWICZ:  If we could get that up on the screen.

9              DEPUTY COURTROOM CLERK:  Mr. Rycewicz, could you get

10   the microphone a little closer.

11             THE WITNESS:  Oh, sure.

12   BY MR. RYCEWICZ: (Continuing)

13   Q.    So did I provide you, for use in rendering your opinion, a

14   copy of Exhibit 1?

15   A.    Yes.

16   Q.    All right.  Now, did I provide you with a lot of other

17   secondary evidence for you to examine?

18   A.    Yes, you did.

19   Q.    Did you write an opinion?

20   A.    Yes, I did.

21             MR. RYCEWICZ:  And let's put up Exhibit 55, if we --

22   I'm sorry, 59, please.

23   BY MR. RYCEWICZ: (Continuing)

24   Q.    Mr. Hughes, is Exhibit 59 a copy of your expert opinion

25   that you've written?

Hughes - D

1    A.    Yes, it is.

2    Q.    Now, what is your opinion as to the questions I've posed

3    to you?

4    A.    My opinion is that St. Paul Mercury and/or St. Paul Fire &

5    Marine insurance companies wrote general liability coverage

6    based on the standard wordings published by the bureaus of the

7    day from February 11, 1957, to July the 1st, 1972, at least,

8    and that those standard wordings provided -- and, by the way,

9    I -- Your Honor, when I talk about limits, et cetera, I'm

10   talking about property damage limits, because that's my

11   understanding that's the issue in this case.  So the policies

12   had limits of $300,000, each occurrence at $300,000 aggregate.

13        Now, the first policy, the -- actually, the -- the policy

14   that -- that I reviewed that was not subject to my report, but

15   it was the basis of my opinions in some of the other areas, did

16   indeed contain a $100,000 property damage limit, but it had a

17   lot of endorsements that advanced that on -- in the context of

18   various contracts to $300,000.

19        So who's to know whether or not the damages that occurred

20   were the result of those contracts or not those contracts?  So

21   it would depend a great deal --

22             MR. MOSES:  Objection.  Your Honor, I think this is

23   speculation and outside the scope.

24             THE COURT:  Mr. Rycewicz, perhaps you could direct

25   some questions first?

Hughes - D

1    MR. RYCEWICZ:  Yes, Your Honor.

2  BY MR. RYCEWICZ:  (Continuing)

3  Q.    I would like to ask you, if you would, Mr. Hughes, to

4  describe for the Court the methodology you used in reaching

5  your opinions.

6  A.    Right.  Well, the first thing you have to do is

7  determine -- the best evidence, of course, is primary evidence,

8  which is a copy of the policy.  So you examine the

9  documentation that you have to be able to see if you could find

10  a copy of the policy.  In this case, we did have a copy of a

11  policy, which was a very early policy.  And it's amazing to me,

12  as an insurance reconstructionist, that the only complete copy

13  of the policy we have is the very oldest one, but it's in --

14  not only is it a complete copy, but it's also a certified copy.

15    So once you've completed your search of the documentation

16  to see if you can find complete policies or if you can find

17  parts of complete policies, then you examine all the other

18  documentation to see what it tells you about the possibility

19  that policies existed and, if they existed, what the terms and

20  conditions of those policies were.

21    And the secondary source is that you can have at your

22  disposal, include not only the information that's provided to

23  you by the policyholder or the policyholder's representatives,

24  but may also include information that comes from the -- the

25  industry historical records as a whole because generally in

Hughes - D

1   these cases we're talking about general liability policies, and

2   those policies were developed jointly by industry organizations

3   from the time the very first comprehensive general liability

4   policy was promulgated, which was in the 1940s.  It was

5   promulgated and published in 1941 by the Stock Company Bureau

6   and by the Mutual Company Bureau.  And the names of all those

7   bureaus changed over a period of time, but they ultimately in

8   the 1970s consolidated into what's now known as the Insurance

9   Service Office, so I may fall into that.  I may call them the

10  ISO.  So it -- they were all promulgated jointly, so it --

11  it -- it serves as a common denominator.

12      But since the -- since you have the commonality of the

13  languages -- and when I talk about policies, I'll use the

14  distinct -- make a distinction between the words "the form"

15  which would, in my idea, encompass the entire policy, and the

16  wording which would encompass the essential coverage granted

17  under the policy.

18      In this case, it's probably good to know that it was the

19  wordings that were promulgated by the bureaus.  The

20  declarations page is usually varied somewhat.  So when you see,

21  as you do have in this case, various editions of the policies

22  that had the same wording, that's because there were some small

23  changes made in the placement of the -- of the information and

24  the policy maybe put the company name on the front instead of

25  on the back, and every time they did that they called it a new

78

Hughes - D

1    edition.

2         But the standard policies themselves were promulgated for

3    the first time in '41 and then the next -- there was a

4    '43 version, there was a '47 version.  The next major change

5    was in '55.  That policy wording prevailed until the really

6    sort of earthshaking change occurred in 1966 when the bureaus

7    developed a policy that was based on -- that was triggered by

8    occurrences which had the definition in a policy.

9         Previous to that, most of the policies indicated that they

10   were policies that would provide coverage caused by accidents.

11        Now, the interesting thing about it is that there was a

12   dichotomy between Pacific Coast companies and the rest of the

13   country.  This is memorialized by -- at best, actually, by an

14   attorney who was involved with the bureaus in the beginning of

15   the CGL named E.W. Sawyer, and he wrote fairly prolifically on

16   the subject, and as time went by, continued to write about it.

17   And he points out in his writings that the Pacific Coast

18   coverages were somewhat broader than the coverages issued in

19   the rest of the country.

20        And if you look at the policy wordings that are at issue

21   in this case, that would include the original policy and then

22   the wordings that were provided by St. Paul.

23        You'll see that they -- for purposes of property damage

24   coverage, they respond to damages, quote/unquote, caused by

25   accident, but that phrase does not appear in the bodily injury.

Hughes - D

1   Not that it's a pertinent point in this matter, but it does

2   tell us that those are, quote/unquote, Pacific Coast policies.

3        Like I say, it doesn't really make a lot of difference,

4   but it is interesting to know, should you read the policy

5   wording and say, "Well, why is this the property damage is

6   caused by accident and the bodily injury is not?"

7        So you can consider the standard policy wordings that are

8   available to you and try to determine if you can make an

9   application of those standard wordings to the policy periods

10  where you don't have an actual policy.

11       And then you -- you try to see if there are any other

12  sources that have not been made available to you by your

13  clientele.

14       In this case they pretty much touched all of the bases.

15  And, as you can see, one of the more prolific sources of

16  secondary evidence for industries that were involved during the

17  war in maritime areas is the Department of Navy, and that

18  document -- I'm not an insurance archaeologist, per se.  I'm

19  not -- I don't do the archeological work where you go down into

20  smelly old basements and look for lost policies.  I work with

21  what people bring to me and try to reconstruct the coverage.

22       But having said that, what I do know is one of the best

23  sources for sample wordings and information about specific

24  clientele during that period of time is the Department of Navy,

25  and it's my understanding that most of the documentation is

Hughes - D

1   confined in the national archives and as a result is

2   searchable, so -- but, like I say, mostly that's brought to me.

3   I don't actually go out and do that search.

4   Q.   Mr. Hughes, let me stop you for a minute there and ask you

5   did you -- have you seen a reference to Exhibit 1, the 1954 to

6   1957 policy, as having come from U.S. Archives?

7   A.   Yes, I did.

8   Q.   All right.  And is that the case also for a number of the

9   other secondary evidence sources that you've relied on in this

10  case?

11  A.   Yes, it is.

12  Q.   I'd like to refer you to Exhibit 1, page 6, if I could,

13  and that's endorsement number 2 to this policy.  And clause two

14  adds, as an additional insured, Industrial Refrigeration and

15  Equipment Company.

16       Let me ask you if you found other documents in the

17  documentation you considered in rendering your opinions in this

18  case that also name Industrial Refrigeration as an additional

19  insured?

20  A.   Yes, I did.

21  Q.   Do you also find, also, other documents that named

22  Electrical Insurance Company as an additional insured?

23  A.   Yes, I did.

24  Q.   So did that lead you to any conclusions as to whether

25  Northwest Marine Iron Works had engaged in a common practice of

Hughes - D

1    naming affiliated entities as additional insureds in its

2    policies?

3    A.    Well, yes, that, and those weren't the only two additional

4    insureds either.  There were other companies that they acquired

5    later on that they added as additional insureds.

6    Q.    I want to get down to the nitty gritty here of talking

7    about some of these specific policy periods.

8    A.    Okay.

9    Q.    I would like to talk, first, about what is the first lost

10   policy period.  And that's 1957 through 1960.

11          And let me ask you to identify a couple of particular

12   exhibits.  I'd like to first show you Exhibit 11.  We have some

13   binders that have the exhibits contained in them.  If it's

14   easier for you to flip through those hard copy documents versus

15   reading them on the screen, would that be helpful for you?

16   A.    So far, I can read these.  I'm happy to have the binders.

17   Q.    Okay.  Well, I just want to mention that those are

18   available to you if you would like to see them.

19   A.    Thank you.

20   Q.    You made a reference to the documents that were provided

21   by counsel.

22          MR. RYCEWICZ:  Let's pull up Exhibit 10.

23   BY MR. RYCEWICZ: (Continuing)

24   Q.    We've got the first page of Exhibit 10 up.  Do you

25   recognize Exhibit 10?

Hughes - D

1   A.    Yes, I do.

2   Q.    And what is that document?

3   A.    Well, this is a cover letter from Gordon & Polscer, signed

4   by Andrew Moses, transmitting documents that, according to

5   them, include what St. Paul believes would have been the forms

6   used in succeeding policies that would have been responsive to

7   the environmental claim at issue if such policies were issued.

8   Q.    So how did you rely on the documents that are contained in

9   Exhibit 10 in reaching your opinions?

10  A.    Well, in several things.  Number one, they are, indeed,

11  standard bureau wordings.  They are in, indeed, a Pacific Coast

12  form.  And that just simply told me that -- excuse me -- that

13  we could rely on these particular wordings to be -- have been

14  applicable to any missing policies that we might be able to

15  prove up.

16  Q.    So did you essentially match up this policy language with

17  conclusions you made based upon review of other evidence that

18  the policies had been issued?

19  A.    I think yes is the answer to that.

20  Q.    Do you want to discuss the particular documents that you

21  relied on in reaching an opinion as to 1957 to 1960?  And maybe

22  tell us what that opinion is again.

23  A.    Well, my opinion is that St. Paul issued policy number

24  504JA1276.  St. Paul Fire & Marine.  The policy was in effect

25  between February 11, 1957, to February 11, 1960; that it

83

Hughes - D

1   provided standard wording, which would have been, in my

2   opinion, Form 23778, which is a form that was provided by

3   counsel out of Exhibit 10 and also is exact policy wording of

4   the policy that we do have, which is the policy 1419213, and

5   that -- that the policy provided limits of $25,000 each

6   occurrence.

7   Q.    Do you want to correct that limit statement?  Don't you

8   say provided limits of $300,000?

9   A.    What did I say?

10  Q.    You said 25,000.

11  A.    I'm sorry.  I was thinking something else.  Yes, it was

12  $300,000 per occurrence.

13  Q.    Do you want to tell us what documents you relied upon to

14  reach that conclusion?

15  A.    Yes.  I relied on Exhibit 10.

16  Q.    Which we just talked.

17  A.    Right.  And Exhibit 1.

18  Q.    Okay.

19  A.    And Exhibit 8.

20  Q.    Tell us --

21        MR. RYCEWICZ:  Can we get Exhibit 8 up on the screen,

22  please?

23  BY MR. RYCEWICZ: (Continuing)

24  Q.    Tell us what importance Exhibit 8 has to your opinion.

25  A.    I think you're right.  I am going to use the book.

Hughes - D

1      This is a letter to the U.S. Navy from Northwest Marine

2   and is referring to a couple of contracts, and it says it is

3   requested -- sorry, it's from the -- from the Navy to Northwest

4   Marine, Northwest Marine Iron Works, and it is asking for a

5   copy of, in the first paragraph, the ship repairer's liability,

6   which we're not talking about, but in the third paragraph it

7   says that a copy endorsement the Office of Naval Materials is

8   being informed that a copy of your comprehensive general and

9   automobile liability policy -- or liability insurance, and it

10  references policy 504JA1276.  It's forwarded by reference.

11      Again, this tells us that at this particular period of

12  time, which was March 1957, that the policy existed and that it

13  was being transferred to the Navy in response to their request.

14  Q.   You relied on other documents?  Yes?

15  A.   Yes.  Sorry.  Exhibit 5.

16  Q.   Explain the significance of Exhibit 5.

17  A.   This is another piece of correspondence between the Navy,

18  and it memorializes enclosers which include certificates of

19  insurance for, among other things, policy 504JA1276.  And it

20  says that upon receipt of certified copies of the renewal

21  policies, now in the process of being issued, a copy will be

22  forwarded to replace the enclosed certificates.

23  Q.   Was there -- were there certificates enclosed?

24  A.   Yes, there were.

25  Q.   All right.  Can you describe those to us?

85

Hughes - D

A.    Page 2 of the exhibit is a certificate issued by the

insurance brokers Jewett, Barton, Leavy & Kern, who I will call

JBL&K from now on, issued to Northwest Marine Iron Works and

including Industrial Refrigeration Equipment or Prescott Iron

Works and then East Portland Iron Works.  Describes it as

blanket liability and property damage, including contractural

and automotive.  It covers all of the assured's operations and

lists the limits of liability.  And the limits of liability for

miscellaneous property damage, which is what we're talking

about in this case, is $300,000 each aggregate and 300,000 --

300,000 each accident and 300,000 aggregate.

Q.    So, in your opinion, how reliable are certificates of

insurance as evidence of insurance?

A.    That's a question with a long -- an answer with a long

history.  I'll try to keep it brief.  But, in brief,

certificates of insurance have been the keystone of most

commercial activity for probably a hundred years.  It is an

essential document that's available to policyholders to provide

information regarding insurance policy coverage without

actually having to provide a certified copy of the policy,

which for most major commercial policyholders is important

because they have hundreds in case -- dozens or hundreds of

people that they have to provide certification of their

insurance.

        So it is a standard practice that is used, and the

Hughes - D

1    certificates are relied upon not only by the policyholder but

2    mostly by the certificate holder, which is the -- the entity to

3    whom the certificate is issued.

4        It's -- that would be banks, business partners,

5    construction people, et cetera.  In this case, the Department

6    of the Navy.  In -- in the context of this documentation that

7    is reviewed, you see that they provided certificates to dozens

8    of people, principally as memorialized in a list made by

9    Argonaut later on.  So it's a very important and reliable

10   document.

11       Now, one interesting thing is that later -- and I don't

12   know the exact date this occurred, but I started dredging up my

13   memory, and I think it was in the '70s sometime when as a

14   result of some litigation that had occurred claiming coverage

15   on the basis of certificates of insurance that were somewhat

16   defective and that offered the possibility that the insurance

17   company might have to pay claims that were not really covered

18   under the original policy, so it became a practice at that time

19   to enter the qualification on certificates of insurance that

20   this certificate neither negatively or affirmatively amends the

21   coverage provided by the original policy.

22       And that has been the subject of much argument, especially

23   in the litigation context, as to whether certificates are

24   really reliable representations of coverage.  But these

25   certificates don't have that qualification.  None of them do.

Hughes - D

1    So I -- I don't have any problem with suggesting that --

2    or with saying, as an expert opinion, that these certificates

3    are extremely reliable representations of the coverage that was

4    actually -- actually provided.

5    Now, do they have every word of the policy on them?  No,

6    they don't.  But we also know that the wording of the policies

7    were standard wordings.

8    Q.    What other documents did you rely upon in rendering your

9    opinion about the 1957 to 1960 time frame?

10   A.    Exhibit 9.

11   Q.    Explain to us how you relied upon Exhibit 9.

12   A.    Well, Exhibit 9 references the insurance requirement in

13   the -- in the context of the proposal, but then it attaches

14   certificates of insurance.  One of which is for the ship

15   repairer's liability, which we will ignore.

16   Q.    Is that at page 11 of this exhibit?

17   A.    That's right.

18   And then page 12 is another certificate, like we've seen

19   before, for 504JA1276, showing the limits of liability, blanket

20   liability, and property damage, including contractural and

21   automotive equipment.

22   And this, interestingly enough, was addressed to the City

23   of Portland.  So any idea that these certificates were solely

24   represented -- representative of coverage for a contract with

25   the Navy is not correct because the certificates were issued to

Hughes - D

1    a lot of different people.

2    Q.    Is there significance to the effective and expiration

3    dates that are reflected on this document?

4    A.    Well, I'm glad you pointed that out.  One of the things

5    that you encounter in reviewing certificates of insurance is

6    that sometimes the agents or brokers would issue their

7    certificates with the inception date being the inception date

8    of the contract itself rather than the policy.

9         Now, I don't think that's an appropriate way to do it, but

10   it's something we run into all the time.  And the reason for

11   that, in many cases, is that the policyholder did not want to

12   certify coverage prior to the date of the contract that they

13   were trying to certify.  And I can understand that as well.

14        So, in this case, you see that they have certified the

15   coverage or they have certified a policy -- a date of March the

16   19th, 1959, to February 11, 1960, when the policy that they

17   actually certified began on February 11, 1959.

18        That's just one of the things that you run into.

19        The other thing that -- I don't think we have it in this

20   case, but the other problem that sometimes you would have a

21   certificate of insurance that would be issued but that would

22   reflect limits of liability that were lower than those actually

23   contained on the policies because the policyholder didn't want

24   to disclose that they had $100 million worth of coverage.  They

25   just wanted to certify what was required in the contract.

Hughes - D

1    Q.    Did you rely on Exhibit 7 in reaching your opinion

2    concerning this period?

3    A.    Yes, I did.

4    Q.    How so?

5    A.    Well, again, this is a -- an acknowledgment from the Navy

6    that they received the policy 504JA1276.  So I also relied on

7    Exhibit 6.  Have we talked about that yet?

8          Again, correspondence from the Navy indicating that they

9    have received the certificates of insurance.

10   Q.    Anything else?

11   A.    I've lost track of what we talked about.  We discussed 5?

12   Q.    Yeah, we discussed 5 and 9 and 7 and --

13   A.    What about 4?

14   Q.    -- 6.

15         I don't think we've mentioned 4.

16   A.    Yeah, 4, again, is a brief note from the Navy, which

17   indicates that there was an enclosure of a copy of policy

18   504JA1276 issued to Northwest Marine Iron Works to expire 11,

19   February 1960.

20   Q.    Is it common for brokers to issue certificates of

21   coverage?

22   A.    Yes, it is.

23         As a matter of fact, the preponderance of certificates of

24   insurance I've seen over my career have been issued by the

25   broker or the agent.

Hughes - D

1    Q.    Have you run across certificates issued by JBL&K before?

2    A.    Yes.  Yes, I have seen a lot of JBL&K in various cases

3    because they were a prominent broker on the Pacific Coast.

4    Q.    Did they write a lot of coverage or broker a lot of

5    coverage that ultimately was written by St. Paul?

6    A.    Yes, they did.  And I'm -- I think that one of the

7    members, Mr. Jewett, I think, sat on the board of directors,

8    but I'm not sure.

9                MR. MOSES:  Objection.  Calls for speculation.

10               THE COURT:  Sustained.  Rephrase.

11               THE WITNESS:  Well, I probably should withdraw it,

12   Your Honor, because I can't prove it.

13        At any rate, they did write a lot of business for

14   St. Paul, and I've seen that for certain, in that I've reviewed

15   dozens and dozens of St. Paul policies that were brokered by

16   JBL&K.

17   BY MR. RYCEWICZ:  (Continuing)

18   Q.    Let's move on to the next policy period, which is

19   February 11, 1960, to May 31, 1963, as reflected in your

20   report.

21   A.    Right.

22   Q.    Now, can you explain to the Court the process you

23   undertook -- I'll withdraw that.

24        Before asking you some specific questions, did you reach

25   an opinion about this period?

Hughes - D

1   A.    Yes.    I reached the opinion that St. Paul wrote policy

2   504JC3433, effective February 11, 1960, with an expiration of

3   May 31, 1963, insuring at least ECCO, but also, more likely

4   than not, being a -- an overall policy like the rest of them

5   written for the Northwest Marine Iron Works and their

6   subsidiary companies.

7   Q.    Will you explain to the Court the process that you used to

8   arrive at that conclusion and the exhibits that you relied

9   upon?

10  A.    I'm sorry?

11  Q.    Can you explain to the Court the process that you used to

12  arrive at that conclusion and the exhibits that you relied

13  upon?

14  A.    Well, if you look at Exhibit 11, you will see in the first

15  instance that there is a copy of contracts between ECCO and the

16  City of Portland, and then later in the exhibit you will find

17  the certificate of insurance that is referenced if you are

18  lucky.

19  Q.    I'll help you out here.    Page 31.

20  A.    Right.    And this certificate says the name of the insured

21  is Electrical Construction Company.    But it shows the address

22  as 2516 Northwest 29th Avenue.    That's not actually the address

23  of ECCO.    It's the address of Northwest Marine Iron Works.

24        And which would lead me to believe that this was a -- and,

25  again, we have a somewhat disparity in the dates where they

92

Hughes - D

1    show the effective date of January the 24th, 1961.  But if you

2    look at the bottom left-hand corner, you'll see that that was

3    the date the certificate was typed, which is, again, not

4    unusual.  I don't think it's a proper practice, but it's not

5    unusual.

6        The next page is an endorsement to 504JC3433, and it adds

7    the City of Portland as an additional insured to the policy,

8    which, again, is evidence of the existence of the policy.

9    Q.    So if you look at page 31, there's also a certificate on

10   page 26.  What are the miscellaneous property damage limits

11   that are listed?

