225

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF OREGON

3                      PORTLAND DIVISION

4

CENTURY INDEMNITY COMPANY        )
5   a Pennsylvania Corporation,     )
                                    )
6                      Plaintiff,   ) Case No. 3:08-cv-01375-AC
                                    )
7             v.                    )
                                    ) November 5, 2015
8   THE MARINE GROUP, LLC, a        )
    California limited liability    )
9   company, as affiliated with     ) Portland, Oregon
    Northwest Marine, Inc., et al.  )
10                                   )
                       Defendants.  )
11  _____)

12

13

14

15                      TRIAL DAY 2

16                 TRANSCRIPT OF PROCEEDINGS

17           BEFORE THE HONORABLE JOHN V. ACOSTA

18      UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

19

20

21

22

23

24

25

```
 1                              APPEARANCES

 2   FOR CENTURY INDEMNITY:R. LIND STAPLEY
                           Soha & Lang, P.S.
 3                         1325 Fourth Avenue
                           Suite 2000
 4                         Seattle, WA 98101

 5   FOR CENTURY INDEMNITY:WILLIAM G. EARLE
                           Davis Rothwell Earle & Xochihua PC
 6                         111 SW 5th Avenue
                           Suite 2700
 7                         Portland, OR 98101

 8   FOR GRANITE STATE:    KENNETH H. SUMNER
     et al.                Sinnott Puebla Campagne & Curet, APLC
 9                         Two Embarcadero Center
                           Suite 1410
10                         San Francisco, CA 94111

11   FOR AGRICULTURAL :    JAMES P. RUGGERI
     SURPLUS and EXCESS    Shipman & Goodwin LLP
12   INSURANCE CO.         1875 K. Street NW
                           Suite 600
13                         Washington, DC 20006

14   FOR AGRICULTURAL :    JAMES P. MURPHY
     SURPLUS and EXCESS    Murphy Armstrong & Felton LLP
15   INSURANCE CO.         701 Millennium Tower
                           719 Second Avenue
16                         Seattle, WA 98104

17   FOR THE ARGONAUT:     MICHAEL D. COMPEAN
                           Black, Compean & Hall, LLP
18                         700 South Flower Street
                           Suite 3350
19                         Los Angeles, CA 90017

20   FOR THE ARGONAUT:     JAY W. BEATTIE
                           Lindsay Hart LLP
21                         1300 SW Fifth Avenue
                           Suite 3400
22                         Portland, OR 97201

23   FOR THE MARINE GROUP: DAVID O. BECHTOLD
                           Miller Nash Graham & Dunn, LLP
24                         111 SW Fifth Avenue
                           Suite 3400
25                         Portland, OR 97204
```

```
 1   FOR THE MARINE GROUP:  CHRISTOPHER A. RYCEWICZ
                            Miller Nash Graham & Dunn, LLP
 2                          111 SW Fifth Avenue
                            Suite 3400
 3                          Portland, OR 97204

 4
     FOR ST. PAUL:          THOMAS A. GORDON
 5                          Gordon & Polscer, LLP
                            9755 SW Barnes Road
 6                          Suite 650
                            Portland, OR 97225
 7
     FOR ST. PAUL:          ROBERT KOLE
 8                          Choate, Hall & Stewart, LLP
                            Two International Place
 9                          100 - 150 Oliver Street
                            Boston, MA 02110
10
     FOR ST. PAUL:          ANDREW S. MOSES
11                          Gordon & Polscer, LLP
                            9755 SW Barnes Road
12                          Suite 650
                            Portland, OR 97225
13
     FOR EMPLOYERS MUTUAL   MARGARET M. VAN VALKENBURG
14   CASUALTY COMPANY:      Bullivant Houser Bailey, PC
                            300 Pioneer Tower
15                          888 SW Fifth Avenue
                            Portland, OR 97204
16

17   ALSO PRESENT TELEPHONICALLY:  Mark Paulson

18

19

20

21

22

23

24

25
```

1                              INDEX

2                           TRIAL DAY 2

3    DENNIS CONNOLLY:

4    Cross-Examination by Mr. Kole                229

5    Redirect Examination by Mr. Ruggeri          263

6    Redirect Examination by Mr. Stapley          271

7    THOMAS HORNBECK

8    Examination by Mr. Rycewicz                  281

9    THOMAS HORNBECK

10   Examination by Mr. Ruggeri                   308

11   LISA LAUF

12   Examination by Mr. Ruggeri                   354

13

14

15

16

17

18

19

20

21

22

23

24

25

Connolly - X

1          TRANSCRIPT OF PROCEEDINGS

2          DEPUTY COURTROOM CLERK:  All rise.

3          THE COURT:  Good morning.  We're back.

4     Mr. Connolly, you're up.  And because it's for the record,

5     Mr. Connolly, you're still under oath.

6          And, Mr. Kole, I believe we stopped during your

7     cross-examination, so if you're ready, you may continue.

8          MR. KOLE:  Thank you, Your Honor.

9

10          CROSS-EXAMINATION

11     BY MR. KOLE:

12     Q.   Good morning, Mr. Connolly.

13     A.   Good morning.

14     Q.   I just want to clarify something from your testimony

15     yesterday.  You testified that Dale Weitzel was employed by

16     St. Paul.  That's not correct, is it?

17     A.   That is not correct.

18     Q.   He was employed by Northwest Marine Iron Works?

19     A.   Oh, well, for the purposes we're concerned with, yes.

20     Q.   You testified yesterday about certain policy forms that

21     were produced by St. Paul in this case.  Do you recall that?

22     A.   Yes.  There were four forms.

23     Q.   Is it your testimony that you reviewed those forms in

24     connection with your expert report?

25     A.   Yes.

230

Connolly - X

1  Q.   And that you relied on those forms for purposes of your

2  opinion in this matter?

3  A.   Yes.

4            MR. KOLE:  Could you pull up Mr. Connolly's

5  deposition at page 1 --

6            THE WITNESS:  Well --

7            MR. KOLE:  -- 23, please?

8            THE WITNESS:  -- once again my book has disappeared.

9            MR. KOLE:  We'll pull it up on the screen.  If you

10  want the actual transcript, I'm sure we can get it for you.

11            THE WITNESS:  It's useful to have the book as well.

12            DEPUTY COURTROOM CLERK:  Is it in the book, then, or

13  is it a separate transcript?

14            THE COURT:  Do we have a paper transcript?

15            THE WITNESS:  I would like the book.  I don't need

16  the paper transcript, but I would like to have the book which

17  has my report.

18            MR. KOLE:  Jim, do you want to just give him the book

19  you had yesterday back?

20            MR. RUGGERI:  Your Honor, we left the book up there

21  yesterday for the witness.

22            THE COURT:  There we go.

23  BY MR. KOLE:  (Continuing)

24  Q.   If you could look at page 123 of the transcript, and it's

25  up on the screen, starting at line six:  Do you recall

Connolly - X

1  reviewing any of those forms in connection with this

2  engagement?

3         Answer:  No.

4         Is it fair to say that you don't rely on these forms for

5  any particular part of your opinion?

6         Answer:  I don't.

7         Do you see that?

8  A.    Yes.

9  Q.    Was that accurate when you said that at your deposition,

10  sir?

11  A.    No, it wasn't.  I was given a cover letter, which I had

12  never seen before, to which the forms were attached, and I

13  didn't make the connection.

14  Q.    And you drafted your report in this matter in or around

15  March of 2015 with Mr. Ruggeri and people from his firm;

16  correct?

17  A.    That's correct.

18  Q.    And you were deposed in April -- April 8th of 2015, about

19  a month later; is that correct?

20  A.    Also correct.

21  Q.    If you could turn to Exhibit 1, which I think is in your

22  book, and this is the alleged 1954 to '57 St. Paul policy; is

23  that right?

24  A.    It is the 1954 to 1957 policy.

25  Q.    In your opinion, is this a complete copy of that policy?

Connolly - X

1    A.    It is complete, in my opinion, and it is complete enough

2    to show the basis of coverage.

3    Q.    And the stated property damage limit on the declarations

4    page is $100,000; correct?

5    A.    Correct.

6    Q.    And you testified on direct that the limit was increased

7    with respect to certain government contracts?

8    A.    That's correct.

9    Q.    Correct?

10   A.    Yesterday I believe I said that I never seen such an

11   endorsement, and I was thinking of something else.

12   Q.    Okay.  What types of claims would the

13   hundred-thousand-dollar limit on the declaration page of this

14   policy apply to?

15   A.    It would apply to property damage, liability, other than

16   automobile.  So it would include an aggregate for products as

17   listed.  It would have each accident, aggregate operations, but

18   it would cover for purposes that we're concerned with, property

19   damage.

20   Q.    When you say "aggregate operation," what's an operations

21   claim?

22   A.    An operations claim is usually a claim for an operation

23   that's ongoing, something like a completed operations, building

24   a building, things of that sort.

25   Q.    So if Northwest Marine Iron Works was engaged in

Connolly - X

1    operations at its facilities unrelated to the specific

2    government contracts and vessels identified in the endorsements

3    to this policy, the hundred-thousand-dollar limit would apply;

4    correct?

5    A.    That is correct, to the extent that this would be a

6    segregable -- that is to say that you could separate, let's

7    say, one ship from another ship's contribution to pollution.

8    Q.    Leave ships to one side for a minute.  If there were

9    claims relating to just waste disposal practices at the sites

10   unrelated to vessels, unrelated to government contracts, the

11   limit for that would be $100,000; correct?

12   A.    If there were a discrete contribution unassociated with a

13   naval vessel, then, yes.

14   Q.    And --

15   A.    But Superfund doesn't make for those distinctions.

16   Q.    If you would turn to the first of the endorsements

17   relating to the government contract, which is number five.

18   A.    This is the one I said I guarantee you I misunderstood

19   your question yesterday.  Yes.

20   Q.    It's been pointed out to me that I speak a little quickly,

21   so it's certainly possible that you misunderstood one of my

22   questions.

23   A.    Well, there's a quote from Sydney Greenstreet in the

24   *Maltese Falcon.*  "In the heat of battle, people make mistakes."

25            MR. KOLE:  That would be the first time I've had the

234

Connolly - X

1    *Maltese Falcon* quoted in the trial.  Aways good to have new

2    things.

3                THE COURT:  Still waiting for *Marbury v. Madison*.

4                MR. KOLE:  I feel reasonably confident it will not be

5    today, Your Honor.

6                THE COURT:  Pretty sure.

7    BY MR. KOLE:  (Continuing)

8    Q.    If you look at the language on the top of endorsement

9    five, it says:  It's hereby understood and agreed that the

10   limits of liability hereunder are amended as follows, but only

11   as respects work being performed under contract MA-283 entered

12   into between the insured and the United States Department of

13   Commerce Maritime Administration.

14        Do you see that?

15   A.    I do.

16   Q.    And do you know what contract MA-283 was?

17   A.    Do I know the details of the contract?

18   Q.    Yes.

19   A.    No.  But being a ship repair facility, I suspect it had

20   something to do with repairing ships.  And also the testimony,

21   the owner yesterday would indicate that.  As I mentioned

22   before -- I think I did -- I worked on ships when I was in law

23   school.  So I have some familiarity of the kind of repairs that

24   go on.

25   Q.    And the language -- strike that.

Connolly - X

1          Would you agree that this endorsement modifies the

2     contract limit only as respects work being performed under that

3     contract?

4     A.    I think it does that.

5     Q.    And the same thing is true of endorsement number eight,

6     correct, which is on Bates number 217115?

7     A.    Yes.

8     Q.    And if you would turn to 21 -- I'm sorry, 7117, which is

9     endorsement nine, the same thing is true; correct?  The

10    contract number is different, but otherwise the same thing is

11    true; correct?

12    A.    Also correct.

13    Q.    If you would turn to the next page, endorsement 10, true

14    for that as well; correct?

15    A.    Yes.

16    Q.    And fair to say that you don't know whether any of the

17    damage alleged in this case at the Portland Harbor site was

18    caused by contamination resulting from any of the specific

19    contracts that we just looked at in endorsements five, eight,

20    nine, and ten?

21    A.    Assume the contracts were carried out in some way.  Under

22    Superfund, there was no de minimis exception.  So if one drop

23    got out, then there would be coverage.

24    Q.    But you don't know whether factually any of the damage

25    alleged at the Portland Harbor site arose from any drop arising

Connolly - X

1    out of these particular contracts; correct?

2    A.    That's correct.

3    Q.    And you can't identify any document that you reviewed in

4    connection with your engagement here that identifies damage

5    that arose from these specific contracts; correct?

6    A.    That's correct.  I can't.  But I wonder if the 104 letter

7    from the EPA and perhaps the complaint in their action against

8    these parties might identify it.

9    Q.    But I don't know if it does?

10   A.    But I don't know.

11   Q.    If you would look at Exhibit 2, please.  I don't know if

12   that is in your book?

13            MR. KOLE:  Jim?

14            MR. RUGGERI:  It is not.

15            MR. KOLE:  It's in the bigger witness book, Mr. Gale,

16   if you wouldn't mind handing that to Mr. Connolly.

17            THE WITNESS:  I can read at the moment, at least.

18   BY MR. KOLE:  (Continuing)

19   Q.    Okay.  If you think you need the paper, please let us

20   know.

21   A.    All right.

22   Q.    What's been marked as Exhibit 2 is -- are three

23   certificates of insurance.  Do you see that?

24   A.    I think I do need the book.  I can only see one.

25   Q.    Okay.  Do you have it?

Connolly - X

1   A.    I do.

2   Q.    You see that Exhibit 2 has three certificates of

3   insurance?

4   A.    I do see that.

5   Q.    And each of them relates to policy number 1419213, which

6   is the policy that we were just looking at; correct?

7   A.    Yes.

8   Q.    And the limits in two of these certificates for property

9   damage are listed as 100,000 and for the -- I'm sorry, as

10  300,000, and the third is listed as 100,000.  Do you see that?

11  A.    Yes.

12  Q.    Do you know why there would be different limits of

13  liability listed in these certificates applying to the same

14  policy?

15  A.    To the extent that there's one that lists 300,000 as the

16  limit for -- I guess the answer to your question is I think it

17  was a mistake, and I don't know why there was a mistake.  I do

18  know that the first policy -- I was exactly 14 years old.

19  March 10th is my birthday.

20  Q.    If it -- is it possible that the limits stated in these

21  certificates were stated that way because that's what the

22  limits were required to be under the contracts relating to

23  those certificates?

24  A.    No.  As we heard yesterday, I think the contracts required

25  by the government and the Navy required 300,000.  I think what

Connolly - X

1    happened is that a person who typed this looked at the front,

2    forgot to look at the endorsements, and so they came up with

3    the wrong number.

4    Q.    So the number for the government contract would be 300.

5    The number for the policy itself would be 100?

6    A.    Correct.

7    Q.    If you would turn to Exhibit 5, please.

8    A.    I have 5.

9    Q.    Okay.  And this is a document that you testified about

10   yesterday.  You recall that, sir?

11   A.    Yes.

12   Q.    And this is the only document that you rely on in your

13   expert report with respect to the policy limit of the alleged

14   1957 to 1960 policy; is that correct?

15   A.    It's the only document that at this moment I recall.

16        However, my report also notes the custom and practice at

17   the time for continuous relationships between policyholders and

18   insurers, and it does note that there is a $300,000 limit.

19   Q.    But this is the only document that you can recall relying

20   on in your report for this particular policy period; correct?

21   A.    I think that's correct.

22   Q.    Okay.  And just like if you turn to the second page --

23   it's actually on the back of the first page.

24   A.    Back to the -- in the exhibit, the back of the first page

25   is blank.

Connolly - X

1  Q.   Okay.

2  A.   So the certificate is the next.

3  Q.   Bates No. ending in 094.  Do you see where I'm looking?

4  A.   Yes.

5  Q.   And the limit identified on that is $300,000; correct?

6  A.   That's correct.

7  Q.   And that's just like two of the three certificates we

8  looked at in connection with the '54 to '57 policy; correct?

9  A.   Yes.

10 Q.   And the $300,000 limit here relates to the specific

11 government contracts that are identified on the bottom of the

12 certificate; is that right?

13 A.   This certificate relates to a particular contract.

14 Q.   Number 7401; correct?

15 A.   Yes.

16 Q.   And if you look at the next certificate, this certificate

17 relates to a specific government contract numbered MST-3251;

18 correct?

19 A.   Correct.

20 Q.   And you haven't seen anything in the 1957 to 1960 time

21 frame that identifies the limit of the -- the operations limit

22 of the policy, as opposed to the limit tied to a particular

23 government contract, which changes the limit from 100,000 to

24 300,000; correct?

25 A.   It is correct.  Although, custom and practice would

Connolly - X

 1 | indicate that there would have been any increase to $300.
 2 | Q.   But there wasn't a increase to 300,000 from 1954 to 1957;
 3 | correct?
 4 | A.   Actually, we don't know that for sure, but, yes, that's
 5 | correct.
 6 |      But around this time there was an increase in capacity by
 7 | the insurance industry, meaning the ability to write insurance,
 8 | quote/unquote, policy over surplus, and so insurers were
 9 | increasing limits and also we were beginning to enter the time
10 | of greater liability and greater litigation.  So it was not
11 | uncommon, in my experience, to see policies written in the --
12 | starting in the 1960s with $300,000 limits.  It was sort of --
13 | it had become the standard.
14 | Q.   Okay.  Thank you.  Can you look at the first page of the
15 | exhibit?  Exhibit -- same one we're looking at, Exhibit 5.
16 | It's before the certificate of insurance.  It's the cover
17 | letter.
18 | A.   Oh, sorry.
19 | Q.   If you look at the bottom of that letter, number two --
20 | it's actually the second number two on the cover letter.
21 | A.   Understood.
22 | Q.   There's a reference to renewal policies.  Do you see that?
23 | I think you actually testified to that on direct.
24 | A.   Yes.
25 | Q.   In this time frame, was it standard practice in the

Connolly - X

1    insurance industry for policyholders to renew their coverage

2    utilizing the same limits as prior coverage?

3    A.    Not always.  Sometimes you would renew a policy.  It would

4    have the same terms and conditions, but it could include just

5    simply a new limit, and, as I said, this was a time period in

6    which limits were -- were increasing.

7    Q.    If you could look at your expert report, please.  In

8    particular, would you look at page 10?  At the top of the page

9    in the carryover paragraph, do you see where I'm looking?

10   A.    Well, I can't read your mind.  I see the top of page 10.

11   Q.    Fair enough.

12        In the third line down there's a sentence starting with

13   "because."  It says:  Because of these factors, it was very

14   common for policyholders, through their brokers, to be offered

15   renewals of their insurance on the same terms, conditions, and

16   limits.  Standard practice was for policyholders to renew their

17   coverage with the same insurer on the same terms, conditions,

18   and limits.

19        Did you write that, sir?

20   A.    I did.

21   Q.    Is that a true statement?

22   A.    It is a true statement, but I would qualify it in the way

23   I have just testified, that in the 1960s the circumstances

24   under which insurance policies were written, the types of

25   liability, and the policyholder surplus of insurers had changed

Connolly - X

1    significantly.   There was more competition, and there was an

2    increase in the number of excess insurers.   The whole system

3    changed.

4        By way of example, policyholder surplus -- this is off the

5    top of my head -- but policyholder surplus in the 1930s was

6    under $2 billion for the entire industry.   In the '40s it had

7    risen to about 5 billion.   In the mid-'50s -- in 1960 the

8    policyholder surplus was, I believe, 22 billion.   So the

9    liabilities were going and so were the availability of

10   insurance.

11       In fact, this was part of my testimony in Congress in

12   1977.

13   Q.   If you would look at your report.   Page 17, please.   You

14   see paragraph 41 is a list of policies.   We've talked about the

15   first two.   So now moving to the next one, which is

16   February 11, 1960, to May 31, 1962, you don't identify any

17   document in your expert report that identifies the limit of

18   that alleged policy; correct?

19   A.   That's correct.   Although, given the fact that the policy

20   before and the policy after that $300 as a limit, custom and

21   practice would be that the limit in between would not be less.

22   Q.   Assuming that the policy limit of the policy before and

23   after were, in fact, 300,000; correct?

24   A.   Well, I think we've shown that they were; but, yes,

25   assuming -- assuming that the limits before and after were

Connolly - X

1    300,000, then it would lead to the conclusion that 300,000 was

2    the limit in the middle.

3    Q.    You haven't seen any document indicating that the limit of

4    the alleged 1960 to 1962 policy itself was $300,000; correct?

5    A.    No.  But I think a company of this -- I have not, but a

6    company of the type and with the kinds of exposure that

7    Northwest Marine had, it just would be extremely unusual to not

8    carry a $300,000 limit.

9    Q.    The next policy in your chart on page 17 is May 31, 1962,

10   to May 31, 1965; correct?

11   A.    Yes.

12   Q.    And you don't identify any document in your report that

13   lists a limit of that policy as $300,000; correct?

14   A.    Actually, I don't remember, but I think in Mr. Hughes'

15   testimony yesterday, documents which I didn't have did confirm

16   that.

17   Q.    You have not amended your report at any point to identify

18   additional documents or amend the policy terms identified on

19   paragraph 41; correct?

20   A.    That's true.

21   Q.    We talked about operations exposures separate and apart

22   from contractual liability provisions.  Is it possible for a

23   policyholder to purchase operations limits for its own

24   liability that are different from its limits with regard to a

25   particular government contract?

Connolly - X

1   A.    Yes.

2   Q.    And it could purchase limits for itself that are either

3   higher or lower than the limits it provides to a specific --

4   under a specific government contract; correct?

5   A.    That's also correct.

6   Q.    And if you would, go back to paragraph 41 of your report

7   on page 17.

8   A.    That's the chart?

9   Q.    Yes.

10  A.    Yes.

11  Q.    And there are six alleged policies in that chart; correct?

12  A.    Yes.

13  Q.    And three of those alleged policies, 1954 to '57, 1957 to

14  1960, and 1962 to 1965 are three-year policies; correct?

15  A.    Correct.

16  Q.    And, in your experience, three-year policies were common

17  in the 1950s and '60s; correct?

18  A.    Yes.  It was the standard.

19  Q.    And one-year policies were common in the 1950s and '60s?

20  A.    Also correct.

21  Q.    And, in your experience, 95 percent or more of those

22  policies issued in that time period would have been either

23  three-year or one-year policies; correct?

24  A.    Well, it would be -- you're correct about five percent,

25  which would not be uncommon, in a sense, would have stub

Connolly - X

1  periods.  But, otherwise, normally, policies are issued either

2  on a one-year or a 36-month period.

3  Q.   It would be accurate to say that anything other than one

4  to three-year policies would be in the district minority for

5  that time period; correct?

6  A.   Right.  But they were, nevertheless, because companies

7  were adjusting their time periods because the -- the insured --

8  the brokers hated the one/one renewals when almost everybody

9  has to renew at the same time.  So there were lots of reasons

10  why policies shifted.

11       Also, when you shift it from one insurer to another or

12  whether there were some cancellation issues, it wasn't uncommon

13  to have three equal, or more, months as a stub period.

