UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

CENTURY INDEMNITY COMPANY, a Pennsylvania Corporation,

Plaintiff,

v.

THE MARINE GROUP, LLC, a California limited liability company, as affiliated with Northwest Marine, Inc.; NORTHWEST MARINE, INC., an inactive Oregon corporation, as affiliated with Northwest Marine Iron Works; NORTHWEST MARINE IRON WORKS, an inactive Oregon corporation,

Defendants.

THE MARINE GROUP, LLC, a California limited liability company, as affiliated with Northwest Marine, Inc.; NORTHWEST MARINE, INC., an inactive Oregon corporation, as affiliated with Northwest Marine Iron Works; NORTHWEST

Case No.: 3:08-CV-1375-AC

FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARINE IRON WORKS, an inactive Oregon corporation; and BAE SAN DIEGO SHIP REPAIR, INC., a California corporation,

Third-Party Plaintiffs,

v

AGRICULTURAL INSURANCE COMPANY and AGRICULTURAL EXCESS AND SURPLUS INSURANCE COMPANY, each an Ohio corporation; AMERICAN CENTENNIAL INSURANCE COMPANY, a Delaware corporation; CHICAGO INSURANCE COMPANY, an Illinois corporation; CONTINENTAL INSURANCE COMPANY, a Pennsylvania corporation; EMPLOYERS MUTUAL CASUALTY COMPANY, an Iowa corporation; FEDERAL INSURANCE COMPANY, an Indiana corporation; GRANITE STATE INSURANCE COMPANY, a Pennsylvania corporation; HARTFORD INSURANCE COMPANY, a Connecticut corporation; INSURANCE COMPANY OF THE STATE OF PENNSYLVANIA, a New Jersey corporation; INSURANCE COMPANY OF NORTH AMERICA, a Pennsylvania corporation; CERTAIN UNDERWRITERS AT LLOYD'S, LONDON and CERTAIN LONDON MARKET INSURANCE COMPANIES, each a foreign corporation; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, a Pennsylvania corporation; NEW ENGLAND REINSURANCE COMPANY, a Connecticut corporation; OLD REPUBLIC INSURANCE COMPANY, an Illinois corporation; PACIFIC MUTUAL MARINE OFFICE INC., a New York corporation; RELIANCE INSURANCE COMPANY, a Pennsylvania corporation; ROYAL

INDEMNITY COMPANY, a Delaware corporation; ST. PAUL FIRE & MARINE INSURANCE COMPANY, individually and as successor to ST. PAUL MERCURY INDEMNITY COMPANY, a Minnesota corporation; TWIN CITY FIRE INSURANCE COMPANY, an Indiana corporation; WATER QUALITY INSURANCE SYNDICATE, a syndicate of foreign corporations; WEST COAST MARINE MANAGERS, INC., a New York corporation; AMERICAN MANUFACTURER'S MUTUAL INSURANCE COMPANY, an Illinois corporation; DANIELSON NATIONAL INSURANCE COMPANY, successor to MISSION NATIONAL INSURANCE COMPANY, a California corporation; FM GLOBAL INSURANCE AGENCY, successor to ARKWRIGHT BOSTON MANUFACTURER'S MUTUAL INSURANCE COMPANY, a Delaware corporation; STERLING CASUALTY INSURANCE COMPANY, successor to NATIONAL AUTOMOBILE AND CASUALTY COMPANY, a California corporation; and JOHN DOE INSURANCE COMPANIES,

Third-Party Defendants.

---

ACOSTA, Magistrate Judge:

*Introduction*

This lawsuit arises from the alleged obligations of numerous insurance companies to defend and indemnify third-party plaintiffs The Marine Group, LLC ("Marine Group"); Northwest Marine, Inc. ("NW Marine"); Northwest Marine Iron Works ("Marine Iron"); and BAE Systems San Diego Ship Repair, Inc. ("BAE Systems") (collectively referred to as "Insureds") with regard to the

assessment, removal, and remediation of hazardous materials released at the Portland Harbor Superfund Site (the "Environmental Claims"). At Insureds' request, the court bifurcated the proceedings into two separate stages. The first stage resolves duty to defend issues, including identification of insurance companies with a duty to defend, allocation of defense costs under the Oregon Environmental Cleanup Assistance Act (OR. REV. STAT. 465.475-465.484) (the "OECAA"), designation of expenditures as defense costs, and the reasonableness and necessity of such defense costs. The second stage will resolve issues related to coverage and the duty to indemnify.

A two-day court trial addressing the existence, provisions, and limits of lost insurance policies allegedly issued by St Paul Fire and Marine Company or St. Paul Mercury Indemnity Company (collectively "St. Paul") to Insureds covering the period from February 11, 1954, to July 1, 1972, commenced on November 4, 2015. On January 26, 2016, the court heard closing arguments on the lost policy issues as well as the proper allocation of defense costs under the OECAA, and the parties' final submissions were provided to the court by February 1, 2016. Thereafter, the court took this case under advisement.

After careful consideration of the facts and evidence presented by the parties at trial through live witnesses and exhibits, and having had the opportunity to assess the demeanor of the witnesses, and review and weigh the evidence, the court makes the following findings of fact, which the court finds and holds were established by a preponderance of the evidence, and conclusions of law, pursuant to Rule 52(a)(1) of the Federal Rules of Civil Procedure.[1]

/ / / / /

[1]To extent any finding of fact constitutes a conclusion of law, or any conclusion of the law constitutes a finding of fact, the courts adopts it as such.