12   A.    Right.  By the way, let's look at page 25.  You'll see the

13   letterhead for ECCO, and their address is 2121 Northwest

14   Thurman Street; whereas, the certificate shows 2516 Northwest

15   29th Avenue, which was the address for Northwest Marine, as

16   evidenced at least by the address on the Exhibit 1, the first

17   page.

18   Q.    Let's get back to the limits issue.  I asked you about

19   whether the limits reflected on page 26 and page 31, the

20   certificates of insurance --

21   A.    And your question is?

22   Q.    My question is what are the limits that are reflected on

23   those page numbers?

24   A.    What are they?

25   Q.    Yes.

93

Hughes - D

1    A.    Well, for property damage, it's $300,000 each accident and

2    300,000 in the aggregate.

3    Q.    And earlier in your testimony you mentioned that there

4    were $25,000 limits as somehow relevant to this case.  Do you

5    know what the required limits of liability coverage were, as

6    reflected in the contract between EC and the City of Portland

7    and --

8    A.    In the first place, I don't know where that $25,000 came

9    from.

10   Q.    Why don't you look at page 8.

11   A.    Right.  Well, it does say $25,000 for property damage.

12   Q.    So is there any significance, in your opinion, to the

13   contractural requirement of only $25,000 in property damage and

14   the actual 300,000 in property damage coverage reflected in the

15   certificates?

16   A.    Well, there's a couple of items that are significant to

17   that.  Number one, the broker has certified that the -- the

18   policy limits and not just the limits that are required in the

19   contract, and that would indicate to me that they were

20   attempting to certify the limits of the actual policy, which

21   would be appropriate to presume was for the entire company.

22   Q.    What other exhibits did you rely upon in reaching your

23   opinion?

24   A.    Exhibit 12.

25   Q.    So this is a letter from Cole, Clark & Cunningham to the

94

Hughes - D

1    commissioner of public docs; correct?

2    A.    Correct.

3    Q.    And noting the return of a certificate relating to some

4    work for Dravo Corporation?

5    A.    Dravo.

6    Q.    Dravo.

7          So how did you consider this information important?

8    A.    Well, it includes information that is pertinent to ECCO,

9    which is, for one, a certificate of insurance on page 5, which

10   again shows the $300,000 limits, if you can read it.

11   Q.    What is the effective date that's reflected on that

12   exhibit?

13   A.    March 22, 1960.

14   Q.    Exhibit -- well, you're on -- are you on page 5 of

15   Exhibit 12?

16   A.    Yes, I am.  Down in the left-hand corner.

17   Q.    That is the -- is that the issuing date?

18   A.    That's the issuing date of the -- of the certificate.  I'm

19   sorry.  I thought that's what you asked me.

20   Q.    I asked about the effective date.

21   A.    Oh, of the policy?

22   Q.    Well, the effective date reflected on the certificate.

23   A.    February 11, 1960.

24   Q.    What's the significance of that date?

25   A.    Well, I think it is the correct date.

95

Hughes - D

1    Q.    Of what?

2    A.    Of the policy itself.

3    Q.    Okay.  Of the inception of the policy itself?

4    A.    That's right.

5    Q.    Okay.

6    A.    Sorry.

7    Q.    Did you rely upon Exhibit 15 in reaching your opinion?

8    A.    Yes, I did.

9    Q.    All right.  How so?

10   A.    This is the document that -- sorry.

11          THE COURT:  Are you all right?

12          THE WITNESS:  I'm just getting dried out.

13       This is the document that memorializes the actions of the

14   board of directors and the acquisition of the majority shares

15   of the capital stock of Electrical Construction Company which

16   occurred -- well, this -- the date of this is the first day of

17   October 1958.  I believe that was the date that the shares were

18   acquired.

19   BY MR. RYCEWICZ: (Continuing)

20   Q.    So if that date is reflected in these minutes, it appears

21   that Northwest Marine Iron Works bought the majority stake of

22   the shares of Electrical Construction Company.  Is that what

23   you're saying?

24   A.    That's right.  That's correct.

25   Q.    And was it -- based upon your review of documents, do you

Hughes - D

1  believe it was a routine practice of Northwest Marine Iron

2  Works thereafter to also name EC as an additional insured under

3  its policies?

4  A.    That's correct.

5  Q.    And does that lead you to believe that the policy in place

6  between -- is that one fact that leads you to believe that the

7  policy in place between 1960 and 1963 named Northwest Marine

8  Iron Works as an insured?

9  A.    Yes.  I believe that was the Northwest Marine Iron Works

10  policy to which ECCO had been added as an additional insured.

11  Q.    So what is your -- what's the basis of your opinion that

12  the -- for the final effective date of the policy of May 31,

13  1963?

14  A.    Well, the policy was amended by endorsement.

15  Q.    Why don't we move on to the next policy period, which is

16  1963 to 1966.

17  A.    All right.

18  Q.    Okay.  Are you ready to do that, or is there more you want

19  to say?

20  A.    Well, I mean you asked me a question and I know that the

21  answer is here, but that's fine if you want to -- if you want

22  to -- that's fine.

23  Q.    Yeah.  Why don't we move to the next period.  Okay?

24  A.    All right.

25  Q.    So the next period is what?

Hughes - D

1   A.    May the 31st, '63, to July the 1st of '66.

2   Q.    Do you have an opinion as to whether you believe St. Paul

3   issued coverage during that time frame?

4   A.    Yes, I do.  I believe that they issued policy 504JF2428

5   for that period of time.  They issued with the same coverages

6   that we've previously seen and a $300,000 per accident, 300,000

7   per occurrence policy limit.

8   Q.    Okay.  Can you walk us through your analysis?

9   A.    Yes.  One of the things, of course, is the question about

10  the expiration date of the policy, excuse me, which, if you

11  look to Exhibit 17, the cover letter from JBL&K references

12  Northwest Iron Marine Works, Industrial Refrigeration and

13  Equipment, Electrical Construction Company of Oregon, and

14  Electrical Construction Company of Oregon, dba, Eastside

15  Electric, and the St. Paul blanket liability policy number

16  504JF2428.

17      And what they're doing is transmitting a copy of the

18  endorsement that extends the expiration date of the policy to

19  July the 1st of 1966.

20  Q.    So was that an unusual practice in the insurance industry,

21  to extend a period -- policy periods by endorsement?

22  A.    "Unusual" did you say?

23  Q.    Yes.  Was that unusual?

24  A.    No, it wasn't.

25  Q.    Was it common?

Hughes - D

1    A.    No, it wasn't unusual at all.  Particularly -- now, I

2    don't recall in this case they used July 1 because it was a

3    calendar date, but it was fairly typical for companies to

4    adjust their expiration dates to fit their -- their accounting

5    periods, but usually the expiration dates were adjusted to

6    accommodate changes in the -- in the environment of the -- of

7    the company.  Sometimes as a result of acquisitions and

8    sometimes it would be the result of mergers, et cetera.

9    Q.    So, also, is -- referring to Exhibit 17, page 1, is there

10   a reference to Northwest Marine Iron Works and other entities

11   as insureds under this policy?

12   A.    Well, yes.  I've read them all.  That's right.

13   Q.    And that was EC; correct?

14   A.    Northwest Marine Iron Works, Industrial Refrigeration,

15   ECC -- the two ECCs -- and the Columbia Tugboat Company.

16   Q.    Now, if you turn over to page 3 of Exhibit 17, what's

17   that?

18   A.    Well, that's the endorsement that I discussed.

19   Q.    All right.  And who does it indicate that it was issued

20   to?

21   A.    Northwest Marine Iron Works.

22   Q.    Do you have any explanation for why it does not list all

23   of the named insureds?

24   A.    Yes.  Because usually these policies contained some sort

25   of omnibus language, but it really wouldn't change -- if you

Hughes - D

1    issued an endorsement just to Northwest Marine Iron Works,

2    which was the initial or principal policy -- insured on the

3    policy, and left off the other named insureds on an endorsement

4    like this, it really wouldn't make any difference.

5    Q.    Is that something you see commonly in the industry?

6    A.    Yes.

7    Q.    Did you also rely on Exhibit 21 in reaching your opinion

8    about this policy period?

9    A.    Yes, I did.

10    Q.    All right.  How so?

11    A.    Well, this is another certificate of insurance.  In this

12    case for policy 504JF3428.  Or is it JP?  I can't remember.

13    J --  JF.

14    Q.    And this certificate names, again, only a single entity;

15    is that correct?

16    A.    That's correct.

17          And, again, that's not all that unusual in -- in

18    certificates; whereas, this certificate -- let's see what the

19    purpose of the issuance was.  Well, on May the 31st of 1963

20    Electrical Construction Company, Marine Electric, Marine

21    Salvage, Eastside Electric, Prescott Iron Works, and Industrial

22    Refrigeration and Equipment Company were merged into Northwest

23    Marine Iron Works, which was the surviving corporation.

24          If you look at Exhibit 20, you'll see the certificate of

25    merger from the State of Oregon.  So as of that point they all

Hughes - D

1  became Northwest Marine Iron Works.

2  Q.    Does -- was there, then, a reincorporation of Electrical

3  Construction?

4  A.    Yes, there was.

5  Q.    And so what's the significance of that, in reaching your

6  opinion?

7  A.    Well, it just explains why you have this various

8  documentation that makes it look like a policy came -- a

9  company disappeared and then came back reconstituted.  I don't

10 know why they did what they did, but it does explain the

11 existence of ECCO after the merger occurred.

12 Q.    So in reaching your opinion about the 1963 to 1966 policy,

13 which of the St. Paul -- at Exhibit 10 -- forms did you think

14 was the operative form?

15 A.    "Exhibit 10" did you say?

16 Q.    Yes.

17 A.    Oh, which are the wordings?

18 Q.    Yes, which are the wordings.  I think you reference that

19 on page 21 of your report.

20 A.    Well, it would have still been the pre-1966 form wording.

21 Q.    Okay.

22 A.    I don't think it makes any difference whether you choose

23 23778, which is the St. Paul form, or the 23778, which was

24 the -- excuse me, the 11745, which was a St. Paul Fire & Marine

25 form.  They were the same.

Hughes - D

1          MR. RYCEWICZ:  Your Honor, it's about noon.  Do we
2    want to break?
3          THE COURT:  Yes, we do.  We'll take our lunch break
4    at this time.  Please be back here ready to resume the taking
5    of evidence at 1:20.
6          MR. GORDON:  Your Honor, since Mr. Hughes is in the
7    middle of his testimony, we would ask that he be instructed not
8    to discuss his testimony with anybody during the lunch hour so
9    as to receive or ask for coaching.
10         THE COURT:  Well, I haven't been concerned there's
11   been any such behavior, but if there is --
12         MR. GORDON:  Me either.
13         THE COURT:  -- it's standard, so let's hold off on
14   talking about your testimony, Mr. Hughes.
15         THE WITNESS:  That's fine.
16         THE COURT:  All right.  1:20.  We'll resume then.
17         DEPUTY COURTROOM CLERK:  Court is in recess.
18                   (Lunch recess taken.)
19         DEPUTY COURTROOM CLERK:  Waiting on the evidence
20   system.  I'll reboot it.
21         THE COURT:  Please be seated.
22         DEPUTY COURTROOM CLERK:  I see a document.
23         THE COURT:  Mr. Rycewicz, you can resume whenever
24   you're ready.
25         MR. RYCEWICZ:  Thank you, Your Honor.

102

Hughes - D

1    BY MR. RYCEWICZ: (Continuing)

2    Q.    Mr. Hughes, I would like to direct you to page 19 of your

3    report, and I would like to read to you a statement on the

4    bottom of page 19, starting with:  The documentation also

5    indicates that July 1 was eventually selected as the

6    anniversary date for Northwest Marine's liability coverage and

7    was changed on or about May 14, 1963, by endorsement, effective

8    May 31, 1963.

9         That's what it says; correct?

10   A.    That's what it says, yes.

11   Q.    And is there a correction that needs to be made to either

12   or both of those dates?

13   A.    Well, yes.  It should be '65 instead of '63.

14   Q.    And is the document that supports that amendment

15   Exhibit 17?

16   A.    Yes.

17   Q.    Okay.  And could you explain to us how you came to the

18   conclusion that you came to as amended?

19   A.    The conclusion that it should be amended or the conclusion

20   that's expressed in the report?

21   Q.    Well, the conclusion expressed in the report as amended.

22   A.    As amended, okay.

23   Q.    And also explain the amendment.

24   A.    Well, I just made a mistake.  It's a typo, obviously.

25   Q.    All right.

Hughes - D

1    A.    Well, we have a copy of the endorsement, which is in

2    Exhibit 17, page 3, which I think we've discussed already, but

3    it says it's an endorsement to 504JF2428, and it points out

4    that the policy period is extended to expire July 1.

5         Now, if I believe that the reason -- no.  Never mind.  It

6    just says that it was extended to -- to July 1, and we have the

7    endorsement that did it.

8    Q.    So when you were referring to an endorsement at the bottom

9    of page 19, were you referring to Exhibit 17?

10   A.    Yes.  Page 3.

11   Q.    Then the next sentence of your report is:  This chain

12   supports my opinion that more likely than not the original

13   expiration date for policy 504JC3433 was amended to May 31,

14   1963.

15        Can you explain the importance of Exhibit 17 in you making

16   that conclusion?

17   A.    Well, if you look at the endorsement, you -- what it says

18   is:  In consideration of an additional premium to be determined

19   at audit, it is agreed that the policy period is amended to

20   expire July 1, 1966.

21        And then it goes on to clarify that -- if you could take

22   the -- take that down.  There you go.  Go back.  There you go.

23        It says -- and then the clarification is the second year

24   period is extended to include the period May 31, 1965, to

25   July 1, 1965, indicating that the expiration date for the

Hughes - D

1    previous policy was May the 31st, 1965.

2         And it's also interesting that the effective date of this

3    endorsement is May the 31st.

4         So the only reason -- the only reason for that and the

5    only way that could have linked together was if that -- if the

6    expiration date of the policy, original policy, was May the

7    31st.

8    Q.   So that leads you to conclude that the previous year

9    policy, effective February 11, '60, was amended to expire on

10   May 31, 1963?

11   A.   Right.

12   Q.   Let's -- we already talked about the 1963 to 1966 policy

13   period, so let's go ahead and move on to the 1966 to 1969

14   policy period.

15   A.   Okay.

16   Q.   Is it your opinion that St. Paul issued a policy for that

17   time period?

18   A.   Yes, it is.

19   Q.   What were the limits that you concluded existed?

20   A.   The limits were -- well, the property damage limits were

21   $300,000/$300,000.

22   Q.   Let's take a look at some of the documents that I believe

23   you relied on.  Let's take a look at Exhibit 22.  Is Exhibit 22

24   a document you relied on in reaching your conclusions?

25   A.   Yes, it is.

Hughes - D

1    Q.    So explain -- explain to us the importance of this

2    document in you reaching your conclusions.

3    A.    Well, again, this is a certificate of insurance of the

4    kind that we've been looking at year after year, and it lists

5    two policies:  JH3407 and JH5406.  I mean 5407 and 5406.

6         Now, we have additional references that shows that one of

7    those is the -- I think the 5406 is an automobile policy and

8    5407 is the general liability policy.  I think that's right.

9    Q.    Did you also rely on Exhibit 23?

10   A.    Yes, I did.

11   Q.    And if you look at the RE: line, it appears that it lists

12   policy numbers -- one being for the general liability coverage

13   and one being the automobile liability coverage.  And I think

14   that confirms what you just said, doesn't it?

15   A.    Right.  This is the document that I was thinking about.

16   Q.    Did you rely on Exhibit 24?

17   A.    Yes, I did.

18   Q.    How so?

19   A.    Well, this certificate is to the brokers from the Port of

20   Portland and it references, in the first paragraph, the policy

21   504JH5407 and describes it as a comprehensive general liability

22   policy.

23   Q.    You called this a certificate, but is it really a letter?

24   A.    I'm sorry.  I got certificates on the brain.  Yes, it's a

25   letter.

Hughes - D

1  Q.    I can understand that.

2        Did you rely on Exhibit 25?

3  A.    Yes.  Again, the regarding line cites this policy, and

4  this is the conversations that went back and forth about

5  whether the Port of Portland is supposed to be an additional

6  insured on the policy or not, and this confirms that they've

7  been taken off.

8  Q.    Did you rely on Exhibit 26?

9  A.    Yes, I did.

10 Q.    So was this a letter from the Port to JBL&K confirming

11 receipt of a certificate of insurance?

12 A.    Yes.  It's a certificate for the policy period 7/1/66 to

13 7/1/69, which confirms that -- and they used a shorthand to

14 describe the limits, but I believe the 300,000 is for the

15 property damage.

16 Q.    Did you rely on Exhibit 27?

17 A.    Yes.  Again, this is a cover letter without the

18 certificates attached, but it references the policy 504JH5407.

19 Q.    And this is a letter from JBL&K directly to the Port, is

20 it not?

21 A.    Correct.

22 Q.    Is that unusual, in this time frame, for a brokerage to

23 communicate directly with an entity in a relationship with an

24 insured?

25 A.    Not at all.  I mean, the broker usually prepared the

Hughes - D

1    certificates and forwarded them directly to the certificate

2    holders.

3    Q.    Did you rely on Exhibit 28?

4    A.    Yes.    This exhibit references, on page 2 of the exhibit,

5    quote:    Your comprehensive general -- your comprehensive

6    liability policy in the St. Paul --

7    Q.    Let's, finally, regarding this policy period, take a look

8    at Exhibit 45.    And does Exhibit 45 relate to this policy

9    period, in your view, this '66 to '69 period?

10   A.    It -- yes.    It -- it references an expiration date of the

11   comprehensive general liability policy as July 1, 1969.

12   Q.    Let's turn to the 1969 to 1972 policy period, which is the

13   last lost St. Paul policy period.    Did you reach -- have you

14   rendered an opinion concerning whether you believe there was a

15   policy issued by St. Paul to Northwest Marine Iron Works during

16   that period?

17   A.    Yes, I have.    I believe they did.    I believe they issued

18   policy 536JB5573 for the period July 1, '69, to '72, with

19   limits of liability of 300,000/300,000.

20   Q.    So let's go through some of the information that you may

21   have relied upon.    Why don't we turn to Exhibit 37.    What is

22   Exhibit 37?

23   A.    This exhibit, Your Honor, is what is known as a placing

24   slip from London.    Quickly, the way insurance was placed in

25   London is the broker would go to Lloyd's and select a lead

108

Hughes - D

1   underwriter, who would set the terms and conditions of the

2   policy, and then the broker would go around and try to fill out

3   100 percent of the security.  And this is a slip that

4   represents the broker's efforts, and the slips always -- almost

5   always contained a thumbnail description of the coverage, which

6   is not that relevant in this matter, except that it includes a

7   schedule of underlying insurances, which is on page 2 of the

8   exhibit.

9       And it lists under general bodily injury and property

10  damage under the property damage section:  300,000/300,000, and

11  it indicates that's written by St. Paul.

12  Q.   Let's take a look -- is that a document you relied on in

13  rendering your opinion?

14  A.   Yes, it is.

15  Q.   Let's look at Exhibit 38.  What is Exhibit 38?

16  A.   Well, this is a -- a proposal that was developed by the

17  brokerage firm Marsh & McLennan to -- apparently to acquire,

18  hopefully, the insurance program or acquire the right to place

19  the insurance program for Northwest Marine Iron Works and

20  affiliated companies, effective August -- effective October 1,

21  or the -- the cover letter is dated October 11, 1972.

22  Q.   Let's take a look at page 11.

23  A.   Right.

24  Q.   So what does page 11 provide?

25  A.   Well, it references the exposures, which is general

Hughes - D

1   liability.  It states that the present carrier is St. Paul Fire

2   & Marine.  They suggest that the policyholder should continue

3   with St. Paul Fire & Marine until they have permission to

4   approach competitive markets.  It shows that the limited

5   liability for property damage of 300,000 each occurrence,

6   300,000 aggregate, and it lists a number of endorsements and

7   policy extensions, which includes broad form contractural,

8   broad form property damage.

9   Q.   Was it accurate, as of October 1972, to set forth that

10  St. Paul was the then CGL coverage provider?

11  A.   Well, was this accurate as of October 1972?

12  Q.   Correct.

13  A.   Yes.

14  Q.   As of October 1972, hadn't Argonaut policy been put into

15  place?

16  A.   Well, yes, but I believe the answer to that is if you

17  review this letter, the cover letter, which is page 4, the

18  second paragraph, it says, "In the spring of this year we asked

19  for and were granted the opportunity to make a complete study

20  of the existing program."  So the data -- the data that they

21  gathered was accumulated in the spring of the year, which at

22  that particular period of time this representation of the

23  coverage would have been correct.

24  Q.   Did you rely on that document in rendering your opinion?

25  A.   Somewhat.  Yes.

Hughes - D

1   Q.   Okay.  Let's look at Exhibit No. 34.

2        I'm sorry.  Let's look at Exhibit No. 35.  What's

3   Exhibit 35?

4   A.   Well, it says that it's a questionnaire for umbrella

5   policy application, which obviously it was.  And this document

6   bears a Bates numbers with the ICSOP indication.  So this was

7   apparently the application that was made to ICSOP for the

8   purchase of an umbrella policy.

9        And on page 2, again, you have the schedule of primary

10  policies, which lists St. Paul general bodily injury and

11  property damage.

12  Q.   And --

13  A.   And it shows 300,000/300,000 for the property damage.

14  Q.   So would you generally consider the information on this

15  type of a document to be reliable?

16  A.   Sure.

17  Q.   Let's take a look at Exhibit 29.  This one is hard to

18  read, but this appears to be a June 6th, I believe, 1972,

19  interoffice correspondence.  It's on Argonaut insurance

20  interoffice correspondence letterhead, and it's referencing

21  Marine Iron Works, Electrical Construction Company, among

22  others.  Did you rely on this document in reaching your opinion

23  as to coverage during the '69 to '72 policy period?