14  Q.   But just so we're clear, it would be the distinct minority

15  of policies during this time frame that were not three-year or

16  one-year policies; correct?

17  A.   I would say that your estimate of five percent is a little

18  low, but ten percent would be more likely.

19  Q.   If you would look at your deposition transcript at page

20  136, please, and actually at line 18.

21       Question:  Were there any policy terms in the '50s and

22  '60s for CGL coverage other than one- and three-year terms

23  that, in your experience, were common?

24       Your answer:  I don't know how you define "common."  I'd

25  say that 95 percent or more of insurance policies in that

Connolly - X

1   period of time were written on either a three-year or a

2   one-year.  Do you see that?

3   A.   I do.

4   Q.   Is it fair to say that the 95 percent or more estimate

5   wasn't mine.  It was yours?

6          MR. RUGGERI:  Your Honor, if I may.  This is the

7   second excerpt that Mr. Kole has read where the answer is cut

8   off.  I don't know that it affects the answer so much as I do

9   believe the witness is entitled to his deposition transcript in

10  full in front of him, and I would ask Mr. Kole to provide that

11  to Mr. Connolly if he's going to use the transcript as he has

12  twice.

13     Again, it comes up because two answers have been cut off

14  in the middle.

15         THE COURT:  So provide the entirety of the answer for

16  the witness.  And just, as an observation, the difference

17  between five percent and ten percent is not so significant that

18  I think it undermines your point, Mr. Kole, that it was the

19  distinct -- or Mr. Connolly's testimony -- the distinct

20  exception.

21         MR. KOLE:  Thank you, Your Honor.

22  BY MR. KOLE: (Continuing)

23  Q.   And --

24         THE COURT:  So we have the entire answer?  No, we

25  don't because it continues on to the next page.

Connolly - X

1          MR. KOLE:  Do we have a copy of -- I'll just read the

2   rest of the answer, Your Honor, so you'll have it all in the

3   record.

4          THE COURT:  Thank you.

5   BY MR. KOLE: (Continuing)

6   Q.   So the remainder of the answer is:  So there might be

7   policies.  It also wasn't uncommon to see stub periods and

8   things of that sort, but those tended to be one off.

9          And then, actually going down, question:  Just so there's

10  no confusion as to what my meaning of "common" might be, using

11  your meaning of common, as used right here, was it common for

12  insurers to provide policies other than one- and three-year

13  policies?  CGL policies in the '50s', 60s and '70s?

14         And your complete answer was:  Was it common for them to

15  provide other than one- or three-year?  I would describe it as

16  a distinct minority.  That's accurate; correct?

17  A.   Well, I think five to ten percent -- yes, that's accurate.

18         MR. KOLE:  Okay.  I have to agree with Your Honor.  I

19  don't think we need to quibble over five or ten percent.

20  BY MR. KOLE: (Continuing)

21  Q.   If we look back at your page 17 of your report,

22  Exhibit 206 -- are you there, sir?

23  A.   That was on 17?

24  Q.   What's that?

25  A.   I'm sorry.  You left me on page 17.  We're still there.

Connolly - X

1  Q.    You're still there.

2       You identify the third policy down, which is a policy that

3  spans two years and three months; correct?

4  A.    Yes.

5  Q.    And then two policies down from there, the policies

6  spanning 13 months; correct?

7  A.    Yes.

8  Q.    And then you end with a six-year policy; correct?

9  A.    Yes.

10 Q.    So 50 percent of the policies that you identified in your

11 report would fall under the category of policies that you

12 describe as a distinct minority; correct?

13 A.    That's correct.

14 Q.    And can you go to the demonstrative?  This is a chart, and

15 I'll state for the record, the information on each side of this

16 chart were just pulled directly from Mr. Hughes' report and

17 your report.  Page 3 of Mr. Hughes' report and page 17 of

18 yours, putting them together, just for convenience sake, to

19 have it on one spot.

20      It's correct, is it not, that the policies that Mr. Hughes

21 identified and the policies you identified were different?

22 A.    The charts are different.  I think the policies are the

23 same.  The terminology -- the -- the additional information

24 that Mr. Hughes was able to find included policy numbers for

25 the policies that I couldn't find.  Didn't have it.  And they

Connolly - X

1    had -- it has different periods.  But as I testified yesterday,

2    I think, Mr. Hughes had additional information and I think --

3    and I watched his testimony, and I think his chart and

4    testimony as to time periods was correct.

5    Q.    And you saw Mr. Hughes' report as of April of this year;

6    correct?

7    A.    I did.

8    Q.    Did you supplement or amend your report after reviewing

9    his report?

10   A.    No.

11   Q.    Did you supplement or amend your report after reviewing

12   any of the additional information that you said you did not

13   have access to at the time of your initial report?

14   A.    I did not.

15   Q.    We talked about the '50 to '57 policy -- I'm sorry, '57 to

16   '60 policy on your chart, which is the second one.  Let's move

17   on to the third one that you identified -- pull that back up.

18   Pull it back up.

19        So the '60 to '62 policy, you haven't seen a copy of that

20   policy; correct?

21   A.    No.

22   Q.    You haven't seen a declarations page for that policy?

23   A.    No.

24   Q.    And you don't know what the policy number is for that

25   alleged policy?

Connolly - X

1    A.   Well, I do because of Mr. Hughes' testimony.

2    Q.   So you think that the policy number that Mr. Hughes

3    identifies for which policy, the '60 to '63 policy, is the same

4    policy number for your '60 to '62 policy?

5    A.   I think Mr. Hughes -- I would adopt Mr. Hughes' -- the

6    chart you have because it's based on additional information

7    that I did not have, and I don't dispute it.

8    Q.   So you think that all the information on your chart that

9    is different from Mr. Hughes' chart is wrong?

10   A.   I think it's different because I didn't have the same

11   information.  To the extent it's different, I adopt Mr. Hughes'

12   chart.

13   Q.   Just to be clear, that means you're saying that your

14   report, to the extent it's different, was wrong?

15   A.   Yes.

16   Q.   And when did you first become aware that in your view your

17   chart was wrong?

18   A.   Probably Friday of last week.

19   Q.   So between -- and I pointed out to you these differences

20   at your deposition; isn't that correct?

21   A.   I don't recall.

22   Q.   At no point between your deposition and Friday did you

23   come to the conclusion that Mr. Hughes was right and you were

24   wrong?

25   A.   That's correct.

Connolly - X

1    Q.   The '60 to '62 policy that you identified in your chart,

2    you don't identify any document in your expert report that

3    relates to that particular policy; correct?

4    A.   I believe that's correct.

5    Q.   And you hadn't seen any document suggesting a policy for

6    that particular time period; correct?

7    A.   Other than the custom and practice of continuous

8    relationships between policyholders and insurers particularly

9    at that time.

10   Q.   You hadn't seen any document related to that particular

11   policy period; correct?

12   A.   I had not seen a document.  I just think that the custom

13   and practice would be that you would not be switching -- at

14   that time you would not be switching insurers and then coming

15   back to insurers.

16   Q.   And you relied on, with regard to the period between 1960

17   and '67, or '66, for which, as we talked about yesterday, you

18   didn't have any -- you didn't identify any particular source

19   documents created in that time period.  You relied on the

20   ledger that was created by Mr. Dale Weitzel; correct?

21   A.   Yes.

22   Q.   And, to your knowledge, did Mr. Weitzel identify a policy,

23   a CGL policy, in the 1960 to 1962 time frame?

24   A.   I think the policies that Mr. Weitzel identified were the

25   ones numbered 1419213, also the policy 54JA2176 and the

Connolly - X

1    54JF2428.   Those are the ones that I, off the top of my head,

2    remember.

3    Q.    And so just to go back to my question, to your knowledge,

4    Mr. Weitzel did not identify on his chart a policy between 1960

5    to 1962, a CGL policy?

6    A.    I believe that my best reading of Mr. Weitzel's document,

7    that is correct.

8    Q.    And, actually, why don't we pull it up, if you would.   And

9    we'll pull up Exhibit 506, which is different -- it's

10   Mr. Weitzel's chart.  I'll state for the record, I find 506 a

11   little easier to read than the version that you used yesterday

12   on direct and a little more complete.

13   A.    Okay.

14   Q.    But if you would look at Exhibit 506 and if you would look

15   at the second page of the exhibit.

16   A.    Wait a minute.  Exhibit 506?

17   Q.    Yes.  You may not have it.

18            DEPUTY COURTROOM CLERK:  Is it in the little notebook

19   or not?

20            MR. RUGGERI:  It is not.

21            THE WITNESS:  It's also not in the big notebook.

22            MR. KOLE:  It's somebody else's exhibit.  If you

23   could give him the exhibit binder for that.

24        Thank you, Mr. Gale.

25   ///

Connolly - X

1        THE WITNESS:  Right.  Thank you.

2    BY MR. KOLE: (Continuing)

3    Q.    Actually, can you confirm for me, sir, that Exhibit 506

4    here is the version of the Weitzel chart that you reviewed in

5    connection with your report?

6    A.    I can't confirm that because it doesn't look like it's the

7    same.  It is much more legible.  It has more pages.

8    Q.    What are the pages you recall reviewing?

9    A.    Well, once again, even these pages look different than the

10   exhibit that I saw, which had a lot of cross-off, but there is

11   very substantial difference between this document and, to the

12   best of my recollection, the one that I saw, in terms of the

13   way it looks.  But -- so I can't be sure it's the same

14   document, but it looks to me as though pages 4 and 5 would have

15   been -- information included in pages 4 and 5 of that document

16   look like the pages that I saw.

17   Q.    Can you actually look at the second page of this exhibit?

18   A.    Yes.  I am looking at that.

19   Q.    There's a reference to some longshore policies between

20   1960 and 1962.  Do you see that?

21   A.    I do.

22   Q.    Mr. Weitzel located longshore policies in that time

23   period, but not CGL policies during that time period; correct?

24   A.    Yes.  As I understand it, yes.

25   Q.    The next policy that you identify in your chart on page 17

Connolly - X

1    is a March -- I'm sorry, a May 31, 1962, to May 31, 1965,

2    policy; is that right?

3    A.    Yes.

4    Q.    And you haven't seen a copy of that policy?

5    A.    That's correct.

6    Q.    You haven't seen a declarations page for that policy?

7    A.    No.

8    Q.    And in your report the only document that you rely on with

9    respect to that policy is Mr. Weitzel's ledger; correct?

10   A.    That's correct.

11   Q.    And your understanding is that Mr. Weitzel wrote his

12   ledger in 1980; is that right?

13   A.    Yes.

14   Q.    And in your report you said that the Weitzel ledger only

15   listed a one-year policy from May 31, 1963, to May 31, 1964;

16   correct?

17   A.    That's what it looks like.

18   Q.    So you assumed in your report, based on the fact that it

19   was common for insurers to write three-year policies, that the

20   policy actually spanned the period from May 31, 1962, to

21   May 31, 1965; right?

22   A.    My assumption was that, given the custom and practice at

23   that time, the way insurers worked, the fact that we had very

24   substantial evidence of the book ends, that this would be

25   consistent with custom and practice that they would be in a

Connolly - X

1  policy of more than one year, even though only one year was

2  identified.  And also the fact that it was identified indicated

3  to me that there was a policy.

4  Q.   But the way that you came up with a three-year policy for

5  this particular policy was your assumption that it would have

6  been a three-year policy because that was common in the time

7  period; correct?

8  A.   It's -- in my opinion, it was substantially more probable

9  that there would have been a three-year policy than just the

10 one-year policy.

11 Q.   Sir, you concluded that this policy was three years, based

12 on industry practice, but three of the other six policies you

13 identified weren't three years; correct?

14 A.   Well, I adopted the theory as stated by Mr. Hughes, yes.

15 Q.   Certainly at the time you wrote your report and you issued

16 your opinion, not Mr. Hughes' opinion, you concluded that three

17 of the six policies weren't three-year policies; correct?

18 A.   I concluded that they had shorter or longer periods, yes.

19 Q.   And you haven't seen any documents suggesting that a

20 policy actually incepted in May of 1962; correct?

21 A.   I see what you mean.  There is no documents that I'm aware

22 of.

23 Q.   The next policy you identify is a 13-month policy from

24 1965 to 1966; correct?

25 A.   You're talking about the unknown?

Connolly - X

1  Q.    Yes.   The unknown policy.

2  A.    May 31?   Yes.

3  Q.    And you haven't seen a copy of that policy?

4  A.    Also correct.

5  Q.    You haven't seen a declarations page for that policy?

6  A.    No.

7  Q.    And you didn't identify any document in your report

8  pointing to a 13-month policy between May of '65 and July of

9  '66; correct?

10 A.    I think that's correct.

11 Q.    You just filled in a gap that your other evidence had left

12 open; right?

13 A.    I felt that the circumstances here would have been a

14 continuous relationship.   And, to the extent that we had to

15 fill in periods, these were the best that I could do.

16      But I saw no indication whatsoever that St. Paul did not

17 issue a policy during the time frame of this whole entire

18 chart.   That, consistent with the custom and practice at the

19 time, consistent with other documents, we knew that there were

20 policies at the beginning and we knew that there were policies

21 after, and I felt that there would have been policies in

22 between.

23 Q.    And does it say anywhere in your report that you were

24 uncertain as to what the policy periods were for any of these

25 policies or that you didn't have enough information to reach a

Connolly - X

1   conclusion?

2   A.   No, it doesn't.

3   Q.   The last policy on your chart is a six-year policy;

4   correct?

5   A.   Yes.

6   Q.   And you haven't seen a copy of a six-year policy?

7   A.   No.

8   Q.   And you haven't seen a declarations page for a six-year

9   policy?

10  A.   That's correct.

11  Q.   You haven't seen any document in this case that references

12  a six-year policy?

13  A.   There are the placement slips -- slip -- excuse me.  The

14  placement slip, the Marsh writeup that would indicate that

15  there was a St. Paul policy.

16  Q.   So the Marsh writeup indicates that whatever it says about

17  St. Paul was as of the time of the writeup in 1972; correct?

18  A.   Yes.  But, as I indicated yesterday, these are the kinds

19  of proposals that we -- Marsh -- would have put forth.  And the

20  indication that St. Paul was an insurer was the kind of thing

21  that would normally have been in there.

22       If you had had a history of other insurers, that would

23  have been reflected.  So if between 1954 and 1966 there were a

24  bunch of different insurers, a Marsh writeup would say, "You

25  previously were with so and so," and it doesn't.  And the

Connolly - X

1   omission to me of mentioning any other insurers is an

2   indication that the same insurer, St. Paul, was on the program

3   for that entire time.

4   Q.    So in your experience, a broker trying to get business in

5   1972 would list insurance coverage going back to the beginning

6   of time?

7   A.    I don't think I said that.

8   Q.    It wouldn't be interesting to people you were trying to

9   pitch the business to what somebody's coverage may have been 20

10  or 30 or 40 years earlier?

11  A.    Right.  I agree with that.

12  Q.    And the Marsh report doesn't say anything about a six-year

13  St. Paul policy; is that correct?

14  A.    If there was a policy within this relatively short period

15  of time, it was from a different insurer, the way a -- an

16  insurer would -- a broker would treat that would be to say,

17  "You previously were with so and so and then you were with so

18  and so and then you came back to so and so," but there would be

19  some mention that would indicate that there was some insurer in

20  the program for this kind of liability other than St. Paul.

21  Q.    Let me go back to my question.

22        The Marsh report doesn't identify a six-year St. Paul

23  policy; correct?

24  A.    No.

25  Q.    And you talked about the London slip.  Can we look at that

Connolly - X

1  quickly?  That would be Exhibit 37.  Do you have that in front

2  of you, sir?

3  A.    I do.

4  Q.    If you would turn to LMI01153.

5  A.    Yes.  Is that -- what's the number of the exhibit?

6  Q.    Exhibit 37.

7  A.    Put in the record "the witness fumbled with papers."

8        I have it.

9  Q.    Okay.  If you look at LMI00153, this is a slip for a

10  London policy, 36 months, starting June '67.  June 8th of 1967;

11  correct?

12  A.    Yes.

13  Q.    And, in your experience, it would be common for underlying

14  insurance to be coterminous, meaning run the same period, as an

15  excess or an umbrella policy that sits over it; correct?

16  A.    That's common.  Not universal.

17  Q.    But it is common?

18  A.    It is common.

19  Q.    And that, in your opinion, did not happen here; correct?

20  A.    Yes.

21  Q.    And if you would actually pull Exhibit 506 back up,

22  please, which is the -- Mr. Weitzel's ledger, and if you would

23  look at page 5, there's a reference, maybe seven lines down, to

24  a St. Paul policy, and there's a JH5406 and a JH5407.  Do you

25  see that?

Connolly - X

1    A.    No.

2    Q.    Okay.  It's six or seven lines down.  If you look for the

3    policy number on the right --

4    A.    Yes.

5    Q.    -- do you see those two references?

6    A.    Yes.

7    Q.    And you see off -- all the way on the right, there's a

8    chart called "policy on hand."  Do you see that?

9    A.    Yes.

10   Q.    And it's your understanding that that meant that

11   Mr. Weitzel was suggesting he had a copy of those policies at

12   the time he issued the report?

13   A.    Actually, I don't know what it means.

14         A viable interpretation would be that that meant he had it

15   on hand.

16   Q.    Do you have an understanding as to why Mr. Weitzel

17   prepared this chart?

18   A.    I can't recall.

19   Q.    If you would look at your report, page 14, paragraph 35 --

20   are you there?

21   A.    Yes, I am.

22   Q.    If you would look at the top of that paragraph, you write:

23   In March and April 1990 Northwest Marine Iron Works employee,

24   Dale Weitzel, created a ledger of all Northwest Marine Iron

25   Works insurance, not just its CGL policies, in response to a

Connolly - X

1   series of asbestos incidents involving Northwest Marine Iron

2   Works employees.  Do you see that?

3   A.   I do.

4   Q.   Does that refresh your understanding as to why Mr. Weitzel

5   prepared the chart?

6   A.   Actually, I don't see where you are.  I'm sorry.  Can you

7   tell me what part of the paragraph?

8   Q.   It's the second sentence of the paragraph.  Paragraph 35,

9   page 14.

10  A.   Yes.  I remember that.

11  Q.   Does that refresh your memory?

12  A.   Yes, sir.

13  Q.   And, in your experience, was it common for policyholders

14  to adopt practices to retain their policies indefinitely in

15  response to long-tail exposures like asbestos claims?

16  A.   At what point?

17  Q.   At the point that long-tail exposures, like asbestos

18  claims, became common.

19  A.   Was it common for them to retain copies of policies

20  written ten years before?  I'm not -- I'm not quite sure what

21  you mean.  I know, for example -- maybe the best way to explain

22  it would be for companies that didn't realize they had an

23  asbestos exposure, they would not necessarily retain policies

24  until they discovered they were an asbestos defendant.

25       It was extremely common that policyholders did not have

Connolly - X

1    policies from the '50s and '60s.

2    Q.    But in this case, Mr. Weitzel, when he prepared his chart,

3    knew that Northwest Marine Iron Works had an asbestos exposure;

4    correct?  That's why he prepared it?

5    A.    Yes.

6    Q.    And it was common for policyholders to keep copies of

7    policies once they became aware that they were subject to

8    long-tail exposures like asbestos claims; correct?

9              MR. STAPLEY:  Your Honor, I'll move to object as

10   beyond the scope of direct, and Mr. Connolly, while an expert

11   in many areas, I don't think has been put up to be an expert on

12   the document retention policies of policyholders.

13             MR. KOLE:  I can simplify this, Your Honor, really

14   quickly, if I could, please.

15             THE COURT:  Go ahead, please.

16   BY MR. KOLE: (Continuing)

17   Q.    Mr. Connolly, can you turn to page 7 of your report?

18         Are you there, sir?

19   A.    I am.

20   Q.    Can you read footnote one into the record, please?

21   A.    Yes.

22   Q.    Can you read it, please?

23   A.    After the advent of long-tail continuous exposure claims,

24   insurers, policyholders, and brokers adopted practices to

25   retain their policies indefinitely.

Connolly - X/ReD

1    Q.    And you wrote that; correct?

2    A.    I did.  For example, as I mentioned, Lloyd's in 1978

3    adopted a requirement for brokers to retain policies

4    indefinitely, but that was in 1978.

5    Q.    It's your understanding that to the extent Mr. Weitzel had

6    on hand a policy in 1980, when he created this chart, that

7    policy no longer exists, to your knowledge.  You have not seen

8    it?

9    A.    I don't know where it is.

10   Q.    But you have not seen it; correct?

11   A.    I have not seen it.

12         MR. KOLE:  One second.  Nothing further at this time.

13   Thank you, Mr. Connolly.

14         THE WITNESS:  You're welcome.

15         THE COURT:  Mr. Ruggeri, redirect?

16

17               REDIRECT EXAMINATION

18   BY MR. RUGGERI:

19   Q.    Good morning, Mr. Connolly.

20   A.    Good morning.

21   Q.    Let's talk initially about policy forms.  Directing your

22   attention to Exhibit 10, the first page of Exhibit 10 is a

23   cover letter; correct?

24   A.    Yes, it is.

25   Q.    The cover letter is followed by four St. Paul policy forms

Connolly - ReD

1    that are Bates stamped; correct?

2    A.    Correct.

3    Q.    The Bates stamps run from STP1 through STP26; correct?

4    A.    Yes.

5    Q.    Now let's turn to your report marked Exhibit 206.  The

6    first page of your report, in the first paragraph, at the end

7    of it, refers to appendix A.  Do you see that?

8    A.    Yes.  Yes.

9    Q.    And directing your attention to the last sentence, you

10   appended to your report as Exhibit A a list of documents that

11   you reviewed; correct?

12   A.    Correct.

13   Q.    Directing your attention to page 3 of Exhibit A -- it's

14   back about 30 pages.  It's on the screen now.

15   A.    Got it.

16   Q.    Do you see the entry about a third, 40 percent down the

17   page, documents produced by St. Paul, STP1 through STP461?

18   A.    Yes.

19   Q.    Am I correct that Bates range includes the policy forms

20   that you reviewed which are assembled as part of Exhibit 10?

21   A.    Yes.  Those were 1 through 26.

22   Q.    And those were the policy forms that you reviewed in

23   preparation of your report; correct?

24   A.    That's correct.

25   Q.    Mr. Kole asked you yesterday questions about the period

Connolly - ReD

1    1960 to 1966, and yesterday you will recall that I showed you

2    the Weitzel ledger marked as part of 205.  Do you remember

3    that?

4    A.    Yes, I do.

5    Q.    I do want to thank Mr. Kole for using a more legible copy

6    this morning, and I'd like to direct your attention to

7    Exhibit 506.  Directing your attention to Exhibit 506, Bates

8    stamp MG215483, two-thirds of the way down the page, do you see

9    an entry for the dates 5/31/63, 5/31/64, St. Paul, and then you

10   go to the second column from the right, it shows the policy

11   number 504JF2428.

12   A.    I see it.

13   Q.    Okay.  Looking down a couple of lines, do you see the same

14   policy number entered for the period 5/31/64 through 5/31/65?