*Prior Findings, Rulings, and Admissions*

1. On January 18, 2008, the United States Environmental Protection Agency ("EPA") forwarded identical letters to BAE Systems, and NW Marine and Marine Group on behalf of Marine Iron (collectively "Marine") invoking section 104(e) of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA") and seeking information related to the Portland Harbor Superfund Site ("Site"). *Century Indem. Co. v. The Marine Group*, 848 F. Supp. 2d 1238, 1243-44 (D. Or. 2012) ("*Century I*"). These letters, as well as other administrative communications notifying Insureds of their status as potentially responsible parties ("PRPs") liable for clean-up costs related to the Site (the "Suit Documents"), gave rise to a "suit" sufficient to trigger a duty to defend. *Id*. at 1255-56.

2. The claims identified in the Suit Documents are based primarily on Insureds' interest in, or relationship to, real property. A January 11, 2008 letter from the EPA included a narrative summary of Insureds' "facility and its relationship to the Site." The summary described Insureds' activities at dry docks, overwater, and on property; likely releases of hazardous substances resulting from Insureds' operations; and tests results revealing contamination associated with these types of activities. Additionally, the EPA identified Insureds as PRPs based on their relationship to, and operations on, their facilities located at 5555 North Channel Avenue, 5815 North Lagoon Avenue, and 5851 North Lagoon Avenue. The summary of Insureds' activities offered by the EPA in support of their initial consideration of Insureds as PRPs included the utilization of several facilities to support its operations such as carpentry and steel fabrication, overwater activities at dry docks used for ship hull surface preparation and painting, and poor housekeeping and waste disposal practices at leased facilities. *Century Indem. Co. v. The Marine Group*, Case No. 3:08-CV-1375-AC, 2015

WL 5317324, *40-41 (D. Or. Sept. 11, 2015) ("*Century II*")

3. The Suit Documents and insurance policies at issue give rise to a reasonable inference that NW Marine, Marine Group, and BAE Systems are corporate successors to Marine Iron. As presumed corporate successors to Marine Iron, NW Marine, Marine Group, and BAE Systems succeed to the benefits of any insurance policy issued to Marine Iron. *Century Indem. Co. v. The Marine Group*, CV No. 08-1375-AC, Opinion and Order dated Dec. 26, 2012 (ECF No. 452)("*Century III*"), at 17.

4. St. Paul has a duty to defend Insureds under Policy No. 1419213 issued to Marine Iron for the period of February 11, 1954, to February 11, 1957 ("1954 St. Paul Policy"). (Ex.[2] 1.) *Century III* at 8, 17.

5. Insurance Company of North America ("INA") has a duty to defend Insureds under Policy Nos. ISG1001 and ISL 1062 issued to Marine Iron for the period of July 1, 1978, to July 1, 1980 ("INA Policies"). (Exs. 51, 52.) *Century I*, 848 F. Supp. 2d at 1250; *Century III*, at 8, 17. The deductible endorsement of the INA Policies does not extinguish or alter INA's duty to defend, rather INA has the duty to pay defense costs up front and, if appropriate, may seek reimbursement up to the deductible amount. *Century I*, 848 F. Supp. 2d at 1250.

6. Great American Assurance Company, formerly known as Agricultural Insurance Company, and Great American E&S Insurance Company, formerly known as Agricultural Excess and Surplus Insurance Company (collectively referred to as "Great American") have a duty to defend Insureds under Policy Nos. SL0005754 and GL0003655 issued to Marine Iron for the period of July 1, 1980, to July 1, 1982 ("Great American Policies"). (Exs. 53, 54.) *Century I*, 848 F. Supp. 2d at 1250;

[2] "Ex." refers to the trial exhibits.

*Century III*, at 8, 17.

7. Argonaut Insurance Company ("Argonaut") admits to having a duty to defend Insureds under Policy No. CL80288808151 issued to Marine Iron for the period of July 1, 1972, to July 1, 1975 (the "Argonaut Policy"), and has been providing such defense. (Ex. 46; Lucchesi Decl. dated July 2, 2010, (ECF No. 221) ¶ 2.)

8. The Insurance Company of the State of Pennsylvania ("ICSOP") insured Marine Iron pursuant to umbrella policies for more than eight years, from June 8, 1970, to July 1, 1978. As an excess insurer over a primary insurer with a duty to defend, ICSOP does not have a present duty to defend during the period from July 1, 1972, to July 1, 1978. *Century II*, 2015 WL 5317324 at *34. ICSOP's duty to defend under Policy No. 450-1641 issued to Marine Iron for the period from June 8, 1970, to July 1, 1972, (the "ICSOP Policy") is contingent on the existence of an underlying primary policy issued by St. Paul during this period. *Century II*, 2015 WL 5317324 at *38.

9. The Home Indemnity Company ("Home") issued Policy Nos. GA996225, GA99635, and GA9382191 to Marine Iron for the period of July 1, 1975, to July 1, 1978 ("Home Policies"). (Exs. 48-50.) Home is insolvent and unable to honor the terms of the Home Policies, including any duty to defend. *Century II*, 2015 WL 5317324 at *34.

10. Insureds status as an uninsured under the OECAA for the period between July 1, 1982, and February 28, 1987, including the commercial availability of occurrence-based general liability insurance for the Environmental Claims after August 1, 1985, will be addressed in the indemnity phase of this litigation. *Century II*, 2015 WL 5317324, at *2, *31.

/ / / / /

/ / / / /

*Findings of Fact*

I. Existence of Lost St. Paul Policies

1. St. Paul does not contest the evidence offered at trial proves the existence of policies issued by St. Paul to Marine Iron covering the period from February 11, 1957, to February 11, 1960, and from May 31, 1963, to July 1, 1972. (St. Paul Post-Trial Mem. at 3; OA Tr.[3] 12:14-23.)

2. In January 1957, Jewett, Barton, Leavy & Kern, Marine Iron's insurance broker ("Jewett"), issued two certificates of insurance indicating the existence of St. Paul Policy 504JA1267 identifying Marine Iron as an insured with an effective date of February 11, 1957, and an expiration date of February 11, 1957 (the "1957 St. Paul Policy"). (Ex. 5 at 2, 4.)