24  A.   Yes.  Again, to a certain extent, because it references

25  the fact that the coverage had been for -- in the hands of

111

Hughes - D

1    St. Paul, the prior coverage, and --

2    Q.    And does it rely on --

3    A.    It says that the St. Paul policies expire in January of

4    '73.

5          And did I rely on what?

6    Q.    Well, did you rely on the information concerning the

7    rating by St. Paul to establish the premium?

8    A.    Well, that -- I mean, no.  It -- that's fairly

9    meaningless, in terms of trying to reconstruct the policy.  It

10   doesn't really matter what the rating is.

11         It does say that the rates were established by St. Paul

12   for the 1971/'72 year, which would indicate that their records

13   indicated that St. Paul wrote the policy during that period of

14   time.

15   Q.    I want to refer you to page 3.

16   A.    Right.  At the bottom of the page it says the renewal date

17   is July 1, 1972.

18   Q.    I think you might have misspoke as to renewal date

19   earlier.  Is that reference relating to the expiration date of

20   the 1969 to 1972 St. Paul policy and using the term "renewal

21   date," is that referring to the next policy period?

22   A.    Well, if you look on page 3, the second paragraph says

23   both St. Paul policies expire in January of '73.  I think

24   they're talking about the ship repair policies there.

25         So to the extent that I referenced that, it probably

112

Hughes - D

1  wasn't correct.

2  Q.   Let me refer you to Exhibit 36, if I could.

3       This is an Argonaut Bates-stamped document that came out

4  of Argonaut underwriting files.  You did not have this document

5  available at the time you rendered your expert opinion, but

6  have you seen it since then?

7  A.   I have.

8  Q.   And does it support any of the opinions that you've

9  rendered in this case?

10 A.   Well, what it supports is the clear indication of the

11 importance of certificates in the operations of Northwest

12 Marine Iron Works and their subsidiary companies.

13      It's also very interesting in that they've listed in

14 the -- the ultimate column the initials of the policy -- the

15 entities, and you see that in some cases all four entities were

16 insured and in some cases only one, which sort of explains the

17 methodology that had been used in preparing and issuing

18 certificates.

19 Q.   And is this a list, in your opinion or your view, of

20 certificates issued during the Argonaut policy period -- at

21 least during a portion of the Argonaut policy period?

22 A.   I don't know.

23 Q.   Does this -- I want you to assume that that's what it is,

24 okay?  Does this document support that in a number of instances

25 certificates were issued naming only Northwest Marine Iron

Hughes - D

1   Works?

2   A.    Well, no.   There's -- there's -- certificates were issued

3   for various entities that are listed here, as I said in the

4   ultimate paragraph.

5   Q.    I may have misstated it in my question, but doesn't this

6   document support that during this time frame that certificates

7   were issued, reflected in this document, that in some instances

8   certificates were issued only naming Northwest Marine Iron

9   Works, some were named listing only Electrical Construction,

10  and in some instances they were issued naming both of them and

11  even others?

12  A.    If that's what that column means, yes.

13  Q.    I want to ask you just a couple of overarching general

14  questions now.

15        So we have an actual St. Paul policy number 1419213;

16  correct?

17  A.    Yes.

18  Q.    And then as of 1957 we get into different types of policy

19  enumeration policy numbers; correct?

20  A.    Yes.

21  Q.    And do you have an explanation for that?

22  A.    Well, St. Paul changed their numbering system.

23  Q.    Do you have knowledge of that?

24  A.    Yes.

25  Q.    And are these numbers consistent with what St. Paul

Hughes - D

1   changed its numbering system to?

2   A.   Yes, they are.

3   Q.   Do you know what any of those numbers and letters mean?

4   A.   I do not.  I have an inkling that the three digits at the

5   beginning -- at the beginning have a reference to the

6   particular underwriting facility, but I don't know that that is

7   correct.

8   Q.   I see.  During this time frame, 1954 to 1972, was it the

9   standard practice of insureds to stay with one carrier for a

10  period of time?

11  A.   I don't know if I can tell you whether it was a standard

12  practice for all insureds.  It certainly was for my clientele.

13  Q.   Now, we've also looked at a bunch of evidence for the 1960

14  to 1963 policy period that indicate that Electrical

15  Construction was a named insured; correct?

16  A.   Right.

17  Q.   And we have evidence that brackets this policy period

18  showing that Northwest Marine Iron Works was a named insured

19  under St. Paul policies; correct?

20  A.   Right.

21  Q.   Now, would it be unusual, in your view, for Northwest

22  Marine Iron Works to have bought coverage in the 1960 to 1963

23  period from a carrier other than St. Paul, given these facts?

24  A.   It would be almost unheard of.

25  Q.   Why is that?

115

Hughes - D

1    A.    Well, I mean, it just doesn't make any sense.    There would

2    be no commercial necessity for that.    They had been having a

3    relationship with St. Paul for years.    ECCO was -- I didn't see

4    any indication that it was a difficult risk.    So I can't

5    imagine why you would do that.    It really makes no sense.

6         The other point is that if you noticed in this document

7    that we were looking at -- you asked me about the rating, and

8    they were using experience rating.    And if you -- and

9    experience rating is -- is governed by the ownership of the

10   company.    So therefore these companies would all have been

11   consolidated by the bureau for experience rating services.    If

12   you jerk ECCO out of there, it upsets the apple cart

13   considerably.

14   Q.    Similarly, if you jerked Northwest Marine Iron Works out

15   of there for a three-year policy period, it would upset the

16   apple cart?

17   A.    Well, if you jerk Northwest Marine Iron Works, which was

18   probably the lead company, that would really upset the apple

19   cart.

20   Q.    So have you ever heard of a sophisticated client that's

21   under contract with the federal government to go bear and not

22   purchase insurance?

23   A.    You mean that -- well, I think I understand your question.

24   And if you mean have I ever heard of a company that was doing

25   business with the federal government and that business required

Hughes - X

1  them to certify that they had coverage going bear, absolutely

2  not.

3             MR. RYCEWICZ:  I have no further questions for you at

4  this time, Mr. Hughes.  Thank you for your testimony.

5             THE WITNESS:  You're welcome.

6             THE COURT:  Any further direct?

7        All right.  Mr. Moses, will it be you?

8             MR. MOSES:  Yes.

9             THE COURT:  Go ahead, please.

10

11                    CROSS-EXAMINATION

12  BY MR. MOSES:

13  Q.   Mr. Hughes, my name is Andrew Moses.  We met at your

14  deposition, if you recall.

15  A.   Yes.  Yes, we did.

16  Q.   Would you consider yourself an underwriter?

17  A.   No, I do not.

18  Q.   Have you ever been licensed to write insurance in Oregon?

19  A.   I'm not exactly sure about that.  The -- when I wrote

20  insurance for Transcontinental Telephone Electronics that was a

21  national -- nationwide company, and they did business in almost

22  all 50 states.  And in order for me to be able to be their

23  broker in certain states, I had to hold a nonresident license

24  in those states.  And I did hold a nonresident license in 27

25  states.  I can't tell you, sitting here today, whether Oregon

Hughes - X

1   was one of those.

2   Q.   Do you recall ever being involved in actually issuing a

3   policy in Oregon?

4   A.   Well, if you mean involved in preparing the policy and

5   issuing it period, I've never -- I wasn't involved in that at

6   all in any state.  If you mean was I involved as a consultant

7   to policies that were prepared and issued in Oregon, I don't

8   recall.

9   Q.   Do you know what -- whether Oregon had specific language

10  in the 1950s and '60s that it required to be in CGL policies?

11  A.   I believe that they did.  I'm sure that they had certain

12  PUC-type language, but I don't know for sure.

13  Q.   What does that stand for?  PUC?

14  A.   Public Utilities Commission.

15  Q.   So would that apply to all policies issued or only those

16  who were with the PUC?

17  A.   I don't know.

18  Q.   In your work as an agent, did you issue or underwrite any

19  policies to ship repairers?

20  A.   No, I didn't.

21  Q.   Prior to 1990, I think you testified you had one ship

22  repairer who you did consulting work for, a Danish company

23  that owned --

24  A.   I -- I told you about that company as an attempt to try to

25  establish the fact that I wasn't some local yocal, not knowing

118

Hughes - X

1  anything about commercial business.

2      I consulted with a number of ship repair companies when I

3  worked with Remco.  They were down south on the Texas Coast.

4  Principally, in the Beaumont area.  And those companies did all

5  kinds of ship repair.  Some of them were painting companies.

6  Some of them were -- actually did welding and that sort of ship

7  repair.

8      But that was on the consulting side.  I didn't write any

9  ship repair companies when I was an insurance agent.

10 Q.   In your work as an expert, have you been exclusively an

11 expert witness since 1990?

12 A.   No, I have not.  And I'm not today.  I run a company with

13 26 consultants scattered all over the country, and I do my own

14 consulting work for my consulting clients in addition to my

15 expert witness work.

16 Q.   Is it accurate that you have been deposed more than 300

17 times?

18 A.   That's correct.

19 Q.   How many of those times were in something other than as an

20 expert?

21 A.   None of them.

22 Q.   Is it still correct that in this matter you are being paid

23 $700 per hour?

24 A.   That's right.

25 Q.   Do you have an estimate as to the total that you've been

Hughes - X

1   paid in this matter?

2   A.   No, I don't.

3   Q.   If you can, turn to Exhibit 1.

4   A.   Okay.

5   Q.   Is it accurate that page 1 of Exhibit 1 is a declarations

6   page?

7   A.   Yes, it is.

8   Q.   What is the purpose of a declarations page?

9   A.   Well, a declaration page to an insurance policy is

10  designed to disclose or to memorialize information about the

11  policyholder and about the coverage that is -- could possibly

12  be variable, as opposed to the preprinted policy wording.  So

13  that's the page where you will see the sort of information you

14  see here.

15  Q.   Is it accurate that there are endorsements on this policy?

16  A.   Yes, it is.

17  Q.   What type of information is on these endorsements?

18  A.   Well, we have to look at them and see.  There's various

19  types of information.  Some of them add coverage terms and

20  conditions.  Some of them simply clarify circumstances.  And to

21  sort of, I guess, ratify my previous testimony, the very first

22  endorsement is an Oregon Public Utilities Commission

23  endorsement, which has to do with motor vehicles not being a

24  public utility, by the way.

25       Policy number two is an additional insured endorsement

Hughes - X

1   ensuring the Port of Portland.

2       Number three is additional loss of consortium coverage,

3   which speaks for itself.

4       Number four is -- provides for a 30 days' written notice

5   of cancellation as it pertains to the Maritime Administration

6   and the Office of Naval Material.

7       Number five is an amendment of the limited liability for a

8   specific contract.

9       Number six is an addition of the broad form property

10  damage.

11  Q.   What does that mean, an addition of broad form property?

12  A.   Well, it extends the coverage to damage or destruction

13  of -- it deletes the -- exclusions E and exclusions F and adds

14  new ones, which are broader or less constrictive -- less

15  constrictive than the ones contained in the policy.

16  Q.   So is it accurate that an endorsement can either expand or

17  limit coverage under the policy?

18  A.   Absolutely.  And it can also be just purely

19  administrative.

20  Q.   Other than the exhibits you have been presented today in

21  your direct, have you seen endorsements to any of the other

22  alleged St. Paul policies?

23  A.   It seems to me that I recall that there was one sort of

24  orphan endorsement.  I can't recall it right now, but that

25  would have been the only one.

Hughes - X

1    Q.   So is it fair to say that you don't know what information

2    would have been included on -- on any other endorsement on the

3    alleged policies?

4    A.   Not quite, because we have in a lot of the

5    correspondence -- or some of the correspondence we have

6    representations of additional coverages that would have been

7    added, and, for instance, you have references in several places

8    to broad form property damage, and I think a couple of other

9    coverages.  But, other than that, we don't -- no, we don't have

10   any other information about endorsements.

11   Q.   And I think I heard you previously.  It's your opinion

12   that Exhibit 1 represents a complete policy?

13   A.   Yes, it is.

14   Q.   I'll move to some of the certificates with respect to this

15   policy, which I believe is Exhibit 2.  So if you look at -- or,

16   I suppose, compare page 1 of Exhibit 2 with page 3 of

17   Exhibit 2.  One of them --

18   A.   Excuse me.

19   Q.   I'm sorry.  Go ahead.

20   A.   I was just saying I'm looking at it.

21   Q.   Okay.  One of them indicates a property damage limit of

22   300,000 each accident and another one indicates 100,000 each

23   accident.  Why do you suppose there was a difference between

24   those?

25   A.   Well, I can't tell you, you know, exactly.  I can give you

Hughes - X

1   an opinion based upon my experience, and that is that it more

2   than likely had to do with the requirements of the particular

3   entity.

4       The first part of the exhibit or the first page is

5   addressed to the Department of Navy, Bureau of Ships, and I

6   know that their requirement was 300,000.

7       The other is the Office of Naval Material, Insurance

8   Branch, and it may be that their requirement was lower, but I

9   don't know that for certain.

10  Q.  Do you know why the certificates that we are looking at

11  right now refer to public liability as a -- on the limits of

12  liability?

13  A.  That was a term that was generally used in this period to

14  describe what later became known as general liability.  Public

15  liability is a term that can be all-inclusive, but it also can

16  be a little bit awkward.  It was used back in this time and

17  even as early as the 1960s, when I first entered the active

18  practice of insurance, but -- and, as a matter of fact, just to

19  emphasize, or just to give you an example, when I first went to

20  work in the insurance agency, I would have people come in to me

21  and say that they wanted to buy some PL and PD insurance, and

22  what they were talking about was public liability and property

23  damage.

24      The term "public liability" was used until probably the

25  mid-1960s as a description of the coverage that we now call

Hughes - X

1    bodily injury coverage.

2    Q.    So would it indicate to you that the inclusion of the

3    words "public liability" on these certificates indicates that

4    JBL&K, perhaps, had some leftover preprinted forms?

5    A.    No.  Because it was a term that was used fairly -- fairly

6    openly in the 1950s.  But it's entirely possible that they had

7    some leftover preprinted forms.  It would -- it's not unusual

8    to see in the 1950s a representation of bodily injury as public

9    liability.

10   Q.    But it's accurate that the 1954 St. Paul Mercury

11   declaration page referred to bodily injury rather than public

12   liability; right?

13   A.    Refers to what?

14   Q.    Bodily injury rather than public liability.

15   A.    Right.  Yes, it does.

16   Q.    So moving on to the wording and standard forms, look at

17   page 14 of your report, which I believe is Exhibit 59.

18   A.    Okay.

19   Q.    In the middle of the page where it says:  That

20   understanding, however, the policy wording of all the four

21   editions of the CGL contained in Exhibit 55 is the same.

22        Yet, in Exhibit 10 -- you can look at that also -- there

23   are multiple versions for -- versions of the same wording.  Is

24   that your testimony?

25   A.    Well, no.  There are multiple versions of the policy form,

Hughes - X

1    but the only differences is they're on the declarations page.

2    If you look at the actual wordings and compare them, they're

3    the same until you get to the 1966 policy.

4    Q.   Okay.  So if there was a policy issued in 1963, which

5    revision would it use?  So -- I'm sorry.  If you -- if you look

6    at page 3 of Exhibit 10 at the bottom left, there's REV 7-55.

7    What does that refer to?

8    A.   It means this is the 7 -- this is the July 1955 edition of

9    their form number 23778.

10   Q.   And then if you look at page 8 of Exhibit 10, bottom left

11   corner, looks like it's a different revision date.

12   A.   Right.  This is the revision of -- I guess it says

13   August '57.

14   Q.   So then if a policy was issued, let's say, in January of

15   1958, would that policy still use the July '55 version, or

16   would it have moved up to the more recent version?

17   A.   Well, number -- there's a lot of things -- a lot of flaws

18   in the particular questioning that you're making.  The first

19   place you need to look is we have a St. Paul Mercury policy on

20   page 3 and a St. Paul Fire & Marine policy on page 8, so

21   there's no question that these are different versions because

22   the declarations page don't say the same thing.  One of them

23   says "St. Paul Mercury," the other one says "St. Paul Fire &

24   Marine."  My position is that that is the only difference in

25   the forms and explains why you have two different editions.

125

Hughes - X

1        If you would simply isolate the wordings of the policy,

2   you could put them side by side and they're absolutely

3   identical.

4   Q.   Sure.  I suppose, perhaps, I am -- I'm not quite asking

5   that -- I guess what I'm asking is -- let's -- well, let's

6   assume that the wording is identical.  Completely identical.

7   The only change is there's a different edition date.  Would the

8   later policy use the later version, or would it still go back

9   and just keep on using the July '55 form?

10  A.   That depends upon a lot of things.  What -- when insurance

11  companies reprinted the standard wording -- let's say you're

12  dealing with a period between 1955 and 1966 where the wordings

13  would all be the 1955 standard wording, but because of various

14  changes in maybe insurance company names or in changes of the

15  security being provided by one company as opposed to another

16  company, et cetera, it would be necessary to revise the policy,

17  but when you revise the policy, you don't necessarily revise

18  the policy wordings.

19       So if -- if you had a policy revision, let's say -- let's

20  say you have a policy that was written in -- in October of 1955

21  and it used the -- the version of the policy that was in force

22  at that particular time, and then you have a renewal of that

23  policy in 1966, October of 1966, in the interim you've had a

24  new publication that made some cosmetic changes or moved the

25  name of the company from the left side to the right side, or

126

Hughes - X

1    whatever, the new renewal policy would probably use that

2    edition of the policy, but it doesn't make a whit of difference

3    in the coverage.

4    Q.    Is it correct to say that insurance companies, especially

5    on the Pacific Coast, were allowed to use manuscript policies?

6    A.    It is correct.

7    Q.    Is it also correct that they were allowed to use

8    manuscript endorsements?

9    A.    Yes, it is.

10   Q.    And was it typical for a company to tailor its coverage to

11   its specific needs using endorsements?

12   A.    An insured?

13   Q.    Yes, an insured.

14   A.    Yes, it was.

15   Q.    And the 1954 policy, which is Exhibit 1, that includes

16   examples of a manuscript endorsement; is that correct?

17   A.    Well, yes, it does.  The -- you know, to the extent that

18   the policies that -- I'm sorry, to the extent that the

19   endorsements that reference the specific contracts were typed,

20   I guess you would call that a manuscript endorsement.

21        There were preprinted endorsements that very were similar

22   that were available, but it was probably just a lot easier just

23   to type them up.

24   Q.    And then so for the other St. Paul alleged policies, other

25   than the exhibits that have been presented and your

Hughes - X

1  recollection of one other, do you know whether any other

2  endorsements were also manuscripted?

3  A.   No.

4  Q.   So then on kind of an overall basis, what type of entity

5  prepares a certificate?  Is it the insurer or is it the agency

6  or broker?

7  A.   Both really.  I would say that in my checkered career,

8  I've seen a preponderance of the certificates that are prepared

9  by the agent or broker.

10      On the other hand, some of the more complicated and

11  sensitive certificates, such as those used in the oil industry,

12  are principally prepared by the insurance company; or, in the

13  case of coverage that's placed through a surplus lines broker,

14  by the surplus lines broker.

15      Now, I've had a number of clients, one of them including

16  Mark Producing, which was the largest offshore drilling company

17  in Houston.  It was the largest offshore drilling company in

18  the Gulf of Mexico, and I acted as their surrogate risk

19  manager.  We negotiated with the insurance company.  They

20  allowed us to issue our own certificates as long as we then

21  sent copies to the insurance company, but that's very rare.

22  Q.   And then -- so in this particular case, is it accurate

23  that it was JBL&K who prepared all of the certificates we've

24  seen?

25  A.   That's correct.

Hughes - X

1    Q.    And would it have been JBL&K that typed in the policy

2    specific information on the forms?

3    A.    Well, I don't know that for sure, but I would say that

4    that's almost certain, yes.

5    Q.    Would JBL&K have had to ask permission from a carrier

6    prior to issuing a certificate?

7    A.    Issuing a certificate?

8    Q.    Yes.

9    A.    Probably not.  I've seen a lot of JBL&K's work.  Very

10   impressive, by the way.  And it -- what I've seen of it gives

11   me an indication that they probably certainly were operating

12   under generally agency contracts so that they had a certain

13   amount of authority.  I can't imagine that they would have had

14   to get permission from St. Paul to issue the certificates that

15   we see here.

16   Q.    And based on your direct testimony, there were some errors

17   on these certificates; right?

18   A.    I don't know whether I would call them errors.  There were

19   some representations on the certificates that were not exact

20   representations of the policies themselves, but I thought I

21   explained that there are usually reasons for that.  I didn't

22   see any blatant errors.  I would be happy to take a look if you

23   know of any, but I didn't see any.

24   Q.    And you also testified that certificates can be issued for

25   a lower limit than what is stated on the declarations page.

129

Hughes - X

1   A.   That's right.

2   Q.   It's also true that they can be issued for a higher limit

3   than what's on the declarations page; correct?

4   A.   Well, I guess you could do it, but it wouldn't be wise

5   because you would be certifying coverage that was greater than

6   was actually provided by the policy.

7   Q.   So I'll now move on to the 1957 policy.   If we can look at

8   Exhibit 5, page 2, in this certificate it looks like the name

9   of the insured has a list of entities and people.

10  A.   Right.

11  Q.   Is that correct?

12       Do you know the relations between each of these entities

13  that are listed?

14  A.   I believe that I know all of them except East Portland

15  Pattern Works.   I think we have evidence that the Industrial

16  Refrigeration and Prescott Iron Works were subsidiary

17  companies.

18  Q.   Has the 1957 policy been located?

19  A.   Not that I know of.

20  Q.   Have you seen any evidence of a payment of a premium for a

21  1957 policy?

22  A.   Your first question you said 1977.   Did you mean 1957?

23  Q.   If I -- I said that, then I was incorrect.   Yes, it is

24  1957.