15   A.    Yes.

16   Q.    The policy number is 504JF2428; correct?

17   A.    That's correct.

18   Q.    Now, directing your attention to Exhibit 21 --

19         MR. KOLE:  Actually, Your Honor, if I could just

20   clarify before we move on from the exhibit, just a point that

21   the question started with a predicate of, "You recall you were

22   asked about policies from 1960 to 1963, and the policies that

23   the -- the entries that were just shown to the witness were

24   from 1963 forward.  So I think we need to clarify the record on

25   that.

Connolly - ReD

1        MR. RUGGERI:  Your Honor, maybe we should clarify the

2   question.  The questions asked, Mr. Kole, was actually directed

3   to whether there was any evidence of policies between the years

4   1960 -- and you'll recall his end date was '67 or '66.

5        MR. KOLE:  You're right.  He's correct, Your Honor.

6   I withdraw that.

7        THE COURT:  Go ahead, please.

8   BY MR. RUGGERI: (Continuing)

9   Q.   Directing your attention to Exhibit 21, we have a match

10  for the policy number, don't we?  504JF2428.

11  A.   Yes.

12  Q.   And the effective and expiration dates on Exhibit 21 show

13  May 31, 1963, and May 31, 1966; correct?

14  A.   Yes.  A three-year period.

15  Q.   Going back to Exhibit 506, the page Bates-stamped

16  MG215484, Mr. Kole asked you if you saw any references to a

17  six-year policy.  Again, this is more legible.  For the top,

18  right there, to the right of it, do you see a reference for a

19  date that appears to be 7/1/66 to 7/1/72?

20  A.   Indeed, I do.

21  Q.   It shows a policy number?

22  A.   504JH -- JH5407.

23  Q.   Okay.  Now, if you go down toward the bottom of that page,

24  do you see another reference to a policy with the dates

25  7/1/69 through 7/1/72, showing the policy number 536JB5573?

Connolly - ReD

1   A.    Also a three-year policy.

2   Q.    And it shows the date 7/1/69 to 7/1/72; correct?

3   A.    That's correct.

4   Q.    Mr. Connolly, Mr. Kole asked you questions yesterday about

5   manuscript endorsements and Travelers endorsements.    My

6   question, sir, is in your 50 years of experience, how many

7   times have you seen an endorsement, manuscript or otherwise,

8   that deletes the defense provision from standard policy forms

9   issued for the periods 1954 to 1972?

10  A.    For primary policies, I've never seen that.

11  Q.    Mr. Connolly, based on your 50 years of experience, how

12  unlikely is it, in your opinion, that Northwest Marine Iron

13  Works placed coverage with St. Paul from 1954 to 1960 and,

14  based on the documents you reviewed, 1967 to 1972, but didn't

15  place coverage with St. Paul, primary coverage, for the period

16  1961 to 1966?

17  A.    Extremely unlikely.

18  Q.    And why is that?

19  A.    Because the -- as I've mentioned a few times, the custom

20  and practice was to build a relationship to stay with the same

21  insurance.    We actually, probably all of us, have some of this

22  experience.    How often have you changed your homeowners

23  insurance or automobile insurance?    There actually -- even in

24  businesses there was a tendency toward inertia on this subject

25  but also was encouraged by both policyholders, insurers, and

Connolly - ReD

1    brokers to stay with the same company.

2    Q.    And, Mr. Connolly, again, based on your 50 years of

3    experience, how unlikely is it that the property damage limits

4    for those middle five or six years was something other than

5    $300,000?

6    A.    It is extremely unlikely.  Practically nil.

7    Q.    Why is that?

8    A.    Because the limits, as I mentioned before, at this period

9    of time for liability policies tended to be around 300,000.

10   You wouldn't go down.  Insurers have the capacity, and the

11   practice would be to maintain at least the coverage you had

12   before, unless there was some market disruption, which there

13   was not in the 1960s and '70s.

14   Q.    Mr. Connolly, for all the policies, again, how unlikely is

15   it that there was a manuscript or other endorsement in any of

16   the policies deleting the defense provision?

17          MR. KOLE:  Objection.  He already asked that exact

18   question and he answered it.

19          THE COURT:  Mr. Ruggeri?

20          MR. RUGGERI:  Your Honor, it's not the exact question

21   that I asked because it was for all the policies.  I'm asking

22   how unlikely is it that it would have happened.  There's been a

23   big deal made of the potential for 40 or 41 manuscript

24   policies, and I think he's entitled to answer the question how

25   unlikely it is.

Connolly - ReD

1        THE COURT:  Overruled.  You can answer.

2        THE WITNESS:  It would be extremely unlikely.  And,

3   furthermore, in the Marsh document and the placement document,

4   custom and practice would be that if you had a policy that was

5   so unusual, then those documents would have referenced it.

6        In other words, when you went to the excess market, the

7   excess market knows you're providing a company that has a

8   general liability policy with all of the standard provisions.

9   If you had something that was different, it would have said so.

10  BY MR. RUGGERI:  (Continuing)

11  Q.   Mr. Connolly, Mr. Kole asked you a series of questions

12  about whether you held the title of underwriter.  Does an

13  underwriter conduct searches for the missing policies?

14  A.   No.

15  Q.   Who does?

16  A.   Usually they are within the insurance carrier.  They would

17  assign it to the paralegal at best.

18  Q.   Now, I'm a little -- this is with a little bit of

19  trepidation here, Mr. Connolly.  Let's take a look at the

20  demonstrative that Mr. Kole showed to you.

21       I'm going to give you a chance, to use a metaphor that

22  you've explained to me, to explain to the Court why it is that

23  it is unsurprising that you and Mr. Hughes would have different

24  tables that were assembled, as you testified, on the basis of

25  different information.

Connolly - ReD

1    A.    Well, I likened it.  This was at some point when we were

2    discussing the case -- not yesterday -- but if you had a puzzle

3    and it was a puzzle -- a picture puzzle and the picture puzzle

4    was the Empire State Building, and you had the bottom, you had

5    the top, but you were missing other pieces -- so, for example,

6    you didn't know how tall the building was.  You'd try and

7    construct the height through other pieces of information.  For

8    example, if you found the elevator button in the puzzle that

9    showed that there was -- were a hundred floors, that would be a

10   good piece of information.  Even though you didn't have the

11   whole puzzle, you would end up knowing it was at least 100

12   floors tall.  You might want to know how wide it is.  If you

13   constructed the entire cross section, you would be able to tell

14   how many windows there were.

15       And this process is a little bit like that.  We don't

16   actually have some of the policies, but we have those pieces of

17   the puzzle which tell us what existed.

18            MR. RUGGERI:  Thank you, Your Honor.  Nothing

19   further.

20            THE COURT:  Thank you, Mr. Ruggeri.

21       Mr. Stapley?

22            MR. STAPLEY:  Your Honor, if I may.

23            THE COURT:  Go ahead.

24

25   ///

Connolly - ReD

1                        REDIRECT EXAMINATION

2    BY MR. STAPLEY:

3    Q.    Good morning, Mr. Connolly.

4    A.    Good morning.

5    Q.    I'm going to reference to the documents that were raised

6    today.  Let's go to Exhibit 5, please, and the second page of

7    that, MG217094.  Are you there, Mr. Connolly?

8    A.    I'm there.

9    Q.    It's on the screen as well.

10   A.    I have to confess that until the beginning of this year, I

11   didn't need reading glasses, so I'm not quite used to pulling

12   these out.

13   Q.    My question on this exhibit is fairly simple.

14   A.    Okay.

15   Q.    You see on the left-hand side of the document there's a

16   phrase in italics "miscellaneous property damage"?

17   A.    Yes, I do.

18   Q.    Okay.  Based on custom and practice, would that phrase,

19   miscellaneous property damage, within a certificate of

20   insurance, imply that that meant general liability coverage?

21   A.    Yes, it would.

22   Q.    Okay.  And would that also imply that that coverage

23   included a defense obligation?

24   A.    Absolutely.

25   Q.    Okay.

Connolly - ReD

1   A.    As I was indicating before, if there was something so

2   unusual as either an endorsement or a manuscript policy that

3   did not have a defense, it would probably say that.

4   Q.    Okay.  I'm going to ask the same question with respect to

5   Exhibit 21 that you just saw.  And, again -- tell me when

6   you're there or if you're there.

7   A.    I am there.

8   Q.    Okay.  And, again, you see the miscellaneous property

9   damage language on that certificate of endorse -- or

10  certificate of insurance?

11  A.    I do.

12  Q.    And, again, would that language tell you that this policy

13  was a general liability policy?

14  A.    It tells me that it was a general liability policy and

15  that there was nothing exceptional about it.

16  Q.    Okay.  Would that general liability policy include a

17  defense obligation?

18  A.    It certainly would.

19  Q.    Okay.  Now let's go to Exhibit 2, and let's go -- there's

20  been some discussion with respect to this exhibit about

21  differing policy limits that are found on different pages of

22  different certificates of insurance.  Do you recall that line

23  of questioning?

24  A.    Yes, I do.

25  Q.    And there was, for example, on page 3 of this exhibit,

Connolly - ReD

1  there was discussion about hundred-thousand-dollar limits and

2  then on page -- page 1 there's $300,000 limits.  Do you recall

3  that discussion?

4  A.    Yes.  I think there was another with 300 as well.

5  Q.    Correct.  The fact that these certificates of insurance

6  may have $300,000 or $100,000 limits, does that change the fact

7  that this policy included a defense obligation?

8  A.    The differing numbers would be irrelevant to the existence

9  of a defense obligation which would exist unless -- unless you

10  had one of the most unique policies I've ever seen.

11  Q.    And we do have a copy of this policy.

12  A.    That's correct.

13  Q.    Did this policy include a defense obligation?

14  A.    Yes, it did.

15        MR. STAPLEY:  Thank you.  Thank you, Your Honor.

16        THE COURT:  Mr. Stapley.

17  Anything further?

18  All right.  Thank you, Mr. Connolly, you may step down.

19        THE WITNESS:  Thank you.

20        THE COURT:  So as I recall from our discussion

21  yesterday, there are no more live witnesses; correct?

22        THE WITNESS:  Correct.

23        THE COURT:  We have deposition excerpts.  All right.

24        MR. SUMNER:  Your Honor, before we get going on that,

25  as others did yesterday, I would like to move ICSOP exhibits

274

Connolly - ReD

1  into the record, and I don't think there was any objection to

2  that, and I think the Court yesterday may have done it already,

3  but just to be sure --

4          THE COURT:  Probably it did, but out of the abundance

5  of caution, yes, yes.

6          MR. STAPLEY:  I guess out of the abundance of

7  caution, my exhibits as well, Your Honor.

8          THE COURT:  You're the 200 series or the 400?

9          MR. STAPLEY:  We're the 200 -- I think we're the --

10 I'll have to look.

11         THE COURT:  You're the 400 series.

12         MR. STAPLEY:  All right.  Then, yes, Your Honor.

13         THE COURT:  401 and 407, so those are admitted as

14 well, consistent with the pretrial rulings.

15         MR. COMPEAN:  Your Honor, on behalf of Argonaut, we

16 would like to request the same with respect to Exhibit 300.

17         THE COURT:  Yes.  That's right.  That's your one

18 exhibit.  Consistent with the pretrial rulings, that will be

19 admitted as well.

20    The first deposition excerpts, Mr. Rycewicz, do you have

21 any or -- I think probably not, but --

22         MR. RYCEWICZ:  Your Honor, we do, but fortunately

23 it's not a three-inch binder.  It's a smaller one.

24         THE COURT:  Okay.  Let's take a ten-minute break, and

25 we'll start with the deposition excerpts.  We're in recess.

Connolly - ReD

1              (Recess taken.)

2         THE COURT:  I realize now I forgot to mention at the

3    pretrial conference that you should consolidate your deposition

4    designations.  So how many -- we have at least two witnesses by

5    deposition; right, Mr. Gordon?  Your two?

6         MR. GORDON:  Yes.  We have Lauf and Hornbeck.

7         THE COURT:  Right.

8         MR. GORDON:  I believe Mr. Ruggeri has those same

9    two, and I don't know if Mr. Rycewicz has any others.

10        MR. RYCEWICZ:  We have some -- some Hornbeck

11   designations from 1911 -- or 2011, so we'll do those

12   separately.  I don't think anyone else does.

13        MR. GORDON:  I think the only two witnesses that are

14   designated are Lauf and Hornbeck.

15        MR. MOSES:  I think we have some from the 2011 also.

16        MR. RUGGERI:  Your Honor, Great American, third-party

17   plaintiffs, have combined our designations.

18        THE COURT:  For 2014?

19        MR. RUGGERI:  From the 2014 transcripts of Lauf and

20   Hornbeck.

21        MR. MOSES:  Your Honor, if we could have another ten

22   minutes, or so, off the record --

23        THE COURT:  Sure.  Let me just ask.

24        MR. MOSES:  -- so we can organize.

25        THE COURT:  Let me ask a few questions here.

Connolly - ReD

1    When you consolidate the excerpts, how long do you think

2    the testimony of the two witnesses will be?

3            MR. RUGGERI:  Mr. Hornbeck longer than Ms. Lauf.  My

4    guess is Mr. Hornbeck will run at least an hour, possibly an

5    hour and a half, and Ms. Lauf, I would estimate maybe half an

6    hour.

7            MR. MOSES:  Although, we also, Your Honor, designated

8    portions of Ms. Lauf's deposition that may add to that half

9    hour.

10            THE COURT:  So -- all right.  Good.

11    The second question is perhaps more of an observation.

12    Going back to what we talked about at the end of the day

13    yesterday where there seemed to be some consensus the

14    deposition excerpts could simply be submitted to the Court to

15    read, given that they're not consolidated and you still need to

16    do that, and given, Mr. Moses, that your ten-minute estimate is

17    probably wrong, just based on my experience, it will take

18    longer to do it in a way to make sure that everyone is

19    confident they have not left anything out and you don't have

20    any duplication, let's just do this:  Submit the excerpts after

21    you confer and consolidate all of the designations, and then

22    we'll read them.

23    Mr. Ruggeri, I know that was probably not your preferred

24    method --

25            MR. RUGGERI:  I wasn't part of the consensus,

277

Connolly - ReD

1   Your Honor.  Actually, I think the rules allow me to have the

2   testimony read into the record, and that is our preference.

3           THE COURT:  Is it your strong preference?

4           MR. RUGGERI:  It's pretty strong, Your Honor.  I

5   think it's important to read them into the record, including so

6   for whatever benefit one gets from hearing, as opposed to

7   reading.

8           THE COURT:  Sure.

9           MR. RUGGERI:  I think they're highly relevant issues

10  of the case.  As you can probably understand from my opening, I

11  think that particularly the 2014 transcripts are very important

12  to the case.

13          THE COURT:  Well, then, Mr. Ruggeri, you have the

14  certainty -- the certain knowledge that the Court actually has

15  heard the testimony because, you know, when you submit it to

16  me, you hope I read it, right, but you can never be sure.

17          MR. RUGGERI:  I would request the Court's indulgence

18  to give us a little bit of time.  It wasn't very hard for

19  Mr. Rycewicz and I -- we have combined our two within a matter

20  of minutes.  I didn't cite to the 2011 transcripts, so it

21  shouldn't be that difficult for those two to get on the same

22  page either.

23          THE COURT:  All right.  So take the time you need to

24  make sure you have the excerpts all consolidated and nothing is

25  left out, and then we'll begin by reading whichever of the

Connolly - ReD

1   witnesses you want to start with.

2        Hopefully that will cut down the time.  And then the final

3   question is:  I would suggest we -- once we start reading the

4   designations, we go until we finish, even if we go through the

5   lunch hour; right?

6        MR. RYCEWICZ:  Sure.

7        THE COURT:  Right.  Then we're done for the day.  All

8   right.  Let me know when you're ready.

9        DEPUTY COURTROOM CLERK:  Court is in recess.

10                      (Off the record.)

11       DEPUTY COURTROOM CLERK:  All rise.

12       THE COURT:  Mr. Rycewicz.

13       MR. RYCEWICZ:  We're going to start, Your Honor, with

14   me playing myself from the 1911 deposition of Thomas

15   Hornbeck -- 2011 -- and it's only the second day, so imagine if

16   it were the fifth.  Mr. Bechtold is going to play Mr. Hornbeck.

17   But there is an issue that we wanted to discuss prior.

18       MR. GORDON:  Well, we think this is all under seal,

19   Your Honor, so I guess the question is, do we need to clear the

20   courtroom of those who are not under the protective order?

21       THE COURT:  So let me ask with respect to the under

22   seal, because it's been -- has been a while since I entered

23   that order, so I'm even less certain why I did.  Are there

24   reasons we can talk about, before we clear the courtroom, of

25   why we're under seal with Mr. Hornbeck's testimony?  Does

Connolly - ReD

1    anyone remember?

2            MR. MOSES:  I think for Mr. Hornbeck's testimony, if

3    I recall, Your Honor, was because it included corporate

4    St. Paul privileged and confidential information.  But it's

5    also true that there were other aspects that were more

6    within -- I don't think it was in Mr. Hornbeck's testimony.

7    The PCI process was Mr. Rycewicz's --

8            MR. GORDON:  That's my recollection is it was a

9    combination of issues.

10           THE COURT:  All right.

11           MR. RYCEWICZ:  I don't have any concerns about PCI

12   issues related to the Hornbeck deposition.

13           THE COURT:  Well, let me ask this before we talk much

14   further about it:  Is there anybody in this courtroom, in this

15   case that involves the riveting issues of insurance coverage,

16   who are not affiliated in any way with one of the law firms or

17   companies involved in the litigation?

18       I see.  Well, Mr. Connolly, I know that.

19       Yes.

20           UNIDENTIFIED WOMAN:  I am monitoring this litigation

21   for the law firm I work with who is interested in the issues

22   and --

23           THE COURT:  Just because they have a similar case or

24   cases or just on the insurance issues generally, but you're not

25   affiliated with a law firm that is involved in this case?

Connolly - ReD

1          UNIDENTIFIED WOMAN:  That's correct.

2          THE COURT:  All right.  Anybody else?

3      Mr. Murphy?

4          MR. MURPHY:  My firm represents a couple PRPs.

5          THE COURT:  But you're --

6          MR. RUGGERI:  You're with me.

7          MR. MURPHY:  Yes.  Yes.

8          THE COURT:  I think you get to stay, Mr. Murphy.

9   There's one person who would have to leave if the concern about

10  the sealing -- if you want to leave the seal in place, only one

11  person would have to leave.

12         MR. GORDON:  I think we're okay with going forward,

13  Your Honor.

14         THE COURT:  All right.  Well, it looks like you get

15  to stay.

16         UNIDENTIFIED WOMAN:  Oh, good.

17         THE COURT:  Yes.  I thought that would be your

18  reaction.

19      Mr. Bechtold, do you want to come up here?

20         MR. RYCEWICZ:  We only have one copy, Your Honor,

21  because we consolidated, so we'd like to stay side by side.

22         THE COURT:  All right.

23         MR. RYCEWICZ:  He's smart, but he can't memorize all

24  of this.

25         THE COURT:  Sure.  Mr. Bechtold, you -- you promise

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  or swear or affirm under penalty of perjury that you will

2  faithfully and correctly read the deposition designations?

3          MR. BECHTOLD:  I do.

4          THE COURT:  All right.  Mr. Rycewicz, go ahead.

5

6  (Deposition excerpt of Thomas M. Hornbeck was read as follows:)

7                    THOMAS M. HORNBECK,

8  was called as a witness and, having been sworn, testified, by

9  deposition, as follows:

10

11                      EXAMINATION

12  BY MR. RYCEWICZ:

13  Q.    For the record, would you state your full name, please?

14  A.    Thomas M. Hornbeck, H-O-R-N-B-E-C-K.

15  Q.    Okay.  And my name is Chris Rycewicz.  I represent the

16  third-party plaintiffs in a pending case called Century

17  Indemnity Company v. Marine Group, et al.  I assume you're

18  generally familiar with that lawsuit?

19  A.    I have heard of the lawsuit, yes.

20          THE COURT:  Mr. Rycewicz, slow down just a bit for

21  the court reporter.

22  BY MR. RYCEWICZ: (Continuing)

23  Q.    And we're here to conduct a 30(b)(6) deposition of the

24  St. Paul entities; correct?

25  A.    That's my understanding.

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  Q.   And you have been designated as the representative of the

2  St. Paul entities for purposes of certain questions that we

3  oppose in a 30(b)(6) deposition notice; correct?

4  A.   That's correct.

5  Q.   Okay.  Let's go ahead and mark for the record as Exhibit 1

6  Final Third-Party Plaintiffs Notice of FRCP Deposition of

7  St. Paul Fire and Marine -- excuse me, St. Paul Fire and

8  Mercury Company.

9        MR. RYCEWICZ:  We -- we then marked it actually as

10  Exhibit 49, Your Honor.

11  BY MR. RYCEWICZ: (Continuing)

12  Q.   So, Mr. Hornbeck, I've handed you a document that's marked

13  30(b)(6) deposition notice for St. Paul.  We have marked it as

14  Exhibit 49.  And you are flipping through it.  Are you

15  generally familiar with that document?

16  A.   I've seen this document before, yes.

17  Q.   I'm going to go ahead and mark as Exhibit 50 the response.

18        MR. RYCEWICZ:  Then we skipped.

19  BY MR. RYCEWICZ: (Continuing)

20  Q.   Okay.  And please give me a sketch of your employment

21  history starting from when you graduated from college.

22  A.   After college, I worked for a year for the Village of

23  Massapequa Park where I served as the assistant to the village

24  administrator.

25        In July of 1979 I started with the St. Paul Fire & Marine

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  Insurance Company as a claims trainee, and I worked as a

2  trainee for about a year and became, after a year, a claims

3  representative.

4      Sometime in 1985 I was promoted to a liability claims

5  supervisor.

6      In 1987 I became an environmental claims supervisor.

7      In 1998 I became a claim manager with St. Paul.

8      Subsequently, there were some mergers with USF&G in 1998,

9  with Travelers in 2004, and I'm currently a regional claims

10  director with Travelers Indemnity.

11  Q.   That was a little quick for me.  You are currently a what?

12  A.   A regional claim director.

13  Q.   And when did you become a regional claim director for

14  Travelers?

15  A.   At the time of the merger with -- or shortly thereafter in

16  April of 2004.

17  Q.   And that's your current position?

18  A.   It is.

19  Q.   And what are your job responsibilities generally?

20  A.   Oversight of hazardous waste, environmental-type claims,

21  primarily written on St. Paul paper.  I'm also responsible for

22  the supervision of three paralegals working in the Hunt Valley

23  office.

24  Q.   Mr. Hornbeck, we've given you Exhibit 52, which is a

25  multipage document.  The cover document is an August 31, 2009,

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   letter on Gordon and Polscer letterhead, under the signature of

2   Thomas Gordon, to me.  And then there are a couple pages of

3   carbon copy recipients and then there are documents that were

4   attached to that letter which were identified as STP0001

5   consecutively through STP0017.  Do you see that?