3. In May 1963, Jewett issued a certificate of insurance indicating the existence of St. Paul Policy 504JF2428 identifying Marine Iron as the insured with an effective date of May 31, 1963, and an expiration date of May 31, 1966 (the "1963 St. Paul Policy"). (Ex. 21 at 1.)

4. On May 31, 1965, an endorsement extended the expiration date of the 1963 St. Paul Policy from May 31, 1966, to July 1, 1966. (Ex. 17 at 3.)

5. In July 1966, Jewett issued a certificate of insurance indicating the existence of St. Paul Policy 504JH5407 identifying Marine Iron as the insured with an effective date of July 1, 1966, and an expiration date of July 1, 1969 (the "1966 St. Paul Policy"). (Ex. 22 at 1.)

6. A schedule of primary policies prepared in June 1970 in support of Marine Iron's application for an umbrella policy identifies St. Paul as Marine Iron's insurance carrier providing property damage limits in the amount of $300,000. (Ex. 35 at 2. ) A ledger prepared by a former Marine Iron employee identifies St. Paul Policy 536JB5573 as Marine Iron's general liability insurer from July

[3]"OA Tr." refers to the transcript of the oral argument (ECF No. 938).

1, 1969, to July 1, 1972 (the "1969 St. Paul Policy"). (Ex. 205 at 3.)

7. The only policy currently identified as lost is a St. Paul policy allegedly issued to Marine Iron on February 11, 1960, and expiring on May 31, 1963.

8. St. Paul's failure to find any evidence of the lost policy within its business records is not significant because of St. Paul's document retention policy directing that documents be destroyed after a set period of time. (Tr.[4] 324:1-13, 329:23-330:6.)

9. Certificates of insurance are essential documents available to policy holders to provide information regarding insurance policy coverage without having to provide the entire policy itself, and are extremely reliable representations of the coverage actually provided. (Tr. 85:12-86:3, 87:1-4.)

10. Marine Iron was a ship repair contractor that operated within the Portland Harbor from the 1940's until the company was purchased by Southwest Marine, Inc., in 1989. (Ex. 55 at 7; Tr. 42:22-43:2.)

11. Marine Iron owned numerous subsidiary companies including, but not limited to, Electrical Construction Co., Industrial Refrigeration & Equipment Co., and Portland Machinery Co. (Ex. 14 at 1.) Marine Iron acquired a majority interest in Electrical Construction Co. ("ECCO") in 1958. (Ex. 13 at 2; Ex. 15.)

12. On May 31, 1963, the State of Oregon issued a Certificate of Merger certifying that "Electrical Construction Company, Marine Electric Co., Marine Salvage Co., Inc., East Side Electric, Inc., Prescott Iron Works, Inc., and Industrial Refrigeration and Equipment Co., all Oregon corporations, are merged with and into Northwest Marine Iron Works, which latter is the surviving

[4] "Tr." refers to the transcript of the trial (ECF Nos. 895 and 896).

corporation." (Ex. 20.)

13. On June 3, 1963, ECCO was incorporated as a new, independent, corporation. (Ex. 56, at 12.)

14. Marine Iron consistently purchased a single comprehensive general liability ("CGL") policy for itself and its affiliated companies. (Exs. 1, 5, 17, 35, 46, 48, 49, 51, 52, 53, 54.)

15. Marine Iron consistently named ECCO as an additional insured in CGL policies purchased after 1963. (Ex. 17 at 1; Ex. 35 at 1; Ex. 46 at 8; Ex. 48 at 32; Ex. 49 at 3; Ex. 51 at 13; Ex. 52 at 12; Ex. 53 at 13; Ex. 54 at 24.)

16. Marine Iron held a federal master ship repair license, which allowed it to bid on work orders, or master ship repair contracts, issued by the United States Department of the Navy (the "Navy"). (Tr. 46:21-47:2)

17. Marine Iron performed ship repair work under various Master Contracts for Repair and Alteration of Vessels ("Ship Repair Contracts") from as early as 1942, and consistently from 1957 to 1985. (Ex. 55 at 7, 65; Tr. 51:5-53:7.)

18. The Navy routinely required master ship repair contractors, including Marine Iron, to regularly submit insurance policies and certificates of insurance to prove compliance with Ship Repair Contract insurance requirements. (Exs. 3, 6, 40, 41, 45, 47; Tr. 48:2-18.)

19. Marine Iron could not have operated as a Navy master ship repair contractor without complying with the Navy's insurance requirements. (Tr. 54:25-55:03.)

20. In the early 1960's, it was common practice for policy holders to maintain a continuous relationship with a single CGL insurer by renewing policies for consecutive terms. (Tr. 114:8-24, 182:20-12.)

21. In March 1960, Jewett issued a certificate of insurance with regard to erection work being performed on an unloader at the Portland public docks by ECCO as a subcontractor of Fought & Company, Inc. (Ex. 12.) The certificate indicated the existence of St. Paul Policy No. 504JC3433 by St. Paul identifying ECCO as the insured with an effective date of February 11, 1960, and an expiration date of February 11, 1963. (Ex. 12 at 2, 5.) The address listed for ECCO on the certificate is not entirely legible, but shows the street is a numbered Avenue in Portland, Oregon. (Ex. 12 at 5.)

22. In January 1961, ECCO entered into a contract with the City of Portland (the "City") to furnish and install a generator at the Central Police Station. (Ex. 11 at 7.) The contract required ECCO to maintain property damage insurance coverage of not less than $25,000. (Ex. 11 at 8.) Jewett provided the City with a certificate of insurance effective January 24, 1961, indicating the existence of St. Paul Policy No. 504JC3433 identifying ECCO as the insured, with an expiration date of February 11, 1963. (Ex. 11 at 26.) The certificate identified ECCO's address as 2516 N.W. 29th Avenue, Portland, Oregon. (Ex. 11 at 26.) ECCO's street address at that time was 2121 N.W. Thurman Street, Portland Oregon. (Ex. 11 at 2, 11.)