25  A.   I don't think we found that either.

130

Hughes - X

1   Q.   Have you found a declarations page for the 1957 policy?

2   A.   Not that I know of.

3   Q.   So let's turn to Exhibit 9, page 13.

4   A.   Okay.

5   Q.   Which entity -- or I should say what entity would have

6   entered the information that is on this page?

7   A.   I would think it was Jewett Barton Leavy & Kern.

8   Q.   Would that have required approval by the insurer?

9   A.   Probably not.

10  Q.   Then it indicates that the policy was issued to Northwest

11  Marine Iron Works, et al.?

12  A.   That's correct.

13  Q.   Do you know what was included in the et al.?

14  A.   Sitting here this moment, I don't.  We could probably

15  figure it out if we went through all of these documents again.

16  Q.   Would it have been the same as the list on page 12 of

17  Exhibit 9 in the name of the insured?

18  A.   I don't know for sure.  It's logical that it would.

19  Q.   And then it looks like the endorsement is endorsement

20  number 41.

21  A.   Yes.

22  Q.   Does that indicate to you that there are at least 40 other

23  endorsements that would have been on this policy?

24  A.   At least.

25  Q.   And you haven't seen any of the other ones; correct?

Hughes - X

1    A.   Not that I know of, no.

2    Q.   And it's probable that at least some of those endorsements

3    would have altered the scope of the policy?

4    A.   I have no idea.

5    Q.   Look, then, at Exhibit 3, page 1, where it refers to the

6    requirements for comprehensive general liability.

7    A.   Right.

8    Q.   And it indicates that clause 10C of the contract required

9    limits of not less than 300,000.

10   A.   Right.

11   Q.   If the 1954 policy satisfied that requirement with

12   $100,000 limits, except for endorsements of 300, why wouldn't

13   the 1957 policy also satisfy that?

14         MR. RUGGERI:  Object to the form, Your Honor.

15   Misstates the record.

16         THE COURT:  Overruled.

17      You can answer.  Go ahead.

18         THE WITNESS:  I have no idea.

19   BY MR. MOSES: (Continuing)

20   Q.   So then if we turn to your report, page 18, at the bottom

21   of the page it refers to freestanding coverage for any of their

22   subsidiaries.  In 1958 would ECCO have been considered a

23   subsidiary of Northwest Marine?

24   A.   Well, I don't remember, sitting here at this moment, when

25   they were actually acquired.  It's been a long day, so -- you

Hughes - X

1  want to give me a chance to look that up?

2  Q.    Sure.  Well, how about if we turn to Exhibit 15.

3  A.    15?

4  Q.    15, yes.  1-5.

5  A.    1-5?  That's it.  What was your question again?

6  Q.    Whether ECCO was a subsidiary of Northwest Marine in 1958.

7  A.    After October the 1st, yes.

8  Q.    And the basis for your opinion of that is what?

9  A.    Well, this document is the minutes of the board of

10 directors where they agreed to acquire a controlling interest

11 in ECCO, which to me is the definition of a subsidiary company.

12 Q.    It looks like one of your bases for your opinion that

13 Northwest Marine would have insured all of the entities within

14 their umbrella is -- the policy, I believe, is from 1985.  So

15 if you look at page 9 of your report, which is Exhibit 59,

16 there's a quote from a policy dated August 1, 1985.

17 A.    Right.

18 Q.    Do you know when the Northwest Marine policies would have

19 started using that language?

20        MR. RYCEWICZ:  Object.  Vague.  I'm not sure what the

21 question means by "that language."

22        THE COURT:  Rephrase please.

23 BY MR. MOSES: (Continuing)

24 Q.    Okay.  Do you know when Northwest Marine Iron Works

25 policies would have started using the following language:  And

Hughes - X

1  all other companies, corporations, firms, or organizations, as

2  were or are hereafter constituted, of which the named insured

3  owns more than 50 percent and/or as the responsibility of

4  placing insurance and for which coverage is not more

5  specifically provided?

6  A.    No, I don't.

7  Q.    That's not on the 1954 policy, is it?

8  A.    The endorsement?

9  Q.    That --

10  A.    You mean the -- the --

11  Q.    That language is not included in the 1954 --

12  A.    Exhibit 1?

13  Q.    Yes, Exhibit 1.

14  A.    No.

15  Q.    And is it included in the Argonaut policy, which I believe

16  is Exhibit 46?  Look at, I think, page 3 of the exhibit.  Maybe

17  it was page 2.

18  A.    Well, that -- that page won't tell me whether there was an

19  omnibus insured provision in the policy.

20  Q.    So there is -- on the declarations page of the Argonaut

21  policy, it refers to Northwest Marine Iron Works, et al.;

22  correct?

23  A.    It does.  And then it says, "Per endorsement number one."

24  Q.    And then if we turn, I think, it's page 6, then -- it's --

25  A.    I believe it's page 7.

Hughes - X

1  Q.   Yes.

2  A.   It lists the specific entities.

3  Q.   And are you aware of any other part of these Argonaut

4  policies that would have included the language that I quoted

5  from 1985?

6  A.   Not without looking, no.

7           DEPUTY COURTROOM CLERK:  Excuse me a second.

8      Mr. Paulson, if you're there, your mute may be off because

9  we heard a couple of rumblings over the microphone.

10          MR. PAULSON:  Sorry about that.  My mute is on, but

11  if it was my fault, I'm sorry.  I'm going back on mute now.

12          DEPUTY COURTROOM CLERK:  Okay.  Thank you.

13  BY MR. MOSES:  (Continuing)

14  Q.   So for the 1960 alleged policy, is it accurate that you

15  have not seen a copy of that policy?

16  A.   Correct.

17  Q.   And other than what has been discussed today, you have not

18  seen any other endorsements?

19  A.   That's right.

20  Q.   Or a declarations page?

21  A.   That's right.

22  Q.   Or evidence of a payment of premium?

23  A.   Correct.

24  Q.   And there aren't any documents that indicate that

25  Northwest Marine is an insured under the policy that ECCO had

Hughes - X

1   provided to the city?

2   A.    There are no direct indications.   I've discussed the

3   indirect implications, the indications that I believe that --

4   that form a foundation for my opinion; but, I mean, there's not

5   anything that says Northwest Marine Iron Works is an insured

6   under this policy.

7   Q.    If you can turn to Exhibit 11, page 31, do you believe

8   that it was JBL&K who typed in the information on this

9   certificate?

10  A.    I do.

11  Q.    And then this is the certificate where your opinion seems

12  to be that the effective date is January 24 because that's when

13  the contract was?

14  A.    Correct.

15  Q.    So it would seem that JBL&K didn't have a standard

16  practice as to how to put in the effective date on the

17  certificate?

18  A.    I think that's probably correct.   It looks to me like

19  the -- you notice that the font on the typewriter is different

20  in some cases, and so they apparently had different employees

21  who did these certificates from time to time, and they -- I

22  guess the employees -- I think you're probably right -- they

23  didn't have a standard procedure.

24  Q.    If we look back at Exhibit 9, page 12, if we look at the

25  lower left-hand corner of that page, it refers to 3/19/59.

136

Hughes - X

1    A.    Right.

2    Q.    Does that indicate to you as to when this certificate was

3    issued?

4    A.    That would make the most sense to me, particularly since

5    it has the initials of the person who typed it.

6    Q.    And that would be after Northwest acquired a controlling

7    interest in ECCO; correct?

8    A.    Yes.

9    Q.    And ECCO is not listed as a name of insured on this

10   certificate; right?

11   A.    That's correct.

12   Q.    Are you aware of what ECCO's insurance profile was prior

13   to it being acquired by Northwest Marine?

14   A.    No.

15   Q.    Presumably, it had insurance, though; correct?

16   A.    You would presume that it did, yes.  It was an electrical

17   contractor who would have had to have insurance to do business.

18   Q.    And you haven't seen any indication that whatever policy

19   ECCO had was cancelled in favor of being added onto a Northwest

20   Marine policy?

21   A.    I have not.

22   Q.    If ECCO was added to a Northwest Marine -- I'll back up.

23   If ECCO was added to a preexisting Northwest Marine policy,

24   would that have increased the premium on the Northwest Marine

25   policy?

137

Hughes - X

A.    Pre -- I don't understand your use of the term

"preexisting."  You mean a Northwest Marine policy that's in

force and ECCO is added to it?

Q.    Yes, that's right.

A.    It would increase the premium, but the question is when.

General liability insurance is usually auditable.  The premium

is developed either by -- the policyholder periodically

reporting the basis of premium to the insurance company or the

insurance company doing physical audits.  For a company this

size, it probably was -- it could have been quarterly.  It

could have been every six months.  But certainly what would

happen would be either at the next audit period or at the end

of the policy the exposures would be audited, and the

additional exposure that was brought to the policy by the added

subsidiary would be automatically accounted for.

     So it's not likely you would have seen some kind of

payment of premium when they added the subsidiary.

Q.    So the increased payment would happen at the next audit

period?

A.    Correct.

Q.    Have you seen evidence in this case of that happening?

A.    No.  No.  I haven't seen any audits.

Q.    If we can turn to Exhibit 16, in about the middle of the

page it refers to Northwest Marine Iron Works performing

supervisory service and all general accounting.

Hughes - X

1    A.    Right.

2    Q.    Does it refer to insurance anywhere in here?

3    A.    It does not.

4    Q.    Is the acquisition of insurance policies something that a

5    parent company will always do?

6    A.    I don't -- I'm not -- I don't quite understand your

7    question.

8    Q.    You're aware that ECCO had a different business than

9    Northwest Marine did; correct?

10   A.    Yes, I am.

11   Q.    Would that -- would ECCO's business have resulted in a

12   separate -- let me back up.  That's not the right way to ask

13   that.  I'll strike -- maybe we can try that again.

14         Could one company handling another company's finances and

15   accounting still have acquired a -- a separate policy for that

16   other company?

17   A.    Would that have been possible?

18   Q.    Correct.

19   A.    It would have been possible, but not likely.  And it would

20   cause a lot of difficulty.  Because we know from the

21   correspondence that this company -- these companies were

22   experience rated.  And the National Council established the

23   rating rules for experience rating, which said that if you have

24   a company that's more than 50 percent owned, it has to -- the

25   experience of that company has to be consolidated with the

Hughes - X

1   experience of the rest of the entity.

2       And so even if you have separate policies, you still have

3   got the claims that occur on the separate policies taken into

4   consideration for the calculation of the experience rate for

5   the whole company.

6       And it's a very bad procedure to purchase separate

7   policies for subsidiary companies, regardless of the fact that

8   they might have entirely disparate exposures.  That's taken

9   care of in the rates.  So it's not likely and certainly not a

10  good idea that they would have continued to buy separate

11  insurance for ECCO, for instance.

12      Now, would it have been appropriate for them to cancel a

13  policy short rate to make that change?  You would have to

14  examine that under the circumstances at the time.

15  Q.   And you don't know what the circumstances were in this

16  instance?

17  A.   I do not.

18  Q.   For the alleged 1963 policy, have you seen a copy of that

19  policy?

20  A.   No, I haven't.

21  Q.   Or seen any evidence of payment of a premium?

22  A.   No, I haven't.

23  Q.   If we look at Exhibit 21, it indicates that the name of

24  the insured is Northwest Marine Iron Works, but it doesn't list

25  anyone else.

Hughes - X

1    A.    That's right.

2    Q.    Do you know why that would be?

3    A.    No, I don't.

4    Q.    Exhibit 17, which we've looked at previously, in order for

5    the alleged policy from 1960 to '63 to have ended in May, that

6    would have also had to have a similar -- similar endorsement as

7    is here; correct?

8    A.    It would have, yes.

9    Q.    We haven't seen that; correct?

10   A.    I have not, no.

11   Q.    And you haven't seen any other endorsements on the 1963 to

12   '66 alleged policy; correct?

13   A.    That's correct.

14   Q.    So if you were to just look at page 3 of Exhibit 17, you

15   wouldn't know that there were other insureds on this policy,

16   would you?

17   A.    No.  If all you had to look at was just this single page,

18   no, you wouldn't.

19   Q.    Similarly, for the alleged 1966 policy, look at

20   Exhibit 22.  Other than Northwest Marine Iron Works, there

21   isn't any indication as to who else would have been insured

22   under this policy; correct?

23   A.    That's correct.

24   Q.    And you haven't -- you haven't seen the declarations page

25   for this alleged policy; correct?

Hughes - X

1    A.    For this 504JH5407?  No.

2    Q.    Or any other indication of a payment of a premium?

3    A.    Correct.

4    Q.    And for the 1969 alleged policy, you haven't seen any

5    endorsements for that one?

6    A.    I have not.

7    Q.    Or any other parts of the policy?

8    A.    Correct.

9    Q.    We talked about the umbrella questionnaire, which is

10   Exhibit 35.  Would you know who or at least what entity entered

11   the information that is on there?

12   A.    I do not.

13   Q.    Would you know what information the person was looking at

14   when they entered this information?

15   A.    I could only guess.  I don't want to do that.

16   Q.    Then in Exhibit 36, we talked about at the end of your

17   direct, that last column looks like a bunch of dates.  My

18   question is can you see any of those that would have predated

19   the Argonaut policy?

20   A.    Not unless this -- the first three -- the letter of

21   6/28/72 refers to the issuance of the certificate.  I -- I

22   think what it refers to is a -- a letter that must have been a

23   transmittal letter for some kind of certificate or certified

24   copy, and that does predate the Argonaut policy.

25   Q.    But there aren't any others, other than potentially the

Hughes - X

1    first three lines, I suppose -- other than the ones that don't

2    have any date whatsoever, which looks like Oregon PUC, there

3    aren't any others that are pre-July 1 of '72?

4    A.    Not that I see.

5    Q.    And do you know who prepared this information?

6    A.    No, I don't.

7    Q.    And, similarly, for Exhibit 37, when the broker was

8    preparing the placing slip, what information would the broker

9    have been looking at?

10   A.    In order to prepare the slip, that is the typed entries in

11   the slip?

12   Q.    Yes.

13   A.    Probably a submission from the U.S. broker.

14   Q.    At some -- in the direct, you testified that often a

15   policyholder would not want to certify coverage from before a

16   contract was -- was in effect that required coverage.  Do you

17   know if that was the case in -- here?

18   A.    No, I don't.

19            THE COURT:  Mr. Moses, let's take a ten-minute break.

20            MR. MOSES:  Okay.

21            THE COURT:  All right.  Ten minutes.

22                    (Recess taken.)

23            DEPUTY COURTROOM CLERK:  Court is in session.  You

24   may be seated.

25            MR. MOSES:  I have nothing further, Your Honor.

143

Hughes - X

1          THE COURT:  Good timing.

2      Mr. Rycewicz, do you have any redirect?

3          MR. RYCEWICZ:  Do you want to see if anyone else has

4  any --

5          THE COURT:  Oh, any more cross?  Thank you for

6  reminding me.

7      Mr. Beattie?

8          MR. BEATTIE:  Your Honor.

9          THE COURT:  Mr. Beattie, do you want to use the

10 podium?  Mr. Gale, can you get the podium out for Mr. Beattie

11 so that he has --

12         MR. BEATTIE:  I can just perch on the corner here, if

13 that's okay.

14         THE COURT:  No, let's get the podium out.  It's going

15 to be more comfortable for you.  Remember, don't try this at

16 home.

17         DEPUTY COURTROOM CLERK:  Speak up, though, because it

18 shows the mic on here, but it doesn't work.

19         THE COURT:  Mr. Hughes, you weren't here when I

20 warned the lawyers at the pretrial conference not to move the

21 podium because it was designed by the lowest bidder.  Only

22 Mr. Gale can move it.

23

24 ///

25 ///

Hughes - X

1                        CROSS-EXAMINATION

2   BY MR. BEATTIE:

3   Q.    Mr. Hughes, I believe you stated in your cross-examination

4   that you didn't see any evidence of a premium audit or a

5   premium bill or payment.  Is that correct?

6   A.    Not that I can recall.

7   Q.    I'd like to direct your attention to Exhibit No. 35.  In

8   particular, page 5.

9   A.    I'm going to find my glasses.  Hold on.  All right.

10  Q.    Can you tell me what that document is?

11  A.    It's a premium audit.  It's a report of the premium audit.

12  The audit itself would have been the physical examination, but

13  it's a report of a premium audit.  It looks to me like it's

14  been used as a markup for a renewal policy, but that's what it

15  is.

16  Q.    Now, as I read this document, if you go down to the bottom

17  and you look at the handwritten numbers, it looks like total

18  premium after this audit was $17,619.58; is that correct?

19  A.    Correct.

20  Q.    Now I'd like you to go to Exhibit 29, if you would,

21  page 5.  Under Exhibit 2, it shows liability premiums that were

22  paid; is that correct?

23  A.    Yes.

24  Q.    And for the same policy period, which is the 1968 through

25  '69, I see again that 17,000 and I believe here it says 609,

Hughes - X

1    although the number is somewhat impaired there, so I can't say

2    exactly what it is, but does that look roughly like the same

3    number as we see in Exhibit 35?

4    A.    It does.    There's -- oh, okay.    Never mind.    Yes, it does.

5    Q.    And in Exhibit -- Exhibit 29, on page 5, it indicates that

6    this is a liability premium; is that correct?

7    A.    It does.    And he says it's modified, which it -- basically

8    that's why I was discussing him in terms of an experienced

9    writer.

10   Q.    So would page 5 of Exhibit 29 indicate what was actually

11   paid for a premium to St. Paul for liability coverage for the

12   periods indicated?

13   A.    Page 5 of 29 or page 5 of 35?

14   Q.    Let's look at Exhibit 29, page 5.

15   A.    Okay.

16   Q.    It gives an indication of the modified premium paid for

17   liability coverage.    These would be under St. Paul policies,

18   correct, for this policy period, from '67 to '72?

19   A.    Yes.    I think that's correct.

20   Q.    Does Exhibit 29 indicate to you premiums actually paid by

21   Northwest Marine Iron Works to St. Paul for liability insurance

22   coverage?

23   A.    Well, the -- everything that's contained in the

24   accompanying letter would indicate that's correct.

25        MR. BEATTIE:    Those are the only questions I have.

Hughes - X

1    Thank you.

2              THE WITNESS:  Thank you.

3              THE COURT:  Any other questions before redirect?

4

5                     CROSS-EXAMINATION

6    BY MR. RUGGERI:

7    Q.   Mr. Hughes, just a couple.  How did Jewett Barton get

8    paid?

9    A.   Excuse me?

10   Q.   How did Jewett Barton get paid?

11   A.   Well, they would have gotten paid as a commission, which

12   would be a percentage of the premium.

13   Q.   Percentage of the premium; correct?

14   A.   Yes.  They would have deducted it -- they would have been

15   paid by the policyholder, the total premium, deducted their

16   commission, and submitted the net to the company.

17   Q.   Is it conceivable to you, Mr. Hughes, that Jewett Barton

18   would have continued to issue certificates of insurance,

19   endorsements, and the other documents you reviewed, if the

20   premium weren't paid?

21   A.   No, it's not.

22   Q.   And you mentioned a phrase "general agency contract."

23   A.   Yes.

24   Q.   You said you believe that Jewett Barton probably was

25   acting under a general agency contract.  What is that?

Hughes - ReD

A.   Well, a general agency contract is a contract that grants
the policy -- grants the agent or broker some privileges, I
guess you would say, that would normally be reserved by the
home office or the underwriting office of the company.  That is
to say they would have probably signature authority in some
cases, granting them the ability to sign certificates of
insurance.  It would give them a certain amount of underwriting
authority so that they could accept business on behalf of the
company, and they probably could pay some claims.

Q.   And they would sign those certificates of insurance on
behalf of the writing company; correct?

A.   Absolutely, yeah.

Q.   Is that why we see both the broker's name and the name
"St. Paul" on the certificate of insurance?

A.   Yes.   Absolutely.

          MR. RUGGERI:  Thank you.

          THE COURT:  Anyone else before redirect?

     Mr. Rycewicz, go ahead please.

          MR. RYCEWICZ:  Thank you, Your Honor.


                    REDIRECT EXAMINATION

BY MR. RYCEWICZ:

Q.   Mr. Hughes, a few questions for you.  You were asked
questions whether you had seen documents indicating any
additional insureds under the 1966 policy, and I think your

Hughes - ReD

1    answer was no.  I'd like you to take a look at Exhibit 37,

2    page 2, if you would, and you previously testified that this is

3    a London Market placement slip.

4    A.    Right.

5    Q.    Right?

6         Now, in the upper right-hand corner, who's listed as an

7    assured?

8    A.    Northwest Marine Iron Works, Industrial Refrigeration and

9    Equipment Company, Marine Salvage Company, and Electrical

10   Construction Company.

11   Q.    And is that referring to underlying coverage or umbrella

12   coverage?

13   A.    Both, really.

14   Q.    All right.  So is that an indication of additional

15   insureds under the primary St. Paul policy?

16   A.    Evidently.

17   Q.    I would also like you to take at look at Exhibit 35,

18   page 5, if you would.

19        And this is a document that I think Mr. Beattie asked you

20   about.  This is a report of audit.  Billing date of November

21   24, 1969.  And that refers back to the 1968 to 1969 period,

22   does it not?

23   A.    Right.  This is obviously the final audit for that period.

24   Q.    Right.  And doesn't this document list additional

25   insureds?

Hughes - ReD

A.   Well, it lists all the insureds, not necessarily additional insureds.  It lists several insureds.  Four, as a matter of fact.

Q.   So it does list Electrical Construction and Industrial Refrigeration and Portland Machine Company; correct?

A.   It does, but it doesn't make any distinction which one of those companies is an additional insured or which one of the companies is a primary insured.

Q.   So would it be your conclusion that all of those companies would be insureds under the policy?

A.   Absolutely.

Q.   You were asked some questions about Exhibit 15, and you testified that on October 1, 1958, Northwest Marine Iron Works acquired a controlling interest in Electrical Construction Company by buying a majority of the shares.