6   A.   Yes, I do.

7   Q.   Okay.  And have you seen these documents before?

8   A.   Yes.

9   Q.   If you go to the lower left-hand corner of this document,

10  there are a series of numbers.  Do you see those?

11  A.   Yes.

12  Q.   And it appears to say 237785M.  It looks like 8-53 S, and

13  then it says REV 7-53.  Did I read that correctly?

14  A.   It's very small, but I think you did.

15  Q.   All right.  Now, what do those numbers in the lower

16  left-hand corner signify?

17  A.   My understanding is that the first five digits you read

18  were -- there were the four numbers.

19  Q.   All right.  And how about the rest of the numbers?

20  A.   I'm not -- I'm not sure.

21  Q.   Do you know what Rev 7-53 means?

22  A.   My understanding of that piece would be the revision date.

23  Q.   Are you aware of whether St. Paul Mercury Indemnity

24  Company had any other forms that it needs to provide property

25  damage liability, other than automobile, during the 1954 to

285

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   1957 time frame?

2   A.   I'm not familiar with all the different forms they had at

3   their disposal in this particular time frame.

4   Q.   So do you know whether they had other forms available?

5   A.   I don't know whether they did or they did not.

6   Q.   Do you have any reason to believe that this policy was not

7   issued to Northwest Marine Iron Works for this policy period

8   under the -- under the terms, conditions, limits, and premiums

9   that are set forth on STP001 et seq?

10  A.   No, I don't.

11  Q.   Are there any other steps that are available to you?  And

12  when I mean "you," I'm using you in the collective sense or you

13  as a representative of your employer here to undertake any

14  additional steps to try to locate evidence of coverage that may

15  have been issued to Northwest Marine Iron Works.

16  A.   No.  No, I can't think of any.

17       I know in reviewing the file in preparation for this

18  deposition, exhaustive efforts were made to locate information,

19  and unfortunately we were not successful in locating anything.

20  Q.   Do you have any information as to the minimum limits of

21  liability coverage for property damage liability other than

22  automobile that St. Paul Mercury was writing in the 1954 to

23  1957 time frame?

24  A.   I don't.

25  Q.   What records exist, if any, that would permit you to

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   answer what minimum limits were written by St. Paul for

2   property damage liability other than auto in the 1954 to 1957

3   time frame?

4   A.   I'm not aware of any guide or information that would

5   assist in responding to that question.

6   Q.   What steps have you taken, has Travelers taken, to locate

7   potentially applicable policy forms for the time periods that

8   are at issue in this case, which are 1954 through about 1972?

9   A.   There was an exhaustive search undertaken through various

10  systems and applications that would have been indexed by both

11  numbers and name to attempt to locate that information.

12  Q.   And let me ask you this:  Do you know what steps St. Paul

13  undertook after receiving this notice to attempt to locate the

14  lost policies?

15  A.   There was a search of, as I said, various systems that you

16  can index both by name and number, various names are put in,

17  portions of names, all the policy numbers -- and I say portions

18  of names to broaden the scope -- and the numbers that are

19  listed here to try to locate any policy information for any of

20  these policies, but none -- none was found.

21  Q.   Were computer records searched?

22  A.   Yes.

23  Q.   Were hard files searched; in other words, paper files?

24  A.   Yes.

25  Q.   Do you know what particular hard files were searched, hard

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  file locations?

2  A.    Again, it would be reflected in the claim file, but I

3  believe there were a policy library that would be searched by

4  number and name in addition to the applications that I referred

5  to, and there were a number of different ones to locate this

6  information.

7  Q.    And is it unusual for St. Paul or Travelers to not be able

8  to locate information for policies issued between 1954 and

9  1972?

10  A.    There have been instances where we've found information,

11  but I can't say it's unusual.  These are old, old policies.

12  Old policy periods were listed and old numbers, but what the

13  experience is overall for searches during this time frame, I

14  wouldn't -- I wouldn't really know what the results were.

15  Q.    Do you know whether a search -- and some of these

16  questions may be a little unfair without the documents before

17  you, which I will put before you in a minute, but right now I'm

18  asking you from your own personal recollection, as well as your

19  preparation for this deposition, whether you know if a ship

20  repair legal liability policy number was put into the search

21  criteria that happened in this case.

22  A.    We put in all the numbers that were provided to us.

23  Q.    Do you have any understanding of the various potential

24  locations that were searched to look for evidence of coverage

25  for these policies that we declared to be lost.

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  A.   I'm sorry.  Could you just repeat the first part of your

2  question?

3  Q.   I'm trying to figure out where these policies -- where, in

4  fact, St. Paul/Travelers looked for actual hard copy, paper

5  copies of the policies that we declared to be lost?

6  A.   The hard copies, there's a policy library in the Hunt

7  Valley office that was searched, along with the -- as I

8  mentioned earlier, the various computer searches that were

9  conducted to try and track down any of this information that's

10  on this document.

11  Q.   So let me see if I understand what you're saying

12  correctly.  It sounds like there were various computer searches

13  that were conducted; correct?

14  A.   Correct.

15  Q.   And then in addition to that, there was a physical search

16  of the policy library in the Hunt Valley office; right?

17  A.   That's my understanding.

18  Q.   Were there any other locations that were searched

19  physically?

20  A.   Not that I'm aware of.

21  Q.   Were there any other locations where policies or policy

22  forms in a physical sense are kept in addition to the Hunt

23  Valley library?  In other words, any other warehouses,

24  facilities around the country that are accessible to Travelers,

25  St. Paul to try to find these policy forms or evidence of them?

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   A.    Well, what I meant to say before, the hard copy, the

2   physical search would have been in the library in Hunt Valley

3   since it's located there.  Offsite storage, any offsite storage

4   of policy information that would be accessed through the --

5   that would be accessed through the various applications that I

6   referred to earlier.

7   Q.    Applications being computer, the computer records?

8   A.    Yes.

9   Q.    So are you saying that some of the computer databases that

10  were searched would have some evidence or indication of where

11  policy forms might be located?

12  A.    Those are the applications where, if they did exist,

13  that's where we would -- that's where the paralegals look to

14  see if they can track down some of that information, yes.

15  Q.    And do you know if the paralegals looked in any other

16  offsite locations for hard file copy -- hard file copies in

17  addition to the Hunt Valley library?

18  A.    Well, again, I'm not sure that I'm being clear as far as

19  how these searches worked.  The policy library in Hunt Valley

20  would have been searched in person by paralegals.  The offsite

21  storage is searched by computer searches that they have access

22  to.

23  Q.    So indexes relating to the offsite storage are searched.

24  Am I understanding you correctly there?

25  A.    Yes.  The information is coded and they have access to

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   those codes and search the locations by using those computer

2   applications.

3   Q.    And do you know whether the coding is by box number?  Is

4   it by a policy number?  Is it by insured?  Is it a combination

5   of those?

6   A.    Well, the searches are done by the policy numbers and the

7   insured name.  Those are the two methods that are utilized to

8   track down information related to whatever the entity may be.

9   Q.    As you sit here today, is it your testimony that, based

10  upon the absence of information about policies issued to

11  Northwest Marine Iron Works, that, in fact, no such policies

12  were issued?

13  A.    No, I can't say that.

14  Q.    So it's fair to say that it's possible.  Let's use that

15  broad term.  It's possible that St. Paul policies were issued

16  to Northwest Marine Iron Works and Travelers/St. Paul's search

17  would simply not find it?

18  A.    That's correct.

19  Q.    Okay.  In the following paragraph on page 2, it says

20  several things.  One, it says that St. Paul is conducting a

21  diligent internal search for any forms in its possession that

22  would assist in identifying which liability forms may have been

23  included in a liability policy issued to Northwest Marine Iron

24  Works in the time frame at issue.  Okay.  And do you know

25  whether that search was conducted?

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   A.   Yes.  I mean, these -- the searches that were done would

2   be consistent with that statement.

3   Q.   So I interpret that statement as saying that St. Paul was

4   in the process of conducting a search for specimen form

5   policies that would have provided coverage to Northeast Marine

6   Iron Works had the coverage been issued.  Is that a fair

7   characterization of that?

8   A.   You know, this is a letter that was written back in

9   December of 2009 by Andrew Moses or Tom Gordon.  I can't

10  comment on what its intent was or what it's -- what it's

11  referring to.  I need to let -- the document speaks for itself.

12  Q.   That's fine.  Let me rephrase the question and ask you

13  personally whether you're aware of steps that St. Paul has made

14  to locate specimen forms that would have been used to issue

15  liability coverage to Northwest Marine Iron Works if the

16  liability coverage had been issued.

17  A.   I can't recall the specific steps that may have been

18  taken, but I do know that in the course of my reviewing

19  documents that specimen forms were produced in regard to this

20  litigation.

21  Q.   Right.  And so is it your testimony that the specimen

22  forms that were produced to us in conformance with the

23  requirements of Oregon law were the forms that would have been

24  used had coverage been issued to Northwest Marine Iron Works?

25  A.   They were forms that were likely to have been used back

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  during the time frame in question.  Whether or not they were

2  used for this particular account or not, I don't know.

3  Q.    Now I'm going to ask you a question relating to a sentence

4  in the middle of that third paragraph.  And the sentence says,

5  quote, "St. Paul is analyzing the forms included in the

6  purported policy located at the Navy Archives to determine if

7  the forms included in the purported policy can lead to

8  additional information as to what forms would have been

9  included in any alleged applicable liability policy issued to

10 Northwest Marine Iron Works in the time frame alleged."  Okay?

11 Do you know if St. Paul conducted such an analysis?

12 A.    I, again, would have to defer to the claim file, but I can

13 say that whatever information is produced in the course of

14 looking for lost policies is utilized by the paralegals to try

15 and locate those policies, so nothing would be overlooked.

16 Every bit of information that's -- that they are given is used

17 in such a way to hopefully, if a policy was issued, to find

18 that policy.

19 Q.    We have handed you a document that's been marked as

20 Exhibit 55.

21     And for those on the phone, and I suppose for the record,

22 it's an August 12, 2010, letter from Mr. Moses addressed to me

23 with documents attached to it that are identified as STP0001

24 through 26.

25     I'll note that some of these are duplicate numbers of

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  documents that were produced earlier and that we have already

2  looked at, but there are different documents.  I think the

3  difference between them, if I'm not mistaken, is that the

4  documents that are attached to the letter, that's the first

5  couple of pages of Exhibit 55, start with four numbers

6  preceding them, four zeros preceding the numerals, as opposed

7  to three, if I'm not mistaken; but, in any event, have you seen

8  Exhibit 55 before?

9  A.    Yes.

10  Q.    Is that the same time you saw everything else in

11  preparation for providing testimony today?

12  A.    Yes.

13  Q.    And is this the documents that were produced to comply

14  with the requirements that policy forms be provided by the

15  carrier in the event of lost policies?

16  A.    Well, I think the cover letter would reflect exactly why

17  it was produced, but that's my understanding.

18  Q.    So your understanding is that the forms that are attached

19  were provided as policy forms that may have been used if a

20  policy was issued to Northwest Marine Iron Works for the policy

21  periods at issue; correct?

22  A.    Yes.

23  Q.    And to be more specific, the letter says that the forms

24  enclosed include what St. Paul believes would have been the

25  forms used in succeeding policies that would have been

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  responsive to the environmental claim at issue if such policies

2  were issued.  That's what the letter says; correct?

3  A.    That's correct.  That's in that August 12, 2010, letter.

4  Q.    Now, looking back at Exhibit 55, Bates STP00001, what's

5  the number in the lower left-hand corner of that document?

6  A.    It appears to be 23778.

7  Q.    So does that appear to be the same number as the policy

8  that's part of Exhibit 52?

9  A.    Yes.

10  Q.    So does that lead you to conclude that the policy forms

11  are the same?

12  A.    It leads me to conclude that the two forms in front of me

13  appear to be -- have the same number.

14  Q.    Would that mean that they are the same policy form?

15  A.    I don't know that that's true.  It's the same policy form,

16  but the numbers after that are different, so, you know, it's --

17  I wouldn't want to say that it's the same form.

18  Q.    What do you -- what do the other numbers mean?

19  A.    Well, as I mentioned earlier, my understanding is that Rev

20  is the revision date.  I'm not sure what the others refer to.

21  Q.    Is there another representative of Travelers who would

22  know?

23  A.    Not that I'm aware of.

24  Q.    There does appear, as you testified, to be differences.

25  And I'm not trying to trick you.  I'm just trying to pin this

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   down as best I can.  There do appear to be differences to the

2   other numbers, including the Rev number.  The policy attached

3   to Exhibit 52 says Rev 7-53.  The number attached to the page

4   that we're referring to that's a part of Exhibit 55 says Rev

5   7-55.  Does that have any significance to you?

6   A.    Just they are different.  That's all I was pointing out.

7   Q.    Do you know what this -- what that means?  I mean, is one

8   a revision from 1953 versus one as being a revision from 1955?

9   A.    That's a possibility.

10  Q.    Is there anybody in the company besides yourself who could

11  answer your question, that you're aware of?

12  A.    Not that I'm aware of.

13  Q.    When I have gone through this, it looks to me like what it

14  is is a bunch of documents that were generated following some

15  specific requests that were made by your firm or your company

16  to look for various policy information.  It looks like searches

17  were made for Travelers policies, St. Paul policies, as well as

18  a bunch of other particular policy forms.  Do you agree with

19  that statement?

20  A.    Yes.

21  Q.    And I want to refer you to STP00274.  It looks like you're

22  there.

23  A.    Yes.

24  Q.    And this particular page lists St. Paul.  And it is

25  correct for me to believe -- strike that -- correction -- and

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  is it correct for me to believe that all of the documents or

2  most of the documents that follow this are documents that

3  relate to specific searches that were made for information

4  concerning St. Paul policies or St. Paul insureds?

5  A.    Yes, that's correct.

6  Q.    Turn to STP00276.  And take me through this document.  If

7  you could just walk us through and explain to all of us what

8  this means, I would appreciate it.

9  A.    CCR customer detail.  That's customer cross-reference.

10 It's an application where the name of the entity is used in an

11 attempt to locate policy information.

12     Would you like me to tell you what I was looking for?

13 Q.    Yes.

14 A.    What I was looking for, they're broken down by the actual

15 documents that are generated by the search and later on there

16 is copies of back and forth correspondence -- not

17 correspondence, emails.

18     STP00357 and 358 reflect an exchange where the search did

19 not locate any premium stats or impact claims with these

20 insured's names coded with the state of Oregon.  So there was

21 further search, and none with regard to an issuing state of

22 Oregon was located.

23 Q.    So what does what mean?

24 A.    That they searched for these policies and were not able to

25 locate them.

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  Q.   All right.  So based upon the hits on computer record,
2  there was an actual physical search that was conducted for the
3  policies and they were not located?
4  A.   This would be a computer search for these numbers.
5  Q.   All right.  So a further computer search was made of
6  databases other than the one -- other than the CCR customer
7  detail, and no further information concerning these policies
8  were found?
9  A.   That's my understanding, yes.
10  Q.   All right.  Flipping to 00282 --
11  A.   Okay.
12  Q.   Is that the CCR customer detail for BAE Systems Ship
13  Repair, Inc.?
14  A.   Yes.
15  Q.   And does that indicate that there was a policy located for
16  that particular entity?
17  A.   It lists a number under policy.  That's a number, but I
18  can't say that I recognize it as a policy number for that time
19  frame.  But that's -- you know, it's listed under the category
20  of policy.
21  Q.   All right.  So this would have also triggered a separate
22  search or a search of a different database?
23  A.   Similar to what we just talked about.
24  Q.   Right.  Just as kind of an example, let's go to STP00290.
25  And what is this document?  What does it tell us?

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   A.   This indicates to me that it was some type of a coverage

2   page for a new application.   AME.

3   Q.   So was this document generated based on some sort of

4   computer search where an account name of Northwest Marine Iron

5   was punched in or used as a search criteria?

6   A.   That's correct.   And the AME is the name of the

7   application, but Northwest Marine iron auto.

8   Q.   And it came up with no account matching the criteria

9   listed?

10  A.   That's correct.

11  Q.   What is AME?   What is that?

12  A.   I can't think of it at the moment.   It might come to me as

13  we go on.   I will be sure and mention it to you, but it just

14  popped out of my head.

15  Q.   Is there any reason why the two policies for that '86/'87

16  time frame that we discussed earlier did not show up on this

17  search?

18  A.   There are different applications that you search for

19  different periods, depending on, you know, time frames and

20  alleged policy periods, and things like that.   Based on the two

21  mergers that I referenced earlier, as well as the affiliated

22  companies that may have been purchased during any time frame,

23  there are so many different applications, and time frames do

24  change or impact that application should be searched.

25  Q.   All right.   So there are multiple applications, multiple

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  databases that might turn up information based upon years?

2  A.    Based upon, you know, companies involved, companies that

3  may have been purchased, things of that nature.  Yes.  All of

4  which -- you know, these paralegals, it's their job.  I mean,

5  they know this, I'm sorry to say, much better than I do, as far

6  as what's out there.  But their job is to search these

7  applications and to track this down.

8  Q.    Let's take a look at STP00402 through 410.

9  A.    You want me to look through these?

10  Q.    Yes.  I'm going to ask you some questions.  But it appears

11  to me that this may be sort of summary or encapsulation of the

12  entire search, and I want to ask you about that.  But, to be

13  fair, go ahead and take a look at these documents, and tell me

14  when you're ready to start talking about them -- or about it.

15  A.    Okay.

16  Q.    Well, to begin, what I said earlier, is that accurate?  Is

17  this document, are these series of documents kind of a summary

18  or encapsulation of the entire search that was performed?

19  A.    It certainly appears to be some type of a summary.

20  Whether it is a complete summary of everything that was done, I

21  don't know.  I can just, you know, try to get some gauge based

22  on the language used.

23  Q.    Well, the first page is an email dated August 8, 2008,

24  from a Lisa Lauf to a Lori Stewart copying you; correct?

25  A.    Yes.

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1    Q.    And who is Lisa Lauf?

2    A.    She's a paralegal.

3    Q.    Is she one of the paralegals that works for you?

4    A.    Yes.

5    Q.    Well, is it fair to say that a number of search parameters

6    were used, that some of the search parameters were various

7    names; correct?

8    A.    Yes.

9    Q.    These listed next to little bullets, Northwest Marine,

10   Inc., Northwest Marine Iron Works, et cetera.

11   A.    Correct.

12   Q.    And is it fair to say that in addition that policy numbers

13   and search -- that policy numbers and policy periods were used

14   as additional search parameters?

15   A.    Those policy numbers that were produced, yes.

16   Q.    And then this email goes on to say, quote, "Name and

17   alleged policy number searches have been conducted through all

18   available systems, corporate archives, premium stats, and claim

19   data."  All right?

20        And then if you look at documents STP00404 through 410,

21   are those the policy research notes that Ms. Lauf is referring

22   to as attachments to the two-page email?

23   A.    Can you repeat your question, please?

24   Q.    Yes.  My question is is STP404 through 410 the policy

25   research notes?

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1  A.   They appear to be some overview of what was done, but,

2  again, I don't know specifically what was -- what her thoughts

3  were at the time she was drafting that email.

4  Q.   Well, let's go through it a bit.  You testified earlier

5  about a number of databases that were available.

6       Does this document lead you to believe that the ECG

7  database was searched?

8  A.   Yes.

9  Q.   What is the ECG database?

10  A.   Environmental Claim Group.

11  Q.   And what -- what's the database compromised of?

12  A.   It was a database developed -- I think it was sometime in

13  the early '90s -- that contained a lot of different information

14  with regards to environmental accounts and information in

15  general.

16  Q.   Right under the line that says "RM response" is "search

17  criteria," and it says "Northwest Marine, Inc. and others," and

18  then it talks about databases searched.  And it lists Opus,

19  microfilm, Claimnet, and File Net.  And what are those

20  databases?

21  A.   Opus is the database that is utilized to search offsite

22  storage.  Microfilm, Claimnet, and FileNet are just different

23  applications that could potentially provide information that

24  could be used to track down lost policies.

25  Q.   So are those just different forms of databases?

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   A.   Correct.

2   Q.   And is microfilm -- is that a database, or is that the old

3   microfilm that Tom used to use when he did law research at

4   Lewis and Clark Law Library?

5   A.   I'm not sure.

6   Q.   Okay.  Continuing, the line under databases searched is

7   "search results" and it says, "Nothing found on film or in

8   storage for search criteria provided."

9        And I'm still not 100 percent clear on what "in storage"

10  means.  I assume that means actual physical files?

11  A.   In storage refers to the Opus search, I believe, offsite

12  storage.

13  Q.   Next line says, "I searched all of them with wildcards on

14  the front and back of each policy number."  What does that

15  mean?

16  A.   That's an asterisk the paralegal uses to broaden the

17  search.

18  Q.   Gotcha.  Flipping over to 407 -- I apologize that some of

19  this may be a little repetitive.  It appears to list a number

20  of databases; is that correct?

21  A.   Yes.

22  Q.   So one is Opus, which includes policy library.  We just

23  talked about that.  AME.  Did we talk about that?

24  A.   We talked about it, but I don't think I answered your

25  question.

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   Q.   All right.

2   A.   It's automated something environment, so we're almost

3   there.

4   Q.   So that -- that's this environmental claim type or

5   environmental information type database you were referring to

6   earlier?

7   A.   No.  It's not exclusive to environmental.  It's a broader

8   database than that, and it's just escaping me at the moment.

9   Q.   What is Docs Web?

10  A.   Just another database, again, to search for potential

11  information that could lead to the location of policies.

12  Q.   Okay.  How about Docs Web?  Do we know what that means?

13  A.   Again, it's just another application that the paralegals

14  use to search for policy information.

15  Q.   So would it be the same for the St. Paul surplus lines

16  database?

17  A.   The same in what manner?

18  Q.   The same that it's referring to a separate -- independent

19  separate database?

20  A.   Yes.

21  Q.   Just another place to look.  And I presume that would be

22  looking for policies for St. Paul as a surplus lines carrier.

23  Is that a fair presumption?

24  A.   That's fair, yes.

25  Q.   What is the next one?  RM-USF&G Retro Microfilm?

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   A.   I believe the RM is Records Management.  It's a unit out

2   of St. Paul, Minnesota, office; oversees all records.  And

3   USF&G Retro Microfilm is just another, again, location that's

4   searched by the paralegals trying to locate useful information.

5   Q.   What is CCR?

6   A.   That's customer cross-reference that we were looking at

7   before.

8   Q.   And if you turn over to the next page, it looks like under

9   CCR was a positive hit for the two -- two policies we talked

10  about earlier?

11  A.   Yes.

12  Q.   "RQ detail stats on these numbers."  What does that mean?

13  A.   I think it refers to premium statistical information.

14  Q.   How about the next line, which says "RV stats and email

15  dated"?  What does that mean?  What does that line mean?

16  A.   I look at that to mean reviewed stats and email dated

17  7/31/2008.

18  Q.   Okay.  Continuing below the redacted stamp, there's an

19  entry that says, quote, "Based on ML/Cov codes, these are OM

20  policies in OR."  What does that mean?

21  A.   Based on the major line coverage codes, these are ocean

22  marine policies in Oregon, is how I read that.