23. Marine Iron's street address from 1954 to 1966 was 2516 N.W. 29th Avenue, Portland, Oregon, 97208. (Ex. 1 at 1; Ex 5 at 2; Ex. 9 at 12; Ex. 21 at 1; Ex. 22 at 1.)

24. The May 31, 1963, effective date of the 1963 St. Paul Policy, and the extension of the expiration date from May 31, 1996, to July 1, 1996, supports a conclusion the previous policy had been extended from February 11, 1963, to May 31, 1963. (Tr. 103:8-104:11.)

25. There is no evidence in the record Marine Iron purchased insurance from someone other than St. Paul for the period from February 11, 1960, to May 31, 1963.

II. Terms of St. Paul Policies

*A. General Terms and Exclusions*

26. The language of CGL policies were developed by industry organizations in the early 1940's and remained relatively consistent from 1955 to 1966. (Tr. 77:1-79:6.)

27. In 1996, the language of CGL policies changed to identify an "occurrence" rather than an "accident" as a triggering event. (Tr. 79:2-10.)

28. Insurance forms provided by St. Paul as examples of those it believes would have been used for CGL policies issued after the 1954 St. Paul Policy included language substantially similar to that found in the 1954 St. Paul Policy. (Ex. 10.)

29. Three of the forms with revision dates of July 1955, August 1957, and June 1961, provide that St. Paul will pay "on behalf of the Insured all sums which the Insured shall become obligated to pay by reason of the liability imposed upon him by law or contract for damages because of injury to or destruction of property, including the loss thereof, caused by accident" and that St. Paul "shall defend in his name and behalf against the Insured alleged such . . . damage or destruction, and seeking damages on account thereof . . . ." (Ex. 10 at 3-4, 8-9, 12-13.)

30. A fourth form with a revision date of October 1966, identified as a broad form CGL policy, similarly requires St. Paul to "pay on behalf of the Insured all sums with the Insured shall become legally obligated to pay as damages because of . . . property damage . . . to which this insurance applies, caused by an occurrence, and the Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such . . . property damages . . . ." (Ex. 10 at 18.)

31. St. Paul also provided a form Contamination or Pollution Exclusion Endorsement with a revision date of June 1970 which provided:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids of gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental and is neither expected nor intended from the standpoint of the insured.

(Ex. 10 at 24.)

32. The forms provided by St. Paul are comparable to the kind of forms that would have been filed with an insurance regulator during the relevant period. (Tr. 196:21-197:13.)

33. During the relevant period, it was standard practice for policy holders to renew insurance policies on the same terms and conditions. (Ex. 206 at 9-10.)

34. There is no evidence specific exclusions, other than those contained in the standard forms provided by St. Paul, were attached to policies issued by St. Paul to Marine Iron between February 11, 1957 and July 1, 1972.

*B. Duty to Defend*

35. St. Paul's primary general liability policies issued during the relevant period would have contained a duty to defend. (Tr. 328:8:329:2.)

36. There is no evidence policies issued by St. Paul to Marine Iron between February 11, 1957 and July 1, 1972, did not contain a duty to defend.

*C. Property Damage Limits*

37. St. Paul does not contest the evidence presented at trial proves the property damage limits for the St. Paul policies issued to Marine Iron and providing coverage from May 31, 1963, to July 1, 1972, are $300,000. ((St. Paul Post-Trial Mem. at 4-5; OA Tr. 44:13-16.)

38. The property damage limits for the St. Paul policies issued to Marine Iron and providing

coverage from February 11, 1954, to May 31, 1963, are at issue.

39. During the period from 1954 to 1972, master ship repair contracts issued by the Navy required master ship repair contractors, including Marine Iron, to maintain CGL insurance policies with $300,000 property damage limits. (Ex. 3; Ex. 42 at 11; Tr. 47:5-13.)

40. This requirement was found in Clause Ten of the Ship Repair Contract ("Clause Ten") (Ex. 42.).

41. The relevant paragraphs of Clause Ten of the August 1968 edition of the Ship Repair Contract specifically provided:

> (c) The Contractor indemnifies and holds harmless the Government, its agencies and instrumentalities, the vessel and its owners, against all suits, actions, claims, costs or demands (including, without limitation, suit, actions, claims, costs or demands resulting from death, personal injury and property damage) to which the Government, its agencies and instrumentalities, the vessel or its owner may be subject or put by reason of damage or injury (including death) to the property or person of any one other than the Government, its agencies, instrumentalities and personnel, the vessel or its owner, arising or resulting in whole or in part from the fault, negligence, wrongful act or wrongful omission of the Contractor, or any subcontractor, his or their servants, agents or employees; provided, that the Contractor's obligations to indemnify under this paragraph (c) shall not exceed the sum of $300,000 on account of any one accident or occurrence in respect of any one vessel. Such indemnity shall include, without limitation, suits, actions, claims, costs or demands of any kind whatsoever, resulting from death, personal injury or property damage occurring during the period of performance of work on the vessel or within 60 days after redelivery of the vessel; and with respect to any such suits actions, claims, costs, or demands resulting from death, personal injury or property damage occurring after the expiration of such period, the rights and liabilities of the Government and the Contractor shall be as determined by other provisions of this contract and by law; provided, however, that such indemnity shall apply to death occurring after such period which results from any personal injury received during the period covered by the Contractor indemnity as provided herein.
>
> (d) The Contractor shall, at his own expense, procure, and thereafter maintain such casualty, accident and liability insurance, in such forms and amounts as may be approved by the Department, insuring the performance of his obligations under paragraph (c) of this clause. In addition, the Contractor shall at his own expense procure and thereafter maintain such ship repairer's legal liability insurance as may