A.   Yes.

Q.   And you were asked whether Electrical Construction appears as an additional insured under the policy in effect at that time, and I think your answer was no.

     Does Electrical Construction, in your opinion, appear as an additional insured under the following policy period, the one in effect from 1960 through 1963?

A.   Well, I don't remember.

Q.   Well, let me ask you this, then:  Is it logical to conclude that at the time of acquisition, Electrical

150

Hughes - ReD

1   Construction Company had its own insurance and that that

2   remained in effect until the renewal period of the St. Paul

3   policy?

4   A.   That's logical.  Not necessarily, in my opinion, the best

5   way to do it, but it's logical, and it was often done.

6   Q.   Now, you were asked a number of questions about

7   endorsements and whether it was possible that St. Paul may have

8   issued manuscript endorsements to Northwest Marine Iron Works.

9   Do you remember that line of questioning?

10  A.   Yes.

11  Q.   Isn't it true that during the operative time period that

12  any coverage forms or endorsements needed to be submitted to

13  the State of Oregon for approval before those endorsements

14  could be used?

15  A.   That's my understanding.

16  Q.   So doesn't that mean that an insurer could not willy-nilly

17  insert manuscript forms into their policies in Oregon, but

18  rather would be required to use forms and endorsements and

19  wordings that were approved by the State of Oregon?

20  A.   That's right.

21  Q.   You were asked some questions as to Exhibit 10, which were

22  the forms that were provided by St. Paul, and I want to read

23  you a phrase from the covering letter.  It appears in the

24  second paragraph of page 1 of Exhibit 10.

25       It says:  Based on the documents provided to us by you --

Hughes - ReD

1    and this is a letter addressed to me -- continuing, related to

2    the alleged St. Paul policy 1419213, effective February 11,

3    1954, to February 11, 1957, the forms enclosed include what

4    St. Paul believes would have been the forms used in succeeding

5    policies that would have been responsive to the environmental

6    claim at issue if such policies were issued.

7         Did I read that correctly?

8    A.   You did.

9    Q.   And were there any manuscript forms or manuscript

10   enforcements that were provided by St. Paul in providing to us

11   evidence of policy language if policies had been issued?

12   A.   No.

13   Q.   So you didn't consider any -- the possibility of

14   manuscript forms being -- having been used by St. Paul, did

15   you?

16   A.   I did not.

17   Q.   You relied upon the statements contained in this letter

18   and the attachments to it, didn't you?

19   A.   Yes.

20   Q.   You explained that there was -- there were various

21   headings on some of the attachments to Exhibit 10; that, in

22   fact, one of the headings was St. Paul Mercury Indemnity

23   Company and also a heading St. Paul Fire & Marine Insurance

24   Company?

25   A.   That's right.

Hughes - ReD

1   Q.    And I think you explained that it was somewhat difficult

2   to tell which forms may have been used at particular time

3   frames because there are factors that we're unaware of.  Is

4   that a correct characterization of what you said?

5   A.    If you're using the term "form" to describe the entire

6   policy, yes, that's correct.

7   Q.    And what was -- what's your understanding of the historic

8   distinction between St. Paul Fire & Marine Insurance Company

9   and St. Paul Mercury?

10  A.    I am unsure at this moment sitting here.  I may have said

11  in my report the date, but prior to a certain date, insurance

12  companies were not permitted in most environments to write on a

13  multiline basis, meaning that if you wanted to write casualty

14  insurance you had to have a company that wrote only casualty

15  insurance.  If you wanted to write property insurance, you had

16  to have a company that wrote only property insurance.  And

17  during that period of time physical damage to automobiles was

18  considered to be property insurance.  So if you bought what was

19  later that you could insure under a comprehensive general

20  liability and automobile policy back in the day, you had to

21  have two companies.  And St. Paul used St. Paul Mercury to

22  issue casualty coverages.

23        Then later the debt barrier crumbled and most of the

24  states, if not all the states, began to permit multiline

25  writing in a single company.  And St. Paul moved most of their

Hughes - ReD

1    coverages of this type over to St. Paul Fire & Marine.

2        So that's why you have a policy originally written by

3    St. Paul Mercury and later written by St. Paul Fire & Marine.

4    But they're the same policy.

5    Q.    The same policy wording?

6    A.    Yes.

7    Q.    Providing the same defense obligation?

8    A.    Absolutely.

9    Q.    Is it your opinion that it wouldn't really matter which of

10   these forms were used up until the 1966 time frame for purposes

11   of determining the defense obligation?

12   A.    You mean which of the policy forms were used?

13   Q.    Yes.

14   A.    That's right.  Because the wordings were the same.

15        MR. RYCEWICZ:  Thank you, Mr. Hughes.

16   Your Honor, I have no further redirect questions.

17        THE COURT:  All right.  Thank you.

18   Mr. Hughes, you may step down.

19        THE WITNESS:  Thank you, sir.

20        THE COURT:  Mr. Rycewicz, any other witnesses?

21        MR. RYCEWICZ:  Your Honor, we have no further

22   witnesses, and I would -- before resting, I would just like to

23   ensure that all of our exhibits are admitted exhibits in this

24   case.  I think the stipulations and your rulings determine

25   that.

1           THE COURT:  I think that's correct.  I think there

2    are no exhibits that third-party plaintiffs marked that I

3    excluded for one reason or another.  I think they're all in.

4    With the stipulation about authenticity, I think that resolves

5    any remaining issues that might have existed.

6           MR. RYCEWICZ:  Thank you, Your Honor.

7        With that clarification, third-party plaintiffs rest.

8           THE COURT:  All right.  Who wants to go next?

9    Mr. Gordon, have you decided would it be you or Mr. Ruggeri?

10          MR. GORDON:  Your Honor, we have no live witnesses.

11   I would also just like to make sure that the two remaining

12   exhibits -- exhibits that we have, 101 and 102, that you

13   haven't already ruled on, are also admitted.

14       There is no objection, Your Honor, to them.

15          MR. RYCEWICZ:  Yeah, no objection, Your Honor.

16          THE COURT:  All right.  Then 101 and 102 are also

17   formally admitted now.

18       Mr. Gordon, I know you said you have no live witnesses.

19   Let's resolve, first, who's going to go next.

20       Mr. Ruggeri, will it be you?

21          MR. RUGGERI:  Your Honor, it will be me.

22          THE COURT:  Okay.  Good.

23          MR. RUGGERI:  I do have a matter of housekeeping as

24   well.

25          THE COURT:  Go ahead.

1          MR. RUGGERI:  We would like to take care of some of

2    the other exhibits that my client identified.  201, 205, and

3    209.  We would move those into evidence.

4          THE COURT:  All right.

5          MR. RUGGERI:  Your Honor, I'm not seeking to move the

6    deposition transcripts that we marked for identification, based

7    on the Court's ruling, understanding that the testimony will be

8    received into evidence as testimony.

9          THE COURT:  Correct.  So 201 is in.  205 is in.

10         MR. RUGGERI:  And 209?

11         THE COURT:  209 is in.

12       So, Mr. Ruggeri, there were other documents you also had

13    listed as exhibits.  Not counting the depo transcripts, are you

14    going to seek to move to admit those other exhibits later?

15         MR. RUGGERI:  Not at this time, Your Honor.  I think

16    the Court's ruling was to wait until we see the context in

17    which they're being offered.

18         THE COURT:  Correct.  All right.

19         MR. RUGGERI:  I do have one other question.  The

20    binders may be a bit unwieldy for me, as well as the witness.

21         THE COURT:  Yes.

22         MR. RUGGERI:  I didn't bring technology with me.

23    Although, it's here.  If the Court is fine with it, I propose

24    to hand a slim binder to the Court, the witness, and opposing

25    counsel to make it a little easier for Mr. Connolly to run

156

1    through the documents.

2              THE COURT:  Sure.  Sure.

3              MR. RUGGERI:  Your Honor, with that, we would call

4    Dennis Connolly to the stand.

5              THE COURT:  Mr. Connolly, if you would come forward,

6    please, and be sworn as a witness.

7                         DENNIS CONNOLLY,

8    called as a witness in behalf of Third-Party Defendants, being

9    first duly sworn, is examined and testified as follows:

10             THE WITNESS:  I do.

11             DEPUTY COURTROOM CLERK:  Please step around and have

12   a seat.

13             MR. RUGGERI:  Mr. Gale, should I give these to the

14   Court?  Your Honor, may I?

15             THE COURT:  Yes, please -- please begin.

16             MR. RUGGERI:  Good afternoon, Mr. Connolly.

17             DEPUTY COURTROOM CLERK:  Let's make it official.

18   Please state your name for the record and spell your last name.

19             THE WITNESS:  My name is Dennis, with two Ns,

20   Connolly.  C-O-N-N-O-L-L-Y.

21             DEPUTY COURTROOM CLERK:  Thank you.

22

23   ///

24   ///

25   ///

Connolly - D

1                       DIRECT EXAMINATION

2   BY MR. RUGGERI:

3   Q.    Mr. Connolly, my colleagues were itching to ask me not to

4   call you, hoping we would be able to leave here today, but I

5   promised them we would be as brief as we can.

6   A.    Okay.  It's not my fault.

7               THE COURT:  You're an expert witness.

8               MR. RUGGERI:  Can you hear me better?

9               THE COURT:  Can you pull -- is it all the way up,

10  Paul?

11              MR. RUGGERI:  It is all the way up.  Should I just be

12  louder?

13              THE COURT:  That's good.

14              DEPUTY COURTROOM CLERK:  The green light is on.  It

15  should be on.

16              MR. RUGGERI:  If it's not projecting, let me know,

17  and I'll speak up.  Thank you.

18  BY MR. RUGGERI: (Continuing)

19  Q.    Mr. Connolly, please describe your education.

20  A.    I graduated from Colby College in Waterville, Maine, in

21  1962, and I was graduated from Brooklyn Law School in 1965.

22  Q.    And what, sir, is your current profession?

23  A.    My current profession is I am a litigation expert and an

24  insurance consultant, doing insurance work, but also claims

25  work.

158

Connolly - D

1   Q.    For how long have you worked in the insurance field,

2   Mr. Connolly?

3   A.    It turns out, now, 50 years.

4   Q.    You graduated law school in 1965.  Where did you go to

5   work after law school?

6   A.    The first place I worked was Liberty Mutual Insurance

7   Company.  I was an employee of Liberty Mutual, and I worked in

8   one of their captive insurers, which at that point was named

9   Fogarty and Nielsen.

10  Q.    And tell us briefly the type of work that you did for

11  Liberty while at Fogarty and Nielsen.

12  A.    Predominantly, my work was as a litigator, defending

13  Liberty Mutual policyholders and defending Liberty Mutual and

14  bringing declaratory judgment actions with regard to policies.

15  We had a large book of business, particularly pharmaceuticals,

16  fabric manufacturers, department stores, but we also had a

17  substantial business in both longshore people and also the

18  insured, for example, Todd Shipyards.

19  Q.    Todd Shipyards was one of the policyholders as to which

20  policies you worked?

21  A.    That's correct.

22  Q.    And your experience tells us you're a little bit at home

23  here today, then, if you were defending deejays and the like.

24        Would you please tell us a little bit more about the types

25  of policies that you worked with while at Fogarty and Nielsen,

Connolly - D

1    specifically general liability policies.

2    A.    Well, we provided coverage, a lot of automobile, as a

3    matter of fact, but we provided general liability, under

4    comprehensive general liability policies, to a wide variety of

5    policyholders.    We provided product liability insurance, and we

6    were involved in the early days of modern litigation when you

7    had what are called long tail or mass torts.    So we had some of

8    those.    We even -- toward the end of my stay, we even had some

9    asbestos claims.

10   Q.    Did any of your work while at Fogarty and Nielsen involve

11   policyholders seeking coverage under missing or lost policies?

12   A.    Probably.    I can't remember any specific instance.    By the

13   way, I also work with underwriters explaining policies and

14   things of that sort.

15   Q.    Again, that's while as a Liberty employee working at the

16   captive firm of Fogarty and Nielsen?

17   A.    That's correct.

18   Q.    And you started at Fogarty and Nielsen in 1965.    When did

19   you leave Fogarty and Nielsen?

20   A.    I left Fogarty and Nielsen in 1973, and I went to Public

21   Service Mutual Insurance Company, and I worked in their captive

22   law firm, which was named Katz and Gantman.

23   Q.    Different insurance company, different captive firm, but

24   were your duties essentially the same?

25   A.    They were very similar.    Although, they were as -- in 1973

160

Connolly - D

1    there was a significant change in policy language and rating,

2    and so part of my function was to explain to underwriters what

3    the implications of that were and how to underwrite, and I

4    worked with underwriters.  It was a much smaller company, so

5    there was a lot of interaction directly -- more interaction

6    directly with senior underwriters and management.  And I also

7    had some regulatory affairs functions, so I dealt with state

8    regulators mostly in New Jersey and New York.

9    Q.    So am I correct that at Katz and Gantman you had

10   experience both on the underwriting side of the house and also

11   the claims side of the house?

12   A.    That's right.  Claims legal was the name of the

13   department.

14   Q.    When did you leave Katz and Gantman?

15   A.    I left Katz and Gantman in 1986 -- wrong.  1976.

16   Q.    Let me ask you this, Mr. Connolly:  During the period 1965

17   through 1976, when you worked for the two captive law firms,

18   how far back in time did the insurance policies date that you

19   worked on in connection with your various matters?

20   A.    Oh, they went back -- back into the 1940s.  We had a lot

21   of cases involving circumstances where, for example, we had a

22   machine called -- one of our clients had a machine called an

23   extractor that was used after you put clothing into a clothing

24   washer and then it would -- with great centrifugal force, it

25   would spill out more water, but it didn't have a shutoff

Connolly - D

1   switch.  And so a large number of children, in fact, lost their

2   arms.  They brought suits after I was at Johnson -- after I was

3   at Liberty Mutual.

4        There were also a number of medical malpractice claims

5   that had the same characteristic.  So I saw policies while I

6   was at Liberty Mutual that had been issued by Liberty Mutual

7   back into the 1940s.

8   Q.    Your work at the firms caused you to work with policies

9   issued in the '40s, '50s, '60s, and into the '70s?

10  A.    Into the '70s, yes.

11  Q.    And you gained experience in the policy form language for

12  the policies issued in those decades?

13  A.    Well, as I said, to a certain extent, in both insureds

14  part of my responsibility was to explain to underwriters what

15  the policies meant.

16  Q.    Mr. Connolly, how, other than what you testified today,

17  did your experience working for those two insurance companies

18  at those two captive law firms inform your testimony about the

19  missing St. Paul policies?

20  A.    Well, they informed my testimony in that I was submitted

21  with the existence of old policies, as I said, going back to

22  the '40s.  Pardon me.  Also, because of the regulatory

23  functions I had and because of working with underwriters, I

24  worked on what -- what do policies mean, how were they

25  underwritten, what kinds of approaches do -- do insurers take

Connolly - D

1   in selecting clients, selecting premium, et cetera.

2   Q.    And, again, at the Katz and Gantman firm, did you have any

3   occasion to reconstruct missing or lost policies?

4   A.    Yes, we did.  We did a lot of searches.  It was a smaller

5   company, but we had a lot of long-tail exposures, particularly

6   because we were the largest insurer of dental malpractice.  So

7   we had a lot of -- in malpractice -- bodily injury and

8   malpractice claims, there tends to be a considerable lag

9   between bringing suit -- time of injury and bringing suit.

10  Q.    So 1976 comes around.  You're at Katz and Gantman, and you

11  leave.  Where did you go?

12  A.    I went from Katz and Gantman to the American Insurance

13  Association, which I may occasionally call the AIA.

14  Q.    What is the American Insurance Association?

15  A.    The American Insurance Association is a trade association

16  composed of predominantly stock insurance companies.  We heard

17  about that before.  It had somewhere between 140 and 190

18  insurance companies.  Those companies were the companies that

19  provided the bulk of commercial general liability -- liability

20  insurance policies.  They included companies such as Hartford,

21  Aetna, Travelers, St. Paul, Argonaut, Chubb, and Foster.

22  Q.    Am I correct, then, Mr. Connolly, that the American

23  Insurance Association acts on behalf of insurers?

24  A.    That's correct.

25  Q.    And what was your position while at the AIA?

Connolly - D

1    A.    My position was vice president -- liability.  What it

2    meant was that I was responsible for any issues concerning

3    liability or liability insurance.  So I was responsible for

4    telling our policy -- our members what kinds of liabilities

5    were arising, what kinds of things they should be concerned

6    about, but also conveying insurers' concerns about those same

7    issues to people who would be concerned.

8    Q.    The concerns.  Concerns on the underwriting front,

9    concerns on the claim front, or concerns on both fronts?

10   A.    Not only claims on both fronts, but -- concerns on both

11   fronts, but also we were concerned with legislation.  So we

12   followed, for example, 50,000 pieces of legislation a year, and

13   it was my function to approve the legislation or resist it or

14   testify about it.

15   Q.    Did any of legislation involve environmental issues?

16   A.    It certainly did.

17   Q.    Would you please tell us briefly about that.

18   A.    Well, we were two kinds of issues -- three.  To begin

19   with, in 1974, RCRA, the Resource Conservation and Recovery

20   Act, was enacted, and it had insurance and financial

21   responsibility requirements as well as the liability aspects

22   with which we were concerned.

23        And then in December of 1980, CERCLA or the Federal

24   Superfund was enacted.  And, subsequently, there were 50 state

25   mini funds, as they were called.  And at AIA we provided the

Connolly - D

1    first comprehensive analysis of all of those 50 state funds.

2         And then in 1984, Superfund was amended and what was

3    called SARA, that is the Superfund Amendments and

4    Reauthorization.

5    Q.   Did you ever testify before a committee on any

6    environmental issues?

7    A.   I testified on -- in Congress and in the Senate

8    approximately 20 times.  I think nine times were associated

9    specifically with environmental issues, but I also testified in

10   probably 17 states on those issues, and then I also testified

11   on those issues in front of state regulators.

12        For example, in 1978 I testified in Portland, Oregon,

13   before Oregon -- before the National Association of Insurance

14   Commissioners, whose president was Les Rawls, who was the

15   commissioner in Oregon -- in Portland -- in Oregon.

16   Q.   While at AIA, did you write any articles on environmental

17   issues?

18   A.   I wrote a number of articles which are listed in my CV;

19   but, in particular, I wrote an article called, "Toxics: Too

20   Risky to Insure? — Yes, No, Maybe So."  That was published in

21   the environment of either the Environmental Claims Journal or

22   the BNA Toxic Law Reporter and also was published by the

23   American Bar Association.

24        And I did a similar article called, "The Slain Messenger."

25        But I also was responsible for writing a paper on

Connolly - D

1    underwriting, rating, claims handling, and reserves telling how

2    the insurance needs to be operated, and I wrote that at the

3    request of our companies, but it was for the benefit and

4    specifically directed toward a federal interagency task force

5    on insurance, and I wrote that, I think, in 1978.

6    Q.    And the articles that you wrote while at AIA,

7    notwithstanding their curious titles, those were written on

8    behalf of the member companies of insurers; correct?

9    A.    Well, we were approved by the member companies, yes.

10   Q.    Mr. Connolly, are you familiar with an amenity we heard

11   during Mr. Hughes' testimony known as the Insurance Services

12   Office?

13   A.    Yes.   I testified often with the Insurance Services

14   Office.

15   Q.    Tell us, what do you understand ISO to be?

16   A.    Well, the insurance industry, under an act called the

17   McCarran-Ferguson Act, is subject basically to state

18   regulation.   After 1943, '44, the states were given authority

19   to regulate the insurance industry, and that gave them

20   authority to approve policy forms and to collect -- and to

21   collect data.

22         ISO, which is a successor to several other rating bureaus,

23   collects data and prepares suggested rates and sometimes

24   mandatory rates for insurance policies.   It also, through

25   committees, it drafts insurance forms.   So the forms we've seen

166

Connolly - D

1  in this case, for example.

2  Q.    And I may have missed it, but can you please tell us

3  briefly how your work at AIA caused you to interact with ISO.

4  A.    Well, we've often had to testify together.  Part of

5  explaining the comprehensive way in which the insurance

6  industry worked, it was necessary not only to have testimony

7  from a person familiar with underwriting and familiar with the

8  companies, but also to explain this relationship with ISO,

9  which otherwise, except for this McCarran-Ferguson Act, would

10 be an antitrust -- subject to antitrust.

11 Q.    The testimony that you gave before Congress, did that

12 testimony involve testimony on underwriting issues?

13 A.    Absolutely.  I dealt with issues of availability of

14 insurance, of problems in writing particular types of

15 insurance, whether it be medical malpractice, product

16 liability, or environmental liability.  But, also, how was it

17 done.

18 Q.    Mr. Connolly, how, if it did, did your experience at the

19 American Insurance Association influence your opinions in this

20 case?

21 A.    Well, it was cumulative because I had experience before

22 working at two insurance companies, but it gave me an

23 understanding of the way in which the insurance industry

24 operated, the climate, the custom and practice, and how they

25 operate.  How did they sell policies?  What were the

Connolly - D

1    competitive attitudes for insurers at different times?  How was

2    the market approach?

3    Q.    When did you leave the American Insurance Association?

4    A.    I left the American Insurance Association in 1986.

5    Q.    So the first 11 years of your career you were working for

6    insurance companies.  The next 10 years of your career you're

7    working for a trade association.  And then where did you go in

8    1986?

9    A.    You're making me feel very old, but I left the American

10   Insurance Association in part because it moved from New York to

11   Washington, and I joined Johnson & Higgins, which was the third

12   largest insurance broker in the world, with 7,800 employees.

13   It was also the world's largest privately held insurance

14   company.

15   Q.    We hear the word "broker" a lot.  What does a broker like

16   Johnson & Higgins do, in general terms?  And please be brief.

17   A.    Be brief?  We created insurance markets.  We placed

18   insurance.  We did premium audit.  We handled claims.  That's

19   somewhat brief.