23  Q.   Is that referring back to the two policies above?

24  A.   I don't know.

25  Q.   Is that referring to policies listed below?  Do you have

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   any idea?

2   A.   I don't.  I can say that the email that we looked at

3   before indicated that they have no codes out of Oregon.  I

4   believe that it is something to that effect.

5   Q.   There's an indication that says "Searched The Marine Group

6   hits and looked up to and no PHs in OR."  What does that mean?

7   A.   No policyholders in Oregon is how I understand that.

8   Q.   Let me ask you a broad question first.  In looking at

9   St. Paul policies and policy numbers particularly, can you

10  identify those by the numbers as policies that were issued by

11  St. Paul during the reflected time periods?

12  A.   No.

13  Q.   Can you tell me, are they of a form -- are the policy

14  numbers of a form that was used by St. Paul during the time

15  frame?

16  A.   Some of them are, yes.

17  Q.   Which ones are?

18  A.   The 504IF2428, 504JH5401.

19  Q.   Okay.

20  A.   596JB5573, 504JA1276.  That's a form of policy number that

21  I've seen before.

22  Q.   All right.  Is there any more you can tell me about these

23  policies based on those policy numbers?

24  A.   It's not -- I can't be sure, but the 5 would indicate or

25  has indicated in the past a casualty policy.

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1   Q.    All right.  How about 04?  Does that tell you anything?

2   A.    No.  That doesn't mean anything to me.

3   Q.    How about IF or JH or JB?

4   A.    No.

5   Q.    How about the last four numerals?  Does that mean anything

6   to you?

7   A.    I don't know.  You know, if it means anything, I'm not

8   sure what that means.

9   Q.    The letters that appear in the middle of that number, do

10  those mean anything?  Are those randomly selected?  Do they

11  mean a type of coverage?  Do they mean anything to you?

12  A.    I'm really not sure what they refer to.

13  Q.    How about 1419213?  Is that a number that you recognize as

14  having been a number used on a St. Paul policy form?

15  A.    I can't say that it is.  I've seen other policies in the

16  past that may be numerical in nature, but this -- these have

17  more numbers than I recall.

18  Q.    What about PH-0213?  Is there anything there that tells

19  you anything about the policy or the coverage?

20  A.    That doesn't look familiar to me at all.

21  Q.    I think maybe you were misrepresenting -- excuse me.  I

22  think maybe you are misinterpreting my question.  I'm not

23  asking what the disposition of the claim is, but I'm asking if

24  you know whether Travelers has essentially assumed the

25  liabilities of the previous St. Paul entities under the

Hornbeck - Deposition Examination as read by Mr. Rycewicz

1    policies that are at issue in this case.

2    A.    I misunderstood.  I apologize.  I believe that's correct.

3    Q.    Are you able to identify -- are you able to identify

4    anything for us that is not attached to Exhibit 52 that in your

5    judgment should be for it to be a complete policy of St. Paul

6    Mercury Indemnity Company?

7    A.    I'm not sure I understand the question.  You're asking me

8    to identify something that's not attached; that I don't know if

9    it should be attached or not.

10   Q.    I'm asking you if you believe it's incomplete.  If there's

11   anything that in your mind should be there to make it complete

12   that's not there.

13   A.    I'm not aware of any particular document.

14   Q.    Okay.

15   A.    The only way I would be able to know the answer to that is

16   if I issued the policy or was there at the time the policy was

17   issued, knew what it contained, and then was presented with a

18   portion of that.

19        MR. RYCEWICZ:  And that concludes the designated

20   excerpts of the 2011 deposition of Hornbeck.

21        THE COURT:  All right.  Who's next?

22        MR. RUGGERI:  Your Honor, should we continue with

23   Mr. Hornbeck?

24        THE COURT:  Yes.  Let's do one witness and complete

25   that witness before we move to the next.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1      MR. RUGGERI:  I will read the questions and

2  Mr. Bechtold will read the answers.

3     May we proceed?

4      THE COURT:  Yes.  Please start.

5

6  (Deposition excerpt of Thomas M. Hornbeck was read as follows:)

7                THOMAS M. HORNBECK,

8  was called as a witness and, having been sworn, testified, by

9  deposition, as follows:

10

11                EXAMINATION

12  BY MR. RUGGERI:

13  Q.   Sir, would you please state your name for the record?

14  A.   Yes.  Thomas M. Hornbeck, H-O-R-N-B-E-C-K.

15  Q.   Where do you work?

16  A.   Travelers Indemnity Company.

17  Q.   What is your position there?

18  A.   Regional claim director.

19  Q.   Were there any documents that you looked at that involved

20  the impairment or exhaustion of St. Paul policies issued to

21  Northwest Marine?

22  A.   No.  There was no actual policy that was issued to

23  Northwest Marine with regard to this matter.

24  Q.   No actual policy, but I thought you referenced a policy

25  that was found in the Navy Archives.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    A.   I did.

2    Q.   So if there's a policy that was found in the Navy

3    Archives, how could there be no policy issued to Northwest

4    Marine?

5    A.   Well, that's -- there's a distinct difference between a

6    policy that was found in the Naval Archives and a policy that

7    was issued.  The policy was found.  Whether or not it was ever

8    issued or enforced, we don't know that.

9    Q.   If it weren't issued or enforced, how could it have been

10   in the Navy Archives?

11       Mr. Gordon:  Objection.  That calls for speculation.  This

12   witness doesn't control that.  You can answer, if you can.

13   A.   Yeah, I don't know how it ended up there, but having a

14   policy located in some final destination and saying that a

15   policy was actually issued by a company and was in force are

16   two very different scenarios.

17   Q.   Right.  Isn't it correct that the fact that the policy

18   ended up in the possession of a third party, isn't that

19   evidence that the policy, in fact, was issued by St. Paul?

20       Mr. Gordon:  I'll object to be that again.

21   A.   Absolutely not.

22   Q.   I'm sorry.  Absolutely not?

23   A.   Absolutely not.

24   Q.   How can it be "not"?

25       Mr. Gordon:  I'll object.  I believe it calls for a legal

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  conclusion and --

2  BY MR. RUGGERI: (Continuing)

3  Q.   Factually, how could it be absolutely not?

4  A.   What you're asking me is a policy was located in the Naval

5  Archives or a portion of a policy.  We don't even know it was a

6  complete policy, but it certainly -- and I testified to this

7  before -- resembles a policy that I've seen, you know, on that

8  type of paper.  Its completeness, I can't testify to that.

9       Whether or not it was actually issued by that company to

10  the Northwest Marine, I can't testify to that either.  I do

11  know that a fact is -- go back.  I do know that a fact is that

12  it was located in the Naval Archives, but to me and to the

13  company, that does not demonstrate it was issued and was ever

14  in force.

15      (Hornbeck Exhibit No. 116 was marked for purposes of

16  identification.)

17  BY MR. RUGGERI: (Continuing)

18  Q.   Mr. Hornbeck, you've been handed a copy of the document

19  marked as Exhibit 116.  The document is Bates-stamped STP1

20  through 16.

21      Sir, is this a copy of the document that you believe was

22  found in the Navy Archives?

23  A.   Yes.  It appears to be.

24  Q.   Okay.  And the first page of the document is entitled,

25  "Comprehensive general and Automobile Liability Policy";

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    correct?

2    A.    Yes, that's correct.

3    Q.    And then you have a seal for the St. Paul Mercury

4    Indemnity Company, with some sort of logo on the first page;

5    correct?

6    A.    That's correct.

7    Q.    And then to the left of that you have another seal,

8    stamped "St. Paul Fire & Marine."  Do you see that?

9    A.    I do.

10   Q.    Okay.  And these are seals that you're familiar with

11   through the course of your 35 years of work for St. Paul and

12   then Travelers; correct?

13   A.    I recall seeing the -- you're calling it the St. Paul

14   Mercury Indemnity Company.  That seal, I've seen that before.

15   And I've seen a dec page similar to this type of layout.  I

16   can't say that I've actually seen that other seal before.

17   Q.    But you don't dispute that these are seals that were used

18   by the company or trademark symbols that were used by the

19   company in the 1950s, do you?

20   A.    I -- all I can say is I've seen the one to the right

21   before.  I haven't seen the one to the left.  Whether or not it

22   was or wasn't, I just -- I'm just not able to testify to.

23   Q.    And then there's a stamp to the right of the seal or

24   trademark symbol in the middle there that says "Navy Insurance

25   Branch"; right?

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    A.    Correct.

2    Q.    And then there is -- at the bottom of the page there's a

3    signature provided by J. Stuart Leavy, L-E-A-V-Y.  Do you see

4    that?

5    A.    I do.

6    Q.    Do you know who Mr. Leavy is?

7    A.    No, I don't.

8    Q.    And above that, the signature, it says, "I hereby certify

9    that this is a true and exact copy of St. Paul Mercury

10   Indemnity Company Policy 1419213."  Do you see that?

11   A.    Yes.

12   Q.    Is that the policy number that is indicated in the upper

13   left-hand corner of this document?

14   A.    Yes, it is.

15   Q.    Have you ever heard of Jewett Barton Leavy & Kern?

16   A.    Just in the context of this litigation.

17   Q.    You were asked some questions about that entity during

18   your earlier deposition.  And since that deposition,

19   Mr. Hornbeck, did you do anything to try to find out what was

20   Jewett Barton, Leavy & Kern?

21   A.    No.  As I testified in my prior deposition, the reason for

22   that is there are no resources available to me that I -- that

23   would assist me in that regard.

24   Q.    Sure.  Did you do anything to try to find out what is or

25   what was Jewett Barton Leavy & Kern?

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  A.    No.   I was told in my first deposition that they were an

2  agent.

3  Q.    And did you do anything to confirm whether or not it was

4  an agency?

5  A.    No.   I didn't doubt that there were an agency.

6  Q.    Did you do anything to figure out whether this agency had

7  writing authority for St. Paul in the 1950s?

8  A.    No.   That's -- that's what I was answering before.   I

9  think I anticipated probably one of your questions that I don't

10 know of any resource available to me that would assist in that

11 regard.

12 Q.    Do you know -- well, did you research the corporate

13 history of this agency?

14 A.    I did not.

15 Q.    Did you try to find out whether this agency had any

16 relationship with Marsh?

17 A.    I did not.

18 Q.    And you're familiar with Marsh?

19 A.    I assume you're talking about Marsh & McLennan.

20 Q.    Maybe now known as Marsh, but yes.

21 A.    Okay.

22 Q.    Marsh & McLennan?

23 A.    Yes.

24 Q.    And you know what Marsh & McLennan is; right?

25 A.    Yes.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    Q.    And what is Marsh & McLennan?

2    A.    I know Marsh & McLennan as an insurance broker.

3    Q.    And, again, on the declarations page, we see here that

4    there's an identification of the named insured typed in

5    Northwest Marine Iron Works; correct?

6    A.    Yes.

7    Q.    And the address; correct?

8    A.    Correct.

9    Q.    And an indication of the business as ship repair; correct?

10   A.    Correct.

11   Q.    And we see a policy period; right?

12   A.    I do.

13   Q.    February 1, 1954, to February 1 -- I'm sorry, February 11,

14   1954, to February 11, 1957; correct?

15   A.    That is correct.

16   Q.    Okay.  Then we see the identification of coverages down

17   below that; right?

18   A.    Yes.

19   Q.    And including coverage C, property damage liability other

20   than automobile; correct?

21   A.    That's correct.

22   Q.    And then we see on the side of that the limits of

23   liability provided for coverages A, B, and C; correct?

24   A.    Yes.

25   Q.    And then we see -- to the right of that, we see the boxes

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  filled in for estimated premiums to be paid for those

2  coverages; correct?

3  A.    Yes.

4  Q.    Okay.  And we see policy form numbers in the lower

5  left-hand corner, don't we?

6  A.    There are numbers in that corner that I think I testified

7  to earlier, in my earlier deposition, that I know them, from my

8  experience, to be form numbers.

9  Q.    Form numbers for forms used by St. Paul the 1950s.  Fair?

10  A.    I'm not familiar with the forms that were all used in the

11  1950s, but I'm not disputing that -- that form number is on

12  this document.

13  Q.    Okay.  There's actually to the right of that form number

14  there's, quote, Rev.  7-53, end quote; right?

15  A.    Yes.

16  Q.    And that tells us the revision date for this form?

17  A.    I believe that's correct.

18  Q.    And if we turn the page, we see identification of the

19  insuring agreements, don't we?

20  A.    We see the insuring agreement listed on that page 2, yes.

21  Q.    And at the top, before the insuring agreements, we see a

22  statement:  In consideration of the premium and statements made

23  to the company by applicable and subject to the terms set forth

24  herein, the St. Paul Mercury Indemnity Company, herein called

25  the company, agrees with the insured.  And then it goes on to

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   state the insuring agreements; correct?

2   A.    That is correct.

3   Q.    And that's followed by the exclusions; correct?

4   A.    Yes.

5   Q.    And one of the insuring agreements is entitled, "Defense

6   settlement, supplementary payments"; correct?

7   A.    Yes.

8   Q.    And that's the insuring -- insuring agreement two; right?

9   A.    Yes.

10  Q.    And then -- this is a little bit unusual in my

11  experience -- if you look at all the pages at the bottom of the

12  policy, this is what we would call a fully countersigned

13  policy, isn't it?

14  A.    There are signatures on the bottom of each page.  I'm

15  not -- I'm not familiar with a fully -- what a fully

16  countersigned policy is.

17  Q.    I think you said earlier that you didn't know this policy

18  was issued or ever in force.  Is that still your testimony

19  after reviewing the document marked as Exhibit 116?

20  A.    Yes, it is.

21  Q.    What would you have to see for you to conclude that the

22  policy was issued and ever in force?

23  A.    I would have to see evidence that there was a payment of

24  premium and the issuance by the company of a policy to the

25  policyholder.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   Q.   Doesn't this show issuance of the policy by the company to

2   the policyholder?

3   A.   No, it does not.

4   Q.   What else would you need to see?  What else could you see?

5   A.   I don't know.  I mean, I -- those are the initial two

6   facts that I'd like to see to prove that the policy was applied

7   for, was accepted, payment was made, and the policy was issued

8   by the company.

9        As far as what the procedure was, if there was other

10  issues that would need to be covered, I would need to talk to

11  someone whose job responsibilities would fall into that area to

12  see if there were other things that they would need.

13       As I sit here at this moment, just trying to respond to

14  your question, those would be somewhat -- some things that I

15  would like to see, as opposed to just finding a policy in the

16  Naval Archives.

17  Q.   Do you agree with me that this shows premiums were charged

18  to Northwest Marine?

19  A.   No.

20  Q.   No?  Even though the estimated premium is shown totaling

21  $1,781.88 on page 1 of the declaration, that still doesn't show

22  what premium was charged?

23  A.   No.  It shows that there was an estimated premium entered

24  for those lines of coverage.  But in one context and for what

25  purpose, I can't conclude anything further than that.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  Q.   Do you see where it says "in advance" on page 1, next to

2  the 1,781.88?

3  A.   Next to -- I'm sorry?

4  Q.   Down at the bottom, the 1,718.88.

5  A.   Oh, yes.

6  Q.   Do you see, quote, "in advance," end quote?

7  A.   Yes, I do.

8  Q.   Doesn't that tell us that, in fact, an advanced premium

9  was charged by St. Paul of 1,781.88?

10  A.   I -- I can't -- I can't make that leap from looking at

11  this document.  And what's written on it as to what the intent

12  was and what actions were taken following that.  I can just say

13  that there is -- in advance, there's a number that you just

14  mentioned next to that, but that's all I can -- all I can say.

15  Q.   What does, quote, "advance premium," end quote, mean?

16  A.   I would just -- I don't know for sure, but what I would

17  guess that it's -- advance premium may be a premium that's paid

18  in advance up front.

19  Q.   Right.  And the variable portion of the premium is years

20  two and three; right?

21  A.   Whether it's variable or not, it says "To be ADJ," which I

22  can just guess to be adjusted.

23  Q.   Yeah, maybe we don't have to guess, because if you look to

24  the left of that, do you see where it says, quote, "Automobile

25  premiums are only for one year and subject to adjustment for

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  second and third years at the company's prevailing rates," end

2  quote?  Do you see that?

3  A.    I do see that, yes.

4  Q.    That helps us determine that, quote, "ADJ," end quote, in

5  fact, means "adjustment"; right?

6  A.    It would certainly indicate that that is probably what it

7  means.

8  Q.    Do you know whether agencies had the ability to write

9  coverages on St. Paul paper in the 1950s?

10  A.    I don't know.

11  Q.    But you know that was common in the industry in the '50s,

12  don't you?

13  A.    I have no idea.

14  Q.    Now directing your attention back to page 1 of this

15  document under policy number.  Do you see where it says, quote,

16  "former policy number," end quote?

17  A.    Yes.

18  Q.    And there's nothing beneath that; right?

19  A.    There's nothing beneath that.  That's correct.

20  Q.    What, if anything, does that tell us about whether

21  St. Paul issued a policy to Northwest Marine Iron Works for the

22  period preceding February 11, 1954, to February 11, 1957?

23      Mr. Gordon:  Again, I'll object to the question.  It

24  assumes a policy was issued.

25  A.    There -- not only can I not tell whether a policy was

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    issued prior to the '54, '57 time period, I can't even tell you

2    that this particular policy was issued.  So I'm certainly not

3    comfortable saying -- relying on this page whether or not any

4    other policies may or may not have been issued.

5    BY MR. RUGGERI: (Continuing)

6    Q.   So the absence of a number tells us nothing about whether

7    St. Paul issued a prior policy.  Is that fair?

8    A.   Whether it issued a prior policy or whether it issued --

9    actually issued this policy.

10   Q.   And what, again, would we need to see, in addition to what

11   we have here, for you to be able to say that a policy was

12   issued by St. Paul, policy number 1419213, for the period

13   February 11, 1954, to February 11, 1957?

14       Mr. Gordon:  Again, I'll object.  It's been asked and

15   answered.

16   A.   What I said before was the best I can recall right now,

17   with the reservation obviously, as I said, to talk to someone

18   who was involved in the issuing of policies by the company.

19   But evidence of a payment by a policyholder and evidence of

20   issuing of a -- an acceptance of a payment and issuance of a

21   policy by the insurer are two things I would like to see.

22       Now, there may be others that are necessary, but those

23   are -- those are two facts that I'd like to take a look at and

24   have in front of me to demonstrate issuance of a policy.

25   ///

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    BY MR. RUGGERI: (Continuing)

2    Q.    Have you ever tried to find out whether anyone was

3    working, anyone work at underwriting in the 1954 year?

4    A.    I personally did not.  I don't know that there haven't

5    been other people involved in this litigation that may have

6    reached out to see if there was underwriters currently

7    available who might have been involved with this matter or

8    during this time frame.

9    Q.    Where are the historical documents archived, the

10    historical Travelers, St. Paul, or USF&G documents archived?

11    A.    Well, I mean, these documents that we're talking about

12    during the time frame from the '50s through currently, they --

13    there are record retention guidelines that would dictate where

14    they were, whether or not they were maintained, and when they

15    might have been destroyed.

16    Q.    Now, you said you would like to see evidence of payment of

17    a premium and receipt or acceptance of that payment.  I assume

18    you mean payment by the insured of a premium?

19    A.    Payment by the insured to the insurer for issuance of a

20    policy, some agreement to have a transaction there to issue

21    insurance.

22    Q.    An agreement to have a transaction, other than what's

23    reflected on the first page, the declarations page of

24    Exhibit 116?

25    A.    Yes.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   Q.    You want more; right?

2   A.    Well, this doesn't tell me anything about the payment of

3   premium for the issuance of a policy.  There was, to my

4   understanding, a document that was located in the Naval

5   Archives.  It doesn't tell me anything about the Northwest

6   Marine paying money as premium to an insurance carrier and an

7   insurance carrier, in return, issuing the policy.  That's what

8   I'm trying to say.

9   Q.    Is a certificate of insurance evidence that a policy was

10  issued?

11  A.    No.

12  Q.    Is a certificate of insurance evidence that coverage was

13  provided regardless of whether the policy was issued?

14  A.    I'm not sure I understand your question.

15  Q.    Sure.  Is a certificate of insurance evidence that

16  coverage was provided -- extended, offer accepted -- regardless

17  of whether the physical copy of the policy was ever issued?

18  A.    No, it's not.

19  Q.    Then what is it?

20  A.    I think I testified to it earlier.  It's a document that

21  I've seen issued by agents.

22        Now, what they used it for in the course of their

23  business, I'm not sure.

24  Q.    And without getting into the precise communications,

25  you've never learned that there is any sort of record that

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   tells you what agents were used and which ones had writing

2   authority for St. Paul in the '50, '60s, and '70s.  Is that

3   fair?

4   A.   That's fair.

5   Q.   Now, these premium payments, where would the evidence of

6   premium payments be for policies issued by St. Paul in the

7   1950s?

8   A.   I don't know the answer to that.

9   Q.   Did St. Paul keep that information?

10  A.   I would imagine at some point they did keep it.  Whether

11  or not they kept it forever, as I said before, I know that

12  during the course of this litigation there had been retention

13  guidelines produced that would indicate that certain things

14  were destroyed over a period of time.

15  Q.   For policies issued in the 1950s, were records of premium

16  payments received by the company maintained ever?

17  A.   I believe that they were.

18  Q.   Were they maintained among the underwriting files?

19  A.   I don't know where they would have been maintained, but

20  those types of business records, I would imagine, would be

21  maintained.

22  Q.   But were they maintained by insured or by policy or by

23  some other method?

24  A.   I -- I'm just not able to answer that question.  I

25  don't -- I don't know.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   Q.    For how long did St. Paul maintain premium payment

2   information?

3   A.    We don't have any, as far as I've seen, retention

4   guidelines that go back to the 1950s.  I know that I've looked

5   at guidelines that were in force in the mid to late '80s.  And

6   even if those guidelines were in place back then this policy

7   was -- when this policy was allegedly issued, they would have

8   been destroyed.

9   Q.    The policies would have been destroyed; right?

10  A.    The policies would have been destroyed.  I believe -- I

11  would have to look at those retention guidelines again, but I'm

12  fairly comfortable saying that the premium information

13  documentation would have been destroyed as well.

14  Q.    So in asking -- or in saying the company requires evidence

15  of payment of premium and receipt for acceptance by the parent,

16  the company has no documents?

17  A.    My understanding is that that's accurate.  The company has

18  no documents, nor does anyone involved in this litigation have

19  any documents to produce to support that, if they, in fact,

20  existed.  That's the issue.

21  Q.    So how could Northwest Marine ever provide information to

22  cause St. Paul to acknowledge a policy was issued if

23  Exhibit 116 isn't good enough?

24  A.    Well, we've talked about our retention guidelines.  I

25  don't know.  Northwest Marine may be a company -- I mean, the

325

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   Naval Archives had this policy.  They may be a company or one

2   of the -- a few companies out there that kept those records.