> be necessary to insure the Contractor against his liability as ship repairer in the amount of $300,000 or the value of the vessel as determined by the Contracting Officer, whichever is the lesser, with respect to each vessel on which work is performed; provided, that, in the discretion of the Contracting Officer, no such insurance need be procured whenever the job order requires work on parts of a vessel only and such work is to be performed at a Plant other than the site of the vessel. Further, the Contractor shall procure and maintain in force Workmen's Compensation Insurance (or its equivalent) covering his employees engaged on the work and shall insure the procurement and maintenance of such insurance by all subcontractors engaged on the work. The Contractor shall provided such evidence of insurance as may be, from time to time, required by the Department.

(Ex. 42 at 11.)

42. The term "Plant" was defined as the Contractor's "organization, plant, and facilities at Portland, Oregon." (Ex. 42 at 4.)

43. The work contemplated by the Ship Repair Contract could be performed by the Contractor "at the Plant or elsewhere under the terms of this contract as conditions at the time will permit him to undertake." (Ex. 42 at 4.)

44. The 1954 St. Paul Policy has a base property damage limit of $100,000 per occurrence and in the aggregate, and endorsements increasing the property damage limits to $300,000 with respect to specified Ship Repair Contracts between Marine Iron and various federal agencies, including the Navy. (Ex. 1 at 1, 9, 12-15.)

45. Three of the endorsements to the 1954 St. Paul Policy provide that the property damage limits under the 1954 St. Paul Policy are amended "but only as respects work being performed under" specified Ship Repair Contracts and the "policy is extended to include liability assumed under Clause 10" of such Ship Repair Contracts. (Ex. 1 at 12-16.)

46. One of the endorsements to the 1954 St. Paul Policy references Article 9(b) rather than Clause Ten. (Ex. 1 at 9.)

47. The Navy acknowledged the existence of the 1957 St. Paul Policy and that it was in "compliance with the requirements of the subject contracts." (Exs. 4, 5, 7.)

48. On January 24, 1957, Jewett issued two certificate of insurances to the Navy indicating the 1957 St. Paul Policy had property damage limits of $300,000 per accident and in the aggregate. (Ex. 5 at 2, 4.)

49. In March 1959, Marine Iron entered into a contract with the City to clean and paint a fireboat. (Ex. 9.) The contract required Marine Iron to provide proof of insurance protecting the City for "bodily injury and property damage in the minimum amounts of $50,000/$100,000 and $50,000 while the Fireboat is in the custody of the contractor." (Ex. 9 at 10.) Jewett provided a certificate of insurance for the 1957 St. Paul Policy listing property damage limits of $300,000 per accident and in the aggregate. (Ex. 9 at 12.)

50. The property damage limit on the March 1960 certificate of insurance for Policy No. 504JC3433 issued by St. Paul to ECCO with an effective date of February 11, 1960, and an expiration date of February 11, 1963, is illegible. (Ex. 12 at 2, 5.)

51. The property damage limit on the January 1961 certificate of insurance for Policy No. 504JC3433 issued by St. Paul to ECCO with an effective date of January 24, 1961, and an expiration date of February 11, 1963, is $300,000 per accident and in the aggregate, while the underlying contract required property damage limits of $25,000. (Ex. 11 at 8, 26.)

52. During the relevant period, it was standard practice for policy holders to renew insurance policies with the same limits. (Ex. 206 at 9-10.)

53. However, in the early 1960's, an increase in capacity in the insurance industry resulted in higher policy limits with $300,000 becoming the standard policy limit for policies written after 1959.

(Tr. 239:20-240:13.)

54. While it is possible, it is not wise to provide a certificate of insurance with limits exceeding those identified on a policy's declaration page because the issuer would be certifying coverage that was greater than that provided by the policy. (Tr. 129:2-6.)

55. There is no evidence any policy other than the 1954 St. Paul Policy had a base property damage limit of $100,000 or specific endorsements increasing property damage limits to $300,000 with regard to Ship Repair Contracts.

III. Allocation under OECCA

56. The Argonaut Policy is a primary CGL policy covering the period from July 1, 1972, to July 1, 1975, with property damage limits of $300,000 per occurrence and in the aggregate. (Ex. 46 at 1, 4.)

57. The INA Policies are primary CGL policies covering the period from July 1, 1978, to July 1, 1980, with property damage limits of $500,000 per occurrence and in the aggregate. (Ex. 51 at 2, 17, Ex. 52 at 2, 15.)

58. The Great American Policies are primary CGL policies covering the period from July 1, 1980, to July 1, 1982, with property damage limits of $500,000 per occurrence and in the aggregate. (Ex. 53 at 4, 16, Ex. 54 at 15, 25.)

59. Great American has been participating in the defense pursuant to a confidential settlement agreement. (OA Tr. 59:15-20.)

*Conclusions of Law*

I. Standard of Proof

1. The Oregon legislature created the OECAA to further the substantial interest of the State of

Oregon "in promoting the fair and efficient resolution of environmental claims while encouraging voluntary compliance and regulatory cooperation," acknowledging the existence of "many insurance coverage disputes involving insured who face potential liability for their ownership of or roles at polluted sites in this state." OR. REV. STAT. 465.478.

2. OR. REV. STAT. 465.479 is a comprehensive framework for the reconstruction of lost insurance policies responsive to environmental claims.