20   Q.    What was your title at Johnson & Higgins?

21   A.    My title was principal.

22   Q.    And what were your duties as principal at Johnson &

23   Higgins?

24   A.    I continued to have some of the duties that I had at AIA.

25   That is to say I continued to function in things like Congress

Connolly - D

1    and regulatory.  My functions included writing insurance

2    policies, creating insurance companies, working with insurance

3    companies to help them write insurance policies, help my

4    clients -- our clients who were predominantly policyholders to

5    process their claims with insurers.  It came up before.  I

6    hadn't even thought about it, but one of the departments I

7    headed up had a premium audit function.  I was co-manager of

8    our casualty department in New York, which was our largest

9    casualty department.  I also had a function related to Johnson

10   & Higgins' own liabilities.

11   Q.    How about a function of trying to find alleged policies

12   that were missing for policyholders?  Was that part of your

13   function with Johnson & Higgins?

14   A.    One of the things that would commonly happen would be, in

15   these kind of cases, I would be contacted by a policyholder

16   asking me to search our records and search other records that

17   we might have access to to find insurance policies or

18   documentation of the existence of policies.

19   Q.    And, Mr. Connolly, by decades, how far back did the

20   policies go that you had occasion to try to find while you were

21   at Johnson & Higgins?

22   A.    Oh, I think we found policies going back to the 1930s.

23   Q.    While you were at Johnson & Higgins, Mr. Connolly, did you

24   have any specific experience with environmental related

25   coverage issues?

Connolly - D

1    A.    About --

2    Q.    Please be brief.

3    A.    -- 40 percent of my time was involved in that.

4    Q.    Can you briefly describe what those experiences were?

5    A.    Well, I had expertise in environmental liability.  I even

6    negotiated, without regard to the insurance, for a couple of

7    policyholders.  I helped them negotiate claims with the EPA

8    because I had contacts there.

9          But, predominantly, I was concerned with two things:  One

10   was finding coverage, to the extent it could be found, for

11   policyholders; that meant creating the insurance companies that

12   would provide such coverage.  And then the bulk of my time

13   dealing with environmental issues dealt with policyholders who

14   were PRPs in particular locations and helping them to process

15   their claims with insurers.

16   Q.    Did you continue your practice of testifying while at

17   Johnson & Higgins on various matters?

18   A.    I did.  I testified.  For example, in 1990 I testified in

19   front of one of the House committees about the cost

20   implications of the Superfund, and I did a lot of educational

21   work.  And, previously, I appeared on practically every news

22   program you can think of.  Every national news program you can

23   think of.

24   Q.    So in your prior two jobs your clients were members, if

25   you will, were insurance companies.  Was that different while

Connolly - D

1  you were at Johnson & Higgins in terms of who you viewed your

2  client to be?

3  A.    Generally speaking, our clients were policyholders.  As I

4  said, there were a few instances in which my function did not

5  have to do with insurance.  So, for example, I helped set up a

6  settlement process for breast implant claims and also for heart

7  valve claims.  Neither of those, as far as I was concerned, had

8  anything to do with insurance.

9  Q.    While you were at Johnson & Higgins, you testified that

10  you had occasion to search for missing policies.  What types of

11  sources of evidence of policies were you looking for?

12  A.    Well, just like Mr. Hughes, I didn't go down to the

13  warehouse.  We had -- sometimes we would use paralegals.

14  Sometimes we would use law students.  I would give them

15  instructions as to what to look for.  But we would look through

16  our own records.  We would look for premium audit,

17  declarations, dec pages, certificates, letters confirming

18  coverage.  Sometimes we could find tax records and things of

19  that sort, but we also would use insurance archaeologists.

20      There was -- this was the time after really the advent of

21  asbestos litigation when these old policies became important to

22  find.  So there were groups that formed who had a specialty in

23  knowing where to go for old policies.  We talked about the

24  naval records.  Of course, that was particularly germane since

25  most of the early asbestos cases arose in the context of

Connolly - D

1   seafaring, of shipbuilding, stevedores, seamen, including me.

2   Q.    Mr. Connolly, when you use the term "insurance

3   archaeologist," it's these people or outfits you're talking

4   about who know where to look for the secondary evidence; is

5   that right?

6   A.    Well, we would help them know where to look.  But we, for

7   example, considered buying or acquiring an insurance

8   archaeologist of our own.  We didn't do it because it wasn't

9   cost-effective.  But these are people who, you know, you do it

10  once, the next time you do it better, and when you've done it

11  500 times you are really pretty skilled.

12  Q.    That's what they tell us about trials, Mr. Connolly.  I'm

13  not sure that's correct.

14        Mr. Connolly, in 1997, did your employer change?

15  A.    In 1997 Johnson & Higgins and Marsh & McLennan merged, and

16  we then became the world's largest insurance program with

17  51,000 employees.

18  Q.    What was your title while at Marsh?

19  A.    My title at Marsh was managing director.

20  Q.    What were your duties as managing director at Marsh?

21  A.    I had many of the same duties.  Although, I had more of a

22  function -- or I increased the function that I had of

23  processing claims for policyholders.

24        And, also, I was the only person at Marsh, and previously

25  at Johnson & Higgins, who was allowed to testify with regard to

172

Connolly - D

1    the kinds of issues we've had in this case.

2         So while at Marsh and while at Johnson & Higgins, I was

3    allowed by my employers to testify about the kind of issues we

4    have here, as well as other issues.

5    Q.    While you were at Marsh, did you also continue your

6    activities to participate in trying to find evidence of missing

7    policies or policyholders?

8    A.    I did.

9    Q.    Can you tell us a little bit about that?

10   A.    That was more or less the same as before.  We would look

11   through records.  Also, this may have been a J & H -- Johnson &

12   Higgins, but while at Johnson & Higgins I was sent to London to

13   negotiate the provisions of the Lloyd's brokers' code, and I

14   think that was in 1978.  One of the provisions was new, which

15   was that brokers, Lloyd's brokers, a special category, were

16   required to maintain insurance policies in perpetuity.

17   Q.    Mr. Connolly, when did you leave Marsh?

18   A.    I left Marsh in March of 2004.

19   Q.    And since then what have you been doing?

20   A.    Well, even before then, I was -- shortly before then, in

21   October of 2003, I set up my own company.

22   Q.    What's the name of that company?

23   A.    The name of that company is Dennis R. Connolly, LLC.

24   Q.    Mr. Hughes said he has 27 employees.  How many employees

25   do you have?

173

Connolly - D

1    A.    I have one.  On LinkedIn I'm listed as janitor.  A friend

2    of mine wrote I did a good job on windows.

3    Q.    Mr. Connolly, have you ever taught any insurance classes

4    or seminars?

5    A.    Many.  Off the top of my head, I taught a law school

6    seminar in Florida with Judge Keeton, now deceased, but the

7    author of "Keeton on Insurance."  I taught a course on

8    environmental liability at the University of Houston Law

9    School, and included in the writeup listed -- listed Antonin

10   Scalia, William Ruckelshaus, William O'Reilly -- he was the

11   head of the EPA -- and others -- others.

12        I also taught three classes -- that is to say one-day

13   class -- at the University of Pennsylvania Law School with

14   Professor Geoffrey Hazard; and then Chief Judge with the Third

15   Circuit, Anthony Scirica; and I also taught a course, a

16   six-week course, on insurance at Harvard Law School.

17        I also was the chairperson of an advisory committee to a

18   center at Wharton Business School, which dealt with -- dealt

19   with risk and decision processes, predominantly insurance.

20   Q.    Did the classes and seminars you teach have anything to do

21   with underwriting issues, Mr. Connolly?

22   A.    They certainly did.

23   Q.    Mr. Connolly, have you ever testified before in the great

24   state of Oregon on missing policy issues?

25   A.    Yes.

174

Connolly - D

1    Q.    When was the last time?

2    A.    I've been told it was 2014.  I couldn't actually remember

3    if it was 2013 or 2014.

4    Q.    I'm told you recognize a number of the faces in this

5    courtroom.  Do you remember what the name of the case was?

6    A.    The name -- I know the plaintiff was Allianz Insurers, and

7    it was against numerous other insurers.  The predominant

8    insurer that was involved was General Insurance Company.

9    Q.    Did you testify at trial?

10    A.    I did.

11    Q.    Did the court credit your testimony?

12    A.    Yes.  The court wrote an opinion in which I was cited

13    several times.

14    Q.    Was the case in federal or state court?

15    A.    It was in state court.  If you walk out the doors, you can

16    see it.

17    Q.    Do you remember the name of the judge?

18    A.    Judge Marshall.

19          MR. RUGGERI:  Your Honor, I think we've been through

20    this through the in limine motions, but, for the record, I

21    would like to offer Mr. Connolly as an expert regarding the

22    customs and practices regarding the reconstruction of missing

23    policies and the terms and conditions of those policies.

24          THE COURT:  All right.  Objections?

25          MR. KOLE:  We made an objection prior to trial.  You

Connolly - D

1    overruled it, so we have no further objections to that,

2    Your Honor.

3                THE COURT:  All right.  Thank you.  All right.  He

4    will be admitted as an expert as described, Mr. Ruggeri.  Go

5    ahead.

6                MR. RUGGERI:  Thank you, Your Honor.

7    BY MR. RUGGERI: (Continuing)

8    Q.    Mr. Connolly, based on the documents that you reviewed in

9    your 50 years of experience in the insurance industry, are you

10   prepared today to state your opinions to a reasonable degree of

11   professional probability regarding the St. Paul policies?

12   A.    Yes, I am.

13   Q.    Do you have an opinion, Mr. Connolly, on whether St. Paul

14   issued primary comprehensive general liability coverage to

15   Northwest Marine Iron Works for the period of February 11,

16   1954, to July 1, 1972?

17   A.    I do.

18   Q.    What is your opinion?

19   A.    My opinion is that they did issue those policies.

20   Q.    Mr. Connolly, do you have an opinion on what were the

21   applicable property damage limited liability under those

22   St. Paul policies?

23   A.    I believe that the applicable limit was $300,000.

24   Q.    Do you have an opinion, Mr. Connolly, on whether those

25   policies contained provisions provided for a duty to defend?

176

Connolly - D

1    A.    They did have a defense obligation.

2    Q.    Mr. Connolly, we don't have as many documents to walk

3    through as folks walked through with Mr. Hughes.  It may be my

4    fault, but let's talk about the basis or bases for your

5    opinions.

6          First, looking at Exhibit 1.

7    A.    I think I would know if you gave me a book.

8              MR. RUGGERI:  Did the book not get received?

9              THE COURT:  I got mine.

10             MR. RUGGERI:  I don't want them to share.

11             DEPUTY COURTROOM CLERK:  Thank you.

12             MR. RUGGERI:  Thank you.

13             THE WITNESS:  I don't think I can do this without a

14   book.

15   BY MR. RUGGERI: (Continuing)

16   Q.    For your benefit, if it's easier to read on the screen, it

17   looks like we'll have some help here with projecting it on the

18   screen as well.

19         Mr. Connolly, is Exhibit 1 a document that you reviewed in

20   connection with your opinions in this case?

21   A.    Yes.

22   Q.    What do you understand this document to be?

23   A.    This document is the insurance policy issued to Northwest

24   Marine, incepting February 11th, '54, expiring February 11th,

25   '57.

Connolly - D

1    Q.    Did you rely on Exhibit 1 in forming your opinions which

2    you stated here today?

3    A.    Yes, I did.

4    Q.    How did Exhibit 1 affect your opinions?

5    A.    It explained -- it showed that there was a policy issued

6    during the period I mentioned before.  It showed beyond the dec

7    page that there were coverage in the amount of $100,000, only

8    on the dec page, $100,000 for property damage for each accident

9    and in the aggregate.

10        It also showed me that the premium -- the estimated

11   premium for that policy -- for that portion of the policy was

12   $68.

13   Q.    What is the significance of the $68 premium?

14   A.    Well, it showed that this was a relatively cheap variety

15   of coverage.  The custom and practice in the insurance industry

16   would be that the first layer, the first insurance company or

17   insurance policy to respond to losses, is commonly called the

18   working layer.  That's because every single claim, no matter

19   how big or how small, will come to that policy.

20        And so after you get through that first 100,000 of loss,

21   any subsequent losses for that insurance company will be

22   reduced.  There just won't be as many.  There won't be as much

23   defense work.

24        And so my opinion is that had this policy initially been

25   issued with 100,000 -- excuse me, a $300,000 limit, the premium

Connolly - D

1    probably would have been about 140, something like that.

2    Q.    And in your review of Exhibit 1, did you see anything to

3    cause you to believe that at least for certain contracts the

4    property damage limit was changed from $100,000 to $300,000?

5    A.    Yes.    There were certain endorsements that did make that

6    change for specific contracts.

7    Q.    And directing your attention to endorsement number five,

8    at page Bates-stamped MG217111, is that one of those

9    endorsements?

10   A.    Yes, it is.

11   Q.    Directing your attention to endorsement eight at page

12   Bates-stamped MG217114, is that another endorsement that

13   changes the limit to $300,000?

14   A.    Yes, it is.

15   Q.    With whom is the contract at issue in endorsement number

16   eight where the limit was increased to $300,000?

17   A.    That is with the Department of Navy.

18   Q.    Is endorsement number nine, directing your attention to

19   MG217116, another contract with the Department of Navy where

20   the limit was increased from $100,000 to $300,000 for property

21   damage liability other than automobile?

22   A.    That's correct.    This was to the Department of Navy Bureau

23   of Ships.    I'm pretty sure, by the way, all of these

24   requirements go back to probably Admiral Rickover, who was a --

25   followed insurance issues and wanted insurance and wanted

Connolly - D

1   asbestos in the ships, but these were Navy requirements.

2   Q.   And, Mr. Connolly, endorsement number 10, is that another

3   endorsement where for purposes of liability, arising out of

4   that contract, the property damage limit was increased from

5   $100,000 to $300,000?  And that's at the page Bates-stamped

6   MG217118.

7   A.   Right.  That's correct.  I just wanted to note one thing.

8   Before, someone -- I'm not sure who -- said for an additional

9   premium these increases occurred.  There is no reference to an

10  additional premium.  This is really throwaway coverage.  The

11  insurance carrier probably just accommodated the need without

12  charging an additional premium.

13  Q.   Mr. Connolly, is Exhibit 1 -- does that represent the

14  first policy period that you were able to confirm through your

15  review of materials in this case?

16  A.   Yes, it does.

17  Q.   And from the declarations page, what is the policy period?

18  A.   The policy period was February 11, 1954, to February 11,

19  1957.

20  Q.   I asked this question of Mr. Hughes, and I'll ask it of

21  you too:  How did Jewett Barton Leavy & Kern get paid?

22  A.   They would have been paid as a percentage of -- or a

23  commission on the placement from the premiums.  In those days,

24  it was customary that the broker's fee or earnings would have

25  been paid by the insurer.  And as Mr. Hughes said, the broker

180

Connolly - D

1    would collect the premium, subtract -- subtract its tithe, and

2    ship the money on to the insurer.

3         Very often you got into fights with the insurer because

4    you held the premium for more than 90 days, but, by and large,

5    that's how insurers in those days got their premium -- got

6    their -- I'm sorry, brokers got their money.

7    Q.   So, in other words, if the premium wasn't paid, the broker

8    wasn't paid?

9    A.   Oh, that's absolutely true.

10   Q.   Let's take a look now, Mr. Connolly, at Exhibit 5.

11        Is Exhibit 5 a document that you reviewed in connection

12   with the opinions you're expressing in this case?

13   A.   Yes.  Pardon me.

14   Q.   What is Exhibit 5?

15   A.   Exhibit 5 is my expert report.

16   Q.   No, it's not.  That's behind it.  206.  The next document

17   in your binder.

18   A.   Oh, Exhibit 5 is a document confirming coverage, a

19   certificate of insurance for blanket liability, and a

20   certificate of insurance for blanket property.

21   Q.   And is this a document on which you relied in reaching

22   your opinions in this case?

23   A.   Yes, it is.

24   Q.   How did Exhibit 5 affect your opinions in this case?

25   A.   Well, Exhibit 5 is a -- contains a certificate of

Connolly - D

1    insurance which was signed by Jewett Barton & Leavy, and it

2    reflects policy limits that we are concerned with of $300,000,

3    and it also reflects the fact that the policy was issued by

4    St. Paul.

5         I note that the signature -- the handwritten signature at

6    the bottom on -- on the certificate is signed, but it's above

7    the -- above the stamp is the notation of St. Paul Fire &

8    Marine.

9         In my opinion, Mr. Hughes is correct that this was

10   probably a general agent and may even have been a managing

11   general agent, meaning they had the pen, as we call it in the

12   insurance industry.

13        Certainly, in order to sign this, and, in fact, in order

14   to be able to place business with an insurer, a producer is

15   required to have authority from the insured.

16   Q.   And authority includes the authority to bind the insurer;

17   correct?

18   A.   It includes -- it includes the ability to negotiate with

19   the insurer.  Sometimes it would include the authority to bind

20   the insurer, but it would normally include the authority to

21   issue certificates of insurance.

22             THE COURT REPORTER:  I'm sorry.  Would or wouldn't?

23             THE WITNESS:  Would normally include the ability to

24   issue certificates of insurance.

25   ///

182

Connolly - D

1   BY MR. RUGGERI: (Continuing)

2   Q.    Mr. Connolly, if you would flip to the first page of

3   Exhibit 5, directing your attention to paragraph 2, what does

4   that paragraph tell us about the sequencing of the issuance of

5   the certificates of insurance and the actual policy?

6   A.    Well, I'm not sure what you mean by "paragraph 2."   There

7   are numbered --

8   Q.    The paragraph at the bottom, above the signature.

9   A.    Okay.   Yes.   This actually almost looks like what we would

10  call a binder.   It says:   Upon receipt of the certified copies

11  of the renewal policies now in the process of being issued, a

12  copy will be forwarded to -- forwarded to replace the enclosed

13  certificates.

14  Q.    What is the significance of the phrase "renewal policies"?

15  What does that tell us?

16  A.    Well, renewal -- there are two ways in which policies can

17  be continued.   One, a policy can be a replacement, or it can be

18  a renewal.   A renewal means that the policy is being renewed or

19  done again.

20  Q.    Does it mean that there was a prior policy?

21  A.    It means there was a prior policy.   It's significant that

22  the prior policy was a three-year policy.   This would also be a

23  three-year policy.   At this time it was the custom and practice

24  in the insurance industry to provide three-year policies.   Not

25  always done, but for desirable business policies would be

Connolly - D

1    issued on a three-year basis.  This meant that you could

2    establish a continuing relationship between the policyholder

3    and the insurer.  So when I look at old policies, it wasn't

4    unusual to find the same insurer and same policyholder for

5    extended periods of time.

6         It also reduced both the need for extensive applications

7    and also extensive underwriting issues.

8    Q.   And the reason for that, in part, was the building of a

9    relationship, you said?

10   A.   That's correct.

11   Q.   Relationship between whom?

12   A.   Relationship between the policyholder and the insurer.

13   Q.   And, again, looking to the first page, do you see the

14   reference to policy numbers issued by St. Paul Fire & Marine

15   Insurance Company?

16   A.   Yes, I do.

17   Q.   And if you turn to the two certificates of insurance that

18   follow, does the policy number match?

19   A.   Yes, it does.  Yes, they do.

20   Q.   And do the contract numbers match, Mr. Connolly, as

21   referred to on the first page and then on the two following the

22   certificates of insurance?

23   A.   Yes.  Contract MST-3251.

24   Q.   And the other one is 170401; correct?

25   A.   Right.

184

Connolly - D

1   Q.   And what are the stated property damage limits on the

2   certificates of insurance which are part of Exhibit 5?

3   A.   The stated limits are miscellaneous property damage

4   $300,000 each accident and in the aggregate.

5   Q.   Now, Mr. Connolly, I don't believe I have a copy of it in

6   my binder, but I'd like to direct your attention to Exhibit 38,

7   if we can pull it up on the screen.

8        Is Exhibit 38 a document you reviewed in the course of

9   developing your opinions in this case?

10  A.   Yes, it is.

11  Q.   What is Exhibit 38?

12  A.   I just broke the binder.  Exhibit 38.

13  Q.   That's quite all right.

14  A.   Pardon me?

15  Q.   That's quite all right.

16  A.   Okay.  It's yours.  Exhibit 38 is a typical document of

17  its time and also representative of the kind of thing that goes

18  on now where a broker is trying to get its hands on a new

19  client.  So you would go to a client and you would say, "We

20  would like to place insurance for you and become your broker."

21  What you had to do was show that you were going to do better

22  than the predecessor broker.

23  Q.   And I believe, Mr. Connolly, Mr. Hughes touched on this,

24  but the face of the document bears an October 1972 date.  But

25  if you flip that page to the narrative before the actual

Connolly - D

1  report, can you tell when the report was done or study was

2  done?

3  A.   I would like to find it, but I -- oh, yes, there we go.

4  Second paragraph.  In the -- in the spring of this year we

5  asked for and were granted the opportunity to make a complete

6  study of the existing program for the purpose of taking a fresh

7  look and providing analysis of the risk including suggestions

8  for a total risk management program.  This is -- this goes on

9  today.

10 Q.   Why did Marsh engage in this study?

11             MR. KOLE:  Objection.  I'm not sure how Mr. Connolly

12 would know why Marsh engaged in a study in 1972.

13 BY MR. RUGGERI: (Continuing)

14 Q.   Do you know why Marsh engaged the study?

15             THE COURT:  Go ahead.

16             THE WITNESS:  The custom and practice would be that

17 Marsh would do a study of this sort in order to become a broker

18 for the policyholder.  The policyholder was perhaps putting it

19 out for competition, and Marsh would create a proposal.  This

20 is a proposal.

21 BY MR. RUGGERI: (Continuing)

22 Q.   While you were at Marsh, did Marsh engage in these types

23 of proposals?