3   And if they paid this premium and had some kind of a receipt,

4   they could -- they could produce that.  I'm sure -- well, I --

5   I would imagine if they --

6       Via Telephone:  Joining the meeting.

7       -- if they had a receipt or evidence that would have been

8   presented by now, but that's what -- the type of thing we're

9   talking about that we're looking for.

10  Q.   St. Paul would expect Northwest Marine to keep evidence of

11  its premium payment at the same time that St. Paul thought it

12  was reasonable to destroy that evidence in the normal course of

13  its operations.  Is that fair?

14  A.   That's not.  You're asking me if it's fair.  It's not what

15  I testified to.  You asked me what I would expect from

16  Northwest Marine as evidence of payment, and I told you.  I

17  didn't say I, or we, expect them to do anything.  I mean, I

18  expect that they would keep their records subject to their own

19  guidelines.  But I'm not drawing any conclusions one way or the

20  other based on what was done by St. Paul.

21  Q.   And unless they show that premium payment evidence,

22  St. Paul believes it's not in a position to acknowledge that a

23  policy was issued.  Is that correct?

24  A.   That is correct.  But, again, as we talked about this

25  before, you asked what I would need to see.  Payment of

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   premium.  Attempt by the insurer to issue the policy.  And I

2   don't -- I don't want to suggest to you that I know all that

3   may be necessary, but that's a good start.  I mean, that shows

4   intent by both sides to purchase and issue insurance.

5   Q.   Directing your attention to Exhibit 116 again, is there

6   anything that, in your review of this document, strikes you as

7   missing that would cause you to conclude that this document is

8   incomplete, assuming, of course, that it ever was issued in the

9   first place?

10  A.   There's no way that I can look at any policy and draw any

11  conclusion as to its completeness or thoroughness, not knowing

12  what the underwriting department initially issued.  Unless

13  there was something so obvious as an endorsement that said one

14  of two and there was number two of two.  But it's impossible

15  for me to say whether or not this is a complete copy of a

16  policy.

17  Q.   How about a document that starts with the declarations

18  page, that continues with the preprinted form, and is followed

19  by endorsements one through ten, without any missing number?

20  Is that evidence do you -- is that evidence to you that the

21  policy is complete, or do you still think you need more?

22  A.   It's not evidence of a policy that's complete, in my

23  opinion.  I'm not --

24  Q.   You need more?

25  A.   I'm sorry.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  Q.   I'm sorry.  I didn't mean to speak over you.

2  A.   I -- I'm not able to say that this is a complete policy.

3  It might be.  I don't -- I can't sit here and say for a fact

4  that this is an incomplete policy.  I can't say it's a complete

5  policy either.

6  Q.   How about with regard to the scope of the defense

7  obligation under this policy?  Is Exhibit 116 complete?  Do you

8  have all that you would need to know to determine whether and

9  to what extent St. Paul has a duty to defend or a duty to pay

10  defense costs under Exhibit 116?  Again, assuming it were

11  issued.

12  A.   I -- without knowing whether or not it was complete

13  policy, I wouldn't draw any conclusions as to coverage until I

14  knew I had a complete policy.

15  Q.   Can you draw a conclusion that it's more likely than not

16  that St. Paul had a defense obligation under Exhibit 116?

17  Again, assuming it were issued.

18       Mr. Gordon:  I'll object to that.  That calls for a legal

19  conclusion.

20       Mr. Ruggeri:  No, I was just handicapping.

21       Mr. Gordon:  I object on the grounds of handicapping.

22  A.   I could not conclude.

23  Q.   Let me ask you this:  How many comprehensive general and

24  automobile liability policies have you reviewed in the course

25  of your 35 years with the company?

328

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   A.   I don't -- I don't have a clue.

2   Q.   A lot; right?

3   A.   Yeah.  I think I would be comfortable saying a lot.

4   Q.   Of those, how many did not contain a duty to defend?

5   A.   I -- you know, I'm comfortable saying a lot.  I say a lot,

6   but I'm not suggesting to you that I recall everyone that I

7   looked at.  I don't know.

8   Q.   Let me ask you this:  Do you recall ever looking at a

9   primary CGL policy issued in the 1950s that did not contain a

10  duty to defend that was issued by St. Paul?

11       Mr. Gordon:  I'll object.  That assumes he has seen other

12  policies from this time period, which is not in evidence at

13  this point.

14  A.   That's what I was going to say.  As I sit here at this

15  moment, I don't recall looking at a policy -- a CGL policy that

16  was issued back in this particular time frame, the late 1950s.

17  Q.   How about the early 1950s?

18  A.   Any time in the 1950s.  I don't have a specific

19  recollection.

20  Q.   How about the 1960s?  Have you ever seen a primary CGL

21  policy issued by St. Paul in the 1960s that did not contain a

22  duty to defend?

23  A.   No.

24  Q.   How about the 1970s?  Have you ever seen a policy issued

25  by St. Paul -- a primary CGL policy issued in the 1970s that

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  did not contain a duty to defend?

2  A.    I do not recall seeing any.

3  Q.    Focusing first on underwriting documents, what was the

4  guideline for underwriting documents as to the mid 1980s?

5  A.    I think it varied from, like, three to seven years.  But,

6  again, I wouldn't feel comfortable guessing because these are

7  multiple pages, and it broke it down much more specifically

8  than just underwriting.  And, if possible, if I could look at

9  that, have that in front of me, I'd be able to respond directly

10  to your question.

11  Q.    The guideline or guidelines for the underwriting

12  documents, was it the same or different for home office versus

13  regional office?

14  A.    I'd have -- I'd have to look and see, but whatever that --

15  you know, it's -- I believe those have been produced.  So

16  whatever is in those guidelines, that's what they were doing --

17  during that time frame.

18  Q.    Am I correct that today the St. Paul guideline for

19  retaining underwriting documents is indefinite or permanent?

20  A.    I believe it -- I saw a document that indicated it's a

21  hundred years, but I also -- I'm not sure what the scope of

22  that was, whether it was claim, underwriting, but --

23  Q.    Do you remember what the guideline was for claims files as

24  of the mid 1980s?

25  A.    Mid 1980s?

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    Q.    Yeah.

2    A.    Again, it was like -- it was three to five years.  But

3    what I am comfortable saying is whatever it was, had it been in

4    place -- had the retention guideline been in place back during

5    the time frame we're talking about, the documents would have

6    been destroyed.  But, you know, it's just -- oh, I'm sure

7    you've seen the document.  It lists by line.  It's, like, 20,

8    30 different lines on a page.  So that's why I can't just throw

9    out a year for you.

10   Q.    116.  The policy document that was produced out of the

11   Navy archive documents, is there anything that you've seen in

12   this document that tells us out of which office this policy,

13   assuming it was issued, was issued?

14   A.    Not that I've seen.

15   Q.    Is there anything about the numbering scheme that was in

16   use by St. Paul in the 1950s that gives any significance to the

17   numbers 1419213?

18   A.    Not that I'm aware of.

19   Q.    None of those numbers indicate the type of coverage

20   provided, as far as you know?

21   A.    As far as I know, no.

22   Q.    And none of those numbers indicate the office out of which

23   the policy was issued, as far as you know?

24   A.    That's correct.

25   Q.    Do you know whether the numbering scheme on this document

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    is consistent with the numbering scheme used by St. Paul in the

2    1950s?

3    A.    I don't know that it is or it isn't.  I'm not aware of, to

4    be honest with you, what the numbering scheme was back in that

5    time frame.

6    Q.    Do you know whether the form, quote, "Comprehensive

7    general and automobile liability (ACP form)," end quote, is a

8    form that was used by St. Paul in the 1950s?

9    A.    I believe it was a form that could have possibly been --

10   have been used during that time frame.

11   Q.    When you say "could possibly have been used," do you say

12   that because you know, in fact, it is a form that was used in

13   that time frame?

14   A.    No.  I say that because in the course of this

15   litigation -- and it's my understanding that there were certain

16   forms produced that were used or could have been used during a

17   particular time frame, and that's the extent of my knowledge.

18   Q.    Who produced those forms that were used or could have been

19   used during particular time frames in this litigation?

20   A.    That was produced by Regina Ryan and Tracey Downing and

21   working with some in-house regulatory people, I believe.

22   Q.    So those were policy forms produced by St. Paul because

23   they, in fact, were policy forms that were used by St. Paul.

24   Fair?

25   A.    No.  That's not fair.  I mean, that's not what I just

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    said.  I said that they could have been used during that time

2    frame.

3    Q.   Why would St. Paul have copies of forms from decades ago

4    that weren't used?

5    A.   Well, we're not saying they weren't used.  We're just

6    saying that they could have been used.  We don't know that they

7    were used.  We're not able to say that.

8    Q.   You don't know that they were used in connection with any

9    policy issued by St. Paul in those time periods?

10   A.   The extent of my knowledge is based on the research done

11   by Ms. Downing and Ms. Ryan; that they were produced with the

12   understanding they could have been used.  That's -- that's the

13   extent of my knowledge.

14   Q.   Did St. Paul ever compare those policy forms against

15   policies issued in those time periods that St. Paul knew were

16   issued to see whether, in fact, the forms were used?

17   A.   I don't know that we, or anybody, was able to identify

18   another policyholder that had a policy issued during this time

19   frame.

20   Q.   Well, St. Paul has a database of insureds and the policies

21   in which they made claims for coverage; right?

22        Mr. Gordon:  I'll object to that.  That calls for

23   speculation.  There's no evidence of that database.

24   A.   I'm not aware of a database similar to the one you just

25   described.

333

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   Q.   How about separate the answer.  Indicate and prove.  Have

2   you seen any documents that would indicate the policies were

3   issued by St. Paul?

4   A.   Yes.

5   Q.   Okay.  What documents have you seen that indicate policies

6   were issued by St. Paul?

7   A.   The policy that was located in the Naval yard indicates

8   that that appears to be and resembles a policy that I've seen

9   in other matters.  St. Paul Mercury Indemnity Company, the

10  form, the dec page.  But whether or not it was issued or not, I

11  don't -- I don't know that that has been decided.

12  Q.   But you'll agree that --

13  A.   I do know in my opinion it hasn't been decided.

14  Q.   Let's use, quote, "documents," end quote, in place of,

15  quote, "evidence," end quote, okay?  Have you seen any of the

16  documents, other than Exhibit 116, that indicates that St. Paul

17  issued coverage?

18       Mr. Gordon:  Other than previously testified to in his

19  other deposition?  We're not here today to redo the other

20  deposition.

21       Mr. Ruggeri:  Correct.  We are not here to redo that

22  deposition.

23  A.   No.

24  Q.   Because, in your view, the certificate of the insurance is

25  not a document that indicates coverage was issued; correct?

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    A.    Correct.

2    Q.    And ledgers maintained by the insured showing various

3    policies is not an indication that coverage was issued,

4    according to you; correct?

5    A.    That is correct.

6    Q.    And ledgers prepared by Marsh, as the broker for Northwest

7    Marine, in your view, is not evidence that policies were

8    issued.  Fair?

9    A.    Fair.

10   Q.    Okay.  What about ship repairer's policies?  Have you seen

11   any evidence that St. Paul issued ship repairer's policies to

12   Northwest Marine Iron Works?

13        Mr. Gordon:  Other than previously testified to in the

14   prior deposition?

15   A.    Not other than what I've already testified to.

16   Q.    Does Exhibit 117, sir, indicate that St. Paul issued ship

17   repairer's legal liability coverage to Northwest Marine Iron

18   Works effective February 1, 1953?

19   A.    No, it doesn't.

20   Q.    It doesn't indicate that a policy was issued?

21   A.    That's correct.

22   Q.    Okay.  And it doesn't indicate that a policy was issued,

23   notwithstanding the seal that we see on the first page of 117,

24   Bates-stamped MG203649?

25   A.    That's correct.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   Q.   That seal or stamp is a St. Paul stamp; right?

2   A.   Again, as I testified to earlier, I recall seeing the

3   St. Paul Fire & Marine Insurance Company the way it's written

4   out.  The seal to the left isn't something that I can recall

5   seeing before.

6   Q.   But this doesn't indicate St. Paul issued coverage?

7   A.   That's my testimony.

8   Q.   Is there any other -- are there any other documents that

9   you've seen to indicate that St. Paul issued ship repairer's

10  liability coverage to Northwest Marine Iron Works at any point

11  in time?

12       Mr. Gordon:  Other than previously testified to in his

13  prior deposition?

14  A.   Not -- no.

15  Q.   Did St. Paul ever look for ship repairer's policies that

16  it issued to Northwest Marine Iron Works?

17  A.   Yes.  Our search looked for any and all policies or

18  evidence of policies that might have been issued.  It didn't

19  distinguish a particular line.

20  Q.   Okay.  Did it also -- did you also -- you looked for

21  policies issued by St. Paul; correct?

22  A.   I don't know that it was even limited to that, but, yeah,

23  it was using multiple systems, using numbers and names.  That's

24  what drove the search.

25  Q.   And would your search have turned up any policies that

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  St. Paul maintained issued by syndicates in which St. Paul was

2  a subscribing member?

3  A.   It could.  It's -- it's difficult to predict all the

4  different types of documents that you might uncover in these

5  types of searches.

6  Q.   But St. Paul did participate in syndicates that issued

7  coverage on behalf of the subscribing members; correct?

8  A.   What -- I don't know the answer to that.

9  Q.   You've never seen that situation?

10 A.   I'm not sure I fully understand the situation you're

11 describing.

12 Q.   St. Paul participates with its insurance, family, friends,

13 sometimes, and pools their resources in the risk and they write

14 coverage together; isn't that right?

15 A.   That's probably right.  I think I've seen a couple of

16 occasions that might have passed where that's -- that's the

17 case.

18 Q.   And when that happens, as a subscribing member, St. Paul

19 gets a copy of the policy that was issued to anyone if a policy

20 was issued; correct?

21 A.   That happens as a result of that relationship.  I'm not --

22 I'm not familiar with that.

23 Q.   But your search included looking for those sorts of

24 policies if they were recorded in your systems?

25 A.   We would look for any -- any evidence that a policy was

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    written.  And the reason I'm answering that way is these

2    applications, these systems that are searched, doesn't have a

3    defined list that you might be able to find there.  I mean,

4    we -- we look for anything.  So I think what you're describing

5    would be within the net that we cast.

6    Q.   What, Mr. Hornbeck, if anything, did you do to testify on

7    topic 12?

8    A.   Well, I know -- as I said before, I read my transcript

9    from my earlier deposition, and that question was asked of me

10   then.  And I answered that truthfully, that I was not aware of

11   any minimum limits of coverage that would -- that they would

12   be -- what they would be.

13   Q.   They would be more than zero; right?  If coverage was

14   issued, the amount would be more than zero?

15   A.   I've never seen a policy that was issued that had limits

16   of zero.

17   Q.   And is your testimony that you don't know what the minimum

18   limits would be?  Is that your testimony for both comprehensive

19   general liability and ship repairer's policies?

20   A.   That is my testimony, yes.

21   Q.   But for the '50s, '60s, and '70s, you never saw a document

22   that informed you on the numbering scheme or whether certain

23   numbers were used to indicate certain things.  Is that fair?

24   A.   That's fair.

25   Q.   And is it your understanding that the company has no

338

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   documents relating to that issue?

2   A.    The -- yeah, that's my understanding.  Whether they ever

3   existed and were destroyed, I don't know.  But, currently, we

4   have been unable to locate any -- any documents similar to the

5   type you just described.

6   Q.    Do you know whether engineering records were searched?

7   A.    I don't know where they would have been kept, but, again,

8   I believe scope of our search through the multiple systems

9   would encompass engineering records.

10  Q.    And you knew that just because you think the company was

11  thorough, not because you have an independent recollection of

12  seeing something that said engineering records were searched.

13       Mr. Gordon:  I'll object.  That's a statement, not a

14  question.

15  BY MR. RUGGERI: (Continuing)

16  Q.    Is that your testimony?

17  A.    That's correct.  More than thorough.  We didn't limit it

18  to reinsurance records, underwriting records, engineering

19  records --

20            THE COURT REPORTER:  I'm sorry, could you slow down?

21            MR. BECHTOLD:  I'll just read that whole thing again.

22            THE WITNESS:  That's correct.  More than thorough.

23  We didn't limit it to reinsurance records, underwriting

24  records, engineering records.  We were looking for any records

25  that could be of assistance to us in locating the existence of

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   a policy.

2   BY MR. RUGGERI: (Continuing)

3   Q.    Let's take a look at Exhibit 121.  Mr. Gordon's letter,

4   specifically page 2.  In the first full paragraph, Mr. Gordon

5   writes, quote, "In St. Paul's policy search to date for alleged

6   policies issued to Northwest Marine Iron Works, it has been

7   able to locate only one internal record indicating a company

8   called, quote, 'Northwest Marine Iron Works,' end quote, as an

9   alleged potential insured," end quote.  Do you see that?

10  A.    Yes.

11  Q.    What is that one internal record?

12  A.    As I sit here at this particular moment, I'm not sure.

13  Q.    Then Mr. Gordon goes on to say, "This record reflects that

14  JBL&K Corp may have been an insurance broker associated with

15  this alleged potential insured."  Do you see that?

16  A.    I do.

17  Q.    Let me ask you this, Mr. Hornbeck:  If Mr. Gordon writes

18  that he found an internal document indicating Northwest Marine

19  Iron Works and he found the record that reflects JBL&K may have

20  been an insurance broker associated with Northwest Marine Iron

21  Works, then how can St. Paul, through Mr. Gordon, say that,

22  quote, "there is no indication in this record of any policy

23  having been issued," end quote?

24      So is it your testimony that even though Exhibit 122 bears

25  the revised date July 1955, you believe that it could have been

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  used for a policy that incepted February 1, 1954?

2  A.   I would never conclude anything, as far as when a policy

3  would be used, based on the revision dates.  I wouldn't limit

4  it by that.

5  Q.   How can a policy be used before the revision date?

6  A.   I'm just saying that I would not look at a revision date

7  and draw any final conclusion as to when a policy may or may

8  not have been used.

9  Q.   For the -- for the period 1954 to 1972, is there anything

10  about Exhibit 122 that you can tell us, in terms of the dates

11  within that range, that you believe this policy form may have

12  been used?

13  A.   All I can testify to is my understanding of the forms that

14  were produced in this litigation are firms -- are forms that

15  may have been utilized during the time frame in question.

16  That's the extent to my knowledge.

17  Q.   At any point in the 18-year range, is that your testimony;

18  this policy form may have been used?

19  A.   I was not -- I am not aware of any finer point put on

20  that, other than what I just testified to.

21  Q.   Going back to 122, for example, directing your attention

22  to insuring agreement two, there's the defense provision;

23  correct?

24  A.   Yes.

25  Q.   And now turning to Exhibit 123, the face page shows a

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    revise date of August '57; correct?

2    A.    That's what it appears to be, yes.

3    Q.    And directing your attention again to insuring agreement

4    two, we see the same defense provision under this form;

5    correct?

6    A.    Yes.  I haven't read it in its entirety, but it certainly

7    appears to be similar, if not identical.

8    Q.    Directing your attention to Exhibit 124, do you see that

9    it shows a revision date of June 1961?

10   A.    That is what it appears to be.

11   Q.    And, again, flipping to insuring agreement two, do you see

12   that, under this form, there's that same defense provision?

13   A.    Yes.

14   Q.    And, again, directing your attention now to their insuring

15   agreement, actually, under coverages A and B, do you see this

16   policy form, marked as Exhibit 125, also contains a duty to

17   defend, above the exclusions?  Do you see that?

18   A.    Yes.

19   Q.    I'll be more specific.  If it wasn't issued, how the heck

20   did the Navy get a copy of the St. Paul forms?

21        Mr. Gordon:  Same objection.  Calls for speculation.

22   A.    I think I testified to earlier I don't know.  I know it

23   was found there.  I don't know how they got it.

24   Q.    It's not St. Paul's position that the Navy improperly got

25   ahold of St. Paul policy forms, is it?

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   A.   I don't think we've taken that position.  But whatever

2   positions have been taken, I'm not aware of them all.  But I

3   don't believe that it's anything that I've ever heard.

4   Q.   Mr. Hornbeck, you've been handed a copy of the document

5   marked as Exhibit 126.  Have you ever seen this document before

6   today's deposition?

7   A.   I believe that I have.

8   Q.   What is it?

9   A.   It's a document that was -- that has the heading of Jewett

10  Barton Leavy & Kern.  It indicates it's a certificate of

11  insurance.

12  Q.   Is the document marked as Exhibit 126 an indication that

13  St. Paul issued coverage to Northwest Marine for the indicated

14  period 2/11/57 to 2/11/60?

15  A.   No, it is not.

16  Q.   Okay.  And it's not?  Why?

17  A.   Well, it's not because the purposes of the certificate of

18  insurance is not to prove -- to prove issuance of a policy.

19  I've seen -- we talked earlier about my experience in E&O.

20  I've seen certificates of insurance that have been issued where

21  a policy was not issued.

22  Q.   And do you see -- in the lower right-hand corner, do you

23  see it is signed by Jewett Barton Leavy & Kern, authorized

24  agent for St. Paul Fire & Marine Insurance Company?

25  A.   I see where it's signed by them as authorized agents.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  Q.    Of St. Paul Fire & Marine Insurance Company.  You see that

2  immediately above the broker's name; right?

3  A.    Well, I'm just -- I'm just reading what's here.  It says,

4  "St. Paul Fire & Marine Insurance Company by Jewett Barton

5  Leavy & Kern, by" -- signature.  And underneath the signature

6  it says "authorized agent."

7  Q.    What's blanket liability coverage?

8  A.    I've heard those terms, quote, "blanket liability," end

9  quote, "excess," quote, "umbrella."  I really don't put one

10  definition on a label like that.  If you have a blanket

11  liability property policy that you want to look at, I'll be

12  happy to look at it and tell you what it is, but I'm not -- I'm

13  not going to tell you what I think something is based on that

14  label.

15  Q.    And you don't have an understanding at St. Paul that

16  blanket liability was a reference for what some people would

17  call comprehensive liability policies.  Is that your testimony?

18  A.    My testimony is I've seen the same term used in so many

19  different ways that I steer away from trying to put them into a

20  particular bucket without looking at the actual policy and its

21  terms and conditions and then draw a conclusion as to what it

22  is.

23  Q.    And, to be clear, the production of this certificate of

24  insurance, in your view, is no indication of whether a policy

25  was issued?

344

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   A.    That's correct.

2   Q.    Let me ask you this -- because that's sort of

3   interesting -- you testified at length that St. Paul looked for

4   evidence of coverage, but then you testified that the documents

5   would have been destroyed in the normal course.  What was there

6   to look for?

7   A.    We would look for whatever may be out there, whether it's

8   policies or the existence of policies.  It's not limited to

9   looking for the actual policy.  It could be -- there's all

10  kinds of information that may assist us in determining, you

11  know, what happened in the past.

12  Q.    For policies issued in the 1950s, you expected to find

13  documents?

14  A.    Well, as I said, these -- all these different applications

15  are not so well defined that we can say, quote, "Okay, based on

16  this time frame, I'm going to look here, here, and here," end

17  quote.  All these applications have evolved over the mergers

18  and over time, and we looked for everything.  So we don't

19  exclude anything.