3. OR. REV. STAT. 465.479 provides, in relevant part:

> (1) If, after a diligent investigation by an insured of the insured's own records, including computer records and the records of past and present agents of the insured, the insured is unable to reconstruct a lost policy, the insured may provide a notice of lost policy to an insurer.
>
> (2) An insurer must investigate thoroughly and promptly a notice of lost policy. An insurer fails to investigate thoroughly and promptly if the insurer fails to provide all facts known or discovered during an investigation concerning the issuance and terms of a policy, including copies of documents establishing the issuance and terms of a policy, to the insured claiming coverage under a lost policy.
>
> (3) An insurer and an insured must comply with the following minimum standards for facilitating reconstruction of a lost policy and determining the terms of a lost policy as provided in this section:
>
> (a) Within 30 business days after receipt by the insurer of notice of a lost policy, the insurer shall commence an investigation into the insurer's records, including computer records, to determine whether the insurer issued the lost policy. If the insurer determines that it issued the policy, the insurer shall commence an investigation into the terms and conditions relevant to any environmental claim made under the policy.
>
> (b) The insurer and the insured shall cooperate with each other in determining the terms of a lost policy. The insurer and the insured:
>
> (A) Shall provide to each other the facts known or discovered during an investigation, including the identity of any witnesses with knowledge of facts related to the issuance or existence of a lost policy.
>
> (B) Shall provide each other with copies of documents establishing facts

related to the lost policy.

(C) Are not required to produce material subject to a legal privilege or confidential claims documents provided to the insurer by another policyholder.

(c) If the insurer or the insured discovers information tending to show the existence of an insurance policy applicable to the claim, the insurer or the insured shall provide an accurate copy of the terms of the policy, upon the request of the insurer or the insured.

(d) If the insurer is not able to locate portions of the policy, or determine its terms, conditions or exclusions, the insurer shall provide copies of all insurance policy forms issued by the insurer during the applicable policy period that are potentially applicable to the environmental claim. The insurer shall state which of the potentially applicable forms, if any, is most likely to have been issued by the insurer, or the insurer shall state why it is unable to identify the forms after a good faith search.

(4) Following the minimum standards established in this sections does not create a presumption of coverage for an environmental claim once the lost policy has been reconstructed.

(5) Following the minimum standard established in this section does not constitute:

(a) An admission by an insurer that a policy was issued or effective; or

(b) An affirmation that if the policy as issued, it was necessarily in the form produced, unless so stated by the insurer.

(6) If, based on the information discovered in an investigation of a lost policy, the insured can show by a preponderance of the evidence that a general liability insurance policy was issued to the insured by the insurer, then if:

(a) The insured cannot produce evidence that tends to show the policy limits applicable to the policy, it shall be assumed that the minimum limits of coverage, including any exclusions to coverage, offered by the insurer during the period in question were purchased by the insured.

(b) The insured can produce evidence that tends to show the policy limits applicable to the policy, then the insurer has the burden of proof to show that a different policy limit, including any exclusions to coverage, should apply.

4. The comprehensive nature of the OECAA and its specific provisions relating to the

procedures and proof required to prove the existence and terms of lost insurance policies supercedes common law principles.

5. The standard of proof applicable to the existence of a lost policy under the OECAA is preponderance of the evidence. OR. REV. STAT. 465.479(6).

6. The OECAA does not distinguish between the standard required to prove the existence of a policy and the standard required to provie the material terms and conditions of a policy.

7. The use of the phrase "tending to show" with regard to information necessary to establish the existence of an insurance policy applicable to a claim, and the similar phrase "tends to show" with regard to evidence of policy limits applicable to a policy, is indicative of the legislature's intent to apply a similar standard to both the existence and the material terms of a lost policy.

8. The standard of proof required to establish the material terms and limits of a lost policy is also preponderance of the evidence. *Fireman's Fund Ins. Co. v. Ed Neimi Oil Co., Inc.*, No. CV 03-25-MO, 2005 WL 3050460, *6 (D. Or. Nov. 9, 2005)("*Fireman's Fund I*")(court found "admittedly thin" evidence sufficient to establish purchase of umbrella coverage and addition of subsequently purchased properties as acquired.)

9. Insureds have the burden of proof on the existence and terms of a lost policy. If Insureds present evidence of policy limits, St. Paul has the burden of proving a different policy limit or exclusions to coverage apply.

II. Existence of Lost Policy

10. The Navy's mandatory insurance obligations requiring Marine Iron to carry insurance while working on Ship Repair Contracts and Marine Iron's work on Navy vessels from 1960 to 1963 is evidence Marine Iron had insurance in place during this period.

11. Evidence of continual coverage by a particular insurer over a period of time may be used to establish the existence of a lost policy issued during that period. *Fireman's Fund I*, 2005 WL 3050460 at *4.

12. The common practice of policy holders maintaining a continuous relationship with a single CGL insurer by renewing policies for consecutive terms during the early 1960's and Marine Iron's established relationship with St. Paul from February 11, 1954, to February 11, 1960, and May 31, 1963 to July 1, 1972, is evidence St. Paul issued a policy to Marine Iron which covered the period from February 11, 1960, to May 31, 1963.

13. A certificate of insurance verifies the existence of a policy. *Fireman's Fund I*, 2005 WL 3050460 at *4.

14. The certificates of insurance indicating St. Paul insured ECCO from February 11, 1960, to February 11, 1963, establishes the existence of Policy No. 504JC3433.

15. The effective date of the 1963 St. Paul Policy is evidence Policy No. 504JC3433 was extended from February 11, 1063, to May 31, 1963.

16. Marine Iron's consistence practice of insuring itself and its affiliated companies under one policy and the use of Marine Iron's address rather than ECCO's address in the certificate of insurance is evidence Policy No. 504JC3433 was issued to Marine Iron, with ECCO identified as an additional insured.

17. The court finds Insureds have proven, by a preponderance of the evidence, St. Paul insured Marine Iron under Policy No. 504JC3433 from February 11, 1960, to May 31, 1963 (the "1960 St. Paul Policy").