24 A.   We did this at J & H.  We did this at -- we did this at

25 Marsh as well.

186

Connolly - D

1   Q.    In the normal course of doing business as a broker;

2   correct?

3   A.    Sure.

4   Q.    Mr. Connolly, directing your attention to MG213914, what

5   does that page tell us about who was the general liability

6   carrier in the spring of 1972?

7   A.    It tells us --

8   Q.    Directing your attention to the column present --

9   A.    Yes.  Present?  Yes.  It tells us that the carrier that

10  the policyholder had was St. Paul Fire & Marine Insurance

11  Company.

12  Q.    And what does this document tell us about what were the

13  property damage limits presently issued by St. Paul in the

14  spring of 1972 or as of the spring of 1972?

15  A.    It tells us that the limits were, as we've seen in the

16  other documents, $300,000 each occurrence and $300,000 in the

17  aggregate.

18  Q.    How did Exhibit 38 affect the opinions that you're

19  offering in this case?

20  A.    Well, the business of Marsh was to get more business.  The

21  way we got more business and the way Johnson & Higgins would

22  also get more business would be by producing a document just

23  like this, taking it to a policyholder and saying, "Give us a

24  chance to reform your insurance program."

25        Obviously, you would not want to go to the prospective

Connolly - D

1    client and misidentify who their insurer was.  So it would be

2    entirely consistent that this is a crucial piece of

3    information.  If you went to Northwest Marine and you said,

4    "Well, your insurance carrier is Travelers," when in fact it's

5    St. Paul, you would be out the door.

6         So it's a document that shows the carrier was St. Paul and

7    it was important that it showed it correctly and that it showed

8    the limits correctly.

9    Q.   Based on your experience, it was important for studies

10   such as this one, done by a broker, to be accurate; correct?

11   A.   Yeah.  You would look like a fool if you went in with the

12   wrong information.

13   Q.   Mr. Connolly, now let's take a look at Exhibit 35.  Is

14   Exhibit 35 a document that you reviewed in the course of your

15   work in this case?

16   A.   Yes, it is.

17   Q.   What is Exhibit 35?

18   A.   35 was -- is a what's called a questionnaire for umbrella

19   policy application.  But it actually looks like an application

20   to me.

21   Q.   And what is an umbrella policy application?

22   A.   An umbrella policy application is an application for an

23   umbrella policy.  In this period of time that would normally,

24   more likely than not, have been to London.

25   Q.   Did you -- London or maybe if you look at the bottom

Connolly - D

1    right-hand corner, you see ICSOP as the producing party.

2    Insurance Company of the State of Pennsylvania.

3    A.    Yes, I do.

4    Q.    Okay.

5    A.    I should correct that.  Until -- give an explanation.

6    Until the early 1960s, very early 1960s -- actually, the late

7    1950s -- the excess umbrella market was almost exclusively in

8    London.  In 1958 the market expanded in domestic insurance;

9    that is to say American domestic insurers got into the umbrella

10   and excess market.

11   Q.    Mr. Connolly, how did Exhibit 35 affect your opinions in

12   this case?

13   A.    Well, it reflects the -- if you go to ICSOP 0090, it

14   reflects the fact that the general liability BI and PD were

15   provided by -- this is to say the coverage was provided by

16   St. Paul.

17   Q.    Does it say anything about the property damage limits

18   provided by St. Paul?

19   A.    It also specifies that the property damage limits are

20   300/300.

21   Q.    Is it important to a writing company that is considering

22   issuing an umbrella policy to know who is the underlying

23   insurer and what the limits are?

24   A.    Absolutely.  One of the most important things for an

25   excess insurer is to know who is the underwriter or underlying

Connolly - D

1    insurance.  That's that working layer again.  Because a

2    mishandled working layer claim can blow up if it's not handled

3    properly.

4        So there are two aspects that an excess underwriter is

5    going to look at with regard to an underlying insurer.  One is

6    do they have good underwriting; and two is do they have good

7    claims handling?

8        When I say "good underwriting," normally it's the primary

9    insurer that actually goes and looks at facilities, does

10   engineering studies, does most of the underwriting.  So as an

11   excess insurer, you're reliant on the carrier below you.  So

12   you don't want a shock insurance company below you.  It's a

13   very important piece of information.

14   Q.   Directing your attention, Mr. Connolly, to the first page

15   of Exhibit 35, the stamp in the upper right-hand corner, is

16   there a date that you relied on in forming your opinions that

17   we see there?

18   A.   Yes.  This is June 1, 1970.

19   Q.   What did that tell you?  What did that mean to you?

20   A.   Well, that means to me that there was a -- the policies

21   described on page ICSOP 0090 were in place June 1, 1970.

22   Q.   So we saw the '54 to '60 policies.  Exhibits 1 and 5.  We

23   now see policies that you believe were in effect in 1970

24   through Exhibit 35.  Directing your attention to the report of

25   audit, at the page Bates-stamped ICSOP 0093, what does that

190

Connolly - D

1   tell you about St. Paul coverage that was in effect at any

2   period of time?

3   A.    It tells me that there was coverage for Northwest Marine.

4   It tells me that the way the premium would be calculated once

5   the program got going was that there would be a premium audit

6   that would show whatever the rating base was.  Probably in this

7   case it would have been receipts, sales receipts.  And it

8   adjusted -- in this particular case, it adjusted the premium

9   by -- what?  It looks like -- looks like about 73 cents.

10  Q.    Mr. Connolly, who did the audit?

11  A.    The audit would be done by St. Paul in this case, or they

12  would perhaps have had -- they would have assigned it out to a

13  competent broker.

14        In our case, we would have -- the -- the premium audit

15  people in my department, we would send it out to make sure that

16  St. Paul was doing it right, but this would have been done by

17  St. Paul.

18  Q.    On whose letterhead was the report provided?

19  A.    It was on St. Paul, the insurance company's, letterhead.

20  Q.    Are you familiar with the trademark in the upper left-hand

21  corner?

22  A.    Yes, I am.

23  Q.    Is that a trademark that you're familiar with that

24  designated St. Paul during this time period?

25  A.    Yes, it is.

Q. What, if anything, does this document, this audit report, tell us about St. Paul coverage and when it was in effect?
A. Well, it tells us that there was coverage from July 1, 1968, to July 1, 1969, with the billing date of November 24, '69.
Q. So we now have '68, '69, '70. I would like you to turn to Exhibit 37.
THE COURT: Mr. Ruggeri, before we go on, I want to just do some housekeeping here. How much longer do you think you have in your examination?
MR. RUGGERI: Your Honor, probably 15 minutes.
THE COURT: Mr. Rycewicz, I'll ask you, since we talked about this at the pretrial conference, how you think we're tracking on our time. You suggested we could finish as early as Friday if the authenticity issues were involved.
MR. RYCEWICZ: Well, I think we could finish tomorrow, Your Honor. I think we're way ahead of my projections.
THE COURT: Mr. Gordon, your thoughts?
MR. GORDON: I agree.
THE COURT: Anybody disagree?
MR. RUGGERI: I was aiming for tonight, Your Honor, but --
THE COURT: Mr. Ruggeri, you're welcome to keep going. I won't be here. I'll just read the transcript. Thank

Connolly - D

1   you.

2        So one more question:  Jill, can you go until 5:00?

3            THE COURT REPORTER:  Yes, I can.

4            MR. RUGGERI:  I will be done before 5:00, Your Honor.

5            THE COURT:  Go ahead, please.

6   BY MR. RUGGERI: (Continuing)

7   Q.   Directing your attention, Mr. Connolly, to Exhibit 37, was

8   this a document you reviewed in the course of your work in this

9   case?

10  A.   Yes, it is.

11  Q.   And what is it?

12  A.   This is a record of premium from --

13  Q.   I heard the phrase "placement slip" or "placing slip."

14  What is a placement or a placing slip?

15  A.   This is a placing slip.  The way it would work is that a

16  broker -- a United States broker would make contact with a

17  non-United States broker.  Customarily, in those days, it would

18  go to a broker in Canada.  The Canada broker would then take it

19  to a Lloyd's broker who specialized.  Only Lloyd's brokers

20  could deal with Lloyd's.  And this is a case placing slip.  It

21  is -- it -- what you're going to ask me is that it does list

22  St. Paul as --

23  Q.   Before we get there, I was going to ask you what's all

24  that crazy scratching on the right-hand side of page LMI1154

25  and then at 1156?  What is all that?

Connolly - D

1   A.   These are what are called -- you called them crazy

2   scratchings.   In fact, what they are is scratches.

3        And, as Mr. Hughes described it, once it got to the

4   Lloyd's broker, the Lloyd's broker would take it to the boxes

5   where the underwriter sat, and then the underwriter would sign

6   it, using their own particular scratch.

7        This indicates, for example, that someone at the bottom

8   right-hand from the page number London Insurance Market 001154,

9   that that particular Orion was going to take seven and a half

10  percent.   And so the broker would bring these around and fill

11  it up to get 100 percent.

12  Q.   They indicate one's willingness to participate in the

13  coverage; is that right?

14  A.   That's correct.

15  Q.   And what was the limit of the coverage in which these

16  folks were participating?

17  A.   The underlying limit was the St. Paul policy.

18  Q.   Okay.   You're looking at the schedule of underlying

19  insurance.   Is that LMI1153?

20  A.   Right.

21  Q.   And it shows St. Paul?

22  A.   Yes.

23  Q.   What does it show as the property damage limits?

24  A.   That's the $300,000 limit.

25  Q.   And then above that do you see limit of liability here

194

Connolly - D

1   under -- under the title Northwest Marine Iron Works U.S.

2   $5 million?

3   A.    Yes.

4   Q.    Okay.  And do you see a reference to a policy period right

5   above that?

6   A.    Not on the page that is shown there.

7   Q.    Do you see the 36 months?

8   A.    Yes, I see that.

9   Q.    June 8, 1967?

10  A.    Yes.

11  Q.    What does that tell us?

12  A.    That tells us that this once again was, as I indicated,

13  consistent with custom and practice for large commercial

14  entities, a three-year policy.

15  Q.    What does it tell us about whether St. Paul was the

16  issuing primary carrier as of June 8, 1967?

17  A.    It tells us that the underlying insurer that was scheduled

18  was St. Paul.

19  Q.    Mr. Connolly, I'd like you to take a look at Exhibit 205.

20  Is Exhibit 205 a document you reviewed in the course of your

21  work in this case?  Is it a document you reviewed?

22  A.    The -- the pages behind the cover letter are documents I

23  did review.

24  Q.    Okay.  What do you understand those pages to be?

25  A.    This is a ledger prepared by Dale Weitzel, an employee of

Connolly - D

1    St. Paul, and it lists the coverage for a certain period of

2    time that was had by Northwest Marine.

3    Q.    And what, if anything, did this tell you about the primary

4    coverage issue by St. Paul during the policy periods at issue

5    in this case?

6    A.    Well, for one thing, there were a number of --

7            MR. RUGGERI:  I'll be the first to admit, Your Honor,

8    that I can't read this very well.  So I'll leave it to the

9    witness or others to read it.  My eyes simply can't make out

10   all the words here.

11           THE WITNESS:  Well, I've got the same problem, but I

12   was, with considerable difficulty and using a magnifying glass,

13   able to read at least some of it.  It refers to some of the

14   policies that we have discussed in this case.  This is over

15   there.  And it shows a pattern that's consistent with kinds of

16   insurance programs that comparably sized policyholders have had

17   showing a longstanding relationship for many kinds of insurance

18   with St. Paul, but also note that it listed Argonaut as its

19   workers comp carrier for certain periods of time.

20   BY MR. RUGGERI: (Continuing)

21   Q.    Mr. Connolly, I would like you to take a quick look at

22   Exhibit 10.  The first page of Exhibit 10 is a cover letter

23   from Andrew Moses to Mr. Rycewicz, followed by various policy

24   forms.  Mr. Connolly, are the policy forms marked as part of

25   Exhibit 10 documents that you reviewed in the course of your

Connolly - D

1   work on this case?

2   A.    Yes, they are.

3   Q.    But you didn't review the cover letter; correct?

4   A.    That's correct.  I don't recall ever seeing the cover

5   letter.

6   Q.    And did these forms affect your opinions in this case?

7   A.    Yes.

8   Q.    How?

9   A.    Well, these are forms produced by St. Paul as the kind of

10  forms that they would have used, most likely, in the

11  circumstances of this case.  The forms are -- even with subtle

12  differences, the forms are standard kinds of forms, the type

13  that would have been filed with an insurance regulator.

14  Q.    Mr. Connolly, do each of these four forms include a

15  defense provision?

16  A.    Yes, they do.

17  Q.    And directing your attention to the page Bates-stamped

18  STP002, paragraph II, is that one of those provisions?

19  A.    Yes, paragraph II, which is titled Defense Settlement

20  Supplementary Payment.

21  Q.    Directing your attention to STP0007, is that another

22  defense provision?

23  A.    This is in the second form submitted.  And, yes, this is a

24  defense provision.

25  Q.    Directing your attention to STP00011, is there a third

Connolly - D

1  defense provision?

2  A.   Once again, it is the defense settlement and supplementary

3  payments.

4  Q.   And directing your attention to STP00020, the language is

5  a little bit different.  But under coverages A and B, is there

6  a defense provision there?

7  A.   Oh, yes.  This is a defense provision in the initial

8  insurance and insuring agreement.

9  Q.   Let me ask you this, Mr. --

10  A.   By the way, I do note that this last form was likely a

11  form introduced in '56, possibly '55, because it is the first

12  form that has the nuclear energy exclusion.  That came about

13  after the adoption of Price-Anderson in 1954, which was the

14  nuclear program.

15  Q.   Got it.

16      Mr. Connolly, I would like you to take a look at your

17  report, which is marked as Exhibit 206.  And if we could pull

18  up Mr. Hughes' report, marked as Exhibit 59, and focus your

19  attention on page 3 of Mr. Hughes' report and page 17 of your

20  report.  Do you have those in front of you?

21  A.   I have -- yes, I do.

22  Q.   The tables aren't an exact match, are they?

23  A.   That's correct.

24  Q.   Why aren't they?

25  A.   Mr. Hughes had available to him additional information,

Connolly - D

1    which we did not have, or at least I was not supplied.

2    Q.    And, Mr. Connolly, if we look at Exhibit 22 -- 22, for

3    example --

4              MR. RUGGERI:  If we can pull up 22?

5              MR. KOLE:  Your Honor?  I'm sorry.

6              THE COURT:  Yes.

7              MR. KOLE:  I'm going to object to this.  Mr. Connolly

8    issued his report in March.  He was deposed in April.  He's had

9    Mr. Hughes' report since at least early April because he

10   testified about it in his deposition in April.  We are now at

11   trial in November.  There was no amended report supplied.

12   Mr. Connolly at no point said that he had new information and

13   wanted to supplement or amend his report, as he could have

14   done, under the rules, within 30 days of trial.  And now at

15   trial Mr. Ruggeri is effectively having him amend his report on

16   the stand.  That isn't proper, and we object.

17             THE COURT:  Right now the only thing Mr. Ruggeri

18   seems to have accomplished is having Mr. Connolly explain why

19   certain information in Mr. Hughes' report on a topic is

20   different from Mr. Connolly's report on the same topic.

21   Mr. Connolly so far is not adding or supplementing his report.

22      Mr. Ruggeri, am I correct so far?

23             MR. RUGGERI:  You're correct.  I think Mr. Kole is

24   jumping the gun.  That is not what we're seeking to do.  We're

25   not seeking to amend the report, Your Honor.

Connolly - D

1          THE COURT:  Mr. Kole, I'll overrule your objection,

2   but you can object again if you think that Mr. Ruggeri is

3   crossing that line.

4          MR. KOLE:  Thank you, Your Honor.

5          THE COURT:  Continue.

6   BY MR. RUGGERI: (Continuing)

7   Q.   Mr. Connolly, Exhibit 22, is that a document that you were

8   not provided in connection with your work in this case?

9   A.   Yes.  This does not look like one I had.

10  Q.   Exhibit 21, please.  Is Exhibit 21 a document that you

11  were not provided in the course of your work on your report?

12  A.   That is also correct.  It was not provided.

13  Q.   Exhibit 17, please.  Is that endorsement a document that

14  you were not provided in connection with the preparation of

15  your report?

16  A.   That's also correct.

17  Q.   Let me ask you this, Mr. Connolly, and you've seen other

18  documents here today:  Do any of the documents that you saw

19  today, that you weren't provided, affect your opinion that

20  St. Paul issued general liability coverage continuously from

21  February 11, 1954, to July 1, 1972?

22  A.   As to that, it does not change my opinion.

23  Q.   Do any of those documents change your opinion that the

24  property damage limited liability was $300,000?

25  A.   No, they do not.

Connolly - D

1    Q.    And do any of those documents change your opinions that

2    each of those St. Paul policies would have contained a duty to

3    defend obligation?

4    A.    They do not change my opinion.

5            MR. RUGGERI:  Thank you, Your Honor.  That's all I

6    have.

7            THE COURT:  All right.  Mr. Rycewicz, do you want to

8    go next?

9            MR. RYCEWICZ:  We have nothing, Your Honor.

10            THE COURT:  Any further direct for Mr. Connolly?

11   Mr. Stapley?

12            MR. STAPLEY:  Yes, Your Honor.  Just some quick

13   clarification, if I may, please.

14            THE COURT:  Go ahead.

15

16                    DIRECT EXAMINATION

17   BY MR. STAPLEY:

18   Q.    Mr. Connolly, nice to see you again.

19   A.    Yes.

20   Q.    Can you hear me all right?

21   A.    I can hear you fine.

22   Q.    All right.  If we can go to Exhibit 38, please.  Page 11.

23   A.    I take it you mean the Bates number ending in 11.

24   Q.    No.  At the bottom it's marked page 11.

25   A.    Oh.

Connolly - X

1    Q.    You don't have that up there.  I'm sorry.  It's Bates

2    No. --

3             MR. KOLE:  14.  Ends in 14.

4             MR. STAPLEY:  Ends in 14.  I'm sorry.

5    BY MR. STAPLEY: (Continuing)

6    Q.    Okay.  You see the section that says limits of liability

7    on the present?

8    A.    Yes.

9    Q.    And you see property damage each occurrence?

10   A.    300,000, yes.

11   Q.    And if you go down it says there are the following policy

12   extensions, okay, and subparagraph B, it says broad form

13   property damage liability.  Do you see that?

14   A.    Yes.

15   Q.    Okay.  Does broad form property damage liability typically

16   include duty to defend language?

17   A.    It can.

18   Q.    In this case is that your opinion?

19   A.    Yes.

20   Q.    Okay.  Let's go to Exhibit 35, please.  And the second

21   page of that.  And then if we can go down again to limits.

22   Okay.  You see general BI and general PD?

23   A.    Yes.

24   Q.    Okay.  General PD, does that mean general liability

25   property damage coverage?

Connolly - X

1    A.    It does.

2    Q.    And would that include a duty to defend?

3    A.    It would.

4    Q.    And that's your opinion in this case that the St. Paul

5    policy included a duty to defend?

6              MR. KOLE:  Objection.  Just to clarify, Your Honor.

7    If he wants to know whether the policy has a defense provision

8    or defense language, it's different than if it has a duty to

9    defend.

10             THE COURT:  Correct.  Sustained.  Rephrase.  Thank

11   you.

12             MR. STAPLEY:  Thank you.

13             THE COURT:  Rephrase.

14   BY MR. STAPLEY: (Continuing)

15   Q.    Is it your understanding that the policy would include a

16   defense -- defense language?

17   A.    It would have a defense obligation.

18   Q.    Yes.  Thank you.

19         Okay.  Let's go to Exhibit 37, please.

20         If we go to the -- yes, you anticipate where I am.  We go

21   down to general BI, PD.  Do you see where I am?

22   A.    I do.

23   Q.    Again, a general PD, is that general liability property

24   damage coverage?

25   A.    That's correct.

Connolly - D/X

1    Q.    And would that policy include a defense obligation?

2    A.    It would have a defense obligation.

3    Q.    And that's your opinion in this case?

4    A.    That's my opinion in this case.

5    Q.    Okay.

6    A.    You -- in certain instances, where you have a large

7    self-insured retention, sometimes when you got a -- you may not

8    have a defense obligation or you might, but as for a primary

9    policy issuing right from the ground up, it would be -- almost

10   never would there be a policy without a defense obligation.

11   Q.    And is it your opinion that all of the St. Paul policies

12   you've been discussing today are primary coverage obligations?

13   A.    I have not seen any indication they are anything other

14   than primary.  It's my opinion they are primary.

15          MR. STAPLEY:  Thank you, Your Honor.

16          THE COURT:  Thank you.  Any other further direct?

17      Mr. Kole, go ahead.

18

19                  CROSS-EXAMINATION

20   BY MR. KOLE:

21   Q.    Good afternoon, Mr. Connolly.

22   A.    Good afternoon.

23   Q.    We had the pleasure of meeting at your deposition.  It's

24   good to see you again.

25   A.    All right.

204

Connolly - X

1   Q.   Let me start with something you said on direct.  You said

2   that in your experience you have found policies going back to

3   the 1930s; is that correct?

4   A.   That's correct.

5   Q.   Certainly, it's possible policies that were issued in '50s

6   or '60s that someone could find them.  Is that fair?

7   A.   That's true.

8   Q.   And you also testified on direct about articles you've

9   written.  Have you written any articles on lost or missing

10  policies?

11  A.   No specific article on lost or missing policies, but it

12  could -- and I don't recall for sure.  It could be included

13  within some of my articles.  I wrote, for example, in an

14  article called "Economic Aspects of Mass Torts."  I wrote that

15  for a judicial conference.  That was one which was paneled.

16  The chairman of the panel was Judge Pointer, who was the MDL

17  for the breast implant cases.  And that may have included,

18  because I was talking about how you aggregate money -- may well

19  have included finding missing policies.