20  Q.    But if everything was destroyed in the normal course under

21  the St. Paul document retention practices, then, when you went

22  to look, you didn't expect to find anything; isn't that right?

23  A.    Well, we're talking about retention guidelines.  What I'm

24  saying is in these applications we're not just talking about

25  policies.  Most times we're not talking about policies but

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  evidence potentially of the existence of a policy.  So we don't

2  really undertake these things with the expectations of exactly

3  what we're going to find.  We go along and take what we can and

4  follow that lead on to the next potential step.

5  Q.    So what, in the applications, did you expect to find that

6  wouldn't have been destroyed in the normal course if the

7  company had adhered to its policy retention guidelines, which,

8  as you said, even by the 1980s was to maintain documents no

9  longer than three to seven years?

10  A.    Again, the expectations -- there are no expectations.  We

11  look at these applications and take the information that's

12  provided to us, and we would hope that we would find policies

13  or the existence of policies.  We have no expectations.  We

14  have hopes.

15        We'd rather find the policies and find out whether or not

16  they were issued, and, if they were, what are the coverages?

17  We would eliminate a lot of this process; but, unfortunately,

18  we weren't fortunate enough to have that happen in this case --

19  in this instance.

20  Q.    And when Northwest Marine presented you with Exhibits 116

21  and 117, which appear to be complete or virtually complete

22  policy documents, you still said not good enough; right?

23  A.    Well, arguably, you feel they're complete.  I'm not sure

24  how you can arrive at that conclusion, but I think it's

25  perfectly fair and it is my testimony that they don't

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    demonstrate that the policy was issued.  This is a document

2    that was found in the Navy Archives.

3         Now, as I've testified to before, it's possible a policy

4    was issued.  It's also policy -- possible that a policy wasn't

5    issued.  But this is not proof of policy issuance.

6    Q.   The effective date, 116, shows a three-year policy

7    incepting 2/11/54 to 2/11/57, and then 126 shows a certificate

8    of insurance with the same property damage limits for the next

9    three-year period, 2/11/57 to 2/11/06; correct?

10   A.   They do.  But what they don't reflect is anything having

11   to do with policy issuance, which is all I'm saying.

12   Q.   Mr. Hornbeck, do you have a copy of a document marked --

13   you have a copy of a document marked Exhibit 127.  The document

14   is Bates-stamped MG213904 through 918.  It's entitled, "Risk

15   Management Program for Northwest Marine Iron Works and

16   Affiliated Companies, October 1972," end quote.

17        Mr. Hornbeck, prior to today's deposition, have you ever

18   seen the document marked as Exhibit 127?

19   A.   No.

20   Q.   Directing your attention to the page Bates-stamped

21   MG213914, who was the carrier that Marsh identifies as the

22   present carrier for general liability?

23   A.   This is 914?

24   Q.   Uh-huh.

25   A.   Under "present," it says the carrier is the St. Paul Fire

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    & Marine Insurance Company.

2    Q.    Limits of liability for property damage.  Do you see it

3    shows $300,000 each occurrence and $300,000 each aggregate?  Do

4    you see that?

5    A.    For property damage, I do.

6    Q.    And those are the same limits for property damage that we

7    saw on Exhibit 126; correct?

8    A.    I believe that's correct.

9    Q.    And those were the same limits that we saw in endorsement

10   ten to Exhibit 116; correct?

11   A.    I really don't have these exhibits memorized, but I --

12   based on our conversation before, I think I know what you're

13   referring to, and I think that's correct.

14   Q.    Is Exhibit 127, in your view, any indication that St. Paul

15   Fire & Marine Insurance Company was the present general

16   liability carrier to Northwest Marine Iron Works in October of

17   1972?

18      Mr. Gordon:  Objection.  The document speaks for itself.

19   It would call for speculation on this -- by this witness.

20   A.    I can't interpret what this purpose or intent of this

21   document is.  That's -- that's up to the people that drafted

22   it.

23   Q.    But, in your view as the St. Paul corporate designee, is

24   this any indication that St. Paul was the current carrier in

25   1972 for general liability coverage?

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    Mr. Gordon:  Same objection.  The document speaks for

2    itself.  It was not prepared by St. Paul, and this witness has

3    testified he's never seen it before.

4    A.   I can't draw any conclusions.  It doesn't tell me anything

5    as to the issuance of a policy or anything along those lines.

6    Q.   Is Exhibit 127, in the view of St. Paul, any indication

7    that St. Paul issued ship repairer's legal liability coverage

8    to Northwest Marine Iron Works that was effective in October of

9    1972?

10   A.   No.

11   Q.   Why is your answer no?

12   And do you see, directing your attention to the first page

13   of the document, the reference by Ms. Russell to the attached

14   register of policies?

15   A.   Yes.

16   Q.   Do you know who prepared the handwritten policy register

17   found at STP01029 through 30?

18   A.   No, I don't.

19   Q.   Directing your attention to the last line of the document,

20   STP01030, do you see a third of the way down the page, it says

21   2/11/55, 2/11/56, St. Paul comprehensive blanket liability.

22   And then below the policy number column it reads 1419213.  Do

23   you see that?

24   A.   I see the dates.  I see St. Paul.  Yeah, I guess that does

25   say "blanket liability" with that number.  Yes, I do.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1   Q.   Okay.  And then do you see down two lines from there, you

2   see the same words and numbers.  The only difference is is the

3   dates are different.  It now reads 2/11/56 to 2/11/57.  Do you

4   see that?

5   A.   Yes.

6   Q.   Same coverage is identified; correct?

7   A.   And by, quote, "same coverage," end quote, you mean what?

8   Q.   The column, it says, quote, "coverage," period, end quote.

9   A.   Oh, yes.  Okay.

10  Q.   And to the left, it says the same company identified,

11  St. Paul; correct?

12  A.   Yes.

13  Q.   And same policy number; correct?

14  A.   Yes.

15  Q.   Okay.  And then the policy number, that matches the

16  document marked as Exhibit 126, doesn't it?

17  A.   Yes.

18  Q.   And these two documents together, Exhibit 116 and

19  Exhibit 128, any indication that St. Paul issued coverage

20  for -- issued policy number 1419213 to Northwest Marine Iron

21  Works?

22  A.   It does not provide proof that the policy was issued, no.

23  Q.   Is it an indication that a policy was issued together with

24  these two documents --

25       Mr. Gordon:  Objection.  Calls for speculation.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  BY MR. RUGGERI: (Continuing)

2  Q.    -- according to you?

3      Mr. Gordon:  He hasn't been able to identify this

4  document, nor authored it.

5  A.    The only thing I can say is that I have already -- is what

6  I've already testified to.  It's not proof that the policy was

7  issued, and that's about all I can say.

8  Q.    Did no one provide this document to you in preparation for

9  your deposition?

10      Mr. Gordon:  He already testified he saw the document.  He

11  may have seen the document in his prior deposition.

12  BY MR. RUGGERI: (Continuing)

13  Q.    Did you see it in preparation for your prior deposition?

14  A.    I -- I haven't seen this.  As I said, the cover email,

15  I've seen copies of it in preparation for my first deposition.

16  I don't recall for this last one.  If I did, it would have been

17  for the first one, but I can't say definitively, yeah, I

18  remember looking at this particular document with this

19  attachment.

20  Q.    What does Lori Stewart know about the attachment?

21  A.    I have no idea.

22  Q.    Well, why didn't you talk to Ms. Stewart about what she

23  knows about the attachment in preparation for your testimony as

24  St. Paul?

25      Mr. Gordon:  Same objection.

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    A.    I -- I don't know.

2    Q.    You never reviewed the claims file over the past three and

3    a half years to see if there's any other information on the

4    issues that we've talked about here today?

5    A.    I think that's fair to say.

6    Q.    How about a diary?  Does the account executive maintain a

7    diary documenting noteworthy events electronically so that you,

8    from Hunt Valley, or someone from Minnesota, or wherever, can

9    access the portal or the claim file to figure out what the heck

10   has happened on this claim?

11   A.    I do not believe so.

12   Q.    So you -- sitting in Hunt Valley, you want to know what's

13   happened on this claim.  How do you go about finding that out?

14   A.    I would pick up the phone.

15   Q.    Okay.  So we pick up the phone.  We do it the

16   old-fashioned way.  We ask the person what's happened; right?

17   A.    We would have a discussion.  Sure.

18   Q.    But you didn't do it here with Ms. Stewart or any claim

19   handler?

20   A.    I think I've already testified that that's the case.

21   Q.    Are you familiar with the Oregon obligation that

22   carriers -- bear with me for a second -- that carriers with

23   respect to matters pending in Oregon are obligated to provide

24   copies of all insurance policy forms issued by it during the

25   applicable policy period that are potentially applicable to the

352

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1    environmental claim?  Is that your understanding?

2    A.    That's my understanding.  I mean, the statute would speak

3    for itself, but that sounds like something I've read before.

4    Q.    All right.  I just want to make sure we're on the same

5    page and that you don't believe I'm stating the law or the

6    obligations of the carrier inaccurately here.

7    A.    I don't believe so.

8    Q.    So is it your testimony that St. Paul, in conformance with

9    its statutory obligations under Oregon law, provided copies of

10   all insurance policy forms issued by it or used by it during

11   the applicable policy periods regarding the lost policy

12   assertions that have been made by my clients?

13   A.    That's my understanding.  As I testified to earlier,

14   Ms. Ryan, Ms. Downing, along with internal regulatory people,

15   worked on that, and they produced the forms that we -- I think

16   we looked at today.

17   Q.    Do you know if Travelers/St. Paul, in searching for

18   evidence of coverage for the lost policies at issue in this

19   case, looked anywhere other than St. Paul's own records,

20   including repositories of, for example, the Port of Portland?

21   Did Travelers/St. Paul make any independent inquiry of the Port

22   of Portland for any records that it may have?

23   A.    I do not believe we did.

24   Q.    How about of the U.S. Navy?

25   A.    I do not believe so.  I believe that's consistent with my

Hornbeck - Deposition Examination as read by Mr. Ruggeri

1  testimony from the first deposition.  I do not believe so.

2  Q.    How about any museum repositories, such as the Baltimore

3  museum that Mr. Ruggeri asked you about earlier today?

4  A.    I do not believe so.

5  Q.    How about any -- how about any libraries?

6  A.    No, I don't believe we did.

7  Q.    Do you know if Travelers/St. Paul may have made inquiries

8  of any law firms that may have handled coverage claims on

9  behalf of its other matters?

10  A.    I'm not aware of any, no.

11  Q.    Do you know if St. Paul/Travelers may have made inquiries

12  of any brokerages or agencies with which it may have had a

13  relationship in the past?

14  A.    Not to my knowledge.

15  Q.    But would all of these sources that you would -- let me

16  start that over.  But would all of these sources be sources

17  that you would expect could potentially hold evidence of

18  policies or secondary coverage?

19  A.    No.

20  Q.    You don't think so?

21  A.    No.  I don't think so.

22         MR. RUGGERI:  That's all, Your Honor, for

23  Mr. Hornbeck, and that reading was from the transcript of the

24  deposition taken March 18, 2014.

25         THE COURT:  All right.  Thank you.  Let's take a

Lauf  - Deposition Examination as read by Mr. Ruggeri

1    break.  Ten minutes, please, and we'll come back for

2    Ms. Lauf's.

3                        (Recess taken.)

4            DEPUTY COURTROOM CLERK:  Court is in session.

5            MR. RUGGERI:  Your Honor, our final reading is the

6    deposition of Lisa Lauf and it, too, is dated March 18, 2014,

7    and I believe Ms. Baxter is here to read along with me.

8            THE COURT:  All right.

9            MR. RUGGERI:  Did you care to give her the same

10   instruction you gave Mr. Bechtold?

11           THE COURT:  Mr. Gale, why don't you administer the

12   oath.

13           (Ms. Baxter was sworn to read accurately.)

14      (Deposition excerpt of Lisa Lauf was read as follows:)

15

16                        LISA LAUF,

17   was called as a witness and, having been sworn, testified, by

18   deposition, as follows:

19

20                       EXAMINATION

21   BY MR. RUGGERI:

22   Q.   Good morning, would you state your name for the record?

23   A.   Lisa Lauf, L-A-U-F.

24   Q.   Ms. Lauf, where do you work?

25   A.   I work for The Travelers.

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   Q.   How long have you worked for The Travelers?

2   A.   I work for Travelers all the way back through when it was

3   USF&G.

4   Q.   And when was it USF&G?

5   A.   I began at USF&G in 1993.

6   Q.   Beginning in 1993, what was your title?

7   A.   I was an environmental paralegal.

8   Q.   What were your duties as an environmental paralegal?

9   A.   Conduct policy searches and assignments on an as-needed

10  basis for the claim group.

11  Q.   Any particular types of claims?

12  A.   Environmental claims.

13  Q.   Are the claims against Northwest Marine related to the

14  Portland Harbor Superfund Site claims that you would call

15  environmental claims?

16  A.   Yes.

17  Q.   And how long did you serve as an environmental paralegal?

18  A.   I was an environmental paralegal for USF&G until 1995.  I

19  returned to the -- St. Paul in 1998.

20  Q.   What was your title when you returned to St. Paul in 1998?

21  A.   I was a first-party property paralegal.

22  Q.   And for how long did you serve as a first-party property

23  paralegal?

24  A.   I served until 2001.

25  Q.   And then you returned?

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   A.   I returned in 2002 as an environmental paralegal in the

2   environmental claim group.

3   Q.   Were your duties as an environmental paralegal in the

4   environmental claim group different than your duties back in

5   the early to mid 1990s as an environmental paralegal?

6   A.   No.

7   Q.   Same?

8   A.   Pretty much the same, yes.

9   Q.   Conducting policy searches?

10  A.   Policy searches.

11  Q.   And then helping out on an as-needed basis?

12  A.   Yes.

13  Q.   At any point during your tenure at USF&G, St. Paul, and

14  Travelers, have you had any responsibilities relating to the

15  Northwest Marine account?

16  A.   Yes, I have.

17  Q.   When did you first have those responsibilities?

18  A.   In 2008.

19  Q.   What were your responsibilities for the Northwest Marine

20  account?

21  A.   My responsibility was to identify and locate policies.

22  Q.   At any point in time have you had any other duties

23  regarding the Northwest Marine account?

24  A.   Yes.

25  Q.   When and what were they?

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  A.    In 2009 I received an additional request asking for

2  additional name research and policy number research.

3  Q.    At any point since 2009, have you performed any duties

4  regarding the Northwest Marine account?

5  A.    Yes.   In 2012 I conducted follow-up research pertaining to

6  the identification and locating policy documents.

7  Q.    Since 2012, have you done anything regarding the Northwest

8  Marine account?

9  A.    Yes.   Just recently, in 2014.

10  Q.    What did you do?

11  A.    Identification and location of policy research.

12  Q.    At any point in time, have you had any other duties

13  regarding the Northwest Marine account?

14  A.    No, I have not.

15  Q.    Do you have a college degree?

16  A.    Yes, I do.

17  Q.    From where?

18  A.    I have an associate's degree from Stevenson University.

19  It's an associate's degree in paralegal studies.

20  Q.    Were you involved in the 2008 name search?

21  A.    Yes, I was.

22  Q.    Let's go back to 2008, then.

23       You did testify that you were asked to identify and locate

24  policies.   And who asked you to try to identify and locate

25  policies?

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   A.   Lori Stewart.

2   Q.   Lori Stewart is -- was an account executive?

3   A.   Yes.

4   Q.   So Ms. Stewart asked you to identify and locate policies.

5   Did she give any information?

6   A.   Yes, she did.  Ms. Stewart provided me with seven alleged

7   policy numbers to research.

8   Q.   Where did she get those policy numbers?

9   A.   I don't know.

10  Q.   Did she give you any other information that you could use

11  to perform your search?

12  A.   Yes.  She provided me with names to research.

13  Q.   Do you remember which names?

14  A.   Northwest Marine, Northwest Marine Iron Works, BAE Ship

15  and Repair -- that's my recollection of that name.  It may be a

16  little different.  Without actually seeing her request, I'm

17  going from my memory here.  As well as Southwest Marine.

18  Q.   You searched those policy numbers and searched those

19  names, and did you come up with anything?

20  A.   That's correct.  No, I did not come up with anything

21  except for potential ocean marine policy numbers.

22  Q.   Did those potential ocean marine policy numbers match any

23  of the seven alleged policy numbers that Ms. Stewart had

24  provided?

25  A.   No, they did not.

359

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   Q.   And did she identify for you the types of coverage that

2   were allegedly provided by those seven alleged policies?

3   A.   In her request and subsequent emails, she requested

4   general liability policies.

5   Q.   Did you limit your search to general liability policies?

6   A.   No.  Because we uncovered the ocean marine policies.

7   Q.   Did you recover any other types of policies?

8   A.   I believe bond policies were located.

9   Q.   Did you locate any other types of policies through that

10  search?

11  A.   No, I did not.

12  Q.   Do you remember for the ocean marine policies and the bond

13  policies who the insured was on those policies?

14  A.   I recall that Northwest Marine Iron Works was the insured.

15  My recollection is that the Southwest Marine was listed as an

16  insured.  However, I believe that once we actually found the

17  policy documents, it was for a different Southwest Marine, not

18  in Oregon.

19  Q.   And policy documents for which type of policies?

20  A.   Ocean marine.

21  Q.   So the insured on the ocean marine policies was Southwest

22  Marine?

23  A.   That's my -- that's what I recall.

24  Q.   How about the bond policies?  Who was the insured on the

25  bond policies?

Lauf  - Deposition Examination as read by Mr. Ruggeri

1    A.   I don't recall.

2    Q.   Do you recall whether it was Northwest Marine Iron Works?

3    A.   I don't recall.

4    Q.   And for which policy period do you recall the ocean marine

5    policies being issued?

6    A.   From 1986 through 1987.

7    Q.   And how about the bond policies, for which years?

8    A.   I don't recall.

9    Q.   And what is your general understanding of the document

10   retention practice and procedures?

11   A.   Well, my general understanding is more on a current level

12   wherein, now, documents are not destroyed depending on the

13   business code or the business.

14   Q.   Do you have an understanding of the document retention

15   practice and procedures in effect in the 1950s?

16   A.   No, I don't.

17   Q.   1960s?

18   A.   No.

19   Q.   1970s?

20   A.   No.

21   Q.   Do you know what the current document retention guideline

22   is today for general liability policies?

23   A.   It's my understanding -- it's my understanding that it is

24   permanent.

25   Q.   Okay.  So Ms. Stewart identified the policy numbers.  You

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   didn't expect to find anything.  And you didn't find anything

2   about those policies; correct?

3   A.   That's correct.

4   Q.   And what -- and that was done in 2008; right?

5   A.   Yes.

6   Q.   And then in 2009 you received an initial request to

7   conduct another search, and that was a request by Ms. Ryan?

8   A.   Yes.

9   Q.   And why did Mrs. Ryan ask you to conduct a further search?

10  A.   I don't know.

11  Q.   She didn't tell you?

12  A.   No.

13  Q.   And was the search that you did in 2009 a repeat of the

14  search you did in 2008?

15  A.   No, it was not.

16  Q.   How was it different?

17  A.   It was different because additional names were provided,

18  as well as one additional alleged policy number was also

19  provided.

20  Q.   What was the additional name?

21  A.   The additional names, as I recall them to be, Industrial

22  Refrigeration & Equipment, Prescott Iron, Sylvia Grebe,

23  G-R-E-B-E.  I believe that is all.

24  Q.   Do you know where Ms. Ryan got those names?

25  A.   I do.

Lauf  - Deposition Examination as read by Mr. Ruggeri

1    Q.    Where?

2    A.    From an insurance certificate.

3    Q.    Do you have an understanding of the policy period for the

4    alleged policy that Ms. Ryan asked you to look for?

5    A.    It's my understanding that the alleged policy period is

6    1956 through 1957.

7    Q.    And when you went to look for information regarding that

8    alleged policy, did you expect to find your search would find

9    anything?

10   A.    No, I did not.

11   Q.    Why not?

12   A.    Again, because of the age of the policy.

13   Q.    And then the next search you did was in 2012; correct?

14   A.    Yes.

15   Q.    Why did you do that search?

16   A.    That search was conducted for Amanda Chase and Ms. Ryan.

17   Q.    So am I correct, then, you didn't perform an additional

18   search in 2012?  Instead, you provided the results of your

19   earlier searches with regard to the ocean marine policy; is

20   that correct?

21   A.    Yes.  And I recall that we -- excuse me.  I recall that I

22   attempted to locate the surety bond policies that were

23   previously identified.

24   Q.    Through another search or through some other means?

25   A.    I would have coordinated my research efforts with records

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   management to locate policy documents and underwriting files

2   for the ocean marine numbers and the bond numbers as well as

3   claim files.

4   Q.   For those same policies?

5   A.   Yes.

6   Q.   Did you do any further searches in 2012?

7   A.   No.

8   Q.   And then you said you conducted an additional search this

9   year, in 2014?

10  A.   Yes.

11  Q.   Why did you do that search?

12  A.   I did that because, as I was reviewing the documents, I

13  found a letter from the agent that identified various

14  additional policy numbers that I had not seen, as well as a

15  request to search Northwest Marine and Southwest Marine in a

16  different fashion.

17  Q.   And how was the search different in terms of name?

18  A.   The search was different in 2014 because Mr. Denton

19  requested a search for Marine, comma, Northwest and Marine,

20  comma, Southwest.

21  Q.   The additional policies.  How many additional policies

22  were identified?

23  A.   I don't recall.

24  Q.   Do you recall whether it was one?  Two?  Many?

25  A.   Probably around 15, as well as various -- variations of

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  those numbers, such as using hyphens and various spaces within

2  the alleged policy numbers.

3  Q.    Explain for me, beginning with the 2008 search, the

4  mechanics of that search.

5  A.    Certainly.  The research project is received, and because

6  alleged policy numbers were provided, I sent a request directly

7  to records management, providing records management with the

8  alleged policy numbers to attempt to locate policy documents,

9  underwriting files, and claim files.

10  Q.    How about reinsurance records?  Any request to search for

11  those documents?

12  A.    Yes.

13  Q.    Were reinsurance documents searched?

14  A.    I believe they were.

15  Q.    So what did records management -- so what did records

16  management do with your request?

17  A.    They ran those numbers using various wildcard scenarios

18  through Opus underwriting, microfilm, and Opus claim.

19  Q.    What information is contained in Opus underwriting?

20  A.    Opus underwriting with regard to the findings --

21  Q.    In general --

22  A.    -- for the numbers?

23  Q.    -- what information --

24  A.    Oh, in general.

25  Q.    -- is contained -- is that a database?

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  A.    It's a database.

2  Q.    And what information is contained in that database?

3  A.    Actually, it's -- it is an indexing database that provides

4  us with the ability to research documents that are warehoused

5  in offsite storage facilities throughout the nation, as well as

6  microfilm documents.

7  Q.    And for what -- how far back does the information go for

8  the information that can be searched through Opus underwriting?