/ / / / /

II. Terms of St. Paul Policies

*A. General Terms and Exclusions*

18. Under the OECAA, the court may consider the form policies provided by the insurer pursuant to OR. REV. STAT. 465.479(3)(d) as evidence of the terms of the lost policy. *Fireman's Fund I*, 2005 WL 3050460 at *4.

19. The court finds Insureds have proven, by a preponderance of the evidence, that the primary CGL policies issued by St. Paul covering the period from February 11, 1957, to July 1, 1972 (collectively the "St. Paul Policies"), were standard CGL policies in the form issued by St. Paul during the relevant years.

20. Without some evidence endorsements modified relevant terms in the form policies, the court must assume the provisions found in the form policies provided by the insurer apply. *Fireman's Fund I,* 2005 WL 3050460 at *7.

21. The only endorsement offered by St. Paul had a revision date of June 1970 and would not have been available at the time the last St. Paul policy was issued.

22. The court finds the St. Paul Policies did not incorporate exclusions not contained in the standard forms.

*B. Duty to Defend*

23. "Whether an insurer has a duty to defend an action against its insured depends on two documents: the complaint and the insurance policy. An insurer has a duty to defend an action against its insured if the claim against the insured stated in the complaint could, without amendment, impose liability for conduct covered by the policy." *Ledford v. Gutoski*, 319 Or. 397, 400 (1994).

24. "An insurer should be able to determine from the face of the complaint whether to accept or

reject the tender of the defense of the action." *Id.* (citing *Ferguson v. Birmingham Fire Ins.*, 254 Or. 496, 505-506 (1969)).

25. Accordingly, the duty to defend arises if:

> the complaint provides *any basis* for which the insurer provides coverage. Even if the complaint alleges some conduct outside the coverage of the policy, the insurer may still have a duty to defend if certain allegations of the complaint, without amendment, could impose liability for conduct covered by the policy. Any ambiguity in the complaint with respect to whether the allegations could be covered is resolved in favor of the insured.

*Id.* (internal citations omitted) (emphasis in original).

26. The court finds the duty to defend language in the St. Paul Policies, which is substantially similar to that in the 1954 St. Paul Policy already determined by the court to obligate St. Paul to provide a defense, requires St. Paul to defend Insureds against the Environmental Claims.

27. In light of the existence of a primary policy issued by St. Paul covering the period of June 8, 1970, to July 1, 1972, ICSOP has no present duty to defend Insureds.

*C. Property Damage Limits*

28. The 1954 St. Paul Policy has a base property damage limit of $100,000 with endorsements increasing property damage limit coverage to $300,000 with regard to work performed pursuant to four Ship Repair Contracts.

29. Clause Ten of the Ship Repair Contract requires Marine Iron to indemnify the federal agency against all claims resulting from property damage arising out of the actions of Marine Iron while engaged in ship repair work and maintain insurance with limits of $300,000 to insure its ability to indemnify the federal agency for such claims.

30. The Suit Documents allege claims for damage to property occurring from 1954 to 1957, while Marine Iron engaged in work pursuant to the Ship Repair Contracts.

31. The Ship Repair Contracts contemplate Marine Iron would perform ship repair work at the Plant.

32. The Suit Documents, which allege property damage based on likely releases of hazardous substances resulting from Insureds' operations at their facilities, state a claim that could impose liability under the Ship Repair Contracts.

33. The increased property damage limits of $300,000 found in the endorsements to the 1954 St. Paul Policy are applicable to the Environmental Claims.

34. A court may rely on limits identified in a certificate of insurance and in other policies issued by the insured to determine the policy limits of a lost policy. *Fireman's Fund I*, 2005 WL 3050460 at *5.

35. The certificates of insurance issued to the Navy by Jewett in 1957, and the acknowledgment by the Navy that the 1957 St. Paul Policy was in compliance with the Ship Repair Contract, establish the 1957 St. Paul Policy had property damage limits of $300,000 with regard to ship repair work performed pursuant to a Ship Repair Contract.

36. The certificate of insurance issued to the City by Jewett in 1959 indicating the 1957 St. Paul Policy had property damage limits of $300,000 when the underlying contract required property damage limits of 50,000 is evidence the $300,000 property damage limit was not limited to ship repair work performed pursuant to a Ship Repair Contract but, rather, was a base limit.

37. The court finds Insureds have proven, by a preponderance of the evidence, that the 1957 St. Paul Policy had property damage limits of $300,000 with respect to all claims, including the Environmental Claims.

38. The certificate of insurance issued to the City by Jewett in 1961 indicating the 1960 St. Paul

Policy had property damage limits of $300,000 when the underlying contract required property damage limits of $25,000 is evidence the $300,000 property damage limit was not limited to ship repair work performed pursuant to a Ship Repair Contract but, rather, was a base limit.

39. The common practice of policy holders maintaining a continuous relationship with a single CGL insurer by renewing policies for consecutive terms during the early 1960's and Marine Iron's established relationship with St. Paul from February 11, 1954, to February 11, 1960, is further evidence the 1960 St. Paul Policy had the same $300,000 property damage limits as the 1957 St. Paul Policy.

40. The court finds Insureds have proven, by a preponderance of the evidence, that the 1960 St. Paul Policy had property damage limits of $300,000.

III. Allocation under OECAA

41. The OECAA governs the obligation of multiple insurers to participate in the payment of defense or indemnity costs and the court's apportionment of covered damages among multiple insurers in an environmental action.

42. OR. REV. STAT. 465.480(3)(a) provides:

> An insurer with a duty to pay defense or indemnity costs, or both, to an insured for an environmental claim under a general liability insurance policy that provides that the insurer has a duty to pay all sums arising out of a risk covered by the policy, must pay all defense or indemnity costs, or both, proximately arising out of the risk pursuant to the applicable terms of its policy, including its limit of liability, independent and unaffected by other insurance that may provide coverage for the same claim.