20  Q.   You don't recall, sitting here today, whether it does or

21  it doesn't?

22  A.   That's correct.

23  Q.   And today you have no other employment beyond serving as

24  an expert witness; is that correct?

25  A.   That is not correct.

Connolly - X

1          MR. KOLE:  Okay.  Could you pull up Mr. Connolly's

2    deposition transcript at page 36, please.

3    BY MR. KOLE: (Continuing)

4    Q.    Line 18.  Question:  Do you have any other employment

5    outside of serving as an expert?

6          Answer:  No.

7          Was that true when you said it, Mr. Connolly?

8    A.    It was true, but I think listening to it at this point, I

9    was thinking about the fact that I, in addition, do consulting

10   work on claims, settlements, and insurance issues, but I do

11   that as an expert.  So as an expert I do things other than

12   testimony.

13   Q.    But, in your view, it's all expert work; correct?

14   A.    Well, you don't go and hire someone who's not an expert.

15   Q.    And you've issued expert reports in about 90 matters; is

16   that correct?

17   A.    Probably more by now.

18   Q.    Okay.  And you make about $200,000 a year serving as an

19   expert witness.  Is that fair to say?

20   A.    Over the past -- since I started this business, I have

21   made approximately $2.2 million.  I live in New Jersey.  We

22   have a high income tax rate.  I pay 41 percent in taxes.  Of

23   the remainder, I give away 50 percent to charity.

24   Q.    And it might go faster if you respond to the question that

25   I ask you.  I didn't ask you about what you pay in taxes.  And

Connolly - X

1    if somebody wants to ask you on redirect, they may, but let's

2    limit ourselves to the questions I ask if we can.

3            MR. RUGGERI:  That's very argumentative.  I'll

4    object.

5            MR. KOLE:  Well --

6            THE COURT:  Stop.  Stop.

7        So, Mr. Connolly, answer the question asked.  Mr. Ruggeri

8    will have a chance on redirect to ask you any questions on

9    follow-up.  And given the lateness of the hour, I think moving

10   along more directly would be appreciated by everyone.

11       Mr. Kole, go ahead.

12   BY MR. KOLE: (Continuing)

13   Q.    What is your current rate serving as a expert witness,

14   Mr. Connolly?

15   A.    My rate in this case is not my current rate.  My current

16   rate is $700 per hour.

17   Q.    What's your rate on this case?

18   A.    600.

19   Q.    Most of your work is on behalf of policyholders; correct?

20   A.    Well, some of my policyholders are, some of my clients are

21   insurers.  As, for example, in the Allianz case, Allianz was an

22   insurer suing other insurers.

23   Q.    Most of your expert work is on behalf of your

24   policyholders; correct?

25   A.    I don't think that's true anymore.

Connolly - X

1    Q.    Historically, most of your work is on behalf of

2    policyholders; correct?

3    A.    I think it's better if I gave you a not a yes or no, a

4    quick answer.

5    Q.    What percentage of your work is on behalf of policyholders

6    as an expert?

7    A.    Right now?

8    Q.    Historically.

9    A.    My current workload is about 40 percent on behalf of

10   insurers and about 60 percent on behalf of policyholders.

11   Q.    Is that --

12   A.    Traditionally --

13   Q.    Go ahead.

14   A.    -- I did more work for policyholders.

15   Q.    And you've been retained to testify in quite a few matters

16   involving lost policies; correct?

17   A.    Certainly other matters, yes.

18   Q.    And you've never been retained to testify that there

19   wasn't sufficient evidence to prove up the existence of terms

20   or conditions of a policy; isn't that right?

21   A.    No.  Because when I was approached to do that and felt

22   there wasn't enough evidence, I didn't accept the assignment.

23   Q.    So you've always testified on the side of there being

24   coverage in respective lost policy cases; correct?

25   A.    To the extent that I testified or have reports, yes.

Connolly - X

1   Q.   And you spent the majority of your career on the claims

2   side of the insurance business.  Is that fair to say?

3   A.   No.  As I explained before, I did a lot of work on

4   underwriting.  I was a broker doing placements.  I created

5   insurance policies.  It is true that the first 11 years, while

6   I did other things, the predominant function that I had was

7   claims legal.

8        MR. KOLE:  Can you pull up Mr. Connolly's deposition

9   transcript to page 49, please.

10  BY MR. KOLE:  (Continuing)

11  Q.   Question:  Fair to say that you spent the majority of your

12  career working on the claims side of the insurance business?

13       Answer:  I spent the majority of my time working on the

14  claims side.

15       Is that a true statement, sir?

16  A.   That is a true statement, but it also says the remainder

17  and a fairly large part of my time dealt with the -- dealt with

18  the insurance policy creation, how -- you're not giving me the

19  whole -- you've taken a sentence out of context.

20  Q.   It is fair to say that the majority of your work was on

21  the claims side of the business; correct?

22  A.   I'd say more than 51 percent; less than 60 percent.

23  Q.   And you hold no professional underwriting designations

24  like a CPCU or a chartered property casual underwriter; is that

25  right?

Connolly - X

1    A.    I hold no designation.

2    Q.    You've never been a line underwriter, meaning the person

3    someone would call up to get an insurance policy; is that

4    right?

5    A.    I was not a line underwriter.  I was an underwriter for

6    insurance companies.

7    Q.    What is the difference between -- strike that.

8          You've never held the title of underwriter; correct?

9    A.    When we created the largest liability policy issued in

10   the -- to be issued in the United States, there were five

11   people involved in creating that product.  All of us were both

12   underwriters, policy writers, claims.  It was multifunctional,

13   and I did that.

14   Q.    My question, sir, was that you never held the title of an

15   underwriter at a company; is that correct?

16   A.    I did not have a title.

17   Q.    You've never been employed in an underwriting department

18   that wrote a CGL policy; correct?

19   A.    I think that's correct.

20   Q.    And you testified on direct about the field of insurance

21   archaeology.  You're not an insurance archeologist, are you,

22   sir?

23   A.    No.

24   Q.    In this case, you didn't do anything to try to locate

25   information outside of what you were provided by counsel, isn't

210

Connolly - X

1   that right?

2   A.   That's correct.

3   Q.   And to the extent that there was information that you

4   testified to on direct that wasn't provided to you, that was

5   information that your counsel didn't provide to you in the

6   context of your engagement; right?

7   A.   That's correct.

8   Q.   If you would look at Plaintiff Exhibit 1, please.   In

9   particular, at page 217105.   In the top left corner there's a

10  condition called premium.   Do you see that?

11  A.   Yes, I do.

12  Q.   Okay.   In the second paragraph it says:   The named insured

13  shall maintain for each hazard a record of information

14  necessary for premium computation on the basis stated above and

15  shall send copies of such records to the company at the end of

16  the policy period and at such times during the policy period as

17  the company may direct.

18       Do you see that?

19  A.   Actually, no.   You started reading it before I ever found

20  it.

21  Q.   I apologize.

22  A.   I'm assuming you are correct.

23  Q.   If you want to look at it, it's the second paragraph under

24  "premium" in the top left corner of the page.

25  A.   The short paragraph?

211

Connolly - X

1   Q.   Yes.

2   A.   Oh, thank you.  Yes.

3   Q.   And you haven't seen any hazard-based premium records,

4   like those described here, for any of the alleged policies at

5   issue in this case; is that correct?

6   A.   That's correct.

7          MR. KOLE:  And if you would pull up Exhibit 400,

8   which is Mr. Connolly's report, and turn to page 7, please.  I

9   have it as 400.  It may be in several times.  206 is fine.

10          THE WITNESS:  Which page did you say?

11   BY MR. KOLE: (Continuing)

12   Q.   Page 7.  I'll let you get there.  It's late in the day.

13   Take your time, sir.  You see paragraph 20 there?

14   A.   Yes.

15   Q.   And at the -- right before the bullet points you write:

16   The existence of insurance policies often is evidenced by the

17   following types of documents.

18   A.   Yes.

19   Q.   And in the bullet point right below you reference

20   underwriting materials.  Do you see that?

21   A.   Yes.

22   Q.   You don't recall reviewing any underwriting materials

23   relating to the alleged St. Paul policies in this case;

24   correct?

25   A.   No.  There were no underwriting materials supplied to me.

212

Connolly - X

1    Q.    And you also mentioned claims records, the next -- right

2    after underwriting materials.  Do you see that?

3    A.    Yes.  Claims records.

4    Q.    You don't recall reviewing any claims records relating to

5    the alleged St. Paul policies at issue in this case; correct?

6    A.    That's also correct.

7    Q.    You also mentioned -- I think it may be in the next bullet

8    point down -- certificates of insurance; is that right?

9    A.    Yes.

10   Q.    And certificates of insurance don't include all of the

11   terms, conditions, or endorsements of a policy; right?

12   A.    That's also correct.

13   Q.    And they're not intended to be detailed descriptions of

14   the policy wordings or the policy provisions; right?

15   A.    Their function is to provide information to persons who

16   may have coverage under a particular policy that there exists a

17   policy.

18   Q.    And to the extent that certificates of insurance relating

19   to Northwest Marine Iron Works were sent to the Navy, for

20   example, in this case, they were sent for informational

21   purposes only to be replaced by a policy at a later date; is

22   that correct?

23   A.    That's correct.

24   Q.    And the alleged St. Paul policies in this case span a

25   period of 15 years, from 1957 to 1972; is that correct?

213

Connolly - X

1    A.    Yeah.

2    Q.    You're including the '54 to '57 policy?

3    A.    Yes, I am.

4    Q.    So for purposes of my question, let's --

5    A.    You're conceding that that policy exists?

6    Q.    We said -- I will just move to the question.

7          From '57 to '72, in your report, you relied primarily on

8    six documents to support your opinion in this case; is that

9    correct?

10   A.    That's correct.

11   Q.    If you would turn -- I think you still have your report

12   there -- to page 12, paragraph 31.

13         Do you see where I am, sir?

14   A.    Yes.

15   Q.    Those are the six documents; correct?

16   A.    You said paragraph 31?

17   Q.    Yes.

18   A.    Those are the documents, but I also said -- I referred to

19   my own 50 years of experience.

20   Q.    And the six documents that you identify there are a 1957

21   to 1960 certificate of insurance, a 1972 Marsh risk management

22   program, a 1967 placement slip, a 1970 application for excess

23   insurance, and a 1980 insurance ledger; correct?

24   A.    Correct.

25   Q.    And none of those documents were created between 1960 and

214

Connolly - X

1    1967; right?

2    A.   Well, the 1967 placement slip was.

3    Q.   Between 1960 and 1967.  To keep it clean, we'd say through

4    1966; is that correct?

5    A.   Yes, I see what you mean.  Yes.

6    Q.   So that's -- depending on how you want to count it, either

7    six or seven out of the 15 years we're talking about in this

8    case you cite to no document; correct?

9    A.   Right.  But I cite to my own experience.

10   Q.   And you talked about ISO on direct.  Parties sometimes

11   deviate from standard ISO language and issue policies, some of

12   which are manuscripted; correct?

13   A.   That's correct.

14   Q.   And that's been true throughout your time in the insurance

15   industry; right?

16   A.   There are issues in that question which are associated

17   with file and use laws in -- in requirements of the insurance

18   department.  So it's not as though you can just willy-nilly

19   issue a manuscript endorsement for one which, for example, in

20   these policies would say we don't cover property damage.

21   Q.   Hopefully nobody willy-nilly ever issues anything; but,

22   just generally speaking, insurance companies have used

23   manuscript endorsements through your career?

24   A.   Yes.  But for these policies they would haven't been

25   endorsements which would have had to have been filed for file

Connolly - X

1    and use purposes.

2    Q.    And CGL policies, whether manuscripted or not, generally

3    contain endorsements; correct?

4    A.    That's true.

5    Q.    And, in fact, one of the alleged policies --

6    A.    Actually, let me redress that.  It is occasionally true.

7    Q.    Do you know whether all the alleged policies in this case

8    contained endorsements?

9    A.    No, I don't.

10    Q.    Can you look at Exhibit 9, please?  And, in particular,

11    page MG902033.

12    A.    As it is put up here, I don't have it in my book.

13    Q.    You can look at the one on the screen, I think.  If you

14    think you need more, I'm happy to give it to you.

15    A.    No.  Sometimes it's easier to read.  I'm trying to find

16    out.  Do I have Exhibit 9?

17    Q.    I think the one what you're looking at is the one

18    Mr. Ruggeri provided you.

19              MR. RUGGERI:  You do not have it.

20              THE WITNESS:  I don't have it.  That's all I was

21    asking.

22              THE COURT:  There you go.

23              THE WITNESS:  Sorry.  I threw my back out.

24              THE COURT:  Thank you, Paul.

25    ///

Connolly - X

1  BY MR. KOLE: (Continuing)

2  Q.    In the top right-hand corner of this endorsement it says

3  endorsement number 41.  Do you see that?

4  A.    At the moment, I don't.

5  Q.    It's at the very top of the endorsement, right corner.  If

6  you look on your screen, it's actually highlighted, if that

7  will help.

8  A.    Then I am looking at the wrong page.  Sorry.  Can you give

9  me the Bates No.?

10 Q.    Sure.  It's Bates No. MG902033.

11 A.    I'll go from this.

12 Q.    Okay.  And you see in the top corner there's a list that's

13 endorsement number 41?

14 A.    I do see that.

15 Q.    Fair to say there are likely at least 40 other

16 endorsements on this alleged policy?

17 A.    Well, sometimes there are endorsements that simply remove

18 prior endorsements, so they may have been -- they -- without

19 knowing, there could have been 40 prior endorsements, each of

20 which created an endorsement and removed an endorsement.

21 Q.    In your experience, is that something that happens often,

22 40 endorsements that add an endorsement and then remove the

23 same endorsement?

24 A.    It's not unheard of.  Not common, but not unheard of.

25 Q.    Fair to say you don't know what any of those 40

Connolly - X

1  endorsements in this case say?

2  A.    I don't know what any predecessor endorsement than this

3  says.

4  Q.    As part of your engagement in this matter, you didn't do

5  any research into the types of endorsements that St. Paul

6  issued on CGL policies in the '50s and '60s?

7  A.    I did not do any research.

8  Q.    And endorsements sometimes include exclusions; correct?

9  A.    That's correct.

10  Q.    And, actually, the '54 to '57 policy has an endorsement

11  that amends an exclusion; isn't that right?

12  A.    I don't recall.  I'll take your word for it.

13  Q.    We can look at it.  If you go to Exhibit 1, it's

14  endorsement number six.

15  A.    Maybe you can pull it up.

16  Q.    Sure.  I think it's in front of you now.

17  A.    Uh-huh.

18  Q.    And the question is just this is an endorsement that

19  amends an exclusion; correct?

20  A.    Yes.  It removes exclusion E and F and has a revision

21  above E and F.

22  Q.    If you had a copy of a policy form for this period but not

23  the endorsements, you wouldn't actually know what the true

24  scope of exclusions E and F were?

25  A.    That's true.  I wouldn't.  But it would be highly unusual

Connolly - X

1    if it was a fundamental change in the insurance agreement, the

2    insuring agreement.

3    Q.    In your career, have you seen endorsements that exclude

4    certain locations from coverage?

5    A.    Yes.

6    Q.    And have you seen endorsements that excluded certain

7    entities from coverage?

8    A.    Yes.

9    Q.    And have you seen endorsements that change the limits of a

10   policy?

11   A.    Yes.

12   Q.    And have you seen endorsements that change the limit

13   either of the policy itself or in connection with certain

14   government contracts?

15   A.    I suppose there are.  I can't off the top of my head say

16   that for sure I saw endorsements that changed the agreement

17   with regard to particularly insuring -- particular government

18   contracts.

19   Q.    You -- sorry.  You can finish.

20   A.    It certainly could have.

21   Q.    Just so we're clear, you don't recall in your career

22   seeing an endorsement that changed a policy limit in connection

23   with a particular government contract?

24   A.    No.  Today I don't recall.

25              THE COURT:  Mr. Kole, we're just a little bit after

219

1   5:00.  How much longer do you think you have?  A lot?

2              MR. KOLE:  I --

3              THE COURT:  I'm not trying to rush you.

4              MR. KOLE:  I appreciate that, Your Honor.  I would

5   guess 20 to 25 minutes.

6              THE COURT:  All right.  Here's what I suggest:  We

7   pick it up tomorrow with Mr. Connolly's testimony.

8        Sorry, Mr. Connolly, you're going to have to stay another

9   day.

10       And we'll move from -- move on from there.

11       Assuming we pick up with Mr. Connolly tomorrow at, let's

12  say, 9:00, are we still on track, do you think, to finish even

13  as early as the end of the day tomorrow?

14             MR. RYCEWICZ:  Absolutely, Your Honor.

15             MR. KOLE:  Your Honor, if I may.  I'll ask anyone

16  else to chime in.  As far as I know, when we're done with

17  Mr. Connolly, we're done.  And so depending on redirect and

18  other things, I'm guessing we'll be done in an hour tomorrow.

19             THE COURT:  Even better.  It won't be an hour

20  tonight.

21             MR. KOLE:  I'm not asking that it be.  I prefer it

22  not, actually, but just so you understand where we are.

23             THE COURT:  Thank you.  That will be very helpful.

24             MR. BEATTIE:  If I can get a little clarification.

25  It's my understanding that the exhibits that were offered that

220

1   were not objected to have become part of the record; is that

2   correct?

3            THE COURT:  They are -- thank you for asking the

4   question.

5       So for those of you who may not have heard Mr. Beattie's

6   full question, he stated his understanding that the exhibits

7   that have been not objected to are part of the record, along

8   with the ones that have been formally admitted.

9       Technically, that's true.  My practice, generally, is

10  this:  Even an exhibit that has been preadmitted as a result of

11  the pretrial briefing that is not used during trial, I usually

12  do not send those exhibits to the jury.  That's my practice.

13      Now, we don't have a jury, obviously, so if there's

14  general agreement that every exhibit that has been preadmitted,

15  whether or not it's referred to specifically by the lawyers or

16  a witness during trial are exhibits the Court still may

17  consider in reaching its ruling, then I'm happy to do that.  I

18  just want to make sure everybody is on -- agrees one way or the

19  other.  So I'm happy to consider everything preadmitted or only

20  those things that have actually been used during the trial.

21      And you can think about it and let me know tomorrow.  I'm

22  fine with that.

23      Mr. Rycewicz?

24           MR. RYCEWICZ:  I tell you, Your Honor, the former is

25  our expectation.  If the document was not objected to, but was

1   submitted, then it is part of the record.  In our direct

2   examination we did not consider that we might need to refer to

3   everything to be a part of the record.

4        THE COURT:  I kind of figured that in this particular

5   case.  I think that's probably the better course, unless

6   somebody has a strong objection.  I don't hear any objection.

7   You may.  Okay.

8        Preadmitted, it's in.

9        MR. BEATTIE:  Thank you, Your Honor.  One last

10  question.  How are we going to deal with deposition testimony?

11  Is that to be read, or are we to submit it to the Court as an

12  exhibit along with all the other exhibits?

13       THE COURT:  Well, technically speaking, deposition

14  transcripts usually aren't exhibits.  Usually deposition

15  testimony used in lieu of live testimony is either read into

16  the record or a video is shown.  Either is fine.

17       It would be more helpful to me, I think, to have you

18  present the deposition testimony.

19       I assume, Mr. Rycewicz, that your estimate of concluding

20  perhaps as early as the end of the day tomorrow contemplated

21  using the deposition testimony as well.

22       MR. RYCEWICZ:  Yes, Your Honor.  I was assuming that

23  the -- that the deposition testimony designated would be part

24  of the record without having to be read.

25       THE COURT:  Without having to be read?

1        MR. RYCEWICZ:  Yes.

2        MR. KOLE:  I think, Your Honor, you have the

3   transcripts and the specific designations that the parties have

4   made, and so whatever is easiest for you is fine.  I'm not sure

5   we gain a lot by having us read those into the record for you

6   to listen to, but if it would help you.

7        THE COURT:  Mr. Ruggeri?

8        MR. RUGGERI:  Your Honor, if I were in your shoes, I

9   may conclude it would help me to hear the excerpts read into

10  the record.  We don't want to waste the Court's time, but all

11  things being equal, based on my experience, is, yes, we do read

12  it into the record.

13       THE COURT:  How many minutes or hours of reading the

14  designations into the record?  Rough estimate?

15       MR. RYCEWICZ:  I would say for us probably 30

16  minutes, and that would be Mr. Bechtold's job.  But he talks

17  fast.

18       THE COURT:  I prefer to have it read.  Then if I have

19  questions, I can write down questions as we go along.  It is

20  helpful.  I've had bench trials before, as you're probably not

21  surprised to hear.  I've had deposition testimony read into the

22  record.  Usually it's helpful to have it read.  It extends our

23  trial a little bit.  We are so far ahead of schedule, I'm not

24  that concerned.  I don't want to keep anyone here

25  unnecessarily, but it looks like everybody will be able to go

1  home over the weekend and not have to come back on Monday.  So

2  I'm happy about that.

3      So plan to read the excerpts tomorrow, and we'll do it

4  that way.

5      All right.  Mr. Beattie, any other questions?

6          MR. BEATTIE:  That covers it.  Thank you, Your Honor.

7          THE COURT:  All right.  Anyone else have housekeeping

8  issues or questions?

9      All right.  So let's start tomorrow at 9:00, ready to

10  resume with Mr. Kole's cross-examination of Mr. Connolly.

11      And we are in recess.

12                 (Trial Day 1 adjourned.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3        CENTURY INDEMNITY COMPANY v. THE MARINE GROUP, et al

4                            3:08-cv-01375

5                             TRIAL DAY 1

6                           November 4, 2015

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record of proceedings in the

10   above-entitled cause.  A transcript without an original

11   signature, conformed signature, or digitally signed signature

12   is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR

15   _____

     Official Court Reporter            Date: December 15, 2015

16

17

18

19

20

21

22

23

24

25