9  A.    I don't know.

10  Q.    Let me ask you this:  If you were trying to find policies

11  issued by St. Paul in the 1950s, understanding the limitations

12  of the database search, how would you go about that search?

13  A.    Right.  I would do -- are you asking -- do I have an

14  alleged policy number?

15  Q.    Sure.  Or you have an insured who says, "I don't have the

16  policy number.  I just know that St. Paul issued a general

17  liability policy to me in the 1950s.  Would you please find

18  it?"  End quote.

19  A.    Sure.  I would research Opus underwriting via the name, as

20  well as the number, and then I would research Opus claims via

21  the name, and then using the alleged number to locate a claim

22  file, because the St. Paul claims, the first ten digits of the

23  claim number is actually -- could be a potential policy number,

24  and you can wildcard in these databases and you can name search

25  as well as number search.

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  Q.   But if you believe that the opus underwriting database

2  didn't contain information or index information that went back

3  to the 1950s, is there anyplace you could go to try to search,

4  for example, hard copy documents?

5  A.   No.

6  Q.   Is there any warehouse that you say, quote, "You know

7  what?  I have reason to believe that the St. Paul documents

8  were warehoused in this facility," end quote?

9  A.   No.  Because all of the documents in our offsite storage

10  facility have been indexed and are available to be researched

11  through Opus underwriting.

12  Q.   So absent a specific request from a -- from the account

13  executive, you would not reach out to the broker?

14  A.   No, I would not.

15  Q.   And in connection with the Northwest Marine account, did

16  any of the account executives ever ask you to reach out to the

17  broker?

18  A.   No.

19  Q.   Have you ever been asked to search for information in the

20  hands -- possibly in the possession of other third parties?

21  A.   No, I have not.

22  Q.   In connection with any of your work for any account,

23  you've never, for example, gone to National Archives to try to

24  find policy documents?

25  A.   No, I have not.

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  Q.   And do you know who within records management performed

2  the search that you requested in 2008?

3  A.   Corey Rau, R-A-U.

4  Q.   And Corey Rau reported back, didn't find anything;

5  correct?

6  A.   That's correct.

7  Q.   And then the search you that you asked to be done at the

8  request of Ms. Ryan in 2009, did that follow the same general

9  procedure?

10  A.   Yes, it did.

11  Q.   Then the one in 2012, same general procedure?

12  A.   Yes.

13  Q.   In 2014, same general procedure?

14  A.   Yes.

15  Q.   How about the names research?

16  A.   I conducted the name research.

17  Q.   Through the databases to which you have access?

18  A.   That's correct.

19  Q.   And those would be the three that we talked about;

20  correct?

21  A.   Yes.

22  Q.   Opus underwriting, microfilm and Opus claim?

23  A.   That's correct.

24  Q.   What information is maintained in the microfilm database?

25  A.   In the microfilm, policy information and claims files.

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   Q.   And it's your understanding that the microfilm in the

2   database is searchable by name?

3   A.   Yes, it is.

4   Q.   And is it also searchable by numbers?

5   A.   Yes, it is.

6   Q.   And Opus claim, what information is in that database?

7   A.   Claim file information.

8   Q.   What do you mean by, quote, "claim file information," end

9   quote?

10  A.   Just the claim file number, and that database can be

11  searched either by name or number, and that will tell you the

12  location of a claim file in our offsite storage facility that

13  may match the search query that was used.

14  Q.   Would you please turn to the exhibit -- the document

15  marked as Exhibit 116?

16  A.   Uh-huh.  Yes.

17  Q.   Have you ever seen this document before today's

18  deposition?

19  A.   Yes, I have.

20  Q.   What do you understand it to be?

21  A.   I understand it to be the document that was found in the

22  Naval Archives.

23  Q.   Is it a policy?

24  A.   On the top of it, it is entitled, "Comprehensive General

25  and Automobile Liability Policy."

Lauf   - Deposition Examination as read by Mr. Ruggeri

1    Q.    Who issued the policy?

2    A.    It's listed here as St. Paul Mercury.

3    Q.    Are you familiar with that company?

4    A.    I'm familiar that this company is under the St. Paul --

5    company was merged with St. Paul in 1957.

6    Q.    Did you find Exhibit 116 in your search?

7    A.    No, I did not.

8    Q.    Why not?

9    A.    Because via name and number research, we were unable to

10   locate the underwriting files, policy documents for this

11   alleged -- for this policy number.

12   Q.    And the work that you've done as a paralegal trying to

13   find policies for older policies, when you find evidence of a

14   policy, do you typically find a complete copy of the policy or

15   do you find a copy of the declarations pages or sometimes a

16   reference to policy forms and endorsements but not physical

17   copies of those forms and endorsements?

18   A.    Right.  Well, with regard to older policies, say, and in

19   the 1950, '60 time frame, if -- I would have no way of knowing

20   whether or not a document -- a policy document is complete.

21   Q.    Have you ever found only parts of a policy and not a

22   complete copy in the -- in your research?

23   A.    Yes.

24   Q.    Do you ever find the declarations page along with the

25   manuscript endorsement and only that in the policy -- in the

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  documents?

2  A.    Again, that would be on a file-by-file basis.  I've seen

3  policy documents containing, you know, a large set of documents

4  or a smaller set of documents.  I would have no way of knowing

5  whether or not it is -- that is a complete copy of the policy.

6  Q.    But you never found Exhibit 116?

7  A.    No, sir.

8  Q.    Let's take a look at Exhibit 117.  Have you ever seen this

9  document before?

10  A.    No, I have not.

11  Q.    Have you ever seen a, quote, "ship repairer's legal

12  liability policy," end quote, issued by St. Paul before today's

13  deposition?

14  A.    Yes, I have.

15  Q.    Does the policyholder form look familiar to you?

16  A.    No, this does not.

17  Q.    Can you tell who issued this policy?

18  A.    The document says St. Paul Fire & Marine.

19  Q.    Did your search uncover this policy?

20  A.    No, it did not.

21  Q.    Why not?

22  A.    Well, this Hull Policy No. PH-0213 was recently

23  researched.

24  Q.    And you found nothing; right?

25  A.    Found nothing.

371

Lauf  - Deposition Examination as read by Mr. Ruggeri

1    Q.    But given the time period, you're not surprised you found

2    nothing.  Fair?

3    A.    That's correct.

4    Q.    Okay.  Let's take a look at Exhibit 121.  The letter from

5    Mr. Gordon.  Directing your attention to page 2, Mr. Gordon

6    says that St. Paul, quote, "has been unable to locate" -- "has

7    been able to locate only one internal record indicating a

8    company called, quote, 'Northwest Marine Iron Works,' end

9    quote, as an alleged potential insured," end quote.

10        Do you know to what internal record the sentence refers?

11   A.    No, I don't.

12   Q.    It goes on to say, quote, "This record reflects that,

13   quote, 'JBL&K Corp,' end quote, may have an insurance broker

14   associated with this alleged potential insured," end quote.

15        Do you know who was referred to by JBL&K Corp?

16   A.    No, I don't.

17   Q.    And then Mr. Gordon writes, quote, "St. Paul is currently

18   conducting a diligent internal search for any forms in its

19   possession," end quote.

20        Were you involved in St. Paul's search for policy forms?

21   A.    No, I was not.

22   Q.    Directing your attention to Exhibit 127, have you ever

23   seen this document before today?

24   A.    No, I haven't.

25   Q.    It's a document prepared by Marsh & McLennan in 1972.  And

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   directing your attention to the page Bates-number MG213914,

2   you'll see that identifies St. Paul -- I'm sorry.  I'll let you

3   get there -- St. Paul Fire & Marine Insurance Company as the

4   then-present general liability carrier.  Do you see that?

5   A.   I see that written here.

6   Q.   Have you found any document showing that St. Paul was the

7   general liability carrier for Northwest Marine Iron Works in

8   1972?

9   A.   No.  I have not found documentation to support that.

10  Q.   And is this documentation, given the date 1972, that you

11  would expect to find in your search?

12  A.   To the extent that documents are found in offsite storage

13  or microfilm via a name or number search, then that would --

14  that would be the result of the search.

15  Q.   Do you know whether documents relating to policies issued

16  in 1972 are contained in any of the three databases that you

17  requested records management to search?

18  A.   From my experience, I have found documents in the '70s in

19  record -- in Opus underwriting, as well as claims.

20  Q.   How about '72, dating back to '72?

21  A.   Yes.

22  Q.   You have?  So if a policy were issued, you'd expect to

23  find it?

24  A.   I wouldn't expect to find it.  I'm saying that if it was

25  in our offsite storage facility for whatever reason, then we

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   would be able to find that a hit was noted and recall that

2   file.

3   Q.   And sometimes you had hits for policies issued in '72?

4   A.   That's correct.

5   Q.   And sometimes, is it fair to say, you received -- you've

6   had misses for policies allegedly issued in '72?

7   A.   Well, we'll re-call the file and perhaps the named insured

8   doesn't match, we were given an incorrect number to search,

9   perhaps the tender came in under a number that they thought was

10  one of their numbers, but actually, when we re-called the file,

11  it had nothing to do.

12  Q.   And in your search did you find any document showing that

13  St. Paul issued a ship repairer's legal liability policy to

14  Northwest Marine Iron Works that was effective in 1972?

15  A.   In 1972?  Again, we looked using the policyholder name,

16  the alleged policyholder name, and the numbers that were

17  provided to us, and we did not locate policy documents for an

18  alleged time frame of 1972.

19  Q.   Directing your attention to Exhibit 128, have you seen

20  this document before today's deposition?

21  A.   No, I have not.

22  Q.   This is not a document that Ms. Stewart forwarded to you

23  to use in connection with your searches for policies?

24  A.   No.

25  Q.   Sitting here today, do you know whether you searched by

Lauf   - Deposition Examination as read by Mr. Ruggeri

1  policy numbers for all of the 19 or so St. Paul policies

2  identified on this ledger?

3  A.   Well, some of these numbers are very difficult to read.

4  Q.   They are.  I agree.

5  A.   I would need to compare the numbers listed here to my

6  research notes.

7  Q.   Now, in the email, you say the search was conducted

8  through all available systems, corporate archives, premium

9  stats, and claim data.  Are those the three databases we talked

10  about?

11  A.   No.  They are additional databases that research was

12  conducted.

13  Q.   What are the additional databases?

14  A.   Well, mainly, the additional databases would not provide a

15  copy of a policy.  The additional databases would -- we would

16  research would be the AME systems.

17  Q.   What does AME stand?

18  A.   Account management environment.

19  Q.   So you search that too?

20  A.   We searched that name.  That is a system -- an

21  underwriting system that would contain the more current policy

22  numbers for an account.  You could then take those numbers and

23  put them into the DOCS Web system, which is a online document

24  repository for, again, more current policies.

25  Q.   Okay.

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   A.    I would run research, request claim finance to run a name

2   search through premium stats to attempt to identify potential

3   policy numbers so that we can look for policy documents or

4   claim files.  In that database, you would not find information

5   pre-1978.

6   Q.    In the premium status database?

7   A.    That's correct.

8   Q.    Why is that?

9   A.    Because that is the earliest data we have available to us.

10  Q.    And what data is included in that database?

11  A.    It's a historical financial database.

12  Q.    Containing premium information?

13  A.    It includes premium information on an account level

14  providing -- you know, it could be a quote the underwriter is

15  working up.

16  Q.    Have you ever talked to Mr. Hornbeck about that issue?

17  A.    No, I did not.  We pretty much take all of our searches

18  that come in, and we search all available resources that we

19  have.

20  Q.    And since you've been at the company, you haven't had any

21  discussions with anyone about the fact that you really don't

22  expect to find evidence of the policies issued in the '50s and

23  '60s?

24  A.    No, not really.

25  Q.    How about generally?  Have you had that conversation with

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  anyone?

2  A.    No.  Regardless of the date of an alleged policy, we were

3  to research for it.

4  Q.    Regardless of whether you expect to find anything, you do

5  a search for it?

6  A.    Exactly.

7  Q.    Did you ever tell Northwest Marine -- let me start over.

8       To your knowledge, as the person here to testify about the

9  search, do you know whether St. Paul ever told Northwest Marine

10  that although it searched for evidence of policies, it didn't

11  expect to find anything in the databases because of the age of

12  the policies?

13  A.    I don't know.

14  Q.    Yeah.  I mean the 19 that are identified in Exhibit 128,

15  you didn't know that there were 19 policies issued by --

16  allegedly issued by St. Paul that were identified on a

17  handwritten register, did you?

18  A.    No.

19  Q.    And because you didn't know that the register existed, you

20  didn't search for all 19 of those policies, did you?

21  A.    Not initially, no.

22  Q.    And you still haven't, to this day, searched for all 19 of

23  those policies, have you?

24  A.    Well, to the extent we can identify the exact numbers

25  listed on the register and see if those numbers were researched

Lauf  - Deposition Examination as read by Mr. Ruggeri

1    in 2014, then I can't -- really can't answer that question.

2    Q.    No one has identified 19 policy numbers for you to search.

3    Fair?

4    A.    No.

5    Q.    And do you know how many films are coded?  In other words,

6    what type of data is entered that pertains to a file?  Is it a

7    name or a named insured, additional insured, policy number, or

8    is it some combination of that or some information in addition

9    to those?

10   A.    In our -- these databases can be researched via

11   policyholder name in the name field or alleged policy number in

12   the number field.

13   Q.    So those are the two parameters that you may search?

14   A.    That we have the research capabilities for.  In addition,

15   on the claim file database, you can research claim file numbers

16   or policyholder names.

17   Q.    Can you search the claim file by policy number?

18   A.    Well, in the situation in the case of St. Paul, you can

19   because on the -- for St. Paul numbers, the first ten digits of

20   a St. Paul claim number is the policy number.

21   Q.    Okay.

22   A.    So by wild-carding in that database, in the number field,

23   you will pick up any claims against an alleged policy number if

24   there are any hits against that.

25   Q.    I think I understand that.  So if you're searching the

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  Opus underwriting database, the two parameters you could enter

2  would be named insured or policy number; correct?

3  A.    Correct.  And you can wildcard in those.

4  Q.    So you can wildcard in both of those.  And then what you

5  do is you enter those search parameters into the database and

6  you get what if there are any hits?  Would you get a piece of

7  paper indicating the file is stored or located somewhere?

8  A.    Right.  On your screen, you will see a location saying

9  that -- well, search results will appear, if any, and you can

10  click on the file level and look at it and see where it's

11  sorted -- where it's stored.  It could be stored in any one of

12  the, I believe, 11 diversified facilities throughout the

13  nation, and then you would request the underwriting file, and

14  then the underwriting file is re-called and sent to Minnesota

15  to be prepared for scanning into the document image database,

16  which is called Net -- FileNet.  And then we'll receive notice

17  saying that the document you requested is now available to

18  review in FileNet, and then you can go in FileNet and look at

19  the documents.

20  Q.    And will that be in an underwriting file that's been

21  scanned?  Is that typically what you find?

22  A.    Yes.  If you're in the underwriting database, yes.

23  Q.    So you'll actually go through the underwriting file or an

24  electronic image of the underwriting file, and then you'll make

25  a judgment as to what's contained therein and whether there's

Lauf  - Deposition Examination as read by Mr. Ruggeri

1    policy-related information?  Is that what you do?

2    A.    No.   I don't make that determination.   I will inform the

3    account executive that a file matching our search criteria of

4    perhaps alleged policy number or policyholder name has been

5    identified and is now available to view in FileNet.

6         I will either email those files directly to the account

7    executive or the records management folks, or the FileNet folks

8    will send an email that -- with the attachments.

9    Q.    Did you find any hits with regard to this particular

10   search that led to any notification that FileNet information

11   should be reviewed?

12   A.    Yes.   I found hits for the ocean marine policy numbers for

13   '86 to '87 time frame.

14   Q.    That was all you located?   That was all you found?

15   A.    Yes.

16   Q.    How is the microfilm file indexed?

17   A.    The microfilm is indexed number and name.

18   Q.    Policy number and policy name again?

19   A.    Yes.   I'm sorry.

20   Q.    So that's also not OCR searchable or full word name

21   searchable?

22   A.    Well, if you get a hit that a document exists on

23   microfilm, you will receive an email from records management

24   with the microfilm documents.   And, no, they're not searchable.

25   Q.    And it lists these initial seven policies and five initial

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  names:  Northwest Marine, Inc.; Northwest Marine Iron Works;

2  The Marine Group, LLC; BAE Systems Ship Repair Inc.; and

3  Southwest Marine, Inc.  And my question is are those the

4  initial names and policy numbers that you searched in 2008?

5  A.  Yes.

6  Q.  This appears to reflect that there was an additional

7  search in a surplus lines database that was unsuccessful; is

8  that correct?

9  A.  Yes.

10  Q.  Let's flip to 357, if we could.  This is an email from you

11  on July 24, 2008.  And you say, "I've come across the

12  below-noted policy numbers via CCR."  And what's a CCR?

13  A.  It's commonly known as client or customer cross-reference.

14  Q.  So what's that?

15  A.  It's actually a database that draws from various

16  underwriting databases, as well as claim file database.

17  Q.  So you found reference to, looks like, a couple policy

18  numbers?

19  A.  Yes.

20  Q.  And were those listings Northwest Marine Iron Works as

21  insured?

22  A.  Yes.

23  Q.  And these are 03 policies?

24  A.  Yes.

25  Q.  So are those the marine policies that you were describing

Lauf  - Deposition Examination as read by Mr. Ruggeri

1  earlier?

2  A.   Yes.

3  Q.   Did you ever locate the policies themselves?

4  A.   Yes.

5  Q.   How often?

6  A.   Oh, I don't know.  It's rare.

7  Q.   How about for 1970s?  Is it rare to find a policy issued

8  in the 1970s?

9  A.   It is.  More likely than not, you're not going to find it

10 in the underwriting database.  You're going to find it in a

11 claim file.

12 Q.   And the claim files database would only give you a hit if

13 there was a claim that had been submitted under a policy;

14 right?

15 A.   Correct.

16 Q.   Is there a date when the underwriting files started to be

17 maintained, St. Paul underwriting files?

18 A.   I don't know.

19       MR. RUGGERI:  Your Honor, that completes the reading.

20 I do believe there was markings on or highlighting on page 23

21 of the deposition.  If we could have a moment just to search

22 for that for completeness?

23       THE COURT:  Go ahead.

24       MR. RUGGERI:  Your Honor, I found -- I believe it was

25 one of the excerpts I noted during my opening, which is why I

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   was familiar that it was left out.  If we could just read that

2   in the record for completeness.

3              THE COURT:  Go ahead.

4   BY MR. RUGGERI: (Continuing)

5   Q.   Again, the question:  When undertook to search for those

6   seven alleged policy numbers based on the policy period, did

7   you expect to find anything?

8   A.   No, I did not.

9   Q.   Why not?

10  A.   Because it's very, very rare that we would find policies

11  that are 50-plus years old.

12  Q.   Why is that?

13  A.   Because they're just not -- they're not available in the

14  resources that we -- that we have available to us.

15  Q.   Do you have any personal knowledge of the USF&G, St. Paul,

16  or Travelers document retention policies?

17  A.   I have a general understanding.  My research is done

18  regardless of retention policy; meaning that when I research

19  for policies, I research for any policies regardless of their

20  effective dates.

21  Q.   What is your general understanding of the document

22  retention practices and procedures?

23  A.   Well, my general understanding is more on a current level,

24  wherein, now, documents are not destroyed, depending on the

25  business code or the business.

383

Lauf  - Deposition Examination as read by Mr. Ruggeri

1   Q.   Do you have an understanding of the document retention

2   practice and procedures in effect in the 1950s?

3   A.   No, I don't.

4   Q.   1960s?

5   A.   No.

6   Q.   1970s?

7   A.   No.

8   Q.   Do you know what the current document retention guideline

9   is today for general liability policies?

10  A.   It's my understanding -- it's my understanding that it is

11  permanent.

12  Q.   Okay.  So Ms. Stewart identified the policy numbers.  You

13  didn't expect to find anything, and you didn't find anything

14  about those policies; correct?

15  A.   That's correct.

16       MR. KOLE:  Your Honor, I think we're reading things

17  we've read in before.

18       THE COURT:  Yes.

19       MR. RUGGERI:  Yeah, I think we've now come in to

20  where we started.  That completes the reading, Your Honor.

21       THE COURT:  Okay.  Thank you.

22    Any more evidence?  I think that was the last.  All right.

23  Good.

24    Mr. Rycewicz, you're still here.  Good.

25       MR. RYCEWICZ:  Yes, Your Honor.

 1          THE COURT:  No rebuttal, I assume?

 2          MR. RYCEWICZ:  No, Your Honor.

 3          THE COURT:  All right.  I think that completes the

 4   evidence phase of phase one.  Although it's not a deadline, the

 5   first date of importance is the date the transcript will be

 6   filed, and I think that was November 30th we've decided.

 7      Good.  All right.

 8      And then the first official date after today, the initial

 9   briefs, post-trial briefs, December 21st.  All the other dates

10   are in the minute order that was entered just a few days ago.

11      All right.  Before we adjourn, anything else,

12   Mr. Rycewicz?

13          MR. RYCEWICZ:  Nothing else, Your Honor.

14          THE COURT:  Mr. Kole?

15          MR. KOLE:  Nothing else, Your Honor.  Thank you very

16   much.

17          THE COURT:  All right.  Mr. Ruggeri?

18          MR. RUGGERI:  Nothing further, Your Honor.

19          THE COURT:  Mr. Stapley?

20          MR. STAPLEY:  Done, Your Honor.  Thank you.

21          THE COURT:  Mr. Sumner?

22          MR. SUMNER:  No, Your Honor.  Thank you.

23          THE COURT:  I want to say before we conclude that I

24   very much appreciated the high and consistent level of

25   professionalism that the lawyers have displayed during trial.

1    It is completely consistent with everything that has gone on in

2    this case beforehand, and I'm quite pleasantly surprised and

3    happy to see that the level of trial skills has exceeded what I

4    have seen in recent trials.  That's an unfortunate observation,

5    but it sure makes everything else easier.

6        I was thinking after the conclusion of yesterday's

7    proceeding, I wished I had had a video of yesterday's trial

8    because I would like to show it to law students and young

9    lawyers so they know how cases should be tried.  Focused,

10   efficient, well-organized, and clear.  And thank you very much

11   for that.  It's been a real pleasure.  And I can honestly say I

12   look forward to further proceedings in the case.  And with

13   that, we're adjourned.

14            DEPUTY COURTROOM CLERK:  Court's adjourned.

15                    (Court trial adjourned.)

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3        CENTURY INDEMNITY COMPANY v. THE MARINE GROUP, et al

4                        3:08-cv-01375

5                          TRIAL DAY 2

6                        November 5, 2015

7

8            I certify, by signing below, that the foregoing is a

9    true and correct transcript of the record of proceedings in the

10   above-entitled cause.  A transcript without an original

11   signature, conformed signature, or digitally signed signature

12   is not certified.

13

14   /s/Jill L. Jessup, CSR, RMR, RDR, CRR
     _____
15
     Official Court Reporter         Date: December 15, 2015
16

17

18

19

20

21

22

23

24

25