43. OR. REV. STAT. 465.480(5) provides:

> (5) If a court determines that the apportionment of recoverable costs between insurers is appropriate, the court shall allocate the covered damages between the insurers before the court, based on the following factors:

> (a) The total period of time that each solvent insurer issued a general liability insurance policy to the insurance applicable to the environmental claim;
>
> (b) The policy limits, including any exclusions to coverage, of each of the general liability insurance policies that provide coverage or payment for the environmental claim for which the insured is liable or potentially liable;
>
> (c) The policy that provides the most appropriate type of coverage for the type of environmental claims;
>
> (d) The terms of the policies that related to the equitable allocation between insurers; and
>
> (e) If the insured is in uninsured for any part of the time period included in the environmental claim, the insured shall be considered an insurer for purposes of allocation.

44. The OECAA provides allocation factors for "covered damages," not defense costs.

45. The term "damages" is generally defined as "money claimed by, or ordered to be paid to, a person as compensation for loss or injury." BLACK'S LAW DICTIONARY, at 445 (9th ed. 2009). An insurer is obligated to indemnify, or "make good any loss, damage or liability" incurred by its insured pursuant to the terms of the insurance policy. BLACK'S LAW DICTIONARY, at 837 (9th ed. 2009). Accordingly, "covered damages" refers to amounts an insurer is obligated to pay to indemnify its insured for loss or injury under an insurance.

46. Defense costs are distinguishable from covered damages. The term "cost" is generally defined as the "amount paid or charged for something; price or expenditure." BLACK'S LAW DICTIONARY, at 397 (9th ed. 2009). Accordingly, "defense costs" refer to the amounts paid to provide a defense. Here, "defense costs" are the amounts paid or charged to defend Insureds with regard to the Environmental Claims.

47. The OECAA differentiates between defense costs and covered damages. OR. REV. STAT. 465.480(7) provides:

> (a) There is a rebuttable presumption that the costs of preliminary assessments, remedial investigations, risk assessments or other necessary investigation, as those terms are defined by rule by the Department of Environmental Quality, are defense costs payable by the insurer, subject to the provisions of the applicable general liability insurance policy or policies.
>
> (b) There is a rebuttable presumption that payment of the costs of removal actions or feasibility studies, as those terms are defined by rule by the Department of Environmental Quality, are indemnity costs and reduce the insurer's applicable limit of liability on the insurer's indemnity obligations, subject to the provisions of the applicable general liability insurance policy or policies.

48. The OECAA provides all insurers are liable for all defense and indemnification costs, independent and unaffected by the existence of other insurance and subject to the terms of the respective policies, including liability limits.

49. All of the relevant policies require the insurer to provide Insureds with an unlimited defense while the insurer's duty to indemnify is expressly limited by applicable policy limits. Accordingly, consideration of policy limits is relevant to allocation of covered damages but generally irrelevant to defense costs.

50. This distinction was acknowledged by the Oregon legislature when it distinguished defense costs from covered costs and limited the allocation factors set forth in the OECAA to covered damages, and not defense costs.

51. The majority of jurisdictions addressing the issue have considered only "time-on-the-risk" when allocating responsibility for defense costs among multiple insurers. *Northwest Pipe Co. v. RLI Ins. Co.*, No CV. 09-CV-1126-PK, 2012 WL 2367143, *6 (D. Or. March 19, 2012) ("*Northwest Pipe I*").

52. Judge Mosman found that, under the OECAA, "defendant insurers are required to contribute defense costs based on policy years for which the possibility of coverage is at issue based on

allegations of the claim." *Fireman's Fund Ins. Co. v. Ed Neimi Oil Co., Inc.*, No. CV 03-25-MO, 2009 WL 5167938, *2 (D. Or. Dec. 16, 2009)("*Fireman's Fund II*")

53. The court acknowledges Judge Brown rejected this conclusion and found the OECAA requires a court consider both time on the risk and respective policy limits where multiple insurers provide consecutive coverage under CGL policies. *Northwest Pipe Co. v. RLI Ins. Co.*, No. 3:09-CV-01126-PK, 2012 WL 2268413, *6 (D. Or. June 13, 2012). However, the court respectfully concludes Judge Mosman's analysis in *Fireman's Fund II*, and Judge Papak's analysis in *Northwest Pipe I,* represent the more persuasive view, and thus adopts that analysis here.

54. The court finds the proper allocation method of defense costs under the OECAA for consecutive primary CGL insurers is pro rata by time on the risk.

55. The concludes the following allocations apply:

a. St. Paul, which insured Marine Iron under primary CGL policies from February 11, 1954, to July 1, 1972, bears a 72.43 per cent responsibility for Insureds' defense costs.

b. Argonaut, which insured Marine Iron under a primary CGL policy covering the period from July 1, 1972, to July 1, 1975, bears a 11.81 per cent responsibility for Insureds' defense costs.

c. INA, which insured Marine Iron under primary CGL policies covering the period from July 1, 1978, to July 1, 1980, bears a 7.88 per cent responsibility for Insureds' defense costs.

d. Great American, which insured Marine Iron under primary CGL policies covering the period from July 1, 1980, to July 1, 1982, bears a 7.88 per cent

responsibility for Insureds' defense costs.

e. The allocation applies to all past and future defense costs.

56. ICSOP has no present duty to defend Insureds.

57. Within thirty (30) days of the entry of this Findings of Fact and Conclusions of Law each insurer shall calculate its share of those past costs which the parties agree are properly designated as defense costs, and reimburse Insureds and Argonaut for their proportionate share of such costs.

DATED this 6th day of May, 2016.

/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge